**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**CENTER FOR BIOLOGICAL DIVERSITY**
1333 North Oracle Road
Tucson, Arizona 85705

Plaintiff,

v.

**DIRK KEMPTHORNE**, Secretary of Interior
Department of the Interior
1849 C Street, N.W.
Washington, D.C. 20240

**H. DALE HALL**, Director
United States Fish and Wildlife Service
1849 C Street N.W.,
Washington, D.C. 20240,

Defendants.

Civ. Action No.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. This action challenges the Department of Interior's ("DOI") and U.S. Fish and Wildlife Service's ("Service" or "FWS") unreasonable delay in making a final decision to grant or deny a rulemaking petition by Plaintiff Center for Biological Diversity ("the Center") to implement steps to stop the critically imperilled Mexican gray wolf ("Mexican wolf") from becoming extinct in the wild. The Service's refusal in well over two years to reach a decision on the Center's March 29, 2004 Petition – even though FWS scientists have concluded that measures advocated by the Center are "required" in order for the wild wolf population to be viable, and, during the agency's delay, the wild wolf population has continued to decline – constitutes agency action "unreasonably delayed," in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(1). Accordingly, Plaintiff

is entitled to a decision on its petition, as required by 5 U.S.C. § 555(b).

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331. Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

## PARTIES

3.      **Plaintiff Center for Biological Diversity** is a non-profit organization dedicated to the conservation of rare and imperilled animals and plants and their ecosystems. With offices in California, Arizona, New Mexico, Oregon, Alaska, and Washington, D.C., the Center uses science, public education, grassroots organizing, administrative advocacy, and litigation to conserve species and natural habitats. The Center brings this action on its own behalf and on behalf of its members, including those who regularly hike, camp, and otherwise engage in recreational activities in the designated recovery area for the Mexican wolf, and enjoy observing and studying, and attempting to observe and study, Mexican wolves in the wild.

4.      The Center has expended substantial resources advocating for Mexican wolf recovery. Among other activities, the Center has paid out and continues to offer a financial reward for apprehension and conviction of poachers of Mexican wolves; compiles information about wolves' survival needs through historic research, contemporary monitoring of wolves, communication with biologists, and review of government documents; disseminates information to the public about the status of wolf recovery; participates in public meetings and communicates with state and federal decision makers; and serves as a member of the federally chartered Southwest Gray Wolf Recovery

Team. After having originally exterminated them from the wild, FWS initiated the reintroduction of Mexican wolves as a result of a lawsuit filed by the Center and other conservation groups in 1990. Since then, the Center has commented on the Service's regulation implementing the reintroduction project for the Mexican wolf, published at 50 C.F.R. § 17.84(k), as well as the Service's periodic reviews of the progress of the reintroduction project and its development of management protocols. On March 29, 2004, the Center submitted the petition at issue in this case, seeking to modify the Mexican wolf reintroduction project based on the conclusions of the Service's own scientific evaluation.

5.    The interests of the Center and its members are impaired by the Service's delay in acting on the Center's Petition. Because FWS has refused to modify the regulation governing this species' reintroduction under Section 10(j) of the Endangered Species Act, 16 U.S.C. § 1531, et seq., the Mexican wolf experimental population has precipitously declined. As a result, the Center's members' ability to observe and study members of the Mexican wolf population in the wild is diminished. Hence, their aesthetic, scientific, recreational, and other interests in this species are impaired. In addition, because of the agency's delay in ruling on its Petition, the Center must continue to expend resources advocating for improved management of Mexican wolves, when such resources could be spent on other conservation projects. If the Service were to grant the Center's Petition and modify the rule in any or all of the respects requested by the Center, the experimental wolf population would be more likely to succeed in the wild and increase in numbers, and there would be more Mexican wolves for the Center's members to observe and study. The Mexican wolf's ecosystem in the Blue Range Wolf Recovery Area ("Recovery Area"), which includes America's and the world's first protected wilderness area, would function more naturally through a resurgence of Mexican wolves in

the wild, thus enhancing the enjoyment, understanding, and overall appreciation of this ecosystem by the Center's members who live and visit there. Even if the Service were to deny the Center's Petition, at least then the Center would have the opportunity to seek judicial review of the agency's decision, and potentially obtain additional protections and conservation measures for Mexican wolves.

6.  **Defendant Dirk Kempthorne** is the Secretary of DOI, and is the official ultimately responsible for implementing the ESA with regard to terrestrial species.

7.  **Defendant Dale Hall** is the Director of FWS, which has been delegated responsibility for implementing the ESA with regard to terrestrial species.

## STATUTORY FRAMEWORK AND FACTS GIVING RISE TO PLAINTIFF'S CLAIMS FOR RELIEF

### A.  RELEVANT STATUTES

#### 1.  The Endangered Species Act

8.  Recognizing that all fish, wildlife, and plant species are "the Nation's heritage," Congress enacted the ESA with the purpose of providing both a "means whereby the ecosystems upon which endangered and threatened species depend may be conserved, [and] . . . a program for the conservation of such endangered species." 16 U.S.C. § 1531(a)(5), (b). To do so, the ESA directs all "Federal agencies" to "utilize their authorities in furtherance of the purposes of this [Act] by carrying out programs for the conservation of endangered and threatened species." Id. § 1536(a)(1). The Act further requires that FWS, through its delegated authority, "develop and implement plans . . . for the conservation and survival of endangered species and threatened species." Id. § 1533(f).

9.  The ESA defines "conservation" to mean the "the use of all methods and procedures

which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this [Act] are no longer necessary," i.e., delisting, or recovery of the species. Id. § 1532(3).

10. For species of wildlife listed as endangered, Section 9 of the ESA makes it unlawful for any person to "take any such species within the United States." Id. § 1538(a)(1)(B). The term "take" includes "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." Id. § 1532(19). Under Section 4, the Service may promulgate special regulations that extend this prohibition to species listed as "threatened" under the Act, or otherwise provide for the conservation of threatened species. Id. § 1533(d).

11. Section 10(j) of the ESA authorizes the Secretary of the Interior to "authorize the release . . . of any population . . . of an endangered species or threatened species outside the current range of such species." Id. § 1539(j)(2)(A).

12. Before designating a species as experimental and authorizing its reintroduction, FWS must make three findings: (1) that the reintroduction will "further the conservation" of the species; (2) whether the population is "essential to the continued existence" of the species; and (3) that the "population is wholly separate geographically from nonexperimental populations of the same species." Id. § 1539(j)(1), (2)(A), (2)(B).

**2. The Administrative Procedure Act**

13. The Administrative Procedure Act (APA), 5 U.S.C. §§ 551 et seq., obligates all federal agencies to give "prompt notice . . . of the denial" of a rulemaking petition, to accompany the denial with a "brief statement of the grounds for the denial," and to "conclude a matter" presented to them "within a reasonable time." Id. § 555(b), (e).

## B. FACTS

### 1. The Mexican Gray Wolf and Its Decline

14. The Mexican wolf, or "lobo," is the smallest subspecies of the gray wolf in North America, typically weighing approximately fifty to ninety pounds and reaching twenty-six to thirty-two inches in height. Mexican wolves live in packs, and prey primarily on hoofed mammals, or ungulates, such as deer, antelope, and elk. Historically, the Mexican wolf lived in desert and forest regions of the Republic of Mexico and Southern New Mexico, Arizona, and Texas.

15. When livestock replaced wild ungulates on the western landscape in the late nineteenth and early twentieth centuries, wolves preyed largely on livestock. In response, states, counties, and stock associations offered bounties on wolf scalps. In 1915, the U.S. Bureau of Biological Survey ("Biological Survey") initiated a more efficient program of salaried federal hunters who systematically trapped wolves, poisoned them, and dug up pups from their dens. As a result, resident breeding populations of wolves, including the Mexican wolf, disappeared from the western United States by the late 1920s. In 1945, FWS (formerly the Biological Survey) killed what was likely the last resident wolf in the western United States, in southern Colorado. In 1950, FWS persuaded the Mexican government to allow U.S. Government salaried wolf hunters to initiate the systematic poisoning of wolves throughout Mexico. FWS also continued to attempt to kill every Mexican wolf that entered the United States until the 1970s, when no more Mexican wolves were known to arrive. In 1996, FWS identified the Mexican wolf as "one of the rarest land mammals in the world." Reintroduction of the Mexican Wolf Within Its Historic Range in the Southwestern United States, Final Environmental Impact Statement (November 1996) ("EIS") at iv.

2. **Mexican Wolf Recovery Efforts**

16. Policies towards Mexican wolves changed with the passage of the Endangered Species Act in 1973 and FWS' listing of the Mexican wolf as an endangered species on April 28, 1976. From 1977 to 1980, five wolves, comprised of four males and only one female, were captured alive in Mexico for an emergency captive breeding program. In 1982, FWS and the Director of the Mexican wildlife agency jointly adopted a Recovery Plan for the Mexican wolf to bring it back to its historic range. 1982 Mexican Wolf Recovery Plan ("Recovery Plan"). The "prime objective" of the 1982 Recovery Plan was to maintain a captive breeding program and re-establish a "viable, self-sustaining population of at least 100 Mexican wolves in the middle to high elevations of a 5,000-square mile area within the Mexican wolf's historic range." Id. at 28. The Recovery Plan directed FWS to protect Mexican wolves from being killed in predator control and fur trapping efforts, conduct research concerning the ecology and behavior of Mexican wolves, propagate Mexican wolves in captivity, and release wolves into Mexico and/or adjoining areas in the southwestern United States. Id. at 30-32.

17. The Service did not take steps to implement the Recovery Plan's direction to reintroduce captive Mexican wolves until over a decade later, and then only as a result of a lawsuit filed by conservation organizations in 1990. In 1993, in a stipulation dismissing the lawsuit, the Service finally agreed to implement the Recovery Plan and "accomplish the reintroduction of the Mexican Wolf into the wild" as "expeditiously as possible."

3. **The Mexican Wolf 10(j) Rule**

18. On January 12, 1998 – over twenty years after FWS first listed the Mexican wolf as endangered – FWS finally promulgated a regulation pursuant to Section 10(j) of the ESA authorizing the first reintroduction of Mexican wolves into eastern Arizona and southwestern New Mexico.

Endangered and Threatened Wildlife and Plants; Establishment of a Nonessential Experimental Population of the Mexican Gray Wolf in Arizona and New Mexico, 63 Fed. Reg. 1752 (Jan. 12, 1998) ("10(j) rule"). By this point, the only known Mexican wolves lived in captivity, as part of the breeding program implemented by non-profit organizations – i.e., the species had become completely extirpated in the wild. EIS at 1-1. The 10(j) rule classified Mexican wolves to be re-established in designated areas of Arizona and New Mexico as an "experimental" population that was "non-essential" to the continued survival of the species. 50 C.F.R. § 17.84(k)(1). In the rule, FWS found that wolf reintroduction would "further the conservation of the Mexican wolf subspecies and of the gray wolf species," id. § 17.84(k)(2), and that the experimental population was "wholly separate geographically" from any other wild gray wolf population or individual gray wolves. Id.

19. The 10(j) rule created an experimental population area covering a large part of Arizona and New Mexico. Id. § 17.84(k)(9)(iii). Within the experimental area, the rule established two recovery areas, the Blue Range Wolf Recovery Area and the White Sands Wolf Recovery Area. Id. § 17.84(k)(9)(I), (ii). The Blue Range Recovery Area consists of all of the Apache and Gila National Forests in southeastern Arizona and southwestern New Mexico. Id. § 17.84(k)(9)(I). The White Sands Wolf Recovery Area in south-central New Mexico consists of several federally protected areas, including all of the White Sands Missile Range, the White Sands National Monument, the San Andres National Wildlife Refuge, and the areas adjacent to, and to the west of, the Missile Range. Id. § 17.84(k)(9)(ii).

20. The 10(j) rule authorized FWS to release captive Mexican wolves into the "primary recovery zone" in the Blue Range Wolf Recovery Area, consisting of about 2,664 $km^2$ of the Apache National Forest, in Arizona. Id. § 17.84(k)(15). Although the rule did not permit FWS to release any

captive wolves into the "secondary recovery zone" – consisting of the remainder of the Apache National Forest and all of the Gila National Forest, in New Mexico – the rule authorized FWS to translocate, or re-release, wolves into this area if the wolves needed to be relocated for predator control or other reasons. Id. However, the rule allowed wolves released into the primary recovery zone to expand naturally into the secondary recovery zone. Id. § 17.84(k)(9)(I). Under the rule, FWS planned to release up to fifteen family groups of captive Mexican wolves over a period of five years, with the objective of "re-establish[ing] 100 wild Mexican wolves . . . by the year 2005." FEIS at I-1.

21. The 10(j) rule authorized private landowners to "take" a wolf (including both by injuring and by killing) when a wolf is found on private land "engaged in the act of killing, wounding, or biting livestock," 50 C.F.R. § 17.84(k)(3)(v), and required that, on public land, livestock owners obtain a permit to take wolves engaged in such activities. Id. § 17.84(k)(3)(vii). The rule also authorized individuals to "harass or take" a Mexican wolf in self defense or in defense of the lives of others, with the restriction only that an individual notify FWS of the harassment or take within 24 hours after its occurrence. Id. § 17.84(k)(3)(xii).

22. Under the 10(j) rule, if a member of the experimental population is found outside of the designated recovery area, but inside the experimental area, FWS must either capture and re-release the wolf within the recovery area, return the wolf to captivity, or otherwise manage the wolf according to provisions of a Service-approved management plan. Id. § 17.84(k)(9)(iii). However, the rule presumes that any wolves found completely outside of the experimental area are of wild origin, and affords them all of the protections of an endangered species. Id.

23. The 10(j) rule committed FWS to "evaluate Mexican wolf reintroduction progress and prepare periodic progress reports, detailed annual reports, and full evaluations after 3 and 5 years that

recommend continuation, modification, or termination of the reintroduction effort." Id. § 17.84(k)(13).

**4. The Paquet Report**

24. In March 1998, FWS released eleven individual wolves into the Blue Range Wolf Recovery Area, and, by March 2001, had released an additional forty-five captive wolves. As required by the 10(j) rule, the Service then initiated a three-year review of the progress of the project, enlisting Dr. Paul C. Paquet, a scientist and one of the world's leading experts on wolves, to assemble a team of experts and make recommendations as to whether to continue, modify or terminate the project.

25. Dr. Paquet and his colleagues completed their scientific report in June, 2001. Based on a review of all of the existing monitoring data, Dr. Paquet's team recommended that FWS continue the Mexican wolf reintroduction project, but make certain modifications to the 10(j) rule. Paul C. Paquet, et al., Mexican Wolf Recovery: Three-Year Program Review and Assessment (June 2001) ("Paquet Report" or "Three-Year Review").

26. First, the Paquet Report recommended that FWS "[i]mmediately" modify the 10(j) rule to provide FWS the authority to conduct initial releases of captive Mexican wolves into Gila National Forest – the "secondary" recovery zone. Paquet Report at 65. According to the Paquet Report, wolves had already settled much of the primary recovery zone, and "[o]ver time, it will become harder for the Service to find suitable release sites in the primary recovery zone." Id. The Paquet Report explained that the Gila National Forest includes "about 700,000 acres that are roadless and free of livestock," and "[s]everal high-quality release sites," and that this is "by far the most important and simplest change the Service can make to the existing reintroduction project." Id. Accordingly, the Paquet Report "strongly recommend[ed] that the Service immediately take whatever action is necessary to conduct initial releases of captive-born (and wild-born if appropriate) Mexican wolves to the Gila

National Forest." Id.

27. Second, the Paquet Report recommended that FWS "[i]mmediately" modify the 10(j) rule to allow wolves that are not "management problems" to establish territories outside of the Recovery Area. Id. The Paquet Report explained that retrieving animals that wander outside of the Recovery Area is "inappropriate" because it is "inconsistent with the Service's approach to recover wolves in the southeast, Great Lakes state, and the northern Rockies;" will lead to "serious logistical and credibility problems as the wolf population grows and more wolves disperse from the area;" and "needlessly" excludes habitat that could "substantially contribute to the recovery" of Mexican wolves. Id. at 65-66. The Paquet Report further noted that, in "sharp contrast" to the Service's efforts to recover gray wolves in other parts of North America, the Service had devised a rule for Mexican wolf reintroduction that "requires wolves to be removed from public and private land outside the Blue Range Wolf Recovery Area, even in the absence of a problem," and that "[s]uch regulations are inappropriate . . ." Id. at 66. In addition, the Report explained that frequent recaptures and re-releases of wolves may "interfer[e] with pack formation and establishment and maintenance of home ranges," and that wolf dispersal outside of the recovery area "is to be expected and required if the regional population is to be viable." Id. at 23.

28. Third, the Paquet Report concluded that FWS should "require" that livestock owners on public land take responsibility for the removal and disposal of dead livestock carcasses, to reduce the likelihood that Mexican wolves will become habituated to feeding on livestock. Id. at 63. In this regard, the Report expressed the concern that wolves may scavenge on livestock carcasses left by ranchers on national forest lands, and become "predispose[d] to eventually prey on livestock." Id. The Paquet Report further explained that, "[w]hile some predation on livestock is inevitable, reasonable

means of reducing the frequency of occurrence will enhance wolf recovery so that it is respectful of the needs and concerns of livestock producers," and, consequently, "livestock producers using public land in occupied Mexican wolf range should be required to exercise reasonable diligence in finding livestock that have died to either dispose of the carcass or enable the Service to do so." Id. at 67-68.

**5. The Center's Petition for Rulemaking**

29. When almost three years had passed and FWS had not taken any steps to implement these recommendations of the Paquet Report, on March 29, 2004, the Center petitioned FWS to amend the 10(j) regulation. The Center's Petition was precipitated by evidence indicating that the experimental population was in serious decline. Specifically, according to the Center's Petition, the number of radio-collared and monitored Mexican wolves in the wild had dropped from twenty-seven – when the Paquet Report was released in June, 2001 – to only eighteen wolves in 2003. Petition for Rule-making (March 29, 2004) ("Petition") at 11. The Petition also reiterated the Paquet Report's concern that wolf "survival and recruitment rates . . . are far too low to ensure population growth and persistence," and, thus, without "dramatic improvement in these vital rates, the wolf population will fall short of predictions for upcoming years." Petition at 10; Paquet Report at 27.

30. Consistent with the views of the Paquet Report, the Center's Petition cited "frequent government control actions" – e.g., capturing and re-releasing wolves that had wandered outside of the designated recovery area – as cause for the "uncertain prognosis for recovery" of Mexican wolves. Petition at 11. According to the Petition, such control actions "directly resulted in the deaths of ten wolves (nine accidental and one purposefully) and in the destruction of numerous packs and the resultant loss in (additional) individual animals' lives and in many possibilities for success in reproduction." Id. Even when wolves are re-released elsewhere, the Petition explained, the wolves'

chances for survival "diminish significantly because family packs break up and their individual members then travel vast distances alone . . ." Id. at 11-12.

31. To remedy these deficiencies, the Center's Petition sought an amendment to the 10(j) regulation that would: (1) provide FWS the authority to release captive Mexican wolves into the "secondary" recovery zone, the Gila National Forest in New Mexico; (2) provide FWS the authority to allow wolves to establish territories outside the boundaries of the Blue Range Wolf Recovery Area; and (3) define "nuisance wolves" and "problem wolves" to exclude animals that scavenge on the carcasses of livestock that die of non-wolf causes. Petition at 3. The Petition contended that each of the proposed amendments was clearly warranted by the Paquet Report's recommendations to FWS. Id.

32. By failing to act on the findings of the Paquet Report, and promulgate amendments t o the 10(j) rule, the Center concluded that FWS was jeopardizing the recovery of the Mexican wolf, and violating Section 7(a)(1) of the Endangered Species Act, which requires all federal agencies to utilize their authorities to recover threatened and endangered species. Id.

**6. Five-Year Review**

33. In 2003, FWS delegated the responsibility for overseeing the reintroduction project to the Mexican Wolf Blue Range Adaptive Management Oversight Committee ("AMOC"). The AMOC is comprised of representatives of FWS, the Arizona Game and Fish Department, the New Mexico Department of Game and Fish, the U.S. Forest Service, the United States Department of Agriculture's Animal and Plant Health Inspection Service, and White Mountain Apache Tribe. The AMOC's responsibilities include conducting a "full evaluation" of the reintroduction project after five years, required by the 10(j) rule.

34. On December 31, 2005, the AMOC submitted to FWS its final report and recommended that FWS continue the project, but with certain modifications to the 10(j) rule. Mexican Wolf Blue Range Reintroduction Project (Dec. 31, 2005) ("Five-Year Review"). As requested by the Center in its Petition, the AMOC recommended that FWS amend the 10(j) rule to allow wolves to disperse outside of the recovery area. The AMOC also recommended that FWS combine the "primary" zone and the "secondary" zones of the designated recovery area, and release and relocate wolves throughout this combined area, to provide additional opportunities for the wolves to disperse and establish their own packs.

35. On July 25, 2006, FWS announced that it agreed with the recommendations of the AMOC. See Press Release, U.S. Fish and Wildlife Service, Mexican Wolf Project to Continue (July 25, 2006). However, FWS did not issue any amendments to the 10(j) rule or indicate when it would propose or adopt a new rule.

36. To date, FWS still has not acted on the Center's March 29, 2004 Petition.

**7. Continued Decline of Mexican Wolves**

37. Since the Center petitioned the agency over thirty-two months ago, the Mexican wolf experimental population – the species' only chance for recovery – has continued its precipitous decline. FWS' annual census data for the experimental population shows that while there were fifty-five Mexican wolves in the wild in 2003, there were as few as forty-four wolves at the end of 2004 and only thirty-five at the end of 2005 – a twenty percent decline each year. FWS projected at the start of the reintroduction project that the experimental population would grow to 102 wolves by the end of 2006 (because the reintroduction began in 1998 instead of 1997, as anticipated in the EIS). This is the bare minimum that FWS determined in the 1982 Recovery Plan was necessary to get the species back on

the road to recovery. However, the reality is that, to date, this minimal objective for the Mexican wolf population has not been achieved. The species' decline has occurred despite the fact that, over the course of the reintroduction project, FWS has released almost eighty captive wolves into the wild.

38.     According to FWS reports, during 2006, wolves continue to be captured, removed from the wild, relocated, and even killed under the terms of the 1998 10(j) rule. The "Nantac Pack," comprised of a male and female wolf pair that were captured and re-released into the Gila National Forest in early 2006, were both shot and killed at FWS' behest in June and July. The pair had attacked and killed livestock subsequent to having scavenged upon the carcass of a bull that died of disease and had been left in the Gila National Forest. In April, FWS issued a removal order for the "Hon-Dah Pack," which consisted of twelve wolves, including seven newborn pups. Ten of the wolves, including all of the pups, were either killed or died accidentally as a result of the shooting and trapping operation.

39.     Even if the Mexican wolf population does not continue a twenty percent annual decline, its numbers will not reach the 100 animals the agency's 1982 Recovery Plan says are needed even to begin to recover Mexican wolves, and which FWS projected would live in the wild by the end of this year. The failure of the population to grow also constricts the species' genetic diversity (stemming from an already depauperate gene pool in the captive Mexican wolf population), which may foreclose future possibilities for recovery.

40.     Despite the continued decline of the experimental population and FWS' agreement with the Five-Year Review's recommendations to modify the 10(j) rule, FWS has yet to make a final decision on the Center's March 29, 2004 Petition.

**PLAINTIFF'S CLAIM FOR RELIEF**

(Administrative Procedure Act)

41. By failing to respond in over thirty-two months to the Center's March 29, 2004 Petition to amend the 10(j) rule for Mexican wolves, when Defendants' own Three- and Five-Year Reviews recommended modifying the 10(j) rule and, during the agency's delay, the Mexican wolf population has precipitously declined far below the level the agency itself has defined as minimally necessary to begin to recover the species, Defendants have "unreasonably delayed" agency action, in violation of Sections 555(b) and 706(1) of the APA.

42. The Service's actions have injured and continue to injure Plaintiff in the manner described in paragraphs 3-5.

**WHEREFORE**, Plaintiff prays that this Court:

(1) Declare that Defendants have violated Sections 555(b) and 706(1) of the Administrative Procedure Act by unreasonably delaying a decision on Plaintiff's Rulemaking Petition;

(2) Order Defendants to issue a final decision on the Center's Petition within 45 days;

(3) Award Plaintiff its costs and reasonable attorneys' fees in this action; and

(5) Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Erin M. Tobin
(D.C. Bar No. 494948)

Katherine A. Meyer
(D.C. Bar No. 244301)

                                                            Meyer Glitzenstein & Crystal
                                                            1601 Connecticut Ave. N.W., Suite 700
                                                           Washington, D.C. 20009
                                                           (202) 588-5206
                                                           (202) 588-5049 fax

Date:   December 14, 2006                Attorneys for Plaintiff

C 06-2119 RCL

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

**I (a) PLAINTIFFS**

Center for Biological Diversity

88888

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Pima
(EXCEPT IN U.S. PLAINTIFF CASES)

**DEFENDANTS**

Dirk Kempthorne & H. Dale Hall

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LA... INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Erin M. Tobin & Katherine A. Meyer
Meyer, Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206

AT...

CASE NUMBER 1:06CV02119

JUDGE: Royce C. Lamberth

DECK TYPE: Administrative Agency Rev

DATE STAMP: 12/14/2006

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

- ○ 1 U.S. Government Plaintiff
- ○ 3 Federal Question (U.S. Government Not a Party)
- ⊙ 2 U.S. Government Defendant
- ○ 4 Diversity (Indicate Citizenship of Parties in item III)

**III CITIZENS...** FOR PLAINTIFF ...

| | PTF | DFT | | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT

**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

**○ A. *Antitrust***

- ☐ 410 Antitrust

**○ B. *Personal Injury/ Malpractice***

- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Medical Malpractice
- ☐ 365 Product Liability
- ☐ 368 Asbestos Product Liability

**⊙ C. *Administrative Agency Review***

- ☐ 151 Medicare Act

Social Security:
- ☐ 861 HIA ((1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g)
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g)

Other Statutes
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

**○ D. *Temporary Restraining Order/Preliminary Injunction***

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

**○ E. *General Civil (Other)*** OR **○ F. *Pro Se General Civil***

Real Property
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

Personal Property
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

Bankruptcy
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

Prisoner Petitions
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

Property Rights
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

Federal Tax Suits
- ☐ 870 Taxes (US plaintiff or defendant
- ☐ 871 IRS-Third Party 26 USC 7609

Forfeiture/Penalty
- ☐ 610 Agriculture
- ☐ 620 Other Food &Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 RR & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

Other Statutes
- ☐ 400 State Reapportionment
- ☐ 430 Banks & Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation

- ☐ 470 Racketeer Influenced & Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Satellite TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 900 Appeal of fee determination under equal access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

(4)

| ○ G. *Habeas Corpus/ 2255* | ○ H. *Employment Discrimination* | ○ I. *FOIA/PRIVACY ACT* | ○ J. *Student Loan* |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ K. *Labor/ERISA (non-employment)* | ○ L. *Other Civil Rights (non-employment)* | ○ M. *Contract* | ○ N. *Three-Judge Court* |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding ○ 2 Removed from State Court ○ 3 Remanded from Appellate Court ○ 4 Reinstated or Reopened ○ 5 Transferred from another district (specify) ○ 6 Multi district Litigation ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Challenge to the FWS's unreasonable delay in making a final decision to grant or deny a rule-making petition under the APA, 5 U.S.C. § 706(1).

**VII. REQUESTED IN COMPLAINT** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 **DEMAND $** ____ Check YES only if demanded in complaint **JURY DEMAND:** YES ☐ NO ☒

**VIII. RELATED CASE(S) IF ANY** (See instruction) YES ☐ NO ☐ If yes, please complete related case form.

**DATE** December 14, 2006 **SIGNATURE OF ATTORNEY OF RECORD** [signature]

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I. COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III. CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV. CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI. CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII. RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.