# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR BIOLOGICAL DIVERSITY,    )
                                    )
    Plaintiff,                      )
                                    )
v.                                  )
                                    )    Civ. Action No. 06-02119 (RCL)
DIRK KEMPTHORNE, et al.,            )
                                    )
                                    )
    Defendants.                     )

## OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

This case under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551 et seq.,

concerns the fate of "one of the rarest land mammals in the world" – the Mexican gray wolf

("Mexican wolf"), which has already been driven to extinction in the wild once by human

activities, and having been "reintroduced" is now in danger of going extinct in the wild again.

See Complaint ("Compl.") ¶¶ 15, 37.  In light of the imperiled status of this federally-listed

species, Plaintiff Center for Biological Diversity ("the Center") filed this lawsuit to compel

Defendants to take a simple step in the process of conserving the nearly extinct, reintroduced

Mexican wolf – i.e., to decide whether or not to grant the Center's March 29, 2004 Rulemaking

Petition requesting that the U.S. Fish and Wildlife Service ("FWS" or "Service") take certain

actions that will help Mexican wolves recover from the brink of extinction.  Id. ¶ 1.

Because the Mexican wolf was exterminated from its historic range in the southwestern

region of the United States, in 1998 the Service undertook a program to "reintroduce" the wolf in

parts of Arizona and New Mexico.  However, by 2001 the program was not working, particularly

because the 10(j) regulations that govern the program are weighed heavily in favor of not

interfering with the interests of livestock owners, and hence allow FWS to frequently capture,

relocate, and even kill wolves – and, thus, separate them from their family packs – if, for

example, the wolves prey on livestock, or simply wander outside of the boundaries of the

designated "recovery area."  See, e.g., 50 C.F.R. § 17.84(k)(9)(iii).  Therefore, in June 2001 –

almost six years ago – scientists hired by the Service concluded that it was absolutely critical, in

fact, "required," that the Mexican wolf 10(j) regulations be amended "immediately" in several

specific ways in order for the Mexican wolf population to be able even to survive in the wild,

much less recover and be removed from the list of endangered species.  Id. ¶¶ 25-8.  Despite the

extreme urgency of the situation, the Service failed to promulgate any amendments to the 10(j)

regulations for this species.  Id. ¶ 36.  Therefore, on March 29, 2004, the Center petitioned the

agency to take certain steps to amend those regulations.  Id. ¶ 29.  However, by December 14,

2006, when this case was filed, the agency still had not acted on the Center's Rulemaking

Petition.  Id. ¶ 40.

     The government now seeks to dismiss this case, contending that it is "moot" because, in

response to the filing of this case, the agency sent the Center a letter asserting that FWS has

"already started the process to modify the 10(j) rule."  Defendants' Memorandum in Support of

Their Motion to Dismiss ("Def. Mem.") at 1 (Docket No. 7).  However, particularly given the

track record of this agency – which several times during the history of Mexican wolf

reintroduction has failed to amend the 10(j) regulations, as drastically needed to protect the

Mexican wolf – and the perilous status of the species, the government's assertion rings extremely

hollow and, in any event, is certainly not of sufficient clarity to shoulder the agency's "heavy"

burden of demonstrating mootness.  See Doe v. Harris, 696 F.2d 109, 112 (D.C. Cir. 1982)

(quoting County of Los Angeles v. Davis, 440 U.S. 625, 631 (1979)).

Indeed, while the government asserts that it has reached a "decision" on the Center's

Petition, Def. Mem. at 6, in fact FWS still has not stated whether or not it will initiate rulemaking

on the three specific amendments to the 10(j) regulations proposed by the Center in its Petition.

Accordingly, this case is not moot, because this Court may still grant Plaintiff effective relief –

i.e., it can order Defendants to make a final, judicially-reviewable decision to either grant or deny

the Center's Rulemaking Petition as to the three specific amendments it has requested.  Thus, as

demonstrated below, because this case is not moot, the most appropriate next step is for the

government to produce the Administrative Record and for the parties to proceed with summary

judgment briefing.

## **BACKGROUND**

To place this case in context, it is necessary to review the relevant statutes and regulatory

provisions, as well as the history of the decline of Mexican wolves and steps that are necessary to

prevent its renewed extinction in the wild.

### A.    **The Endangered Species Act**

As the Supreme Court has observed, the Endangered Species Act represents "the most

comprehensive legislation for the preservation of endangered species ever enacted by any

Nation."  Tennessee Valley Auth. v. Hill, 437 U.S. 153, 180 (1978).  Its stated purpose is to

provide both a "means whereby the ecosystems upon which endangered and threatened species

depend may be conserved," and a "program for the conservation of such endangered species and

threatened species."  16 U.S.C. § 1531(b).  The ESA directs the Secretary of Interior to "review

-3-

other programs administered by him and utilize such programs in furtherance of the purposes" of

the Act.  16 U.S.C. § 1536(a)(1).  The Act further directs all "Federal agencies" to "utilize their

authorities in furtherance of the purposes of this [Act] by carrying out programs for the

conservation of endangered and threatened species."  Id.  The Secretary of Interior has delegated

to FWS its obligations with respect to terrestrial species.  50 C.F.R. § 402.01(b).

　　　　The Act requires that FWS "develop and implement plans . . . for the conservation and

survival of endangered species and threatened species."  16 U.S.C. § 1533(f)(1).  The ESA

defines "conservation" to mean the "the use of all methods and procedures which are necessary

to bring any endangered species or threatened species to the point at which the measures

provided pursuant to this [Act] are no longer necessary," i.e., "recovery" of the species.  16

U.S.C. § 1532(3) (emphasis added).  As emphasized by the Supreme Court, "examination of the

language, history, and structure of the legislation under review here indicates beyond doubt that

Congress intended endangered species to be afforded the highest of priorities."  TVA, 437 U.S. at

174 (emphasis added).

　　　　Therefore, to further the recovery of listed species, section 10(j) of the ESA enables the

Secretary of the Interior to "authorize the release . . . of any population . . . of an endangered

species or threatened species outside the current range of such species,"  16 U.S.C. §

1539(j)(2)(A) – i.e., breed the species in captivity and then release the progeny back into the

wild in areas where the species once existed, but is no longer viable.  These populations of

"reintroduced" species are deemed "experimental," 16 U.S.C. § 1539(j)(1), which means that

members of such populations are treated as a "threatened" species and, therefore, provided fewer

protections under the Act than species designated as "endangered," so that FWS may take actions

-4-

necessary to recover the species that might otherwise be prohibited by the Act.  16 U.S.C. §

1539(j)(2)(C); <u>see also</u>, <u>e.g.</u>, 16 U.S.C. § 1538(a)(1)(B) (prohibiting the "take"of endangered, but

not threatened, species).

> **B.**     **<u>Relevant Facts</u>**

>> **1.**     **<u>The Status of Mexican Wolves</u>**

Efforts by the federal government over the last century to exterminate wolves in the

United States and in Mexico earned the Mexican wolf – a subspecies of gray wolf – its

description as "one of the rarest land mammals in the world."  Compl. ¶¶ 14-5.  Mexican wolves

typically live in small packs of four to eight animals, and have "complex" social structures that

include an "alpha" (or dominant) male and female, and several generations of their offspring.

<u>See</u> http://www.fws.gov/southwest/es/mexicanwolf/natural_history.shtml (last visited on April

24, 2007) (FWS overview of natural history of Mexican wolves).  The Mexican wolf historically

numbered in the thousands before Europeans settled North America, and "occurred over much of

New Mexico, Arizona, Texas, and northern Mexico, mostly in or near forested, mountainous

terrain."  <u>Establishment of a Nonessential Experimental Population of the Mexican Gray Wolf in</u>

<u>Arizona and New Mexico</u>, 63 Fed. Reg. 1752 (Jan. 12, 1998) ("10(j) rules").  Because Mexican

wolves are capable of dispersing great distances to establish a new population – up to five

hundred miles – they historically have established and occupied extremely large territories in

which they live, hunt, and raise their young.  <u>Reintroduction of the Mexican Wolf Within its</u>

<u>Historic Range in the Southwestern United States, Final Environmental Impact Statement</u> 1-3

(Nov. 1996) ("EIS") (Att. 1).

Mexican wolves are carnivores, and prey primarily on hoofed mammals, or ungulates, such as deer, antelope, and elk. Compl. ¶ 14. They also prey on non-indigenous cattle that are raised in the southwestern United States. Id. ¶ 15. In 1915, the U.S. Bureau of Biological Survey (a predecessor of the Interior Department's Fish and Wildlife Service) initiated a program whereby federal salaried hunters systematically trapped and poisoned wolves, and dug up wolf pups from their dens to exterminate them. Id. With the permission of the Mexican government, that agency later extended its extermination efforts further south into Mexico. Id. As a result, by the late 1920s, resident breeding populations of wolves disappeared from the western United States and, while all wolf populations were nearly decimated, Mexican wolves were hardest hit. Id. Thus, by 1998, if not earlier, the only known Mexican wolves in the world lived in a captive breeding program – i.e., Mexican wolves were completely extirpated in the wild. Id. ¶ 18.

After the United States Congress enacted the federal Endangered Species Act in 1973, FWS' policies towards Mexican wolves changed dramatically: on April 28, 1976 FWS listed the Mexican wolf as an "endangered" species, and, at least in principle, became committed to bringing about its recovery in the wild. See id. ¶ 16; see also 41 Fed. Reg. 17736 (April 28, 1976) (listing Mexican wolf as endangered under the ESA); 16 U.S.C. § 1531(b) (purpose of ESA is to "conserve" – i.e., recover – all endangered and threatened species).

Toward that end, in 1982, FWS and Mexico's counterpart wildlife agency jointly adopted a Recovery Plan for the Mexican wolf to bring it back to its historic range. Compl. ¶ 16. Recognizing that Mexican wolves were likely extirpated in the wild, the 1982 Recovery Plan committed FWS to maintaining a captive breeding program and to re-establishing a "viable, self-sustaining population of at least 100 Mexican wolves in the middle to high elevations of a 5,000-

square mile area within the Mexican wolf's historic range," by releasing captive wolves into Mexico and/or adjoining areas in the southwestern United States.  Id.  Demonstrating the urgency of the situation, in 1996 FWS recognized that "<u>international experts rate recovery of the Mexican wolf subspecies as the highest priority of all gray wolf recovery programs</u>."  EIS iv (Att. 1) (emphasis added).

However, FWS failed to implement the Recovery Plan's direction to reintroduce Mexican wolves, and it was not until 1998, sixteen years later, that the agency finally promulgated the regulations necessary to begin reintroducing Mexican wolves into the wild – <u>i.e.</u>, the "10(j) regulations."  Compl. ¶ 18; <u>see</u> <u>also</u> 63 Fed. Reg. 1752 (authorizing the reintroduction of Mexican wolves under section 10(j) of the ESA).

### 2.    <u>The 10(j) Regulations</u>

On January 12, 1998, FWS issued final regulations pursuant to ESA Section 10(j), authorizing the first reintroduction of Mexican wolves into eastern Arizona and southwestern New Mexico.  <u>See</u> 63 Fed. Reg. 1752.  The 10(j) rules designate Mexican wolves as an "experimental population" under the ESA, and create an "experimental population area," comprised of a significant portion of Arizona and New Mexico.  50 C.F.R. § 17.84(k)(9)(iii).  Within the "experimental population area," the rules establish two distinct "recovery areas," only one of which is relevant to this case – the Blue Range Wolf Recovery Area ("Recovery Area").  50 C.F.R. § 17.84(k)(9)(ii).  Within this Recovery Area, the 10(j) rules create a "primary recovery zone" and a "secondary recovery zone."

The "primary recovery zone," which consists of portions of the Apache National Forest, in Arizona, is the principal habitat used to release captive-raised Mexican wolves into the wild.

-7-

See 50 C.F.R. § 17.84(k)(15) (definition of "primary recovery zone"). The "secondary recovery zone" consists of the remainder of Arizona's Apache National Forest and all of the Gila National Forest in New Mexico, 50 C.F.R. § 17.84(k)(15) – a largely remote area with many acres of land that do not have roads or livestock, Compl. ¶ 26. FWS does not release captive-raised Mexican wolves into the "secondary recovery zone." Rather, this region is set aside as an area where wolves that have already been released into the "primary recovery zone" can disperse naturally, and where FWS can also relocate wolves that, for example, disperse outside of the Recovery Area, or prey on livestock in the primary zone or elsewhere. 50 C.F.R. § 17.84(k)(15).

Under the regulations, if a member of the experimental population is found outside of the Recovery Area, but inside the boundaries of the larger "experimental population area," FWS must either capture and re-release the wolf somewhere inside the Recovery Area, return the wolf to captivity, or otherwise "manage" the wolf according to provisions of a Service-approved management plan, 50 C.F.R. § 17.84(k)(9)(iii).[1] All of these actions necessarily result in separating the "problem" wolf from the rest of its pack, which can have significant impacts on the viability of the remainder of the pack. See, e.g., Paquet, Paul, et. al, Mexican Wolf Recovery: Three Year Program Review and Assessment 16 (June 2001) ("Paquet Report") (Att. 3) ("frequent social disruption via mortality, recaptures, and re-releases may have altered the natural territorial behavior of packs" because "the establishment, location, and maintenance of home

---

[1] For example, the Five Year Review explained that the "greatest single cause of removal [of wolves] was wolves moving outside of the recovery area." See Mexican Wolf Blue Range Reintroduction Project 5-Year Review (Dec. 31, 2005) ("Five Year Review") TC-13 (Att. 2).

ranges likely depend on a stable pack structure and the persistence of traditional pack knowledge").

The 1998 10(j) rules also commit FWS to "evaluate Mexican wolf reintroduction progress and prepare periodic progress reports, detailed annual reports, and <u>full evaluations after 3 and 5 years that recommend continuation, modification, or termination of the reintroduction effort</u>." 50 C.F.R. § 17.84(k)(13) (emphasis added).

### 3.    FWS' Efforts To Amend The 10(j) Regulations

In 1999, a panel of experts convened by FWS to review the reintroduction project "strongly recommended" modifying the rule to enable FWS to release wolves into remote areas in New Mexico's Gila National Forest – in the "secondary recovery zone" – because there is very little ranching that occurs in this region and, thus, less potential for wolves to attack livestock. Although FWS approved proceeding with steps to amend the regulations and implement the scientists' recommendations, and even completed a proposed rule to this effect in February 2000, FWS never published the proposed rule in the Federal Register or circulated the proposal for public review and comment.  In April 2000, after a "new Mexican Wolf Recovery coordinator was hired," the agency's priorities were "redirected" towards other issues, and "[t]his shift put rule change momentum on hold" indefinitely.  <u>See generally</u> Five Year Review AC-16 (Att. 2).

In 2001, FWS enlisted a leading wolf expert, Dr. Paul C. Paquet, and several other scientists to conduct a "Three Year Review" of the reintroduction project, as required by the 10(j) rules, 50 C.F.R. § 17.84(k)(13).  Compl. ¶ 24.  Based on that review, Dr. Paquet's team made several recommendations, some of which also require amendment of the 10(j) regulations. <u>Id.</u> ¶25.  Particularly relevant here, the Paquet Report recommended that FWS:

(1) "[i]mmediately" modify the 10(j) rules to provide FWS the authority to release captive

Mexican wolves into the "secondary zone" in the Gila National Forest, "by far the most

important and simplest change the Service can make to the existing reintroduction project;" (2)

"[i]mmediately" modify the rules to allow wolves that are not "management problems" to

establish territories outside of the Recovery Area, because it is "inappropriate" to exclude these

areas as habitat, and the practice of relocating the wolves "interfer[es] with pack formation and

establishment and maintenance of home ranges," and therefore wolf dispersal outside of the

recovery area "is to be expected and required if the regional population is to be viable;" and (3)

"require" that livestock owners on public land take responsibility for the removal and disposal of

dead livestock carcasses, to reduce the likelihood that Mexican wolves will become habituated to

feeding on such livestock.  Id. ¶¶ 26-8 (emphasis added).

Rather than "immediately" amend the 10(j) regulations, as recommended by the Paquet

Report, FWS instead continued to review the matter.  In 2002, the Arizona Game and Fish

Department and the New Mexico Department of Game and Fish agreed to conduct an analysis of

Dr. Paquet's Report.  See Five Year Review AC-10 (Att. 2).  The States completed their review

in September 2002, and concluded that: "the findings and recommendations of the [Paquet

Report] are scientifically valid, and largely represent an objective scientific analysis project."

Arizona-New Mexico Review of the U.S. Fish and Wildlife Service's 3-Year Review of the

Mexican Wolf Reintroduction Project 18 (Sept. 30, 2002) (Att. 4).  In response, FWS delegated

the responsibility for overseeing the existing reintroduction project to a newly created multi-

agency task force called the "Mexican Wolf Blue Range Adaptive Management Oversight

Committee" ("AMOC").  Compl. ¶ 33.[2]  However, despite the unanimous conclusions of the scientists who participated in the 2001 Paquet Report, and the 2002 conclusions of the wildlife agencies of New Mexico and Arizona that the Paquet Report was "scientifically valid," FWS did not amend the Mexican wolf 10(j) regulations in any respect.

### 4.        The Center's Rulemaking Petition

Following publication of the Paquet Report, FWS continued to manage the reintroduced population of Mexican wolves pursuant to the existing 10(j) regulations.  The agency has therefore continued its practice of capturing individual wolves, separating them from their packs, and removing them from the wild – not only when such wolves prey on livestock, but also when they simply wander outside of the boundaries of the Recovery Area.  See Five Year Review TC-29 (Att. 2) (between 2001 and 2003, fifteen wolves were captured and removed because they dispersed outside of the Recovery Area boundaries, the highest cause of removal of the wolves).  At least twenty wolves died during this same period of time, resulting in a "failure rate" – i.e., rate at which wolves either were removed from the wild, died, or went missing – of over sixty-four percent for the entire reintroduction program.  See id. TC–28 (Att. 2) (between 1998 and 2003, ninety-five wolves either died, went missing, or were removed from the wild).

Based on all of these data, and on the 2001 recommendations of the Paquet Report, on March 29, 2004, the Center petitioned the Service to amend the 10(j) regulations.  Compl. ¶ 31.  The Center's Petition explained that, consistent with the "adaptive management" principles upon

---

[2]  The AMOC is comprised of representatives of FWS, the Arizona Game and Fish Department, the New Mexico Department of Game and Fish, the U.S. Forest Service, the United States Department of Agriculture's Animal and Plant Health Inspection Service, and White Mountain Apache Tribe.  Compl. ¶ 33.

which the reintroduction project is premised, FWS should heed the recommendations made by the Paquet Report, because it is the only published scientific research study of the Mexican wolf population in the wild.  Petition for Rulemaking to Enhance Prospects for Recovery of the Mexican Gray Wolf Experimental Population, in Accordance With Scientific Findings 3, 6 (March 29, 2004) ("Petition") (Att. 5).  The Center cautioned that failure to act on the recommendations of the Paquet Report would have dire consequences, because survival rates of reintroduced wolves "are far too low to ensure population growth or persistence."  Id. at 10. Accordingly, the Center explained that to prevent further decline of the species and provide the wolves any chance of recovery, FWS must amend the 10(j) regulations:  (1) to provide FWS the authority to release captive Mexican wolves into the "secondary" recovery zone, i.e., the Gila National Forest in New Mexico; (2) to provide FWS the authority to allow wolves to establish territories outside the boundaries of the Blue Range Wolf Recovery Area; and (3) to define "nuisance wolves" and "problem wolves" to exclude animals that scavenge on the carcasses of livestock that die of non-wolf related causes.  Compl. ¶ 31; see also Petition 3 (Att. 5).

On June 30, 2004, FWS sent a letter to the Center, acknowledging receipt of the Center's Petition and explaining that "the Service is currently evaluating the need for modifying the rule, but no final determination has been made at this time."  Letter from Acting Regional Director to Michael Robinson (June 30, 2004) (Att. 6) (emphasis added).

### 5.    Five Year Review

As a result of the agency's intensive management of this species under the 10(j) regulations, Mexican wolves began to seriously decline.  Compl. ¶ 37.  According to FWS' annual census data, while there were fifty-five Mexican wolves in the wild in 2003, there were as

few as forty-four wolves at the end of 2004 and only thirty-five at the end of 2005 – a twenty

percent decline each year.  Id.  However, FWS still failed to take steps to amend the 10(j)

regulations, as had been urgently recommended by independent scientists and the Center in its

Petition.

On December 31, 2005, the AMOC submitted to FWS its "Five Year Review" of the

reintroduction project.  Compl. ¶ 34.  The AMOC recommended that FWS continue the existing

reintroduction project, but with certain modifications to the 10(j) rules.  Id.  As the Center had

requested in its 2004 Rulemaking Petition, the Five Year Review recommended that FWS

combine the "primary" and the "secondary" zones of the designated recovery area, and release

and relocate wolves throughout this combined area, to provide additional opportunities for the

wolves to disperse and establish their own packs.  See id. ¶¶ 31, 34.

However, although the Five Year Review also stated that the AMOC would "advocate"

for an amendment to the 10(j) rules that would allow wolves to disperse outside of the designated

recovery area, the Review stated that the AMOC had not yet "determine[d]" on

"biological/ecological grounds" whether it would be necessary to expand the boundaries of the

"experimental zone" to accomplish this task.  Five Year Review AC-19, ARC-3 (Att. 2).

Moreover, the Five Year Review's final recommendations to FWS did not address the Center's

third request that the regulatory definitions of "nuisance" and "problem" wolves (that FWS must

remove or otherwise manage) be amended to exclude wolves that had fed on livestock that had

died of natural causes, which would – if adopted – allow the wolves to remain in their packs, and

put the burden on the owners of livestock carcasses that attract wolves to remove those carcasses

to prevent the wolves from feeding on them and becoming habituated to preying on livestock.
See Five Year Review ARC-3-RC-6.

### 6.        This Lawsuit And Defendant's Motion To Dismiss

By 2006, although FWS reported that the Mexican wolf population had grown to fifty-
nine wolves, this is far below the 102 wolves the agency determined would need to be in the wild
to even begin to recover Mexican wolves.  See Mexican Wolf Blue Range Reintroduction Project
Statistics (Att. 7) (projecting that 102 wolves would live in the wild by the end of 2006); see also
Compl. ¶ 39 (Recovery Plan recognized that goal of 100 reintroduced wolves would not be
sufficient to fully recover Mexican wolves in the wild).  Moreover, the Paquet Report specifically
concluded that the more "fluctuations" there are in population growth rates – as appears to have
occurred here – "the greater the extinction risk."  Paquet Report at 41 (Att. 3) (emphasis added).
In addition, although FWS also had projected that by 2006 there would be eighteen "breeding
pairs" of Mexican wolves in the wild as a result of the reintroduction project – i.e., "an adult
male and an adult female wolf that have produced at least two pups during the previous breeding
season that survived until December 31 of the year of their birth," 50 C.F.R. § 17.84(k)(15) –
FWS has reported that, in fact, in 2006 there are only seven such breeding pairs in the wild.
Att. 7.

Accordingly, having not received a final answer from the Service on its Rulemaking
Petition, and in light of the severe deterioration of the Mexican wolf population, on December
14, 2006, the Center filed this lawsuit, seeking to compel FWS to make a final determination on
its 2004 Rulemaking Petition, as required by the APA, 5 U.S.C. § 555(b).

On February 8, 2007, three days before filing its Answer to Plaintiff's Complaint, the Service sent a letter to the Center, asserting that it had already "responded" to the Center's Petition by way of its June 30, 2004 letter acknowledging receipt of the Petition, even though that letter said that "no final determination has been made at this time." See Letter from Action Regional Director to Michael Robinson 1 (February 8, 2007) (Exhibit 1 to Defendants' Motion to Dismiss) ("Def. Exhibit"); see also June 30, 2004 FWS letter (Att. 6). The Service further explained that, as a "second response and decision," and "[s]ubject to available funds," it had started the "process" to modify the 10(j) rules. Id.

However, the Service's letter candidly explained that the agency "cannot commit to what changes, if any, will be made," because the modifications will be "subject to the rule-making process and public input." Id. The agency also provided no indication as to whether, or when, it intended to publish proposed rules for this project. Id. In fact, to date, the Service still has not published in the Federal Register any proposed rules concerning the 10(j) regulations, let alone proposed rules that addressed the specific issues requested by the Center in its Petition.

Accordingly, while FWS continues to "assess" the merits of modifying the 10(j) regulations, see Def. Exhibit 2 at 1 – as it has been doing for the last seven years – the agency also continues to kill, trap, and relocate wolves under the terms of the 1998 rules at the behest of the livestock industry, even though the Paquet Report concluded that such actions "interfer[e] with pack formation and establishment and maintenance of home ranges." See Compl. ¶¶ 27, 38. Thus, for example, in February 2007 – just two months ago – FWS issued a "permanent" removal order for one wolf, and trapped, removed from its pack, and killed another wolf, for

purportedly killing livestock.  See Blue Range Wolf Reintroduction Area Monthly Project
Update (March 13, 2007) (Att. 8).

## ARGUMENT

### I.    Standard of Review

In reviewing a motion to dismiss for lack of subject matter jurisdiction under Rule
12(b)(1) of the Federal Rules of Civil Procedure, the Court "must accept as true all material
allegations of the complaint, and must construe the complaint in favor of the complaining party."
Warth v. Seldin, 422 U.S. 490, 501 (1975); see also Jerome Stevens Pharmaceuticals, Inc. v.
Food & Drug Admin., 402 F.3d 1249, 1253 (D.C. Cir. 2005) ("in deciding whether to grant a
motion to dismiss for lack of jurisdiction, the court must . . . accept all of the factual allegations
in [the] complaint as true") (internal citations and quotations omitted).  Thus, a reviewing court
must "construe the complaint liberally, granting plaintiff the benefit of all inferences that can be
derived from the facts alleged."  Barr v. Clinton, 370 F.3d 1196, 1199 (D.C. Cir. 2004) (internal
citations and quotations omitted) (emphasis added); see also DL v. Dist. of Columbia, 450 F.
Supp. 2d 11 (D.D.C. 2006) (internal citations omitted) ("in evaluating whether it has subject
matter jurisdiction, the court must construe the complaint liberally, and give the Plaintiff the
benefit of all reasonable inferences") (internal citations omitted).

Where, as here, a defendant contends that the court lacks subject matter jurisdiction under
Article III of the Constitution because "defendant's post-complaint actions in this matter have
rendered the issues raised by plaintiff's complaint moot," Lake Pilots Ass'n v. U.S. Coast Guard,
257 F. Supp. 2d 148, 156 (D.D.C. 2003), a court may only dismiss the complaint if the defendant
meets a "heavy" burden, United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953), of

demonstrating that "interim relief or events have <u>completely and irrevocably</u> eradicated the

effects of the alleged violation." <u>Doe v. Harris</u>, 696 F.2d 109, 111 (D.C. Cir. 1982) (quoting

<u>County of Los Angeles v. Davis</u>, 440 U.S. 625, 631 (1979)) (emphasis added); <u>see</u> <u>also</u>

<u>Kennecott Utah Copper Corp. v. U.S. Dep't of Interior</u>, 88 F.3d 1191, 1207 (D.C. Cir. 1996)

(defendants have the burden of proving that "interim relief or events have <u>completely and</u>

<u>irrevocably</u> eradicated the effects of the alleged violation") (emphasis added);  <u>Lake Pilots Ass'n</u>,

257 F. Supp. 2d at 156 (same); <u>Longwood Village Rest. v. Ashcroft</u>, 157 F. Supp. 2d 61, 67

(D.D.C. 2001) ("an intervening event will render [a] case moot only if the plaintiff is wholly

divested of all personal interest in the outcome of the controversy or if the event completely

eliminates the effect of the alleged violation") (internal citations and quotations omitted).

 Thus, if there is even "some trace of a continuing injury" to Plaintiff, <u>Kennecott</u>, 88 F.3d

at 1207, or if there exists a "partial remedy" that the Court can grant Plaintiff – even if it is one

that is not "fully satisfactory" – the court may not dismiss this case on mootness grounds.

<u>Calderon v. Moore</u>, 518 U.S. 149, 150 (1996) (quoting <u>Church of Scientology of Cal. v. United</u>

<u>States</u>, 506 U.S. 9, 13 (1992)); <u>see also</u> <u>United States v. Chrysler Corp.</u>, 158 F.3d 1350, 1354

(D.C. Cir. 1998) ("The availability of a partial remedy . . . is sufficient to prevent this case from

being moot").

 In particular, as the Court of Appeals for this Circuit recently held, when a court must

resolve whether an agency has unreasonably delayed responding to a citizen petition under the

APA, 5 U.S.C. § 555(b), an agency's actions will not eliminate the petitioner's entitlement to

relief if the agency fails to provide a response that is "unequivocal" and "coherent."  <u>See</u> <u>In re</u>

<u>American Rivers & Idaho Rivers United</u>, 372 F.3d 413, 419 (D.C. Cir. 2004) (rejecting agency

argument that it had "already done what was requested" by a petition) (internal quotations omitted).

## II.    This Case Is Not Moot Because FWS Has Not Provided Plaintiff A Final Decision On Its March 29, 2004 Rulemaking Petition.

Pursuant to the APA, "[e]ach agency shall give an interested person the right to petition for the issuance, amendment, or repeal of a rule." 5 U.S.C. § 553(e). Moreover, federal agencies must "conclude a matter" presented to them "within a reasonable time," 5 U.S.C. § 555(b), and, if agency action is "unlawfully withheld or unreasonably delayed," a reviewing court "shall" "compel" that agency action. 5 U.S.C. § 706(1). In light of these principles, it could not be clearer that this action is not moot, since, to date, the government has not provided the Center a definitive decision on its Rulemaking Petition and, thus, the government has yet to comply with its duty to "conclude" a matter presented to it within a reasonable time, 5 U.S.C. § 555(b). This is particularly true in light of the urgency of the matter presented to the agency in this case – i.e., the fact that without certain immediate changes to the 10(j) regulations, the reintroduced Mexican wolf may again become extirpated in the wild. See, e.g., Public Citizen Health Research Group v. FDA, 740 F.2d 21, 34 (D.C. Cir. 1984) ("unreasonableness" of delay is heightened when requested relief had immediate health implications).

Indeed, as set forth above, the Center's Rulemaking Petition sought three extremely specific amendments to the regulations governing the reintroduction of Mexican wolves, see Compl. ¶ 31 – all of which are desperately needed to prevent the existing reintroduced wolf populations from going extinct in the wild and to ensure any chance for this extremely vulnerable species to ever be viable, much less eventually recover and be removed from the list of

endangered species.  <u>See id.</u> ¶¶ 26-8 (Paquet Report concluded, <u>inter alia</u>, that amending the rules

to allow wolves to disperse outside of the recovery area is "required" if the "regional population

is to be viable").  Nevertheless, FWS has not instituted, or even proposed instituting, <u>any</u> of these

specific requests.

  Moreover, the government's February 8, 2007 letter, upon which it principally relies for

its mootness argument, does not provide Plaintiff a "coherent" or "unequivocal" response by the

agency as to whether or not it intends to adopt – or propose to adopt – regulations that address

the specific issues presented to the agency in the Center's 2004 Petition.  <u>See</u> <u>American Rivers</u>,

372 F.3d at 419 (ordering agency to answer a rulemaking petition because it had not provided a

petitioner an "unequivocal" or "coherent" response).  Rather, that letter provides merely a

laundry list of <u>other</u> activities the Service has engaged in since the AMOC released its Five Year

Review, such as:  committing to "formally consider" changes to the 10(j) regulations (without

specifying <u>what</u> all of those changes are or <u>when</u> they will be proposed); amending a

Memorandum of Understanding with various members of the AMOC that "sets the stage" for

these agencies to "prepare a proposed revision of the 10(j) rule;" and obligating funding to state

wildlife agencies to initiate an environmental impact statement for "a <u>potential</u> formal 10(j) rule

change."  <u>See</u> Def. Exhibit 1 (emphasis added).  While such activities may be steps towards

eventually amending the 10(j) regulations in some respect, they certainly do not demonstrate that

Defendants have "completely and irrevocably eradicated the effects of the alleged violation" at

issue here, <u>Doe v. Harris</u>, 696 F.2d at 111 (internal citations and quotations omitted) – <u>i.e.</u>, the

government's failure to provide Plaintiff a final decision whether to grant or deny the Center's

2004 Rulemaking Petition.  <u>See also</u> <u>American Rivers</u>, 372 F.3d at 420 (ordering agency to

provide a "judicially reviewable response to [a] petition within 45 days"); The Fund for Animals v. Norton, 294 F. Supp. 2d 92, 102 (D.D.C. 2003) (plaintiff entitled to "answer" on its rulemaking petition even though the agency had already prepared a draft proposed rule).[3]

FWS resorts to other material in the Record before the Court to argue that the agency has already initiated a rulemaking in response to a separate process – i.e., the AMOC's Five Year Review. See Def. Mem. at 7-8; see also Def. Exhibit 2. However, such arguments are a red herring because these documents do not explain whether FWS intends to propose – much less adopt, as requested by the Center in its Petition – the specific amendments to the 10(j) regulations that the Center asked for in its Petition. See, e.g., Def. Exhibit 2 (committing FWS only to "[i]nitiate rule revision" without specifying what the proposed revisions will be, nor any schedule for such possible revisions). Moreover, as explained supra at 13-14, the recommendations made by the AMOC as part of the Five Year Review fall far short of what the Center has requested as necessary to protect and conserve the Mexican wolf.

The government appears to argue that it is impossible for the agency to provide Plaintiff a definitive answer concerning the three amendments sought by its Petition because any final amendments to its regulations must go through notice and comment rulemaking, and, therefore, may change at some point in the future. See Def. Exhibit 1 (FWS "cannot commit to what changes, if any, will be made" because modifications will be "subject to the rule-making process and public input"). However, in order for the Center's Rulemaking Petition to be "conclude[d],"

---

[3]     While FWS' February 8, 2007 letter suggests that the agency will "consider" a rule change that would include "expansion of recovery area boundaries that are under Federal jurisdiction," Def. Exhibit 1, the Center's Petition did not seek such an amendment to the regulations.

as required by the APA, 5 U.S.C. § 555(b), at the very least the Center is entitled to receive from the Service a final, judicially-reviewable decision as to whether or not the Service intends to engage in rulemaking that will address all of the specific problems presented by the Center in its detailed Rulemaking Petition.  See American Rivers, 372 F.3d at 420 (ordering FERC to provide a "judicially-reviewable response" to a rulemaking petition by a date certain).  However, the Center has thus far been denied even this most basic response.

Indeed, the fundamental problem with the government's alleged "response" to the Center's Rulemaking Petition is that, if the Court agrees with the Defendants that this case is "moot," and if FWS does not engage in rulemaking on any one of the specific amendments that the Center requested in its Petition, the Center will effectively be prevented from obtaining judicial review of the agency's decision not to promulgate such rules, even though Plaintiff is entitled to do so under the APA.  See 5 U.S.C. § 706(2) (courts "shall" set aside "agency action" if it is arbitrary and capricious); see also Massachusetts v. EPA, 127 S. Ct. 1438, ___ U.S. ____, 2007 WL 957332, *17 (2007) ("[r]efusals to promulgate rules [in response to rulemaking petitions] are . . . susceptible to judicial review").

Such a result is precisely what this Circuit's unreasonable delay precedents are intended to avoid.  See Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 76 (D.C. Cir. 1984) ("TRAC") (judicial relief is available to ensure that the court's duty to review the merits of agency decisions is not "defeated by an agency that fails to resolve disputes"); see also Sierra Club v. Thomas, 828 F.2d 783, 795 (D.C. Cir. 1987) ("a 'final agency action' review provision confers jurisdiction upon this court to review the inaction claim for the same reason that justifies review of action 'unlawfully withheld' . . . without such review, the agency could effectively

evade its statutory duty of timeliness"); see also Garland, Merrick, Deregulation and Judicial Review, 98 Harv. L. Rev. 505, 567 -568 (1985) ("delay cases indicate the courts' resolve not to allow agencies to thwart congressional mandates by failing to exercise their delegated authority").

Defendants are wrong, therefore, to suggest that the Center seeks a Court order that would compel final regulations that are "fully consistent with Plaintiff's request."  Def. Mem. at 8 n.5. The Center does not seek such a result here.  Rather, it simply seeks a definitive, judicially-reviewable answer, one way or the other, as to whether FWS intends to initiate rulemaking addressing all of the modifications to the 10(j) regulations proposed by the Center in its Petition.

Accordingly, this case is governed by the Court of Appeals' ruling in American Rivers & Idaho Rivers United, involving a petition that requested that FERC consult with the National Marine Fisheries Service under the Endangered Species Act on its operation of certain hydroelectric dams and their effect on federally protected species of salmon.  372 F.3d at 419. Finding that although certain material in the Administrative Record indicated that FERC in fact had initiated consultation on the dams, the Court held that FERC nevertheless failed to provide an "unequivocal" or "coherent" response to the plaintiff's petition.  Id.  It therefore remanded the matter to the agency to "issue a judicially reviewable response to the [] petition within 45 days." 372 F.3d at 420.

As in American Rivers, here the Service's "response" to the Center's Rulemaking Petition  – i.e., its February 8, 2007 letter and the Record material referred to in the government's brief – fails to provide a "coherent" or "unequivocal" answer as to whether or not the agency intends to initiate a rulemaking that will address the specific regulatory amendments sought by

the Center in its 2004 Petition.  Absent any such response, the government simply cannot

demonstrate that its action "irrevocably eradicated the effects of the alleged violations."  Doe,

696 F.2d at 111.  Accordingly, this case is not moot.  See id.; see also Kennecott Utah Copper, 88

F.3d at 1208 (agency's promulgation of a rule in compliance with the APA's notice and comment

requirements did not render moot a claim that an earlier agency action did not comply with such

requirements, because the two agency actions "did not cover all of the same issues"); Lake Pilot

Ass'n, 257 F. Supp. 2d at 158-59 (case was not moot because agency's post-complaint actions

did not address all of the actions challenged by the Plaintiff) (internal quotations omitted);

Longwood Village Rest., 157 F. Supp. 2d at 67 (rejecting defendant's claim that case was moot

because a portion of plaintiff's claim was not addressed).[4]

In short, while the agency continues to "assess" whether to modify the 10(j) regulations –

as it has done for the last seven years, with no clear end in sight – the Service has failed to

provide the Center the simple relief it requested over three years ago – i.e., a final answer to its

Rulemaking Petition.  Such a delay is particularly egregious because the rulemaking petition at

issue was submitted in regards to a "law designed to halt and reverse the trend toward species

---

[4]    This case is therefore distinguishable from Action on Smoking & Health v. Dep't
of Labor, referred to in Defendants's brief, Def. Mem. at 8 n.5, because there the court held that
an unreasonable delay claim against the Department of Labor, seeking to compel the agency to
regulate tobacco smoke, was moot because the Department published in the Federal Register a
notice of proposed rulemaking to regulate tobacco smoke, as specifically sought by the Plaintiff's
rulemaking petition.  28 F.3d 163, 164 (D.C. Cir. 1994).  Far from the situation involved in that
case, here the government has not published a notice of proposed rulemaking in the Federal
Register indicating the subject matter and contours of any regulatory changes.  Indeed, it is far
from clear whether or not the agency intends to actually adopt – or even propose to adopt –
regulations addressing the issues raised by the Center's Petition.  Cf. Cent. Louisiana Elec. Co. v.
Interstate Commerce Comm., 724 F.2d 173, 176 (D.C. Cir. 1983) (unreasonable delay claim was
moot where agency published a Notice of Proposed Rulemaking and made clear that it would
"consider" comments "on the issues of concern to petitioners").

extinction, <u>whatever the cost</u>," <u>American Rivers</u>, 372 F.3d at 420 (quoting <u>TVA</u>, 437 U.S. at 184) (emphasis added); <u>see also</u> <u>MCI Telecomm. Corp. v. FCC</u>, 627 F.2d 322, 340 (D.C. Cir. 1980) (although "theories may change . . . new information may become relevant [and] one proceeding may have to take account of another," there "must be some reasonably prompt decision making point at which [an agency]" concludes its action); <u>Midwest Gas Users Ass'n v. FERC</u>, 833 F.2d 341, 359 (D.C. Cir. 1987) (a reasonable time for an agency decision could encompass "'months, occasionally a year or two, but not several years or a decade'") (citing <u>MCI</u>, 627 F.2d at 340).

Finally, the Court has "ample means" to protect Plaintiff from the "adverse effects of agency delay." <u>Public Citizen</u>, 740 F.2d at 34. Thus, for example, at an absolute minimum, the Court may grant Plaintiff effective relief by ordering the Service to make a final, judicially-reviewable decision on the Center's Petition. Alternatively, in light of the critically imperilled status of the federally protected species at issue in this case, and the numerous delays that have plagued this agency and prevented it from taking decisive action to comply with its statutory mandate to recover the Mexican wolf and prevent its extinction, the Court should set a schedule for publication in the Federal Register of any proposed rules the agency contends would constitute a response to the Center's 2004 Petition. <u>See</u>, <u>e.g.</u>, <u>Public Citizen</u>, 740 F.2d at 23 (in light of the significant human health considerations at issue, court remanded case for a determination of whether FDA unreasonably delayed "resolution" of a rulemaking petition and, if so, "to order FDA to commence rulemaking on the labeling issue immediately and to reach a decision as expeditiously as is possible"). At that point, the Center – and the Court – would at least have a basis for deciding whether or not the agency is actually addressing the measures that are needed to protect this magnificent species from again being extirpated in the wild.

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants's Motion to Dismiss should be denied, and

the Court should set a schedule by which Defendants must produce the Administrative Record,

and the parties may submit summary judgment briefing, consistent with the parties' Joint Rule

16.3 Report.

Respectfully submitted,


      /s/ Erin M. Tobin
Erin M. Tobin
(D.C. Bar No. 494948)
Katherine A. Meyer
(D.C. Bar No. 244301)
Meyer Glitzenstein & Crystal
1601 Connecticut Ave. N.W., Suite 700
Washington, D.C. 20009
(202) 588-5206
(202) 588-5049 fax

Date:   April 26, 2007          Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )    **Civ. Action No. 06-02119 (RCL)** |
| **DIRK KEMPTHORNE, <u>et al.</u>,** | ) |
| | ) |
| | ) |
| **Defendants.** | ) |

**[PROPOSED] ORDER**

Upon consideration of the Defendant's Motion to Dismiss, Plaintiff's Opposition to

Defendant's Motion to Dismiss, Defendant's Reply, and the entire record before the Court, it is

this ____ day of _____, 2007,

ORDERED that Defendant's Motion to Dismiss is Denied.


Date:  _____        _____
                                              U.S. District Judge Royce C. Lamberth

Civ. Action No. 06-2119 (RCL)

Attachment 1

Excerpts

# REINTRODUCTION OF THE MEXICAN WOLF WITHIN ITS HISTORIC RANGE IN THE SOUTHWESTERN UNITED STATES

Final
Environmental
Impact
Statement



Fish and Wildlife Service
U.S. Department of the Interior

# REINTRODUCTION OF THE MEXICAN WOLF WITHIN ITS HISTORIC RANGE IN THE SOUTHWESTERN UNITED STATES

Final
Environmental
Impact
Statement

Fish and Wildlife Service
U.S. Department of the Interior

November 1996

Prepared with the assistance of the
Center for Wildlife Law, Institute of
Public Law, University of New Mexico.

Cover illustration: Brian Cobble

# Final Environmental Impact Statement on Reintroduction of the Mexican Wolf Within Its Historic Range in the Southwestern United States

Lead agency: United States Department of the Interior, Fish and Wildlife Service.

**Cooperating agencies in preparation of the EIS:**
Arizona Game and Fish Dep't; New Mexico Dep't of Game and Fish; San Carlos Apache Tribe; U.S. Dep't of Agriculture, APHIS, Animal Damage Control; U.S. Dep't of Agriculture, Forest Service; U.S. Dep't of the Army, White Sands Missile Range.

**States and counties where the Preferred Alternative is located:** Arizona: Apache and Greenlee Counties; New Mexico: Catron, *Doña Ana, Grant, *Lincoln, *Otero, Sierra, and *Socorro Counties.
(* indicates counties that are only in the Preferred Alternative if the back-up White Sands Wolf Recover-y Area is used.)

**Abstract:** The U.S. Fish and Wildlife Service (FWS) proposes to reintroduce a nonessential experimental population of Mexican gray wolves (*Canis lupus baileyi*) within part of the subspecies' historic range in the southwestern United States. The endangered Mexican wolf currently is known to exist only in captivity. Under the Preferred Alternative, commencing in 1997 or as soon thereafter as practical, the FWS will gradually release up to 15 pairs or family groups into the Blue Range area of east-central Arizona. If it is determined to be both necessary and feasible, up to five pairs or family groups may be released into the back-up area, the White Sands Missile Range of south-central New Mexico. The objective is to re-establish 100 wild Mexican wolves distributed over 5,000 mi$^2$ by about the year 2005. The FWS and cooperating agencies will closely monitor, study, and evaluate the reintroduction. They will have authority under a Mexican Wolf Experimental Population Rule to actively manage the wolves, including preventing dispersal outside the designated wolf recovery areas and moving or removing any wolves causing significant conflicts.

The key impacts of the Preferred Alternative analyzed in the Final Environmental Impact Statement (FEIS) are as follows. After the wolf population grows to approximately 100, it is projected to kill between one and 34 cattle annually, mostly calves. A private livestock depredation compensation fund exists. For the Blue Range Wolf Recovery Area, the net long term effect on wild ungulates is projected to be between 1,200 and 1,900 fewer elk, and between 4,800 and 10,000 fewer deer, than would occur if there were no wolves. If the back-up White Sands Wolf Recovery Area is used, the net long term effect is projected to be between 760 and 2,000 fewer deer than would occur if there were no wolves. Densities of coyotes and mountain lions probably will drop in occupied wolf range. The major regional economic impacts will be reductions in the value of ungulate hunting and in hunting expenditures. Some regional economic benefits are expected from increases in tourism and in non-hunting recreation associated with the wolf. Limited minor land use restrictions may be imposed around occupied release pens, dens, and rendezvous sites, on public lands only, as necessary to prevent disturbance of the wolves. The use of M-44s and choking neck snares in occupied wolf range will be restricted. If the White Sands Missile Range is used, some inconvenience, but no major conflicts with military or testing uses, are expected from wolf reintroduction.

The FEIS also analyses potential impacts of three alternatives to the Preferred Alternative: 1) reintroduction of nonessential experimental wolves limited to significantly smaller recovery areas, 2) reintroduction of wolves, in the Blue Range Wolf Recovery Area only, with full "endangered" status under the Endangered Species Act and no restriction of wolf dispersal by managers, and 3) a "No Action" alternative that considers the speculative possibility of natural recolonization of wolves from Mexico into southeastern Arizona, southwestern New Mexico, and Big Bend National Park in Texas.

The FEIS will be given to decision makers in the FWS and Department of Interior for a decision. A Notice of Availability of the FEIS will be published in the Federal Register. A Record of Decision can be approved 30 days after publication of the Notice of Availability. Any decision on Mexican wolf recovery in the southwestern United States will be well publicized. Send information requests to: David R. Parsons, Mexican Wolf Recovery Program, U.S. Fish and Wildlife Service, P.O. Box 1306, Albuquerque, NM 87 103.

Approved:

_Nancy M. Kaufman_
(Signature)

_November 6, 1996_
(Date)

Nancy Kaufman
Regional Director, Region 2
U.S. Fish and Wildlife Service

# Final Environmental Impact Statement - Reintroduction of the Mexican Wolf Within Its Historic Range in the Southwestern United States

## Summary

### Introduction

The United States Department of the Interior, Fish and Wildlife Service (FWS), proposes to reintroduce a nonessential experimental population of Mexican gray wolves (*Canis Lupus baileyi*) within part of the subspecies' historic range in the southwestern United States. The endangered Mexican wolf currently is known to exist only in captivity. The FWS has prepared a final environmental impact statement (FEIS) on its reintroduction proposal and three alternative approaches to re-establishing the subspecies under the Endangered Species Act (ESA). This Summary outlines the full FEIS.

### Cooperating Agencies in Preparation of the EIS

Arizona Game and Fish Dep't; New Mexico Dep't of Game and Fish; San Carlos Apache Tribe; U.S. Dep't of Agriculture, APHIS, Animal Damage Control; U.S. Dep't of Agriculture, Forest Service; U.S. Dep't of the Army, White Sands Missile Range.

### States and Counties Where the Preferred Alternative is Located

Arizona: Apache and Greenlee Counties; New Mexico: Catron, *Doña Ana, Grant, *Lincoln, *Otero, Sierra, and *Socorro Counties. (* indicates counties that are potentially affected by the Preferred Alternative only if the back-up White Sands Wolf Recovery Area is used.)

### Scoping, Public Review, and Changes to the Draft EIS

This FEIS is based on a lengthy period of scoping, preparation, review, and revision of a draft EIS (DEIS). Four public scoping meetings were held in 199 1 and 1992 to obtain public input regarding the FWS's general proposal to reintroduce Mexican wolves. A total of 838 people attended. In addition,

public comment periods following the meetings resulted in 1,324 written comments, which the FWS compiled and analyzed. The seven main areas of public concern related to: 1) the FWS's planning of the Proposed Action and the alternatives to it; 2) impacts of wolf depredation on livestock; 3) economic impacts; 4) ecological and biological impacts of wolf recovery; 5) the viability of the captive Mexican wolf population; 6) impacts on wildlife management; and 7) philosophical and ethical concerns. The interagency Mexican Wolf EIS Interdisciplinary Team, which oversaw the writing of the EIS, considered these issues as well as additional issues.

The DEIS was prepared between 1993 and 1995; it was released in June 1995. The public comment period on the DEIS ended more than four months later, on October 3 1. Public review was extensive, with participation by almost 18,000 people or organizations, in a variety of ways. Fourteen public open house meetings were held throughout the potentially affected areas; total registered attendance was 1,186. Three formal public hearings were held in Austin, Texas; Phoenix, Arizona; and Socorro, New Mexico; total registered attendance was 95 1. Each written and transcribed oral comment has been reviewed and considered in the preparation of the FEIS. The public comments are on file and available for inspection at the FWS Regional Office in Albuquerque, New Mexico.

Notable changes from the DEIS to this FEIS are listed below; they largely are in response to comments received on the DEIS or to developments since the DEIS was written. Also, numerous minor corrections, revisions, and updates have been made.

### Alternatives

- Re-writing of the Proposed Action as the Preferred Alternative (Alt. A), now specifying use of the biologically preferable Blue Range Wolf Recovery Area (BRWRA) first, with the White Sands Wolf Recovery Area (WSWRA) as a back-up, only to be used if necessary and feasible and if additional information is available that the deer population can support a wolf population. The specific

decision criteria in the DEIS regarding whether to use the BRWRA or WSWRA first have been deleted.

· Deletion of the provision for closing backcountry roads.

· Support for a Citizen Advisory Committee to advise on management.

· Alt. B now proposes reintroductions in both the BRWRA and WSWRA primary recovery zones at the same time.

· Alt. C now proposes full-endangered wolf reintroduction into the BRWRA only. The WSWRA is deleted as a potential reintroduction area under Alt. C, largely because the reintroduction objective could be met with releases to just the BRWRA with subsequent unlimited expansion of the reintroduced population. Related discussion of impacts to the WSWRA and the adjacent potential dispersal areas is deleted.

· Rewording of Alt. D to emphasize the "No Action" aspect and that natural recolonization is very speculative. Costs of this alternative are re-calculated. Less quantification is provided in the impact discussion due to greater emphasis on uncertainty.

## Clarifications/Corrections

· More discussion of historic information about wolf depredation on livestock, in Chap. 1 under Reasons for Listing.

· New or more clear definitions of "problem wolves," "rendezvous sites," and "disturbance-causing land use activities" in the Glossary, Appendix G. The latter definition includes specific activities and types of public access that may not be allowed within a radius of one mile or less around active pens, dens, and rendezvous sites, as well as exemptions, i.e., activities specifically allowed.

· Deletion of the provision for removing wolves when they are "conflicting with a major land use"; addition of a provision for removing them if they endanger themselves

by occurring when and where military or testing activities are scheduled.

· Clarification that modification of wolf habitat (outside the protection areas for pens, dens, and rendezvous sites) by land uses in the recovery areas would not be considered a "take" of nonessential experimental wolves under ESA sec. 9(a).

· Apportionment of potential impacts on deer, elk, hunting, and related economic impacts by whether they would occur in Arizona or New Mexico.

· Discussion of potential impacts on bighorn sheep in the BRWRA.

· More discussion of potential impacts on the San Carlos Apache Reservation.

· Revision and more detailed explanation of cost estimates for each alternative in Appendix B.

## Updates

· Updated version of Appendix C, the Proposed Mexican Wolf Experimental Population Rule, as published in the Federal Register.

· Inclusion of the detailed Public Comment Summary and the Agency Comments on the DEIS, both as part of Chap. 5, and both with FWS responses to the comments.

· A summary of the DEIS review process, compilation of the numbers of various types of public comments received, and a listing of personnel involved in the public review process.

· New Mexico League of Women Voters wolf opinion survey results.

· Impacts from wolf reintroduction in Yellowstone and Central Idaho to date.

- Drought and management impacts on deer, oryx, and feral horse populations on White Sands Missile Range.

- Proposed reductions in permitted grazing to Apache National Forest allotments in BRWRA.

- Mexican spotted owl recovery in Cumulative Impacts section and discussion on impacts on National Forest management.

- Status of captive Mexican wolf population and genetics, and revision of taxonomy and historic range sections.

- More current information on investigations of whether any Mexican wolves remain in the wild in the U.S. or Mexico (none confirmed).

## New Appendices

**Appendix J -** Update on Yellowstone and Central Idaho Gray Wolf Reintroductions and Economic Benefits of Wolf Recovery, and **Appendix K -** Response to Mr. Dennis Parker's Comment on the DEIS.

## Future Decision Making

A Notice of Availability of this FEIS is being pub-lished in the Federal Register. The FEIS will be given to decision makers in the FWS and Department of Interior. A Record of Decision can be approved 30 days after publication of the Notice of Availability. Any decision on Mexican wolf recovery in the southwestern United States will be well publicized. Send information requests to: David R. Parsons, Mexican Wolf Recovery Program, U.S. Fish and Wildlife Service, P.O. Box 1306, Albuquerque, NM **8710.3.**

_(Signature)_

_(Date)_

Nancy **Kaufman**
Regional **Director, Region 2**
U.S. Fish and Wildlife Service

## Background

### Mexican Gray Wolf Description

The Mexican wolf is the southernmost and one of the smallest subspecies of the North American gray wolf. Adults weigh 50 to 90 lbs., average 4'6" to 5'6" in total length, and reach 26" to 32" in height at the shoulder. Its pelt color varies. The "lobo"-its popular name-is genetically distinct from other wolves and no confirmed population exists outside captivity. It is one of the rarest land mammals in the world. International experts rate recovery of the Mexican wolf subspecies as the highest priority of all gray wolf recovery programs.

### Reasons for Listing

Many factors contributed to the Mexican wolf's demise, but the concerted federal eradication effort in the early 1900s was predominant. Other factors were: commercial and recreational hunting and trapping; killing of wolves by game managers on the theory that more game animals would be available for hunters; habitat alteration; and safety concerns, although no documentation exists of Mexican wolf attacks on humans.

### Reintroduction Procedures

All Mexican wolves to be released under Alternatives A, B, and C, below, would come from the certified U.S. captive population of 114 animals (as of March 1996) maintained in 24 zoos, wildlife parks, and other facilities located around the country. The wolves have exhibited no major genetic, physical, or behavioral problems affecting their fitness resulting from captivity. The FWS will move male/female pairs identified as candidates for possible release to its captive wolf management facility on the Sevilleta National Wildlife Refuge, north of Socorro, New Mexico. In the event of a decision to proceed with reintroduction, the FWS would select release ani-mals from among the candidate pairs based on reproductive performance, behavioral compatibility, response to the adaptation process, and other factors. Only wolves that are genetically well-represented in the remaining captive population would be used as release stock.

# Alternatives

**Alternative A (the Preferred Alternative): The U.S. Fish and wildlife Service proposes to reintroduce Mexican wolves, classified as nonessential experimental, into the Blue Range Wolf Recovery Area. Wolves will be released into the primary recovery zone and allowed to disperse into the secondary recovery zone. If feasible and necessary to achieve the recovery objective of 100 wolves, a subsequent reintroduction of wolves into the White Sands Wolf Recovery Area will be conducted.**

In 1997, the FWS will begin to reintroduce family groups of captive-raised Mexican wolves into the primary recovery zone of the BRWRA (Fig. 1). The FWS will gradually release up to 15 family groups into the BRWRA and later, if necessary and feasible, up to five family groups into the back-up WSWRA (Fig. 1). Reproduction in the wild would increase the populations to approximately the recovery objective. Wolves will be released into the primary recovery zone and allowed to disperse into the secondary recovery zone.

The recovery objective of the Preferred Alternative is to re-establish 100 wild wolves distributed over more than 5,000 $mi^2$ by about the year 2005, consistent with the 1982 Mexican Wolf Recovery Plan. The FWS projects that the population will eventually fluctuate near this level as result of natural processes, such as intra-specific aggression and changes in prey abundance and vulnerability, and management actions, such as wolf control and translocation. The FWS and its cooperators will monitor, research, evaluate, and actively manage the wolves, including translocating or removing wolves that disperse outside the wolf recovery areas or that cause significant conflicts.

A federal regulation will designate the population to be released as experimental and nonessential to the continued existence of the subspecies. This Mexican Wolf Experimental Population Rule will delineate the precise geographic boundaries (see Box 1) and prescribe the protective measures and management authority that apply. No formal ESA Section 7 consultation would be required regarding potential impacts of land uses on nonessential experimental Mexican wolves, except on National Wildlife Refuges and National Park Service areas.

Reintroduction will occur under management plans that allow dispersal by the new wolf populations from the immediate release areas ("primary recovery zones") into designated adjacent areas ("secondary recovery zones") (Fig. 1). However, the FWS and cooperating agencies will not allow the wolves to establish territories outside these wolf recovery area boundaries unless this occurs on private or tribal lands and the land manager does not object. The FWS would attempt to enter into cooperative management agreements with such landowners regarding control of the wolves. If the land manager objects to the presence of wolves on private or tribal lands, field personnel would recapture and relocate the wolves.

The FWS and the cooperating agencies will use a flexible "adaptive management" approach based on careful monitoring, research, and evaluation throughout the release phase. This will include adjusting the numbers actually released according to the needs and circumstances at the time. Initially, to reduce the likelihood of wolf dispersal onto the White Mountain Apache and San Carlos Apache reservations to the west, the wolf releases will occur on the eastern side of the BRWRA primary recovery zone, close to the Arizona/New Mexico border. The FWS will encourage and support the formation of a Citizen Advisory Committee, or similar management oversight body, to assist the FWS and cooperating agencies in responding to citizen concerns.

The following future circumstances will be considered in decision-making about using the WSWRA subsequent to initial releases in the BRWRA:

- whether using the WSWRA, in combination with the BRWRA, is necessary to achieve the recovery objective of re-establishing 100 wolves; that is, it would be used if it appears that the initial introduction in the BRWRA will not achieve a total population of 100 wolves,

- whether, based on future research, it appears that the WSWRA deer herd could support a wolf population that would contribute to meeting the recovery objective, and

- other future circumstances that could affect the feasibility of using the WSWRA, such as

**Figure 1.** **Mexican Wolf Geographic Boundaries.**



**Box 1. Geographic boundaries for Mexican wolf reintroduction (see Fig. 1).**

---

**Blue Range Wolf Recovery Area:** all of the Apache National Forest and all of the Gila National Forest.

**BRWRA primary recovery zone:** the area within the Apache National Forest bounded on the north by the Apache-Greenlee County line; on the east by the Arizona-New Mexico State line; on the south by the San Francisco River (eastern half) and the southern boundary of the Apache National Forest (western half); and on the west by the Greenlee-Graham County line (San Carlos Apache Reservation boundary).

**BRWRA secondary recovery zone:** the remainder of the BRWRA not in the primary recovery zone.

White **Sands Wolf Recovery Area:** all of the White Sands Missile Range, the White Sands National Monument, and the San Andres National Wildlife Refuge, and the area adjacent and to the west of the Missile Range bounded on the south by the southerly boundary of the U.S. Department of Agriculture Jornada Experimental Range and the northern boundary of the New Mexico State University Animal Science Ranch; on the west by the New Mexico Principal Meridian; on the north by the Pedro Armendaris Grant boundary and the Sierra-Socorro County line; and on the east by the western boundary of the Missile Range.

**WSWRA primary recovery zone:** the area within the White Sands Missile Range bounded on the north by the road from former Cain Ranch Headquarters to Range Road 16, Range Road 16 to its intersection with Range Road 13, Range Road 13 to its intersection with Range Road 7; on the east by Range Road 7; on the south by U.S. Highway 70; and on the west by the Missile Range boundary.

**WSWRA secondary recovery zone:** the remainder of the WSWRA not within the primary recovery zone.

**Mexican wolf experimental population area:** the portion of Arizona lying north of Interstate Highway 10 and south of Interstate Highway 40; the portion of New Mexico lying north of Interstate Highway 10 in the west, north of the New Mexico-Texas boundary in the east, and south of Interstate Highway 40; and that portion of Texas lying north of US Highway 621180 and south of the Texas-New Mexico boundary.

---

the wolf program budget, management concerns, future military uses of the missile range, and so on.

The Proposed Mexican Wolf Experimental Population Rule was published in the Federal Register on May 1, 1996 (pp. 19237-19248). In summary, the Proposed Rule provides:

· No one will be in violation of the ESA for unavoidable and unintentional take of a wolf within the Mexican wolf experimental population area when the take is incidental to a legal activity, such as driving, trapping, and military testing or training activities, and is promptly reported. Anyone may take a wolf in defense of human life.

• No private or tribal land use restrictions will be imposed for wolf recovery without the concurrence of the private owner or tribal government. On public lands, public access and disturbance-causing land use activities may be temporarily restricted within a one-mile radius around release pens, and around active dens between March 1 and June 30 and around active wolf rendezvous sites between June 1 and September 30.

· On *public* lands allotted for grazing, livestock owners and their designated agents: (1) may harass wolves for purposes of scaring them away from livestock provided the harassment is promptly reported, and (2) may be allowed to take wolves actually engaged in attacking livestock.

- Permission for private parties to take wolves on public grazing lands must meet all of these conditions: **1)** six or more breeding wolf pairs occur in the BRWRA, or three or more breeding wolf pairs occur in the WSWRA (if used); 2) previous livestock loss or injury by wolves has been documented by an authorized FWS, ADC, or state employee and efforts to control the offending wolves have been undertaken but have not succeeded; 3) physical evidence exists that an attack occurred at the time of the take; and 4) the take is promptly reported.

- On *private or tribally-owned land,* regardless of location, property owners and livestock owners and their designated agents may harass wolves near livestock, people, buildings, facilities, pets, or other domestic animals at any time and may take wolves attacking livestock under more liberal conditions than those applicable to public grazing lands. That is, such take can occur regardless of the number of recovered wolf pairs in the area and no requirement exists for government agencies to have completed their efforts to take the depredating wolves. However, physical evidence that an attack occurred at the time of the take must be present and the take must be promptly reported.

- Any FWS-authorized person may capture and remove or translocate reintroduced wolves consistent with a FWS-approved management plan or special management measure. These may include wolves that: **(1)** prey on livestock, (2) attack domestic animals other than livestock on private land, (3) impact game populations in ways which may inhibit further wolf recovery, (4) prey on state-endangered desert bighorn sheep on the White Sands Missile Range (if used), (5) are considered problem wolves, are a nuisance, or endanger themselves by their presence in a military impact area, or (6) are necessary for research.

- The **FWS** does not intend to change the "nonessential experimental" designation to

"'essential experimental" or "endangered" and the FWS does not intend to designate critical habitat for the Mexican wolf.

- Any taking of a wolf contrary to the experimental population rule may be referred to the appropriate authorities for prosecution.

Post-release management will follow an interagency cooperative management plan. This will include working with the Arizona Game and Fish Department to meet the requirements of its Cooperative Reintroduction Plan and working with the New Mexico Department of Game and Fish. A wolf management team representing the FWS, the State Game and Fish departments, and other cooperating agencies will determine whether particular actions are necessary. The interagency management plan will cover issues such as release pen siting, veterinary management, depredation control, capture and relocation, research, radio tracking, aerial overflights, prey monitoring, and prey habitat management. Field staff will conduct monitoring and research, trapping, depredation investigation, mortality investigation, control, and other on-the-ground actions.

**Alternative B: Reintroduction of Mexican wolves, classified as nonessential experimental, into both the Blue Range Wolf Recovery Area and the White Sands Wolf Recovery Area primary recovery zones. Wolves dispersing from the primary recovery zones will be captured and returned to the primary zones or captivity.**

In 1997, the FWS will begin to reintroduce family groups of captive-raised Mexican wolves into both the BRWRA and the WSWRA primary recovery zones and actively prevent the populations from expanding beyond these zones (Fig. 1). In the BRWRA primary recovery zone the FWS will release about eight family groups over four years with the goal of reaching a population of 20 wild wolves by 200 1. In the WSWRA primary recovery zone the FWS will release about four family groups over two years with the goal of reaching a population of **14** wild wolves by 1999. The total recovery objective will be 34 wolves.

The FWS will designate the population as nonessential experimental under the ESA. The FWS will adopt basically the same Mexican Wolf Experimental Population Rule as under Alt. A, but it would apply to the smaller areas. The FWS and its cooperators will follow the same release, monitoring, and management procedures as under Alt. A, but on a smaller scale due to the smaller areas involved. Control will be accomplished through a combination of aggressive monitoring and management methods to promptly recapture wolves that leave the primary recovery zones. Wolves could be translocated between the two areas as needed.

## Alternative C: Reintroduction of Mexican wolves, classified as endangered, into the Blue Range Wolf Recovery Area only. Wolves will be released into the primary recovery zone and unlimited dispersal will be allowed. Wolves will receive full protection under the Endangered Species Act.

In 1997, the FWS will begin to reintroduce family groups of captive-raised Mexican wolves under their current full-endangered status into the primary recovery zone of the BRWRA in east-central Arizona, following the same release procedures as under Alt.s A and B. The FWS will gradually release up to 15 family groups into the BRWRA. No releases will occur in the WSWRA. The recovery objective of the alternative is to re-establish 100 wild wolves distributed over more than 5,000 $mi^2$ by about the year 2002, consistent with the Mexican Wolf Recovery Plan. The FWS and its cooperators will monitor and conduct research on the wolves, but they will not actively manage them.

The ESA allows unrestricted dispersal; that is, the FWS will not restrict the population to the designated wolf recovery areas, as under Alternative A, or to the smaller primary recovery zones, as under Alternative B. No attempts will be made to recapture or return wolves with the possible exception of individual depredators.

The wolves will have the full protection against "take" by humans provided by the ESA. Anyone who would "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct" against a Mexican wolf will be violating the ESA. The only exceptions will

be takings to protect human life or by special permit "for scientific purposes or to enhance the propagation or survival of the affected species," 16 USC sec. 1539(a)(l)(A).

Land use restrictions could be imposed under this alternative. Restrictions could include limiting the use of predator control methods that might kill or injure wolves, closing roads, modifying livestock grazing, and imposing other protections to limit any jeopardy resulting from human activities. Other federal agencies would be expected to pursue their responsibilities under the ESA to conserve, and not harm, a recolonizing population. This would include managing to maintain and create high quality ungulate and wolf habitat.

## Alternative D: No Action

Under the No Action alternative, the FWS will take no action other than continuing its present course. It will neither release wolves nor take any other steps to directly ensure Mexican wolf recovery. The FWS will neither adopt an experimental population rule nor designate any wolf recovery areas. The agency will continue to support the captive population objectives established in the SSP Master Plan, but the agency will not support breeding for maximum growth.

Based on its current ESA obligations, the FWS would still encourage protection and expansion of wild wolf populations under this alternative, if any were discovered. No evidence exists to indicate a likelihood of natural recolonization in U.S. portions of the historic Mexican wolf range, but the FWS will support continued research on this possibility. Natural recolonization is considered extremely speculative. Based on historical wolf abundance, recent sighting reports alleged to be wolves, proximity to Mexico, and other factors, the most suitable areas for potential natural recolonization by wild wolves probably would be the mountainous parts of southeastern Arizona and southwestern New Mexico, and Big Bend National Park in southern Texas. This alternative analyzes these three areas. No confirmed sighting reports have come from these areas or from Mexico in recent years.

Any wolves that did naturally recolonize would be fully protected as an endangered species in the United States. It would be illegal to harm or harass

them except under very narrow circumstances authorized by an ESA permit.

Land use restrictions could be imposed under this alternative depending on if, and where, wolves occurred. Restrictions could include limiting the use of predator control methods that might kill or injure wolves, closing roads, modifying livestock grazing, and imposing other protections to limit any jeopardy resulting from human activities. Other federal agencies would be expected to pursue their responsibilities under the ESA to conserve, and not harm, a recolonizing population. This would include managing to maintain and create high quality ungulate and wolf habitat.

## Impacts

Table **1** summarizes the features of the four alternatives. Table 2 outlines their projected environmental consequences. The FEIS provides detailed explanations of the impacts, descriptions of the methods of impact analysis, and supporting references.

**Table 1. Summary of Mexican wolf re-establishment alternatives.**

**Key:** BR = Blue Range Wolf **Recovery Area;** WS = White Sands Wolf Recovery Area.

| Alternative | Description | Areas Analyzed | Definite Boundaries Around Recovery Areas? | Endangered Species Act Protection Status | Area Wolf Population Goal | Estimated Area to be Occupied by Wolves (square miles) |
|---|---|---|---|---|---|---|
| **A (Preferred Alternative)** | **Nonessential experimental releases allowing dispersal into secondary recovery zones;** BR first, WS back-up | **BR and WS** primary and secondary recovery zones | Yes | Per experimental population rule | RR and WS (if used) Total - 100 | BR and WS (if used): Total - **5,000** |
| B | Nonessential experimental releases preventing dispersal from primary zones | BR and WS primary recovery zones only | Yes | Per experimental population rule | ws - 14 BR - 20 Total - 34 | **WS** 720 BR - 1,000 Total **1,720** |
| C | Releases under full ESA protection | BR only plus likely dispersal areas | No | Endangered | BR - 100+ | BR - >5,000 |
| D | No releases; research and support possible natural recolonization | Southeastern Arizona, Southwestern New Mexico, and Big Bend National Park, Texas | No | Endangered (if wolves discovered) | (speculative) SE. Ariz. - 30 SWNM - 20 Big Bend NP - 5 Total - 55 | (speculative) SE Ariz. - 1,500 SW NM - 1,000 Big Bend NP - 250 Total 2,750 |

**(continued below)**

| Alternative | Meets 1982 Mexican Wolf Recovery Plan's Population Objective? | Estimated Years to Reach Area Population Goal | Estimated Annual Percentage of Established Population Lost to Control and Other Factors [1] | Major Land Use Restrictions | Intensity of Wolf Management and Control | Total Estimated Implementation Costs[2] |
|---|---|---|---|---|---|---|
| A (Preferred Alternative) | BR Yes WS - No Together Yes | BR - 9 **ws - 3** | BR - 35% **ws - 25%** | None | **Medium** | $7,247,000 (over 14 years) |
| B | WS No BR - No Together - No | **ws - 3** BR - 5 | **ws - 30%** BR - 40% | None | High | $5,890,000 (over 10 years) |
| C | BR Yes | BR - 6 | RR - 25% | Some possible | Low | $5,692,000 (over 10 years) |
| D | SE Ariz. No SW NM - No Big Bend NP - No Together - No | Decades (speculative) | No estimates | Some possible (if wolves discovered) | Low | $150,000 to $217,000 per year (period indeterminate) |

[1] In addition, about one-third of the captive-raised wolves that are released annually are expected to quickly die, disappear, disperse from the recovery area, or to require recapturing for a variety of reasons, and not to become part of the established population.

[2] See Appendix B for cost accounting.

**Table 2. Summary of key projected impacts under each alternative.**

**Notes:** Chap. 4 provides background for all information summarized here. All impacts in the back-up White Sands Wolf Recovery Area under Alt. A depend on whether the area is used. This table emphasizes quantifiable adverse impacts and is not a cost-benefit summary. Monetary losses are in 1994 dollars.

Key: BR = Blue Range Wolf Recovery Area; WS = White Sands Wolf Recovery Area.

| Alternative | Net impact of wolf recovery on wild prey populations (low to high range)[1] | Impact on annual hunter take in area (low to high range)[1] | Annual lost value of hunting (low to high range)[2] | Annual lost hunter expenditures in region (low to high range)[2] | Number of cattle killed annually (low to high range) |
|---|---|---|---|---|---|
| A (Preferred Alt.) | BR: 4,800-10,000 fewer deer; 1,200-1,900 fewer elk | BR: 300-560 fewer deer; 120-200 fewer elk | BR: $716,800-$1,336,600 | BR: $579,100-$1,079.100 | UK: 1-34 |
|  | **WS:** 1,200-3,000 fewer deer | **WS:** 10-24 fewer deer | **WS:** $3,000-$7,100 | WS: $2,900-$7,000 | **WS: 0.0 1-0.3** |
| B | RR: 970-1,900 fewer deer; 230-350 fewer elk | BR: 57-110 fewer deer; 24-33 fewer elk | RR: $123,100-**$214,800** | BR: $58,200-$101,500 | BR: **0.0.3-1** |
|  | WS: 760-2,000 fewer deer | WS: 5-11 fewer deer | **WS:** $1,500-$3,300 | WS: $1,500-$3,200 | WS: 0 |
| C | BK: 3,700-8,800 fewer deer; 870-1,700 fewer elk | BR: 240-480 fewer deer; 90-150 fewer elk | BR: $582,800-$1,119,200 | RR: $470,700-**$902,700** | BR: 1-34 |
| D[3] | not modelled | not modelled (none in Big Bend NP) | not modelled (none in Big Bend NP) | not modelled (none in Big Bend NP) | not estimated (none in Big Bend NP) |

[1] Figures given compare prey populations under the wolf reintroduction scenario, at a point in time five years after the wolf population goal for the area is achieved, to what the prey populations are projected to be if wolves are not reintroduced,

[2] These figures likely overstate the actual losses. Hunters may not actually hunt less overall because of fewer deer and elk in the wolf recovery areas, but instead turn their attention to substitute areas or species. Further, deer and elk hunting in Arizona and New Mexico are dominated by resident hunters. Most of the money not spent by residents as hunter expenditures in the region probably will be spent in some other sector of the state economy.

[3] All projected impacts in the potential natural recolonization areas are speculative.

(continued on next page)

**Table 2. Continued.**

| Alternative | Value of cattle killed annually (low to high range)* | Economic benefits | Impacts on ADC activities | Impacts on government policies and plans | Impacts on land use and military activities | Impacts on recreation |
|---|---|---|---|---|---|---|
| A (Preferred Ah.) | BR: $640-$21,600 | HR: increased recreational use value and expenditures | BR: M-44 and neck snare restrictions; limits on other tools | BR: conflict with local ordinances | BR: minor access restrictions near pens, dens, and rendezvous sites | BR: increased visitation |
|  | WS: $10-$200 | WS: little impact | WS: little impact | WS: limited conflict with local ordinances | WS: very limited access restrictions; inconvenience for security administration | WS: little impact |
| B | BR: $20-$600 | BR: limited increased recreational use value and expenditures | BR: limited M-44 and neck snare restrictions; limits on other tools | BR: no conflict | BR: minor access restrictions near pens, dens, and rendezvous sites | BR: limited increased visitation |
|  | ws: $0 | WS: no impact | WS: no impact | ws: no conflict | WS: very limited access restrictions; inconvenience for security administration | WS: no Impact |
| C | BR: $640-$21,600 | BR: increased recreational use value and expenditures | RR: M-44 and neck snare restrictions; limits on other tools | BR: conflict with local ordinances; potential conflict with San Carlos and White Mountain Apaches' tribal sovereignty | BR: access restrictions near pens, dens, and rendezvous sites; restrictions on grazing and other activities | BR: Increased visitation |
| D' | not estimated (none in Big Bend N P) | All 3 areas: increased recreational use value and expenditures | All 3 areas: M-44 and neck snare restrictions; limits on other tools | All 3 areas: no conflict | All 3 areas: access restrictions near pens, dens, and rendezvous sites; restrictions on grazing and other activities | All 3 areas: increased visitation |

[4] Livestock losses may be compensated by a private depredation compensation fund.

# Table of Contents

Abstract ............................................................................................................ IX
Summary .......................................................................................................... x

## Chapter 1: Purpose and Need for Action

Introduction ................................................................................. 1-1
Purpose ........................................................................................ 1-1
Need ............................................................................................ 1-1
Overview of the Mexican Wolf ....................................................... 1-2
Environmental Impact Statement Scoping ...................................... 1-7
  Public Involvement ..................................................................... 1-7
  Alternatives and Impact Questions Raised in Scoping ................. 1-7
  Alternatives and Impact Questions Addressed in this FEIS .......... 1-7
  Alternatives and Impact Questions not Addressed in this FEIS ..... 1-10
Permits and Clearances ................................................................ 1-12

## Chapter 2: Alternatives Including the Proposed Action

Introduction ................................................................................. 2-1
The Mexican Wolf Recovery Program .............................................. 2-1
The Soft Release Approach ............................................................ 2-1
Selection of Potential Areas for Releasing Mexican Wolves .............. 2-2
Alternative A (Preferred Alternative) .............................................. 2-5
  Actions Associated with the Alternative ...................................... 2-5
  Mitigation Measures ................................................................... 2-16
  Summary of Alternative A ........................................................... 2-17
Alternative B ................................................................................ 2-18
  Actions Associated with the Alternative ...................................... 2-16
  Mitigation Measures ................................................................... 2-21
  Summary of Alternative B ........................................................... 2-21
Alternative C ................................................................................ 2-21
  Actions Associated with the Alternative ...................................... 2-18
  Mitigation Measures ................................................................... 2-23
  Summary of Alternative C ........................................................... 2-23
Alternative D ................................................................................ 2-24
  Actions Associated with the Alternative ...................................... 2-21
  Mitigation Measures ................................................................... 2-27
  Summary of Alternative D ........................................................... 2-27
Comparison of the Alternatives ..................................................... 2-27

## Chapter 3: Affected Environments

Introduction ................................................................................. 3-1
Blue Range Wolf Recovery Area ..................................................... 3-1
  Geography .................................................................................. 3-1
  Climate ...................................................................................... 3-1
  Water.. ....................................................................................... 3-4
  Vegetation ................................................................................. 3-4

Animals ................................................................................................... 3-4
Land ownership and management .......................................................... 3-8
Agency and local government plans and policies ................................... 3-9
Land development .................................................................................. 3-10
Livestock grazing .................................................................................. 3-11
Forestry .................................................................................................. 3-11
Mining and other natural resource extraction ...................................... 3-12
Public access and recreation ................................................................ 3-13
Regional economy, employment and population ................................... 3-13
Likely Dispersal Areas Associated with the Blue Range Wolf Recovery Area ............... 3-14
San Carlos and White Mountain Apache Reservations ......................... 3-14
History of wolves ............................................................................... 3-14
San Carlos Apache Reservation ............................................................ 3-16
White Mountain Apache Reservation .................................................... 3-19
Lakeside Ranger District, Sitgreaves National Forest ........................... 3-24
San Mateo Mountains Unit of Cibola National Forest. .......................... 3-25
White Sands Wolf Recovery Area ........................................................... 3-25
Geography ............................................................................................ 3-25
Climate ................................................................................................. 3-27
Water .................................................................................................... 3-27
Vegetation ............................................................................................ 3-29
Animals ................................................................................................ 3-29
Land ownership and management ........................................................ 3-33
Land development ................................................................................. 3-33
Livestock grazing .................................................................................. 3-35
Mining and other natural resource extraction.. .................................... 3-35
Military activities ................................................................................. 3-35
Public access and recreation ................................................................ 3-36
Regional economy, employment and population ................................... 3-36
White Sands National Monument .......................................................... 3-36
Jornada Experimental Range ................................................................ 3-37
The Potential Natural Recolonization Areas ......................................... 3-38
Southeastern Arizona ........................................................................... 3-38
Coronado National Forest South of Interstate 10 ................................. 3-38
Coronado National Memorial ............................................................... 3-45
Chiricahua National Monument ........................................................... 3-45
Fort Huachuca .................................................................................... 3-46
Southwestern New Mexico ................................................................... 3-47
Big Bend National Park ....................................................................... 3-50

## Chapter 4:    Environmental Consequences

Introduction ......................................................................................... 4-1
Consequences of Alternative A (Preferred Alternative) ......................... 4-2
Blue Range Wolf Recovery Area ............................................................ 4-2
Impacts on wild prey of wolves .......................................................... 4-2
Impacts on hunting ............................................................................ 4-4
Impacts on livestock ........................................................................... 4-4
Impacts on predator control programs ................................................ 4-10
Impacts on agency, tribal, and local government policies and plans ......... 4-10

Impacts on land use ................................................................................................4-12
Impacts on recreation ...........................................................................................4-12
Regional economic impacts ...................................................................................4-12
White Sands Wolf Recovery Area ............................................................................    4-15
Impacts on wild prey of wolves .............................................................................    4-15
Impacts on hunting...............................................................................................    4-15
Impacts on livestock .............................................................................................    4-15
Impacts on predator control programs .................................................................    4-I 7
Impacts on agency, tribal, and local government policies and plans .......................4-17
Impacts on military activities and land use ............................................................    4-17
Impacts on recreation ...........................................................................................    4-18
Regional economic impacts ...................................................................................    4-18
Summary of Adverse Effects of Alternative A in the BRWRA and the WSWRA ........................4-19
Short-term and Long-term Effects ........................................................................    4-19
Irreversible and Irretrievable Commitments of Resources ....................................................4-20
Cumulative Effects ...............................................................................................    4-20
Consequences of Alternative B ...................................................................................    4-23
Blue Range Wolf Recovery Area Primary Recovery Zone .........................................    4-23
Impacts on wild prey of wolves .............................................................................    4-23
Impacts on hunting ..............................................................................................    4-23
Impacts on livestock .............................................................................................    4-23
Impacts on predator control programs ..................................................................    4-25
Impacts on agency and local government policies and plans ...................................    4-25
Impacts on land use ..............................................................................................    4-25
Impacts on recreation ...........................................................................................    4-25
Regional economic impacts ...................................................................................    4-25
White Sands Wolf Recovery Area Primary Recovery Zone ......................................    4-27
Impacts on wild prey of wolves .............................................................................    4-27
Impacts on hunting...............................................................................................    4-27
Impacts on livestock .............................................................................................    4-28
Impacts on predator control programs ..................................................................    4-28
Impacts on agency and local government policies and plans ...................................    4-28
Impacts on military activities and land use ............................................................    4-28
Impacts on recreation ...........................................................................................    4-28
Regional economic impacts ...................................................................................    4-28
Summary of Adverse Effects of Alternative B in the
    BRWRA and WSWRA Primary Recovery Zones ................................................    4-28
Short-term and Long-term Effects ........................................................................    4-29
Irreversible and Irretrievable Commitments of Resources .....................................    4-29
Cumulative Effects ...............................................................................................    4-30
Consequences of Alternative C ...................................................................................    4-30
Introduction ........................................................................................................    4-30
Blue Range Wolf Recovery Area ............................................................................    4-30
Impacts on wild prey of wolves .............................................................................    4-30
Impacts on hunting ..............................................................................................    4-31
Impacts on livestock .............................................................................................    4-31
Impacts on predator control programs ..................................................................4-31
Impacts on agency, tribal, and local government policies and plans ....................."..........4-31
Impacts on land use...............................................................................................4-33
Impacts on recreation ...........................................................................................    4-33

Regional economic impacts ........................................................................................... 4-34
Impacts in Likely Dispersal Areas .............................................................................. 4-34
Summary of Adverse Effects of Alternative C ........................................................ 4-37
Short-term and Long-term Effects ............................................................................. 4-37
Irreversible and Irretrievable Commitments of Resources .............................. 4-38
Cumulative Effects ......................................................................................................... 4-38
Consequences of Alternative D .......................................................................................... 4-39
Introduction ....................................................................................................................... 4-39
The Potential Natural Recolonization Areas ....................................................................... 4-39
Southeastern Arizona ..................................................................................................... 4-39
Southwestern New Mexico ........................................................................................... 4-41
Big Bend National Park .................................................................................................. 4-42
Summary of Adverse Effects of Alternative D in the Three Potential
Natural Recolonization Areas ................................................................................... 4-43
Short-term and Long-term Effects ............................................................................. 4-43
Irreversible and Irretrievable Commitments of Resources .............................. 4-43
Cumulative Effects ......................................................................................................... 4-44

## Chapter 5: Consultation and Coordination

Development of the Proposal and Draft and Final Environmental Impact Statements ................... 5-1
Agencies, Organizations, and Persons Sent the DEIS for Review ........................................ 5-2
List of Preparers .......................................................................................................................... 5-6
Agency, Government, Tribal, and Legislator Comments on the DEIS
with Fish and Wildlife Service Responses ........................................................................... 5-11
Public Comment Summary with Fish and Wildlife Service Responses ............................... 5-80

## Appendices

Appendix A:  Mexican Gray Wolf Life History and Ecology.. ............................................. A-1
Appendix B:  Projected Costs of Implementing the Alternatives ...................................... B-1
Appendix C: Proposed Mexican Wolf Experimental Population Rule .............................. c-1
Appendix D: Section 7 Consultation on Proposed Action ................................................. D-1
Appendix E: Arizona Game and Fish Department's Twelve-Step
Procedure for Reestablishment of Nongame and Endangered Species ....................... E-1
Appendix F:  Background Information on Livestock Depredation Projections .................. F-1
Appendix G:  Glossary .......................................................................................................... G-1
Appendix H:  Literature Cited.. ........................................................................................... H-1
Appendix I: List of Scientific Names ................................................................................. I-1
Appendix J:  Update on Yellowstone and Central Idaho Gray Wolf
Reintroductions and Economic Benefits of Wolf Recovery.. ...................................... J-1
Appendix K: Response to Mr. Dennis Parker's Comment on the DEIS ........................... K-1

# List of Tables and Boxes

**Table 1-1.** Most common questions raised during public scoping and their treatment in this final environmental impact statement................................................... 1-8

**Table 2-1.** Suitability rankings of candidate areas for releasing Mexican wolves ........................................................................................................................2-4

**Box 2-1.** Geographic boundaries for Mexican wolf reintroduction ................................................ 2-7

**Table 2-2.** Projected wolf population growth to recovery area goal after releases into the Blue Range Wolf Recovery Area under nonessential experimental classification (Alternative A) ............................... 2-8

**Table 2-3.** Projected wolf population growth to recovery area goals after releases into the White Sands Wolf Recovery Area under nonessential experimental classification (Alternative A) ............................... 2-10

**Table 2-4.** Projected wolf population growth to recovery area goal after releases into the Blue Range Wolf Recovery Area under nonessential experimental classification with restricted dispersal (Alternative B) ................................................................................... 2-19

**Table 2-5.** Projected wolf population growth to recovery area goal after releases into the White Sands Wolf Recovery Area under nonessential experimental classification with restricted dispersal (Alternative B) ................................................................................... 2-20

**Table 2-6.** Projected wolf population growth to recovery area goal after releases into the Blue Range Wolf Recovery Area with full Endangered Species Act protection (Alternative C) ............................... 2-22

**Table 2-7.** Summary of Mexican wolf re-establishment alternatives ........................................ 2-28

**Table 2-8.** Summary of key projected impacts under each alternative ...................................... 2-29

**Table 3-1.** Average harvests, numbers of hunters, and success rates in the general BRWRA area, 1988-1992 ................................................................. 3-8

**Table 3-2.** Approximate predator densities, 1993-94, and total predators taken by ADC, 1987-91, in Arizona portion of Apache National Forest ................................................................................... 3-9

**Box 3-1.** General description of southwestern cattle ranching ................................................ 3-12

**Table 3-3.** Summary of regional U.S. Census data for Blue Range wolf recovery area ................................................................................... 3-15

**Table 3-4.** Summary of regional U.S. Census data for Blue Range wolf recovery area, primary recovery zone only ................................................................................... 3-15

**Table 3-5.** Game densities on San Carlos Apache Reservation, 1993-94 estimate ................................................................................... 3-18

**Table 3-6.** San Carlos game permits, harvest, and hunter success for tribal members and non-members, and fee revenue for non-member permit sales, 1993-94 hunt year ................................................................. 3-18

**Table 3-7.** Summary of regional U.S. Census data for the San Carlos Apache Reservation ................................................................................... 3-20

**Table 3-8.** Population estimates, densities, and estimated habitat areas of potential wolf prey species on the White Mountain Apache Reservation ................................................................................... 3-21

**Table** 3-9. White Mountain Apache Reservation non-member hunting revenues for 1994 ............................................................................. 3-22

**Table** 3-10. White Mountain Apache Reservation livestock losses reported to APHIS-ADC, 1990-92 ..................................................... 3-23

**Table** 3-1 1. Summary of regional U.S. Census data for the White Mountain Apache Reservation ................................................................. 3-24

**Table** 3-12. Average annual temperatures for White Sands Missile Range, New Mexico ...................................................................................... 3-29

**Table** 3-13. Population estimates of ungulate prey species for the WSWRA, 1994 .................................................................................................. 3-30

**Table** 3-14. Oryx population estimates for the WSWRA .......................... 3-31

**Table** 3-15. Average annual mule deer harvest, White Sands Missile Range, 1989-1993 ................................................................................ 3-32

**Table** 3- 16. Average annual pronghorn and oryx harvest, White Sands Missile Range, 1986-1993 ..................................................... 3-33

**Table** 3-17. Summary of regional U.S. Census data for White Sands wolf recovery area ........................................................................ 3-37

**Table** 3-1 8. Number and density of potential wild prey of wolves in Coronado National Forest south of Interstate 10 ..................... 3-43

**Table** 3-19. Predator population estimates and densities in Arizona Game and Fish Department management units corresponding to Coronado National Forest south of Interstate 10. ....................... 3-44

**Table** 3-20. Summary of regional U.S. Census data for southeastern Arizona potential natural recolonization area ............................... 3-46

**Table** 3-21. Summary of regional U.S. Census data for southwestern New Mexico potential natural recolonization area ....................... 3-5 1

**Table** 3-22. Summary of regional U.S. Census data for Big Bend National Park potential natural recolonization area ...................... 3-54

**Box** 4-1. Modelling Mexican wolf impacts on prey populations ............. 4-3

**Table** 4- 1. Estimated annual reduction of hunting five years after achievement of recovery area goals in the BRWRA under Alternative A ...................................................................................... 4-5

**Box** 4-2. Calculating Mexican wolf impacts on hunting and associated economic values ................................................................................. 4-6

**Box** 4-3. Projecting rates of Mexican wolf livestock depredation ............ 4-7

**Table** 4-2. Mean livestock depredation rates from northern study areas ............................................................................................. 4-8

**Table** 4-3. Number and percentage of cattle available projected to be killed annually by Mexican wolves after achievement of recovery area goals .................................................................... 4-9

**Table** 4-4. Estimated annual livestock depredation costs after achievement of recovery area goals in the BRWRA under Alt. A ..................................................................................................... 4-9

**Table** 4-5. Estimated annual reduction of hunting-related economic value and expenditures in region five years after achievement of recovery area goals in the BRWRA under Alternative A ................. 4-13

**Table** 4-6. Estimated annual reduction of hunting five years after achievement of recovery area goals in the WSWRA under Alternative A. ..................................................................................... 4-16

Table 4-7. Estimated annual livestock depredation costs after
achievement of recovery area goals in the WSWRA under Alt. A. ........................................................ **4-16**

Table 4-8. Estimated annual reduction of hunting-related economic
value and expenditures in region five years after achievement
of recovery area goals in the WSWRA under Alternative A ............................................................... **4-19**

Table 4-9. Estimated annual reduction of hunting five years after
achievement of recovery area goals in the BRWRA primary
recovery zone under Alternative B ................................................................................. 4-24

Table 4-10. Estimated annual livestock depredation costs after
achievement of recovery area goals in the BRWRA primary
recovery zone under Alternative B ................................................................................. 4-24

Table 4-l 1. Estimated annual reduction of hunting-related economic
value and expenditures in region five years after achievement
of recovery area goals in the BRWRA primary recovery zone
under Alternative B .................................................................................................... 4-26

Table 4-12. Estimated annual reduction of hunting five years
after achievement of recovery area goals in the WSWRA primary
recovery zone under Alternative B ................................................................................. 4-27

Table 4-13. Estimated annual reduction of hunting-related economic
value and expenditures in region five years after achievement
of recovery area goals in the WSWRA primary recovery zone
under Alternative B .................................................................................................... 4-29

Table 4-14. Estimated annual reduction of hunting five years after
achievement of recovery area goals in the BRWRA under
Alternative C ...........................................................................................................4-32

Table 4-15. Estimated annual livestock depredation costs after
achievement of recovery area goals in the BRWRA under Ah. C ............................................. 4-32

Table 4-16. Estimated annual reduction of hunting-related economic
value and expenditures in region five years after achievement
of recovery area goals in the BRWRA under Alt. C ............................................................ 4-34


Table 5-1. How people commented ........................................................................... 5-83


Table F-l. Low range of estimated annual number of cattle killed
after Mexican wolf re-establishment based on comparison
with Alberta, Minnesota, and Montana study areas ............................................................ F-4

Table F-2. High range of estimated annual number of cattle killed
after Mexican wolf re-establishment based on comparison
with Alberta, Minnesota, and Montana study areas ............................................................ F-5

# List of Figures

Fig. 1. Mexican Wolf Geographic Boundaries ....................................................................... vi

Fig. 1-1. Approximate historic range of the Mexican wolf............................................................ 1-4

Fig. 1-2. Wolves reported taken by federal and state cooperative
hunters in Arizona and New Mexico, fiscal years 1916
through 1960 .................................................................................................................1-6

Fig. 2-1. Five candidate areas for releasing Mexican wolves .................................... 2-3

Fig. 2-2. Blue Range Wolf Recovery Area.............................................................. 2-5

Fig. 2-3. White Sands Wolf Recovery Area ........................................................... 2-9

Fig. 2-4. Mexican wolf geographic boundaries ..................................................... 2-13

Fig. 2-5. Mexican wolf potential natural recolonization areas,
southeastern Arizona and southwestern New Mexico ................................................ 2-25

Fig. 2-6. Mexican wolf potential natural recolonization area,
Big Bend National Park, Texas ......................................................................... 2-26

Fig. 3-1. Affected areas under Alternatives A, B, and C in the
BRWRA region..................................................................................................3-2

Fig. 3-2. Affected areas under Alternatives A and B in the
WSWRA region ......................................................................................... 3-3

Fig. 3-3. Blue Range Wolf Recovery Area .......................................................... 3-4

Fig. 3-4. White Sands Wolf Recovery Area......................................................................3-27

Fig. 3-5. White Sands Missile Range extension areas .......................................... 3-28

Fig. 3-6. Impact areas and range centers...............................................................3-34

Fig. 3-7. Mexican wolf potential natural recolonization areas,
southeastern Arizona and southwestern New Mexico ...................................... 3-39

Fig. 3-8. Mexican wolf potential natural recolonization area,
Big Bend National Park, Texas ......................................................................... 3-40

**Chapter 1**

# Purpose and Need for Action



# CHAPTER 1
# Purpose and Need For Action

## Introduction

This final environmental impact statement (FEIS) addresses the reintroduction of the endangered Mexican gray wolf (*Canis lupus baileyi*), a subspecies of the gray wolf, within part of its historic range in the southwestern United States. Formerly found in many of the mountainous areas of the Southwest and Mexico, the Mexican wolf has been extirpated from the United States and may have been extirpated from Mexico, where it has not been confirmed to exist since the early 1980's. The only known Mexican wolves reside in captivity in a breeding program overseen by the United States Department of Interior, Fish and Wildlife Service (FWS), Region 2, headquartered in Albuquerque, New Mexico, in cooperation with Mexican authorities.

This chapter begins with a discussion of the purpose and need for the reintroduction action proposed by the FWS. Then, an overview description of the Mexican wolf is provided. The public scoping process that helped define the issues to be covered in the draft environmental impact statement (DEIS), then in this FEIS, is then reviewed. Chap. 1 concludes with a list of the various permits and approvals that may be needed to implement a decision arising out of this federal environmental impact assessment process.

## Purpose

The Mexican Wolf Recovery Plan, adopted under rhe authority of the Endangered Species Act (ESA), has two prime recovery objectives: maintaining a captive population and re-establishing at least 100 wild wolves in a 5,000 mi² area within the subspecies' historic range (Mex. Wolf Rec. Team 1982).[1] Thep urpose of the proposed action (Alter-

native A, now designated as the Preferred Alternative) in this FEIS is to begin implementing the re-establishment objective of the Recovery Plan by releasing Mexican wolves from the captive population into the wild.

Commencing in 1997, or as soon thereafter as practical, the FWS will gradually release up to 15 pairs or family groups into the Blue Range area of east-central Arizona. Also, if it is determined to be necessary and feasible, up to five pairs or family groups may be released into the back-up area, the White Sands Missile Range of south-central New Mexico. The objective is to re-establish 100 wild Mexican wolves distributed over 5,000 mi² by the year 2005. The FWS and cooperating agencies will closely monitor and study the reintroduced wolves. Management of the reintroduction will be constantly evaluated and adapted as new circumstances arise.

This proposal represents the beginning of recovery for the Mexican wolf in the wild within a small part of its former range and the proposal contributes to conservation of the gray wolf species as a whole. Full recovery of the Mexican wolf subspecies likely will require additional reintroduction projects elsewhere and may take several decades to accomplish.[2] Full recovery is beyond the scope of this EIS.

## Need

The FWS is acting under the ESA, which directs the Secretary of Interior to develop and implement recovery plans for species and subspecies such as the Mexican wolf that are in danger of human-caused extinction, 16 USC sec. 1533(f). The FWS also agreed to make "expeditious" progress toward Mexican wolf recovery under a 1993 settlement of a lawsuit filed by several private groups that advocate wolf recovery.[3]

---

[1] Written materials relied on in this EIS are cited by the author's last name and the year of publication. Full citations are provided alphabetically in Appendix H.

[2] Downlisting and delisting would occur after meeting population and other recovery criteria to be defined in a revised Mexican Wolf Recovery Plan, currently in the revision process. Complete restoration throughout the subspecies' former range is neither required nor planned.

[3] *Wolf Action Group, et al. v. United States, et al.*, U.S. District Court for the District of New Mexico, Civil Action No. CIV-90-0390-HB.

Purpose and Need for Action

Other federal agencies are required by the ESA to take actions within their authority to conserve threatened and endangered species, 16 USC sec. 153 1 (c) ( 1). This is to be done in consultation with the FWS, 16 USC sec. 1536(a)( 1). States that have entered into cooperative agreements with the Secretary of Interior, which include Arizona, New Mexico, and Texas, also have responsibilities to conserve threatened and endangered species, 16 USC sec. 1535. The State of New Mexico has its own endangered wildlife law that provides for conservation of listed species including the gray wolf, the Wildlife Conservation Act (Secs. 17-2-37 through 17-2-46, NMSA 1978) and State Game Commission Regulation No. 682 (Amending the Listing of Endangered Species and Subspecies of New Mexico 1990). Arizona's Game and Fish Department also has a policy supporting endangered species recovery (AGFD 1987). The Department has drafted a "Cooperative Reintroduction Plan for the Mexican Wolf in Arizona" that calls for a joint reintroduction effort with the FWS in the Blue Range area (Groebner et al. 1995).

Additional duties to recover the Mexican wolf arise from international law. Both Mexico and the United States signed the Convention on Nature Protection and Wildlife Preservation in the Western Hemisphere, which took effect in 1942. Its preamble states the parties desire "to protect and preserve in their natural habitat representatives of all species and genera of their native flora and fauna." Mexican wolf recovery would serve to implement this convention (anon. 1985).

Recovery programs for the gray wolf are underway elsewhere in the United States; however, they involve less rare subspecies. Experts have rated recovery of the Mexican wolf subspecies as the highest priority of all such programs.[4] The subspecies is genetically distinct from other wolves (Wayne et al. 1992), and no confirmed population exists outside captivity. It is one of the rarest land mammals in the world.

## Overview of the Mexican Wolf

## Description

The Mexican wolf is among the smallest of the North American gray wolves. Adults weigh 50 to 90 Ibs., average 4'6" to 5'6" in total length, and reach 26" to 32" in height at the shoulder (Young and Goldman 1944, Brown 1983). Its pelt color varies. The "lobe"-its popular name-is the southernmost subspecies of what once was the most wide-ranging species of the North American mammals (Paradiso and Nowak 1982).

Appendix A summarizes what is known about Mexican wolf life history and ecology. However, little scientific research was done while the animal existed in the wild. The only field data came from a period of rapidly dwindling numbers when human activities had disrupted pack structures and natural prey populations.

## Taxonomy

Hall and Kelson (1959), relying heavily on the prior work of Young and Goldman (1944), described 24 subspecies of gray wolves (*Canis* lupus) in North America, five of which occurred in the southwestern United States and Mexico: *C. l. baileyi, C. l. mogollonensis, C. 1. monstrabilis, C. l. nubilus,* and *C. l. youngi.* A taxonomic revision proposed by Bogan and Mehlhop (1980 and 1983), and adopted by the Mexican Wolf Recovery Team and the FWS (Mex. Wolf Rec. Team 1982, USFWS 1984), lumped *C. l. mogollonensis* and C. l. *monstrabiiis* into *C. 1. baileyi.* In a recent reclassification of North American gray wolves, Nowak (1995) proposed reducing the original 24 named subspecies to five, of which *C. l. baileyi* is one. However, Nowak's reclassification differs from that proposed by Bogan and Mehlhop in that Nowak includes *C. l. mogoffonensis* and C. l. *monstrabilis* with *C. l. nubilus* rather than with *C. l. baileyi.* It should be noted that no individual taxonomist or publication has official or ruling status on questions of mammalian taxonomy.

---

[*]**The Wolf Specialist Group, a worldwide body of experts on wolves organized under the International Union for the Conservation of Nature (the World Conservation Union), Species Survival Commission, has endorsed Mexican wolf recovery "as its highest priority project"** (Mech 1990).

The classifications proposed by Hall and Kelson (1959), Bogan and Mehlhop (1980), and Nowak (I 995) were based on comparisons of morphological characteristics, primarily skull measurements. They all concluded that *C. l. baileyi* is a morphologically distinct subspecies of gray wolf. Molecular genetic analyses have identified distinct attributes of Mexican wolves (Garcia-Moreno 1995, Hedrick 1995, see Appendix K). Thus, consensus exists among experts that *C. l. baifqi* is a distinct gray wolf subspecies. However, the lingering question of which of the formerly recognized subspecies (Hall and Kelson 1959) belong to *C. l. bailqi* continues to confuse the delineation of the Mexican wolf's historic distribution.

## Historic Distribution

As indicated above, the drafters of the original Mexican Wolf Recovery Plan accepted the recommendations of Bogan and Mehlhop **(1980)** and included the ranges of the former C. l. *mogollonensis* and *C. l. monstrabilis* in the range of C. *l. baileyi* (Mex. Wolf Rec. Team 1982). However, in Nowak's (1995) opinion, the original core geographic range of *C. l. bailqi* extended just north of the Gila River, which bisects the Gila National Forest. This brings into question the taxonomic affinity of specimens collected from the Gila National Forest area (Nowak 1995). Nowak does not describe the limits of the northeastern portion of his proposed range for the Mexican wolf, but the line on his map appears to bisect White Sands Missile Range then turns southeast through western Texas and enters Mexico just east of Big Bend National Park. Nowak **(1995)** speculates that individuals from the core geographic range of *C. l. baileyi* regularly dispersed into the range of populations to the north. He found that, following the large-scale extermination of wolves in the southwestern U.S., the later occurrence of wolves in these areas was attributable to *C. l. baileyi* dispersing from Mexico (Nowak 1995).

In reality, the boundaries between ranges of adjacent gray wolf subspecies were wide zones of intergradation where genetic mixing between subspecies occurred, rather than distinct lines on a map

(Mech 1970, Brewster and Fritts 1994). The width of these zones relates to the ability of wolves to disperse. They are capable of dispersing hundreds of miles, with the longest known dispersal exceeding 550 miles (Fritts 1983). Thus for gray wolves, these zones of subspecies intergradation were likely hundreds of miles wide.

In light of these considerations, the Mexican Wolf Recovery Team has determined that the probable historic range of the Mexican wolf included the core geographic range of *C. l. baifqi,* plus an approximately 200-mile extension to the north and northwest of that area (Fig. l-l) (D. Parsons, USFWS, pers. comm.). This range delineation includes the core range of *C. l. baileyi* as described by Young and Goldman (1944), Hall and Kelson (1959), and Nowak (1995); includes much of the expanded range resulting from the consolidation of subspecies proposed by Bogan and Mehlhop (1980); accommodates the range expansion of *C. l. baileyi* following extermination of adjacent wolf populations described by Nowak (1995); and is consistent with the dispersal capability of gray wolves. Fig. 1- 1 delineates the probable historic range of *C. l. baifqi* for purposes of reintroducing the subspecies into the wild with experimental status, 50 CFR 17.81(a). Chap. 3 on the Affected Environment summarizes the historical evidence of wolves for each of the recovery areas under consideration.

The last 100 years have seen the Mexican wolf's range, which in the past may have sustained a population of many thousands, shrink very severely. Not all habitat types within the area in Fig. l-l were occupied by these wide-ranging predators, however. Historic reports refer to the Mexican wolf as primarily associated with forested mountainous terrain (Bednarz 1988). While it does not require particular vegetation, it reportedly most often occurred above 4,500 feet elevation in or near woodlands of pine[5], oak, or pinon-juniper, interspersed with grasslands (Brown 1983).

---

[5]Appendix **I provides a List of Scientific Names for all species mentioned.**

Figure 1-1.  Approximate historic range of the Mexican wolf.



## Reasons for Listing

Many factors contributed to the Mexican wolf's demise, but its reputation as a livestock killer, which led to concerted federal eradication efforts, was predominant (Brown 1983, McBride 1980). Other less important factors were: commercial and recreational hunting and trapping; killing of wolves by game managers on the theory that more game animals would be available for hunters (Leopold 1944); habitat alteration; and human safety concerns (although no documentation exists of Mexican wolf attacks on humans).

Fig. 1-2 illustrates the subspecies' rapid decline in New Mexico and Arizona following initiation of federal eradication efforts in 1915. After about 15 years of' trapping, shooting, and poisoning of adults, and "denning" of pups (digging them out of dens and killing them), very few Mexican wolves remained. The last killings by control agents occurred around 1960. A similar decline occurred in Texas (Scudday 1977). Eradication efforts were stimulated by bounties offered by federal, state, and local governments, as well as livestock associations and individual ranchers (Mex. Wolf Rec. Team 1982).

It is difficult now to assess the accuracy of reports regarding the Mexican wolf's historic impact on livestock (see Appendix A, Livestock Depredation section). Some representative quotes from commentators illustrate the animal's reputation as a livestock killer:

> "In my opinion, the lobo is the cruelest, most wanton killer of all our Southwestern predators. Bears and lions do sometimes become stock killers, and both do sometimes kill wantonly, beyond the need for food. But such animals are the exceptions to the rule: whereas the opposite is true, in my opinion of the lobo.... A favorite method of killing large animals is to hamstring the animal, breaking him down and making him completely helpless.... A few incidents like this will teach anyone to hate wolves.... The Fish and Wildlife Service (formerly The Biological Survey) has rendered an invaluable service to the livestock and game interests of the Southwest by the determined warfare they have carried on against the lobo." (Evans 1951).

> "The gray wolf was abundant in northern Mexico (present day New Mexico), where 'they sometimes make dreadful havoc among the cattle, frequently killing and devouring even mules and horses'" (Gregg, quoted in Young and Goldman 1994).

> "Wolves' hunting techniques changed when ranchers began to settle the West and bring in livestock. Deer, always difficult for canids to obtain, became increasingly scarce under the pressure of subsistence hunting by homesteaders, miners, and cowboys. More importantly, livestock were easy picking everywhere. Once set, this table was too easy to resist.... the adaptable wolves readily abandoned their natural prey and turned almost entirely to cattle." (D.E. Brown 1983).

> "The big wolves, the worst predatory enemy of cattle, have been brought under control.... We are concerned merely to the extent of preventing reinfestation from Mexico." (Ligon 1927).

The apparently high historical depredation rates are inconsistent with the situation now in other areas where gray wolves and cattle co-exist, such as the northern Rocky Mountains and northern Minnesota, where depredation is quite uncommon relative to livestock numbers available (range: 0.004% to 0.09% of available cattle killed by wolves annually; Mack et al. 1992). Gipson (quoted in McIntyre 1994) questions the validity of historic accounts of wolf depredation rates.

## Status

The subspecies is now considered extirpated from the southwestern United States because no wild wolf has been confirmed to exist since 1970. Occasional sightings of "wolves" continue to be reported from U.S. locations but, to date, none have been confirmed through clear evidence, despite continuing investigation (Girmendonk 1994a, Whitaker et al. 1995, Wolok 1994).

Survival of the animal in the wild in Mexico also remains unconfirmed. Based on field surveys in 1977-1978, McBride (1980) estimated that "some 50 wolves may still inhabit Mexico." Computer

**Figure 1-2. Wolves reported taken by federal and state cooperative hunters in Arizona and New Mexico, fiscal years 1916 through 1960.**



Notes: Based on annual reports of Arizona and New Mexico districts of the Predatory Animal and Rodent Control (PARC) bureau. May include some wolves not discussed in PARC reports and some animals that were not wolves.

*Estimates

**SOURCE:** Brown (1983)

simulations by Ardura (1992), based on McBride's estimate, indicated a high probability that this suggested population of 50 remnant wolves would be extinct by 1994 (although the simulations relied on unverifiable assumptions). Recent field research has revealed few reports, and no confirmation, of wolves remaining in Mexico (Carrera 1994). Investigation is continuing.

The Mexican wolf was listed as an endangered subspecies in 1976 (41 FR 17736). In 1978, the gray wolf species in North America south of Canada was listed as endangered, except in Minnesota where it was listed as threatened (43 FR 9607). This listing of the species as a whole continued to recognize valid biological subspecies for purposes of research and conservation (43 FR 96 10). The Directors of the FWS and the Mexican Direccíon General de la Fauna

Silvestre approved the Mexican Wolf Recovery Plan in 1982 (Mex. Wolf Rec. Team 1982). The Plan recognizes that the subspecies' recovery depends on re-establishment in suitable habitats within its historic range.

Two males and one pregnant female captured in the wild in Mexico from 1977 to 1980 and the uncaptured mate of the pregnant female founded the certified captive population of Mexican wolves. In 1995, the Mexican Wolf Recovery Team approved the addition of two other captive Mexican wolf lineages, representing four additional founders, into the certified population, based on state-of-the-art genetic analysis. One is known as the Ghost Ranch lineage, some of which were kept and bred at the Ghost Ranch Living Museum in northern New Mexico; the other is the Aragon lineage based at the

Aragon Zoo in Mexico City. As of March, 1996, the total certified captive population in the three lineages stood at 139 animals; 114 are held at 24 facilities, mostly zoos and wildlife sanctuaries, in the United States and 25 are held at five facilities in Mexico. The FWS also has a captive population management facility on the Sevilleta National Wildlife Refuge in central New Mexico to hold surplus wolves from the other facilities (USFWS 1994a). These surplus animals would be the potential release stock if the FWS undertakes the proposed reintroduction effort.

## Environmental Impact Statement Scoping

### Public Involvement

The FWS has involved the public, pursuant to 40 CFR sec. 150 1.7, in determining the significant questions that this EIS should address. At the time of the public scoping in 1991 and 1992, five candidate areas for releasing Mexican wolves were under consideration. These five areas had been identified by the FWS and the Arizona, New Mexico, and Texas state wildlife agencies as potentially suitable for wolf release (USFWS 1992). The areas were centered on: 1) the Blue Range, 2) the Chiricahua Mountains, 3) the Galiuro and Pinaleno Mountains, and 4) the Atascosa and Patagonia Mountains, all in Arizona; and 5) the White Sands Missile Range in New Mexico.

The FWS held four public meetings, two in Tucson, Arizona, one in Las Cruces, New Mexico, and one in Albuquerque, New Mexico. Written comment periods followed each meeting and followed publication of the FWS's Notice of Intent to Prepare an Environmental Impact Statement (USFWS 1992). 0ver 838 people attended the meetings and the FWS received a total of 1,324 written comments during the comment periods (Jenkins 1993). These consisted of individual letters, form letters, responses to opinion questionnaires sent

out by private groups, and petitions. All comments were tabulated. The 65 oral comments made during the three recorded public meetings were transcribed and tabulated. Also, numerous other agencies and experts have been consulted (see Chapter 5 - Coordination and Consultation).'

## Alternatives and Impact Questions Raised in Scoping

The public raised approximately 112 definable questions in eight general categories (Jenkins 1993). Some questions related to the alternative actions to be considered; most related to the potential impacts of wolf releases. Table 1-1 identifies the most common questions and the alternatives or environmental impacts to which the questions relate.

The Mexican Wolf EIS Interdisciplinary Team, charged with overseeing the writing of this document, determined which of the questions raised in the public scoping process represented reasonable alternatives or potentially significant impacts meriting treatment in the FEIS, pursuant to 40 CFR sec. 150 1.7(a) (2).[7] Table 1 - 1 indicates the Interdisciplinary Team's determinations for the most common questions.

## Alternatives and Impact Questions Addressed in this FEIS

### Alternatives

The Notice of Intent to Prepare an Environmental Impact Statement (USFWS 1992) preliminarily identified three alternative actions under consideration for the candidate areas:

·    reintroduction of captive-raised Mexican wolves classified as a nonessential experimental population,

·    reintroduction under full protection of the

---

"The scoping process occurred prior to the issuance of President Clinton's 1994 Executive Order, No. 12898, entitled "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations." Environmental justice issues were not commonly raised in the scoping process. Based on the analysis in this FEIS, the proposed action is not expected to significantly impact minority or low-income populations.

'Members of the Interdisciplinary Team are identified in the List of Preparers in Chapter 5.

**Table l-l. Most common questions raised during public scoping and their treatment in this final environmental impact statement.**

Key:   l = addressed in Chap. l on purpose, need, and Mexican wolf overview,
       2 = addressed in Chap. 2 on alternatives
       3 = addressed in Chap. 3 on affected environment
       4 = addressed in Chap. 4 on consequences
       **A** = addressed in Appendix A on Mexican wolf life history and ecology
       X = alternative or impact question not addressed directly in FEIS, see text for explanation

**Treatment**

**Questions Related to Alternatives or Planning**

**X**  A:   Should release sites in Mexico be considered?
X   B:   Should release sites in Texas be considered!
2   C:   Should reintroduced Mexican wolves be designated as experimental and non-essential to the continued existence of the species?
2   D:   Should reintroduced Mexican wolves retain full endangered species status and related protection?
2   E:   Should additional areas be considered as release sites?
2   F:   Should more than one initial release site be considered?
2   G:   Should wolves that disperse off of target recovery areas be controlled?

**Questions Related to Potential Impacts**

*1. Livestock Depredation Impacts*

4   A:   Will wolves prey on domestic livestock?
4   B:   Will livestock depredation impacts be significant?
2,A   C:   Could changes in livestock management practices reduce the depredation impacts?

*2. Economic Impacts*

2   A:   Should livestock owners be compensated for wolf-caused losses?
2,4   B:   Will compensation programs be effective?
4   C:   Will hunting license sales be impacted by wolf reintroduction?
x   D:   Should states be compensated for game losses?
4   E:   Will wolf reintroduction adversely impact local economies in New Mexico and Arizona?
X   F:   Can costs of Mexican wolf recovery be justified?

**Table 1- 1. Continued.**

## 3. Ecological/Biological Impacts

| | | |
|---|---|---|
| X | A: | Does maintenance of ecosystem health require the presence of native predators and a balanced predator-prey relationship? |
| 4,A | B: | Will wolf predation adversely impact other wildlife populations? |
| **3.4** | C: | Are prey populations in the potential recovery areas adequate to support wolf populations? |
| 4,A | D: | Do wolves perform an important evolutionary service to prey species by removing unfit animals from their populations? |
| **3** | E: | Is White Sands Missile Range within the historic range of *Canis* **lupus** *baileyi*? |
| 2 | F: | Has life in captivity caused Mexican wolves to lose their fear of humans? |
| 2 | G: | Has life in captivity impacted the Mexican wolfs ability to survive in the wild? |
| X | H: | Are wolves an essential component of the ecosystem? |

## 4. Population Viability Considerations

| | | |
|---|---|---|
| 1,2 | A: | Does recovery and long-term survival of the Mexican wolf require its reintroduction to the wild? |
| 2 | B: | Is inbreeding depression evident in the captive population? |

## 5. Wildlife Management Impacts

| | | |
|---|---|---|
| **4** | A: | Will wolves compete with human hunters for the same prey? |
| A | B: | Do wolves pose a threat to human safety? |
| A | C: | Will reintroduction of the Mexican wolf pose any significant disease-related impacts? |

## 6. Philosophical/Ethical Considerations

| | | |
|---|---|---|
| X | A: | Do wolves have a right to exist? |
| X | B: | Do wolves have a right to exist in a natural environment/ecosystem? |
| X | C: | Should wild lands be restored and conserved? |

## 7. Other Impacts/Considerations

| | | |
|---|---|---|
| **4** | A: | Will existing land uses or land use plans be impacted by wolf reintroduction? |
| A | B: | Will wolves kill pets? |
| 1,3 | C: | Do Mexican wolves still exist in the wild? |
| **4** | D: | Will wolf reintroduction on White Sands Missile Range impact the operations there? |
| 1 | E: | Is the wolf an endangered species? |
| X | F: | If the wolf is released in Arizona, what will be the impact if it disperses into Mexico? |

**ESA, and**

· no action, in which Mexican wolves are not reintroduced.

The second and third of these alternatives have not changed fundamentally in this FEIS (see Chapter **2** - Alternatives Including the Proposed Action, which describes the alternatives in detail). However, public input and further scoping by the Interdisciplinary Team led to dividing the first-listed alternative, above, into two alternatives, as follows:

· reintroduction of captive-raised Mexican wolves, classified as nonessential experimental, under management plans to *allow* dispersal from the primary recovery zones into secondary recovery zones (the Preferred Alternative), and

· reintroduction as nonessential experimental under management plans to ***prevent*** dispersal from the primary recovery zones.

This change reflects that a key distinction among the alternatives is the degree of control the FWS would exert over the movements of the population. The first alternative allows the released wolves and their progeny to establish territories well away from the release areas (or "primary recovery zones"), while the latter alternative calls for the FWS to prevent the wolves from dispersing beyond the primary recovery zones.

The alternatives scoping process also included the selection of two of the five candidate areas within the subspecies' former range as the most suitable for releasing Mexican wolves. This involved comparing and ranking all the candidates based on key suitability attributes (see Chapter 2 - Selection of Potential Areas for Releasing Mexican Wolves). The two candidates selected were the Blue Range area in east-central Arizona and the White Sands Missile Range in south-central New Mexico. Largely in response to comments on the DEIS, the Interdisciplinary Team and the FWS has decided that the Preferred Alternative (Alt. A) should focus on the Blue Range area for the initial releases and treat the White Sands area as a back-up, to be used only if necessary and feasible. In summary, the wolf recovery areas selected-and the alternative actions for

these areas considered in this FEIS-reflect agency, expert, and public input.

**Impacts**

This FEIS addresses most of the major impact questions raised by other agencies, outside experts, and the public. Those impacts judged to be potentially significant receive detailed, alternative-by-alternative, analysis in Chapter 4 - Environmental Consequences. The Interdisciplinary Team determined that alternative-by-alternative analysis was appropriate for six of the impacts most stressed by the public and for three additional potentially significant impacts that released wolves could cause. The three additional impact topics were impacts on: **1)** predator control activities, especially of USDA's Animal Damage Control division, 2) agency, tribal, and local government policies and plans, and 3) recreational uses in the areas involved. In sum, the nine potentially significant impact topics are:

Impacts on wild prey of wolves
Impacts on hunting
Impacts on livestock
Impacts on predator control programs
Impacts on agency, tribal, and local
    government policies and plans
Impacts on land use
Impacts on military activities
Impacts on recreation
Impacts on regional economies

Chapter 4 describes the scope of these topics in detail.

## Alternatives and Impact Questions Not Addressed in this FEIS

### Alternatives

The following questions that relate to alternatives or planning were considered but dropped from detailed analysis in this EIS because they were determined not to raise reasonable alternatives meriting consideration (see Table 1-1 regarding the treatment of all alternative or planning issues):

*Should release sites in Mexico be considered?* This is not addressed because the FWS lacks any authority over recovery actions in Mexico. Further, the FWS lacks information on potential impacts there. Obtaining this information for purposes of analyzing such an alternative would present major logistical and diplomatic difficulties. Mexican wildlife authorities may consider wolf reintroductions in the future.

*Should release sites in Texas be considered?* This is not addressed here because suitable areas to support a reintroduced wolf population have not been identified or designated in Texas. However, this FEIS does consider Big Bend National Park, Texas, as a potential natural recolonization area that could support a very small wolf population that would not be independently viable (see Chapter 2 - Alternative D). Release sites adjacent to the Mexican border are generally undesirable, absent further cooperation with Mexico, because of the likelihood that wolves would then disperse into Mexico beyond the protection of the ESA and beyond the control of U.S. agencies.

*Should wolves be captured in Mexico and released in the United States?* This is not addressed because no evidence of a viable wild population exists from which suitable release stock could be drawn. (However, the original breeding stock of the captive population proposed here for release was captured in Mexico.) Further, the FWS would lack any authority to undertake such actions in Mexico even if sufficient numbers of wolves were found and it is uncertain whether the Mexican government would approve such actions.

*Should captive-raised wolves be released as an essential experimental population, under section 10(j) of the ESA, 16 USC sec. 1539?* This is not addressed because the FWS determined that the nonessential experimental classification fits the Mexican wolf's status. Only wolves surplus to the captive breeding program will be released. (See Appendix C - Proposed Mexican Wolf Experimental Population Rule, section **on** Findings Regarding Reintroduction, and Appendix D - Section 7 Consultation on Proposed Action, section on Effects on Mexican Gray Wolf, regarding definition of "surplus" wolves and significance of their **removal** from the captive population.) Their loss would not jeopardize the continued

survival of the subspecies. The nonessential experimental classification allows for management flexibility deemed vital to successful wolf recovery (USFWS 1993a). The essential experimental classification in many ways could be similar to the alternative of releasing wolves classified as fully endangered, which this FEIS does address (Chap. 2 - Alternative C). Alternatively, if a very flexible experimental population rule was adopted, then the essential experimental classification could be similar to the nonessential experimental approach, analyzed here as Alternative A. Detailed analysis of the essential experimental classification would be redundant.

**Impacts**

The following questions relating to impacts were considered but dropped from detailed analysis because they were determined either to lie outside the reasonable scope of this EIS or not to raise potentially significant impacts (see Table 1-1 regarding the treatment of all impact issues):

*Should any game Losses to stategovernments be compensated?* This is a policy choice rather than an environmental impact. There is no objective answer. Nevertheless, Chap. 4 does estimate the hunting-related economic losses in Arizona and New Mexico.

*Can impacts to taxpayers because of costs of Mexican wolf recovery be justified?* This also is a policy choice without an objective answer. However, Chap. 2, Table 2-8, and Appendix B do provide cost estimates for the four alternatives.

*Impacts involving long-term evolutionary or philosophical concerns.* These include "are wolves an essential component of the ecosystem?", "should wild lands be restored and conserved?", and "do wolves have a right to exist?" These are policy questions involving value judgments rather than environmental impacts. Their consideration is either not required by the National Environmental Policy Act or would be beyond the reasonable coverage of this EIS.

*Are there possible impacts in Mexico if wolves were released in the United States?* This question is not addressed because the two areas considered for releasing wolves are well north of the border and the

proposal calls for retrieval of wolves that disperse out of the designated recovery areas. Impacts in Mexico, while remotely conceivable, are not likely. It should be noted that if wolves did naturally recolonize border areas from further south in Mexico under Alternative D-that is, without a release of captive-raised wolves-then associated impacts in Mexico would be anticipated. The probability of natural recolonization actually occurring is considered
very low.

## Permits and Clearances

The following regulatory approvals and cooperative arrangements may be necessary prior to releasing captive Mexican wolves:

a)  NEPA required the FWS to submit a draft EIS, subject to an agency and public review period. The draft EIS was approved on June 8, 1995, and the comment period on the draft ended October 31 (see Chapter 5 for further information on the public input on the draft). The revision of the draft has lead to this FEIS, which is to be followed by a decision on which action to take, 42 USC sec. 4321 et seq. The Record of Decision will follow issuance of the FEIS by at least 30 days, 40 CFR sec.s 1505.2 and 1506.10. Also, before construction of the proposed release pens, the agencies involved would need to cooperatively decide on precise pen locations within the primary recovery zone or zones and then prepare one or more environmental assessments under NEPA of the potential site-specific impacts.

b)  The FWS would need to promulgate an experimental population rule describing protection and management of the proposed nonessential experimental population, 16 USC sec. 1539(j). The provisions of the FWS's Proposed Mexican Wolf Experimental Population Rule are summarized in Chapter 2 and provided in full in Appendix C. This version was officially published in the Federal Register on May 1, 1996, pages 19237- 19248. Various changes have been made to the proposed action between the

DEIS and this FEIS that are not reflected yet in the proposed experimental population rule re-printed in Appendix C. A decision to proceed with the proposed action, or any alternative that involves experimental reintroduction, would need to be followed by issuance of a final experimental population rule. Pursuant to 50 CFR sec. 17.8 1 (d), the rule is being developed in consultation with appropriate state fish and wildlife agencies, local governmental entities, affected agencies, landowners, and others. The EIS process has provided the opportunity for such consultations to occur (see Chap. 5 for additional information on consultation and coordination). In addition, a consultation and public hearing process specific to the proposed rule has been undertaken.

c)  The FWS would need an internally-issued endangered species permit authorizing movement of captive wolves for purposes of release, 16 USC sec. 1539(a). Also, the FWS would need an internal Section 7 consultation regarding potential impacts of the proposal on federally-listed threatened and endangered species, 16 USC sec. 1536. This has been undertaken and no adverse effects are anticipated (Appendix D). A similar consultation has been provided by the New Mexico Game and Fish Department regarding state-listed species (Hubbard 1994), under New Mexico's Wildlife Conservation Act, NMSA 17-2-37 to -46.

d)  Action by the Arizona Game and Fish Department will follow its process for approving endangered species releases (AGFD 1987) (Appendix E). The Department has drafted a "Cooperative Reintroduction Plan for the Mexican Wolf in Arizona" that calls for a joint reintroduction effort with the FWS in the Blue Range area (Groebner et al. 1995). It sets forth minimum criteria to be considered in evaluating implementation of the plan.

e)  Various agencies, tribes, and local governments have policies and plans that could be affected by the final decision. The FWS has

attempted to cooperate with these parties in the EIS process through meetings and sharing information. They may need to follow their own decision making procedures regarding their participation in future wolf recovery actions.

f)    Other arrangements with federal, state, and tribal agencies covering such matters as access, trapping, research, radio-tracking, and airplane overflights would need to be formalized through one or more interagency cooperative management plans or agreements. These would follow the Record of Decision.

Civ. Action No. 06-2119 (RCL)

Attachment 2

Excerpts

Mexican Wolf Reintroduction Project

# Mexican Wolf Blue Range Reintroduction Project 5-Year Review

*Prepared by the*
*Mexican Wolf Blue Range*
*Adaptive Management Oversight*
*Committee and Interagency*
*Field Team*



*December 31, 2005*

Terry B. Johnson, AGFD
2221 W. Greenway Road
Phoenix, AZ 85023-4399
602/789-3707

Chuck Hayes, NMDGF
PO Box 25112
Santa Fe, NM 87504
505/476-8101

David Bergman, USDA-WS
8836 N. 23 Ave., Suite 2
Phoenix, AZ 85021
602/870-2081

Wally Murphy, USFS
333 Broadway Blvd., SE
Albuquerque, NM 87103
505/842-3194

John R. Morgart, USFWS
2105 Osuna Rd, NE
Albuquerque, NM 87113-1001
505/761-4748

John Caid, WMAT
PO Box 220
Whiteriver, AZ 85941
928/338-4385

December 31, 2005








RECOMMENDED CITATION

Mexican Wolf Blue Range Adaptive Management Oversight Committee and Interagency Field Team. 2005. Mexican wolf Blue Range reintroduction project 5-year review. Unpublished report to U.S. Fish and Wildlife Service Region 2, Albuquerque, New Mexico.

ACKNOWLEDGMENTS

Completion of the 5-Year Review has been a result of effort and contributions from far too many people to mention by name. First and foremost, the Adaptive Management Oversight Committee and the Interagency Field Team thank all who contributed to the 3-Year Review that set the stage for this effort. Whether you were authors of components of that review or interested parties or stakeholders, you provided a rich foundation for us to work with. We also thank all Lead Agency employees, including the Directors, for persistent, enthusiastic support whenever it was needed; we will not identify any of you by name, lest we overlook anyone. Yet, two individuals must be mentioned by name – we thank Hector Ruedas and Kay Gale of Greenlee County AZ for going way above the call of duty to contribute in so many ways, not the least of which was those endless conference calls toward the end of the process. Truly, you set the bar for excellence as public servants, ably and assertively yet always constructively representing the interests of your Greenlee County constituents while still keeping a broad focus on "what's best for the public." Last but not least, we thank each and every member of the public, whether affiliated agency or NGO representative or private individual, who took the time to express their opinions about Mexican wolf reintroduction during this review, or in previous interactions that also contributed to it. Whether you submitted a form letter, post card, or email, or a personal verbal or written indication of your beliefs, opinions, or preferences, your thoughts were invaluable to the review and were considered very carefully before decisions were made. Knowing what people think overall about Mexican wolf reintroduction and recovery (an overwhelming majority of respondents favor it) was as important in its own way as knowing specifics about what individuals believe is working well in the reintroduction effort and what they think needs to be improved. For those who provided substantive specifics not just on what "to fix" but on how to fix it, we are especially thankful.

PREFACE

Mexican wolf reintroduction has been prominent in the American public's eye since long before January 28, 1998, when the first captive-reared wolves were placed in acclimation pens in the Blue Range of east-central Arizona and west-central New Mexico for eventual release to the wild. Nor did controversy end with the first release.

The mass media have been rich with Mexican wolf-related stories for more than 20 years, and references to ongoing controversy run rampant through them. Entire books, and parts of others, have been devoted to the subject; among the more prominent examples are: Brown (1983), Burbank (1990), Grooms (1993), Holaday (2003), Nie (2003), and Robinson (2005). In stark contrast, the definitive book on wolf ecology, L.D Mech's (1970) "The wolf: the ecology, and behavior of an endangered species," includes just a few lines about the Mexican wolf, reflecting a personal communication from B.R. Villa:

> In Mexico, the wolf is now restricted to three distinct areas….but the population is still declining and is in danger of extinction (Villa 1968)."

Mech's book makes even less mention of the Mexican wolf's occurrence in the United States, from which it had long since been eradicated as a viable breeding species. But, the final tale is yet to be told, because the journey continues today. Reintroduction is underway, and perhaps recovery might yet be achieved.

Whether reintroduction and recovery should be allowed, and if so where and how, were hotly debated through the 1990s, when reintroduction was formally proposed. They still are. Regardless, the proposal process ended with an affirmative decision pursuant to a Final Environmental Impact Statement (hereafter FEIS; USFWS 1996); a Record of Decision (hereafter ROD; USFWS 1997) pursuant to the National Environmental Policy Act (NEPA) of 1969; and finally a nonessential experimental population rule (hereafter Final Rule; USFWS 1998) approved on January 12, 1998, pursuant to the Endangered Species Act (ESA) of 1973, as amended.

In keeping with the stated experimental nature of the reintroduction effort, and respectful of the doubts expressed by many, the Final Rule required full evaluations after 3 and 5 years to recommend continuation, modification, or termination of the Reintroduction Project. The 3-Year Review, conducted in 2001, concluded that reintroduction should continue, albeit with important modifications (Paquet et al. 2001; Kelly et al. 2001). However, as we discuss elsewhere in this report (e.g. AMOC Responses to Public Comment Component), for many reasons the 3-Year Review recommendations were not implemented, at least not to the extent that interested parties and stakeholders expected or desired. Regardless of cause, the apparent lack of closure was a significant agency and public concern when the time came for the next review.

5-Year Review

By agreement among the primary cooperating agencies, responsibility for the Reintroduction Project's 5-Year Review fell to the Mexican Wolf Blue Range Adaptive Management Oversight

Committee (AMOC) that oversees the Project on behalf of six Lead Agencies and various formal and informal Cooperator agencies. AMOC Lead Agencies include the following: Arizona Game and Fish Department (AGFD), New Mexico Department of Game and Fish (NMDGF), USDA-Forest Service (USFS), USDA-APHIS Wildlife Services (WS), U.S. Fish and Wildlife Service (hereafter USFWS or Service), and White Mountain Apache Tribe (WMAT). Formal Cooperator agencies active in the review include the following: Greenlee County (AZ) and the New Mexico Department of Agriculture (NMDA). The Project's Interagency Field Team (IFT) also contributed significantly to the review, especially the technical aspects.

AMOC and the IFT conducted the 5-Year Review to comply with the Final Rule, but above and beyond that the intent was to identify and implement improvements in the Project. The Review consists of several primary components: Administrative, Technical, Socioeconomic, and Recommendations. Each is detailed in this report.

Regardless of implementation issues, the 3-Year Review's technical component (i.e. Paquet et al. 2001) and stakeholder component (Kelly et al. 2001) were excellent departure points for the 5-Year Review. Both were rich with information. Unfortunately, conflicts within and among their recommendations were never resolved, so this added complexity to the 5-Year Review.

The Draft Administrative and Technical Components of the 5-Year Review primarily addressed the period of January 1998 through December 31, 2003 (available information for 2004-2005 was also incorporated as it became available, and if was useful to include it. The Administrative and Technical Components were released for public comment in December 2004. Contract glitches with the Socioeconomic Component caused its release to be delayed until April 26, 2005.

The public comment period for the 5-Year Review extended from January 2005 through July 31, 2005. More than 10,000 written comments were received on the Draft Review and related documents, including Standard Operating Procedures and a Proposed Moratorium for the Reintroduction Project. Additional comments were heard at 14 public meetings from January through June 2004. All comments received, whether they were written or verbal, were carefully considered in completing the final report.

AMOC conducted the 5-Year Review on behalf of all agencies cooperating in the Reintroduction Project, but responsibility for its rigor and contents resides solely with AMOC. None of the cooperating agencies constrained the review; in fact, all of them were highly supportive of an objective, comprehensive analysis.

The 5-Year Review serves several primary purposes with regard to the Final Rule and previous reviews of the Reintroduction Project, including evaluating:

1. Questions identified in the 1998 Mexican Wolf Interagency Management Plan (Parsons 1998).
2. Recommendations and suggested modifications from the 3-Year Review technical component (Paquet et al. 2001) and stakeholder component (Kelly et al. 2001).

3. Recommendations from the Arizona-New Mexico independent review of the 3-Year Review that was directed by Congress (AGFD and NMDGF 2002).
4. "Commission Directives" to the State Wildlife Agencies of AZ and NM (Attachment 1).
5. All aspects of the Reintroduction Project from 1998 through 2003.
6. All public comment received during AMWG meetings and written comment periods from January through July 2005.

Review and adaptive management of the Reintroduction Project will not stop with this review. Project cooperators will continue to seek internal and public input regarding Mexican wolf reintroduction to help achieve recovery goals and objectives. The public input sought through this 5-Year Review analysis is an important part of that process.

Wrestling with implementation issues will perhaps be even more important. Thus, we look forward to high levels of engagement in public meetings throughout the Blue Range area in 2006 et seq., as we strive to move forward with this Reintroduction Project, and contribute toward recovery and eventual delisting of the Mexican wolf.

Adaptive Management Oversight Committee
December 31, 2005

# Mexican Wolf Blue Range Reintroduction Project 5-Year Review:

# Administrative Component

by

Adaptive Management Oversight Committee

Arizona Game and Fish Department
New Mexico Department of Game and Fish
U.S.D.A. – APHIS, Wildlife Services
U.S.D.A. Forest Service
U.S. Fish and Wildlife Service
White Mountain Apache Tribe

December 31, 2005

ABBREVIATIONS, ACRONYMS, AND TERMS

The following abbreviations, acronyms, and terms have been used to help make this document readable. We regret any inconvenience this creates for readers who do not like this approach.

| | |
|---|---|
| AGFD | Arizona Game and Fish Department |
| AMOC | Adaptive Management Oversight Committee |
| AMWG | Adaptive Management Working Group |
| APA | Administrative Procedures Act of 1946 |
| AC | Administrative Component |
| ARC | AMOC Recommendations Component |
| ARPCC | AMOC Responses to Public Comment Component |
| AUM | Animal Unit Month |
| AZ | Arizona |
| BLM | Bureau of Land Management |
| BRWRA | Blue Range Wolf Recovery Area |
| CBD | Center for Biological Diversity |
| CBSG | Conservation Breeding Specialist Group |
| C/R | Comment/Response entries (611 total) |
| CV | Current Value |
| CWD | Chronic Wasting Disease |
| CY | Calendar Year |
| DEA | Draft Economic Analysis |
| Defenders | Defenders of Wildlife |
| DPS | Distinct Population Segment |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act of 1973, as amended |
| EQIP | Environmental Quality Incentive Program |
| EPA | Environmental Protection Agency |
| FAIR | Fort Apache Indian Reservation |
| FEIS | Final Environmental Impact Statement of 1996 (for proposed reintroduction of Mexican wolves) |
| Final Rule | Final "nonessential experimental population" or "10(j)" rule of 1998 (for Mexican wolf reintroduction in Arizona and New Mexico) |
| FMD | Foot and Mouth Disease (hoof and mouth disease) |
| FOIA | Freedom of Information Act of 1966 |
| FR | Federal Register |
| FTE | Full Time Employee (or Full Time Equivalent) |
| FY | Fiscal Year |
| GMU | Game Management Unit |
| IFT | Interagency Field Team (for the Reintroduction Project; see below) |
| IMAG | Interagency Management Advisory Group (for the Mexican wolf) |
| IMPLAN | USFS IMPLAN Model |
| MOU | Memorandum of Understanding |
| MWEPA | Mexican Wolf Experimental Population Area |
| NEPA | National Environmental Policy Act of 1969 |

| | |
|---|---|
| NGO | Non-Governmental Organization |
| NM | New Mexico |
| NMDA | New Mexico Department of Agriculture |
| NMDGF | New Mexico Department of Game and Fish |
| NRCS | Natural Resources Conservation Service |
| PRIA | Public Rangelands Improvement Act of 1978 |
| PVA | Population Viability Analysis |
| ROD | Record of Decision of 1997 for the 1996 FEIS (see above) |
| SCAR | San Carlos Apache Reservation |
| SCAT | San Carlos Apache Tribe |
| SEC | Socioeconomic Component of 5-Year Review |
| SOP | Standard Operating Procedure for the Reintroduction Project |
| SSP | Species Survival Plan |
| SWCD | Soil and Water Conservation District |
| SWDPS | Southwestern (Gray Wolf) Distinct Population Segment (emphasis on *Canis lupus baileyi*, the Mexican wolf) |
| TC | Technical Component of 5-Year Review |
| TESF | Turner Endangered Species Fund |
| US or USA | United States of America |
| USDA | United States Department of Agriculture |
| USDA-APHIS | USDA-Animal Plant Health Inspection Service |
| USFWS | U.S. Fish and Wildlife Service |
| USFS | USDA Forest Service |
| WMAT | White Mountain Apache Tribe |
| WS | USDA-APHIS Wildlife Services |
| WSMR | White Sands Missile Range |
| WTP | Willingness-to-Pay |
| YNP | Yellowstone National Park (and environs) |

Mexican Wolf Blue Range Reintroduction Project

5-Year Review: Administrative Component

by

Adaptive Management Oversight Committee

INTRODUCTION

The 5-Year Review Administrative Component evaluates the following: (a) Administrative questions identified in the 1998 Mexican Wolf Interagency Management Plan (Parsons 1998); (b) Organizational recommendations from the 3-Year Review technical component (Paquet et al. 2001) and stakeholder component (Kelly et al. 2001); (c) Recommendations from the AZ-NM independent review of the 3-Year Review that was directed by Congress (AGFD and NMDGF 2002); and (d) "Commission Directives" to the State Wildlife Agencies of AZ and NM following discussion of the States' independent review (see Attachment 1).

Each question, comment, or recommendation below is accompanied by a Status statement indicating that the task it represents is: (a) Completed; (b) Not completed but being implemented and necessary to complete (followed by an assessment of the task and an estimated completion date), or Not completed because it is a continuing need that is being addressed, or Not completed; no action but necessary to complete; or (c) Not considered necessary to complete or to implement (followed by an assessment of why completion/implementation is not necessary). Each entry or item concludes with a 5-Year Review "Finding."

5-YEAR REVIEW ISSUES, ASSESSMENTS, AND FINDINGS

A.    Administrative questions identified in the Mexican Wolf Interagency Management Plan (Parsons 1998).

A-1.    Is effective cooperation occurring with other agencies and the public?

*Status*: Not completed but being implemented and necessary to complete.

*Assessment*: Kelly et al. (2001) and AGFD and NMDGF (2002) noted that neither agencies nor the public were satisfied with the level of internal or external cooperation in the Reintroduction Project. In September 2002, the Arizona Game and Fish Commission and the New Mexico Game Commission directed their respective wildlife agencies to include improved interagency and public cooperation as a focal point of efforts to restructure and improve the Reintroduction Project. After a year of agency and public discussion, AMOC was created in October 2003 to help achieve that objective.

As noted elsewhere in this document (see the AMOC Responses to Public Comment Component), AMOC believes interagency cooperation has vastly improved since 2001 (although

NM and some AZ counties still do not participate) and cooperation with permittees has also improved (but again there is much room for further improvement).

A draft 2005 statewide public survey in AZ and NM (Responsive Management in prep.; 1514 respondents, sampling error ±2.5%) indicated a majority of respondents (67%) had heard about Mexican wolf reintroduction. Of the respondents who had heard about it, 73% were somewhat familiar with it. Among all respondents, 62% favored reintroduction and 13% opposed it. Most respondents (up to 83%) were not sufficiently informed about reintroduction to have an opinion on levels of cooperation. Although most did not know how effective or ineffective cooperation is within the Project or between the Project and the public, respondents were more likely to respond they were effective than ineffective, except cooperation with the public. In the latter area, 19% said it is very or somewhat ineffective and 20% said it is very or somewhat effective.

We also note that 25% of respondents in the above-referenced survey said the responsibilities of the cooperating agencies, programs, and counties are now well, or at least adequately, defined, and 68% of those 25% respondents believe those responsibilities are serving the Project's needs.

An area of special concern to the public, as evidenced in comment at AMWG meetings as well as in written comment on the 5-Year Review, is the relatively large number of apparently unlawful wolf mortalities since 1998. From 1998 through 2005, 25 wild Mexican wolves succumbed to gunshots; two of the incidents were resolved (one through a finding of self defense and the other through successful criminal prosecution, but the other 23 investigations remain open. Discussion of specific aspects of active investigations is precluded, but AMOC has itself expressed concern about the need to ensure that all available enforcement resources within the cooperating agencies are used effectively and efficiently in preventing as well as addressing unlawful take of Mexican wolves.

*Finding*: Clearly, much work remains to be done in regard to improving cooperation with the public (including defining what such "cooperation" entails). Also, existing levels of interagency cooperation need to be maintained and enhanced (e.g. general cooperation as well as law enforcement issues), and additional effort needs to be put into increasing cooperation with counties other than Greenlee County AZ, which is a full and constructive participant in every aspect of the Project. Toward that end:

1. AMOC will maintain and improve administrative and adaptive management processes for the Reintroduction Project to enhance meaningful opportunities for, and participation by, the full spectrum of stakeholders and interested parties. AMOC efforts will include meeting with the IFT twice each year at the Alpine field office, and offering to meet once each year with the Commission or Board of Supervisors for each County within the Blue Range Wolf Recovery Area (BRWRA).

2. AMOC will direct Reintroduction Project-related outreach efforts in 2006 through the IFT Annual Work Plan to identify and reach specific target audiences, with emphasis on local communities and cooperating agencies within the BRWRA (>75% of outreach activity) and outside the BRWRA (<25% of outreach activity).

3.  AMOC will identify no later than June 30, 2006, in a confidential report to USFWS, any law enforcement actions that might help prevent unlawful take of Mexican wolves or help achieve closure on existing active investigations.

A-2.  Are combined agency funds and staff adequate to carry out needed management, monitoring, and research?

Status: Not completed but being implemented and necessary to complete.

Assessment: The 3-Year Review identified a lack of resources essential to carrying out needed management, monitoring, and research. For example: management activities were constrained by insufficient staff to carry them out; annual reports, work plans, incident analyses, and operating procedures were not completed due to higher priorities for existing staff; local residents asserted they could not reach an IFT member when assistance was needed; public outreach languished as staff tried to manage the increasing number of released and free-ranging wolves; vehicles were in short supply, and most that existed were high-mileage disposal trucks close to or beyond their useful lifespan when assigned to the Project; some IFT members worked out of their homes due to lack of office space; the trailer housing the Alpine Field Office was questionable in terms of structural stability; monitoring was limited by availability of flights, which reflected limited air support and lack of funds to ensure that flight time could be increased to more fully meet Project needs; and basic questions about wolf movements and behavior, impacts on native and domestic prey, wolf relationships to total predator load, and all aspects of the human dimensions (sociocultural and economic issues), etc. remained unanswered due to lack of funding.

This does not mean, however, that the Project's budget was inconsequential during this period. In fact, the cooperating agencies estimate (Table 1) that from FY1998 through FY 2004 they spent a combined $7,543,598 on wolf-related activities, including expenses associated with captive breeding and the over-arching rangewide recovery program, as well as the AZ-NM Reintroduction Project.

When the two State Wildlife Agencies conducted an independent review of the 3-Year Review (see AGFD and NMDGF 2002), the lack of essential resources was still obvious. Thus, both State Wildlife Commissions endorsed a recommendation that USFWS "Restructure the Interagency Field Team response protocols, and enhance staff capacity to ensure immediate response capability to, and resolution of, urgent operational issues, such as depredation incidents."

However, the situation did not improve much over the next two years, as the agencies began to restructure the Project. In fact, by late 2003 the pressures of cutbacks in Federal agency budgets began forcing States to either pick up the increasing funding shortfall or allow further decay in the IFT's ability to carry out its responsibilities. The partners had not begun trying to build an overall IFT budget to jointly expand the pool of available resources by December 31, 2003, the end of the period on which the 5-Year Review is primarily focused. Consequently, the available

resources were not always shared effectively, and Project accomplishments and public and agency acceptance and satisfaction were appreciably hampered.

Staff shortfalls in the Project have also been exacerbated by turnover throughout the Project. Given that the agency budgets for this Project are one-year commitments at best, and often are not fully resolved until well into the Fiscal Year, Project personnel have had an understandable degree of uncertainty as to their employment status. This has induced several IFT employees to leave the Project for more stable positions elsewhere, often with wolf management projects in other states or organizations. Disparities in State and Federal salaries for Field Team members have also contributed to dissatisfaction, and eventual vacancies. Government hiring processes tend to extend vacancy periods, imposing even greater workloads on remaining employees who are already stretched to or beyond their limits.

The situation improved in 2004, as AMOC began to work more effectively as a collaborative effort under the October 2003 Project MOU. Initially that year, progress was again impeded by delayed Congressional approval of the Federal budget (i.e. USFWS did not receive its FY2004 allocation until June 2004; FY2004 began in October 2003), and further cutbacks (excluding salaries) in USFWS wolf budgets. However, in February 2004, under the new MOU, the Lead Agencies began building a joint Annual Work Plan and an overall budget for the year in progress. Unfortunately, available funds were not sufficient to cover full-time equivalent (FTE) needs (a total of 14.25 personnel) identified in the Project's (first joint) Annual Work Plan.

Considerable progress was made in 2004 and 2005 as cooperating agencies brought more resources to bear, despite continued delays and cutbacks at the Congressional level. However, disparities in individual agency contributions continued to result in disparities in IFT resources available to address on-the-ground management issues in AZ vs. NM.

The disparities in FTEs and the budget shortfalls had not been fully resolved as this 5-Year Review was completed. Thus, although the IFT and the cooperating agencies are increasingly working as a team, allocating IFT staff resources to a pressing issue of the day still means that other essential priorities, especially long-term issues and public expectations, are deferred beyond the prescribed response deadline or completion date. The same applies to the agency employees providing administrative oversight for the Project, and conducting the adaptive management program and contributing to this review. Other than most of the USFWS employees directly involved, and all the IFT employees except WS personnel, none of the agency staff are assigned only to the Project. Most have at best a small percentage of their work week available to address Project issues, which continues to cause delays in completing Project-related assignments and shortfalls in carrying out needed management, monitoring, and research.

In addition to staffing funding issues, lack of a governmentally funded and administered program to address livestock depredation losses remains a huge impediment to local acceptance of wild Mexican wolves. Such a program would not eliminate opposition, but it would separate those who are adamantly opposed regardless from those who are opposed at least in part because they bear brunt of the real (i.e. documented) and perceived (i.e. undocumented or speculative) economic impacts of reintroduction.

Insufficient resources have been significant problems to date in this Project, but the issue is even more problematic for the future. The reintroduced population is at a point at which exponential population growth might reasonably be expected. As the number of free-ranging wolves increases, and recovery and delisting are approached, management issues will increase proportionately. If those needs go unmet, public dissatisfaction, especially among local residents who are most affected by the Project, will inevitably sky rocket.

*Finding*: Significant infusion of funding is essential to sustaining progress toward Project objectives, thus to contributing toward wolf recovery. Toward that end:

1. AMOC will develop, no later than June 30, 2006, a report describing a proposed Federally, State, and/or Tribally-funded incentives program to address known and potential economic impacts of wolf nuisance and livestock depredation behavior on private, public, and Tribal Trust lands. AMOC may convene, if necessary, a technical advisory group of individuals with appropriate expertise to assist with this task. The conservation incentives discussion will consider all relevant livestock depredation issues, including: livestock depredation prevention; livestock depredation response; carcass discovery, monitoring, removal, burial, and/or destruction; and possible adjustment of the Federal grazing (AUM) fee (and any Tribal grazing subsidies) within the Mexican Wolf Experimental Population Area (MWEPA) to provide de facto compensation for documented and likely undocumented losses of livestock. The AMOC report shall also include a thorough evaluation of the effectiveness and procedural efficiency of the Defenders of Wildlife wolf depredation compensation fund, and provide recommendations for appropriate improvements.

2. AMOC will advocate creating an IFT position in the Alpine field office to work with cooperators and stakeholders throughout Arizona and New Mexico on proactive measures by which to avoid or minimize wolf nuisance and livestock depredation problems. Note: AMOC as a body will not advocate regulatory changes to address carcass removal or disposal issues.

3. AMOC will collaborate with an appropriate entity to complete an IFT staffing needs assessment no later than June 30, 2007, based on (a) Reintroduction Project experience to date and (b) the Arizona-New Mexico Mexican Wolf Nonessential Experimental Population Rule recommended to USFWS.

4. AMOC will advocate creating sufficient IFT positions in each Lead Agency as appropriate to implement the staffing needs assessment conducted pursuant to Recommendation (30), above. AMOC will also recommend that at least one IFT member from each Lead Agency be stationed in the Alpine field office, to facilitate and enhance interagency communication and cooperation.

5. Concomitant with any recommended MWEPA Rule changes, AMOC recommends that State and Tribal Lead Agencies and non-Federal Cooperators make a contingent-

obligation request for annual Congressional line item allocations sufficient to cover all aspects of AMOC and AMWG participation in NEPA processes and ESA-related rulemaking processes required by such activities, through to the Record of Decision.

6.  AMOC recommends that no later than April 30, 2006, AMOC State and Tribal Lead Agencies and non-Federal Cooperators complete and deliver to Congress a funding request that is sufficient to fully staff and equip the Reintroduction Project as of October 1, 2006, at levels commensurate with all on-the-ground responsibilities in all areas of responsibility, including wolf management (including control), enforcement, outreach (including establishing a Mexican wolf education center in Hon-Dah Arizona), citizen participation in adaptive management, Reintroduction Project-related research, and landowner incentives.

B.  Evaluation of the organizational recommendations from the 3-Year Review Paquet Report (Paquet et al. 2001) and Stakeholders Workshop (Kelly et al. 2001).

As noted elsewhere in this report (e.g. AMOC Responses to Public Comment Component), recommendations from the 3-Year Review were not implemented to the extent that many stakeholders desired or expected. This was surprising to some people, because at least some of the recommendations seemed to be potentially valuable tools that, if implemented, might help further Mexican wolf recovery through successful reintroduction. What was not made clear to the public is that although USFWS regularly seeks peer and public review of its work and gives the results serious consideration, implementation is typically discretionary because recommendations must inevitably be balanced by logistical and other considerations, such as workload, staff availability, budget constraints, rulemaking requirements, direct input from key cooperators and local stakeholders, and the need to redefine or strengthen partnerships to support long-term conservation efforts. Moreover, in this case follow-up discussion with the reintroduction effort's primary cooperators was not carried out, thus conflicts among recommendations in the two review components were not resolved. Failure to resolve such conflicts made implementation all the more unlikely, especially for the much more plentiful and sometimes more complex recommendations in the Stakeholder Workshop (Kelly et al. 2001). Even in the 5-Year Review, we were unable to directly address those recommendations (hence they are omitted below) because of the process failures within the 3-Year Review that left Stakeholder consensus on substance, priorities, and completion timeframes unresolved.

<u>3-Year Review Stakeholder Workshop Problem Statements</u>

Participants in the August 2001 Stakeholder Workshop (see Kelly et al. 2001) were divided into six Working Groups, to identify Problem Statements (issues), goals, and actions, and set within-group priorities. The intent was to conclude the Workshop with cross-group vetting and development of overall priorities. However, the Workshop ran so long that most Working Groups did not complete their own work, let alone review the work of other Working Groups. Thus, the Problem Statements provide insight into

discussions within the Stakeholder Workshop, especially regarding the Paquet Report (Paquet et al. 2001) technical component of the 3-Year Review, but they do not represent stakeholder consensus.

Even within the above-described limitations, the Workshop Problem Statements offer useful contrast to the Paquet Report, for two reasons in particular. First, technical shortcomings (e.g. Final Rule issues, science-based concerns about wolf management) in the Reintroduction Project are reaffirmed again and again. The Technical Component of the 5-Year Review will address these issues, so they are not addressed further in the Administrative Component. Second, they resurrect social issues that were lost when the Paquet Report failed to address two of the 3-Year Review issues put forth in the Mexican Wolf Interagency Management Plan (Parsons 1998): (1) Is effective cooperation occurring with other agencies and the public?; and (2) Are combined agency funds and staff adequate to carry out needed management, monitoring, and research? If these two questions had been addressed in the Paquet Report, they might have served well as reminders that feasibility issues must also be addressed when considering management solutions to biologically-based problems, and ultimately on a public lands landscape, feasibility has strong social and economic components.

The Workshop Problem Statements are included below, as excerpts from Kelly et al. (2001), for information purposes. As noted above, technical aspects of the statements are addressed within the Technical Component of this review. Organizational and social aspects of the statements were addressed above, in Section A, covering the two questions from the Mexican Wolf Interagency Management Plan (Parsons 1998), thus they will not be discussed further. The Problem Statements follow, organized by Working Group:

> The Wolf Management Working Group identified, in priority order, the following six Problem Statements: (1) Areas for release and establishment of wolves have not always been selected on the basis of biological suitability, cost efficiency, logistical feasibility, wolf management feasibility, and minimized potential for impacts on existing land uses; (2) current post-release wolf management guidelines do not adequately address all relevant issues; (3) effective wolf management is hampered by a lack of information and by questions and concerns about the accuracy of the information on which it is based; (4) no mechanism has been clearly defined by which to monitor, evaluate and modify the Mexican wolf reintroduction program; (5) program staff may lack adequate training to meet the needs of implementing Mexican wolf recovery; and (6) current pre-release management guidelines do not adequately address all relevant issues.

> The Data Gathering Working Group crafted seven Problem Statements that were not prioritized. They are listed here in the same order they were listed in the group's report: (1) The Mexican Wolf Recovery Plan lacks current information and needs to be revised; (2) a Population Viability Analysis (PVA) has not been conducted for the wild Mexican Wolf population; (3) the effects of wolf populations on other wild predator and prey species and ecological process are not

understood in the southwestern United States; (4) causes of wolf-human and wolf-livestock conflicts are not sufficiently understood; (5) management actions such as capture and supplemental feeding may negatively effect wolves; (6) current boundaries hinder wolf recovery but may result in more human or wildlife wolf conflicts (7) there is a lack of historical data on wolves.

The Communication and Trust Working Group crafted ten Problem Statements, listed here in priority order: (1) Mechanisms used to communicate are inadequate for stakeholder's satisfaction; (2) information handling and acquisition are not sufficient for good decision making; (3) important decisions are, or appear to be, preordained resulting in stakeholder disenfranchisement; (4) there is a lack of consultation and respect for local expertise which results in missing information, bad decisions, and erosion of local trust and support; (5) there is a lack of specific goals and objectives on how to reach recovery; (6) there is lack of recognition and inclusion of other forms of knowledge in addition to science; (7) changing the rules in the middle of the game, such as direct releases of wolves into the Gila, is premature; (8) anti-government sentiment which has developed from other issues and agencies has contributed to distrust of Wolf Recovery Program; (9) at times, rulemaking does not follow legislation and when it does there is no accountability or consequences; and (10) there is little consistency, permanency, and continuity of agency actors resulting in disrupted t rusting relationships and loss of local information. In addition, a plenary presentation by a member of this Working Group focused on the impact of the Mexican wolf recovery and reintroduction on the health of the local communities (see Appendix I of Kelly et al. 2001).

The Human Dimension Working Group crafted five Problem Statements, listed here in priority order: (1) The administrators of the Mexican Gray Wolf Recovery Plan need to be accountable for their actions and the actions of the introduced wolves in order to obtain credibility with the public and other agencies; (2) lack of lines of communication, used in a timely manner, between program staff, agency partners and public needs to be improved; (3) there is a conflict between rural and urban values, perceptions and points of view that stresses the Mexican gray wolf program and local resident s in many ways; (4) the Mexican Wolf Program will inherently be a political issue; (5) there is lack of access to the program administrators from the local public that results in decisions that do not fully consider local views.

The Economic Issues Working Group crafted three Problem Statements, but did not assign priorities to them. Thus, the three Problem Statements are listed here in the same order they were listed in the Working Group's report: (1) There are actual losses to the individual and local communities due to the introduction of the Mexican Wolf that are not being adequately addressed and will not be addressed until more permanent solutions are found; (2) the Mexican Wolf Recovery Program needs a better consideration of full costs, including an incentive program, control, accountability, and better use of budget , defining and

accepting the financial and legal liabilities of the USFWS and the State entities involved in the project; and (3) the Mexican Wolf Recovery Program may create potential and actual benefit s and losses that have not been evaluated, quantified and considered for the proper balance of the program.

The Livestock/Animal Conflict Working Group crafted six Problem Statements, listed here in priority order: (1) Current management techniques have not been optimally effective in reducing livestock/animal conflicts; (2) Economic impacts of wolf recovery on livestock and animal conflicts are unknown; (3) there is insufficient communication between agencies, livestock producers, and the public; (4) effective husbandry practices to decrease livestock-wolf conflicts have not been fully implemented; (5) existing rules and regulations regarding livestock and animal conflicts do not adequately address concerns of private and public land users and government agencies; and (6) impacts of wolves on the ecosystem are not fully understood.

B-1.    Modify the Recovery Team by inviting an appropriate individual other than the Recovery Coordinator to serve as the team leader

*Status*: Completed.

*Assessment*: In August 2003, USFWS convened the Southwestern Gray Wolf Distinct Population Segment (SWDPS) Recovery Team (see below) and appointed Peter Siminski to serve as Team Leader. Mr. Siminski has a long-standing history with the Mexican wolf recovery program, dating back to 1983, shortly after five Mexican wolves had been captured in Mexico and transported to the Arizona-Sonora Desert Museum (ASDM) to establish a captive breeding program. Mr. Siminski, then an ASDM employee, was appointed as the official Mexican wolf studbook keeper and participated in recovery planning coordination of the captive management program.

In 1985, a consortium of holders of captive Mexican wolves (i.e. the Mexican Wolf Captive Management Committee) was established. Through that body, Mr. Siminski has been instrumental in expanding the captive breeding program from the first few initial facilities that held Mexican wolves to currently more than 45 facilities in the United States and Mexico. Mr. Siminski is also credited with establishing management of captive Mexican wolves under the Mexican Wolf Species Survival Plan (SSP), a program of the American Zoo and Aquarium Association. He has served as Mexican Wolf SSP Coordinator since 1993. He also served as a member of the original Mexican Wolf Recovery Team since 1985, and of the second iteration of that Team in the 1990s. In 2003, Mr. Siminski was chosen as Team Leader for the newly convened SWDPS Recovery Team because of his vast knowledge of the program, his fair and unbiased approach toward recovery, and strong leadership abilities that would be needed to lead a diverse team with myriad viewpoints.

*Finding*: AMOC finds that no further action is required on this topic.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                    December 31, 2005

B-2.    Instruct the modified Recovery Team to revise by June 2002 the 1982 Recovery Plan.

*Status*: Not completed but being implemented and necessary to complete.

*Assessment*: USFWS recognizes the importance of revising the 1982 Recovery Plan (USFWS 1982), given the plan (albeit intentionally) lacks recovery (downlisting or delisting) goals or strategies. When the plan was written, only a handful of Mexican wolves existed in captivity and recovery was virtually inconceivable unless the captive program was successful enough to produce enough wolves for reintroduction purposes. Therefore, the plan contained an overall primary objective to conserve and ensure the survival of *Canis lupus baileyi* by maintaining a captive breeding program and re-establish a viable, self-sustaining population of at least 100 Mexican wolves within their historic range. This was not intended to be a recovery objective for delisting purposes, but rather an interim goal given the uncertain progress of the captive propagation program at the time and recognition that a population of 100 wolves does not constitute recovery of the species.

A second Mexican Wolf Recovery Team was convened in the 1990s, in part to assist in preparing NEPA documents associated with possible Mexican wolf reintroduction in the American Southwest. The Team, assisted by a private contractor, prepared a draft revised Recovery Plan but the document was never completed, nor was it subjected to peer review or shared with the public.

Clearly, the 3-Year Review recommendation to revise the 1982 Recovery Plan was appropriate and valid. Revision was long overdue in 2001. However, the recommended completion date of June 2002 was unrealistic. Recovery planning is a lengthy process, especially with respect to recovering a species as complex and controversial as the wolf. A recovery plan requires a thorough evaluation of all relevant information, often necessitating much more time than the one year afforded by the 3-Year Review recommendation. Moreover, as occurred in this case, litigation sometimes has drastic effects on recovery planning.

The following is an overview of circumstances that led to commencement of recovery planning in 2003 and a hiatus in 2005 that precluded completion of a revised Mexican Wolf Recovery Plan in conjunction with the 5-Year Review. Pursuant to the Final Rule, in 2001 USFWS conducted a 3-Year Review of Mexican wolf reintroduction. One of the Review's primary recommendations, in what is commonly referred to as the "Paquet Report" (Paquet et al. 2001) was to revise the 1982 Mexican Wolf Recovery Plan so it includes downlisting and delisting goals. However, in June 2001 Congress directed USFWS to obtain an independent review of the 3-Year Review. As a result, USFWS chose to delay implementing the 3-Year Review recommendations, including proceeding with recovery planning, until the independent review had been completed. In late August 2002, at USFWS request, AGFD and NMDGF agreed to conduct the independent review. USFWS chose the two State Wildlife Agencies because of their expertise and their participation and long history with the Mexican wolf program.

The States' independent review was completed in September 2002 (AGFD and NMDGF 2002). The results were presented separately to each State's Commission, which resulted in the following direction to the two agencies:

1. The roles and functions of the Primary Cooperators (AGFD, NMDGF, and the Service) must be restructured to ensure State participation, authorities, and responsibilities as reflected in today's [Commission meeting] discussion.
2. The administrative and adaptive management processes must be restructured to ensure opportunities for, and participation by, the full spectrum of stakeholders.
3. The Interagency Field Team response protocols must be restructured, and staff capacity must be enhanced, to ensure immediate response capability to, and resolution of, urgent operational issues, such as depredation incidents.
4. Project outreach must be restructured as necessary to address the Commission, Department, and public concerns expressed today.
5. All actions in the Project must be in strict compliance with any applicable, approved special rules, policies, protocols, management plans, and interagency agreements.
6. The Project's review protocols and procedures must be restructured and improved to ensure that the 5-year review is effective and efficient, and an improvement over the 3-Year Review.

Following the States' review, AGFD initiated discussion with USFWS and NMDGF to address the Commissions' guidance. Despite clear direction and USFWS Region 2 Director concurrence with it, considerable effort was required to overcome staff resistance. However, by February 2003, progress was at last being made and additional potential cooperators were brought into the discussion, including USDA-APHIS WS, USFS, WMAT, NMDA, and various counties in AZ and NM. The lengthy process of restructuring the Blue Range reintroduction effort under State and Tribal leadership was culminated in an October 2003 MOU among AGFD, NMDGF, WS, USFS, USFWS, and WMAT as Lead Agencies and NMDA and Greenlee, Navajo, and Sierra counties as Cooperators. The MOU guides the Reintroduction Project through an adaptive management approach to managing the reintroduced wolf population.

Concurrent with the activities outlined above, at a national level USFWS was in the process of reclassifying the gray wolf to remove it from the list of endangered and threatened wildlife throughout portions of the conterminous United States. This rule, which became effective on April 1, 2003, established three Distinct Population Segments (DPS) for the gray wolf, one of which was the Southwestern Gray Wolf DPS. This action did not change the status of Mexican wolves; wolves in the Southwestern DPS retained their previous experimental population or endangered status. However, establishment of the SWDPS required USFWS to achieve recovery at the DPS level (i.e. the DPS would be delisted when recovery is achieved within the DPS), which had important implications for how recovery is achieved in the Southwest. In recognition of this forthcoming rule, USFWS continued to hold off on recovery planning for the Mexican wolf until gray wolf policy at the national level was determined.

Following the final reclassification rule in April 2003 (which established the SWDPS), and at the direction of the Regional Director, USFWS began to convene a new Recovery Team. The Team,

composed of technical and stakeholder sub-groups to address science and social and economic considerations of wolf recovery, was assembled by August 2003.

The Recovery Team consists of a Technical Sub-Group and a Stakeholder Sub-Group. The Technical Sub-Group is a body of scientists who represented expertise in wolf reintroduction and management, population demographics, general wolf biology and behavior, genetics, captive propagation, and research. The Stakeholder Sub-Group includes a variety of interests from local and private sectors representing the livestock and ranching industry, hunters, hunting guides and outfitters, and environmental and conservation organizations, as well as Federal, State, Tribal, and County governments. The Stakeholder Sub-Group provides the opportunity for those directly or indirectly affected by wolf recovery to voice their concerns, and concerns of the constituents they represent, regarding impacts of wolves on resource management, land use, and socioeconomic factors.

Five Recovery Team meetings were held from October 2003 through October 2004. Progress was at last being made toward a revised Recovery Plan. In January 2005, the 2003 reclassification was vacated (see: Defenders of Wildlife v. Norton, 03-1348-JO; National Wildlife Federation v. Norton, 1:03-CV-340, D. VT. 2005). This caused USFWS to revert to the 1978 gray wolf listing, which listed the species (*Canis lupus*) as a whole but continued to recognize valid biological subspecies (e.g. *Canis lupus baileyi*) for purposes of research and conservation.

In response to these rulings, in 2005 USFWS put the SWDPS Recovery Team "on hold" indefinitely; its charge to develop a recovery plan for the SWDPS was no longer valid, because there no longer was a SWDPS. In December 2005, the Department of Interior announced that it would not be filing appeals for either case (see below). This announcement provides impetus for the Southwest Region to reinitiate recovery planning, which USFWS will now proceed with in coordination with other wolf management activities.

Note: On December 19, 2005, AMOC was informed that Craig Manson, Assistant Secretary of the Interior for Fish, Wildlife and Parks, had that day issued a statement on the USFWS decision regarding the U.S. District Court decisions earlier this year striking down the USFWS 2003 reclassification of gray wolf populations. Mr. Manson's statement was as follows:

> The U.S. Fish and Wildlife Service will not appeal U.S. District Court decisions earlier this year striking down the Service's reclassification of gray wolf populations from endangered to threatened for much of the species' current range in the United States, although we continue to believe the reclassification was both biologically and legally sound. We are exploring options for managing wolf populations that comply with the Courts' rulings, while recognizing, as the courts did, that the Yellowstone and Great Lakes wolf populations have reached the recovery goals necessary for delisting.

> The Department of the Interior plans to issue separate, proposed rules to delist new distinct population segments of gray wolves in the northern Rocky Mountains and the

Great Lakes as early as possible in 2006. Both proposed rules will have public comment periods lasting 90 days.

In the meantime, gray wolves will continue to be managed as they were prior to the 2003 reclassification. Gray wolves in Minnesota are classified as threatened, as a result of a 1978 reclassification. Gray wolves in the remaining 47 conterminous states and Mexico are endangered, except where they are listed as part of an Experimental Population for reintroduction purposes in the northern Rockies and parts of the Southwest. Citizens with concerns about wolf management should contact the Fish and Wildlife Service or their State wildlife agency for clarification of what actions are currently allowed under the management designation in effect where they live.

In light of Assistant Secretary Manson's statement (above), USFWS Region 2 also affirmed on December 19, 2005 that it would move forward with wolf recovery planning in the Southwest. Meanwhile, after considering all public and cooperator comment during the 5-Year Review, and its own evaluations, AMOC has made various recommendations to USFWS and for AMOC action on issues that it considers necessary to address within the context of the 5-Year Review of the Reintroduction Project and the Final Rule under which the Project operates (see the AMOC Recommendations Component).

*Finding*: AMOC recommends that USFWS complete a Mexican Wolf Recovery Plan no later than June 30, 2007. Note: AMOC appreciates that this recommended deadline is impractical, but offers it, nonetheless, to strongly underscore that (a) revision is long overdue, and (b) lack of a current Recovery Plan (and overall recovery goal) is negatively affecting the Reintroduction Project in several ways, perhaps most importantly that for a reintroduction project population (management) objective to have meaning and credibility, it must be placed in appropriate context by well-defined rangewide downlisting and delisting (recovery) goals.

B-3.    Immediately engage the services of the modified Recovery Team.

*Status*: Not completed but being implemented and necessary to complete.

*Assessment*: As noted in B-2 (above), the Recovery Team has been on hold due to litigation that vacated the 2003 reclassification rule. Prior to that ruling, however, USFWS was using the full team in this recommended capacity, due to the body of expertise within both sub-groups of the Team. One such example included inviting the Team's Technical and Stakeholder Sub-Group members to review this 5-Year Review, and to provide feedback regarding reintroduction and overall management of wolves in the BRWRA.

*Finding*: Given the December 19, 2005 Department of Interior announcement (see above) that it will not appeal the court cases that vacated the 2003 rule, USFWS, in coordination with AMOC, will now determine appropriate and necessary activities for the Recovery Team pertinent to the BRWRA. The Team may be able to provide assistance with at least two AMOC 5-Year Review Recommendations, which are as follows (see the AMOC Recommendations Component for these recommendations in full and for related recommendations):

1. AMOC will determine, on biological/ecological grounds, and conclude in a written report to the USFWS Region 2 Director no later than June 30, 2006, whether (and, if so, the extent to which) the current MWEPA outer boundaries should be expanded within Arizona-New Mexico to enable the Arizona-New Mexico Mexican wolf population to exist within a metapopulation context consistent with Leonard et al. 2005 and Carroll et al. in press. AMOC may convene, if necessary, a technical advisory group of individuals with appropriate expertise to assist with this assessment.

2. AMOC will develop, no later than June 30, 2006, a report describing a proposed Federally, State, and/or Tribally-funded incentives program to address known and potential economic impacts of wolf nuisance and livestock depredation behavior on private, public, and Tribal Trust lands. AMOC may convene, if necessary, a technical advisory group of individuals with appropriate expertise to assist with this task. The conservation incentives discussion will consider all relevant livestock depredation issues, including: livestock depredation prevention; livestock depredation response; carcass discovery, monitoring, removal, burial, and/or destruction; and possible adjustment of the Federal grazing (AUM) fee (and any Tribal grazing subsidies) within the MWEPA to provide de facto compensation for documented and likely undocumented losses of livestock. The AMOC report shall also include a thorough evaluation of the effectiveness and procedural efficiency of the Defenders of Wildlife wolf depredation compensation fund, and provide recommendations for appropriate improvements.

B-4.   Immediately modify the final rule and develop authority to conduct releases into the Gila National Forest.

*Status*: Not completed; no action but necessary to complete.

*Assessment*: The existing Final Rule restricts direct releases of Mexican wolves from captivity to the Primary Recovery Zone (PRZ), in the southern portion of the Apache National Forest, entirely within AZ (Greenlee County). Wolves released into the PRZ are allowed to disperse throughout the entire BRWRA, including the Apache National Forest (AZ) and the Gila National Forest (NM). Additionally, wolves that have previously been free-ranging (wild) may be translocated for management purposes anywhere within the Secondary Recovery Zone (SRZ), which includes the remainder of the BRWRA.

AMOC recognizes there are limitations with the existing rule. The Gila National Forest is approximately 75% of the BRWRA and contains much of the best wolf habitat, due to existence of areas with low or no road densities, good populations of large native ungulates (primarily elk), and few to no permitted livestock. Currently, AMOC is limited to releasing (translocating) wolves that have had previous wild experience into New Mexico. This restricts the pool of available release candidates and limits AMOC's ability to release wolves for management purposes, such as replacement of lost mates or genetic augmentation. The ability to augment the wild population with wolves that are genetically underrepresented is important to increasing the overall fitness of the population, thereby aiding recovery of the species.

Additionally, there is public perception that AMOC is concentrating "problem" wolves in New Mexico, because wolves translocated into the Gila are "problem" wolves that have been removed from the wild for livestock depredations or other such nuisance/problem behavior. However, data indicate that translocated "problem" wolves are *more* likely to succeed, not less likely. In other words, this means wolves are less likely to have to be removed because of problem behavior again after being translocated. The data indicate that relocating the offending problem animal(s) to another area can alter their behavior, thereby rendering them no longer "problem" wolves. Nonetheless, AMOC recognizes the value of being able to directly release wolves without any previous history of problem behavior into New Mexico. Aside from the obvious biological considerations, it could help improve relations and build trust with those most affected by wolf reintroduction.

Clearly, a consistent policy needs to be in place that allows wolves with successful experience in surviving on wild prey (even if that includes limited involvement in depredation situations), and wolves that are more naïve but have no experience with livestock to be candidates for release or translocation throughout the BRWRA. In fact, pairings of wolves that are naïve with those having previous wild experience could lead to establishment of pairs or packs with more of the desired attributes for successful establishment in the wild. As stated above, however, the current rules and policies limit the ability to translocate or release wolves with successful experience with wild prey throughout the recovery area, and limit the availability of wolves with no history of depredation for translocations to the SRZ (e.g. New Mexico).

As early as 1999, USFWS began internally discussing the possibility of modifying the Final Rule.[1] In the short time since they had been released, Mexican wolves had colonized the majority of the PRZ, leaving fewer release sites in which to conduct further releases. Additionally, the Project had experienced several conflicts between wolves and human activities in rural areas, wolf/dog conflicts, and several confirmed depredations. Many illegal wolf shootings had also occurred. Thus, USFWS convened a Mexican wolf program review in January 1999, in which experts strongly recommended modifying the rule to gain authority to release wolves in remote areas (i.e. the Gila National Forest) in the NM portion of the BRWRA, to minimize the conflicts. Based on its experience at that time with managing and monitoring the free-ranging population, the IFT also supported this action.

In September 1999, approval was received from the USFWS Southwest Regional Director at the time to proceed with steps that would allow for releases in the Gila National Forest, including focused outreach, relocation/release site clearances, and revision of the Final Rule, the latter of which would require extensive public comment opportunities (e.g. public scoping, review and comment periods, public meetings and/or hearings) under section 10(j) of the Endangered Species Act (ESA), the Administrative Procedures Act (APA), and the National Environmental Policy Act (NEPA).

---

[1] It should also be noted that a potential rule amendment regarding direct releases into New Mexico was foreseen by USFWS and mentioned as a possibility in the FEIS (public comment and response on pages 5-87 – 5-88).

In October 1999, the Mexican Wolf Recovery Coordinator retired from USFWS, but momentum for proceeding forward with modifying the Final Rule continued. Internal draft Proposed Rule language to allow for direct releases into New Mexico was completed by USFWS in February 2000, and was then to be released to the public through the appropriate NEPA process to solicit public comment. However, it was never released. In April 2000, a new Mexican Wolf Recovery Coordinator was hired and Project priorities were redirected toward improving the IFT's effectiveness and responses to field issues and conflict situations. This shift put rule change momentum on hold, in order to focus on establishing a system of Recovery Protocols to ensure consistency and quality of data collection, consistency in how IFT personnel respond to field situations, safety of Project personnel and wolves, and to provide mechanisms for project peer review and Project and individual accountability.

In 2001, following drafting of various Recovery Protocols, USFWS began the Project's 3-Year Review pursuant to the Final Rule. With USFWS concurrence and support, an independent team of scientists was contracted by the Conservation Breeding Specialist Group (CBSG) to perform the technical portion of the review, which is commonly referred to as the Paquet Report (Paquet et al. 2001). The Paquet Report concluded that the simplest and most important change USFWS could make to enhance recovery would be to modify the Final Rule to allow for initial releases of captive-born (and wild-born if appropriate) Mexican wolves into the Gila National Forest.

Similarly, the "Wolf Management Working Group" of the 3-Year Review's August 2001 Stakeholder Workshop in Show Low, AZ identified (see Kelly et al. 2001) the highest two ranking goals as: (1) to reassess and refine the boundaries for wolf recovery in Arizona and New Mexico; and (2) select better wolf release/management areas within the recovery zones in Arizona and New Mexico. The stakeholders group further indicated that the flexibility to select wolves that have a greater probability of success, and thereby impact landowners and economic interests the least, is in the best interest of the program, both biologically and for those that may be impacted by wolves.

Importantly, both the Paquet Report and the Stakeholders Workshop provided recommendations on strengths and weaknesses of the Reintroduction Project as it was then being implemented. However, some recommendations in the Stakeholders report conflicted with some in the Paquet report or with others in the Stakeholders report. Due to review process design and execution problems, the 3-Review failed to result in an overall set of recommendations from the various components that the primary cooperators (at that time: USFWS, AGFD, NMDGF, and WMAT) agreed to implement. This problem was duly noted in the Stakeholders Workshop Report (Kelly et al. 2001, see minority reports therein) and again in AGFD and NMDGF (2002).

To date, USFWS has not taken action on the Paquet Report recommendation to modify the Final Rule to allow for releases into the Gila National Forest. Shortly after completion of the 3-Year Review, a new Regional Director, H. Dale Hall, was assigned to Region 2. His main priorities for the Mexican wolf recovery program were (1) to restore intended levels of cooperation with State, Tribal, and other interests in reintroduction and recovery planning, and (2) to revise the 1982 Recovery Plan, since the plan does not identify criteria (i.e. how many wolves in how many areas constitutes recovery?) for removing the Mexican wolf from the endangered species list.

Once the 2003 reclassification rule solidified the direction that USFWS would take with respect to wolf recovery (i.e. DPS listings instead of species/subspecies listings), Mr. Hall directed his wolf recovery program staff to revise the Recovery Plan to include downlisting/delisting criteria and describe the larger picture of recovery for the entire SWDPS before considering a rule change for the BRWRA reintroduction effort. Concurrently, he also indicated that in order to revise the rule, USFWS must first have a recommendation from the SWDPS Recovery Team, including both the technical and stakeholder sub-groups, and from AMOC.

However, due to the 2005 court decisions vacating the 2003 reclassification rule, thus putting the SWDPS Recovery Team on hold, Mr. Hall stated in Spring 2005 that in the absence of a functioning Recovery Team, he would look to AMOC and the 5-Year Review for recommendations on changes to the Final Rule. Accordingly, AMOC has made recommendations in the final 5-Year Review for Final Rule changes to address boundary modification concerns (see AMOC Recommendations Component). USFWS will then determine whether and how to proceed with AMOC's recommendations. If and when proposed rule change language regarding authorizing releases into the Gila National Forest is drafted, it will be released to the public pursuant to the APA, ESA, and NEPA to ensure appropriate opportunities for participation and input by the public.

*Finding*: AMOC proposes combining the current BRWRA Primary and Secondary Recovery Zones, the Fort Apache Indian Reservation (FAIR), and/or any other appropriate contiguous areas of suitable wolf habitat into a single expanded Blue Range Wolf Reintroduction Zone (BRWRZ) and allowing initial releases and translocations throughout the BRWRZ in accordance with appropriately amended AMOC Standard Operating Procedures (SOPs) 5.0: Initial Wolf Releases and 6.0: Wolf Translocations.

B-5.    Immediately modify the final rule to allow wolves that are not management problems to establish territories outside the BRWRA.

*Status*: Not completed; no action but necessary to complete.

*Assessment*: (Note: Please see B-4 above for additional information regarding rule change modification that is also relevant to this entry). Under the current Final Rule, AMOC is required to capture wolves that establish territories on public land wholly outside the designated wolf recovery areas and return them to the BRWRA or captivity. Additionally, if wolves establish themselves on private or Tribal land outside the BRWRA, AMOC must remove them unless the landowner agrees they may remain.

The 3-Year Review Paquet Report criticizes USFWS for promulgating a rule in which the boundary is so constrained. The report states, "Such regulations are inappropriate for at least 2 reasons: 1) they are nearly impossible to effectively carry out as the wolf population grows because of the difficulties of managing an ever-increasing number of wide-ranging dispersing animals, and 2) they establish a precedent that could be effectively used to argue for the removal of other endangered species inhabiting certain tracts of public or private land (Paquet et al.

2001). They further point out that nowhere else in the United States does USFWS remove wolves simply for being outside a boundary in the absence of a problem.

Although it was the prerogative of the Paquet panel, as an independent reviewer, to make such comments, these opinions are hindsight that was not shaped by the lengthy evaluation and discussions that led to the Final Rule. The criticized constraints were not offered lightly, or without consideration of the problems they might present in the future. USFWS promulgated the Final Rule based on circumstances at the time, including the full range of agency and public comment on the Draft EIS; in the absence of such provisions, USFWS and its primary cooperators believed that reintroduction would likely not have been possible.

The proposed rule change language drafted by USFWS in February 2000 (discussed in B-4, above) did not address allowing wolves that are not a management problem to establish territories outside the BRWRA. At the time the proposed rule change language was drafted, the most important issue viewed as hindering wolf recovery in the Southwest was the inability to release wolves into the Gila National Forest, which makes up of the majority of the BRWRA and contains some of the best wolf habitat. Therefore, the draft primarily addressed modifying the final rule to allow for direct releases of captive-raised wolves into the SRZ (i.e. Gila NF) of the BRWRA. Along with this amendment, USFWS intended to seek suggestions from program cooperators and the public for any other needed rule changes. Because the presence of wolves throughout the entire BRWRA, with all anticipated associated impacts, were analyzed in detail in the FEIS, a rule change considering direct releases into New Mexico would not have required a Supplemental EIS (SEIS). This was because the proposed action of allowing direct releases into the SRZ would not have altered the scope or scale of the impacts, and the actual impacts observed in the BRWRA after two years of wolf releases generally were consistent with what was predicted in the EIS. Therefore, no significant change or new information had been presented that would require a SEIS, and a revision to the rule presumably could have proceeded, in the absence of any new information received during the public comment period.

As the free-ranging wolf population expanded however, a more important issue surfaced that revolved around the BRWRA boundary. As the population grew, dispersing wolves began to travel beyond the BRWRA boundary, sometimes requiring retrieval, as mandated by the Final Rule, even in the absence of problem behavior or conflict situations. As stated in the Paquet Report, this is problematic for several reasons, the most obvious being that it hinders natural dispersal and recolonization of wolves into new areas, thereby slowing recovery. As the number of un-collared wolves increases, it also sets an unrealistic expectation that the IFT will be able to remove wolves that establish outside the BRWRA boundary, when in fact there is no guarantee that even collared wolves can always be captured due to their wide-ranging capabilities. This creates credibility issues with the public, and significant frustration. It also presents serious logistical and staffing concerns, since the IFT must spend considerable time and resources removing otherwise non-problematic wolves, when their time could be spent more productively dealing with more pressing field issues, such as daily monitoring, trapping for un-collared wolves or responding to wolf-livestock conflicts.

To date, as noted in B-4, above, USFWS still has not taken action on the Paquet et al. (2001) recommendation to modify the Final Rule to allow wolves that are not a management problem to establish territories outside the BRWRA. Any proposed rule change language is now separate from the recovery planning process and will come through AMOC as part of this 5-Year Review. Accordingly, AMOC has made recommendations in the final 5-Year Review for Final Rule changes to address boundary modification concerns (see the AMOC Recommendations Component). USFWS will then determine whether and how to proceed with AMOC's recommendations. If and when proposed rule change language regarding authorizing wolves that are not management problems to establish territories outside the BRWRA is drafted, it will be released to the public pursuant to the APA, ESA, FACA, and NEPA to ensure appropriate opportunities for participation and input by the public.

*Finding*: AMOC will determine, on biological/ecological grounds, and conclude in a written report to the USFWS Region 2 Director no later than June 30, 2006, whether (and, if so, the extent to which) the current MWEPA outer boundaries should be expanded within Arizona-New Mexico to enable the Arizona-New Mexico Mexican wolf population to exist within a metapopulation context consistent with Leonard et al. 2005 and Carroll et al. in press. AMOC may convene, if necessary, a technical advisory group of individuals with appropriate expertise to assist with this assessment. The AMOC assessment will also consider other relevant issues, such as: likelihood of expansion area occupancy by wolves dispersing from northerly states or from Mexico; the merits of extending nonessential experimental population status beyond the current boundaries; and estimated costs associated with managing wolves in an expanded area. The technical advisory group, if convened, shall be chaired by an AMOC representative and shall include no more than 15 other members, each with appropriate scientific expertise. AMOC will advocate that the MWEPA recommendation constructed as a result of its Recommendations allow wolves to disperse from the BRWRZ throughout the MWEPA, subject to management consistent with current Blue Range Reintroduction Project SOPs. Any recommendation to amend the existing Final Rule or to create a new Final Rule would ultimately, if acted on by USFWS, be in full compliance with all applicable APA, ESA, FACA, and NEPA requirements.

B-6.    Resist any opportunity to reintroduce Mexican wolves in the White Sands Wolf Recovery Area.

*Status*: Not completed; being implemented but necessary to complete.

*Assessment*: As authorized by the Final Rule (USFWS 1998) and Record of Decision (USFWS 1997), USFWS is implementing the "Preferred Alternative" of the FEIS on reintroduction of the Mexican wolf (USFWS 1996). The Preferred Alternative allows wolves to be reintroduced into a portion of the BRWRA, and if feasible and necessary to achieve recovery, White Sands Missile Range (WSMR) would be used as a secondary reintroduction site.

Limiting use of WSMR solely as a secondary site was based on two independent assessments (Bednarz 1989, Green-Hammond 1994) that concluded WSMR by itself could not support a viable population of wolves due to its relatively small size and its isolation from other suitable habitat. This finding was reiterated in the 3-Year Review, noting wolf dispersal would be

hindered by Interstate-25 and poor wolf habitat surrounding WSMR (Paquet et al. 2001). Another more recent habitat modeling analysis (Carroll et. al. in press) came to the same conclusion, stating, "Conversely, an area such as the WSMR, even in the doubtful event that it could support a viable population, would make little contribution to regional recovery goals due to its isolation and small size." Carroll et al. evaluated WSMR in a regional context, but also summarized habitat quality for WSMR as a stand-alone area for reintroduction. Their results suggest that habitat within WSMR would play little or no role in facilitating reintroduction success.

*Finding*: AMOC sees no benefit to continuing to hold WSMR up as a possible reintroduction site or primary recovery area. Although wolves might eventually disperse to WSMR, neither the habitat (prey base) nor the management constraints of that site (i.e. national defense and Homeland Security issues) would be conducive to establishing a significant population segment or to contributing toward wolf recovery on a rangewide basis. Thus, AMOC recommends that any amended or new Mexican Wolf Nonessential Experimental Population Rule drafted in conjunction with Recommendations (1) and (2), above, not include WSMR as a Mexican Wolf Recovery Area (i.e. its designation in the current Final Rule) or as a Reintroduction Zone. This would not preclude natural dispersal to WSMR, nor would it require removal of wolves dispersing to WSMR.

B-7.    Provide biologists with opportunities to visit other wolf projects to gain training with capturing and handling free-ranging and captive wolves.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: AMOC and the IFT recognize that the highest levels of professionalism, expertise, and ethical standards are required of a workforce in a field as dynamic, broad-based, and closely scrutinized as the Mexican wolf reintroduction effort. AMOC and the IFT include a multitude of agencies that bring to the Project a tremendous diversity in workforce. Each agency represented on the IFT ensures that its own personnel will meet the annual training requirements placed upon them by their own agency, including as a result of consideration of Project needs. The IFT goes even further in ensuring that its members are trained. The IFT currently holds annual training (e.g. immobilization training) that is open to employees of cooperating agencies and held at captive facilities in New Mexico, the Alpine Field Office, and other sites within AZ and NM. Where appropriate, each agency invites other agency personnel to training sessions or to be a trainer at agency meetings. Project staff members have also been detailed to other wolf programs to gain field experience. In addition, and dependent upon funding, AMOC and the IFT will strive to provide additional training opportunities, such as net-gunning wolves in the Rocky Mountains, to increase proficiency and knowledge of IFT members.

*Finding*: No later than December 15, 2007, AMOC and the IFT will identify training recommendations to build and enhance administrative, project management, supervisory, communication, and technical skills and knowledge as appropriate to each staff member's job functions within the Reintroduction Project.

B-8.    Station the Field Coordinator in the BRWRA (e.g. in Glenwood or Silver City, New Mexico or Alpine, Arizona) and insist that this person be intimately involved with all aspects of fieldwork (wolf management, public relations, data collection, management, analysis, report preparation, etc.).

*Status*: Completed.

*Assessment*: Mexican wolves were first released to the wild in March 1998. At that time, the USFWS Mexican Wolf Field Coordinator position was stationed in the Regional Office in Albuquerque NM. In 1999, USFWS began making plans to station the Field Coordinator in the BRWRA, specifically Glenwood NM. This shift in operations was initiated in order for USFWS to have more presence in local communities affected by wolves. It also gave USFWS the ability to be more responsive to wolf situations in a timely manner as they arose in the field.

From 2000 through May 2001, the Field Coordinator was stationed part-time in Glenwood until her departure from the Mexican wolf recovery program. The Field Coordinator position remained vacant until September 2002, when the current Field Projects Coordinator was hired. The Field Projects Coordinator has been stationed in Alpine AZ, headquarters for the IFT, since being appointed. At this time, USFWS intends to keep the Field Projects Coordinator position stationed in the BRWRA.

As a fully functioning member of the IFT, the Field Projects Coordinator is intimately involved in all aspects of fieldwork, as suggested in the 3-Year Review recommendation. The functions and duties of the Field Coordinator are spelled out in the MOU among the Lead Agencies and other Cooperators as follows:

The Field Coordinator shall:

1.  Serve as a member of the IFT and assist the Field Team Leaders in carrying out any field activities necessary to accomplish project goals and objectives.
2.  Serve as the communication liaison between the Adaptive Management Oversight Committee and the IFT.
3.  Collaborate with the IFT to draft recovery protocols.
4.  Assist the Field Team Leaders in drafting Annual Work Plans, Annual Performance Reports, and new or revised project operating procedures.
5.  Plan and coordinate, with assistance from the Field Team Leaders, the identification of review of additional release sites for release or translocation of Mexican wolves.

Additional insight on the Field Projects Coordinator can be gleaned from the referenced MOU (see Administrative Component Attachment 2).

*Finding*: Under current structure, for coordination and communication purposes AMOC believes it is essential for the Field Projects Coordinator to remain stationed in the IFT field office (currently in Alpine AZ). The same logic applies to other agency cooperators, if, as projected,

the IFT expands to meet needs resulting from a growing wolf population. Thus, AMOC recommends that at least one IFT member from each Lead Agency be stationed in the Alpine field office, to facilitate and enhance interagency communication and cooperation.

B-9.    Put forth a concerted effort to develop realistic expectations for the Project.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: This recommendation from the Paquet Report identified a need to "constantly remind the public and the media" that "restoration is an imprecise process that is by definition 'heavy handed.'" It further reflected Paquet et al.'s admonition that USFWS would face (and need to overcome) many "great challenges," meaning that "intervention will be required, wolves will disappear, and that some animals will die. But just as certainly, meeting the challenges will ensure the restoration of a self-sustaining population of Mexican wolves in the Blue River [sic] Wolf recovery area."

Clearly, establishing more realistic expectations for the Reintroduction Project was a pressing priority in August 2001, as the 3-Year Review came to a close. The Stakeholders Workshop underscored the Paquet Report admonition about realistic expectations. It seemed evident that to some, the death of any wolf, perhaps even from natural causes, was unacceptable, and especially so for any wolf that died as a direct consequence of human action. Yet, as Paquet et al. (2001) pointed out, mortality was inevitable.

Unrealistic expectations were also evident in regard to human ability to control, or at least modify, wolf behavior. The difficulties of tracking wolves in extremely rugged terrain, from searing summers through snow-bound winters, were too often casually dismissed, as some people questioned why the IFT did not know where every wolf was at every second. And even as these questions were asked, other people or even some of the same people criticized the Project for too much intervention, opining that the wolves should be allowed to adjust to the wild and people would simply need to adjust to them.

Also, IFT response time to "nuisance" and "problem" wolves was often perceived by local residents as inadequate, even as criticisms were constantly lodged about the cost of the Project, which would only be increased if additional resources were allocated to increase responsiveness.

The need for more realistic expectations was reaffirmed a year later, in the State Wildlife Agencies' September 2002 independent review of the 3-Year Review (AGFD and NMDGF 2002). To better address public expectations for a well-managed reintroduction project that appropriately considered and responded to the public's expectations, the AZ and NM State Wildlife Commissions requested in September 2002 that USFWS:

1. Restructure the roles and functions of the Primary Cooperators (AGFD, NMDGF, and the Service) to ensure State participation, authorities, and responsibilities.
2. Restructure the administrative and adaptive management processes to ensure opportunities for, and participation by, the full spectrum of stakeholders.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                      December 31, 2005

3.  Restructure the Interagency Field Team response protocols, and enhance staff capacity, to ensure immediate response capability to, and resolution of, urgent operational issues, such as depredation incidents.
4.  Restructure Project outreach as necessary to address Commission, Department, and public concerns.
5.  Ensure that all actions in the Project be in strict compliance with any applicable, approved special rules, policies, protocols, management plans, and interagency agreements.
6.  Restructure and improve the Project's review protocols and procedures to ensure that the 5-year review is effective and efficient, and an improvement over the 3-Year Review.

The State Wildlife Commissions and their respective agencies were willing to help USFWS restructure the Project from top to bottom, and work toward successful reintroduction and recovery, but first they needed to know that USFWS was receptive to a more collaborative partnership than the States and the public perceived had existed since the initial wolf releases in 1998. Fortunately, the new leadership in USFWS Region 2 was more than receptive to this concept, as Regional Director H. Dale Hall both embraced and helped structure the necessary changes in organizational philosophy, structure, and function.

By November 2002, Directors of the two State Wildlife Agencies and USFWS Region 2 had agreed upon a course of action to address these concerns in such a way that more realistic expectations would be developed on both sides of the equation: the agencies that manage the Project and the public that is interested in and/or affected by it. Identifying themselves as Primary Cooperators, the three agencies agreed (see Attachment 1, dated November 8, 2002):

>   The Service is responsible for providing guidance and coordinated information to all interested parties relative to recovery of the Mexican wolf. The States and Tribes are responsible for conducting reintroduction efforts in such a manner that they contribute directly to recovery. Other federal, state, local, and private stakeholders have to some extent shared responsibilities, or at least significant stakes, in these areas. The intent of the current Primary Cooperators is to realign the Recovery and Reintroduction components so they are fully integrated, smoothly coordinated, and effective.

>   This document begins, but does not complete progress toward achieving the direction that was given to the two State Wildlife Agencies by their respective Commissions in September 2002. The Primary Cooperators will, however, complete this effort before March 31, 2003, through appropriate collaboration with Tribal and other interested parties.

From November 2002 through October 2003, the original Primary Cooperators met frequently, and over time with an increasing number of other State agencies, tribes, and local governments, to discuss a new framework for collaboration to ensure that expectations about the Project were more realistic, and more importantly that they were met. Agencies-only meetings were blended with what evolved into quarterly AMWG public meetings for open discussion of virtually all

aspects of the Project. One of the more frequently voiced criticisms reflected a lack of trust in the agencies managing the Project.

The transition from Federal to State and Tribal implementation lead for the Mexican Wolf Blue Range Reintroduction Project was problematic at times for some Project cooperators, as new roles and responsibilities of agencies were defined and implemented. Uncertainty in how the new structure might affect day-to-day operations and decision-making at the field level prevailed.

Many of these issues remained unresolved as staff-level discussions continued; consequently, interagency meetings from February 2003 through October 2003 covered many of the same issues repeatedly, thus delaying addressing fundamental problems such as insufficient funding and staff required to carry out the needed management, monitoring, and research. It was difficult to reach consensus decisions about such issues, as agency representatives at the negotiating table struggled under the new organizational structure they had been directed to implement. Roles, functions, and authorities were debated repeatedly.

Overcoming the trust issues among Project cooperators required time, persistence, and a spirit of cooperation. Nevertheless, by October 2003, the agencies had crafted an MOU (Attachment 2) as a foundation for adaptive management of the Reintroduction Project. Quarterly meetings of AMOC, which guides the Project, and AMWG, which affords a forum for public participation, thus became the primary mechanism for ongoing discussion and re-discussion of what to expect from the Project, and what the Project might expect from the public. Many of the same questions and concerns came up at virtually every meeting in 2003 and 2004, and they were addressed each time. Over-commitment of limited resources in a partnership effort was finally beginning to give way to a more realistic accounting of what could and would be done, and doing it. That seemed to be a significant step forward in a Project as complex and controversial as wolf reintroduction, and it is a credit to all the agencies and public involved.

As of the time at which this 5-Year Review is being completed, the cooperating agencies are continuing to diligently work to develop more realistic expectations for and by the Project in all sectors. It is, however, a never-ending, difficult task. Few individuals inside and especially outside the agencies are sufficiently attuned to the Project to stay fully abreast of its problems, and its progress. Many other issues and activities draw on their time. Thus, the focus is on constant re-education as well as on education. Information is now flowing better about the Project than ever before. The Project has established a toll-free number (1-888-459-WOLF) whereby the public can call during business hours to report sightings or incidents, or to receive information about the project. A 24-hour radio dispatch (1-800-352-0700; the AGFD Operation Game Thief Hot Line) is also operational to report incidents, depredations, or emergencies after hours. SOPs have been completed for all essential areas of IFT activity, and they are continually revised as new experience and knowledge is brought to bear. Lead Agency Directors meet twice each year with AMOC, the IFT, and Cooperators for Project updates on key issues and activities, and to discuss significant issues of concern. The backlog of uncompleted Annual Reports has been eliminated. AMOC and the IFT now engage in joint annual work planning and budgeting, to ensure that staff resource allocations appropriately match product and service expectations and the available resources. Electronic self-subscription update services at http://azgfd.gov/signup

complement information posted on the AGFD wolf website, http://azgfd.gov/wolf, and the USFWS Mexican wolf website, http://mexicanwolf.fws.gov. Enhanced signage in wolf-occupied areas, brochures, public adaptive management discussions, outreach presentations by the IFT, and countless "one-on-one" field staff conversations with local residents are occurring to ensure that people have opportunities to gain more knowledge about the Project, express their opinions, and form more realistic expectations about it. The same mechanisms of interaction serve to inform the agencies about the public's expectations, and how they can best be met.

*Finding*: As stated before, the "concerted effort" necessary to "develop realistic expectations" (within and outside the Reintroduction project) is indeed never-ending, thus this Paquet Report recommendation can only be described as "Being Implemented;" it will never be "Completed."

B-10.   Initiate programs to educate people about wolf behavior.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: Education and public outreach is essential and should be a continual, dynamic, and effective part of the Mexican Wolf Recovery Program. Providing sufficient and accurate information on wolves and their behavior is important to all entities involved in this program.

Many strategies have been introduced to provide this information to the public. An interim "Education and Public Outreach Position" was created by USFWS to initially coordinate program goals. It has been superseded by AMOC SOP 3.0: Outreach (available at http://azgfd.gov/wolf). AGFD now employs a full-time person on the IFT to meet overall outreach responsibilities for the Project, with emphasis on local education and information (i.e. outreach) efforts. Wolf education boxes have been provided to agencies for public forums; mounts of wolves are on display in various places in the BRWRA, with additional mounts expected in the future. Public outreach presentations have been initiated for schools, communities, and requesting groups. Permanent educational displays are being promoted for various locations. Traveling displays exist but are limited in number at the present; funding is being pursued to develop additional displays. Other educational materials such as brochures and posters have been created and are available from participating agencies. Signs have been developed and posted in wolf areas; additional sign postings are pending. Information has been included in Hunting and Recreation Regulations and made available with permits or hunt tags; presentations have been made at Hunter Safety Courses. Flyers have been made available and passed out to hunters prior to and during hunt seasons. A 24-hour report, information, and emergency phone line and a web-site to sign up for monthly updates are currently in place (see B-9, above). Monthly Project Updates are provided to the public at large via an electronic self-subscription newsletter (*Endangered Species Updates*), at http://azgfd.gov/signup, and to certain interested or affected parties who have a specific need for more specific, current information are provided weekly updates after routine monitoring flights, via e-mail, fax, and by local postings. Personal contacts are also made via the phone or by one-on-one discussion with parties reporting wolf sightings or incidents. IFT field activities have been, and will continue to be, conducted to demonstrate wolf monitoring techniques. Wolf issues are discussed and coordinated on a regular basis during AMOC and AMWG meetings, which are held at least quarterly and more often as

necessary. Wolf identification, behavior, and pertinent report information is coordinated for release to local media, including radio stations, television stations, and newspapers, especially prior to hunting seasons. Many Project-related articles have appeared in magazines, as well as professional journals. Partnerships have been established with local businesses and private organizations. Planning and development for educational outreach opportunities are a continuing and expanding part of the recovery program.

The need for public education about measures by which to prevent or at least minimize risks associated with free-ranging animals, whether feral dogs or predatory wildlife, was underscored just as AMOC was completing this 5-Year Review. The event occurred in Canada, and might be highly relevant to the subject of human-wolf interactions in North America. On November 8, the body of 22-year-old Kenton Joel Carnegie, a 3rd-year survey crew intern with an energy exploration company, was found in northern Saskatchewan. Dr. Paul Paquet (personal communication, December 13, 2005) advises AMOC that a final Provincial Coroner's report is expected in January 2006, at which time it also will be made public. However, Dr. Paquet, a wolf expert well known to the Southwest as author of the 3-Year Review "Paquet Report" (Paquet et al. 2001), advises AMOC that preliminary investigation by law enforcement officials, and his own ongoing investigation for the Provincial Coroner, indicate a pack of four wild wolves might have attacked and killed the young man. However, death by wild dogs, with subsequent scavenging by wolves, had not yet been ruled out as this account was being written.

If wolves are proven to have killed Mr. Carnegie, it would be the first documented human death attributed to healthy wild (free ranging) wolves in North America in at least 100 years (see McNay 2002a and 2002b). Canadian experts and officials speculate that several factors might have contributed to the attack. In particular, huge expansion of exploration and mining for oil, gas, precious metals, etc. has resulted in an explosion of "wildcat" dumps (i.e. unregulated dumps), which are well known to attract predators (and wild dogs) and to result in increased risk of negative human-wildlife interactions.

The excerpted article below from the International Wolf Center is the most recent and thorough account available as to what might have occurred. It is included here in the 5-Year Review to ensure that it becomes part of the context for considering the issue of human-wolf interactions.

Regardless of the final outcome of the investigations, the fatal incident and increasing prevalence of habituated wolves and wild dogs in Saskatchewan underscore the need to take precautions in minimizing risks, including: ensuring that garbage dumps (regulated and not) are maintained in such a way that bears, wolves, wild dogs, and mountain lions do not become habituated to them; never feeding free-ranging predators, especially not at arm's-length distances; never providing food to domestic dogs or other domestic animals in such a way that predators might be attracted, and maintaining ready access to deterrent sprays and other protective devices in case of approach closely; etc. AMOC SOP 13.0: Control of Mexican Wolves provides additional information on this subject, as do other public education materials disseminated by the Reintroduction Project.

*Finding*: Educating people about wolf behavior (and the Reintroduction Project as a whole) is a never-ending process, thus this Paquet Report recommendation can only be described as "Being Implemented;" it will never be "Completed."

B-11.   Require livestock operators on public land to take some responsibility for carcass management/disposal to reduce the likelihood that wolves become habituated to feeding on livestock.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: The 3-Year Review identified an issue concerning livestock carcasses. Simply stated, the concern was that free-ranging Mexican wolves that scavenge on domestic livestock carcasses become habituated, and subsequently depredate domestic livestock. This suspected behavior in turn results in management actions ranging from capture and translocation to permanent removal from the wild, sometimes by lethal control of the offending wolf. Scavenging in this context means that free-ranging wolves encounter a livestock carcass and feed on it. The animal might have died from any of a variety of causes other than attack by wolves.

To put this issue into context, we reviewed the issue as outlined in the 5-Year Review and the findings in both the 3-Year Review Stakeholders Workshop final report and Paquet report.

We conducted a thorough review to evaluate whether a carcass feeding issue does exist, and if so what its magnitude might be. First, we accessed the IFT's Mexican wolf "Incident Database" for all records of Mexican wolf carcass feeding, depredations, and subsequent management actions. Next, we reviewed information that the Center for Biological Diversity (CBD) had previously received under FOIA, to determine whether the IFT Incident Database contained all relevant information on depredations and carcass feeding. In reviewing the CBD data, we found that all carcass feeding and depredation events noted therein were in fact included in the Incident Database. We also examined land management agency (i.e. USDA Forest Service and USDI Bureau of Land Management) regulations and policies to determine if the agencies have policies or other authorities regarding this issue.

Changes between Draft and Final 5 Year Review: The Draft 5-Year Review noted that 91 percent of the wolves involved with carcasses had also been involved with depredations. This "association" has been widely cited by interested parties during the 5-Year Review public comment period. However, further analysis indicates the 91 percent figure (see old Table 2 in the Draft Technical Component) is misleading, in that it was not based on analysis of the chronology of depredations and carcass feeding incidents.

After preliminary internal review and discussion among AMOC and the IFT, we conducted a further review of depredation and carcass involvement data from the Draft 5-Year Review. Our primary focus was the chronology of the depredations and carcass involvement incidents. Three groupings emerged from this analysis: Group One involves 12 wolves that were clearly involved in a depredation incident prior to being seen feeding on a livestock carcass. Group Two involves six wolves that were seen feeding on a carcass that was the direct result of a depredation. Group

Three involves five wolves that fed on a carcass and later depredated livestock. (Please refer to the following Analysis Section).

Summary of Public Comments to the Draft 5 Year Review: AMOC solicited public comment on the Draft 5-Year Review through a variety of venues. Comments concerning the carcass issue can be summarized as follows: those who felt that the section should be removed from the document because it leads to increased conflict and animosity with the livestock industry; those who felt that carcass removal was not at all practical due to problems finding carcasses and the time and expense involved in disposal; those that felt removing carcasses would lead to further depredations; those that felt using the CBD data biased the results; those that felt the agencies should develop and/or enforce policies for carcass removal; and those that felt incentives for livestock owners should be developed to promote voluntary carcass removal. (Please refer to Response to Comments Section).

3-Year Review: Participants in the Stakeholders Workshop were organized into six working groups. One, the "Wolf-Livestock-Animal Conflict Working Group," identified finding and disposal of livestock carcasses as an "issue," and further identified lack of implementation of effective husbandry practices to decrease livestock-wolf conflicts as a "problem." This Working Group called for livestock producers and land management agencies to work together to develop guidelines for detection and disposal of livestock carcasses to reduce wolf-livestock conflicts.

The 3-Year Review's Paquet Report addressed the livestock carcass issue in a section titled "Has the Livestock Depredation Control Program been Effective" (pages 52-85). The concluding remarks assert that "Similarly, livestock producers using public lands can make a substantive contribution to reducing conflicts with wolves through improved husbandry and better management of carcasses." The "Overall Conclusions and Recommendations" (pages 67 to 68) include a recommendation that "livestock operators on public land be required to take some responsibility for carcass management/disposal to reduce the likelihood that wolves become habituated to feeding on livestock."

5-Year Review: Building on the Paquet Report, with additional information from Project experience since 2001 and from public comment on the 5-Year Review, AMOC now offers an analysis of documented Mexican wolf livestock depredations and incidents of livestock carcass feeding. The information is this section was derived from the IFT's Incident Database and, for purposes of completeness and accuracy, was checked against information the CBD provided to AMOC that it had obtained via Federal FOIA. Table 2 displays information on wolves involved in known depredation incidents from 1998 through 2004: a total of 46 depredation incidents have been recorded; of those, 23 (50%) involved documented cases of wolves feeding on domestic livestock carcasses.

Because this issue involves a suspected link between wolves scavenging on domestic livestock carcasses and subsequent depredation on domestic livestock, Table 2 presents data on wolf activities such as depredations and scavenging on livestock carcasses as well as management actions associated with each type of incident from capture to translocation. The current fate of each wolf (as of 2005) is also included in Table 2.

Of the 46 wolves involved in known depredation incidents through 2004, 16 (35%) were involved in more than one depredation incident. Of these 46 wolves, 20 (43%) were removed from the wild for depredations; 24 (52%) were translocated into New Mexico; 11 (24%) were permanently removed from the wild population; and 19 (41%) died (Table 2; Note: because some wolves were assigned to multiple activity categories, percentages total more than 100). Of the 46 wolves involved in livestock depredations, 9 (20%) are currently in captivity and 8 (17%) remain in the wild (Table 3).

In the Draft 5-Year Review, we reported that 91 percent of the 22 wolves involved in known livestock depredations had fed on livestock carcasses. Between Draft and Final, we took a further look at the data and separated it by the chronology of depredations versus the chronology of confirmed carcass feeding events. As a result of this analysis, our results have changed and the way we are reporting them has changed. In addition, the sample size increased by 1 from 22 to 23 wolves involved with both carcasses and depredations.

By looking at the chronology of the depredation and carcass feeding incidents, three groupings emerged: Group One involves 12 wolves that were clearly involved in a depredation incident prior to being seen feeding on a livestock carcass. Group Two involves six wolves that were seen feeding on a carcass that was the direct result of a depredation. Group Three involves five wolves that fed on a carcass and later depredated livestock. Table 3 reveals that 5 of the 46 wolves (11%) with records of suspected or confirmed depredations had fed on carcasses prior to their documented depredation incident(s).

The 12 wolves in Group One were involved in depredations prior to any documented carcass feeding event. Six wolves in Group Two were seen feeding on a livestock carcass clearly associated with a depredation incident. Only the five wolves in Group Three were known to have fed on a livestock carcass prior to being involved in a depredation incident; this amounts to 11% of all wolves known to have depredated or suspected of depredations in the BRWRA. Table 4 displays the "locations" of the five wolves identified in Group Three.

Federal Land Management Agency Regulations and Policies Concerning Domestic Livestock Carcass Removal: USDA Forest Service and USDI Bureau of Land Management are the two principal federal land management agencies involved in or affected by Mexican wolf reintroduction and recovery. Neither agency has authority by law, regulation, or policy to require a permittee to remove dead livestock, render dead livestock unpalatable, or bury dead livestock on public lands where domestic livestock grazing is authorized. However, if a permittee voluntarily wanted to commit to such actions, both agencies could write such a commitment into the permittee's grazing permit. Authority for such mutually agreed-upon actions (essentially, self-imposed commitments) stems from (BLM) 43 CFR Chapter II §4130.3-2 (other terms and conditions) and (Forest Service) 36 CFR 222 and Forest Service Handbook 2209.13 §16.11 (Modification After Issuance). These allow each agency to address the issue of requiring the removal of livestock carcasses, rendering dead livestock unpalatable or burying dead livestock through individual grazing lease/permit authorizations or modifications.

State Statutes Pertaining to Carcass Disposal: The carcass disposal issue is also constrained by AZ and NM State Law. The following Statutes have bearing on whether livestock carcasses can be removed from public lands, to reduce risk of wolves or other predators feeding on them.

Arizona (Note: this information was taken from Arizona's on-line Statutes, which are available at http://www.azleg.state.az.us/ArizonaRevisedStatutes.asp)

Chapter 11, Article 4, Section 3-1293. Procedure for owner to authorize another person to deal with animals; violation

A.    A person who desires to authorize another person to gather, drive or otherwise handle animals bearing the recorded brand or mark owned by the person granting the authority, or animals of which he is the lawful owner but which bear other brands or marks, shall furnish the other person an authority in writing which lists the brands or marks authorized to be handled, and authorizes the other person to gather, drive or otherwise handle the animals described.

B.    If a person who gives written authority for the purposes provided in subsection A inserts therein any brand or mark of which he is not the lawful owner and an animal bearing such brand or mark is unlawfully taken, gathered, driven or otherwise unlawfully handled by virtue of the written authority by the person to whom the written authority was given the person giving the written authority shall be deemed a principal to the unlawful taking, gathering, driving or handling of such animals.

Chapter 11, Article 4, Section 3-1302. Taking animal without consent of owner; classification

A person who knowingly takes from a range, ranch, farm, corral, yard or stable any livestock and uses it without the consent of the owner or the person having the animal lawfully in charge is guilty of a class 2 misdemeanor.

Chapter 11, Article 4, 3-1308. Evidence of illegal possession of livestock

Upon trial of a person charged with unlawful possession, handling, driving or killing of livestock, the possession under claim of ownership without a written and acknowledged bill of sale, as provided by section 3-1291, is prima facie evidence against the accused that the possession is illegal.

Chapter 11, Article 4, 3-1303. Driving livestock from range without consent of owner; classification

When livestock of a resident of the state is intentionally driven off its range by any person, without consent of the owner, the person is guilty of a class 5 felony.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

Chapter 11, Article 4, 3-1307. Unlawfully killing, selling or purchasing livestock of another; classification; civil penalty; exception

A.    A person who knowingly kills or sells livestock of another, the ownership of which is known or unknown, or who knowingly purchases livestock of another, the ownership of which is known or unknown, from a person not having the lawful right to sell or dispose of such animals, is guilty of a class 5 felony.

B.    A person who knowingly attempts to take or does take all or any part of a carcass of any such animal, pursuant to subsection A, for such person's own use, the use of others or for sale is guilty of a class 5 felony.

C.    In addition to any other penalty imposed by this section, a person depriving the owner of the use of his animal or animals under subsection A or B of this section shall be liable to the owner for damages equal to three times the value of such animal or animals.

D.    This section shall not apply to taking up animals under the estray laws.

New Mexico (Note: this information was taken from New Mexico's on-line Statutes, which are available at http://www.lawsource.com/also/usa.cgi?nm)

Article 9. Section 77-9-45. Ownership; possession; transportation; seizure; disposition of livestock; refusal of certificate.

If any duly authorized inspector should find any livestock or carcasses in the possession of any person, firm or corporation for use, sale or transporting by any means, and said person, firm or corporation in charge of said livestock or carcasses is not in possession of a bill of sale, duly acknowledged, or cannot furnish other satisfactory proof of lawful ownership or said inspector has good reason to believe that said livestock or carcasses, are stolen, said inspector shall refuse to issue a certificate authorizing the transportation of said livestock or carcasses, and shall seize and take possession of same.

Livestock Industry Perspective in the Southwest: Both the Arizona and New Mexico Cattle Growers Associations are on public record in Mexican Wolf Adaptive Management Work Group meetings as opposing any mandatory removal of dead livestock from public lands.

*Finding*: Five (11%) of the 46 wolves known to have been involved in a depredation incident had fed on a livestock carcass prior to committing a depredation. Of these five wolves, two remain in the wild, one is "fate unknown," and two have been permanently removed from the wild. This sample size is too small to support even preliminary, let alone definitive, conclusions as to correlations, trends, or "depredation predisposition" resulting from carcass feeding.

Federal land management agencies do not have the authority to require lease/permit holders to remove livestock carcasses from public land. Permittees can voluntarily commit to such actions, and these commitments could be written into their BLM or USFS grazing permit if the permittee

AC-31

so desired (i.e. perhaps in exchange for incentive payments of some sort?). The livestock industry in the Southwest opposes mandatory removal of livestock carcasses from Federal lands.

In light of the above:

1. AMOC will develop, no later than June 30, 2006, a report describing a proposed Federally, State, and/or Tribally-funded incentives program to address known and potential economic impacts of wolf nuisance and livestock depredation behavior on private, public, and Tribal Trust lands. AMOC may convene, if necessary, a technical advisory group of individuals with appropriate expertise to assist with this task. The conservation incentives discussion will consider all relevant livestock depredation issues, including: livestock depredation prevention; livestock depredation response; carcass discovery, monitoring, removal, burial, and/or destruction; and possible adjustment of the Federal grazing (AUM) fee (and any Tribal grazing subsidies) within the MWEPA to provide de facto compensation for documented and likely undocumented losses of livestock. The AMOC report shall also include a thorough evaluation of the effectiveness and procedural efficiency of the Defenders of Wildlife wolf depredation compensation fund, and provide recommendations for appropriate improvements. Note: (a) The technical advisory group, if convened, shall be chaired by an AMOC representative and include a maximum of 15 other members, each with appropriate expertise. (b) AMOC as a body will not advocate regulatory changes to address carcass removal or disposal issues.

2. AMOC will convene a stakeholders group to assist AMOC in evaluating, and reporting in writing no later than December 31, 2006, social (human and socioeconomic) implications (including estimated annual livestock depredation losses) for any boundary expansions recommended. Note: The stakeholders advisory group will be Co-Chaired by an AMOC representative and an AMWG Cooperator (County) representative, and include a maximum of 50 other members, representing, insofar as is possible, the full spectrum of stakeholders. This group will comply with FACA, if necessary.

3. No later than March 1, 2006, AMOC will convene a science and research advisory group. The group will review, on a continuing basis, current and proposed management practices and recommend research priorities for AMOC to advocate to external entities and the cooperating agencies on all aspects of the Reintroduction Project. Review tasks will include, but not be limited to: overall Reintroduction Project effectiveness, statistically reliable wolf survey and population monitoring techniques, wolf population dynamics (demographics), prey base dynamics, total predator loads, seasonal wolf livestock depredation rates, annual wolf impacts on native ungulate populations, prey base monitoring techniques appropriate to determining when prescribed unacceptable levels of impact on native wild ungulates have been met or exceeded, wolf-related disease occurrence and prevention, seasonal livestock depredation rates, prevention and/or remediation of wolf nuisance and livestock depredation problems, livestock husbandry, wolf-related tourism, socioeconomics, and human dimensions.

4.  AMOC will advocate creating an IFT position in the Alpine field office to work with cooperators and stakeholders throughout Arizona and New Mexico on proactive measures by which to avoid or minimize wolf nuisance and livestock depredation problems. Note: AMOC as a body will not advocate regulatory changes to address carcass removal or disposal issues (but see Recommendation [12], above, regarding a process by which AMOC will explore possible mechanisms to address this issue).

B-12.  When writing or lecturing about the project, the Service should emphasize a community approach to understanding the wolf reintroduction project and its effect on other species and ecological processes

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: Apparently, Paquet et al. (2001) presumed that only USFWS had a role or stake in guiding and implementing the Reintroduction Project. What caused that presumption is moot. In any event, this recommendation from the Paquet Report and indeed all others apply to all Lead Agencies, not just to USFWS, thus AMOC responds along those broader lines.

This recommendation appears to be based on the Paquet Report's rationale that "Conservation policy is shifting away from the preservation of single species toward preservation and management of interactive networks and large scale ecosystems.…" Although the authors did not provide specific references for this statement, their review does discuss changes in entire food webs that can result from disruption of top predator populations (e.g. McLaren and Peterson 1994, Terborgh et al. 1999). The authors also discuss the effects of wolves on prey survival and behavior (e.g. Nelson and Mech 1981, Ballard et al. 1987, Messier 1994), and influences of prey densities on wolf demographics (e.g. Messier 1985, Fuller 1989).

The driving authorities and policy leading to re-establishment of Mexican wolves within the BRWRA were the ESA, the 1982 Mexican Wolf Recovery Plan, and State and Tribal laws and regulations pertaining to wildlife management and conservation. Although the ESA calls for conservation of ecosystems that support listed species, the majority of its protections and regulations are directed at the single-species (as opposed to ecosystem) level. State and Tribal wildlife agency authorities for management and conservation also focus on individual species, rather than habitats. Even public land management agencies, which have mandates to provide for a multitude of land uses, and extensive authority over wildlife habitat, have specific direction regarding individual wildlife species that may be given special status for management or planning purposes. Therefore, while the statement that "conservation policy is shifting…toward preservation and management of interactive networks" may be reflective of the current academic and even public understanding of the importance of landscape-level factors in conservation of wildlife (particularly large carnivores), it has yet to be manifested in significant changes to the State, Federal, and Tribal legal and policy frameworks that guide Mexican wolf reintroduction.

Despite the lack of a clear ecosystem-level mandate related to Mexican wolf reintroduction, community-level changes remain an interest of many of the involved or affected agencies and stakeholders. Possible impacts to game populations are of strong interest to State Wildlife

Agencies, sportsmen, and those involved in or supported by hunting-related industries. Similarly, questions are frequently raised regarding possible impacts of wolves on industries such as ranching, either through direct or indirect impacts that could result from effects to secondary carnivores (e.g. coyotes), ungulate populations, alternate prey populations, or even primary producers (plants). At this time, little information is available to answer these community-level questions regarding Mexican wolf reintroduction.

AMOC has not attempted to quantify a broad array of ecosystem parameters for the explicit purpose of pre- and post-reintroduction comparisons. Also, because the objective for number of wolves to be established within the BRWRA has yet to be reached, community-level influences of wolves may not yet be detectable. Density of wolves within the 17,752 km$^2$ BRWRA is estimated at approximately 3 wolves/1,000 km$^2$. This density is at the far lower end of wolf densities where authors such as Ballard et al. (1987) (range of ~3 wolves/1,000 km$^2$ after wolf control to ~10 wolves/1,000 km$^2$ before control), Parker (1973) (range of 2 wolves/1,000 km$^2$ to 28-50 wolves/1,000 km$^2$ concentrated on prey winter range), and Hayes et al. (2003) (1.7 wolves/1,000 km$^2$ after wolf control and 6.0 wolves/1,000 km$^2$ before) evaluated interspecific interactions at multiple wolf densities. In comparison, wolves on Isle Royale have represented the high end of wolf densities found in North America, up to 91/1,000 km$^2$, (Peterson and Page 1988), and currently exist at about 50 wolves/1,000 km$^2$ in Yellowstone's northern range (Smith et al. 2003).

Although it is expected that populations of ungulate prey, alternate prey, competing predators, and the amount of primary production would be decreased in more arid wolf habitats, such as the Southwest, these parameters have not all been quantified within the BRWRA or within other wolf study areas. Therefore, it is difficult for AMOC to provide unequivocal information at this time regarding any landscape-level changes that might occur through Mexican wolf reintroduction. More time is needed for the wolf population to grow, and for effects to be determined through focused research. Paquet et al. (2001) acknowledged this, stating that wolf reintroduction has influenced the carnivore guild (wolves, bears, coyotes, mountain lions) within the northern Rocky Mountains (where wolves had already approached or surpassed recovery levels), but recommending research within the BRWRA regarding interaction of wolves with other carnivores to inform future Mexican wolf reintroduction project evaluations and adjustments.

*Finding*: Based on the information above, the recommendation from the 3-Year Review that "When writing or lecturing about the project, the Service should emphasize a community approach to understanding the wolf reintroduction project and its effect on other species and ecological processes" (Paquet et al. 2001) is not considered appropriate at this time. Rather, this recommendation is replaced with a related one that:

When writing or speaking about the Mexican wolf reintroduction project, entities cooperating in Mexican wolf reintroduction should accurately reflect the available current information regarding projected and realized community and ecosystem-level functions involving Mexican wolves in all appropriate outreach materials and Project reports or presentations. Wherever

possible, they should also support studies, monitoring, and analyses to evaluate any community-level changes that might result from Mexican wolf reintroduction.

Specifically:

1.  No later than March 1, 2006, AMOC will convene a science and research advisory group. The group will review, on a continuing basis, current and proposed management practices and recommend research priorities for AMOC to advocate to external entities and the cooperating agencies on all aspects of the Reintroduction Project. Review tasks will include, but not be limited to: overall Reintroduction Project effectiveness, statistically reliable wolf survey and population monitoring techniques, wolf population dynamics (demographics), prey base dynamics, total predator loads, seasonal wolf livestock depredation rates, annual wolf impacts on native ungulate populations, prey base monitoring techniques appropriate to determining when prescribed unacceptable levels of impact on native wild ungulates have been met or exceeded, wolf-related disease occurrence and prevention, seasonal livestock depredation rates, prevention and/or remediation of wolf nuisance and livestock depredation problems, livestock husbandry, wolf-related tourism, socioeconomics, and human dimensions.

2.  AMOC will ensure that all Reintroduction Project-related outreach activities emphasize wolf conservation and management as an integrated component of the social (human) as well as the ecological landscape, and provide a balanced, objective perspective on positive and negative aspects of wolves as ecosystem components in a multiple-use landscape of intermingled public, private, and Tribal Trust lands.

C.  Evaluation of the recommendations from the Arizona-New Mexico independent review of the 3-Year Review indicating the status of the recommendations as either: a) completed/being implemented; b) not completed/being implemented but necessary (provide justification for why it has not been completed and estimated time-frame for completion); and c) not considered necessary to complete/implement (include justification).

In October 2001, USFWS completed a review of the first three years of the Mexican wolf reintroduction within the BRWRA. This review was required under the Final Rule for Mexican wolf reintroduction (Parsons 1998, USFWS 1998). The language within this rule directed USFWS to conduct "full evaluations after 3 and 5 years that recommend continuation, modification, or termination of the reintroduction effort." This direction was also included within the final EIS for Mexican wolf reintroduction (USFWS 1996) and the Mexican Wolf Interagency Management Plan (Parsons 1998).

In June 2001, Congress directed USFWS to conduct an independent assessment of the Reintroduction Project's 3-Year Review (House of Representatives Report 107-103). In August 2002, USFWS asked AGFD and NMDGF if they would conduct the review, which was due for completion by September 30, 2002. AGFD and NMDGF agreed to jointly conduct the independent assessment. The two agencies completed their evaluation and submitted it to

USFWS Region 2 Director H. Dale Hall in September 2002 (see AGFD and NMDGF 2002). Their report contained a series of recommendations regarding the process and outcomes of the 3-Year Review, including six overarching points that both State Game Commissions directed the respective agency to transmit to USFWS.

In developing the process and content for the Mexican wolf Reintroduction Project's mandated 5-Year Review (USFWS 1996, Parsons 1998, USFWS 1998), the Project's cooperating agencies agreed to revisit the recommendations from the States' evaluation of the 3-Year Review. This would include both the six overarching directives, and more detailed recommendations contained within the states' evaluation. The purpose was to determine if the recommendations were still valid, whether they had been implemented, and any rationale for changes in validity or failure to implement the recommendations. Following are AMOC's assessments of the State Game Commission directives regarding the Reintroduction Project and thus the 3-Year Review:

C-1.    The roles and functions of the Primary Cooperators (AGFD, NMDGF, and the Service) must be restructured to ensure State participation, authorities, and responsibilities as reflected in today's discussion.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: Restructuring of roles and functions has been embodied within the MOU among the cooperating agencies in Mexican wolf management. This agreement was completed and received its initial signatures in November 2003. All the Primary Cooperators had signed the agreement by April 2004. One major task in the restructuring of roles and functions is still outstanding. This is Item #8 under the "Lead Agencies agree to:" portion of the MOU, and reads:

> Describe the roles, responsibilities, and processes necessary to address involvement, participation, and duties of the Lead Agencies, Project staff, and recognized committees, work groups, or other managing bodies involved with the Project. These descriptions will be completed within six months of the date of the last initial signature on this Agreement.

*Finding*: AMOC will make this task a priority action item for completion no later than June 30, 2006.

C-2.    The administrative and adaptive management processes must be restructured to ensure opportunities for and participation by the full spectrum of stakeholders.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: An MOU for collaborative Mexican wolf reintroduction was completed among the six Lead agencies and various Cooperators, establishing AMOC to oversee the Project and promote cooperation, coordination, and communication among interested and affected parties. The MOU also establishes an Adaptive Management Work Group (AMWG) to provide opportunities for interested publics to help AMOC identify local issues, review and make recommendations regarding Mexican wolf management activities, and evaluate the effectiveness

of ongoing management and communication processes. AMOC meets in closed session at least quarterly in the BRWRA (more often as necessary, with meetings rotating between northern and southern AZ and NM. AMWG meetings are public sessions; they are held on the same temporary and geographic rotation as AMOC meetings. Both have been occurring since February 2003.

Despite the increased frequency and logistical convenience of AMOC and AMWG meetings, participation by some interests has lagged. State, Federal, and Tribal (WMAT) agencies and Greenlee Co. AZ have been consistent, constructive participants. Two Counties signatory to the MOU (Navajo Co. AZ and Sierra Co. NM) have not attended recent meetings. Catron Co. NM participated in developing the MOU, and many Project SOPs, but with a change in County leadership announced in AMOC and AMWG meetings in 2005 that they would not be participating any further for fear of lending credibility to the effort. Various NGOs, primarily livestock owners and growers, have not attended most working AMWG meetings but have attended sessions to provide comment on proposed actions such as a Moratorium on initial releases, SOP 13.0: Control of Mexican Wolves, and the 5-Year Review. NGOs within the conservation community have attended every AMWG meeting, although only one or two have been represented each time. Private (non-affiliated) individuals attend every AMWG meeting, though again no single individual attends each one.

The reasons most often given for non-participation are variable (see AMOC Responses to Public Comment Component). Logistical issues (e.g. travel time and expense), other more pressing issues, lack of prior notice, "too many meetings," and lack of engagement in discussion and resolution of priorities are among the more frequent reasons given. Many, perhaps even most, public participants in 2004 and 2005 seemed particularly frustrated by how much time AMOC spent establishing procedures for engagement that, ironically, the Project had previously been criticized for failing to establish. Even so, as SOPs and the 5-Year Review came to closure late in 2005, public comment at AMWG meetings began to acknowledge the progress that had been and was being made, and to acknowledge that more attention was now being focused on what needs to be done as opposed to how to work together to identify and address those needs.

*Finding*: AMOC Lead Agencies and active Cooperators are in complete agreement that constructive engagement of interested and affected parties is essential to Reintroduction Project success, and ultimately to Mexican wolf recovery. Toward that end:

1. AMOC will convene a stakeholders group to assist AMOC in evaluating, and reporting in writing no later than December 31, 2006, social (human and socioeconomic) implications (including estimated annual livestock depredation losses) for any boundary expansions recommended per Recommendation (5), above. Note: The stakeholders advisory group will be Co-Chaired by an AMOC representative and an AMWG Cooperator (County) representative, and include a maximum of 50 other members, representing, insofar as is possible, the full spectrum of stakeholders. This group will comply with FACA, if necessary.

2. No later than December 15, 2006, AMOC will complete a detailed plan for another Reintroduction Project Review. Note: The Reintroduction Project Review will be conducted in 2009-2010 and completed no later than December 31, 2010.

3. AMOC will make all Reintroduction Project wolf management, outreach, and budget information (redacted as appropriate to protect confidential personal information) available to the public through Annual Reports for the Reintroduction Project, and other publications and outreach materials as appropriate.

4. AMOC will recommend, through IFT Annual Reports, or a special report updated each year, wolf-related habitat enhancements that can be accomplished through private property incentives programs and Federal, State, Tribal, and County agency planning processes.

5. AMOC will advocate creating an IFT position in the Alpine field office to work with cooperators and stakeholders throughout Arizona and New Mexico on proactive measures by which to avoid or minimize wolf nuisance and livestock depredation problems. Note: AMOC as a body will not advocate regulatory changes to address carcass removal or disposal issues.

6. AMOC will maintain and improve administrative and adaptive management processes for the Reintroduction Project to enhance meaningful opportunities for, and participation by, the full spectrum of stakeholders and interested parties. AMOC efforts will include meeting with the IFT twice each year at the Alpine field office, and offering to meet once each year with the Commission or Board of Supervisors for each County within the BRWRA.

7. Concomitant with any recommended MWEPA Rule changes, AMOC recommends that State and Tribal Lead Agencies and non-Federal Cooperators make a contingent-obligation request for annual Congressional line item allocations sufficient to cover all aspects of AMOC and AMWG participation in NEPA processes and ESA-related rulemaking processes required by such activities, through to the Record of Decision.

8. AMOC recommends that no later than April 30, 2006, AMOC State and Tribal Lead Agencies and non-Federal Cooperators complete and deliver to Congress a funding request that is sufficient to fully staff and equip the Reintroduction Project as of October 1, 2006, at levels commensurate with all on-the-ground responsibilities in all areas of responsibility, including wolf management (including control), enforcement, outreach (including establishing a Mexican wolf education center in Hon-Dah Arizona), citizen participation in adaptive management, Reintroduction Project-related research, and landowner incentives.

C-3.  The IFT response protocols must be restructured, and staff capacity enhanced, to ensure immediate response capability to, and resolution of, urgent operational issues, such as depredation incidents.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: SOPs were completed in 2005 for all major IFT activities, through extensive public review during comment periods and discussion in AMWG public meetings. The SOPs are available in downloadable PDF format from http://azgfd.gov.wolf. However, existing SOPs will need to be updated as necessary, dysfunctional ones discontinued, and new ones created as the Project evolves.

Overall, capacity for the IFT was not substantially enhanced prior to October 2004. From October 2004 through Spring 2005, enhancement largely consisted of allocating available employees from Lead Agencies to address priority management issues in the field. However, through 2005 IFT staff capacity began to be expanded in more substantial form. Cooperator Public Information Officers began assisting more regularly and more effectively in overall outreach activities. Three FTEs were added to the IFT in 2005, two for AGFD and one for NMDGF. One of the AGFD positions was allocated to IFT outreach responsibilities (see C-4, below); the other two new positions are dedicated to on-the-ground wolf management (the one in NM also will carry IFT Leader responsibilities).

Although much progress has been made, and to a person the IFT is extremely hardworking and productive, through 2005 IFT staff capacity continued to be impacted by within-agency and among-agencies issues, such as:

1. USFWS has consistently fully staffed its committed IFT positions, but, as noted in the Draft 5-Year Review, in 2004 USFWS approved one of its IFT positions to begin graduate studies. Although the thesis project is germane to the Reintroduction Project, graduate study obligations have affected the employee's availability for other Project priorities and the study does rely on IFT resources that might be committed to other priorities if the study were not underway. By and large, though, interns and temporary details of other USFWS (non-Project) staff have probably compensated for any shortfall.

2. Due to base-budget funding constraints, WS is only able to commit 1.25 of a minimum "available" 2.0 FTEs to the Project, when AMOC has assessed the need for WS assistance at 4.0 FTEs dedicated to wolf management purposes, including capture and control as well as depredation investigation.

3. Through 2005, NMDGF allocated 1.0 FTE to all wolf management activities in NM, and IFT staff from other cooperators are frequently required to meet those needs in the periodic absence of the NMDGF employee or to assist the employee in meeting them.

4. USFS has allocated operating expense funds to the IFT, but has not yet responded to an AMOC request for a dedicated USFS communications liaison (minimum 0.5 FTE) within the IFT.

5. As wolf numbers increase on the FAIR, and WMAT is faced with a greater need for information on potential projected wolf impacts on trophy elk hunts, at least another 1.0 FTE and perhaps more will be needed.

6. AGFD has staffed up to meet existing needs in AZ, and to help meet IFT needs throughout the BRWRA, but in the long run will likely not be able to sustain State funding support for these employees.

7. The San Carlos Apache Tribe (SCAT), by Tribal Council choice, is not a Lead Agency or Cooperator in the Reintroduction Project (nor is SCAR included in the BRWRA), but by agreement between SCAT and USFWS Region 2 (Albuquerque NM) IFT resources are used to remove wolves from SCAR as soon as they occur there (regardless of occurrence of depredation issues). These management actions draw on IFT resources (USFWS and WS staff) that would otherwise be available for wolf management on lands that are within the BRWRA.

*Finding*: SOPs: Although all SOPs identified as essential to the Project were completed in 2005, existing SOPs will need to be updated as necessary, dysfunctional ones discontinued, and new ones created as the Project evolves.

Staff capacity: Given the issues noted above, and the certainty that the BRWRA wolf population will grow with time, IFT staff capacity must be increased in the near term. If the MWEPA were expanded, or dispersal allowed throughout the MWEPA, or initial releases allowed in NM, expansion would be needed even more. Increased effectiveness in planning and evaluation, community outreach, proactive measures to reduce risk of depredation, and response to nuisance and depredation issues are among the more obvious pressing needs.

Therefore:

1. AMOC will maintain all AMOC Reintroduction Project SOPs and continue to require employee compliance with them. Note: herein, "maintain" includes modify, revise, or delete existing SOPs, or add new SOPs, as necessary for purposes of adaptive management.

2. AMOC will advocate creating an IFT position in the Alpine field office to work with cooperators and stakeholders throughout AZ and NM on proactive measures by which to avoid or minimize wolf nuisance and livestock depredation problems. Note: AMOC as a body will not advocate regulatory changes to address carcass removal or disposal issues.

3. AMOC will collaborate with an appropriate entity to complete an IFT staffing needs assessment no later than June 30, 2007, based on (a) Reintroduction Project experience to date and (b) any proposal to amend or replace the current AZ-NM MWEPA.

4. AMOC will advocate creating sufficient IFT positions in each Lead Agency as appropriate to implement the staffing needs assessment conducted pursuant to (2), above.

AMOC will also recommend that at least one IFT member from each Lead Agency be stationed in the Alpine field office, to facilitate and enhance interagency communication and cooperation.

5. Concomitant with any recommended MWEPA Rule changes, AMOC recommends that State and Tribal Lead Agencies and non-Federal Cooperators make a contingent-obligation request for annual Congressional line item allocations sufficient to cover all aspects of AMOC (i.e. including the IFT) and AMWG participation in NEPA processes and ESA-related rulemaking processes required by such activities, through to the Record of Decision.

6. AMOC will recommend that no later than April 30, 2006, AMOC State and Tribal Lead Agencies and non-Federal Cooperators complete and deliver to Congress a funding request that is sufficient to fully staff and equip the Reintroduction Project as of October 1, 2006, at levels commensurate with all on-the-ground responsibilities in all areas of responsibility, including wolf management (including control), enforcement, outreach (including establishing a Mexican wolf education center in Hon-Dah Arizona), citizen participation in adaptive management, Reintroduction Project-related research, and landowner incentives.

C-4.     Project outreach must be restructured as necessary to address the Commission, Department, and public concerns expressed here today.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: The approved Project MOU (Attachment 2) establishes and formalizes various means of project-related outreach, including through AMOC and AMWG. The MOU calls for interagency cooperation in developing and reviewing media releases, projects, and other outreach activities. Guidelines for coordinating, developing, and disseminating information for a variety of project-related events have been developed and implemented. An additional outreach component has been the maintenance of a full-time position on the IFT (as an employee of AGFD) that has Project outreach as the primary duties of that position. Moreover, AMOC has approved SOP 3.0: Outreach, to ensure appropriate guidance is given to the IFT and interested parties on performance expectations at the Project and individual employee level. See A-1, A-2, B-4, B-9, B-10, and B-12, above, for additional information regarding outreach.

*Finding*: Although the basic recommendation for restructuring Project outreach was accomplished in 2004-2005, continual effort will be needed to ensure that progress made to date is sustained, and remaining concerns resolved. Thus:

1. AMOC will direct Reintroduction Project-related outreach efforts in 2006 through the IFT Annual Work Plan to identify and reach specific target audiences, with emphasis on local communities and cooperating agencies within the BRWRA (>75% of outreach activity) and outside the BRWRA (<25% of outreach activity).

2.  AMOC will ensure that all Reintroduction Project-related outreach activities emphasize wolf conservation and management as an integrated component of the social (human) as well as the ecological landscape, and provide a balanced, objective perspective on positive and negative aspects of wolves as ecosystem components in a multiple-use landscape of intermingled public, private, and Tribal Trust lands.

3.  AMOC will collaborate with an appropriate entity to complete an IFT staffing needs assessment no later than June 30, 2007, based on (a) Reintroduction Project experience to date and (b) the Arizona-New Mexico Mexican Wolf Nonessential Experimental Population Rule recommended to USFWS.

4.  AMOC will advocate creating sufficient IFT positions in each Lead Agency as appropriate to implement the staffing needs assessment conducted pursuant to (3), above. AMOC will also recommend that at least one IFT member from each Lead Agency be stationed in the Alpine field office, to facilitate and enhance interagency communication and cooperation.

5.  AMOC will maintain and improve administrative and adaptive management processes for the Reintroduction Project to enhance meaningful opportunities for, and participation by, the full spectrum of stakeholders and interested parties. AMOC efforts will include meeting with the IFT twice each year at the Alpine field office, and offering to meet once each year with the Commission or Board of Supervisors for each County within the BRWRA.

6.  AMOC recommends that no later than April 30, 2006, AMOC State and Tribal Lead Agencies and non-Federal Cooperators complete and deliver to Congress a funding request that is sufficient to fully staff and equip the Reintroduction Project as of October 1, 2006, at levels commensurate with all on-the-ground responsibilities in all areas of responsibility, including wolf management (including control), enforcement, outreach (including establishing a Mexican wolf education center in Hon-Dah Arizona), citizen participation in adaptive management, Reintroduction Project-related research, and landowner incentives.

C-5.    All actions in the wolf project must be in strict compliance with any applicable, approved special rules, policies, protocols, management plans, and interagency agreements.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: All cooperating agencies in the Reintroduction Project obtained detailed legal reviews of the draft MOU prior to signing the agreement. A primary purpose of these legal reviews was to ensure compliance with the laws, regulations, and policies of each of the respective cooperating entities. All Project SOPs are also reviewed while being drafted and before approval to ensure compliance with all applicable laws, regulations, and policies. Compliance with applicable rules and mandates is a continuing responsibility of all cooperating agencies in the AMOC. Thus, AMOC will maintain all AMOC Reintroduction Project SOPs and

continue to require employee compliance with them. Note: herein, "maintain" includes modify, revise, or delete existing SOPs, or add new SOPs, as necessary for purposes of adaptive management.

C-6.    The Project's review protocols and procedures must be restructured and improved to ensure that the 5-Year Review is effective and efficient, and an improvement over the 3-Year Review.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: Procedures for conducting the 5-Year Review were developed using input from AMOC Lead Agencies and formal and informal Cooperators. This was a distinct contrast to the 3-Year Review, when the review process was determined by USFWS, although vetted to some extent through the Interagency Management Advisory Group (IMAG). All parties involved in development of the 5-Year Review worked to create a process that would be more effective and efficient than, and an improvement on, the 3-Year Review. A key focus was on providing more opportunities for public comment.

Given that the 5-Year Review will be completed at the end of the eighth year of the Reintroduction Project, albeit due to late formation of AMOC and restructuring of virtually the entire Project, whether it can be considered particularly efficient is moot at best. However, its procedures were agreed upon specifically to improve on aspects of the 3-Year Review, including: (1) assigning AMOC and IFT staff directly involved in administering and implementing the Project to draft the Administrative and Technical components, to make use of their intimate knowledge of Project history and operations and to provide a fresh perspective compared to the 3-Year Review; (2) contracting an independent socioeconomic assessment (a facet absent from the 3-Year Review); and (3) allowing ample time-frames for AMWG discussion and public review of and comments on the draft 5-Year Review report before making findings (recommendations) and finalizing the report.

In particular, AMOC and the IFT allocated considerable time to analyzing and responding to public comment on the draft 5-Year Review, and to editing the document to incorporate suggestions for improvement and to address questions, concerns, and criticisms.

*Finding*: Strictly from an AMOC perspective, the 5-Year Review has been a substantial improvement over the 3-Year Review from several perspectives: (1) It has been conducted in transparent fashion, in accordance with a reasonably well defined process; (2) AMOC and AMWG meetings throughout the process enabled interested and affected parties who wanted to be well informed about the process to be so informed and ample opportunity to provide comment; (3) Socioeconomic issues were addressed; (4) All recommendations and materials from earlier reviews of the Project and relevant information from all aspects of Project implementation were carefully considered; (5) The 5-Year Review was actually completed, with a thorough discussion among all Lead Agencies and Cooperators, including their Directors, before findings or final recommendations (with completion timeframes as appropriate) were

offered that target specific issues of concern, obstacles to progress, and important areas in which progress to date needs to be sustained.

D.    Specific Recommendations from the State Evaluation of the 3-Year Review.

Roles and Functions

D-1.    The Mexican Wolf Recovery Program must be restructured to ensure that the two primary components (recovery planning and reintroduction) are managed as collaborative but separate projects.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: The signed MOU describes distinct roles related to recovery and reintroduction for the Lead Agencies. After overcoming various inter-agency issues in 2003 (see B-9, above), increasingly through 2004 and 2005 those distinctions are now being maintained, although constant vigilance is necessary to ensure this. Formation of a new SWDPS Recovery Team in August 2003, with the intent to complete a revised recovery plan by Spring 2006 (see B-2, above), was well coordinated with the overlapping transition to State and Tribal leadership in AMOC for implementing reintroduction activities in AZ and NM. The Recovery Team initially served as a valuable review resource while AMOC and the IFT drafted the 5-Year Review, but this asset was lost when the Team was placed on hiatus in February 2005 (see B-2, above).

Perhaps the key factor in progress on this recommendation was USFWS's hiring of a new Recovery Coordinator in mid-November 2004. The new Coordinator embraced interagency collaboration from the outset, and was consistently able to distinguish between USFWS obligations to leadership of recovery issues and AMOC responsibility for matters pertaining to the Reintroduction Project. This has greatly facilitated efforts to ensure that the two components are managed as collaborative but separate projects.

*Finding*: The 5-Year Review reaffirms prior conclusions that a Recovery Team, as a means of crafting an updated Recovery Plan and rangewide recovery goals, is essential to articulating and attaining Reintroduction Project population objectives (goals). Nevertheless, AMOC believes it remains important to maintain separation between the two components, to ensure that local interested parties and stakeholders know to whom to look (i.e. AMOC and the IFT) for discussion and resolution of wolf management issues. AMOC is the agreed-upon forum for adaptive management of the Reintroduction Project, and that functionality must be maintained. The Recovery Team needs to be resurrected, to focus on timely completion of an updated Recovery Plan with clear-cut recovery goals that cover but are not restricted to the BRWRA. Both the Technical and Stakeholder Sub-Groups of the Recovery Team could provide valuable support to AMOC in 2006, but the key aspect of AMOC's recommendations in this regard (see the AMOC Recommendations Component) is that the Team would serve in an advisory capacity, not a directive capacity.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

D-2.    The roles and functions of the Primary Cooperators (AGFD, NMDGF, and the Service) must be restructured to ensure State participation, authorities, and responsibilities as reflected in this report.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment* and *Finding*: See C-1 and C-2 under Commission Directives, above.

D-3.    The administrative and adaptive management processes for the Reintroduction Project must be restructured to ensure meaningful opportunities for, and participation by, the full spectrum of stakeholders and interested parties (see also "Public Participation and Outreach" below).

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment* and *Finding*: See C-1 and C-2 under Commission Directives, above.

D-4.    The Service should immediately ask the White Mountain Apache Tribe whether it wishes to become a Primary Cooperator in the overall Reintroduction Project component, or retain such status only on its own Tribal lands.

*Status*: Completed.

*Assessment*: Through development of the interagency MOU for the Reintroduction Project, WMAT became a Lead Agency and has been an active participant in all AMOC discussions and decisions regarding Mexican wolf reintroduction. Under the MOU, WMAT has the lead for all activities relating to Mexican wolf reintroduction that occur on WMAT Tribal Trust Lands (i.e. FAIR), and plays a support role as appropriate and feasible off the FAIR.

Finding: WMAT has been a valuable cooperator in the Reintroduction Project. The Project would benefit if SCAT were to voluntarily take on a similar role with regard to the SCAR. However, at this time SCAT remains opposed to wolf reintroduction and declines to become a formal participant in the Reintroduction Project or to allow wolves to disperse to and remain on SCAT.

D-5.    The Mexican Wolf Recovery Planning component should be staffed by the Service's Mexican Wolf Recovery Coordinator, and centered in Albuquerque. Other elements of this Federally-staffed component should address the captive breeding program, pre-release acclimation husbandry at Sevilleta and other cooperating facilities, program-level outreach, revision of the 1982 Mexican Wolf Recovery Plan, and coordination of the Mexican wolf recovery planning range-wide, as well as conceptual oversight (not daily supervision) of the reintroduction effort in Arizona and New Mexico.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: USFWS has maintained a Mexican Wolf Recovery Coordinator (or Acting) since 1992. However, this position was vacant from June 2003, when the former Recovery Coordinator left the program, until mid-November 2004. Although USFWS did assign recovery program personnel to perform in the Recovery Coordinator's capacity during that period of vacancy, not all Recovery Coordinator functions were performed during this time.

USFWS Mexican wolf recovery staff members manage facilities and activities involving acclimation pens at Sevilleta National Wildlife Refuge, assist with other cooperating facilities, establish Recovery Protocols for pre-release husbandry at captive facilities and in on-site acclimation pens, and provide guidance to the AZA Mexican Wolf SSP Program. USFWS Region 2 recovery staff, although not dedicated solely to Mexican wolf recovery, also led range-wide recovery planning and initial revision of the 1982 Mexican Wolf Recovery Plan during 2003 and 2004.

USFWS has not hired or maintained staff dedicated to recovery-related outreach functions, due to lack of funding. However, all USFWS personnel assigned to Mexican wolf recovery participate in limited programmatic outreach activities. The only dedicated Mexican wolf outreach staff member is an AGFD IFT employee who performs public outreach for Mexican wolf reintroduction in the BRWRA.

USFWS recovery program staff initially provided limited conceptual oversight of the Reintroduction Project during 2003 and 2004. Conceptual guidance came primarily from the State Wildlife Agencies, though it was vetted with (and approved by) the USFWS Region 2 Director before being implemented through formation of AMOC and AMWG. Since the new USFWS Mexican Wolf Recovery Coordinator was hired in mid-November 2004, however, through him USFWS has increasingly provided the desired blend of conceptual guidance while respecting AMOC and State and Tribal Field Team Leader responsibilities for daily supervision of the IFT and on-the-ground wolf management activities.

*Finding*: AMOC finds that:

1. USFWS adequately addressed Recovery Program structure issues. As of November 2004, USFWS staff had reinitiated Mexican Wolf recovery planning, and hired a new Recovery Coordinator, who is stationed in Albuquerque.

2. USFWS is adequately addressing captive breeding issues (i.e. facilities and programs), except that Recovery Protocols for pre-release husbandry at captive breeding facilities and in on-site acclimation pens has not been discussed with AMOC. Therefore, no later than June 30, 2006, AMOC will review the USFWS Recovery Protocols for pre-release husbandry at captive breeding facilities and in on-site acclimation pens, and advise USFWS as to whether AMOC believes they are adequate to maximize post-release survival and breeding success.

3.  USFWS should allocate sufficient resources to Recovery Program outreach to ensure that the public (particularly interested parties and stakeholders) is adequately aware of progress and impediments thereto.

4.  AMOC recommends completion of a rangewide USFWS Mexican Wolf Recovery Plan no later than June 30, 2007. AMOC notes that this will likely not be possible unless the USFWS budget is sufficient to dedicate sufficient staff and resources to fully support the Recovery Team.

5.  AMOC recommends sustaining the current Recovery Coordinator's approach to providing conceptual oversight (i.e. recovery perspective as opposed to daily supervision) of the reintroduction effort in AZ and NM. It facilitates progress, yet gives appropriate deference to the AMOC and State and Tribally-led adaptive management effort.

D-6.   The Recovery Planning component should be responsible for reviewing and approving adaptive management Project implementation protocols and procedures that are developed by the Reintroduction Project component that is outlined below.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: See Item C-3 under Commission Directives, above. The Reintroduction Project MOU draws appropriate distinction between recovery protocols (rangewide protocols that would apply to processes and activities that support any and all wolf reintroduction efforts within the region) and reintroduction procedures (SOPs that apply specifically to the BRWRA Reintroduction Project). All AMOC SOPs developed thus far have been developed in collaboration with USFWS Mexican Recovery Program staff. However, per the MOU, AMOC is the approving body for all AMOC SOPs, except the SOP that identifies the approval process; that one was approved by the AMOC Lead Agency Directors, including the USFWS Region 2 Director, thus delegating their approval authority to AMOC.

*Finding*: AMOC's existing SOPs were developed and approved appropriately. AMOC will maintain all AMOC Reintroduction Project SOPs and continue to require employee compliance with them. Note: herein, "maintain" includes modify, revise, or delete existing SOPs, or add new SOPs, as necessary for purposes of adaptive management

D-7.   The Reintroduction Project component (in Arizona and New Mexico) must be centered in Alpine, Arizona, and/or elsewhere in the Recovery Area to ensure adequate field presence and outreach to manage released and wild-born wolves effectively, and to minimize real and perceived public conflicts.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: Project field staff members are appropriately distributed in the BRWRA at this time. Most IFT members are stationed in Alpine AZ, working out of an administrative site constructed by AGFD on USFS property in 2005. AMOC Lead Agencies cooperatively fund operational and

maintenance costs for the facility. This central facility helps maximize interaction within the IFT, facilitating communication and teamwork.

As needed, IFT members are sent to outlying locations for temporary duty assignments, typically in conjunction with livestock depredation issues.

*Finding*: AMOC believes the Reintroduction Project is appropriately centered in Alpine AZ and that recent AGFD contribution of an administrative site provides adequate office space for the IFT at its present capacity. AMOC also believes that the IFT Leaders appropriately deploy staff members to outlying locations as necessary to provide local presence and to address local management issues. IFT coverage is best in Arizona, and sparsest in New Mexico, due to disparities in State Wildlife Agency IFT staffing. See C-3, above, regarding AMOC recommendations on increasing IFT staff capacity and the need for each Lead Agency to assign one of its IFT members to the Alpine administrative site to enhance intra-IFT communication and coordination.

D-8.    The IFT Leader must be a state employee, and all elements of the IFT (including biologists and outreach specialists) must report to that Leader. If IFT presence is needed in New Mexico, it must be funded, staffed, structured, and supervised as agreed by the Primary Cooperators, in keeping with the State-lead recommendation above.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: The approved Reintroduction Project MOU states that Field Team Leaders shall be State and Tribal personnel, and the IFT shall act under guidance of the AGFD Field Team Leader on non-tribal lands in AZ, under guidance of the WMAT Field Team Leader on FAIR, and under guidance of the NMDGF Field Team Leader on non-tribal lands in NM.

*Finding*: Although compliance with this guidance was uneven in 2003 and 2004, it appears to have improved in 2005. Joint annual work planning, monthly IFT meetings, quarterly AMOC meetings, and twice-yearly AMOC Directors Summits seem to have helped improve IFT coordination and cooperation. This progress needs to be sustained, and improved upon.

D-9.    The IFT response protocols must be restructured, and staff capacity must be enhanced (and funded) as necessary to ensure immediate (24-hour or less) response capability for, and resolution of, urgent operational issues, such as depredation incidents. Response capability should be reviewed each calendar year to identify appropriate staffing, budget, and response protocol adjustments as reintroduction continues.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment* and *Finding*: See C-3 under Commission Directives, above. See also the AMOC Responses to Public Comment Component for affirmation that IFT response time to depredation incidents is less than 24 hours after the report is received, and improved appreciably from 1998 through 2005.

D-10.  All field and other Reintroduction Project protocols, and all management actions in the Project, must always be in strict compliance with any applicable, approved special rules, policies, and protocols, management plans, and interagency agreements.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment* and *Finding*: See C-5 under Commission Directives, above.

D-11.  The Reintroduction Project must be adaptively managed by collaboration and consensus among all three Primary Cooperators, with appropriate and meaningful opportunities for participation by stakeholder and other interested parties (see below).

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: The approved MOU has an explicit objective of implementing interagency coordination and cooperation. This coordination involves an expanded set of six Lead Agencies and additional Cooperators. These entities do adaptively manage the Reintroduction Project, with meaningful opportunities for public participation, through AMOC and AMWG. In cases where consensus cannot be reached, management decisions regarding the reintroduction project ultimately lie with the Lead Agency that has jurisdictional authority for wildlife within the geographic area of the management actions (e.g. AGFD for management actions on non-tribal lands in Arizona, NMDGF for management actions in New Mexico, etc.).

*Finding*: The operational procedure of "jurisdictional leads" (see above) that AMOC uses should be codified as necessary in AMOC's SOPs and within the descriptions of roles, responsibilities, and processes as described under paragraph 8 of the MOU's "Lead Agencies agree to:" section. See also the *Finding* for C-1 under Commission Directives, above

D-12.  The Reintroduction Project Coordinator position must be restructured and empowered to coordinate the adaptive management process, including identification, planning, review, and approval of future release sites and release protocols for Arizona and/or New Mexico. The Project Leader shall provide a transition between Recovery (Federal) and Reintroduction (State), by reporting to the Recovery Coordinator (Federal) and supervising the Field Team Leader (State).

*Status*: Not considered necessary to implement.

*Assessment*: The AGFD, NMDGF, and USFWS Region 2 Directors agreed in discussion on October 31, 2002 and in a November 8, 2002 written summary of that meeting (see Attachment 1) to implement this recommendation. However, the USFWS Region 2 Director changed his mind in February 2003, due to his agency's previous commitments to the employee in question (i.e. regarding job responsibilities). The AGFD and NMDGF Directors agreed to defer to the USFWS Region 2 Director on this issue. Thus, the approved MOU contains a different description of roles and responsibilities for the Reintroduction Coordinator (renamed as the Field

Projects Coordinator). The MOU states that the USFWS Field Projects Coordinator will serve as communication liaison between AMOC and the IFT; assist with drafting reintroduction procedures, protocols, annual work plans, and annual reports; and plan and coordinate the identification and review of release and translocation sites. Within the IFT, the Field Projects Coordinator thus provides support to the IFT Leaders.

*Finding*: The State recommendation was superseded by agreement among the AGFD, NMDGF, and USFWS Region 2 Directors. Thus, the roles and responsibilities of the USFWS Field Projects Coordinator should be as described in the signed Reintroduction Project MOU.

D-13.  The adaptive management component of the Reintroduction Project must be restructured in collaboration with stakeholders and other interested parties, in accordance with the primary roles and function identified herein. IMAG should be dissolved or restructured to provide a forum open to any and all interested parties. The States prefer that a State-led Conservation Team approach be used to create this forum.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: IMAG has been dissolved, and has been replaced by AMOC, with AMWG as a forum for public participation in adaptive management of the Reintroduction Project. The revised structure is working increasingly effectively, but further improvements are needed (see AMOC Responses to Public Comment Component).

*Finding*: AMOC will maintain and improve administrative and adaptive management processes for the Reintroduction Project to enhance meaningful opportunities for, and participation by, the full spectrum of stakeholders and interested parties. AMOC efforts will include meeting with the IFT twice each year at the Alpine field office, and offering to meet once each year with the Commission or Board of Supervisors for each County within the BRWRA.

D-14.  With the new adaptive management forum, the Primary Cooperators should use other Cooperators signatory to a Memorandum of Agreement as a sounding board for Project management recommendations that are subsequently approved and implemented by the Primary Cooperators. Consensus should be sought with all formal Cooperators and other interested parties for all decisions, but in the absence of consensus the Primary Cooperators should be jointly responsible and accountable for making the necessary decisions. Signatory cooperator status in this adaptive management forum should be open to any interested governmental and non-governmental agency or organization. Participation by individuals should be without limit, except that voting on recommendations should be restricted to formal Cooperators.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: The recommendation listed above generally describes the means by which Lead Agencies and Cooperators have been operating under the approved MOU. They actually began to function along those lines beginning in February 2003, prior to completion of the MOU. Two

departures from the recommendation as stated above are that (1) in the absence of consensus, Lead Agencies are not jointly (or at least not equally) responsible for management decisions, but primary responsibility rests with the agency that possesses wildlife management authority within the jurisdictional boundaries of that action, and (2) non-governmental entities are not eligible to be signatories to the MOU but can participate in AMWG to assist in adaptively managing Mexican wolf reintroduction. Where the above recommendation differs from the approved MOU, the guidance within the MOU should be followed.

*Finding*: As noted in D-13, AMOC will maintain and improve administrative and adaptive management processes for the Reintroduction Project to enhance meaningful opportunities for, and participation by, the full spectrum of stakeholders and interested parties. However, AMOC will continue to recognize agency legal authorities and mandates by: (1) in the absence of consensus, deferring final decisions, after consideration of recommendations from all Lead Agencies, to the Lead Agency with primary responsibility (i.e. wildlife management authority) within the jurisdictional boundaries of that action; and (2) ensuring that governmental and non-governmental entities are not signatory to the MOU are afforded ample opportunity through AMWG meetings to contribute to adaptively managing Mexican wolf reintroduction.

<u>Public Participation and Outreach</u>

D-15.    The administrative and adaptive management processes for the Reintroduction Project component must be restructured to ensure meaningful opportunities for, and participation by, the full spectrum of stakeholders and interested parties (see above).

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment* and *Finding*: See D-2 under Commission Directives, above.

D-16.    Reintroduction Project outreach must be restructured and funded as necessary to address the Commission, Department, and public concerns expressed in this report.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment* and *Finding*: See D-4 under Commission Directives, above.

D-17.    An outreach specialist must be added to the IFT, to be supervised by the IFT Leader with funding provided through the AGFD-NMDGF-Service Memorandum of Understanding for this Project, to focus entirely on reintroduction issues as opposed to recovery issues.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: Prior to 2005, an AGFD IFT position served a part-time outreach function (40% outreach; 60% field work). This was clearly insufficient to meet Project needs (see AMOC Responses to Public Comment Component). Thus, the Draft 5-Year Review included a recommendation that USFWS provide an outreach specialist for Mexican wolf reintroduction,

because of a perception that a USFWS employee would have greater ability as a Federal employee to move across State and Tribal boundaries when requested. The recommendation also suggested that if additional Project outreach specialists were deemed necessary by individual Lead Agencies or Cooperators, they should be encouraged to support the USFWS specialist. However, the recommendation noted that funding for additional outreach specialists should not be provided through USFWS funds that would otherwise support implementation of Mexican wolf reintroduction by the Lead Agencies.

In 2004 discussions, AMOC noted that a Project outreach specialist, regardless of agency of employment, should be able to serve all cooperating agencies under the MOU without regard for jurisdictional boundaries, so long as individual agency protocols for press releases and media events were respected and the appropriate Lead Agency has final approval over release of such information. It was also clear by that time that USFWS was not in a position to fund an outreach specialist for the Project. It had also become very clear that public dissatisfaction with the Project outreach effort was growing. Thus, in 2005, AGFD responded to AMOC discussion and priorities by increasing its part-time outreach position to full-time Project outreach throughout the BRWRA. In addition, in 2004 cooperating agency Public Information Officers began increasing their support for the Project, primarily in terms of outreach through broader mass media outlets, especially those in Albuquerque NM, Phoenix AZ, and Pinetop-Lakeside AZ.

*Finding*: IFT staff outreach capacity has been increased to a level believed sufficient to meet Project needs. Ongoing assessment of performance needs to be maintained, and sufficient funds must be allocated to support the effort. Therefore, AMOC will direct Reintroduction Project-related outreach efforts in 2006 through the IFT Annual Work Plan to identify and reach specific target audiences, with emphasis on local communities and cooperating agencies within the BRWRA (>75% of outreach activity) and outside the BRWRA (<25% of outreach activity).

<u>Technical (Biological) Recommendations in the 3-Year Review</u>

D-18.   Given the time constraints of this independent review, the States are unable to provide detailed technical recommendations on biological aspects of the Reintroduction Project. However, we wish to affirm that we find scientific merit in the biological recommendations offered in Paquet et al. (2001), and in some of those offered in the Stakeholders Workshop final report.

*Status*: Comment only; not considered necessary to complete or implement.

*Assessment* and *Finding*: This comment did not require further consideration.

D-19.   Not later than January 31, 2003, the Primary Cooperators should jointly decide upon which technical recommendations to take through the newly restructured Reintroduction Project adaptive management process, for discussion, refinement, and implementation, and which ones to assign to the Recovery Program to address at that level. We note again that the Reintroduction Project continues to suffer from the Service's failure to revise the

Mexican Wolf Recovery Plan, to integrate reintroduction population objectives with appropriate recovery objectives.

*Status*: Completed.

*Assessment*: This item was initiated but was not completed within the assigned timeframe. Technical recommendations could not be brought to the Reintroduction Project's newly restructured adaptive management process by January 2003, because the MOU codifying that process was not completed until October 2003. However, the Lead Agencies and Cooperators recognized the value in completing this task, thus they used the 5-Year Review process to complete it.

*Finding*: The 5-Year Review includes recommendations that AMOC will implement through AMWG and others that could most effectively be pursued with assistance from the Recovery Team. However, only the recommendation regarding completion of a Recovery Plan clearly must be assigned to the Recovery Team (see B-2, above, for additional relevant information).

D-20.  Not later than March 31, 2003, the Primary Cooperators must discuss their recommendations with other Cooperators in public session, and develop a draft plan for implementing the recommendations selected. This plan must include timelines and measurable objectives for implementation.

*Status*: Not completed.

*Assessment*: See D-19 Assessment, above.

*Finding*: AMOC's 5-Year Review recommendations (see AMOC Recommendations Component) include, as appropriate timeframes and defined objectives. The recommendations and the implementation process will be discussed at length in AMWG meetings, beginning on January 26, 2006 (Safford AZ) and January 27, 2006 (Silver City NM).

D-21.  At least annually thereafter, the Primary Cooperators must present to stakeholders and cooperators an annual report and annual work plan for discussion and comment. These documents would collectively serve as the monitoring and evaluation components needed for adaptive management. The agreed-upon annual work plans must be flexible (adaptive), so changing needs can be met, but must also be followed sufficiently closely to allow effective evaluation and monitoring of project actions in a manner that will provide a solid foundation for subsequent decision-making processes and adaptive management.

*Status*: Not completed because it is a continuing need that is being addressed.

*Assessment*: Since 2003, considerable progress has been made in "catching up" on production of Annual Reports. All IFT Annual Reports for 1998-2004 are now posted in downloadable PDF format at http://azgfd.gov/wolf). Although Annual Work Plans were not completed in timely

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

fashion in prior years, the 2006 plan was completed before the Calendar Year (2006) began and will be discussed in AMWG sessions in January 2006.

*Finding*: AMOC will continue to work toward completing IFT Annual Work Plans in October for the coming Calendar Year, and will make all Reintroduction Project wolf management, outreach, and budget information (redacted as appropriate to protect confidential personal information) available to the public through Annual Reports for the Reintroduction Project published in April of each year, and other publications and outreach materials as appropriate.

<u>Five-Year Review</u>

D-22.  The Reintroduction Project's review protocols and procedures must be restructured and improved to ensure that the 5-Year Review is (a) effective and efficient, (b) makes full use of all appropriate material from the 3-Year Review, (c) an improvement over the 3-Year Review, and (d) completed by September 30, 2004.

*Status*: Completed.

*Assessment* and *Finding*: See C-6 under Commission Directives, above.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

TABLES AND FIGURES

| Table 1 (information current as of October 2005). Estimated costs of Mexican wolf conservation by cooperating agencies since initial releases occurred in 1998 in the Arizona-New Mexico Blue Range Reintroduction Project. See footnotes below for information essential to understanding the limitations of the information provided below; the costs reported herein are "best possible" estimates, not exact figures. | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Cost Estimates (= Funds Expended) | | | | | | | | |
| Fiscal Year | AGFD State[2] | AGFD Federal[3] | NMDGF State[4] | NMDGF Federal[5] | USDA FS[6] | USDA WS[7] | USFWS[8] | Total |
| 98 | 60,632 | 25,797 | 0 | 0 | 3,000 | 0 | 489,700 | 579,227 |
| 99 | 36,094 | 100,100 | 12,250 | 36,750 | 10,000 | 0 | 581,750 | 777,043 |
| 00 | 50,896 | 139,513 | 17,000 | 51,000 | 11,500 | 0 | 744,187 | 1,014,096 |
| 01 | 56,500 | 168,711 | 17,000 | 51,000 | 13,500 | 0 | 936,589 | 1,243,301 |
| 02 | 53,000 | 161,277 | 17,000 | 51,000 | 7,000 | 0 | 781,223 | 1,070,502 |
| 03 | 110,000 | 188,163 | 17,000 | 51,000 | 12,500 | 150,000 | 819,977 | 1,348,643 |
| 04 | 174,357 | 210,135 | 20,000 | 60,000 | 62,500 | 150,000 | 833,790 | 1,510,786 |
| 05[9] | 279,942 | 312,246 | 20,000 | 60,000 | 142,500 | 150,000 | 1,057,000 | 2,021,688 |
| 06[10] | 291,750 | 518,250 | 40,000 | 120,000 | 62,500 | 150,000 | 1,265,000 | 2,447,500 |
| Total | 1,113,171 | 1,824,192 | 160,250 | 480,750 | 325,000 | 600,000 | 7,509,216 | 12,012,786 |

[2] "AGFD State" includes all AGFD funds other than those received from Federal sources.

[3] "AGFD Federal" includes all funds expended by AGFD that were of Federal origin via ESA Section 6, Pittman-Robertson, Wildlife Conservation and Restoration Program, State Wildlife Grants, and/or contract with USFWS, USFS, or another Federal agency.

[4] "NMDGF State" includes all NM funds other than those received from Federal sources.

[5] "NMDGF Federal" includes all funds expended by NMGFD that were of Federal origin. Prior to FY06, all these were USFWS Mexican Wolf Recovery Program contract funds received by NMDGF. Beginning in FY06 (estimates), 50% are expected to originate from USFWS Mexican Wolf Recovery Program contract funds and 50% from State Wildlife Grant funds.

[6] "USFS" cost figures through 2002 are estimates generated in April 2003 for the Apache-Sitgreaves National Forests (Alpine and Clifton Ranger Districts) and the Gila Nation Forest (Wilderness Ranger District).

[7] "USDA WS" cost figures represent directed Congressional allocations specifically for wolf work in AZ-NM.

[8] "USFWS" cost figures are for the Service's Mexican Wolf Recovery Program only, and include all funds conveyed by contract to USDA WS and WMAT (White Mountain Apache Tribe) for work on the Mexican wolf reintroduction project. USFWS Mexican Wolf Recovery Program contract funds conveyed to AGFD (all of which are included in the AGFD Federal column in this Table) are as follows: FY98 $400; FY99 $88,100; FY00 $126,513; FY01 $152,711; FY02 $146,277; FY03 $162,623; FY04 $189,795; FY05 $0 (zero); and FY06 $175,000.

[9] FY05 costs are estimates; the Fiscal Year will not end until June 30 (State) or September 30 (Federal), 2005. The totals will be adjusted when final expenditures for the year have been reported.

[10] FY06 costs are estimates; the Fiscal Year will not end until June 30 (State) or September 30 (Federal), 2006. The totals will be adjusted as changes occur during the year, and again when final expenditures for the year have been reported.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

| Table 2. Documented depredation incidents and associated wolf activities and management actions (N=46) (Incidents occurred from 1999-2004). | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wolf # | Pack Name | CD | MD | SD | RFD | Carcass | Translocated | Fate as of end of 2005 |
| 166 | Campbell Blue | X | | | X | X | | Permanently Removed |
| 168 | Gavilan | X | | | X | | | Permanently Removed |
| 183 | Gavilan | X | | | X | X | | Permanently Removed |
| 190 | Mule | X | | | X | X | | Permanently Removed |
| 191 | Pipestem | X | | | X | X | X | Dead |
| 208 | Pipestem | X | | X | X | X | X | Permanently Removed |
| 507 | Bluestem | X | X | | | X | | In the Wild |
| 509 | Francisco | X | | X | | X | X | Dead |
| 511 | Francisco | X | | X | | X | X | Captivity |
| 521 | Bluestem | X | X | | | X | | In the Wild |
| 555 | Gavilan | X | | | | | | Unknown |
| 562 | Pipestem/Luna | X | | X | X | X | | In the Wild |
| 574 | Saddle | X | X | | X | | | Lethally Controlled |
| 582 | Gavilan | X | X | | | | | Dead |
| 583 | Gavilan/Luna | X | | | X | | X | In the wild |
| 584 | Gavilan/Gapiwi | X | X | | X | X | X | Dead |
| 585 | Gavilan | X | X | | X | | | Dead |
| 586 | Gavilan | X | X | | | | X | Unknown |
| 592 | Campbell B/Sycam | X | X | | X | X | X | Lethally Controlled |
| 623 | Pipestem | X | | X | X | | | Dead |
| 624 | Pipestem/Wild/Gap | X | | X | | X | X | Unknown |
| 625 | Pipestem | X | | X | X | | | Dead |
| 626 | Pipestem | X | | X | X | | | Dead |
| 627 | Pipestem | X | | X | | | X | Unknown |
| 628 | Pipestem | X | | | X | X | X | Permanently Removed |
| 632 | Lupine | | | X | | X | X | Permanently Removed |
| 639 | Bluestem | X | X | | | | X | Dead |
| 644 | Francisco/Cerro | | | X | | | | Dead |
| 646 | Saddle | X | | | | X | | Dead |
| 648 | Saddle/Sycamore | X | | X | X | | X | Captivity |
| 729 | Red Rock | X | | | X | X | | Lethal Control |
| 732 | Red Rock | X | | X | | | X | In the Wild |
| 754 | Bluestem | X | | | | | X | Unknown |
| 756 | Bluestem | X | X | | | | X | Dead |
| 755 | Bluestem | X | X | | | | | Unknown |
| 757 | Bluestem | X | X | | | | | Unknown |
| 758 | Bluestem | X | X | | | | | Unknown |
| 794 | Francisco/Bonito | X | | | | | | Unknown |
| 796 | Cienega/San Mat | X | X | | | X | X | In the wild |
| 797 | Francisco/Saddle | X | X | | X | X | X | In the wild |
| 798 | Francisco | X | | X | | X | X | Dead |
| 799 | Francisco | X | X | | X | X | X | Dead |
| 800 | Francisco | X | | | | | X | Dead |
| 801 | Francisco | X | | | | X | X | Dead |
| 832 | Francisco | X | | X | | X | | Unknown |
| 903 | San Mateo | X | | X | | | | In the Wild |
| 46 | Totals | 44 | 16 | 16 | 20 | 23 | 24 | |
| 100 | Percentage | 96 | 35 | 35 | 43 | 50 | 52 | |

Abbreviations:
    CD = Confirmed depredation
    MD = Multiple depredations
    SD = Suspected depredation
    RFD = Removed for depredation

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                    December 31, 2005

Note: Carcass = Wolves that have been seen Scavenging on dead livestock

Table 3. Three chronological groupings of wolf depredation incidents and carcass scavenging events.

| GROUP | Wolf # | Pack Name | Carcass Feeding Date/s | Depredation Date/s | Carcass-feeding Preceded Depredation (Yes/No) |
|---|---|---|---|---|---|
| Group One | 183 | Gavilan | 8/15/99 | 8/11/99, 8/30/99, 9/8/99, 12/26/99, 1/11/00 | N |
|  | 509 | Francisco | 3/6/03 | 8/16/02 | N |
|  | 511 | Francisco | 3/6/03, 8/19/03 | 8/16/02 | N |
|  | 584 | Gavilan/Gapiwi | 2/8/00 | 8/11/99,8/30/99, 9/8/99, 12/26/99, 1/11/00 | N |
|  | 592 | Campbell Blue Sycamore | 5/01 | 4/18/01, 6/3/01 | N |
|  | 624 | Pipestem/Wild/ Gapiwi | 4/10/03 | 7/11/99 | N |
|  | 628 | Pipestem | 5/11/01, 4/26/02 | 7/11/99, 6/15/00,5/11/01 | N |
|  | 632 | Lupine | 12/27/01, 4/5/02 | 12/27/01 | N |
|  | 646 | Saddle | 7/30/99 | 7/11/99 | N |
|  | 798 | Francisco | 3/7/03, 8/19/03 | 8/16/02 | N |
|  | 799 | Francisco | 3/7/03 | 8/16/02, 3/9/04, 3/18/04 | N |
|  | 801 | Francisco | 3/7/03, 8/11/03 | 8/16/02 | N |
| Group Two | 190 | Mule | 5/11/01,4/26/02 | 5/11/01, 3/23/02, 3/26/02,4/26/02 | N |
|  | 191 | Pipestem | 4/4/99, 6/16/99 | 4/4/99, 6/15/99, 6/22/99, 6/26/99, 7/4/99, 7/11/99 | N |
|  | 208 | Pipestem | 4/4/99, 6/16/99 | 4/4/99, 6/15/99, 6/22/99, 6/26/99, 7/4/99, 7/11/99 |  |
|  | 507 | Bluestem | 8/23/02 | 8/21/02, 9/29/02 | N |
|  | 521 | Bluestem | 8/23/02 | 8/21/02, 9/29/02 | N |
|  | 562 | Pipestem | 4/4/99, 6/16/99 | 4/4/99, 6/15/99, 6/22/99, 6/26/99, 7/4/99, 7/11/99 | N |
| Group Three | 166 | Campbell Blue | 2/7/01, 3/2/01, 5/01 | 6/3/01 | Y |
|  | 729 | Red Rock | 8/7/03, | 3/9/04, 3/18/04 | Y |
|  | 796 | Cienega/ San M | 11/17/03 | 5/1/04 | Y |
|  | 797 | Francisco | 3/7/03, 8/25/03, 8/26/03 | 3/20/04 | Y |
|  | 832 | Francisco | 7/21/03 | 5/1/04 | Y |

| Table 4. Disposition of the five Group Three wolves | |
|---|---|
| Wolf # | Current "Locations" |
| 166 | Permanently Removed |
| 729 | Dead-Lethal Control |
| 796 | In the Wild |
| 797 | In the Wild |
| 832 | Unknown |

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

Appendix 1. Commission Directives to Arizona Game and Fish Department and New Mexico Department of Game and Fish.

Summary of Discussions Among the Arizona Game and Fish Department, New Mexico Department of Game and Fish, and the U.S. Fish and Wildlife Service Regarding Management of Mexican Wolf Recovery and Reintroduction Efforts

November 8, 2002 (Revised Final)

In separate public sessions during September 2003, the Arizona Game and Fish Commission and the New Mexico State Game Commission passed motions providing guidance to the two agencies on changes they deemed necessary in Mexican wolf Recovery and Reintroduction, as they pertain to the States of Arizona and New Mexico. The direction was as follows:

1. The roles and functions of the Primary Cooperators (AGFD, NMDGF, Service) must be restructured to ensure State participation, authorities, and responsibilities as reflected in today's [Commission meeting] discussion.
2. The administrative and adaptive management processes must be restructured to ensure opportunities for, and participation by, the full spectrum of stakeholders.
3. The Interagency Field Team response protocols must be restructured, and staff capacity must be enhanced, to ensure immediate response capability to, and resolution of, urgent operational issues, such as depredation incidents.
4. Project outreach must be restructured as necessary to address the Commission, Department, and public concerns expressed today.
5. All actions in the Project must be in strict compliance with any applicable, approved special rules, policies, protocols, management plans, and interagency agreements.
6. The Project's review protocols and procedures must be restructured and improved to ensure that the 5-year review is effective and efficient, and an improvement over the 3-Year Review.

The Arizona Commission also:

1. Required its Department to resolve issues 1, 2, and 3 within 60 days of September 30, 2002, at the Primary Cooperator level, and that the changes and the issues they reflect be taken through the restructured Adaptive Management Process for stakeholder discussion and further refinement.
2. Directed its Department to restructure the Mexican Wolf Reintroduction Project within 180 days of September 30, 2002, and report back to the Commission on the results of this effort in April 2003.
3. Reserved the right, if these issues are not resolved within the timeframes outlined in the letter, to take further action on the Department's participation in this Project.

The two State agencies met with the Service on October 31, 2002 to discuss how to comply with the Commissions' guidance. They resolved that the Recovery and Reintroduction components would be separated more clearly in future planning and implementation efforts. To achieve this:

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                    December 31, 2005

<u>Recovery</u>

1. The Service will disband the current MW Recovery Team and assemble a new one to revise the outdated current plan, using:
   a. The draft "Thiel plan."
   b. New information gained through ongoing wolf recovery efforts.
   c. Information contained in the Service's 3-year review of the Mexican wolf conservation program.
   d. Any other available and relevant information.
2. The Service and the States will ensure that the revised Recovery Plan provides specific, measurable objectives for accomplishing downlisting and delisting the Mexican wolf.
3. The Service, with assistance from the States, will identify prospective Recovery Team members from the appropriate stakeholders range-wide and technical experts, with a clear understanding of the dichotomy between the Team's role (developing a Recovery Plan) and the separate and distinct State-led Reintroduction effort.
4. The Service will focus its Mexican Wolf Recovery Coordinator (B. Kelly) on guiding and implementing the Recovery Program, thus providing appropriate guidance to the Reintroduction Project (see below).

<u>Reintroduction</u>

1. The Service will focus its Mexican Wolf Reintroduction Coordinator (J. Oakleaf) as the administrative and coordination liaison between the Federal Recovery Coordinator and the State-led Reintroduction Project. The Reintroduction Coordinator will be responsible for:
   a. Developing and maintaining, in collaboration with the States, protocols and processes by which the Project shall be planned, conducted, and evaluated through the principles of adaptive management. Said protocols and processes must be compatible with any guidance from the Recovery Team as it revises the Recovery Plan (subject to approval by the Service's Regional Director), and of course must fully comply with applicable Federal and State laws.
   b. Planning and coordinating identification, review, and approval (subject to State concurrence) of additional release sites in the current Recovery Area.
2. The States shall be responsible for implementing the Reintroduction Project in Arizona and New Mexico, given that:
   a. Tribal roles and functions in this restructuring have yet to be discussed, let alone resolved, with the Tribes. Tribal authorities will be fully respected by the States in re-defining Reintroduction Project roles and functions of the Primary and any other cooperators.
   b. The principles of adaptive management shall be used to oversee the Reintroduction Project.
      i. A representative from each State wildlife agency and the Service's Reintroduction Coordinator shall be the leads in adaptive management.

AC-59

    ii.  The States, in collaboration with the Reintroduction Coordinator, shall discuss and resolve with current IMAG (Interagency Management Advisory Group) members, and other interested and affected parties, how best to structure and conduct the adaptive management process. The intended objective is to afford any and all responsible interested parties opportunities to constructively and productively participate in the adaptive management process.

    iii.  The Primary Cooperators shall document the revised adaptive management process and construct appropriate guidance documents for it.

    iv.  The Primary Cooperators shall use the Adaptive Management Group as a sounding board for discussions and issues pertaining to the Reintroduction Project, but shall remain responsible for making the necessary decisions for the Project, and/or recommendations to the Recovery Program.

c.  The Reintroduction Project shall be implemented on the ground through a State-led (or Tribal-led, as appropriate to the jurisdictions involved) Field Team approach.

    i.  The Field Team may operate in both States as a single Team, or be split into separate Teams or Sub-Teams as appropriate to ensure the required management and response capability at the local level.

    ii.  The Field Team(s) may operate differently on Tribal lands, subject to pending discussions with Tribal partners.

    iii.  The Field Teams shall be guided by, and report back up through, the Primary Cooperators, represented by their Adaptive Management leads.

        1.  A State Field Team Leader shall be responsible for directing the daily activities of the Field Team.

        2.  The Field Team shall draft annual Work Plans, Performance Reports, and new or revised operating protocols/procedures that are subject to Primary Cooperator approval, after the Primary Cooperators complete appropriate discussions with the Adaptive Management Group.

<u>Summary</u>

The Service is responsible for providing guidance and coordinated information to all interested parties relative to recovery of the Mexican wolf. The States and Tribes are responsible for conducting reintroduction efforts in such a manner that they contribute directly to recovery. Other federal, state, local, and private stakeholders have to some extent shared responsibilities, or at least significant stakes, in these areas. The intent of the current Primary Cooperators is to realign the Recovery and Reintroduction components so they are fully integrated, smoothly coordinated, and effective.

This document begins, but does not complete progress toward achieving the direction that was given to the two State wildlife agencies by their respective Commissions in September 2002. The Primary Cooperators will, however, complete this effort before March 31, 2003, through appropriate collaboration with Tribal and other interested parties.

Appendix 2. Memorandum of Understanding (MOU) under which the Mexican Wolf Blue Range Reintroduction Project operates.


Memorandum of Understanding
among the
Arizona Game and Fish Department,
New Mexico Game and Fish Department,
U.S.D.A. Animal and Plant Health Inspection Service/Wildlife Services,
U.S.D.A Forest Service,
U.S. Fish and Wildlife Service,
White Mountain Apache Tribe,
Arizona Counties of Graham, Greenlee, and Navajo,
New Mexico Counties of Catron and Sierra,
and the
New Mexico Department of Agriculture

Final (Agency Approval): October 31, 2003


This Memorandum of Understanding (hereafter Agreement) is made and entered into by and among the:

1. Arizona Game and Fish Department (AGFD), as authorized to enter into agreements as the administrative agent of the Arizona Game and Fish Commission, i.e. A.R.S. Title 17-231.B.7; and consistent with Cooperative Agreement 1416000291201 - A.G. Contract No. KR90-1847-CIV, between AGFD and the Service for recovery of federally listed endangered species;

2. New Mexico Department of Game and Fish (NMDGF), as authorized to enter into agreements by NMAC Section 11-1-1 et seq. and NMSA Section 17-2-42; and consistent with Memorandum of Agreement 1448-00002-95-0800, which delineates a cooperative working relationship for accomplishment of mutual goals in endangered species conservation and recovery; NMDGF's participation in this Agreement is both authorized and limited by New Mexico laws, particularly the New Mexico Wildlife Conservation Act (17-2-37 NMSA through 17-2-46 NMSA 1978); NMDGF can attempt to undertake only those actions within this Agreement that are in compliance with the laws and regulations of the State of New Mexico;

3. U.S.D.A. Animal and Plant Health Inspection Service, Wildlife Services (WS), as authorized to enter into agreements, i.e. Animal Damage Control Act of March 2, 1931, as amended (46 Stat. 1468; 7 USC 426-426b and 426c);

4. U.S.D.A Forest Service Southwestern Region (USFS), as authorized under the Multiple-Use Sustained-Yield Act of 1960 (16 U.S.C. 528 (note 528-531)), and the Endangered Species Act of 1973 (16 U.S.C. 1531-1536, 1538-1540);

5. U.S. Fish and Wildlife Service Region 2 (Service), as authorized to enter into agreements, i.e. the Endangered Species Act, 1531 USC et seq.;
6. White Mountain Apache Tribe (WMAT), as authorized to enter into agreements, i.e. Article IV Section 1 of the Tribal Constitution;
7. Graham County (GraCo), Greenlee County (GreCo), and Navajo County (NaCo), as authorized under the State of Arizona, enabling counties to protect the health, safety, and welfare of its citizens, pursuant to Arizona Revised Statutes 11-806(B), as well as County laws, including County land-use plans, water and watershed plans, and environmental and natural resource laws and policies, as well as the Treaty of Guadalupe Hidalgo;
8. Catron County (CaCo) and Sierra County (SiCo), as authorized under the State of New Mexico, granting powers necessary and proper to provide the safety, preserve the health, promote the prosperity, and improve the morals, orders, comfort, and convenience of any County or its inhabitants, pursuant to New Mexico Revised Statute 4-7-31 (NMSA 1978), as well as County laws, including County land-use plans, water and watershed plans, and environmental and natural resource laws and policies, as well as the Treaty of Guadalupe Hidalgo; and
9. New Mexico Department of Agriculture (NMDA), as authorized to enter into agreements in accordance with 76-1-2-F NMSA 1978.

Collectively, all parties to this Agreement are referred to as Signatories.

Collectively, the AGFD, NMDGF, USFS, Service, WMAT, and WS are referred to in this Agreement as Lead Agencies, the agencies with primary regulatory jurisdiction and/or management authority over the Mexican wolf in Arizona and New Mexico. Additional Lead Agencies (i.e. additional Tribal Governments) may be added to this Agreement upon their request, by concurrence from the Signatory Lead Agencies and written amendment to this document.

Collectively, the Counties and NMDA are referred to in this Agreement as Cooperators, which are other State agencies and County governments that have an interest in Mexican wolf management. Additional Cooperators may be added to this Agreement upon their request, by concurrence from the Signatory Lead Agencies and Cooperators and written amendment to this document.

Purpose

The purpose of this Agreement is to establish a framework for adaptively managing the Mexican wolf reintroduction project in and around the BRWRA to contribute toward recovery, including downlisting and delisting.

Objectives

This Agreement is made and entered into by the Signatories to achieve the following objectives:

1. Continue a long-term effort (hereafter referred to as "Project") to reestablish Mexican wolves in the BRWRA of east-central Arizona and west-central New Mexico, and thus contribute to achieving approved recovery goals.

2. Apply the principles of adaptive management to all aspects of the Project, and provide opportunities for the Signatories and all other interested parties to engage in discussion of (and provide timely, substantive, constructive comment on) Project-related issues and activities.

3. Develop and implement interagency coordination and cooperation protocols, procedures, and schedules for this Agreement.

4. Develop and facilitate implementation of appropriate management, monitoring, evaluation, impact assessment, mitigation, and other Project-related practices.

5. Recognize and respect the separate authorities of the Signatory agencies, and the interests of other governmental entities and other parties.

6. Enhance awareness of the Signatory agencies, other interested (non-signatory) parties (e.g. cities, towns, citizens, and nongovernmental organizations) regarding the Project, and encourage and enhance their participation in the Project.

Witnesseth:

WHEREAS, the Endangered Species Act of 1973 declared the policy of Congress to be that all Federal departments and agencies shall seek to conserve endangered species and threatened species and shall utilize their authorities in furtherance of the purposes of this Act;

WHEREAS, the AGFD, a State resource agency, has determined that direct participation in reestablishment of the Mexican wolf would be consistent with its current program to reestablish extirpated nongame and endangered wildlife in Arizona, and is essential to representing the State's interest in, and authority for, management of the wildlife resources that are held as a public trust for the people of Arizona;

WHEREAS, the NMDGF, a State resource agency, has determined that direct participation in reestablishment of the Mexican wolf would be consistent with its mandates under the New Mexico Wildlife Conservation Act, and is essential to representing the State's mandates and authorities for management of all protected wildlife resources that are held as a public trust for the people of New Mexico;

WHEREAS, the AGFD and NMDGF, as State wildlife agencies, have policies that recognize it is essential for the success of wildlife programs to recognize, assess, and protect the customs and cultures of peoples and communities affected by wildlife programs.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                    December 31, 2005

WHEREAS, the USFS, a Federal land management agency has the responsibility under the National Forest Management Act, of 1982, to provide for the diversity of plant and animal communities and manage fish and wildlife habitat to maintain viable populations and to further the conservation and recovery of Federally listed species under Section 7(a)(1) of the Endangered Species Act, 1973 as amended on National Forest Lands;

WHEREAS, the Service, a Federal land management and regulatory agency, is responsible for initiating, conducting, and supporting programs for the recovery of listed populations under the authority of the Endangered Species Act of 1973. Such programs include those designated to recover the Mexican wolf;

WHEREAS, the Service is responsible for providing guidance and coordinated information to all interested parties relative to recovery of the Mexican wolf; the States and (if they so choose) Tribes are responsible for conducting reintroduction efforts in such a manner that they contribute directly to recovery; and other Federal, State, local, and private Cooperators have to some extent shared responsibilities, or at least significant stakes, in these areas;

WHEREAS, the Service, AGFD, and NMDGF have been cooperating since 1998 under a Memorandum of Understanding to carry out this Project, and that agreement is scheduled to expire in October 2003;

WHEREAS, the Service conducted a 3-year review of the Mexican Wolf Recovery and Reintroduction Program in 2001 that identified areas of potential improvement;

WHEREAS, at the request of the Service, the AGFD and NMDGF conducted an independent review of the Service 3-year review in 2002, and the Lead Agencies have determined it advisable to redefine their relationships and responsibilities, and their relationships with Cooperators and other interested parties, by:

1. Restructuring the roles and functions of the Lead Agencies to ensure appropriate State and Tribal participation, and recognition of State and Tribal authorities and responsibilities as reflected in discussions among the Lead Agencies during and subsequent to the 2002 independent review.

2. Restructuring the Project's administrative and adaptive management processes to ensure opportunities for, and participation by, the full spectrum of Cooperators and other interested parties.

3. Restructuring the Project's Interagency Field Team response protocols, and enhancing staff capacity, to ensure immediate response capability to, and resolution of, urgent operational issues, such as depredation incidents.

4. Restructuring the Project's outreach efforts as necessary to address the concerns expressed by State Wildlife Commissions, State and Tribal Wildlife Agencies, and the public during the aforementioned reviews.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review          December 31, 2005

5. Ensuring that all actions in the Project are in strict compliance with any applicable approved special rules, policies, protocols, management plans, and interagency agreements.

6. Restructuring the Project's review protocols and procedures, and improving them to ensure that the Project's 5-year review is effective and efficient, and an improvement over the 3-Year Review.

7. Realigning Recovery and Reintroduction components so they are fully integrated, smoothly coordinated, and effective, through appropriate collaboration with Tribes and other interested parties.

WHEREAS, the WMAT, a Federally-recognized Indian Tribe, has determined that direct participation in reestablishment of the Mexican wolf would be consistent with its current wildlife and resource management programs and plans, and is important to representing the Tribe's interests in, and authority for, management of wildlife resources on the Fort Apache Indian Reservation;

WHEREAS, the WMAT adopted the WMAT Mexican Wolf Management Plan in 2000, and the WMAT and Service have been cooperating under Cooperative Agreements since 2000 to carry out this Project on the Fort Apache Indian Reservation;

WHEREAS, the WS, a Federal program, is responsible for providing Federal leadership and expertise to resolve conflicts between humans and wildlife, including threatened and endangered species. Conflicts are resolved in cooperation with Federal, State, and Tribal agencies, individuals, and other public and private agencies, organizations, and institutions;

WHEREAS, Arizona and New Mexico Counties are legally responsible for the protection of health, safety, and welfare of individuals and communities that may be affected by reintroduction and recovery of the Mexican wolf;

WHEREAS, the Arizona Counties are participating in the Mexican wolf recovery and delisting program and this Project under the County authorities to protect the health, safety, and welfare of their citizens, and to manage natural resources within the boundaries of the Counties.

WHEREAS, the New Mexico Counties are participating in the Mexican wolf recovery and delisting program and this Project under the County authorities to protect the health, safety, and welfare of their citizens, and to manage natural resources within the boundaries of the Counties.

WHEREAS, "adaptive management" is a foundation for this Agreement, and means "learning by doing" and using objective analysis and informed opinion to determine the need for, and direction of, changes in relevant policies, procedures, plans, and actions," for purposes of this Agreement "adaptive management" includes public participation, and processes for evaluating

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

and adjusting the Project to better achieve its objectives, as experience and knowledge are gained through implementation, study, scientific research, and discussion.

WHEREAS, in the interest of enhancing communication, Black's Law Dictionary (7th Edition; ISBN 0314241302) and Merriam-Webster's Collegiate Dictionary (11th Edition; ISBN 0877798095) shall be the primary references for words used in this Agreement;

NOW THEREFORE, in consideration of the above premises, the Signatories enter into this Agreement to accomplish its purpose and objectives.

The Lead Agencies agree to:

1. Use the principles of adaptive management to manage this Project, and to cooperate, coordinate, and communicate with each other, all Cooperators, and other interested and affected parties to restructure and document the adaptive management framework for this Project.

2. Assign one employee (and one or more alternates) as Lead Participant in an Adaptive Management Oversight Committee (hereafter Committee; one member per Lead Agency) to guide this Project. The Committee Lead Participant from AGFD, NMDGF, or WMAT shall serve as Committee Chair (2-year term, subject to renewal), to establish a non-Federal lead to ensure compliance with the Federal Advisory Committee Act.

3. Afford any and all interested parties substantive opportunities to constructively and productively participate in the Project, through an Adaptive Management Work Group (hereafter Work Group). The Lead Participant from AGFD, NMDGF, or WMAT shall serve as Work Group Chair (2-year term, subject to renewal), to establish a non-Federal lead to ensure compliance with the Federal Advisory Committee Act. The Work Group shall:
    a. Meet regularly (at least quarterly – January, April, July, and October) in public session to enhance communication among, and provide for broader participation in the Project by the public, including Lead Agencies and Cooperators (i.e. signatory entities) and other interested parties (i.e. non-signatory participants);
    b. Review and make recommendations to the Lead Agencies on any management plans (including Annual Work Plans) or operating procedures that pertain specifically to this Project, as opposed to the overall Recovery Program;
    c. Enhance communication with other interested parties and the public, to keep them informed on the Project;
    d. Identify (and, as appropriate, address) local issues and concerns;
    e. Evaluate the effectiveness of management and communication processes each year; and
    f. Provide a public forum for discussion of issues pertaining to the Project. However, the Lead Agencies shall, by applicable State, Tribal, and Federal law, remain responsible for making necessary decisions for the Project, and any recommendations to the Recovery Coordinator.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review            December 31, 2005

4. Provide logistical and other support as necessary for the Committee, Work Group, and Project.

5. Implement, through the Project (subject to guidance by the Service Region 2 Regional Director-approved recovery protocols), the objectives and strategies of the:
   a. Service Mexican Wolf Recovery Plan;
   b. Final Environmental Impact Statement on Reintroduction of the Mexican Wolf in the Southwest;
   c. Mexican Wolf Nonessential Experimental Population Rule (50 CFR 17.84(k));
   d. AGFD cooperative reintroduction plan for the Mexican wolf in Arizona (NGEWP Technical Report 56);
   e. 1998 Mexican Wolf Interagency Management Plan (or any subsequent revisions); and
   f. WMAT Mexican Wolf Management Plan and the Cooperative Agreement between WMAT and the Service for Assistance in Mexican Wolf Monitoring and Management.

6. Maintain one or more State/Tribally-led Interagency Field Teams (hereafter Field Team[s]) to plan, direct, and implement the Project on the ground; and, when appropriate, designate a primary contact (and one or more surrogates) for their agency to interface with the Field Team(s). [Note: Availability of staff is subject to the limitations identified on page 12, Paragraphs 1 and 2].
   a. Members of the Field Team(s) shall be those agency employees and interns or volunteers who, for the majority of their duties, perform the Project's on-the-ground activities.
   b. The Field Team(s) shall include the following positions: Field Team Leaders (one per State and Tribal Lead Agency), wildlife biologists/specialists (varying numbers from any Lead Agency or Cooperator), depredation specialists (varying numbers from or certified by Wildlife Services), conservation education/outreach specialists (varying numbers from any State or Tribal Lead Agency); field assistants (varying numbers of seasonal technicians, interns, and volunteers); and such other staff as the Lead Agencies and Cooperators may deem appropriate and necessary.
   c. The Project-related activities of Field Team members shall be guided and directed by the Field Team Leaders (see next paragraph). However, each employee shall be supervised by their superior in the chain of command within their respective agency.
   d. Under guidance and direction from the Lead Agencies functioning as the Committee, the Field Team(s):
      i. Shall be guided by the AGFD Field Team Leader on non-Tribal lands in Arizona, by the WMAT Field Team Leader on WMAT lands in Arizona, and by the NMDGF Field Team Leader in New Mexico.
      ii. May operate in both States as a single Field Team, or be split into separate Field Teams or Sub-Teams as appropriate to ensure the desired management and response capability at the local level.
      iii. May operate differently on Tribal lands, subject to direction from the Tribal Field Team Leader(s).

    e.  Field Team Leader(s) shall jointly be responsible for:
        i.  Planning, directing, and implementing the daily activities of the Team(s);
        ii.  Drafting Annual Work Plans, Annual Performance Reports, and new or revised Project operating procedures that will be subject to Committee approval (as described in paragraph #8, below), after appropriate discussion with and review by the Work Group. Project procedures must be compatible with any guidance approved by the Service Region 2 Director, and must fully comply with applicable Federal, State, and Tribal laws;
        iii.  Seeking assistance from the Field Projects Coordinator (see below, subsection 3 of "The Service agrees to"), as necessary to conduct its activities;
        iv.  Communicating with the Committee through the Field Projects Coordinator to ensure that issues are brought to the Committee, and reported back to the Field Team(s), in timely fashion; and
        v.  Assisting the Field Projects Coordinator in identifying and reviewing additional areas and sites for release or translocation of Mexican wolves, pursuant to procedures established under paragraph #8, below.

7.  Provide facilities, equipment, logistical support, and land access for the Field Team(s) and any other field personnel, under any subsequent and distinct funding documents separate from this Agreement.

8.  Describe the roles, responsibilities, and processes necessary to address involvement, participation, and duties of the Lead Agencies, Project staff, and recognized committees, work groups, or other managing bodies involved with the Project. These descriptions will be completed within six months of the date of the last initial signature on this Agreement.

9.  Develop and distribute public information and educational materials on the Project.

10.  Cooperate in development of all Project-related media releases, media projects, and outreach activities, and ensure that all Lead Agencies have ample opportunity to review and approve such materials before they are released.

11.  Cooperate in providing sufficient funding for this Project. The Federal Lead Agencies' intent is to endeavor to use the Congressional budget process to recover and delist the Mexican wolf. The non-Federal Lead Agencies' intent is to seek sufficient Federal funding for Mexican wolf reestablishment and management through direct Congressional allocation, and/or, as appropriate and necessary, other sources that are in addition to Federal funds currently available to AGFD, NMDGF, or WMAT, rather than by reallocation of existing funds. Examples of new sources of funding may include, but are not limited to: Landowner Incentives Program, Partners for Fish and Wildlife, State Wildlife Grants, and any other appropriate sources.

Note: Funds raised by non-Federal parties shall be separate and distinct from the Federal partners. This shall not preclude non-Federal partners from using Federally-originated funds to contribute to their operating budgets. It is understood by all parties that Federal

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

funds cannot be used to match Federal funds (as in cost-share agreements), unless Congress has specifically authorized an exception.

The Service agrees to:

5. Provide guidance to this Project by:
   a. Developing appropriate guidance for the Project through a Recovery Plan, recovery protocols, and other recovery guidelines approved by the Regional Director, Region 2.
   b. Ensuring that the revised Recovery Plan provides specific, measurable objectives for accomplishing downlisting and delisting the gray wolf in the southwestern gray wolf distinct population segment.
   c. Completing a final draft revision of the Mexican Wolf Recovery Plan by 2004, and striving to secure approval (i.e. Directors' signature) by 2005.
   d. Ensuring that any Service Region 2 Regional Director-approved guidelines or protocols pertaining to Mexican wolf recovery are communicated in timely fashion to the Committee to use in providing direction to the Field Team.

6. Continue designating wolves released to repopulate the BRWRA, and their descendants, as a nonessential experimental population, in accordance with Section 10(j) of the Endangered Species Act of 1973, as amended.

7. Provide a Mexican Wolf Field Projects Coordinator, who shall:
   a. Serve as a member of the Field Team(s), and assist the Field Team Leader(s) in carrying out any field activities necessary to accomplish Project goals and objectives.
   b. Serve as the communication liaison between the Committee and the Field Team(s).
   c. Collaborate with the Field Team to draft recovery protocols.
   d. Assist the Field Team Leader(s) as requested in drafting Annual Work Plans, Annual Performance Reports, and new or revised Project operating procedures that will be subject to Committee approval (pursuant to procedures developed under paragraph #8 under "The Lead Agencies agree to"), after appropriate discussion with and review by the Work Group. Project procedures must be compatible with any guidance approved by the Service Region 2 Regional Director, and must fully comply with applicable Federal, State, and Tribal laws.
   e. Plan and coordinate, with assistance from the Field Team Leader(s), the identification and review of additional areas and sites for release or translocation of Mexican wolves, pursuant to procedures established under paragraph #8 of "The Lead Agencies agree to".

8. Assess Project priorities annually with the Lead Agencies, and, subject to availability, provide supplemental funding to the States, Tribe(s), and WS to support the Project. Funds for WMAT shall require no Tribal match. Funds for States shall be matched by AGFD and/or NMDGF, generally on a ratio of 3:1 (Federal:Non-Federal) or greater,

meaning that the Service shall not require the State (Non-Federal) contribution to exceed 25 percent of total cost, although the States/Cooperators may voluntarily do so.

9.  Provide all necessary Service authorizations and permits to all Signatories on a timely basis, as sanctioned under applicable laws.

The AGFD agrees to:

3.  Be responsible for implementing the Project in Arizona on non-Tribal lands, and for providing assistance as available (a) on Tribal lands as requested by the appropriate Tribe, and (b) in New Mexico on non-Tribal lands as requested by NMDGF.

4.  Maintain on staff: (a) one Field Team Leader(s); (b) one or more conservation-education specialists to assist in Project outreach activities; and (c) additional staff as deemed necessary, pursuant to paragraphs #8 and #11 under "The Lead Agencies agree to".

5.  Provide administrative and other support for the Project.

6.  Provide all necessary AGFD authorizations and permits to all Signatories on a timely basis, as sanctioned under applicable laws.

The NMDGF agrees to:

1.  Be responsible for implementing the Project in New Mexico on non-Tribal lands, and for providing assistance as available (a) on Tribal lands as requested by the appropriate Tribe, and (b) in Arizona on non-Tribal lands as requested by AGFD.

2.  Maintain on staff: (a) one Field Team Leader(s); (b) one or more conservation-education specialists to assist in Project outreach activities; and (c) additional staff as deemed necessary, pursuant to paragraphs # 8 and #11 under "The Lead Agencies agree to".

3.  Provide administrative support for the Project.

4.  Facilitate issuance of necessary NMDGF authorizations and permits to all Signatories on a timely basis, as sanctioned under applicable laws.

The USFS agrees to:

1.  Assist the Field Team as necessary to ensure timely, effective, and well-coordinated implementation of the Project's Annual Work Plan.

2.  Strive to provide all necessary USFS authorizations and permits to all Signatories on a timely basis, as sanctioned under applicable laws.

The WS agrees to:

Mexican Wolf Blue Range Reintroduction Project 5-Year Review          December 31, 2005

1. Provide Federal leadership and expertise to resolve conflicts between humans and wildlife in regard to this Project, in cooperation with Federal, State, and Tribal agencies, individuals, and other public and private agencies, organizations, and institutions.

2. Maintain on staff one or more wildlife depredation specialists to assist in Mexican wolf damage management, primarily livestock depredations.

The WMAT agrees to:

1. Be responsible for, and retain lead authority for, implementing the Project on the Fort Apache Indian Reservation.

2. Maintain on staff: (a) a Field Team Leader; (b) one or more conservation education specialists to assist in outreach activities regarding the Project; and (c) additional field staff as deemed necessary.

3. Provide administrative and other support for this Project.

4. Strive to provide all necessary Tribal authorizations and permits to all Signatories on a timely basis, as sanctioned under applicable laws.

The Arizona and New Mexico Counties agree to:

1. Assign an Elected or Appointed Official, or a designee thereof, to participate in the Project's Adaptive Management Work Group.

2. Cooperate, coordinate, and communicate with other interested and affected parties to participate in the Project's Work Group.

3. Enhance communication with other interested parties and the public to keep them informed on the Project and the Recovery Program.

4. Provide logistical and other support as necessary for the Work Group.

5. Coordinate impact assessments and mitigation measures that may occur from reintroduction and recovery of the Mexican wolf, on health, safety, and welfare of the Counties and their residents.

The New Mexico Department of Agriculture agrees to:

1. Assign an Elected or Appointed Official, or a designee thereof, to participate in the Project's Adaptive Management Work Group.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

2. Cooperate, coordinate, and communicate with other interested and affected parties to participate in the Project's Work Group.

3. Enhance communication with other interested parties and the public to keep them informed on the Project and the Recovery Program.

4. Provide logistical and other support as necessary for the Work Group.

It is Mutually Agreed and Understood by and among the Lead Agencies and Cooperators (i.e. the Signatories to this Agreement) that:

1. Sufficiency of Resources. The terms of this Agreement are contingent upon sufficient resources being available to the Signatories for the performance of this Agreement. The Lead Agencies will agree to a work plan each year, develop budgets, and, as funding is available from all sources, assess priorities and apply the available funding to those priorities. The decision as to whether sufficient resources are available to each Signatory shall be determined by each Signatory, shall be accepted by all other Signatories, and shall be final. [Note: For NMDGF, "sufficient resources" means appropriated dollars, and NMDGF is not obligated by this Agreement to seek funds from the Legislature.]

2. Non-Fund Obligating Document. Nothing in this Agreement shall obligate the Signatories to obligate or transfer any funds, expend appropriations, or to enter into any contract or other obligations. Specific work projects or activities that involve transfer of funds, Services, or property among the Signatories may require execution of separate agreements or contracts and be contingent upon the availability of appropriated or other funds. Appropriate statutory authority must independently authorize such activities; this Agreement does not provide such authority. Negotiation, execution, and administration of each such agreement must comply with all applicable statutes and regulations.

3. Establishment of Responsibility. This Agreement is non-binding and establishes no duty or obligation on any party; this Agreement is not intended to, and does not create or establish, any substantive or procedural right, benefit, trust responsibility, claim, cause of action enforceable at law, or equity in any administrative or judicial proceeding by a party or non-party against any party or against any employee, officer, agent, or representative of any party.

4. Responsibilities of Parties. The Signatories to this Agreement and their respective agencies and offices will handle their own activities and use their own resources, including the expenditure of their own funds, in pursuing the objectives of this Agreement. Each party will carry out its separate activities in a coordinated and mutually beneficial manner. Employee assignment to the Project is subject to approval by the employing agency.

5. Freedom of Information Act (FOIA). Any information provided to the Federal Agencies under this instrument may be subject to release under the Freedom of Information Act (5

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                    December 31, 2005

U.S.C. 552). However, nothing in this Agreement shall be construed to affect the applicability of the exemptions set forth in 5 U.S.C. Section 552 (b)."

6.  <u>Participation in Similar Activities</u>. This instrument in no way restricts the Signatories from participating in similar activities with other public or private agencies, organizations, and individuals. This Agreement does not modify or supersede other existing agreements between or among any of the Signatories.

7.  <u>Commencement/Expiration/Withdrawal</u>. This Agreement takes effect upon the date of the last signature of approval and shall remain in effect for no more than five years from the date of execution, unless renewed, extended, or canceled. This Agreement may be renewed, extended, or amended upon written request by any Signatory, and subsequent written concurrence of the other Signatories. All such actions shall be discussed in a public meeting of the Work Group. Any Signatory may withdraw from this Agreement with a 60-day written notice to the other Signatories, through the Work Group Chair. Withdrawal by one party shall not affect the continued cooperation of the remaining parties under this Agreement. Further:
    a.  In accordance with the laws of the State of Arizona, all parties are hereby put on notice that State of Arizona participation this Agreement is subject to cancellation pursuant to A.R.S. § 38-511.
    b.  In accordance with the laws of the State of New Mexico, this Agreement is subject to approval by the Department of Finance and Administration. If any money has been contributed by the parties to this Agreement, after completion of the Agreement's purposes any surplus money on hand shall be returned in proportion to the contributions made. No property shall be acquired as the result of the joint exercise of powers under this Agreement.

8.  <u>Additional Signatories</u>. This Agreement may be amended at any time to include additional Signatories. An entity requesting inclusion as a Signatory shall submit its request to the Work Group Chair in the form of a document defining its proposed responsibilities pursuant to this Agreement.
    a.  Inclusion of additional Lead Agencies shall be approved by majority voice concurrence of the current Lead Agency signatories present in a Work Group meeting.
    b.  Inclusion of additional Signatories shall be approved by majority voice concurrence of the current Lead Agency and Cooperator signatories present in a Work Group meeting.
    c.  On approval, the new Cooperator must comply with all aspects of the Agreement as it was structured at the time of approval of its request for Cooperator status.

9.  <u>Conflict Resolution</u>. Conflicts between or among the Signatories concerning this Agreement that cannot be resolved at the lowest possible level shall be referred to the next higher level, et seq., as necessary, for resolution.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review            December 31, 2005

10. <u>Principal Contacts</u>. Appendix A lists the principal implementation and contract administration contacts for this Agreement. Agencies may change their contact(s) by written notification to the Work Group Chair, who shall distribute an updated Appendix A to all Signatories. Principal Contact changes by one Signatory shall not require concurrence by other parties to this Agreement.

IN WITNESS WHEREOF:

The Signatories hereto have executed the Agreement as of the last written date below.


_____          _____

Duane L. Shroufe, Director                 Date
Arizona Game and Fish Department


_____          _____

Bruce C. Thompson, Director                Date
New Mexico Department of Game and Fish


_____          _____

H. Dale Hall, Director, Region 2           Date
U.S. Fish and Wildlife Service


_____          _____

Harv Forsgren, Regional Forester           Date
USDA Forest Service Southwestern Region


_____          _____

Michael V. Worthen, Regional Director, Western Region    Date
USDA APHIS/Wildlife Services


_____          _____

Dallas Massey, Sr., Chairman               Date
White Mountain Apache Tribe


_____          _____

Name and Title of Elected Official         Date
Catron County, New Mexico

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                 December 31, 2005

_____                    _____
Name and Title of Elected Official             Date
County of Sierra, New Mexico


_____                    _____
Name and Title of Elected Official             Date
Graham County, Arizona


_____                    _____
Name and Title of Elected Official             Date
Greenlee County, Arizona


_____                    _____
Name and Title of Elected Official             Date
Navajo County, Arizona


_____                    _____
I. Miley Gonzalez, Ph.D., Director/Secretary   Date
New Mexico Department of Agriculture

[Other Lead Agencies and Cooperators yet to be inserted]

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

## Appendix A: Primary Contacts for Agreement

Project Contacts are the individuals who represent their agencies in implementing this Agreement. Contract Administration Contacts are the individuals whom Project Contacts consult regarding administrative (contractual) issues related to this Agreement. Project Contacts and Contract Administration Contacts may or may not be the same individual.

| Project Contacts: | Phone, FAX, E-Mail: |
| --- | --- |
| AGFD Terry B. Johnson | 602.789.3507; 602.789.3926; teebeej@gf.state.az.us |
| NMDGF Chuck Hayes | 505.476.8102; 505.476.8128; clhayes@state.nm.us |
| USDA APHIS WS David L. Bergman | 602.870.2081; 602.870.2951; david.l.bergman@aphis.usda.gov |
| USDA FS Wally J. Murphy | 505.842.3195; 505.842.3800; wmurphy@fs.fed.us |
| USFWS Colleen Buchanan | 505.761.4782; 505.346.2542; colleen_buchanan@Service.gov |
| WMAT John Caid | 928.338.4385; 928.338.1712; jcaid@wmat.nsn.us |
| County Catron | |
| County Greenlee Hector Ruedas | 928.865.2072; 928.865.4417; kgale@co.greenlee.az.us |
| County Sierra Adam Polley | 505.894.6215; 505.894.9548; adam@riolink.com |
| NMDA Bud Starnes | 505.646.8005; 505.646.1540; bstarnes@nmda.nmsu.edu |
| | |

| Contract Administration Contacts: | Phone, FAX, E-Mail: |
| --- | --- |
| AGFD Terry B. Johnson | 602.789.3507; 602.789.3926; teebeej@gf.state.az.us |
| NMDGF Tod Stevenson | 505.476.9010; 505.476.8124; tstevenson@state.nm.us |
| USDA APHIS WS | 602.870.2081; 602.870.2951; david.l.bergman@aphis.usda.gov |
| USDA FS Susan Mcdonnell | 505.842.3345; 505.842.3152; smcdonnell@fs.fed.us |
| USFWS Susan MacMullin | 505.248.6671; 505.248.6692; susan_macmullin@Service.gov |
| WMAT John Caid | 928.338.4385; 928.338.1712; jcaid@wmat.nsn.us |
| County Catron | |
| County Greenlee Kay Gale | 928.865.2072; 928.865.4417; kgale@co.greenlee.az.us |
| County Sierra | 505.894.6215; 505.894.9548; adam@riolink.com |
| NMDA | 505.646.8005; 505.646.1540; bstarnes@nmda.nmsu.edu |
| | |

:tj

Master Document: MW 5YR Administrative Component.20051231.Final.doc

AC-76

# Mexican Wolf Blue Range Reintroduction Project 5-Year Review:

## AMOC Recommendations Component

by

Adaptive Management Oversight Committee

Arizona Game and Fish Department
New Mexico Department of Game and Fish
U.S.D.A. – APHIS, Wildlife Services
U.S.D.A. Forest Service
U.S. Fish and Wildlife Service
White Mountain Apache Tribe

December 31, 2005

Mexican Wolf Blue Range Reintroduction Project

5-Year Review: Recommendations Component

by

Adaptive Management Oversight Committee

Mexican wolf reintroduction in Arizona and New Mexico is conducted under authority of a 1998 Final Rule (USFWS 1998; 63 Fed. Reg. 1752-1772, January 12, 1998) that defines a Mexican Wolf [nonessential] Experimental Population Area (MWEPA). Within the MWEPA, the Reintroduction Project is focused in the Blue Range Wolf Recovery Area (BRWRA) of eastern Arizona and western New Mexico. The Final Rule requires a 5-Year Review to determine whether and how to modify the Reintroduction Project.

Below, the Adaptive Management Oversight Committee (AMOC) presents Recommendations from its 5-Year Review of the Blue Range Reintroduction Project. Recommendations (1) through (14) are offered to the U.S. Fish and Wildlife Service (USFWS) Region 2 Director, for consideration, and to elicit USFWS guidance to AMOC on whether and how to pursue them. Recommendations (15) through (37) are essentially findings that are within AMOC's purview to pursue (though see below, regarding process issues). These Recommendations are guidance and not rules or regulations. They are not legally binding.

Consistent with the existing Final Rule, all these Recommendations identify changes that are intended to (a) facilitate progress toward establishing a viable Mexican wolf population in Arizona-New Mexico, (b) contribute toward rangewide recovery, and (c) accomplish both within the framework of a landscape mosaic of multiple-use public, Tribal Trust, and private lands.

Although AMOC will diligently pursue timely action on these Recommendations, the time-frame and/or content of one or more might need to be adjusted, or AMOC might need to add or delete Recommendations, as necessary to respond to changes in law, regulation, policy, management issues, budget allocations, workloads, acts of nature, etc.

In short, these Recommendations should not be considered etched in stone. AMOC will change them as necessary to adaptively manage the Reintroduction Project, consistent with the Final Rule and a Memorandum of Understanding under which AMOC operates. Any changes, however, would be discussed within AMOC's Adaptive Management Work Group, and vetted through appropriate processes, before they are implemented. Further, all actions undertaken pursuant to these Recommendations and the Standard Operating Procedures (SOPs) referenced therein shall be in full compliance with applicable State, Tribal, and Federal laws, including but not limited to the Endangered Species Act of 1973, as amended.

Also, interested parties should realize that these AMOC Recommendations do not constrain any of the individual AMOC Lead Agencies or Cooperators from advocating agency-specific

Mexican Wolf Blue Range Reintroduction Project 5-Year Review          December 31, 2005

positions on each of the relevant issues as AMOC begins moving forward to act on these Recommendations in 2006. If formal agency positions are needed, or desired, they will be developed through the appropriate internal or public processes for each agency, whether that includes Board of Supervisor meetings, Commission meetings, Tribal Council discussions, etc.

Finally, the appropriate Federal, State, and/or Tribal regulatory processes will be used to propose, vet, and reach final decisions on any of the following Recommendations that trigger a requirement for procedural compliance, including review and rulemaking pursuant to the Administrative Procedures Act (APA), Endangered Species Act (ESA), Federal Advisory Committee Act (FACA), National Environmental Policy Act (NEPA), and other applicable State, Tribal, and Federal laws.

Other Abbreviations, Acronyms, and Terms Used Below

AUM: Animal Unit Month – the tenure of one animal unit (AU) for a one-month period (M), or the amount of forage required by one animal unit for one month. Example: an AUM for cattle is typically defined as one mature (1000 lb) cow and her suckling calf grazing for one month. AUMs for other livestock species, such as sheep, are typically calculated via conversion factors as ratios of the cattle AUM. For sheep in Arizona, the conversion factor currently is 5. See the Society for Range Management Glossary for further information.

BRWRA: The existing Blue Range Wolf Recovery Area as designated by the current Final Rule, consisting of the Primary and Secondary Recovery Zones in Arizona and New Mexico and (per a Memorandum of Understanding between the U.S. Fish and Wildlife Service and the White Mountain Apache Tribe) the Fort Apache Indian Reservation in Arizona.

BRWRZ: The future Blue Range Wolf Reintroduction Zone, as it would be defined by proposed changes in the current Final Rule.

Fair Market Value: The price that a seller is willing to accept and a buyer is willing to pay on the open market in an arms-length transaction, meaning the point at which supply and demand intersect (i.e. agreement is reached that results in sale). Methods and resources used to determine fair market value (i.e. compensation value) of animals killed or injured by wolves might include, for example, auction market operators and/or county animal damage committees. In the case of purebred breeding stock, breeders seeking compensation might be required to furnish purchase receipts for the animals damaged, or if raised on a farm or ranch, sale receipts for animals of similar age, weight, and breeding value. Factors to consider when determining fair market value include: a) class and weight of animals; b) stage of production for breeding animals; and c) age.

MWEPA: Mexican Wolf Experimental Population Area.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

Stakeholders: People and organizations that have a vested or other interest in an issue.

Tribal Trust Lands: lands set aside by Congress as reserved for governance by a Native American Tribe (i.e. Congressionally allocated reservation lands, as opposed to Tribal lands acquired by fee-simple, purchase, easement, lease, etc.).

Recommendations

1. No later than March 31, 2007, AMOC will use the results of Recommendations (3) through (14), below, to draft a recommended Mexican Wolf Nonessential Experimental Population Rule by which to redefine the MWEPA, including appropriate external and internal (i.e. BRWRZ) boundaries.

2. No later than April 30, 2007, AMOC will submit its recommended Mexican Wolf Nonessential Experimental Population Rule to the USFWS Region 2 Director.

   Note: Recommendations (3) through (14), below address actions undertaken in the course of recommending a new or amend final rule. While that process is underway, all components and requirements of the current Final Rule continue to apply, and the Reintroduction Project shall be conducted in strict accordance with them.

3. AMOC recommends continuing the Reintroduction Project with modifications as outlined below. In other words, AMOC does not recommend terminating the Reintroduction Project.

4. AMOC recommends that any amended or new Mexican Wolf Nonessential Experimental Population Rule drafted in conjunction with Recommendations (1) and (2), above, not include White Sands Missile Range as a Mexican Wolf Recovery Area (i.e. its designation in the current Final Rule) or as a Reintroduction Zone.

5. AMOC will determine, on biological/ecological grounds, and conclude in a written report to the USFWS Region 2 Director no later than June 30, 2006, whether (and, if so, the extent to which) the current MWEPA outer boundaries should be expanded within Arizona-New Mexico to enable the Arizona-New Mexico Mexican wolf population to exist within a metapopulation context consistent with Leonard et al. 2005 and Carroll et al. *in press*. AMOC may convene, if necessary, a technical advisory group of individuals with appropriate expertise to assist with this assessment.

   Note:
   a. The AMOC assessment will also consider other relevant issues, such as: likelihood of expansion area occupancy by wolves dispersing from northerly states or from Mexico; the merits of extending nonessential experimental population status beyond the current boundaries; and estimated costs associated with managing wolves in an expanded area.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review          December 31, 2005

    b.   The technical advisory group, if convened, shall be chaired by an AMOC representative and shall include no more than 15 other members, each with appropriate scientific expertise.

    c.   AMOC will advocate that the MWEPA recommendation constructed under Recommendations (1) and (2), above, allow wolves to disperse from the BRWRZ (see Recommendation [7], below) throughout the MWEPA, subject to management consistent with current Blue Range Reintroduction Project SOPs.

    d.   Any recommendation to amend the existing Final Rule or to create a new Final Rule would ultimately, if acted on by USFWS, be in full compliance with all applicable APA, ESA, FACA, and NEPA requirements.

6. AMOC will propose, within the context of Recommendation (5), above, that the MWEPA population (management) objective be to establish and maintain a total of at least 100 wolves.

   Note: The Reintroduction Project's population (management) objective is not a recovery goal for delisting the Mexican wolf from the list of threatened and endangered species; an updated recovery goal covering the Blue Range has not yet been determined by a Recovery Team. A population (management) objective of at least 100 wolves is, however, consistent with the Mexican Wolf Recovery Plan (USFWS 1982), Final Environmental Impact Statement (USFWS 1996), and Record of Decision for Mexican wolf reintroduction within the BRWRA of the MWEPA (USFWS 1997).

7. AMOC will propose, within the context of Recommendation (5), above, combining the current BRWRA Primary and Secondary Recovery Zones, the Fort Apache Indian Reservation, and/or any other appropriate contiguous areas of suitable wolf habitat into a single expanded Blue Range Wolf Reintroduction Zone (BRWRZ) and allowing initial releases and translocations throughout the BRWRZ in accordance with appropriately amended AMOC SOPs 5.0: Initial Wolf Releases and 6.0: Wolf Translocations.

8. AMOC will propose, within the context of Recommendation (5), above, prohibiting initial releases outside the new BRWRZ, except as necessary to allow latitude for any new Tribal "Statement of Relationship" based agreements with USFWS within the MWEPA that might allow initial releases on Tribal Trust Lands.

9. AMOC will propose, within the context of Recommendation (5), above, that wolves occurring within the MWEPA (but outside the re-defined BRWRZ) that must be relocated to address nuisance or livestock depredation issues (per AMOC SOP 13.0: Control of Mexican Wolves), may be translocated anywhere within the MWEPA except into the BRWRZ. Conversely, AMOC will also propose, within the context of Recommendation (5), above, that wolves occurring within the BRWRZ that must be relocated to address nuisance or livestock depredation issues (per SOP 13.0) may only be translocated to other areas within the BRWRZ. Regardless, all translocations must be carried out in accordance with AMOC SOP 6.0: Wolf Translocations.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review          December 31, 2005

10. AMOC will propose, within the context of Recommendations (5) and (6), above, that States and Tribes be authorized to issue permits, in accordance with an appropriately revised AMOC SOP 13.0: Control of Mexican Wolves, to private individuals and/or their delegated representative(s) to use authorized non-lethal means (e.g. cracker shells, rubber bullets) to harass wolves engaged in nuisance behavior or livestock depredation, or which are attacking domestic pets on private, public, or Tribal Trust lands, and to take (i.e. permanent removal by authorized lethal means) wolves in the act of attacking domestic dogs on private or Tribal Trust lands.

11. AMOC will propose, within the context of Recommendations (5) and (6), above, that, when the MWEPA population (management) objective estimate on December 31 for two sequential years is 125 wolves or more, in each immediately subsequent year the States of Arizona and New Mexico and any Tribal AMOC Cooperators may:

    a. Take (i.e. permanently remove by any authorized means) as many wolves as necessary, above a MWEPA baseline of 125 wolves, to resolve documented wolf nuisance and livestock depredation incidents, consistent with AMOC SOP 13.0: Control of Mexican Wolves;

    b. Issue State or Tribal permits to private individuals to take (i.e. permanently remove by any authorized means) as many wolves as necessary, above a MWEPA minimum baseline of 125 wolves, to resolve documented wolf nuisance and livestock depredation incidents, consistent with AMOC SOP 13.0: Control of Mexican Wolves;

    c. Take (i.e. permanently remove by any authorized means) as many wolves as necessary, above a minimum baseline of 125 wolves, to resolve local unacceptable impacts on native ungulate populations.

    Note: Unacceptable impacts" will be defined in AMOC's recommended Mexican Wolf Nonessential Experimental Population Rule (see Recommendations [1] and [2], above).

12. AMOC will develop, no later than June 30, 2006, a report describing a proposed Federally, State, and/or Tribally-funded incentives program to address known and potential economic impacts of wolf nuisance and livestock depredation behavior on private, public, and Tribal Trust lands. AMOC may convene, if necessary, a technical advisory group of individuals with appropriate expertise to assist with this task. The conservation incentives discussion will consider all relevant livestock depredation issues, including: livestock depredation prevention; livestock depredation response; carcass discovery, monitoring, removal, burial, and/or destruction; and possible adjustment of the Federal grazing (AUM) fee (and any Tribal grazing subsidies) within the MWEPA to provide de facto compensation for documented and likely undocumented losses of livestock. The AMOC report shall also include a thorough evaluation of the effectiveness and procedural efficiency of the Defenders of Wildlife wolf depredation compensation fund, and provide recommendations for appropriate improvements.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review          December 31, 2005

Note:
a. The technical advisory group, if convened, shall be chaired by an AMOC representative and include a maximum of 15 other members, each with appropriate expertise.
b. AMOC as a body will not advocate regulatory changes to address carcass removal or disposal issues (but see Recommendation [12], above, regarding a process by which AMOC will explore possible mechanisms to address this issue).

13. AMOC will convene a stakeholders group to assist AMOC in evaluating, and reporting in writing no later than December 31, 2006, social (human and socioeconomic) implications (including estimated annual livestock depredation losses) for any boundary expansions recommended per Recommendation (5), above.

Note: The stakeholders advisory group will be Co-Chaired by an AMOC representative and an AMWG Cooperator (County) representative, and include a maximum of 50 other members, representing, insofar as is possible, the full spectrum of stakeholders. This group will comply with FACA, if necessary.

14. No later than December 15, 2006, AMOC will complete a detailed plan for another Reintroduction Project Review.

Note: The Reintroduction Project Review will be conducted in 2009-2010 and completed no later than December 31, 2010.

15. AMOC will collaborate on a systems evaluation of all Reintroduction Project databases, to identify in a written report no later than December 31, 2006, recommendations for improving efficiency, reliability, and access relative to Reintroduction Project management information systems.

16. No later than March 1, 2006, AMOC will convene a science and research advisory group. The group will review, on a continuing basis, current and proposed management practices and recommend research priorities for AMOC to advocate to external entities and the cooperating agencies on all aspects of the Reintroduction Project. Review tasks will include, but not be limited to: overall Reintroduction Project effectiveness, statistically reliable wolf survey and population monitoring techniques, wolf population dynamics (demographics), prey base dynamics, total predator loads, seasonal wolf livestock depredation rates, annual wolf impacts on native ungulate populations, prey base monitoring techniques appropriate to determining when prescribed unacceptable levels of impact on native wild ungulates have been met or exceeded, wolf-related disease occurrence and prevention, seasonal livestock depredation rates, prevention and/or remediation of wolf nuisance and livestock depredation problems, livestock husbandry, wolf-related tourism, socioeconomics, and human dimensions.

17. AMOC will refine its annual population (management) objective estimates, including (if possible) developing a statistically valid confidence interval and making use of techniques in

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                    December 31, 2005

addition to telemetric monitoring, and promptly implement any constructive changes in its population estimation methods.

18. AMOC will use its IFT Annual Work Plan process to determine the need for initial releases of wolf packs in Calendar Year 2007 and beyond. Note: Releases of individual wolves as appropriate for management purposes (e.g. enhancing genetic diversity within the wild population) are not affected by this Recommendation.

19. AMOC will maintain all AMOC Reintroduction Project SOPs and continue to require employee compliance with them. Note: herein, "maintain" includes modify, revise, or delete existing SOPs, or add new SOPs, as necessary for purposes of adaptive management.

20. AMOC will make all Reintroduction Project wolf management, outreach, and budget information (redacted as appropriate to protect confidential personal information) available to the public through Annual Reports for the Reintroduction Project, and other publications and outreach materials as appropriate.

21. AMOC will collaborate with the USDA National Wildlife Research Center to complete and report no later than December 31, 2006, an independent evaluation of modified #3 soft-catch traps, McBride #7 traps, and any other live traps considered appropriate or potentially appropriate for capturing Mexican wolves.

22. AMOC will identify no later than June 30, 2006, in a confidential report to USFWS, any law enforcement actions that might help prevent unlawful take of Mexican wolves or help achieve closure on existing active investigations.

23. AMOC will direct Reintroduction Project-related outreach efforts in 2006 through the IFT Annual Work Plan to identify and reach specific target audiences, with emphasis on local communities and cooperating agencies within the BRWRA (>75% of outreach activity) and outside the BRWRA (<25% of outreach activity).

24. AMOC will ensure that all Reintroduction Project-related outreach activities emphasize wolf conservation and management as an integrated component of the social (human) as well as the ecological landscape, and provide a balanced, objective perspective on positive and negative aspects of wolves as ecosystem components in a multiple-use landscape of intermingled public, private, and Tribal Trust lands.

25. AMOC will collaborate with State and Tribal wildlife agencies to obtain updated abundance and distribution information for deer and elk populations every two years for each Game Management Unit in the BRWRA, and for as much of the rest of the wolf-occupied MWEPA as feasible.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

26. AMOC will recommend, through IFT Annual Reports, or a special report updated each year, wolf-related habitat enhancements that can be accomplished through private property incentives programs and Federal, State, Tribal, and County agency planning processes.

27. No later than June 30, 2006, AMOC will review the USFWS Recovery Protocols for pre-release husbandry in captive-breeding facilities and on-site acclimation pens, and advise USFWS as to whether AMOC believes they are adequate to maximize post-release survival and breeding success.

28. No later than December 15, 2007, AMOC and the IFT will identify training recommendations to build and enhance administrative, project management, supervisory, communication, and technical skills and knowledge as appropriate to each staff member's job functions within the Reintroduction Project.

29. AMOC will advocate creating an IFT position in the Alpine field office to work with cooperators and stakeholders throughout Arizona and New Mexico on proactive measures by which to avoid or minimize wolf nuisance and livestock depredation problems. Note: AMOC as a body will not advocate regulatory changes to address carcass removal or disposal issues (but see Recommendation [12], above, regarding a process by which AMOC will explore possible mechanisms to address this issue).

30. AMOC will collaborate with an appropriate entity to complete an IFT staffing needs assessment no later than June 30, 2007, based on (a) Reintroduction Project experience to date and (b) the Arizona-New Mexico Mexican Wolf Nonessential Experimental Population Rule recommended to USFWS per Recommendations (1) and (2), above.

31. AMOC will advocate creating sufficient IFT positions in each Lead Agency as appropriate to implement the staffing needs assessment conducted pursuant to Recommendation (30), above. AMOC will also recommend that at least one IFT member from each Lead Agency be stationed in the Alpine field office, to facilitate and enhance interagency communication and cooperation.

32. AMOC will collaborate with an independent entity to identify all information needs (e.g. data types and sample sizes) for a statistically valid habitat/population viability analysis for the BRWRZ wolf population to be conducted and completed in Calendar Year 2010.

33. AMOC will recommend to USFWS completion of a Mexican Wolf Recovery Plan no later than June 30, 2007.

34. AMOC will maintain and improve administrative and adaptive management processes for the Reintroduction Project to enhance meaningful opportunities for, and participation by, the full spectrum of stakeholders and interested parties. AMOC efforts will include meeting with the IFT twice each year at the Alpine field office, and offering to meet once each year with the Commission or Board of Supervisors for each County within the BRWRA.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

35. AMOC will continue to advocate a clear and appropriate distinction between the AMOC-managed Blue Range Reintroduction Project and the USFWS-managed Mexican Wolf Recovery Program.

36. Concomitant with any recommended MWEPA Rule changes pursuant to Recommendations (1) and (2), above, AMOC recommends that State and Tribal Lead Agencies and non-Federal Cooperators make a contingent-obligation request for annual Congressional line item allocations sufficient to cover all aspects of AMOC and AMWG participation in NEPA processes and ESA-related rulemaking processes required by such activities, through to the Record of Decision.

37. AMOC recommends that no later than April 30, 2006, AMOC State and Tribal Lead Agencies and non-Federal Cooperators complete and deliver to Congress a funding request that is sufficient to fully staff and equip the Reintroduction Project as of October 1, 2006, at levels commensurate with all on-the-ground responsibilities in all areas of responsibility, including wolf management (including control), enforcement, outreach (including establishing a Mexican wolf education center in Hon-Dah Arizona), citizen participation in adaptive management, Reintroduction Project-related research, and landowner incentives.

Literature Cited

Carroll, C., M.K. Phillips, C.A. Lopez Gonzalez, and N.A. Schumaker. *In press*. Defining recovery goals and strategies for endangered species: the wolf as a case study. BioScience 56(1):1-13.

U.S. Fish and Wildlife Service. 1982. Mexican wolf recovery plan. U.S. Fish and Wildlife Service, Albuquerque, New Mexico. 115 pages.

_____. 1996. Final environmental impact statement: reintroduction of the Mexican wolf within its historic range in the southwestern United States. U.S. Fish and Wildlife Service, Albuquerque, New Mexico.

_____. 1997. Notice of record of decision and statement of findings on the environmental impact statement on reintroduction of the Mexican gray wolf to its historic range in the southwestern United States. U.S. Fish and Wildlife Service, Albuquerque, New Mexico. 21 pages.

_____. 1998. Establishment of a nonessential experimental population of the Mexican gray wolf in Arizona and New Mexico. Federal Register 63: 1752-1772.

Document MW 5YR Recommendations.20051231.Final.doc

**Mexican Wolf Blue Range Reintroduction Project 5-Year Review:**

**Technical Component**


by


Interagency Field Team


Arizona Game and Fish Department
New Mexico Department of Game and Fish
U.S.D.A. – APHIS, Wildlife Services
U.S.D.A. Forest Service
U.S. Fish and Wildlife Service
White Mountain Apache Tribe


December 31, 2005

Mexican Wolf Blue Range Reintroduction Project

5-Year Review: Technical Component

by

Interagency Field Team

Note: see the Administrative Component for a list of abbreviations, acronyms, and terms.

INTRODUCTION

The Mexican wolf (*Canis lupus baileyi*) was relentlessly pursued in the wild and eventually extirpated from the southwestern United States, in large part because of conflicts with livestock (Bailey 1907, Young and Goldman 1944, Brown 1983, Robinson 2005). Many techniques were used to eradicate them, including trapping, shooting, and poisoning with strychnine, arsenic, or sodium cyanide (Young and Goldman 1944, Parsons 1996, Brown 1983, Robinson 2005). Federal government trappers reported taking more than 900 wolves in Arizona and New Mexico from 1915 to 1925 (Brown 1983). How many more were killed there but not reported is unknown. Wolf removal efforts in Mexico in the early to mid-1900s were not completely successful, in that some wolves survived at least until the 1980s (McBride 1980).

Little is known about the Mexican wolf's natural history prior to reintroduction to the Blue Range Wolf Recovery Area (BRWRA) in Arizona and New Mexico in 1998. The Mexican wolf is the most genetically distinct (Garcia-Moreno et al. 1996) and southern-most occurring gray wolf subspecies in North America (Nowak 1995 and 2003). One obvious difference between Mexican wolves and other gray wolves is their smaller size. Historic weights of wild Mexican wolves ranged from 25-49 kg (54-99 lbs) (Young and Goldman 1944, Leopold 1959, McBride 1980), versus 36-55 kg (80-120 lbs) in more northern animals (Mech 1970).

Prior to reintroduction of Mexican wolves, biologists suggested their primary prey had been white-tailed deer (*Odocoileus virginianus*) and mule deer (*O. hemionus*) (Brown 1983, Parsons 1998); however, data collected on Mexican wolves since their reintroduction indicates their current wildlife prey are primarily elk (*Cervus elaphus*) (Reed 2004[1]). The dichotomy between the two perspectives is at least partially attributable to nonparallel frames of reference: historically-based perspectives (e.g. Brown 1983 and Parsons 1998) reflect the fact that deer were the prevalent wild ungulates in Mexican wolf range as it was known prior to the late 1990s (southern AZ and NM south into Mexico, where elk were virtually absent); in contrast, elk are common to locally abundant (sometimes even more so than mule or white-tailed deer) in the BRWRA, where Mexican wolf reintroduction is occurring.

---

[1] In Reed (2004), opportunistic scat collection occurred in BRWRA from 1998-2001, where radio-collared wolves were present. Scats were actively collected from June-August 2000 and March-October 2001 within BRWRA. Relative abundance of wild ungulate prey and livestock in areas of wolf occurrence and scat deposition was not determined. Seasonal and area differences (e.g. winter-summer and AZ-NM) and conservative identification of scats as wolf (i.e. scats >28 mm) may have biased the results toward larger ungulates commonly found in larger scats. Also, note that wolf scats collected by a permittee reporting livestock depredations in the study area during this time were not made available to Reed.

Historically, Mexican wolves were distributed across a significant portion of the southwestern United States and northern and central Mexico. This range included eastern and central Arizona, southern New Mexico, and west Texas (Brown 1983, Parsons 1996). In addition, recent genetics work that looked at historic wolf specimens collected in 1916 and earlier (Leonard et al. 2004) suggests that Mexican wolves intergraded with more northern races well into Colorado. Mexican wolves were extirpated in New Mexico around 1942 (Bednarz 1988). Fewer than 50 Mexican wolves still existed in Chihuahua and Durango, Mexico by 1980 (McBride 1980). Subsequent surveys in Mexico have not confirmed presence of wolves in the wild (Carrera 1994), and it is unlikely that a viable population exists (Parsons 1996).

Five wolves (4 males and 1 pregnant female) were live-trapped in Mexico between 1977 and 1980 to establish a captive population known as the "Certified" (Parsons 1998) or "McBride" lineage. Two other lineages, both from captive facilities in the United States and Mexico, were also certified for the captive breeding population in 1995 (Hedrick et al. 1997). The latter wolves were referred to as the "Aragon" and "Ghost Ranch" lineages. There were a total of seven founders of the Mexican wolf Certified captive population: three from McBride, two from Aragon, and two from Ghost Ranch.

The Mexican wolf was listed as endangered under provisions of the Endangered Species Act (ESA) in 1976 (Parsons 1998). The Mexican Wolf Recovery Team was formed in 1979 and the Mexican Wolf Recovery Plan was approved and signed by the United States and Mexico in September of 1982 (U.S. Fish and Wildlife Service [USFWS] 1982). The main objectives of the Recovery Plan were to maintain a captive population and to re-establish a viable, self-sustaining wild population of Mexican wolves. Following approval of a Final Environmental Impact Statement (FEIS; USFWS 1996), the Secretary of the Interior approved the reintroduction of Mexican wolves to establish a population of at least 100 wolves in the BRWRA of Arizona and New Mexico in March 1997 (USFWS 1998). The USFWS classified wolves reestablished in this area as a "nonessential experimental population" under section 10(j) of the ESA (USFWS 1998). In 2003, the USFWS reclassified the gray wolf in North America creating three Distinct Population Segments (USFWS 2003). Under this reclassification wolves occupying the Southwestern Distinct Population Segment (SWDPS) including the current BRWRA population, were listed as endangered and a recovery team was convened to develop a new recovery plan for the SWDPS. Recovery planning for the Mexican wolf was put on hold, however, in January 2005 when an Oregon U.S. District Court judge enjoined and vacated the 2003 gray wolf reclassification rule (USFWS 2003), which also abolished the SWDPS. In December 2005, the USFWS decided not to appeal the Oregon Court ruling. This decision re-opened the door for the USFWS, Region 2 to once again move forward with Mexican wolf recovery planning in the Southwest. Target deadlines for Recovery Plan development and completion will be identified once the Recovery Team resumes meeting. In the meantime, the Mexican wolf in the BRWRA will continue to be managed as part of a Nonessential Experimental Population for reintroduction purposes.

Mexican wolves were first reintroduced to the BRWRA in March 1998 when 11 animals were initial-released into the primary recovery zone (Parson 1998). Additional individuals and family groups of Mexican wolves have been released or translocated into various parts of the BRWRA

Mexican Wolf Blue Range Reintroduction Project                                  December 31, 2005

each year through 2003. Interagency Field Team (IFT) members have monitored the reintroduced population for reproduction, food habits including livestock depredation, and other biological traits of Mexican wolves. Predictions in the FEIS estimated that by the sixth year of the reintroduction, the number of wolves in the wild would be about 55 (USFWS 1996). In 2003, the IFT estimated the Mexican wolf population in the BRWRA to be approximately 50 to 60 wolves, indicating population numbers were on track with FEIS (1996) predictions (Arizona Game and Fish Department [AGFD] 2004) in regards to this population parameter.

Herein, we: (1) provide a 5-Year Review of the Mexican wolf reintroduction pursuant to the Mexican wolf Final Rule (USFWS 1998), and (2) highlight additional analyses that provide valuable information to the current reintroduction effort. In addition, we identify home range and dispersal patterns; analyze release success; document reproduction, population growth, causes of mortality, survival and removal rates; assess prey numbers; investigate livestock depredation patterns, and classify human/wolf encounters in the BRWRA.

STUDY AREA / REINTRODUCTION AREA

The BRWRA includes all of the Apache and Gila National Forests (NF) in east-central Arizona and west-central New Mexico, encompassing 17,775 km² (6,845 mi²) (USFWS 1996). In addition, the White Mountain Apache Tribe (WMAT) has developed a management plan for wolves that adds 6,475 km² (2,500 mi²) for wolves to recolonize. Elevations ranged from <1,220 m (4,000 ft) in the semi-desert lowlands along the San Francisco River to 3,353 m (11,000 ft) on Mount Baldy, Escudilla Mountain, and the Mogollon Mountains (USFWS 1996). The BRWRA has four distinct seasons including autumn (Sep-Nov), winter (Dec-Feb), spring (Mar-May), and summer (Jun-Aug). The BRWRA has relatively mild weather with cool summers and moderate to cold winters over most of the higher elevations, and warm year-round temperatures in the lower elevations (USFWS 1996). Average temperatures ranged from 43 to 65 °F in the higher elevations and lower elevations, respectively (USFWS 1996). Yearly precipitation ranged from 30.5 cm (12 in) in the southern woodlands to 94.0 cm (37 in) in the mixed conifer forests (USFWS 1996). Snow typically occurred at higher elevations from December to March, however snow is also possible in the BRWRA as early as October and as late as June. Mixed conifer forests in the higher elevations and semi-desert grasslands in the lower elevations characterized the area, with ponderosa pine (*Pinus ponderosa*) forests dominating the area in between (USFWS 1996). Potential native prey of Mexican wolves included elk, white-tailed and mule deer, and to a lesser extent, pronghorn (*Antilocapra americana*), javelina (*Tayassu tajacu*), and Rocky Mountain bighorn sheep (*Ovis canadensis*) (Parsons 1996). Elk populations were estimated in the FEIS at 15,800 (3.7/km²) (USFWS 1996). Both species of deer were estimated at 57,170 total (average density 13.36/ km²) (USFWS 1996). Approximately 82,600 cattle and 7,000 sheep were permitted to graze roughly 69% of the BRWRA, and 50% of the allotments were grazed year-round when the Reintroduction Project began (USFWS 1996). The actual numbers of cattle and sheep varied each year relative to environmental factors, and were generally lower because of drought conditions (see also Section 3.2 of the Socioeconomic Component of the 5-Year Review). Other domestic animals in the BRWRA that wolves might encounter include cats, dogs, poultry, goats, horses, and mules. Other large predators in the

BRWRA included coyotes (*Canis latrans*), cougars (*Puma concolor*), and black bears (*Ursus americanus*) (USFWS 1996).

METHODS

All adult wolves released from captivity or trapped in the wild were radiocollared (models 400 and 500, Telonics, Inc., Mesa, Arizona). Wolves were radiotracked periodically from the ground (i.e. triangulation) and a minimum of once a week from the air (White and Garrot 1990). Location data (i.e. date, UTM location, wolf identification number, sex, age, number of wolves, behavior, and weather) were entered into the Reintroduction Project's database, along with reports for specific incidents (e.g. depredations, wolf/human conflicts, aversive conditioning, captures, mortalities, translocations, initial releases, predation). The cut-off date for data analysis for the Technical Component of the 5-Year Review was December 31, 2003. However, data from subsequent years (i.e. 2004 and 2005) were used when available and appropriate.

Home Ranges

Aerial locations of wolves were used to estimate home ranges (White and Garrott 1990). Annual home range polygons were based on locations from January through December each year that were evenly distributed across summer and winter seasons for wolves from a given pack (Mladenoff et al. 1995, Wydeven et al. 1995). Some packs maintained home ranges for several years; thus, we used each pack year as an independent home range sample. In order to maximize sample independence, only individual locations of radiomarked wolves that were spatially or temporally separated from other radiomarked pack members were used. This approach minimizes pseudoreplication (Garton et al. 2001) among locations.

Wolf home range size in some areas reaches an asymptote at around 30 locations. In such cases increasing the number of locations beyond this level has little effect in increasing estimated home range size (Carbyn 1983, Fuller and Snow 1988). Thus, we elected to use ≥30 locations per year as a threshold for analyzing home ranges. Alternatively, some authors have suggested that in recolonizing wolf populations, a larger number of locations (≥80) may be required for home range size to reach its asymptote (Fritts and Mech 1981). To account for this potential sampling bias, we used the fixed kernel (FK) method to estimate wolf home ranges due to its low bias when sample sizes are small (Kernohan et al. 2001). In contrast, previous wolf home range analyses have relied largely on the less stable and less accurate minimum convex polygon (MCP) method (e.g. Carbyn 1983, Fuller and Snow 1988, Burch 2001). Fixed kernel home ranges derived from smaller samples typically yield more accurate home range size estimates than estimates more dependent on increased sample size to develop accurate home ranges (Seaman et al. 1999, Powell 2000, Kernohan et al. 2001). Thus, we used a 95% FK approach to describe home range sizes due to its improved performance relative to other home range estimators.

Polygons were generated using the FK method (Worton 1989) at the 95% (home range use) and 50% probability levels (core use areas) (White and Garrott 1990), with least-squares cross-validation as the smoothing option in the animal movement extension in the program Arcview (Hooge et al. 1999; Environmental Systems Research Institute 2000). Home range polygons

were only created for wolves that localized and established an exclusive use area. Home range sizes were compared with each other and with those in the literature (e.g. Fuller and Murray 1998, Fuller et al. 2003).

Releases and Translocations

We defined "initial releases" as wolves released directly from captivity, with no previous free-ranging experience, into the Primary Recovery Zone (Fig. 1). "Translocations" were defined as free-ranging wolves (either captive reared or wild born) captured in the wild and moved from one area to another. This included wolves temporarily (<24 hrs to 24 months) placed in captivity after being free-ranging. Candidate release wolves were acclimated prior to release in USFWS approved facilities, where contact between wolves and humans was minimized and carcasses of road-killed deer and elk supplemented their routine diet of processed canine food. Information on captive facilities, genetic lineages of Mexican wolves, and individual wolves chosen for release is discussed elsewhere by García-Moreno et al. (1996), Parsons (1996, 1998), Hedrick et al. (1997), and Brown and Parsons (2001).

Three initial release or translocation methodologies were employed: (1) hard releases in which a wolf or wolves were released directly from a crate to the wild (Fritts et al. 2001), (2) soft releases in which a wolf or wolves were held in a chain link enclosure for one to six months until acclimated to the area (Fritts et al. 2001), and (3) modified soft releases in which a wolf or wolves were held in a mesh enclosure until they self-released by tearing through the mesh after ≤1 day to 2 weeks of acclimation. We considered a successful initial release or translocation to be any wolf that ultimately bred and produced pups in the wild (breeding season data from 2004 for wolves released in 2003 was included in the analysis). We excluded wolves whose fate was unknown (e.g. uncollared released pups, or missing collared animals) from this analysis. We considered each time an animal was released to be an independent sample. The number of successful and unsuccessful-released wolves was compared using a chi-square analysis to limit the number of variables subsequently used in a logistic regression analysis (Hosmer and Lemeshow 2000). We used likelihood-based methods (i.e. $\Delta AIC_c$ and $w_i$) as a means to quantify the strength of models explaining release success patterns (Burnham and Anderson 1998). The dependent variable was a binomial (whether a release was successful or not), while independent variables included: (1) year of release, (2) type of release (i.e. initial release or translocation), (3) method of release, (4) season of release (autumn, winter, spring, and summer), (5) number of adults in the group, (6) if the group was released with pups or not, (7) status of the wolf (i.e. breeder, subadult, or pup), (8) sex, (9) age, (10) time spent in captivity, (11) time spent in wild, (12) proportion of wolf's life spent in the wild , (13) time spent in the acclimation pen, and (14) State (i.e. New Mexico or Arizona). Logistic regression provides poor confidence intervals when there are empty cells. Thus, models with overdispersed data were removed from further consideration (Hosmer and Lemeshow 2000).

Reproduction and Population Growth

Population estimates were determined through the use of howling surveys (Harrington and Mech 1982, Fuller and Sampson 1988), tracks, and visual observations during aerial and ground

radiotelemetry (White and Garrot 1990). A "breeding pair" was defined as an adult male and adult female wolf that produced at least two pups during the previous breeding season that survived until December 31 of the year of their birth (USFWS 1998). "Pack" was defined as two or more wolves traveling together. Thus, minimum population estimates incorporated the total number of collared wolves, uncollared wolves, and pups, documented as close to December of the year of interest as possible. We attempted to maintain at least two radiocollared wolves in each pack within the BRWRA and investigated (i.e. looked for sign, howling surveys) reports in areas where packs were not known to exist.

Pups were born from early April to May within the wild population and were counted post-emergence from the den whenever opportunity allowed. Counts of pups, failed radiocollars, and uncollared wolves were based on the latest date in the year in which verification was available. This period for pups was prior to October because they become less distinguishable from uncollared subadult and adult wolves after that. The period following 28 weeks of age in a pup cycle is generally referred to as the slow growth rate (Mech 1970, Kreeger 2003). Although wolves continue to grow until 12 to 14 months of age, relatively little mass is gained by either sex from 28 to 51 weeks of age (Kreeger 2003). Further, pups tended to be closely associated with collared animals prior to October, at den or rendezvous sites. After October, pups occasionally disperse or travel separately from the breeding pair, either alone or with other uncollared members of the pack.

Finally, average pack size for free-ranging Mexican wolves, and average litter size for reproducing packs were calculated and compared with other gray wolf populations. In this case, litter size represented the earliest documented count of the pups in a given pack. These observations do not represent the number born in a given year as some mortality likely occurs before initial counts.

Mortality

Wolf mortalities were identified via telemetry and reports received from the public. We investigated mortality signals within 12 hours of detection to determine the status of the wolf. Carcasses were investigated by law enforcement agents and later necropsied to determine proximate cause of death. We summarized causes for all known deaths. For radiocollared wolves, we calculated mortality, missing, and removal rates using methods presented in Heisey and Fuller (1985).

We calculated overall cause-specific mortality rates (i.e. human-caused versus natural mortality), however, similar to other studies (e.g. Fritts and Mech 1981, Fuller 1989, Pletscher et al. 1997, Bangs et al. 1998), mortality was primarily human-caused. Thus, there was not enough consistent variability in cause of death to justify additional breakdown of mortality rates, or to warrant calculation of yearly cause-specific mortality rates. However, management removals may have an equivalent effect as mortality on the free-ranging population of Mexican wolves (see Paquet et al. 2001). Thus, we also calculated yearly cause-specific removal rates for radiocollared wolves because sufficient sample sizes existed for these classifications. Later in recovery, these removals may actually be deaths, as wolves will be increasingly removed

through lethal control (Bangs et al. 1998). Wolves were removed from the population for four primary causes: (1) dispersal outside the BRWRA, (2) cattle depredations, (3) nuisance to humans, and (4) other (principally to pair with other wolves, or move to a better area without any of the other causes occurring first). Each time a wolf was moved to a new location was considered a removal, regardless of animal status later in the year (e.g. if the wolf was translocated or held in captivity). We calculated an overall failure rate of wolves in the wild by combining mortality, missing, and removal rates to represent the overall yearly rate of wolves that were affected (i.e. managed, dead, or missing) in a given year. Mortality, missing, and removal rates were then compared with predictions in the FEIS (USFWS 1996) and in other wolf populations (Fuller et al. 2003).

In addition, we developed single variable models using Cox's proportional hazards model (Cox and Oakes 1984) to identify possible important covariates that influenced wolf survival. We developed one model for mortality and one model for removals. The dependent variable was hazard rate (i.e. the mortality or removal rate), while independent variables included: (1) year, (2) status of the wolf (i.e. breeder, subadult, or pup), (3) sex, (4) age, (5) time spent in captivity, (6) time spent in the wild, (7) proportion of the wolf's life spent in the wild, and (8) state (i.e. New Mexico or Arizona).

We generated rates inside of 1:24,000 quadrangle maps to determine how mortality, missing, and removal rates varied across the landscape. Spatially explicit survival models needed for each quadrangle were based on: (1) aerial locations, (2) mortalities, (3) missing animals, and (4) removals. Time between aerial locations averaged $6.25 \pm 5.75$ (SD) days ($n = 4,909$). Thus, we calculated the number of radio days by multiplying the number of locations in a given quadrangle by 6.25 days. Quadrangles that contained <5 aerial locations or <30 radio days were areas where data were insufficient for full evaluation. We calculated monthly mortality, missing, and removal rates within a cell and considered monthly failure rates (see above) >3% (34% yearly) as a sink area. In this case, a sink area would be considered any quadrangle where mortality, missing, and removal create an area in which the growth rate of Mexican wolves is <1.0. We identified 34% yearly failure rate as the equivalent to a 1.0 growth rate in a regression equation developed from other wolf populations (Fuller 2003). Further, we identified quadrangles with monthly failure rates between 4 and 6% as weak sinks. We also identified the last location of wolves that disappeared, to examine the possibility that these wolves were killed in that area. In the scope of these analyses, we attempted to answer the following questions: (1) is wolf mortality substantially higher than projected in the FEIS, (2) have any sinks been identified, and (3) are any sources of mortality significantly higher than expected?

Dispersal

To evaluate the self-sustaining potential of the Mexican wolf population, we investigated dispersal and movement patterns of individual wolves on the landscape. Wolf dispersal was defined as the time when a wolf permanently left its' natal home range (Boyd and Pletscher 1999). To account for wolves that functioned as individual animals following release or translocation, we defined these as movements rather than classic dispersals. Distance and direction of travel, age and sex of the wolf, and result of the movement (i.e. the ultimate fate of

the animal) were recorded for each event. We calculated travel distance and direction using Arcview (Environmental Systems Research Institute 2000), either between the central point of successive home ranges, or the distance and direction from the original home range or release site, to the point where individual wolves died or were captured. Movements were considered successful if the animal ultimately produced pups. The purpose of this analysis was to evaluate the effects of dispersal and movements on population growth within the BRWRA.

Predation

We opportunistically searched for wolf-killed and scavenged native ungulate carcasses throughout the year. After wolves abandoned a carcass, IFT members attempted to determine the proximate cause of death (Roy and Dorrance 1976, Fritts and Mech 1981, Mech et al. 1998, Mech et al. 2001). Kills were classified as confirmed, probable, or possible based upon standardized criteria (Roy and Dorrance 1976) and the preponderance of evidence. Only confirmed or probable kills were used for analysis purposes. Data on species, age (calf/fawn, or adult), sex, and amount consumed were recorded for each carcass. In addition, bone marrow and mandibles were collected as an indicator of overall health (i.e. percent fat) and for aging, respectively.

We also recorded the location of each kill relative to a specific state game management unit. Each kill was referenced to population estimates of deer and elk within each management unit and year in which the kill occurred. This represented prey availability. For Arizona, data on population estimates for individual management units were based upon deer and elk management summaries for 2003 (AGFD unpublished data). In New Mexico, we used the most recent aerial population survey relative to when the predation event occurred (New Mexico Department of Game and Fish [NMDGF] unpublished data). Thus, each kill had a specific reference to the population of elk and deer, and the male: female, and female: calf or fawn ratios. Ungulate estimates were then averaged across all years and game management units to represent available prey. We then compared documented wolf kills to the available prey estimate (AGFD unpublished data, and NMDGF unpublished data) and ratios using chi-square analysis (Sokal and Rohlf 1981). The available ungulate estimates differed between states (i.e. methods and accuracy). However, we believe the data were sufficient to give relative proportions of deer versus elk, male: female, and female: calf or fawn ratios for comparisons with wolf kills. We did not extend the data to suggest what the estimated numbers of elk or deer were within the BRWRA.

We located select packs from fixed-wing aircraft daily during a one month period (March 2003) to determine the feasibility of a winter study to document kill rates (Peterson 1977; Ballard et al. 1987, 1997; Mech et al. 2001; Smith et al. 2004). Ground tracking was done on days we were unable to fly. Kills discovered during this study were included in analyses. Except for this pilot study, we expected data collected on ungulate kills would be biased toward larger ungulates (e.g. large elk are more likely to be discovered than elk calves or deer). Thus, selection patterns were only valid if selection occurred for smaller animals, or alternatively against larger animals.

Prey density estimates were not available for the entire BRWRA; therefore, we were unable to use this parameter to estimate the number of wolves the BRWRA could support (Keith 1983, Fuller 1989). However, we compared the mass change during repetitive examinations of captive adult ($\geq 2$ years) Mexican wolves with the mass gain or loss in repetitive captures of wild adult Mexican wolves to evaluate the ability of wild wolves to find or kill enough food to maintain their mass. The hypothesis that mass gain or loss was equivalent between wild and captive wolves was tested with a two-sample t-test. Starvation in adults is indicative of food limitation (e.g. prey availability or inability of a wolf to capture adequate prey such as might occur when a "naive" wolf is initially-released) in wild wolf populations (Fritts and Mech 1981, Ballard et al. 1997). Thus, any significant deviation from 0 weight loss between captures would indicate food limitation.

Depredations

Personnel from the U.S.D.A.-APHIS Wildlife Services (WS), or other members of the IFT if WS personnel were unavailable, examined dead or injured cattle, sheep, horses, and dogs to determine cause of death. Domestic animal depredations were classified as confirmed, probable, or possible wolf kills, non-wolf, or unknown, in adherence with standardized criteria (Roy and Dorrance 1976, Fritts 1982). We compared depredations with projections in the FEIS and other population of wolves (Bangs et al. 1998, USFWS et al. 2003). These comparisons were normalized to represent the number of wolf-caused mortalities relative to 100 wolves within the population.

The effectiveness of the wolf depredation investigation program (i.e. livestock and other domestic animals) was evaluated based on: (1) response time from reported to arrival of personnel, (2) number of documented confirmed or probable livestock kills compared with that predicted in the FEIS (USFWS 1996), (3) trend in confirmed depredations per 100 wolves, (4) number of wolves removed per livestock depredation, and (5) recurrence of depredations by wolves translocated due to previous depredations. We considered a response time of <24 hours, documented confirmed or probable kills less than or equal to estimates identified in the FEIS (1996), and a decreased or stable trend per 100 wolves as a sign of an effective depredation program. Although, we recognize that not all livestock kills from wolves or other causes are documented (Fritts 1982, Bangs et al. 1998, Oakleaf et al. 2003), the most valid analysis must be based on the best available data, which currently are depredation investigations, versus unknown livestock loss figures. However, Project personnel and ranchers spent a considerable amount of time monitoring wolves and/or livestock, looking for possible depredations. Further, biases (i.e. not all livestock kills are found) should be similar to other areas in the United States, making comparisons between Mexican wolves and other wolf populations reasonable.

Human/Wolf Interactions

We summarized human-wolf encounters based on categories described by McNay (2002). Three categories applied to Mexican wolves: investigative search, investigative approach, and aggressive charge. We considered wolf behavior an investigative search when the wolf ignored humans or human activity. An investigative approach described wolves that moved toward

Mexican Wolf Blue Range Reintroduction Project                          December 31, 2005

people in an inquisitive, non-threatening manner. In an aggressive charge, wolves moved toward people rapidly. Because every documented aggressive charge by a Mexican wolf occurred when a dog was present, we did not feel that any of the other terms used by McNay (2002) were appropriate (e.g. agonism, predation, prey testing, self-defense, and rabies). Encounters triggered by a dog were considered provoked, while other cases were considered non-provoked (McNay 2002). We also identified whether the interaction was related to food conditioning (i.e. associating food with people). Further, we identified wolves that appeared habituated (i.e. close proximity to humans and habitations with an apparent lack of fear or concern for human presence) to people (Appendix I).

We also identified cases where aversive conditioning (e.g. hazing with cracker shells or rubber bullets, translocations) was applied. We determined what proportion of the wolves was removed for nuisance behavior and the general trend of wolf/human interactions.

Genetics

All animals released to the wild in the BRWRA were genetically redundant to the captive Mexican wolf population. Data from microsatellite analysis show that all three lineages (i.e. McBride, Ghost Ranch, and Aragon) can definitively be differentiated from northern gray wolves, coyotes, and dogs (Hedrick et al. 1997). Prior to releasing Mexican wolves from captivity, we pulled blood from each animal for genetic analysis and storage at the National Forensics Laboratory in Ashland, Oregon. In addition, we pulled blood from every wild wolf captured to determine if it was a pure Mexican wolf. This allowed us to determine the parentage and pack affiliation of each animal. This also allowed us to monitor for possible introgression of coyote, dog, or wolf-dog hybrid genes into the Mexican wolf population. Finally, blood was also collected and banked from any non-target canids (i.e. feral dogs, coyotes, wolf-dog hybrids) that were captured in order to monitor for possible introgression of Mexican wolf genes into coyote or dog populations.

RESULTS

Home Ranges

Home ranges (95% FK probability contour) were determined for 19 packs totaling 39 pack years (Fig. 2) and averaged $462 \pm 63$ km$^2$ (SE) ($182 \pm 24$ mi$^2$). Core use areas (50% FK probability contour) averaged $59 \pm 9$ km$^2$ ($23 \pm 4$ mi$^2$). During a pack's first year of home range establishment, their home range (log transformed to normalize) was smaller than packs which had been in the wild greater than one year or for packs that formed naturally in the wild ($t = 3.310$, $P = 0.002$, $n = 39$; and $t = 2.610$, $P = 0.013$, $n = 39$ for home ranges and core use areas, respectively). Home ranges were primarily contained within the BRWRA (partly as a function of the Final Rule (Fig. 1). However, 28% ($n = 11$ out of 39) of pack annual home ranges had at least small portions (approximately 20%) outside of the reintroduction boundary (Fig. 2). The total area occupied by established wolf packs has continued to increase during each successive year of the Project, primarily due to an increase in the number of colonizing packs (Table 1).

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

Releases

Ninety wolves were released 130 separate times including 51 translocations ($n = 11$ translocated wolves were wild born), and 79 initial releases from captivity. Overall, wolves were successful (i.e. produced pups in the wild) 26% of known fate releases (i.e. dead, produced pups in the wild, or removed). Success was 18% for known-fate animals initial-released from captivity ($n = 60$), while known-fate translocated wolves ($n = 46$) were twice as successful (37%; $\chi^2 = 4.646$, $P = 0.031$, $df = 1$). Wolves released in New Mexico (translocations; 47% success) were more successful than those released in Arizona (initial releases and translocations; 22%; $n = 106$, $\chi^2 = 5.229$, $P = 0.022$, $df = 1$). Not surprisingly, adult wolves were more successful (38% success), than subadults (16%) or pups (10%; $n = 106$, $\chi^2 = 7.767$, $P = 0.021$, $df = 2$).

Temporal effects also influenced release success, with 2002 (67% success) the best year for releases, followed by 2000, 2003, 1998, 1999, and 2001 (32, 29, 13, 12.5, and 11%, respectively [$n = 106$, $\chi^2 = 15.486$, $P = 0.008$, $df = 5$]). Fall (75% success) and summer (35% success) were more successful periods for release than winter (22%) or spring (18%; $n = 106$, $\chi^2 = 8.221$, $P = 0.042$, $df = 3$). Further, successful releases consisted of wolves that spent a greater proportion of their lives in the wild prior to release ($0.236 \pm 0.323$ [SD]; unsuccessful released wolves $0.117 \pm 0.214$; $n = 106$, $t = -2.186$, $P = 0.031$), and a greater number of months in the wild ($6.679 \pm 8.474$ [SD] months; and unsuccessful released wolves $3.088 \pm 6.2225$; $n = 106$, $t = -2.369$ $P = 0.020$). Successful wolves were older at the time of release ($3.111 \pm 1.765$ years) than unsuccessful animals ($2.217 \pm 1.739$, $n = 106$, $t = -2.35$, $P = 0.022$). Similarly, successful wolves spent more time in captivity ($2.731 \pm 1.660$ years) relative to unsuccessful ($1.991 \pm 1.706$, $n = 106$, $t = -2.35$, $P = 0.022$). However, the last result is likely because years in captivity and age were highly correlated ($r = 0.956$) and age was believed to be an overriding influence. All other significant variables were not highly correlated ($r < 0.70$), and thus only years in captivity was removed from the model-building process. All other variables had no significant effect on the successful release of Mexican wolves and were excluded from the model-building process (all $P > 0.10$).

Logistic regression analysis determined the top candidate model included status of the wolf, the proportion of the released wolf's life spent in the wild, and year of release as dependent variables (Table 2). There was also support for models with state, season of release, and age dependent variables (Table 2). The top candidate model described the data ($R^2 = 0.223$), and predicted unsuccessful released animals well (specificity = 0.804). However, the model did not predict successfully released animals as well (sensitivity = 0.454).

Reproduction and Population Growth

We estimated the Mexican wolf population within the BRWRA grew from 4 in 1998 to 55 in 2003 (Table 3). Initially (1998-2001), this growth came primarily through reintroductions. From 2002-2003, reproduction has been the primary factor influencing growth (Table 3). At the end of 2003, 25 radiocollared wolves were free-ranging within the BRWRA. There were also approximately 12 uncollared subadult wolves and $\geq 20$ pups documented by the end of September (Table 3). During 2003, the population consisted of 13 packs (i.e. two or more wolves

traveling together), and five lone collared wolves. In 2003, seven packs (i.e. Hawks Nest, Cienega, Saddle, Bluestem, Bonito Creek, Gapiwi, and Luna) produced wild conceived and wild born litters. The number of uncollared subadults observed during a given year generally tracked the number of pups observed the previous year (e.g. the total number of pups in the wild prior to 2003 was 37, while the sum of subadults observed was 22 [Table 3]). This trend indicated that a large proportion of pups that survived until late October were likely to survive late into the following year.

The number of breeding pairs (e.g. $n = 4$ versus 10 in 2003) and pups produced (e.g. $n = 20$ versus 40 in 2003) were below the level predicted in the FEIS (Figs. 3a-3b; USFWS 1996), while the number of released, removed, and population estimates were generally at or above predicted levels (Figs. 3c-3e; USFWS 1996).

Compared with other reintroduced or recolonizing wolf populations in the United States, the rate of Mexican wolf population growth was intermediate (Fig. 4a). Similarly, the number of Mexican wolf breeding pairs lay between other expanding wolf populations (Fig. 4b). Average litter size for wild conceived and wild born pups was 2.1 pups/litter ($n = 16$, range 1-5); far less than the average litter size of 4.2 -6.9 observed elsewhere (Fuller et al. 2003). The average number of wolves per pack (packs that had been in the wild for at least one year) was 4.8 ($n = 16$, range 2-11) based on autumn estimates.

Mortality

Causes of death for Mexican wolves in the wild from 1998-2003 were largely human-related (i.e. vehicle collision [8], illegal gunshot [19], self defense [1], lethal control [1], and capture complications [1]). Other causes of death included (one each) death by dehydration, brain tumor, infection, cougar attack, and unknown. Three of the preceding deaths were documented from uncollared wolves. An adult male from the Lupine Pack was bitten by a rattlesnake. As a consequence of the bite, his neck became swollen, which likely led to asphyxiation from the radiocollar. Canine bite marks on his head were likely caused by other pack members reacting to his aberrant behavior. In addition, 5 pups died (i.e. three parvovirus, two distemper) in a captive facility following capture and removal from the wild. Out of 31 radiocollared wolves that were classified as mortalities from 1998-2003 (Table 4), 26 were human-caused, four were natural mortalities, and one was unknown cause of death. This resulted in an overall mortality rate of 0.21 (Table 4) and rates of 0.18 and 0.03 for human-caused and natural mortalities, respectively.

Loss rates (i.e. mortality and missing wolves) were predicted at 25% in the FEIS (USFWS 1996). We added mortality and missing rates to compare with this prediction, resulting in a 25% overall loss rate (Table 4). Loss rates were below the 25% level during three years (i.e. 1999, 2000, and 2002). Although loss rates were similar to the 25% loss rate predicted within the FEIS, removal rates were higher than the 10% removal rate predicted within the FEIS (Table 4; USFWS 1996). Thus, the overall mortality/removal rate was also much higher than that predicted in the FEIS (Table 4; USFWS 1996). However, the FEIS also anticipated that 5 of the 15 wolves released each year (1998-2002) were expected to die or be removed relatively quickly and did not incorporate these removals/deaths into the overall estimate. By including these 5 removals in the

overall removal rate (as we did in Fig. 3d), the overall annual removal rate was 22%. Thus, for comparison with our data (we included data on removal and survival regardless of the timing of the event relative to releases), the removal/mortality level predicted in the FEIS was 47% (USFWS 1996). The removal/mortality level observed in the wolf population was higher (64%) than that predicted by the FEIS (Table 4; USFWS 1996).

The greatest single cause of removal was wolves moving outside the recovery area (Fig. 1, Table 5). Further, this is the only removal cause that did not decrease over time (Table 5). Predictably, nuisance and other removals (e.g. generally to pair with a new mate) decreased over time (Table 5).

Cox's proportional hazard models (Cox and Oakes 1984) ($n$ = 185 observations, 33 failures, and 33,415 radio days) identified three variables that may be important in predicting which wolves become mortalities: year, months in the wild, and proportion of the wolf's life spent in the wild. Year differences were a result of high mortality during 1998. All other years appeared similar and reduced the hazard rate relative to 1998 (1999: 0.237, -1.71, 0.087, 0.046-1.230 [hazard ratio, $z$, $P$, 95% confidence ratio]; 2000: 0.268, -1.95, 0.051, 0.071-1.005; 2001: 0.285, -2.11, 0.035, 0.089-0.914; 2002: 0.116, -2.89, 0.004, 0.027-0.500; 2003: 0.352, -1.86, 0.062, 0.118-1.05). The greater amount of time spent in the wild (0.964, -1.76, 0.078, 0.926-1.004 [hazard ratio, $z$, $P$, 95% confidence ratio]) and the greater proportion of a wolf's life spent in the wild (0.301, -1.87, 0.061, 0.086-1.057) also reduced the hazard rate in univariate model building analysis. All other variables did not affect the hazard rate (all $P$ > 0.15).

Similarly, Cox's proportional hazard models (Cox and Oakes 1984) ($n$ = 185 observations, 58 failures, and 33,415 radio days) identified the same three variables that may be important in predicting which wolves succumb to removal. Year differences were a result of high removal during 1998, 1999, and 2000. Thus, the hazard rates relative to 1998 were: (1) 1999: 0.714, -0.58, 0.561, 0.230-2.222 [hazard ratio, $z$, $P$, 95% confidence ratio]; (2) 2000: 1.197, 0.38, 0.702, 0.477-3.004; (3) 2001: 0.398, -1.73, 0.084, 0.140-1.131; (4) 2002: 0.307, -2.11, 0.035, 0.102-0.919; (5) 2003: 0.409, -1.74, 0.081, 0.150-1.117). The greater amount of time in the wild (0.962, -2.41, 0.016, 0.933-0.993 [hazard ratio, $z$, $P$, 95% confidence ratio]) and the greater proportion of a wolf's life spent in the wild (0.478, -1.70, 0.089, 0.205-1.118) also reduced the hazard rate in univariate model building analysis. All other variables did not affect the hazard rate (All $P$ > 0.24).

Depicting survival rates across the landscape ultimately produced a checkered pattern of source-sink areas within and outside the reintroduction boundary (Fig. 5). A total of 218 1:24,000 quadrangles (quads) contained a minimum of one aerial location from 1998-2003. The majority (77%, $n$ = 168) of these quads were sources, however, 65% ($n$ = 109) of these source quads were based on data insufficient for full evaluation (radio days <30). The remainder of quads ($n$ = 50) were considered sinks due to various causes (Fig. 5). However, a proportion of sink quads were also based on data insufficient for full evaluation ($n$ = 22).

Dispersal

Collared wolves ($n = 45$) functioned in the wild as individual wolves either immediately following release ($n = 32$) or through natural dispersal ($n = 13$). Only 8 (5 following release and 3 natural dispersal) of these animals were ultimately successful (i.e. bred and produced pups in the wild). The majority of single wolves (60%) died ($n = 12$), or were removed for being outside the boundary ($n = 15$). Other fates of single wolves included removal for nuisance ($n = 5$) and cattle depredations ($n = 1$), wolves still alive but had not bred ($n = 2$), and missing wolves ($n = 2$). Three of the successful dispersing animals were ultimately removed. The majority of single wolves (68%) were outside the boundary for at least one location ($n = 31$ out of 45), even if they were not necessarily removed for this cause. Movement distances were similar between natural dispersal and movements following release ($t = 1.211$, $P = 0.233$), thus these two groups were pooled to analyze movements. Movement distances for lone wolves averaged $87 \pm 10$ km ($54 \pm 6$ mi). Movement distances were similar between male and female wolves ($t = -0.951$, $P = 0.347$, $n = 44$). Neither sex was more prone to display lone movements relative to the released population ($\chi^2 = 0.207$, $P = 0.649$, $df = 1$). Wolves primarily dispersed in a northwest or southeast direction (51%), which was the same direction as the mountain ranges in the BRWRA (Fig. 6). Not surprisingly, yearlings were more prone to disperse than adults relative to the released population ($\chi^2 = 8.391$, $P = 0.004$, $df = 1$).

Predation

From 1998-2003, the IFT documented 72 confirmed or probable native ungulate kills made by wolves. In addition, wolves were documented to feed or scavenge on 28 native ungulates killed by other predators, hunters, vehicles, or natural causes. Of the 72 confirmed or probable kills, 90% ($n = 65$) were elk, indicating a strong preference for elk relative to ungulate species available (32% elk, and 68% deer [$\chi^2 = 116.192$, $P < 0.001$, $df = 1$]). Mexican wolves also killed mule deer ($n = 4$), white-tailed deer ($n = 1$), and bighorn sheep ($n = 2$). However, it was unknown if this preference for elk was simply a function of prey size (e.g. larger elk being easier for the IFT to find than deer due to consumption rates), or alternatively a 'true' selection. Further, areas used by wolves appeared to be in high-density elk areas on a state game management unit scale. Prey availabilities on a local scale were not available.

Wolves selected for calf elk within the population (39% and 23% of kills and population, respectively), and selected against cow elk (47% and 60% of kills and population, respectively), while bulls were selected similar to availability (14% and 17% of kills and population, respectively; $\chi^2 = 5.098$, $P = 0.078$, $df = 2$). This trend would likely be more significant if systematic locations of ungulate kills were more prevalent during the study because wolves appear to be selecting for smaller prey (e.g. calves that are presumably harder to locate) and against larger prey (e.g. cow elk). The preference for elk relative to deer was supported by a recent scat study (Reed 2004).

Adult wolves lost mass between subsequent captures in the wild ($\bar{x} = -1.025$ kg [-2.260 lbs], $n = 40$). This pattern was significantly different from the pattern observed in captivity where wolves gained weight ($\bar{x} = 0.519$ kg [1.146 lbs], $t = -2.647$, $P = 0.009$, $n = 139$). However, weight loss between captures of wild wolves was not significantly different from 0 ($t = -1.705$, $P = 0.096$, $n = 40$). Both of these results were influenced by two wolves (M190, F189) from the same pack

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

that lost 15.9 kg (35 lbs) and 8.39 kg (18.5 lbs) soon after release. After removal of these outliers, the difference between wild and captive wolves weight change was not significant ($t = -1.599$, $P = 0.112$, $n = 129$). Further, when these two wolves were removed from the sample the difference from 0 for weight loss of wild wolves was further obscured ($t = -0.994$, $P = 0.327$, $n = 38$).

Depredations

There were 89 reported incidents within the WS database between 1998 and 2003. Average response time to investigate complaints was 23 hours (12 hrs min, 120 hrs max). Cattle killed (i.e. confirmed, probable, possible) by wolves from 1998-2003, consisted of one bull, 12 cows, and 24 calves (Table 6). Also, 6 dogs, 4 horses, and 5 cattle were confirmed injured by wolves, and 3 additional cattle possibly injured by wolves. Twenty two wolves were removed or translocated as a result of livestock depredations. Thus, 1 wolf was removed for every 1.18 confirmed depredations.

WS personnel also investigated livestock kills not related to wolf depredation. These included nine accidents, six feral dogs, three black bears, five coyotes, one domestic hybrid wolf, two cougars, and one unknown causes not related to wolves. Depredation rates (per 100 wolves) on cattle varied from year to year, but were always within the 1-34 range predicted in the FEIS (Table 7; USFWS 1996). There was no clear trend in the data, but 2003 had one of the lowest depredation rates observed during the six years (Table 7). Five of 18 wolves translocated following depredations (not necessarily removed for depredations, but had previously depredated) ultimately depredated again before the end of 2003. In contrast, 39 of 83 (47%; released and radiocollared in the wild and never translocated) wolves caused at least one confirmed depredation (injury or kill). Further, 9 of 17 known-fate wolves (53%) translocated following depredations ultimately bred and reproduced in the wild. This rate exceeded the overall release success of 26%, as well as translocation success rate (37%).

Human/Wolf Interactions

We documented wolves displaying limited fear of humans on 33 occasions. The majority of these were considered investigative searches (64%) in which wolves did not approach people, but simply ignored their presence (Appendix I). Most other cases were considered investigative approaches (27%) where the wolf approached a human in a non-threatening manner. Three charge incidents (9%) occurred where wolves were more aggressive. In all of the charge incidents and most of the investigative approaches (5 out of 9), dogs were involved, and these cases were considered provoked. Similarly, most of the investigative search cases involved dogs (12 of 21) and were considered provoked. Of the 12 non-provoked incidents where wolves displayed a lack of fear of humans, six involved wolves or a wolf considered habituated (Appendix I). One involved a carcass hanging in a deer camp that the wolves fed on, and another was an unknown large canid (a wolf or large dog). Two other incidents involved people encountering wolves while riding horses, followed by a brief interaction.

Overall, nine wolves were removed due to human nuisance behavior on 11 occasions. Human-nuisance removal rates declined after 2000 (Table 5). Further, 23 of the 33 known wolf incidents occurred within three months of initial release or translocation of the animal, including all of the aggressive charges, and all of the non-provoked cases. Of the remaining nine cases, seven involved domestic dogs, one was unknown if dogs were present, and two were the result of unverified wolf reports.

In 20 of the 33 cases, aversive conditioning and/or removal was applied in an attempt to prevent recurrence of the behavior. On several occasions ($n = 6$) aversive conditioning may have contributed to the ultimate success of the wolves with minimal future problems (See Appendix I).

Genetics

Two Mexican wolf hybrid litters totaling 13 pups ($n = 7$ and $n = 6$) have been confirmed since the onset of reintroduction. Both litters resulted from a female Mexican wolf breeding with a male dog. The first wolf (628) was born in the wild and the second (613) was born in captivity. The first incident occurred in 2002 and involved 628 which had been traveling with a male wolf. The second incident occurred in 2005 (although this incident occurred outside the scope of the 5-Year Review, it is included because of its relevance to the discussion) and involved lone 613 which bred with a feral dog. Both hybrid litters were promptly discovered while the pups were still den-bound and were humanely euthanized. Genetic testing verified hybridization had occurred in both litters.

DISCUSSION

Home Ranges

Wolf home range size differences 1across their geographic range appear to be principally related to prey abundance or biomass (Keith 1983, Fuller 1989, Fuller et al. 1992, Fuller et al. 2003). Specifically, home range size and area/wolf likely relate to the amount of vulnerable prey biomass available to wolves, and thus are also possibly related to prey species (Fuller et al. 2003). Eighteen Mexican wolf packs established territories between 1998 and 2003, totaling 39 pack years, and averaging $462 \pm 63$ km$^2$ (SE), or $182 \pm 24$ mi$^2$. The average home range size of Mexican wolves most closely resembled moose (*Alces alces*) dependent gray wolf packs studied in the north (see table 6.3 in Fuller et al. 2003, and table 1 in Fuller and Murray 1998). However, home range size was smaller than that of other reintroduced populations that principally preyed on elk in central Idaho, and the Greater Yellowstone Area (Oakleaf 2002). The large territories in these areas and in the Mexican wolf population may reflect wolf populations that are not subject to density-dependent constraints, or alternatively a general pattern for wolf packs relying primarily on elk (Oakleaf 2002). Further, the spatial distribution of elk may require wolves to maintain a larger home range to encompass sufficient summer and winter ranges of elk. More importantly, however, Mexican wolves have successfully established and maintained home ranges, regardless of size, within the BRWRA.

Mexican Wolf Blue Range Reintroduction Project                                    December 31, 2005

Releases

Release success was limited with our population (26% success), particularly for wolves released directly from captivity (18%). These success rates were similar for red wolves (*Canis rufus*) (21%; Phillips et al. 2003), but less than those for gray wolves in Idaho (68%) and Yellowstone (77%; Fritts et al. 2001). Similar to Fritts et al. (2001) and Phillips et al. (2003), release success did not depend on the type of release (i.e. hard release, soft release, or modified soft release). However, similar to other studies, hard releases tended to produce more movement and less pack cohesiveness relative to soft release strategies (Bangs et al. 1998, Fritts et al. 2001).

Our model-building efforts identified 3 primary variables that predicted successful and unsuccessful release efforts: (1) status of the animal (breeder, subadult, or pup), (2) proportion of the released wolf's life spent in the wild, and (3) year of the release). Red wolves also had reduced success among pups released (Phillips et al. 2003).

Perhaps most importantly, the proportion of the wolf's life spent in the wild influenced success, with wolves with a greater proportion of time in the wild being more likely to survive and reproduce. Again, this result was similar to that observed in red wolves (Phillips et al. 2003). This result likely also influenced the increased success of translocated wolves relative to initial released wolves, and the increased success of wolves released in New Mexico (only translocated animals) relative to Arizona (translocated and initial released wolves). This variable might also relate to the increased success of released wolves in Yellowstone and Idaho relative to red wolves and Mexican wolves. Other variables not modeled that might relate to the increased success of wolves in Yellowstone and Idaho include differences in cattle numbers and grazing patterns, road density, and the lack of a boundary rule. Because all wolves released in Yellowstone and Idaho were captured in the wild in Canada (Bangs and Fritts 1996, Bangs et al. 1998, Fritts et al. 2001), it was likely that these latter wolves were more adept initially to adaptation in the wild. Brown (1983) suggested use of captive stock is the biggest impediment to successful Mexican wolf reintroduction, and that wild wolves from Yellowstone or Canada would be more successful in Arizona and New Mexico. However, we agree with Phillips et al. (2003) that captive wolves can contribute to establishment of a viable wild population, and as such are an appropriate source stock to reestablish wolf populations. In regard to the Mexican wolf, there is no other option; all known extant animals are of captive origin.

Reproduction and Population Growth

Population growth within the BRWRA more closely resembled patterns observed in northwestern Montana and Wisconsin than those observed in the released population in Idaho and Yellowstone. Mexican wolf pack sizes averaged 4.8 wolves, which was less than populations in other areas of North America that principally preyed on deer (5.6 wolves/pack), elk (10.2 wolves/pack), moose (6.5 wolves/pack), and caribou (*Rangifer tarandus*) (9.05 wolves/pack [see table 6.1 in Fuller et al. 2003]). Similarly, litter size was small for Mexican wolves, averaging 2.1 pups/litter, relative to other populations of gray wolves (see table 6.4 in Fuller et al. 2003). However, litter size was similar to the 2.8 pups/litter observed in red wolf populations (Phillips et al. 2003, calculated from Table 11.4).

Several competing hypotheses can be developed from these data. First, there is a strong correlation between litter size and ungulate biomass available for wolves (Fuller et al. 2003). Thus, one hypothesis is that wolves in the BRWRA may be limited by the amount of vulnerable prey. Generally, winter snow is ephemeral in the BRWRA, and elk can escape snow pack by changing elevations (USFWS 1996). Other areas where wolves have been studied are much further north where snow is more consistent and deeper across the range, and thus may have more profound effects on prey vulnerability to wolf predation (Nelson and Mech 1986, Mech and Peterson 2003, Smith et al. 2004). Thus, one would predict less vulnerable prey in winter for wolves simply as a result of weather differences between the BRWRA and other areas in North America where wolves have been studied. However, based on ungulate biomass indexes, Paquet et al. (2001) found that the BRWRA could support about 213 wolves, based solely on elk populations, and in theory up to 468 wolves, based on all ungulates. Thus, it would appear there are enough ungulates available to support more wolves than currently exist. However, it is not just prey numbers that wolves respond to, but rather vulnerable prey biomass (Packard and Mech 1980, Fuller et al. 2003).

A second hypothesis is that pack size and pup production are a result of historical adaptation within the environment. For example, Bednarz (1988) suggested Mexican wolves historically occurred in small family groups of 2-8 individuals. However, McBride (1980) reported mean litter size of 4.5 pups and a mean litter size before parturition of 6.8 pups. Further, the captive population of Mexican wolves has a mean litter size of 4.6 pups (Siminski 2003). Also, female Mexican wolves captured in the wild and returned to captivity while pregnant or shortly after whelping had a mean litter size of 4.6 ($n = 6$). Thus, it is likely that more pups are born than are observed in the wild.

The final hypothesis is that wolves released from captivity may be initially less capable of exploiting vulnerable prey, and thus have fewer surviving pups when counts are conducted. This is illustrated by the fact that Mexican wolf and red wolf populations (Phillips et al. 2003) appear to have relatively low litter sizes in the wild. In theory, we would expect to be able to test this hypothesis in the future as more wild born wolves pair and produce pups. Further, frequent management (see below) of these populations may influence the ability of these wolves to fully exploit their home range. Indeed, the two Mexican wolf packs that produced the greatest number of pups in the wild ($n = 5$) were within their respective territories for approximately 3 years prior to achieving this litter size. Data should be collected to evaluate all three hypotheses, especially the first, because of lack of information addressing these issues.

These competing hypotheses, however, do not change the overriding fact that Mexican wolves have successfully reproduced in the wild within the BRWRA. Further, the wild population of Mexican wolves has continued to increase as a result of releases, translocations, and, more recently, natural reproduction in a fashion consistent with predictions in the FEIS (USFWS 1996).

Mortality

Mortality rates of Mexican wolves were among the lowest observed relative to other wolf populations across North America (Fuller et al. 2003). However, the level of mortality that eventually leads to a declining population is likely related to the level of reproduction in the population, and whether breeding wolves are killed (Fuller 1989; Ballard et al. 1987 and 1997; Fuller et al. 2003). We found low levels of reproduction, and no differential mortality rates among age or status classes. In other words, the Mexican wolf population may still decline at lower mortality rates relative to other, more fecund, wolf populations. Further, this population is essentially a closed population with presumably no opportunity for recovery via immigration except for additional releases from captivity. Nevertheless, loss rates observed in the wild were similar to levels identified in the FEIS (USFWS 1996), and the population is increasing.

The absolute number of removals and removal rates were above levels identified in the FEIS (USFWS 1996). Further, removal rates were consistently higher than mortality rates. Thus, the dominant factor influencing an individual wolfs' persistence on the landscape was not mortality, but rather removal. Some forms of removal (e.g. those caused by livestock depredations) will likely remain near current levels or vary yearly with environmental factors (Bangs et al. 1998, Mech et al. 1988), as they are a necessary part of any successful wolf-recovery program. Nuisance-related removals are declining, and likely will continue to decline as initial releases from captivity are reduced in the BRWRA (see below). Similarly, other removals (e.g. removals to pair animals, or move wolves to better locations) have dropped since the first few years of the Project, with no such removals in the last two years. Despite some removal rates dropping following the recommendations of the 3-Year Review (Paquet et al. 2001), the elevated trend in boundary-related removals (36% of all removals) remains a concern.

We agree with Paquet et al. (2001) and Phillips et al. (2003) that removal of wolves for no other cause than being outside the BRWRA: 1) increases the cost of the overall recovery program and requires that field personnel be increasingly allocated to trap individual wide-ranging wolves, 2) fosters the erroneous perception that all wolves can be contained within artificial boundaries, 3) is in direct conflict with management philosophies employed by the USFWS on other projects (USFWS 1994a, 1995), 4) excludes habitat that could enhance recovery efforts, and 5) artificially restricts natural dispersal. Dispersal behavior is vital to establishing long-term population viability through colonization of new areas (Boyd and Pletscher 1999, see below).

Cox-proportional-hazard models (Cox and Oakes 1984) identified three covariates (year, proportion of the individual wolf's life spent in the wild and absolute number of months spent in the wild) that were potentially important in reducing wolf mortality and removal rates. Two covariates (i.e. year and proportion of the individual wolf's life spent in the wild) were also retained in the release success model discussed above.

Source and sink habitat was distributed inside and outside the BRWRA. Many cases of suspect data occurred within individual 1:24,000 quadrangle areas due to the random distribution of wolf locations and therefore the number of radio days per cell was similarly uncertain. The number of suspect data cells may suggest that either: 1) we analyze the data using a larger grid size (e.g.

1:100,000 quadrangles), or 2) we interpret the current data and continue to track the changes as data accumulate within individual cells. We chose the latter option, as this is a long-term study with consistent data collection through time. Overall, there appear to be two primary sink areas; the northwest corner of the BRWRA, and the northeastern side of the BRWRA (Fig. 5). The overall pattern of source-sink dynamics within the BRWRA suggest that a large area may be required to maintain a viable population of wolves within the southwestern United States (e.g. the more sink areas identified, the larger the area needed to maintain a viable population).

Dispersal

Movement distances for lone wolves averaged $87 \pm 10$ km ($54 \pm 6$ mi [SE]), with a maximum distance of 271 km (168 miles), and two other lone wolves moving >200 km across the landscape. This mean movement distance was similar to other studies conducted on colonizing wolves (see Table 6 in Boyd and Pletscher 1999). These long distance dispersers crossed interstate highways and the non-essential experimental population boundary, and persisted in various habitat types ranging from the New Mexico-Mexico border (e.g. desert habitat) to north of Flagstaff, Arizona (Fig. 6). The number of dispersals appear to be increasing (Fig. 6).

Under the Final Rule (which requires that all wolves remain within the BRWRA), few "legal" dispersals could occur. For example, if a wolf moved the average lone-movement distance (i.e. 87 km) from the geographic center of the BRWRA and the FAIR in a random direction, it would end outside the BRWRA 66% of the time. Thus, the average dispersing wolf in the ideal spot (i.e. the geographic center of the area that wolves can occupy) would still use areas outside the BRWRA 66% of the time. Indeed, single wolf movements resulted in the majority spending some time outside the BRWRA (68%).

Currently, we are documenting more dispersal by wild born wolves, as would be expected with increased pup production in recent years. Generally, wolves disperse between 1-2 years of age (Fuller 1989, Fritts and Mech 1981), although there is some variation depending on prey abundance and wolf densities (see Ballard et al. 1987 and 1997; pages 116-119 in Mech et al.; and Table 6 in Boyd and Pletscher 1999). However, as wild born wolves (i.e. the segment of the population with a decreased chance of mortality and removal) approach dispersal age, it is increasingly likely that many will ultimately disperse outside the BRWRA and will need to be removed if current rules and regulations remain unchanged.

Predation

Without human management and mortality, wolf population densities are principally related to vulnerable prey densities (Keith 1983, Fuller 1989, Ballard et al. 1997, Fuller et al. 2003). Wolves tend to kill less fit prey that is predisposed to predation in some form (Mech and Peterson 2003). Documented kills by Mexican wolves were principally elk, with calf elk preferred prey. Mexican wolf selection for calf elk was similar to other studied wolf populations (Smith et al. 2004, Husseman 2002). Selection for elk may be related to prey distribution, such that deer are more scattered across the landscape, relative to the more predictable and larger elk herds (Huggard 1993, Mech and Peterson 2003). Current research investigating winter (through

daily aerial flights, and GPS collars), and summer (through GPS collars) kill rates should allow a better evaluation of predation patterns in the future and help elucidate the overall impact of wolves on ungulates. To date, however, no detectable changes have occurred to big game populations as a result of wolf reintroduction.

Although the number of pups produced per litter is of concern (see discussion above), the majority of adult wolves maintained their weight in the wild, with two notable exceptions. There were no wolf mortalities from intraspecific strife, and we found no Mexican wolves dead from starvation. High levels of intraspecific strife or any indication of starvation would be indicative of a food-stressed environment (Fritts and Mech 1981, Ballard et al. 1997). The lack of evidence that these indicators occurred combined with a suggested wolf population level that ungulates in the area could support (Paquet et al. 2001), leads to the conclusion that there was ample vulnerable prey in the area to support wolves.

Depredations

Healthy populations of native ungulates throughout the United States have allowed wolf recovery to occur. As a consequence, the proportion of livestock lost to wolves is generally low in most areas where wolves and livestock coexist in North America, (Bjorge and Gunson 1985, Fritts et al. 1992, Bangs et al. 1998, Fritts et al. 2003, Oakleaf et al. 2003).

Fritts et al. (2003) noted that most livestock losses in previously studied areas were killed during the summer grazing season. At this time of year, wolves and livestock were often located in remote forest grazing areas (Oakleaf et al. 2003). The pattern was markedly different in the BRWRA, with many of the remote areas year-round forest grazing operations (i.e. cattle calved, raised their young, and were present in remote areas year-round), compared with summer operations in northern areas. Newborn livestock and younger calves in remote locations may be the most vulnerable segment of the cattle population (Oakleaf et al. 2003).

One hypothesis regarding the question of why wolves do not kill more livestock given the availability of relatively vulnerable animals has been that wolves react differently to livestock than to wild prey due to limited exposure of wolves to livestock (e.g. livestock are only present during a portion of the year in more northerly latitudes [Fritts et al. 2003]). If this hypothesis were correct, one would expect that where wolves and livestock coexist year-round, depredations would be greater and the number of vulnerable livestock in the area would be greater. However, confirmed depredations are currently occurring at only a slightly higher rate in the BRWRA, despite 3-4 times greater time for cattle and wolves to interact (Table 8). Thus, confirmed depredations by wolves have remained within levels identified within the FEIS (USFWS 1996).

Another pattern that is markedly different than that observed in other wolf recovery areas (see Bangs et al. 1998) is the relative success of translocating previously depredating wolves. We found that these wolves contributed to recovery and caused fewer depredations than average for the entire population. Fritts et al. (2003) suggested that typically when wolves depredate on cattle, they do not depredate again for several weeks, if at all. Even in the northern Rockies recovery area, the pattern of wolves translocated for depredations and ultimately depredating

again, was generally only observed in northwestern Montana (Bangs et al. 1998), with translocated wolves in Idaho showing far fewer repeat depredations. This pattern may relate to the ability, both in Idaho and the BRWRA, to translocate wolves into unoccupied wolf habitat free of livestock.

Human/Wolf Interactions

Overall, Mexican wolves were involved in 30 incidents of apparently fearless behavior. However, the majority of these incidents (79%) involved wolves that had recently been released and had spent limited time in the wild, with the remainder of the cases involving dogs. Similar to other areas where wolves and humans interact, aggressive behavior by wolves in the Southwest toward humans with dogs were the most frequent occurrence (McNay 2002, Fritts et al. 2003). Wolves have been documented to kill domestic dogs virtually everywhere the two coexist (Bangs et al. 1998, Fritts et al. 2003), including the BRWRA. Wolf attacks on dogs may sometimes result in a temporary loss of flight response to humans (McNay 2002, Fritts et al. 2003). In the three cases that a Mexican wolf or wolves appeared aggressive and charged toward humans, dogs were in the area and the aggression appeared to be focused on the dogs rather than the people.

As of December 2005, this Reintroduction Project has not documented, nor have there been reported, any instances in which wolves have come into physical contact with humans. However, wolves released from captivity may be more prone to initial fearless behavior toward humans, despite minimizing human contact in captivity and developing appropriate standards for selecting individual wolves to release (see Parsons 1998, Brown and Parsons 2001). Aversive conditioning and/or removal resolved all problems reasonably quickly. The paucity of documented wolf attacks in North America suggests that wolves rarely attack people there (McNay 2002). However, as the Adaptive Management Oversight Committee (AMOC) was completing the 5-Year Review, an event occurred in Canada that might be relevant to the subject of human-wolf interactions in North America. On November 8, 2005, a pack of wolves or wild dogs may have attacked and killed a man. These animals may have become habituated to humans due to a proliferation of garbage dumps associated with mines and mining exploration activities. This incident is currently under investigation and an official coroner's report is expected in January 2006. However, wolves in protected populations generally are less fearful of humans than those in exploited populations (McNay 2002). Thus, managers should continue to closely monitor initial released wolves and initiate aggressive aversive conditioning, or removal if appropriate, when wolves are near humans.

Genetics

There is no genetic evidence to date that suggests introgression with dogs or any other canids is occurring in the free-ranging Mexican wolf population. While there have been two documented hybrid incidents in the BRWRA, each litter was detected and removed from the wild before any of the offspring could potentially reproduce in the wild. Where hybridization has been known to occur (i.e. Europe), hybrid survival was typically poor and had no detectable impacts on wolf population viability or genetics (Mengel 1971, Vila and Wayne 1999). Differences in seasonality

of female estrus and male fertility between wild and domestic species may also shed light on the apparent lack of effect of isolated hybrid events. While domestic dogs of both sexes are known to breed year-round, wolf-dog hybrids retain the annual breeding cycle of their wild wolf parent; however, the timing is shifted so that the wolf-dog hybrid breeds approximately three months earlier (Mengel 1971). Mengel (1971) concluded that the phase shift in the breeding season of wolf-dog hybrids served as an effective block to introgression of dog genes into wolf populations. Therefore, even had the two litters not been detected, there likely would have been no negative impacts to the free-ranging Mexican wolf population.

We promptly discovered both hybrid litters as a result of ongoing management and monitoring. In the first incident, an entire wolf pack was in the process of being removed from the wild for depredating on cattle. Upon locating the den and removing the pups, we noticed that one pup had markings (i.e. whitish with spots) that were inconsistent with typical Mexican wolf pups, which immediately prompted genetic testing of the entire litter. When the tests determined the litter was a wolf-dog mix, the pups were humanely euthanized. In the second incident, female 613 was translocated as a single wolf near another pack's home range in January 2005, just prior to the breeding season. The pack's breeding female had previously been killed. The intent of this translocation was to create a new pair by augmenting the population with 613, a genetically important female. Although 613 was located within 3 miles of the breeding male, the two wolves were never documented together. Subsequently, 613 was seen on several occasions in an area with numerous feral dogs. When she exhibited localized denning behavior in the spring, the IFT closely monitored the den and discovered the pups had obvious dog markings. The litter was humanely euthanized.

The Final Rule identified the potential for hybridization between Mexican wolves and dogs. We will continue to monitor the genetic purity of the Mexican wolf population by genetically testing all captured wild wolves, dogs, and coyotes. In this way, we will continue to investigate genetic data and determine if introgression of either domestic dog or coyote genes has occurred in the Mexican wolf population or vice versa.

MANAGEMENT IMPLICATIONS

Many of the goals and projections described in the FEIS (USFWS 1996) have been met or exceeded. Most notably, population counts are at projected levels, with mortality lower than estimated in the FEIS (USFWS 1996). Thus, the overall Reintroduction Project is functioning at least as well as projected and should continue with some modifications. This is consistent with Recommendation 3 in the Recommendations Component of the 5-Year Review.

First, both the number of released, and the number of removed wolves have exceeded levels projected within the FEIS (USFWS 1996). These higher levels are largely a result of guidelines in the Final Rule for the BRWRA that require wolves to be removed if they establish a home range wholly outside the recovery area, or at the request of private landowners for wolves on their lands outside the recovery area (USFWS 1996). These policies conflict with normal wolf movements (see Table 6 in Boyd and Pletscher 1999), and differ from management of wolves elsewhere in the United States (USFWS 1994a, 1995). Accordingly, we recommend the USFWS

modify the Final Rule to allow wolves to expand into adjacent areas of the Mexican Wolf Experimental Population Area (Fig. 1). This step alone would greatly reduce the number of removals due to boundary violations and bring removal rates more in line with predictions in the FEIS (USFWS 1996). This is consistent with Recommendations 5, 7, and 9 in the Recommendations Component of the 5-Year Review.

Data suggest that animals living in the wild for a greater proportion of their life are more likely to be successful, and are less likely to succumb to mortality or removal. Thus, our second recommendation is that wolves with wild experience continue to be translocated after their first removal event, except in extreme situations (i.e. lethal control or permanent removal from the wild following three depredations in a one year period). This is consistent with Recommendation 9 in the Recommendations Component of the 5-Year Review.

Our third recommendation is that greater effort be placed on appropriate centralized databases. There is a need to continue improving the efficiency, reliability, and accessibility of the Project's databases. This is consistent with Recommendation 15 in the Recommendations Component of the 5-Year Review.

Finally, the Blue Range Wolf Reintroduction Project differs socially, biologically, and environmentally from other wolf recovery programs. Ample research opportunities exist to collect and compare data with more northerly and better-studied wolf populations. As such, we recommend that more research opportunities be explored and funded to provide insight into overall Mexican wolf biology and Reintroduction Project effectiveness. This is consistent with Recommendation 16 in the Recommendations Component of the 5-Year Review.

Mexican Wolf Blue Range Reintroduction Project                                    December 31, 2005

Table 1. Average 95% fixed kernel home range and 50% core use areas documented for Mexican wolves in the Blue Range Wolf Reintroduction Area, Arizona and New Mexico, 1998-2003.

| Year | No. packs | $\bar{x}$ home range size (km$^2$)[a] | $\bar{x}$ core use size (km$^2$)[b] | Total area occupied by packs (km$^2$) |
|------|-----------|------------------|------------------|------------------------|
| 1998 | 2 | 150 | 19 | 301 |
| 1999 | 5 | 118 | 21 | 590 |
| 2000 | 5 | 575 | 71 | 2,872 |
| 2001 | 6 | 479 | 52 | 2,876 |
| 2002 | 9 | 299 | 37 | 2,691 |
| 2003 | 12 | 725 | 92 | 8,700 |

[a] $\bar{x}$ home range size was based on 95% fixed kernel estimators.
[b] $\bar{x}$ core use size was based on 50% fixed kernel estimators.

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

Table 2. Models supported within the analysis for successful Mexican wolf releases in the Blue Range Wolf Recovery Area, Arizona and New Mexico, 1998-2003. The dependent variable was based on 28 successes (i.e. wolves that bred and produced pups in the wild) and 78 failures (i.e. wolves that did not successfully breed and produce pups in the wild).

| Model | $AIC_c$ | $\Delta AIC$ | $w_i$ |
|---|---|---|---|
| Status[a] + Wild/Life[b] + Year | 113.71 | 0.00 | 0.334 |
| Status + Wild/Life | 114.64 | 0.93 | 0.210 |
| Status + Season[c] + State[d] | 115.67 | 1.96 | 0.125 |
| Age + Wild/Life + Year | 116.69 | 2.98 | 0.075 |
| Year + Status | 116.84 | 3.13 | 0.242 |
| Age + Wild/Life | 117.02 | 3.31 | 0.064 |
| Status + Season | 117.49 | 3.78 | 0.050 |
| Translocation[e] + Status | 119.25 | 5.54 | 0.021 |
| Status + Months in the Wild | 119.98 | 6.27 | 0.015 |
| Age + Season | 119.99 | 6.28 | 0.014 |
| Season + State | 120.49 | 6.78 | 0.011 |
| Year | 120.73 | 7.02 | 0.010 |

[a] Status of the wolf (breeder, subadult, or pup).

[b] The proportion of the wolf's life spent in the wild at the time of the release.

[c] Season of release for the wolf (autumn, winter, spring, or summer).

[d] State of release of the wolf (New Mexico or Arizona).

[e] Either translocation or initial release.

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

Table 3. Minimum population estimates of Mexican wolves in the Blue Range Wolf Recovery Area, Arizona and New Mexico, 1998-2003, based on visual counts, removals, and releases.

| Year | Released[a] | Removed[b] | Mortalities | Pups[c] | Collared | Uncollared[d] | Estimate[e] |
|------|-------------|------------|-------------|---------|----------|---------------|-------------|
| 1998 | 16 | 6 | 5 | 0 | 4 | 0 | 4 |
| 1999 | 23 | 12 | 2 | 8[f] | 7 | 0 | 15 |
| 2000 | 31 | 23 | 4 | 5 | 15 | 2[f] | 22 |
| 2001 | 21 | 10 | 9 | 3 | 18 | 5 | 26 |
| 2002 | 16 | 7 | 3 | 21 | 25 | 3 | 42 |
| 2003 | 23 | 14 | 13 | 20 | 23 | 12 | 55 |
| Total | 130 | 58 | 36 | 57 | | 22 | |

[a] Based on the number of initial releases and translocations of Mexican wolves. Any animal that was captured and moved was considered a new translocation. Thus, a single wolf may have been released several times in a given year.

[b] Wolves captured and moved. We considered it removal regardless of whether the animal was re-released or not. These estimates include wolves that were removed and died in captivity (not included in mortalities), animals that were lethally removed (1 in 2003, included in mortalities), and animals that died during capture (1 in 2002, included in mortalities).

[c] Based on the number of pups observed in the wild as close as possible to the end of the year. Radiocollared pups (n= 7) were also included in the collared end-of-year count for 2002.

[d] Uncollared subadult wolves (not pups of the year) documented by this Project as close to the end of the year as possible. These numbers do not include missing wolves.

[e] Minimum population estimate for the end of the year. These numbers represented the cumulative of pups, collared, and uncollared animals observed near the end of the year for any given year.

[f] Six of these pups were removed in 2000 and not counted as subadults in 2000.

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

Table 4. Mortality, removal, and missing rates of collared Mexican wolves in the Blue Range Wolf Recovery Area, Arizona and New Mexico, 1998-2003. The table also includes failure rate (i.e. dead, removed or missing) of wolves in the wild. All rates were calculated using the program Micromort (Heisey and Fuller 1985). The numbers in parentheses represent the number of radiocollared wolves that were removed, missing, or died during a given time frame by cause.

| Year | N[a] | Removal Rate | Mortality Rate | Missing Rate | Failure Rate |
|---|---|---|---|---|---|
| 1998 | 13 | 0.46 (6) | 0.39 (5) | 0.08 (1) | 0.93 (12) |
| 1999 | 14 | 0.49 (6) | 0.16 (2) | 0 (0) | 0.65 (8) |
| 2000 | 30 | 0.65 (19) | 0.14 (4) | 0.07 (2) | 0.86 (25) |
| 2001 | 31 | 0.28 (9)[b] | 0.22 (7) | 0.06 (2) | 0.56 (18) |
| 2002 | 34 | 0.26 (7) | 0.11 (3) | 0.04 (1) | 0.41 (11) |
| 2003 | 37 | 0.30 (11)[b] | 0.27 (10) | 0 (0) | 0.58 (21) |
| Total[c] | 75 | 0.39 (58)[b] | 0.21 (31) | 0.04 (6) | 0.64 (95) |

[a] N represents the total number of collared wolves in the population during the full year. Some wolves had more radio days than other wolves.

[b] Includes one wolf that died while being removed outside the BRWRA (2001), and one wolf that was lethally removed for cattle depredations (2003). These wolves were exclusively classified as a removal rather than both a removal and mortality. This treatment of animals is consistent with Heisey and Fuller (1985), in that individuals can only be uniquely classified as to one fate.

[c] Total represents the summation of all mortality or removal events divided by the radio days and raised to the 365 power, to describe the average yearly mortality, removal, and failure rates.

Mexican Wolf Blue Range Reintroduction Project                     December 31, 2005

Table 5. Removal rates (Heisey and Fuller 1985) of Mexican wolves within the Blue Range Wolf Recovery Area, Arizona and New Mexico, 1998-2003, by cause. Values in parentheses represent the number of radiocollared wolves that were removed during a given time frame by cause. Some wolves were translocated immediately following removal, while others were placed in captivity, or translocated at a later date.

| Year | N[a] | Removal Rate | Boundary[b] | Nuisance[c] | Cattle[d] | Other[e] |
|------|------|--------------|-------------|-------------|-----------|----------|
| 1998 | 13 | 0.46 (6) | 0.08 (1) | 0.15 (2) | 0 (0) | 0.23 (3) |
| 1999 | 14 | 0.49 (6) | 0 (0) | 0 (0) | 0.245 (3) | 0.245 (3) |
| 2000 | 31 | 0.65 (19) | 0.17 (5) | 0.17 (5) | 0.14 (4) | 0.17 (5) |
| 2001 | 30 | 0.28 (9) | 0.13 (4) | 0.06 (2) | 0.06 (2) | 0.03 (1) |
| 2002 | 34 | 0.26 (7) | 0.15 (4) | 0.04 (1) | 0.07 (2) | 0 (0) |
| 2003 | 37 | 0.30 (11) | 0.19 (7) | 0.03 (1) | 0.08 (3) | 0 (0) |
| Total | 75 | 0.39 (58) | 0.14 (21) | 0.07 (11) | 0.10 (14) | 0.08 (12) |

[a] N represents the total number of collared wolves in the population during the full year. Some wolves had more radio days than other wolves.

[b] The removal rate of wolves that moved outside of the Blue Range Wolf Recovery Area (see Fig. 1).

[c] The removal rate of wolves that displayed poor behavioral characteristics and were located close to humans.

[d] The removal rate of wolves that depredated repeatedly on livestock

[e] Wolves removed to pair with other wolves or to relocate to a better area prior to other causes of removals being initiated.

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

Table 6. Number of livestock and dogs confirmed (Conf.), probable (Prob.), or possible (Poss.)
killed by Mexican wolves in the Blue Range Wolf Recovery Area, Arizona and New Mexico,
1998-2003. Information from the U.S. Department of Agriculture, Animal and Plant Health
Inspection Service, Wildlife Services database.

|       |       | Cattle |       | Dog   | Sheep | Horse |
| Year  | Conf. | Prob.  | Poss. | Conf. | Conf. | Poss. |
|-------|-------|--------|-------|-------|-------|-------|
| 1998  | 0     | 0      | 0     | 1     | 0     | 0     |
| 1999  | 5     | 0      | 4     | 0     | 0     | 0     |
| 2000  | 1     | 0      | 2     | 0     | 1     | 0     |
| 2001  | 5     | 0      | 3     | 0     | 0     | 0     |
| 2002  | 9     | 0      | 0     | 1     | 0     | 0     |
| 2003  | 3     | 4      | 1     | 0     | 1     | 1     |
| Total | 23    | 4      | 10    | 2     | 2     | 1     |

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

Table 7. Number of cattle confirmed killed by wolves, wolf population estimates, and number of cattle killed per 100 wolves in 5 states. Data represent the years 2000-2002 for all states except Arizona/New Mexico, which includes 1998-2003. We used USDA-APHIS, Wildlife Services annual reports from each state to determine the number of cattle killed by wolves. Kills were verified by specialists trained in field necropsies to determine cause of death and do not reflect those animals that were determined to be probable or possible kills.

| State/year | Cattle killed | Wolf population | Cattle killed/wolf population x 100 |
|---|---|---|---|
| Montana 2000 | 14 | 97 | 14 |
| Montana 2001 | 12 | 123 | 10 |
| Montana 2002 | 20 | 183 | 11 |
| Montana Mean | 15.33 | 134.33 | 11 |
| | | | |
| Wyoming 2000 | 3 | 159 | 2 |
| Wyoming 2001 | 18 | 189 | 10 |
| Wyoming2002 | 23 | 217 | 11 |
| Wyoming Mean | 14.67 | 188.33 | 8 |
| | | | |
| Idaho 2000 | 15 | 187 | 8 |
| Idaho 2001 | 10 | 251 | 4 |
| Idaho 2002 | 9 | 263 | 3 |
| Idaho Mean | 11.33 | 233.67 | 5 |
| | | | |
| AZ/NM 1998 | 0 | 4 | 0 |
| AZ/NM 1999 | 5 | 15 | 33 |
| AZ/NM 2000 | 1 | 22 | 5 |
| AZ/NM 2001 | 5 | 26 | 19 |
| AZ/NM 2002 | 9 | 42 | 21 |
| AZ/NM 2003 | 3 | 55 | 5 |
| AZ/NM Mean | 3.83 | 27.33 | 13.83 |

Mexican Wolf Blue Range Reintroduction Project                                    December 31, 2005

Figure 1. The Mexican wolf Blue Range Wolf Recovery Area (comprised of the primary and secondary recovery zones) and non-essential experimental population area, Arizona and New Mexico.



Figure 1.  The Mexican Wolf Blue Range Wolf Recovery Area in Arizona and New Mexico.

Mexican Wolf Blue Range Reintroduction Project                                    December 31, 2005

Figure 2. Mexican wolf home ranges established from 1998-2003 in Arizona and New Mexico. Numbers represent individual packs (≥2 wolves traveling together) that had enough locations (>30) and movement characteristics consistent with a home range (See text on following page for description of the packs).



Mexican Wolf Blue Range Reintroduction Project                          December 31, 2005

Figure 2, Continued.

| No. | Pack name | Release year(s)[a] year(s) | Home range year(s)[b] | Breeding pair in 2003 | No. wolves map |
|-----|-----------|------------------|--------------|----------------|----------------|
| 1 | Hawks Nest | 1998 IR, 1998 TR | 1998-2003 | 1999, 2002-2003 | 4 |
| 2 | Campbell Blue | 1998 IR | 1998 | N/A | 0 |
| 3 | Campbell Blue II | 1998 TR, 2000 TR | 1999-2000 | N/A | 0 |
| 4 | Mule | 1999 IR | 1999 | 1999 | 0 |
| 5 | Pipestem | 1999 IR | 1999 | N/A | 0 |
| 6 | Gavilan | 1999 IR | 1999 | 1999 | 0 |
| 7 | Francisco | 2000 IR | 2000-2003A | 2000-2002 | 0 |
| 8 | Cienega | 2000 IR | 2000-2003 | 2002 | 5 |
| 9 | Mule II | 2000 TR | 2000 | N/A | 0 |
| 10 | Pipestem II | 2000 TR | 2001-2002 | N/A | 0 |
| 11 | Saddle | 2001 IR | 2001-2003 | 2003 | 8 |
| 12 | Bonito Creek | 2001 NP | 2001-2003 | 2003 | N/A[c] |
| 13 | Luna | 2002 TR | 2002-2003 | 2002 | 4 |
| 14 | Gapiwi | 2002 TR | 2002-2003 | N/A | 4 |
| 15 | Bluestem | 2002 IR | 2002-2003 | 2002-2003 | 7 |
| 16 | 729 and 799 | 2003 NP | 2003 | N/A | 2 |
| 17 | Francisco II | 2003 TR | 2003 | N/A | 1 |
| 18 | Hon-Dah | 2003 TR | 2003 | N/A | N/A[c] |
| 19 | Cerro | 2003 NP | 2003 | N/A | 0 |

[a] Represents the year that the pack was initially released from captivity (IR), translocated (TR), or naturally paired in the wild (NP).

[b] Represents individual years that a pack had an adult female, an adult male and at least two pups that survived until December 31 of the year.

[c] Numbers of wolves on Fort Apache Indian Reservation are not provided, at the request of the White Mountain Apache Tribe.

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

Figure 3. Observed (dashed line) and predicted (USFWS 1996; solid lines) Mexican wolf population trends in the FEIS (USFWS 1996).

A:



B:



Mexican Wolf Blue Range Reintroduction Project                                    December 31, 2005

Figure 3, Continued.

C:



D:



Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

Figure 3, Continued.

E:



Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

Figure 4. Population trends observed with Mexican wolf and other reintroduced or recolonizing gray wolf populations in the United States.

A:



B:



Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

Figure 5. Source-sink dynamics of Mexican wolves in the Blue Range Wolf Recovery Area, Arizona and New Mexico, 1998-2003. Inset figures identify areas with multiple causes for sinks (see the legend in the bottom left corner).



Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

Figure 6. Movement patterns of individual Mexican wolves in the Blue Range Wolf Recovery Area from 1998-2000 (A), and 2001-2003 (B). Each line represents one dispersal/movement of a lone wolf.



Mexican Wolf Blue Range Reintroduction Project                     December 31, 2005

APPENDIX I—Wolf/Human Interactions in the Blue Range Wolf Recovery Area, Arizona and New Mexico, 1998-2003

| Event | Date | Wolves involved | Dog presence (provoked) | Classification (bolded items indicate IFT actions) | Memo |
|---|---|---|---|---|---|
| 1 | April 28, 1998 | 156 | Yes | Charge/ Investigative approach, Dead | Wolf 156 was shot by a camper who feared for his family's safety when the wolf was in the area of their camp and attacked their dog |
| 2 | May 8, 1998 | 494 | | Investigative search, **Aversive conditioning** Habituated, **Removed** | Wolf 494 became a nuisance by frequenting the town of Alpine, Arizona, from May 8 to 28, 1998 and was permanently removed from the wild. |
| 3 | May 1999 to August 1999 | 191, 208, 562, | Yes | Investigative approach, **Aversive conditioning** Removed for livestock depredation | 191 (alpha female), 208, and 562 (all recently released) approached ranch house with loose dogs, dogs chased wolves, wolves chased dogs, dog was bitten. Owner ran wolves off, one wolf M208 followed owner back toward house. F191 subsequently denned and several more encounters with dogs ensued near the house. Attempts at aversive conditioning were mostly unsuccessful. All wolves removed in August due to livestock depredation. |
| 4 | January 6, 1999 | 166, 482 | | Investigative search, Food conditioning | Campbell Blue pair pulled down a deer carcass hanging in a hunter's camp |
| 5 | January 5, 2000 | 522 | Yes | Investigative search, **Removed** | Female 522 hung around hunter's camp and interacted with dogs. Trapped and put in acclimation pen to hold through hunting season. |
| 6 | February 6, 2000 | 522 | Yes | Investigative search, **Removed** | Interacted with dogs at a ranch house immediately post-release. |

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

| Event | Date | Wolves involved | Dog presence (provoked) | Classification (bolded items indicate IFT actions) | Memo |
|---|---|---|---|---|---|
| 7 | April 14, 2000 | 166, 518 | Yes | Charge, **Removed** | Permittee reported an aggressive encounter with Campbell Blue pair when the female (518) bumped his horse and passed under it. Wolves also attacked one of his dogs. They followed him to a cabin and he stayed in it until the wolves left. |
| 8 | May 16, 2000 | 191, 208, | Yes | Investigative approach, Removed for livestock depredation | A female was jogging with 2 dogs when 2 wolves approached. According to the jogger, the wolves were clearly interested in her dogs and she was able to scare them away. |
| 9 | June 1, 2000 | 624 | | Investigative search. **Removed** | Frequented a ranch house |
| 10 | July 16, 2000 | 624 | Yes | Investigative search. **Removed** | Frequented a ranch and exhibited playful behavior with a dog. |
| 11 | August 20, 2000 | 509, 511, 587, 590 | Yes | Aggressive charge, Habituated, **Aversive conditioning** | Camper and his cocker spaniel were in the middle of a meadow behind his trailer when 4 wolves (most likely Francisco) came running out of the woods toward them. Camper fired one shot in front of the wolves but they kept coming. He fired a second shot as they got closer and they turned away. He was upset at the situation and felt that the wolves were a danger to people and animals/pets. Later that week, people camped nearby observed several wolves and pups resting in the shade under and around the camper's trailer. At the time he was inside with his dog, unaware wolves were outside. He was upset when he learned of the incident, stating that this was not the behavior of wild animals and was concerned about what would have happened had he or his dog come out of the trailer. |

Mexican Wolf Blue Range Reintroduction Project                                    December 31, 2005

| Event | Date | Wolves involved | Dog presence (provoked) | Classification (bolded items indicate IFT actions) | Memo |
|-------|------|-----------------|-------------------------|----------------------------------------------------|------|
| 12 | August 24, 2000 | 511, 509, 587, 590 | | Investigative approach, Habituated, **Aversive conditioning** | Camper observed Francisco and Cienega packs on multiple occasions camping at Double Cienega. Sometimes they came through camp, <5 ft of him taking pictures, although the pups seemed more skittish. He saw them other times farther away within the campground or out in the meadow. |
| 13 | Sept. 25, 2000 | 590 | | Investigative search, Habituated, **Aversive conditioning** | Yearling male 590 frequented Double Cienega Campground most of one day. |
| 14 | Sept. 29, 2000 | 509, 511, 587, 590 | | Investigative approach Food conditioning, Habituated, **Aversive conditioning** | 5-6 people camped in Double Cienega from about August 21 to 30, 2000. They had interactions with Francisco Pack throughout the week. On multiple occasions campers howled them in, chased them on ATVs, left food out, and shot blunt arrows at them. The wolves also chased their horses, mules, and people on ATVs. The IFT informed them this behavior was not acceptable, and explained that what they were doing could have negative effects on the wolves' behavior. On August 30, 2100, while speaking with the hunters, an IFT member observed the wolves chasing the mules. He then hazed the wolves by running at them and throwing rocks. The wolves did not respond. We first spoke with the group on about August 23, 2000. IFT personnel informed them about the Mexican Wolf Reintroduction Project, the presence of wolves in the area, and proper behavior with respect to wolves (e.g. do not leave food out; keep an eye on mules/horses; if you see wolves, yell and throw rocks at them). We also asked them to let us know if they had any interactions with the wolves. |

Mexican Wolf Blue Range Reintroduction Project                December 31, 2005

| Event | Date | Wolves involved | Dog presence (provoked) | Classification (bolded items indicate IFT actions) | Memo |
|-------|------|-----------------|-------------------------|--------------------------------------------------|------|
| 15 | October 1, 2000 | Unknown | | Investigative search, Food conditioning | At about 0440 hrs, the homeowner went out the front door on the porch and observed an animal in the driveway. At first he thought it was a German shepherd, then by the color and size he realized it was a wolf. He scared it away and it headed west down the road. He tried to follow it in his truck but lost track of it. When he got back to the house it was by the back door eating out of the dog dish. He scared it away again and it ran behind the house between the animal pens and the barn. He checked the dog dish and it was empty. He was not sure if there had been food in it or not. IFT personnel responded to the call made by the landowner's sister. The IFT observed large canid tracks in the driveway and yard. (track size = 5 x 3 ½", in the sand and gravel). No other tracks were found in area. IFT personnel returned on October 2, 2000 at about 0500 hrs. |
| 16 | November 2001 | M580; Wildcat | Yes | Investigative search, **Removed** | Point of Pines, San Carlos Apache Reservation. Wolf frequented a residential area. There were many domestic and feral dogs in the area. The wolf was captured by helicopter. |
| 17 | Summer 2002 | Bluestem | | Investigative search, Habituated | Vicinity of PS Knoll, Apache National Forest, Arizona. Permittee was on horseback and encountered a wolf while monitoring cattle. The permittee shouted at the wolf, however the animal made no response. The wolf eventually left the area. The wolf did not approach the permittee, therefore, most likely was displaying curious behavior. Unknown if a dog was with permittee or not. |

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

| Event | Date | Wolves involved | Dog presence (provoked) | Classification (bolded items indicate IFT actions) | Memo |
|-------|------|-----------------|--------------------------|-----------------------------------------------------|------|
| 18 | Summer 2002 | Bluestem | Yes | Investigative search, Habituated | Vicinity of PS Knoll, Apache National Forest, Arizona. Permittee on horseback encountered a wolf while monitoring cattle; dog present. Shouted at wolf; wolf vacated area. Wolf most likely displaying curious behavior, possibly due to the presence of the dog. |
| 19 | Summer 2002 | 637; Bluestem | | Investigative search, Habituated, **Aversive conditioning** | U.S. Forest Service reported a wolf walking down the Big Lake campground road, in Apache National Forest, Arizona. Project personnel located wolf f637 150 yards south of active campsites. Project personnel responded that same day and fired/hit the wolf with a rubber bullet. Wolf vacated area. |
| 20 | Summer 2002 | 637; Bluestem | Yes | Investigative search, Habituated, **Removed** | White River, Fort Apache Indian Reservation, Arizona. Project personnel located f637 around White River for several days. The wolf was seen traveling adjacent to residential area. Project personnel attempted to haze the wolf from these areas. Many domestic and feral dogs in area. Wolf observed interacting with resident's dog about 8 miles to the north of White River in the yard of a private residence. Wolf was captured and returned to captivity. |
| 21 | Summer 2002 | Bluestem | Yes | Investigative search, **Aversive conditioning** | Sprucedale Ranch, Apache National Forest, Arizona. No direct interaction between wolves and humans, but wolves were observed from the ranch headquarters. A female domestic dog with pups was present which was killed by the wolves after she attempt to chase them away from area. Project personnel intensively monitored wolves, and aversively conditioned them when located in area. Wolves eventually stayed away from ranch. |

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

| Event | Date | Wolves involved | Dog presence (provoked) | Classification (bolded items indicate IFT actions) | Memo |
|-------|------|-----------------|-------------------------|-----------------------------------------------------|------|
| 22 | Summer 2002 | Bluestem | Yes | Investigative search, Habituated, **Aversive conditioning** | Beaver Creek Ranch, Apache National Forest, Arizona. On several occasions the wolves were in the vicinity of the ranch headquarters and cabins. No direct interaction between wolves and humans. Several dogs and horses at residence. The IFT intensively monitored and aversively conditioned wolves when located in area. Wolves eventually stayed away from ranch. |
| 23 | August 23, 2002 | Francisco | Yes | Investigative search | Four Drag allotment, Apache National Forest. Permittee was checking cattle along Malay pasture fence line with his working dogs. Permittee encountered WS and was told he could ride into the area with the dogs based on a wolf radio signal in a different direction. The dogs were released and began barking while working cattle. When a dog squealed, the permittee saw a wolf holding it by the back of the neck and shaking. The rancher yelled and the wolf let go. The rancher left with his dogs. |
| 24 | Summer 2002 | Francisco | Yes | Investigative search | Four Drag Cattle allotment, Apache National Forest hunter encountered wolves while hunting cougar in a remote area. Hunter was on horseback with a pack of hounds. The dogs got in a fight with the wolves; one of the dogs suffered extensive injuries. Hunter heard the fight, rode his horse toward the wolves, and fired a shot in the air. However, one wolf would not let go of the one hound. The other three wolves were about 50 yards away when he approached. He fired two more shots and scared the wolf away at about 10 yards. Hunter reported being in fear for the dogs but did not feel threatened himself. The wolves had a kill nearby and may have had pups in the area. |

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

| Event | Date | Wolves involved | Dog presence (provoked) | Classification (bolded items indicate IFT action) | Memo |
|-------|------|-----------------|-------------------------|--------------------------------------------------|------|
| 25 | October 19, 2002 | 584, 624; Gapiwi | Yes | Investigative approach | Chicken Coop Canyon, Gila Wilderness, New Mexico. Hunters saw two wolves near camp. Later wolves followed outfitter (on horseback) and her dogs. Hound ran at wolves, brief fight, hound came back and wolves left. |
| 26 | October 21, 2002 | 584, 624; Gapiwi | Yes | Investigative approach | On October 21, 2002, two wolves came by outfitter's camp. Meat from three elk was near camp. There were also dogs in the camp. Hunters ran out to take pictures and the wolves left. Adult pair of wolves had a rendezvous site nearby with one pup. |
| 27 | May 1, 2003 | 648 (?); Sycamore | | Investigative approach, **Aversive conditioning** | Near Little Turkey Creek, Gila Wilderness, New Mexico. Hunter saw a wolf on trail during middle of the day. Wolf moved toward hunter, and he threw a rock at the wolf, causing it to leave. |
| 28 | May 2003 | 592, 648; Sycamore | | Investigative search, Removed | Seventy-Four Draw, Gila National Forest, New Mexico. Young female on horseback encountered 2 wolves. Closest wolf was approximately 10 yards away, second wolf was further off and moving away from. Gun fired to scare wolf off. Wolf showed limited fear of person and gunshot, but eventually moved away. Incident lasted approximately 10 minutes. |

Mexican Wolf Blue Range Reintroduction Project                                    December 31, 2005

| Event | Date | Wolves involved | Dog presence (provoked) | Classification (bolded items indicate IFT action) | Memo |
|-------|------|-----------------|-------------------------|---------------------------------------------------|------|
| 29 | May 2003 | 592, 648; Sycamore | | Investigative search, **Removed** | Seventy-Four Draw, Gila National Forest, New Mexico. Wolves followed armed rancher six miles. He was on foot driving cattle down a canyon toward home. The wolves had been observed trying to kill calves in that group and the rancher chose to move them onto private land. He drove the herd of cows and was followed by the wolves for an hour. Rancher stated, "The wolves followed right behind me and kept getting closer and closer, I yelled at them and threw rocks at them, and it didn't work. When they got within 40 feet of me at that point I thought wild animals don't act like this, and because I felt threatened, I fired one round from my 30-30 over them. Their reaction was to skulk off the road and go around me and get in front of the cows again, they still showed no signs of leaving. They seemed to try and hold the cows up, just like when we originally saw them. From that point on I had trouble driving the cows and had to throw rocks over the cows trying to scare the wolves off, this continued until the vehicle the IFT member was driving came into earshot then the wolves moved up on the side of the canyon wall but still didn't leave. The IFT person was informed the wolves were right there with me and he confirmed that." |
| 30 | Spring 2003 | Unknown; Cienega Pack home range | Yes | Investigative approach | Foote Creek trail area, Apache National Forest, Arizona. Cougar hunters had wolf a follow them for approximately one mile. The hunters had several hounds with them. The wolf never approached the hunters or dogs and eventually left the area. |

Mexican Wolf Blue Range Reintroduction Project                                    December 31, 2005

| Event | Date | Wolves involved | Dog presence (provoked) | Classification (bolded items indicate IFT action) | Memo |
|-------|------|-----------------|-------------------------|---------------------------------------------------|------|
| 31 | July 1, 2003 -July 31, 2003 | 613; Red Rock | | Investigative search, **Aversive conditioning** Habituated, **Removed** | Occurred around Aragon and Cruzville, New Mexico. Wolf near residences at Cruzville, hit with one rubber bullet, and moved to Aragon area. Sighted repeatedly near residences, no direct threats; F613 would leave area or hide when observed. Caught near residence east of Aragon after killing a turkey. Wolf caught and returned to captivity. |
| 32 | Fall 2003 | 729; Red Rock | Yes | Investigative search | Sheep Basin, Gila National Forest, New Mexico. Hunters pulled into camp at night and saw M729 confronting their two dogs, that were tied to a tree. Hunters got out of vehicle and yelled at the wolf. The wolf stared at the hunters and eventually fled from the area. No threat to human safety. Wolf was drawn into area by presence of dogs. |
| 33 | Fall 2003 | Unknown | | Investigative approach, **Aversive conditioning** | Dry Prong, San Carlos Apache Reservation. Based on a second hand report from a San Carlos Apache Tribe representative. A wolf approached a tribal hunting camp within 50 yards and was hanging around near the camp and was unafraid of people. The hunters tried to scare the wolf away by yelling and throwing things in the direction of the wolf, but it wouldn't leave. The hunters did not feel safe and moved their camp. |

Mexican Wolf Blue Range Reintroduction Project                                      December 31, 2005

APPENDIX II—Assessment of Blue Range Wolf Recovery Area Project Evaluation Questions
Identified in the 1998 Mexican Wolf Interagency Management Plan (Parsons 1998)

The 1998 Mexican Wolf Interagency Management Plan identified nine questions to serve as the
foundation for the 3-Year and 5-Year Reviews. Each question was analyzed in a scientific
manner and discussed in the body of the Technical Component of the 5-Year Review. However,
for ease in evaluating the nine questions, they are also addressed separately, below. Note that two
of the questions (i.e. Is effective cooperation with other agencies occurring? Are combined
agency funds adequate?) are addressed in the Administrative Component of the 5-Year Review.
Two additional questions (i.e. Have sinks been identified? Have any sources of mortality been
higher than expected?) identified by an AMOC cooperator have been added to this section.

1. Have wolves successfully established home ranges within the designated wolf
   reintroduction area?

   *Response:* The data show that many home ranges have been established and maintained
   within the designated reintroduction area. Overall, 19 packs established home ranges in
   39 cumulative pack years (see Table 1, and Fig. 2). However, many of these packs had a
   small portion of their individual home ranges outside the current reintroduction boundary.

2. Have reintroduced wolves reproduced successfully in the wild?

   *Response:* Reintroduced wolves have successfully produced pups in the wild. Most of the
   successful reproduction from 1998-2003 was documented in 2002 and 2003. Overall, 16
   packs produced wild-conceived and wild-born pups. Average litter size, however, was
   below that observed in other wolf populations in the United States and the projections in
   the FEIS (USFWS 1996) (Fig. 3).

3. Is wolf mortality substantially higher than projected in the FEIS?

   *Response:* Wolf loss rates (i.e. mortality plus missing rates) were similar to estimates
   identified in the FEIS (USFWS 2003). However, removal rates were higher than
   mortality rates and were the dominating processes influencing the population (see Tables
   4 and 5). Combining removal, missing, and mortality rates to form a failure rate (e.g.
   wolves that did not persist on the landscape) indicated that overall levels were higher than
   predicted in the FEIS (see Tables 4 and 5).

4. Is population growth substantially lower than projected in the FEIS?

   *Response:* Projected population growth and current population are very similar (Fig. 3).
   However, releases are also higher than projected in the FEIS (USFWS 1996) (Fig. 3),
   thus the population is likely artificially high.

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

5.  Are numbers and vulnerability of prey adequate to support wolves?

    *Response:* This is a difficult question to analyze because of the difficulties in quantifying levels of vulnerable prey within the overall prey populations. Different measurements produce different results. For instance, the small number of pups per litter suggest that prey might be limiting within the population (see the Reproduction and Population Growth section of the Discussion). Other matrices indicate the level of available and vulnerable prey is adequate (e.g. number of wolves predicted by Ungulate Biomass Index, weight loss indexes, and the level of intraspecific strife). Overall, it appears there is an adequate natural prey base for Mexican wolves within the BRWRA.

6.  Is the livestock depredation control program adequate? *(*include evaluation of the number of depredations vs. number projected vs. other wolf programs vs. the first 3 years of reintroduction).

    *Response:* Each of the five measures used to define a successful depredation control program indicate current methods are adequate. The number of confirmed wolf-killed cattle was within projections in the FEIS (USFWS 1996), although higher than that observed in other populations of gray wolves. This higher number of killed cattle within the BRWRA relative to other wolf populations likely relates to differing grazing regimens between areas (i.e. the BRWRA has year-round grazing, whereas other wolf occupied areas in the United States do not).

7.  Have documented cases of threats to human safety occurred?

    *Response:* No cases of physical contact between a Mexican wolf and a human have occurred during the six years of data analyzed. On three occasions, wolves behaved aggressively toward humans or the dogs that accompanied them (see Appendix I). In all three cases, wolves were within three months of initial release and dogs were present.

8.  Have any sinks been identified?

    *Response:* Sinks were scattered inside and outside the BRWRA (see Fig. 5). Two clusters of sinks occurred within the BRWRA, one each in the northwestern and northeastern corners of the BRWRA.

9.  Have any sources of mortality been significantly higher than expected?

    *Response:* Sources of mortalities are consistent with other studied populations, and were principally human-caused (e.g. illegal shootings or vehicle collisions). See also Question 3, above.

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

APPENDIX III—Evaluation of the Biological and Technical Recommendations Identified in the 3-Year Review Paquet Report (Paquet et al. 2001)

The following is an evaluation of the biological and technical recommendations from the 3-Year Review Paquet Report (Paquet et al. 2001), indicating the status of each recommendation as either completed, not completed, or not considered necessary to complete, and the appropriate assessments and findings.

1. Continue to develop appropriate opportunities to release (and re-release) wolves for at least 2 years to ensure the restoration of a self-sustaining population

   *Status (Time Frame)*: Completed/being implemented (ongoing)

   *Assessment*: Releases and translocations continue to be used as management actions to ensure the restoration of a self-sustaining wolf population. Adaptive management will facilitate the continuation of these management practices as needed in the future.

   *Finding*: This is consistent with Recommendation 3 in the Recommendations Component of the 5-Year Review.

2. Begin developing population estimation techniques that are not based exclusively on telemetric monitoring.

   *Status (Time Frame)*: Not completed (initial stages; time frame for completion unspecified)

   *Assessment:* Staff and funding have not been available to fully implement this Recommendation. Currently, the IFT uses howling surveys, track counts, and observational data, in association with trapping/collaring, and telemetric monitoring, to obtain population estimates. A standardized system for determining population estimates still needs to be developed, and additional techniques need to be implemented or refined.

   *Finding*: This is consistent with Recommendation 17 in the Recommendations Component of the 5-Year Review.

3. Develop data collection forms and data collection and management procedures similar to those used by the red wolf restoration program in North Carolina.

   *Status (Time Frame)*: Completed/being implemented (ongoing)

   *Assessment:* New forms and procedures have been incorporated into Project Standard Operating Procedures (SOPs) and other procedural documents, based in part on examples from wolf projects in Minnesota, North Carolina, and the Northern Rockies.

   *Finding*: Continues to be adaptively implemented as needs for new forms and procedures are identified.

Mexican Wolf Blue Range Reintroduction Project                                    December 31, 2005

4. Require biologists to promptly and carefully enter field data into a computer program for storage, proofing, and analysis.

   *Status (Time Frame)*: Completed/being implemented (ongoing)

   *Assessment:* The IFT has developed, enhanced, and maintained Project databases for all essential field data, including but not limited to wolf locations, mortalities, survivorship, incident reports, depredation investigations, releases, and predation/carcass analysis. In addition, a comprehensive database documenting the chronological history for all wolves past and present, both in the wild and in acclimation facilities, has been created, and is regularly maintained for accuracy and completeness.

   *Finding*: This is consistent with Recommendation 15 in the Recommendations Component of the 5-Year Review.

5. Make all data available for research and peer review.

   *Status (Time Frame)*: Completed/being implemented (ongoing)

   *Assessment:* Project data for research and peer review are available to individuals and entities with appropriate research proposals. Data have been made available to a graduate-level scat study, the 3-Year Review, a depredation study, an undergraduate summer intern study, and an ongoing graduate-level study on Mexican wolf predation patterns.

   *Finding*: This is consistent with Recommendation 16 in the Recommendations Component of the 5-Year Review.

6. Carefully consider using a modified #3 soft-catch trap for capturing Mexican wolves rather than the McBride #7

   *Status (Time Frame)*: Being implemented

   *Assessment:* The IFT considered, but decided against, using modified #3 soft-catch traps because the amount of injuries caused using McBride #7 traps was minimal, and the concern that too many wolves would be able to pull out of the #3 traps. The IFT documented wolves pulling out of McBride #7 and Newhouse #4 traps.

   *Finding*: The question of efficacy of #3 soft-catch traps for capturing Mexican wolves has not been satisfactorily answered and will be pursued further. This is consistent with Recommendation 21 in the Recommendations Component of the 5-Year Review.

7. Encourage research that will help inform future program evaluations and adjustments.

   *Status (Time Frame)*: Completed/being implemented (initial stages; ongoing)

Mexican Wolf Blue Range Reintroduction Project                         December 31, 2005

*Assessment:* The Reintroduction Project is implementing a cattle depredation study and a preliminary winter predation study in the BRWRA. In addition, a graduate-level study on wolf predation patterns was initiated in fall 2004.

*Finding*: This is consistent with Recommendation 16 in the Recommendations Component of the 5-Year Review.

8.   Develop a contemporary definition of a biologically successful wolf reintroduction and the criteria needed to measure success.

*Status (Time Frame)*: Not completed

*Assessment:* Recovery planning for the Mexican wolf was put on hold in February 2005, after an Oregon U.S. District Court judge enjoined and vacated the 2003 gray wolf reclassification rule (USFWS 2003). In December 2005, USFWS decided not to appeal the Oregon ruling. This decision re-opened the door for USFWS Region 2 to once again move forward with Mexican wolf recovery planning in the Southwest. Target deadlines for Recovery Plan development and completion will be identified once the Recovery Team resumes meeting. Criteria to measure reintroduction and recovery success will be developed in the Recovery Plan. After recovery goals have been established, the BRWRA can be evaluated relative to those goals.

*Finding*: This is consistent with Recommendation 33 in the Recommendations Component of the 5-Year Review.

APPENDIX IV—Evaluation of the Recommendations from the Six Working Groups of the 3-Year Review Stakeholder Workshop

The following is an evaluation of recommendations generated by the six Working Groups of the 3-Year Review Stakeholders Workshop (Kelly et al. 2001), indicating the status as either completed, not completed, or not considered necessary to complete, and the appropriate assessments and findings.

1. Create maps and reports that reflect population levels of prey base, their spatial and temporal distribution, and current and projected management objectives and direction for New Mexico, Arizona, and Mexico.

   *Status (Time Frame)*: Not completed (time frame for completion unspecified)

   *Assessment:* Detailed information on spatial, temporal, and density distribution of prey species would be helpful, but funding and personnel restraints in all three AMOC-member Game and Fish agencies (i.e. AGFD, NMDGF, WMAT) preclude such detailed surveys. Current management objectives for ungulates within the BRWRA can be obtained from the appropriate management agency (AGFD, NMDGF, or White Mountain Apache Outdoor and Recreation Department). Projected game management objectives cannot be described at this time, because of the many variables that affect future management strategies. In Mexico, wildlife management is much more complex and less structured, due to the large amount of private land and limited financial ability of government agencies to carry out these activities. Also, neither the Recovery Program nor the Reintroduction Project has authority or jurisdiction in Mexico.

   *Finding*: AMOC and the IFT will continue to seek innovative approaches to support and encourage the referenced State and Tribal wildlife agencies in improving the quality of prey base surveys. In addition, they will continue to use existing data sets to adaptively describe prey bases across the BRWRA in a manner that is consistent with data quality.

2. Identify wild ungulate prey base habitat enhancements to be accomplished through private property incentives programs and federal, state, tribal, and county, land management agency planning processes.

   *Status (Time Frame)*: Not completed (time frame for completion unspecified)

   *Assessment:* This activity has not been pursued due to other higher priority management activities and a lack of planning, funding, and personnel to address this issue.

   *Finding*: Developing a list of prey base habitat enhancements that can be employed at some time in the future, when planning, funding, and personnel permit, is consistent with Recommendation 26 in the Recommendations Component of the 5-Year Review.

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

3. Predation losses to be determined by cooperators and stakeholders on game species and develop definitive statements on anticipated allocations of wild ungulates to wolves and hunters.

*Status (Time Frame)*: Not completed (partially implemented; time frame for completion unspecified)

*Assessment:* Intensive winter monitoring has provided minimum food consumption rates and characteristics of prey being fed on by wolves. Supporting information is gathered through the analysis of other wolf kills found opportunistically throughout the year. An ongoing graduate study on Mexican wolf predation patterns should provide further insight toward food habits of wolves. However, losses to predation will be localized and difficult to determine, without additional research focused on ungulate population dynamics. Allocating wild ungulates to predators is not currently, or planned as, a management strategy in Arizona, New Mexico, or on FAIR.

*Finding*: This is consistent with Recommendation 11.c. in the Recommendations Component of the 5-Year Review.

4. When livestock depredation is suspected, utilize partnerships between stakeholders to assist with increased monitoring of vulnerable livestock and local populations of wolves in order to determine if and when depredation occurs.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* When wolves are in close proximity to livestock, the IFT informs ranchers and other livestock owners of the wolf locations. In addition, when wolf territories overlap with active livestock pastures, and depredations are confirmed or suspected, livestock managers may be provided telemetry equipment to assist with monitoring of vulnerable livestock. Under these circumstances, the IFT intensifies monitoring efforts.

*Finding*: Additional assistance (i.e. riders, ranch-hands, monetary compensation etc.) can be acquired through Defenders proactive carnivore conservation fund.

5. Notify livestock operators when wolves are likely to den in livestock pastures and consider modifying livestock grazing use to minimize opportunities for depredation.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* This Recommendation has been implemented, with successful results, through partnerships between the IFT, livestock permittees, U.S. Forest Service, and Defenders.

*Finding*: The IFT, AMOC lead agencies, and cooperating organizations continue to seek innovative approaches to notifying affected livestock owners and to minimize wolf-livestock conflicts.

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

6.  Inform livestock operators of procedures to preserve evidence of depredation and contact points to have kills confirmed.

    *Status (Time Frame)*: Completed/being implemented (ongoing)

    *Assessment:* This information is provided to livestock operators that have wolf/livestock conflicts through personal communication.

    *Finding*: A flyer has been developed with this information and has been distributed. The flyer needs to be revised to incorporate information contained in recently completed SOP 10.0: Incident Reporting by Other Agencies and SOP 11.0: Depredation on Domestic Livestock and Pets.

7.  When wolves are confirmed to be involved in livestock depredation, apply direct control measures in an attempt to curtail depredation and monitor effects to determine if depredation reoccurs

    *Status (Time Frame)*: Completed/being implemented (ongoing)

    *Assessment:* Intensive monitoring and direct control measures are implemented after depredations are confirmed or suspected, in accordance with protocols.

    *Finding*: Direct control measures and circumstances for their use are described in the recently completed SOP 13.0: Control of Mexican Wolves.

8.  If wolves are observed chasing/harassing livestock, utilize aggressive aversive conditioning in an effort to curtail the behavior and if these attempts fail take direct control actions to curtail the behavior or remove the offending animal or animals.

    *Status (Time Frame)*: Completed/being implemented (ongoing)

    *Assessment:* Aggressive aversive conditioning may be successful in temporarily deterring wolves from livestock in some cases. Direct control measures may be needed but other less drastic options need to be implemented before direct control (removal) of the wolves will occur.

    *Finding*: These management responses are conducted in accordance with SOP 13: Control of Mexican Wolves. This is consistent with Recommendation 10 in the Recommendations Component of the 5-Year Review.

9.  Review and refine the criteria for release site selection and timing, including: potential conflicts with previously released wolves, potential conflicts with land uses; potential conflicts with humans; potential conflicts with management priorities for other species of wildlife; desired impacts on other species (i.e. reducing populations of other predators), den-

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

site potential; wild ungulate prey base abundance and availability; post-release movements and dispersal potential; any other relevant biological factors; logistical feasibility; cost of field monitoring; and field project staffing needs.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* A comprehensive analysis of release site areas should increase chances of wolf survival and reproduction, and lessen impacts to current land uses and local residents.

*Finding*: Through adaptive management and information gained from previous releases, the release site selection process has become more refined and is likely to have increased success in the future. In addition, SOPs 5.0: Initial Wolf Releases and 6.0: Wolf Translocations address these.

10. Create a review team that includes stakeholders to identify and prioritize potential release sites within the reintroduction area (includes timing, prey base, land ownership).

*Status (Time Frame)*: Not completed/being implemented (initial stages; time frame for completion unspecified)

*Assessment:* AMOC did this for the spring 2004 release proposal, through AMWG and Greenlee County AZ. This Recommendation was considered not completed because a new review team was not created to accomplish this task. In Arizona, this was done initially to identify the eight original release sites within the primary recovery area, and also on FAIR through the White WMAT planning process. Similarly, New Mexico completed this task for four initial sites selected within the Gila wilderness.

*Finding*: The IFT, on an ongoing basis, will continue to evaluate and propose potential release sites as identified in SOP 5.0: Initial Wolf Releases and SOP 6: Wolf Translocations.

11. Develop criteria for class of wolves to be released (individual vs. pack; male vs. female; pregnant female; old vs. young; etc.).

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* Analysis of previously released wolves to determine the most successful characteristics has helped make subsequent releases more successful. However, adherence to strict criteria may not be possible, given the relatively small number of genetically surplus wolves that can be released, and other field considerations.

*Finding*: The IFT will use criteria developed in SOP 5.0: Initial Wolf Releases and SOP 6.0: Wolf Translocations.

12. Develop a formal supplemental feeding protocol.

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* Supplemental feeding is dictated by factors such as: 1) use of food caches 2) wild experience of released wolves 3) release site fidelity 4) natural prey use, etc. Flexibility must be maintained to allow for adaptive management under dynamic situations.

*Finding*: The IFT will follow the supplemental feeding protocol in SOP 8.0: Supplemental Feeding.

13. Review and refine all depredation management procedures and guidelines on public and on private lands.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* Depredation management procedures and guidelines were reviewed and refined.

*Finding*: Three SOPs related to this Recommendation were approved in 2005: SOP 13.0: Control of Mexican Wolves, SOP 11.0: Depredation on Domestic Livestock and Pets, and SOP 10.0: Incident Reporting by Other Agencies.

14. Review and refine all procedures and guidelines for detecting and monitoring released wolves, radiotracking and recapture practices in proximity to livestock and elsewhere.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* Procedures and guidelines for detecting, monitoring, and capturing wolves were reviewed and refined.

*Finding*: Nine SOPs related to this Recommendation were approved in 2005: SOP 11.0: Depredation on Domestic Livestock and Pets, SOP 13.0: Control of Mexican Wolves, SOP 15.0: Helicopter Capture and Aerial Gunning, SOP 16.0: Howling Surveys, SOP 17.0: Ground Telemetry, SOP 18.0: Aerial Telemetry, SOP 21.0: Handling, Immobilization, and Processing Live Mexican Wolves, SOP 22.0: Chemical Darting, and SOP 23.0: Blood Collection, Handling and Storage.

15. Review and refine all procedures and guidelines for translocation.

*Status (Time Frame)*: Completed/being implemented.

*Assessment*: Translocation procedures and guidelines were reviewed and refined.

*Finding*: SOP 5.0: Initial Wolf Releases and SOP 6.0: Wolf Translocations were revied, revised, and approved in 2005.

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

16. Review and refine all criteria, procedures, and guidelines for temporary and/or permanent removal from the wild of released wolves.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* Criteria, procedures, and guidelines for removal of wolves were reviewed and refined.

*Finding*: SOP 11.0: Depredation on Domestic Livestock and Pets and SOP 13.0: Control of Mexican Wolves were approved in 2005. Relocating wolves previously removed from the wild is recommended by the IFT, and approved by the respective agency where the release site is located. Relocating wolves is based on cause of removal, genetic profile of population, population density, and amount of breeding pairs in the wild.

17. Review and refine all procedures and guidelines for preventing, managing, or monitoring dispersal.

*Status (Time Frame)*: Not completed (time frame for completion unspecified)

*Assessment:* Analysis of previously released wolves to determine the age class of most common dispersers, pack size with highest dispersal rates, and other circumstances of dispersal has allowed the IFT to better prevent, manage, and monitor dispersal. Routine aerial and ground telemetry monitoring has allowed the IFT to track dispersing wolves.

*Finding*: Formal procedures or guidelines have not been developed specifically for dispersal, but portions of this Recommendation are covered in various other Project documents such as: the FEIS, the nonessential experimental rule, and various SOPs (i.e. SOP 5.0: Initial Wolf Releases, SOP 6.0: Wolf Translocations, and SOP 13.0: Control of Mexican wolves). However, dispersal is a natural and desirable behavior of wolves, which facilitates natural pair formation, reproduction, and recolonization. Therefore, it is impossible to prevent and is extremely time consuming to manage dispersal behavior.

18. Review and refine all procedures and guidelines for detecting or monitoring prey use.

*Status (Time Frame)*: Completed

*Assessment:* Various IFT activities are designed to document prey use (i.e. winter study, depredation study, and ongoing graduate research). In addition, wolves are intensively monitored after direct releases from captivity or when in close proximity to cattle, to determine prey use.

*Finding*: SOP 19.0: Intensive Winter Monitoring and Ungulate Mortality Collection outlines specific guidelines for detecting and monitoring prey use, through intensive aerial and ground monitoring.

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

19. Review and refine all procedures and guidelines for detecting and monitoring selection and use of den sites.

*Status (Time Frame)*: Not completed (not considered necessary)

*Assessment:* Routine monitoring has detected the selection and use of most den sites; therefore, formal procedures or guidelines have not been deemed necessary by the IFT. Some den sites have been analyzed for their physical and biological characteristics.

*Finding*: Current procedures appear adequate for detecting and monitoring den sites and additional formal guidelines are not deemed necessary at this time.

20. Review and refine all procedures and guidelines for detecting and monitoring reproduction.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* The IFT initially documents reproduction through monitoring, observational data, localized movements during denning season, and later determines successful reproduction through den site analysis, howling for pups, and observations. The current field practices of the IFT have been very successful at determining reproduction.

*Finding*: Current procedures appear adequate for detecting and monitoring reproduction, but the IFT continues to look for opportunities to adaptively improve methodology.

21. Review and refine all procedures and guidelines for detecting and monitoring pup recruitment (survival past one year).

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* The IFT documents recruitment through collaring pups and tracking survival. Supplemental information is obtained by acquiring pack size and pup counts through observational reports, howling surveys, and track counts. Collaring or ear tagging pups with remote transmitters is the best way to accurately determine pup recruitment (survival past one year).

*Finding*: Monitoring pup recruitment is difficult, but current procedures appear adequate at this time. The IFT continues to assess and evaluate opportunities to adaptively improve methodology, however.

22. Review and refine all procedures and guidelines for detecting and monitoring availability and use of water.

*Status (Time Frame)*: Not considered necessary to complete/implement

Mexican Wolf Blue Range Reintroduction Project                                December 31, 2005

*Assessment:* Implementing this Recommendation would require intensive monitoring and research efforts beyond the current scope of the IFT. Prior to releasing wolves, the IFT considers the proximity of a release site to perennial water sources, as part of the release site selection criteria.

*Finding*: Creating procedures and guidelines for detecting and monitoring water availability and use has no application for the Reintroduction Project, and therefore, is deemed unnecessary.

23. Review and refine all procedures and guidelines for identifying and addressing conflicts with land uses and land users.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* Conflicts with land uses and users are identified and addressed through AMOC and AMWG.

*Finding*: SOP 13.0: Control of Mexican Wolves was approved in 2005 and addresses approaches to mediating conflicts with land uses and users.

24. Develop procedures and guidelines for minimizing undesired and maximizing desired impacts on other species of wildlife.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* Concerns over minimizing undesired and maximizing desired impacts of wolves are addressed through AMOC and AMWG.

*Finding*: Provisions to address this topic were incorporated into the FEIS, Final Rule, and SOP 13.0: Control of Mexican Wolves. Additional procedures and guidelines will be developed when issues arise.

25. Review the protocol for husbandry of captive pre-release wolves in on-site acclimation pens to ensure it is adequate to maximize post-release survival and breeding success.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* A husbandry protocol for captive wolves in on-site acclimation pens was developed in 1998, prior to the first release of Mexican wolves. Since the inaugural release of Mexican wolves in 1998, Project personnel have been refining methodologies used for releases to maximize post-release survival and breeding success.

*Finding*: This is consistent with Recommendation 27 in the Recommendations Component of the 5-Year Review.

Mexican Wolf Blue Range Reintroduction Project                December 31, 2005

26. Develop guidelines to ensure that Project staff solicit and consider information from all available knowledge bases (including published and unpublished sources, locally knowledgeable individuals, natural historians, academicians, agency staff, and historical as well as recent information) during Project planning and implementation.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* During development of SOPs and other Project guidelines, IFT members solicited and considered information from professionals and specialists within the field of wolf research/management, review published and unpublished documents, and research archived data within each of the respective agencies. AMOC and AMWG provide opportunities to use all available knowledge bases in other planning and implementation stages, including public/stakeholder input.

*Finding*: This Recommendation is consistent with Recommendations 13 and 16 in the Recommendations Component of the 5-Year Review.

27. Compile data to ensure availability of data

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* Data are collected and compiled on all facets of the Reintroduction Project, including but not limited to: wolf locations, mortalities, incident reports, observation reports, depredation investigations, predation/carcass analysis, releases/translocations, acclimation facilities, and the captive breeding program. Project personnel assimilate archived data to disseminate internally among the cooperating agencies, the public, and academic entities. Information dissemination occurs through status reports, monthly updates, briefings, recommendations, proposals, and technical, professional, and general presentations. In addition, data were made available for the 3-Year Review and are gradually being released to academia for research purposes.

*Finding*: This is consistent with Recommendation 15 in the Recommendations Component of the 5-Year Review.

28. Develop the 5-Year Review criteria

*Status (Time Frame)*: Completed

*Assessment:* Criteria were developed by AMOC.

*Finding*: 5-Year Review criteria are completed as supported in this document.

29. Develop the 5-Year Review process

Mexican Wolf Blue Range Reintroduction Project                              December 31, 2005

*Status (Time Frame)*: Completed

*Assessment:* The 5-Year Review process was developed by AMOC.

*Finding*: Development of the 5-Year Review process is completed as supported in this document.

30. Provide technical training opportunities for field staff in the broader recovery zone and other wolf projects (including Mexico) in order to standardize methods and provide quality control.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* Several Reintroduction Project employees previously participated in the red wolf recovery program, the northern Rockies wolf recovery project, and the northeastern wolf recovery project. Frequent discussions with other projects and familiarity with the literature has helped ensure standardized methods and quality control. Continuing education for staff will help staff retention and make the Project more effective and efficient. Mexican interns have worked on the Mexican wolf Reintroduction Project, acquiring technical skills and exposure to policies and procedures, and developing a partnership with their United States counterpart.

*Finding*: This is consistent with Recommendation 28 in the Recommendations Component of the 5-Year Review.

31. Ensure that Project staff have competency in data gathering, storage, retrieval, and analysis.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* Appropriate Project staff are trained and evaluated in data gathering, storage, retrieval, and analysis. On-the-job training and fulfillment of employee professional development plans provides Project personnel with opportunities to enhance and refine their ability to accomplish the aforementioned objectives. However, agencies need to provide their staff with more opportunities to acquire skills and appropriate knowledge required to perform these tasks using current scientific methodologies. Agencies should identify deficiencies through regular job performance appraisals.

*Finding*: This is consistent with Recommendation 28 in the Recommendations Component of the 5-Year Review.

32. Ensure that Project staff have competency in verbal and written communication skills

*Status (Time Frame)*: Completed/being implemented (ongoing)

Mexican Wolf Blue Range Reintroduction Project                               December 31, 2005

*Assessment:* Training and evaluation of all appropriate staff in verbal and written communication skills is an ongoing process.

*Finding*: This is consistent with Recommendation 28 in the Recommendations Component of the 5-Year Review.

33. Agency personnel should attend at least two communication training sessions annually.

*Status (Time Frame)*: Not considered necessary to complete/implement

*Assessment:* Project personnel attend regular training as part of their respective professional development plans, and are also continually involved with on the job training opportunities.

*Finding*: Given time and funding constraints, it is considered excessive for staff to attend two communication-training sessions annually. Opportunities for in-house and on-line training will be explored.

34. Develop mechanisms to communicate and inform stakeholders, especially for local communities

*Status (Time Frame):* Completed/being implemented (ongoing)

*Assessment:* AMOC and AMWG provide opportunities for local communities and other stakeholders to communicate directly with Project managers quarterly, within or near the BRWRA. In addition, monthly updates are posted on Project websites and disseminated throughout local communities within the BRWRA. Furthermore, livestock producers and affected members of the public are informed about wolf presence, depredations, and nuisance animals found in the vicinity of their livestock or residence.

*Finding*: This is consistent with Recommendations 23 and 24 in the Recommendations Component of the 5-Year Review.

35. Provide accurate bi-monthly information on FWS website by the USFWS

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* In 2003, the IFT converted bi-monthly updates into monthly updates to increase the amount of detail and depth of these reports. These reports are also accessible via the AGFD and USFWS websites. Individuals requiring immediate information on wolf locations (i.e. livestock producers and affected citizens), due to depredation or nuisance behavior, are provided appropriate information by the IFT.

*Finding*: This is consistent with Recommendations 23 and 24 in the Recommendations Component of the 5-Year Review.

36. Identify resources, individuals, or groups that can aid outreach activities.

    *Status (Time Frame)*: Completed/being implemented (ongoing)

    *Assessment:* This Recommendation was implemented through development and coordination of teacher wolf workshops, in cooperation with the Information and Education Branch of the AGFD, and other organizations. Partnerships between the IFT and volunteer groups are also occurring to aid in development and dissemination of outreach materials.

    *Finding*: This is consistent with Recommendations 23 and 24 in the Recommendations Component of the 5-Year Review.

37. Information provided in outreach programs should be balanced and objective and not designed to persuade attitudes and opinions.

    *Status (Time Frame)*: Completed/being implemented (ongoing)

    *Assessment:* All information provided during outreach programs is evaluated for its balance and objectivity as outlined in SOP 3.0: Outreach. Recommended changes can be made through IFT staff and supervisors, public comment, AMOC, and AMWG.

    *Finding*: This is consistent with Recommendations 23 and 24 in the Recommendations Component of the 5-Year Review.

38. Increase the sensitivity of program staff and partners to cultural differences in attitudes and values specific to the program.

    *Status (Time Frame)*: Completed/being implemented (ongoing)

    *Assessment:* Project personnel are cognizant there is a diverse array of cultural attitudes and values specific to the wolf reintroduction. Information is presented to the public in a non-biased manner and Project personnel are receptive to all questions and concerns. Understanding different cultural attitudes and values toward the Project enables the IFT and agency administrators to appropriately represent the full spectrum of public interests. AMOC and AMWG provide forums for the public and public representatives to address issues of this nature.

    *Finding*: This is consistent with Recommendations 23 and 24 in the Recommendations Component of the 5-Year Review.

39. Scientists and administrators involved in the program need to have a high level of sensitivity to the political factors, operating at various levels, that seek to influence the program and resist purely politically motivated solutions to problems.

    *Status (Time Frame)*: Completed/being implemented

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

*Assessment:* The IFT generally attempts to resolve issues by specifically addressing solutions based on the scientific literature and overall working knowledge of specific problems. Political realities should always be a part of the IFT and AMOC decision -making process, however.

*Finding*: The IFT's primary role is to present the best science-based recommendations (while keeping in mind political and other considerations). AMOC's responsibility is to evaluate the recommendations and consider the socio-political context.

40. Incorporate local citizen views into the Mexican gray wolf recovery program.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* AMOC and AMWG provide opportunities for local citizen views to be incorporated into the Reintroduction Project. In addition, the Mexican Wolf Recovery Team Stakeholder Sub-Group is composed of representatives from local communities and organizations involved in development of a new Mexican Wolf Recovery Plan.

*Finding*: This is consistent with Recommendation 34 in the Recommendations Component of the 5-Year Review.

41. Cooperators and stakeholders develop and define measurable techniques for reducing livestock and animal conflict by the end of the 5-Year Review.

*Status (Time Frame)*: Not completed/being implemented (time frame for completion unspecified)

*Assessment:* Techniques to reduce livestock and animal conflicts are described in SOP 13.0: Control of Mexican Wolves. Defenders of Wildlife coordinated discussions with Project cooperators, stakeholders, and interested parties, trying to develop an insurance compensation program for livestock depredations, which doesn't require depredations to be confirmed in order to receive monetary compensation. However, this compensation system is only a concept at present, in preliminary discussion phase. Project personnel also acquire input from stakeholders through day-to-day interactions.

*Finding*: This is consistent with Recommendation 12 in the Recommendations Component of the 5-Year Review.

42. Develop information dissemination network to provide current and timely information to pet owners, sporting dog owners, recreationists within occupied wolf areas.

*Status (Time Frame)*: Completed/being implemented (ongoing)

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

*Assessment:* Project briefings and signs are posted throughout the BRWRA, special notices are posted at trailheads or campgrounds, and personal contacts are made with campers, hunters, and residents when wolves are in their area.

*Finding*: IFT and AMOC will continue to seek innovative solutions to provide current and timely information to all users of the land within occupied wolf areas.

43. Minimize management action (e.g., capture/recapture, supplemental feeding, and removal of wolves).

    *Status (Time Frame)*: Completed/being implemented

    *Assessment:* Management actions have been minimized through application of hazing techniques, release of family groups with pups, reductions in the number of wolves directly released from captivity, and less supplemental feeding of wolves. However, management actions will always be needed to address various reintroduction concerns.

    *Finding*: Toward this end, a set of Reintroduction Project SOPs has been developed to guide when and how various management actions will be applied.

44. Monitor long-term disease and health trends to include a health assessment and vaccinations into wolf handling protocols to limit health and disease concerns.

    *Status (Time Frame)*: Completed/being implemented (ongoing)

    *Assessment:* Long-term disease and health trends have been and are being monitored through regular testing of wolves and blood samples.

    *Finding*: Health assessments, vaccination tracking, and blood collection have been incorporated into SOP 21.0: Handling, Immobilization, and Processing Live Mexican Wolves.

45. Identify local misconceptions, with help of local sources of the Mexican wolf, and address them as part of the outreach plan.

    *Status (Time Frame)*: Completed/being implemented (ongoing)

    *Assessment:* Many local misconceptions were identified through the 3-Year Review public open house and workshop process. All these misconceptions were considered during development of SOP 3.0: Outreach, which is carried out by Project personnel during formal presentations and informal communication with the public.

    *Finding*: AMOC is preparing a "myth busters" document to address the more common misconceptions dealing with Mexican wolf reintroduction. The document will be downloadable from http://azgfd.gov/wolf when it is completed.

Mexican Wolf Blue Range Reintroduction Project                              December 31, 2005

46. There is a need to address the issue of livestock carcass detection and disposal to reduce wolf and livestock conflicts.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* Carcasses of livestock are, when feasible and acceptable to the livestock owner(s), made unavailable to wolves by removal, rendering inedible, or on-site disposal by the IFT (however, see C/R 257 in the AMOC Responses to Public Comment Component). Carcasses on public lands that are seen during aerial telemetry flights, or discovered through regular field monitoring, are routinely disposed of or rendered inedible by the IFT, when feasible and acceptable to the permittee. Similar actions are taken by the IFT on private lands, when given permission.

*Finding*: This is consistent with Recommendations 12.b and 29 in the Recommendations Component of the 5-Year Review.

47. Compile and review all monitoring and recapture information collected to date on dispersing wolves to evaluate effectiveness, program costs, and impacts to landowners and other stakeholders due to current boundaries.

*Status (Time Frame)*: Not completed (time frame for completion unspecified)

*Assessment:* It would be difficult, if not impossible, to split off time and expense figures for monitoring dispersing wolves. In addition, the effectiveness of the activities would be difficult to define and the impacts to landowners might be extremely difficult to quantify. However, managing wolves that establish territories wholly outside the BRWRA requires an extensive amount of resources, and limits the ability of IFT staff to pursue other field responsibilities.

*Finding*: This is consistent with Recommendation 13 in the Recommendations Component of the 5-Year Review.

48. Conduct a staffing need assessment based on Project experience to date.

*Status (Time Frame)*: Completed/being implemented (2005)

*Assessment:* AGFD conducted a staffing needs assessment, and initiated an expansion and reorganization of the AGFD portion of the IFT to reflect roles and responsibilities, as described in the MOU. Thus, as of 2005, AGFD has 5 full-time employees assigned to the IFT. WMAT recruited a technician in 2003 to complement the existing wolf biologist position. USFWS stationed the Mexican Wolf Field Projects Coordinator in Alpine AZ, to facilitate communication between cooperating agencies and become a functional member of the IFT. NMDGF has hired an additional person for the IFT who will report for duty in early 2006. WS has assigned 2 employees to part-time duty (total 1.25 FTEs) on the IFT.

Mexican Wolf Blue Range Reintroduction Project                                    December 31, 2005

*Finding*: This is consistent with Recommendations 29, 30, and 31 in the Recommendations Component of the 5-Year Review.

49. Compile, review, and publish an assessment of all release program impacts reported to date on existing land uses, local customs, cultures, and economies in Arizona and New Mexico, including a determination of appropriate measures.

    *Status (Time Frame)*: Completed

    *Assessment:* This Recommendation is addressed in the Socioeconomic Component of the 5-Year Review.

    *Finding*: See the Socioeconomic Component of the 5-Year Review for information compiled to date on this Recommendation. This is also consistent with Recommendation 13 in the Recommendations Component of the 5-Year Review.

50. Compile and analyze all incidents involving livestock, other domestic animals, or humans to identify preventative measures and to assess the effectiveness of current management options.

    *Status (Time Frame)*: Completed/being implemented (ongoing)

    *Assessment:* All reported incidents of wolf-livestock or wolf-human interactions during the initial stages of the Project are discussed in the Technical Component of the 5-Year Review.

    *Finding*: Compilation and analysis of all incidents involving livestock, other domestic animals, and humans is completed as supported in this document.

51. Assess the impact of wolves on other species of wildlife.

    *Status (Time Frame)*: Not completed (time frame for completion unspecified)

    *Assessment:* To produce valid information a study would have to extend over several years, for each species studied, requiring significant funding which has not been available. With approximately 50 wolves spread out over 2500 mi$^2$ it would be very difficult to assess with any accuracy the wolves' impact on other species of wildlife, in any specific area. Another impediment to completing this Recommendation is the lack of any defensible density data for any of the various prey species in the area.

    *Finding*: This is consistent with Recommendation 25 in the Recommendations Component of the 5-Year Review.

52. Survey the public, academicians, and agencies to identify areas in which they believe they can appreciably contribute knowledge that is not currently reflected in the program.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* This was done through the 3-Year Review process, and continues through the activities of AMOC and AMWG, as well as, the 5-Year Review. The Recovery Team is comprised of a diverse group of people from the public, academia, and government agencies; it contributes knowledge and information that otherwise might not be as well represented in the Reintroduction Project.

*Finding*: This is consistent with Recommendation 34 in the Recommendations Component of the 5-Year Review.

53. Survey the public and program staff to identify information gaps, weaknesses, perceived misleading information that affect their understanding of the need for and/or quality of the program.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* This is already being done on an informal basis but could be better structured to provide more complete information to the public.

*Finding*: This was done through the 3-Year Review process and continues through the activities of AMOC and AMWG, as well as the 5-Year Review.

54. Collect data on aversive conditioning to identify management actions.

*Status (Time Frame)*: Completed/being implemented

*Assessment:* Hazing of wolves through intensive short-term harassment usually causes wolves to move from an area temporarily or sometimes permanently. Management actions conducted by the Project revealed that aversive conditioning has greater success in smaller defined areas.

*Finding*: The IFT will continue to gather literature on aversive conditioning and document all pertinent data (e.g. method employed, wolf response, follow-up) when aversive conditioning is applied. These data will be used through adaptive management to evaluate, modify, and improve the efficacy of aversive conditioning actions applied to Mexican wolves.

55. Collect data on Mexican wolf food habits to quantify actual diet composition.

*Status (Time Frame)*: Completed/being implemented (ongoing)

*Assessment:* A graduate student completed a Master's Thesis (Reed 2004), analyzing wolf scats to determine food habits of Mexican wolves. Intensive winter monitoring and opportunistic collection and analysis of wolf kills have also provided characteristics of prey

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

used by Mexican wolves. In addition, a graduate level study on wolf predation patterns is underway to further address this issue.

*Finding*: Innovative approaches to refine, expand, and fund Mexican wolf food habit studies will continue to be sought out.

56. Conduct a population/habitat viability analysis of the wild population in the BRWRA using modern, scientifically accepted methods, to be completed by FWS contracted experts by February 2002.

*Status (Time Frame)*: Not completed

*Assessment:* A population/habitat viability analysis has not been completed for three reasons: (a) AMOC believes there is not yet sufficient demographic and other required information to conduct a robust PVA; (b) expert opinion is mixed at best on the utility of population/habitat viability analyses in "real world" management; and (c) population/habitat viability analyses are significant time and money sinks, and until both (a) and (b) have been satisfactorily resolved, AMOC will place higher priority on other facets of the Reintroduction Project, such as on-the-ground wolf management and community outreach. However, in anticipation of these problems being overcome, AMOC will collaborate with an independent entity to identify all information needs (e.g. data types and sample sizes) for a statistically valid habitat/population viability analysis for the BRWRZ wolf population to be conducted and completed in Calendar Year 2010.

*Finding*: This is consistent with Recommendation 32 in the Recommendations Component of the 5-Year Review.

57. Establish baseline numbers and distribution data for selected (examples) wild organisms and ecological processes by August 2002, and implement ongoing monitoring of change.

*Status (Time Frame)*: Not completed (not considered necessary)

*Assessment:* This is beyond the scope of the BRWRA Reintroduction Project, and would require resources and research assets not currently available. However, AMOC encourages independent research on this and other aspects of the wolf reintroduction.

*Finding*: This is consistent with Recommendation 16 in the Recommendations Component of the 5-Year Review.

58. Analyze the short and long term effects of management actions on wolf behavior, social structure, and evolution.

*Status (Time Frame)*: Not completed

*Assessment:* Analysis of management actions on wolves is an ongoing activity.

Mexican Wolf Blue Range Reintroduction Project                                    December 31, 2005

*Finding*: Data related to this Recommendation are routinely collected during ongoing IFT management activities. An objective assessment of this Recommendation will require dedicated research. This Recommendation is consistent with Recommendation 16 of the Recommendations Component of the 5-Year Review.

59. Collect and analyze all available historical information on past wolf numbers and distribution.

    *Status (Time Frame)*: Completed

    *Assessment:* This information can be found in the FEIS (USFWS 1996) for reintroduction of Mexican wolves.

    *Finding*: See the FEIS (USFWS 1996), Parsons (1996), and Brown (1983) for scholarly discussions of the history of Mexican wolves, including past numbers and distribution.

60. Develop a better understanding of ethical considerations related to Mexican gray wolf recovery, including the reintroduction of captive-raised predators into the wild, allowing extinction of this sub-species, and the conflicting attitudes and resulting stresses among residents of the area directly affected by wolf recovery.

    *Status (Time Frame)*: Completed/being implemented (ongoing)

    *Assessment:* Prior to inception of the reintroduction effort, extensive deliberation occurred on whether or not Mexican wolves should be reintroduced, analyzing the ethical, biological, and socio-political implications and ramifications. Conclusions from this analysis were incorporated into the policies, rules, and regulations that govern the Reintroduction Project.

    *Finding*: Ethical considerations are discussed and analyzed through AMOC and AMWG. Information on conflicting attitudes and resulting stresses is provided in the Socioeconomic Component of the 5-Year Review.

61. Contract an independent comprehensive economic (costs - benefits) analysis that evaluates and quantifies the potential and actual benefits and losses of the Wolf Reintroduction in the activities of the local communities. The results have to be immediately incorporated to the adaptive management in the program, the 5-Year Review and any subsequent reviews in order to maximize the benefits and minimize the costs.

    *Status (Time Frame)*: Completed

    *Assessment:* A Socioeconomic study was conducted as part of the 5-Year Review.

    *Finding*: See the Socioeconomic Component of the 5-Year Review for a synopsis of the best information gathered to date on cost/benefit analysis of Mexican wolf reintroduction.

Mexican Wolf Blue Range Reintroduction Project                    December 31, 2005

62. Evaluate effectiveness of current compensation fund and implement monetary reimbursement.

   *Status (Time Frame)*: Not completed (time frame for completion unspecified)

   *Assessment:* A sub-group from AMOC has been created to handle this issue.

   *Finding*: This is consistent with Recommendation 12 in the Recommendations Component of the 5-Year Review.

63. Analyze behavior of wolves released to date to determine what the recovery zone boundaries should be from a biological perspective (i.e. considering denning and foraging behavior, and seasonal or other movements).

   *Status (Time Frame)*: Completed

   *Assessment:* Data discussed in the Technical Component of the 5-Year Review reveal that present recovery zone boundaries are inadequate. Wolves are natural dispersers, traveling extensive distances in search of available home range, mates, and appropriate habitat. Since inception of the Reintroduction Project, several wolves have dispersed outside the BRWRA, and even outside the experimental population area, before localizing and establishing a home range. A few denning packs have also established territories wholly outside the BRWRA. All the aforementioned wolves were subsequently removed and relocated due to violation of the boundary rule. Further analysis is being conducted through the 5-Year Review to determine whether or not recovery zone boundaries should exist, and if so what they should be from a biological perspective. The New Mexico Game Commission has also directed NMDGF to analyze this Recommendation.

   *Finding*: This is consistent with Recommendation 5 in the Recommendations Component of the 5-Year Review.

   Document MW 5YR Technical Component.20051231.Final.doc

# Mexican Wolf Blue Range Reintroduction Project 5-Year Review:

## AMOC Recommendations Component

by

Adaptive Management Oversight Committee

Arizona Game and Fish Department
New Mexico Department of Game and Fish
U.S.D.A. – APHIS, Wildlife Services
U.S.D.A. Forest Service
U.S. Fish and Wildlife Service
White Mountain Apache Tribe

December 31, 2005

Mexican Wolf Blue Range Reintroduction Project

5-Year Review: Recommendations Component

by

Adaptive Management Oversight Committee

Mexican wolf reintroduction in Arizona and New Mexico is conducted under authority of a 1998 Final Rule (USFWS 1998; 63 Fed. Reg. 1752-1772, January 12, 1998) that defines a Mexican Wolf [nonessential] Experimental Population Area (MWEPA). Within the MWEPA, the Reintroduction Project is focused in the Blue Range Wolf Recovery Area (BRWRA) of eastern Arizona and western New Mexico. The Final Rule requires a 5-Year Review to determine whether and how to modify the Reintroduction Project.

Below, the Adaptive Management Oversight Committee (AMOC) presents Recommendations from its 5-Year Review of the Blue Range Reintroduction Project. Recommendations (1) through (14) are offered to the U.S. Fish and Wildlife Service (USFWS) Region 2 Director, for consideration, and to elicit USFWS guidance to AMOC on whether and how to pursue them. Recommendations (15) through (37) are essentially findings that are within AMOC's purview to pursue (though see below, regarding process issues). These Recommendations are guidance and not rules or regulations. They are not legally binding.

Consistent with the existing Final Rule, all these Recommendations identify changes that are intended to (a) facilitate progress toward establishing a viable Mexican wolf population in Arizona-New Mexico, (b) contribute toward rangewide recovery, and (c) accomplish both within the framework of a landscape mosaic of multiple-use public, Tribal Trust, and private lands.

Although AMOC will diligently pursue timely action on these Recommendations, the time-frame and/or content of one or more might need to be adjusted, or AMOC might need to add or delete Recommendations, as necessary to respond to changes in law, regulation, policy, management issues, budget allocations, workloads, acts of nature, etc.

In short, these Recommendations should not be considered etched in stone. AMOC will change them as necessary to adaptively manage the Reintroduction Project, consistent with the Final Rule and a Memorandum of Understanding under which AMOC operates. Any changes, however, would be discussed within AMOC's Adaptive Management Work Group, and vetted through appropriate processes, before they are implemented. Further, all actions undertaken pursuant to these Recommendations and the Standard Operating Procedures (SOPs) referenced therein shall be in full compliance with applicable State, Tribal, and Federal laws, including but not limited to the Endangered Species Act of 1973, as amended.

Also, interested parties should realize that these AMOC Recommendations do not constrain any of the individual AMOC Lead Agencies or Cooperators from advocating agency-specific

positions on each of the relevant issues as AMOC begins moving forward to act on these Recommendations in 2006. If formal agency positions are needed, or desired, they will be developed through the appropriate internal or public processes for each agency, whether that includes Board of Supervisor meetings, Commission meetings, Tribal Council discussions, etc.

Finally, the appropriate Federal, State, and/or Tribal regulatory processes will be used to propose, vet, and reach final decisions on any of the following Recommendations that trigger a requirement for procedural compliance, including review and rulemaking pursuant to the Administrative Procedures Act (APA), Endangered Species Act (ESA), Federal Advisory Committee Act (FACA), National Environmental Policy Act (NEPA), and other applicable State, Tribal, and Federal laws.

Other Abbreviations, Acronyms, and Terms Used Below

AUM: Animal Unit Month – the tenure of one animal unit (AU) for a one-month period (M), or the amount of forage required by one animal unit for one month. Example: an AUM for cattle is typically defined as one mature (1000 lb) cow and her suckling calf grazing for one month. AUMs for other livestock species, such as sheep, are typically calculated via conversion factors as ratios of the cattle AUM. For sheep in Arizona, the conversion factor currently is 5. See the Society for Range Management Glossary for further information.

BRWRA: The existing Blue Range Wolf Recovery Area as designated by the current Final Rule, consisting of the Primary and Secondary Recovery Zones in Arizona and New Mexico and (per a Memorandum of Understanding between the U.S. Fish and Wildlife Service and the White Mountain Apache Tribe) the Fort Apache Indian Reservation in Arizona.

BRWRZ: The future Blue Range Wolf Reintroduction Zone, as it would be defined by proposed changes in the current Final Rule.

Fair Market Value: The price that a seller is willing to accept and a buyer is willing to pay on the open market in an arms-length transaction, meaning the point at which supply and demand intersect (i.e. agreement is reached that results in sale). Methods and resources used to determine fair market value (i.e. compensation value) of animals killed or injured by wolves might include, for example, auction market operators and/or county animal damage committees. In the case of purebred breeding stock, breeders seeking compensation might be required to furnish purchase receipts for the animals damaged, or if raised on a farm or ranch, sale receipts for animals of similar age, weight, and breeding value. Factors to consider when determining fair market value include: a) class and weight of animals; b) stage of production for breeding animals; and c) age.

MWEPA: Mexican Wolf Experimental Population Area.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

    Stakeholders: People and organizations that have a vested or other interest in an issue.

    Tribal Trust Lands: lands set aside by Congress as reserved for governance by a Native American Tribe (i.e. Congressionally allocated reservation lands, as opposed to Tribal lands acquired by fee-simple, purchase, easement, lease, etc.).

<u>Recommendations</u>

1. No later than March 31, 2007, AMOC will use the results of Recommendations (3) through (14), below, to draft a recommended Mexican Wolf Nonessential Experimental Population Rule by which to redefine the MWEPA, including appropriate external and internal (i.e. BRWRZ) boundaries.

2. No later than April 30, 2007, AMOC will submit its recommended Mexican Wolf Nonessential Experimental Population Rule to the USFWS Region 2 Director.

    Note: Recommendations (3) through (14), below address actions undertaken in the course of recommending a new or amend final rule. While that process is underway, all components and requirements of the current Final Rule continue to apply, and the Reintroduction Project shall be conducted in strict accordance with them.

3. AMOC recommends continuing the Reintroduction Project with modifications as outlined below. In other words, AMOC does not recommend terminating the Reintroduction Project.

4. AMOC recommends that any amended or new Mexican Wolf Nonessential Experimental Population Rule drafted in conjunction with Recommendations (1) and (2), above, not include White Sands Missile Range as a Mexican Wolf Recovery Area (i.e. its designation in the current Final Rule) or as a Reintroduction Zone.

5. AMOC will determine, on biological/ecological grounds, and conclude in a written report to the USFWS Region 2 Director no later than June 30, 2006, whether (and, if so, the extent to which) the current MWEPA outer boundaries should be expanded within Arizona-New Mexico to enable the Arizona-New Mexico Mexican wolf population to exist within a metapopulation context consistent with Leonard et al. 2005 and Carroll et al. *in press*. AMOC may convene, if necessary, a technical advisory group of individuals with appropriate expertise to assist with this assessment.

    Note:
    a. The AMOC assessment will also consider other relevant issues, such as: likelihood of expansion area occupancy by wolves dispersing from northerly states or from Mexico; the merits of extending nonessential experimental population status beyond the current boundaries; and estimated costs associated with managing wolves in an expanded area.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review          December 31, 2005

      b.   The technical advisory group, if convened, shall be chaired by an AMOC representative and shall include no more than 15 other members, each with appropriate scientific expertise.

      c.   AMOC will advocate that the MWEPA recommendation constructed under Recommendations (1) and (2), above, allow wolves to disperse from the BRWRZ (see Recommendation [7], below) throughout the MWEPA, subject to management consistent with current Blue Range Reintroduction Project SOPs.

      d.   Any recommendation to amend the existing Final Rule or to create a new Final Rule would ultimately, if acted on by USFWS, be in full compliance with all applicable APA, ESA, FACA, and NEPA requirements.

6.    AMOC will propose, within the context of Recommendation (5), above, that the MWEPA population (management) objective be to establish and maintain a total of at least 100 wolves.

     Note: The Reintroduction Project's population (management) objective is not a recovery goal for delisting the Mexican wolf from the list of threatened and endangered species; an updated recovery goal covering the Blue Range has not yet been determined by a Recovery Team. A population (management) objective of at least 100 wolves is, however, consistent with the Mexican Wolf Recovery Plan (USFWS 1982), Final Environmental Impact Statement (USFWS 1996), and Record of Decision for Mexican wolf reintroduction within the BRWRA of the MWEPA (USFWS 1997).

7.    AMOC will propose, within the context of Recommendation (5), above, combining the current BRWRA Primary and Secondary Recovery Zones, the Fort Apache Indian Reservation, and/or any other appropriate contiguous areas of suitable wolf habitat into a single expanded Blue Range Wolf Reintroduction Zone (BRWRZ) and allowing initial releases and translocations throughout the BRWRZ in accordance with appropriately amended AMOC SOPs 5.0: Initial Wolf Releases and 6.0: Wolf Translocations.

8.    AMOC will propose, within the context of Recommendation (5), above, prohibiting initial releases outside the new BRWRZ, except as necessary to allow latitude for any new Tribal "Statement of Relationship" based agreements with USFWS within the MWEPA that might allow initial releases on Tribal Trust Lands.

9.    AMOC will propose, within the context of Recommendation (5), above, that wolves occurring within the MWEPA (but outside the re-defined BRWRZ) that must be relocated to address nuisance or livestock depredation issues (per AMOC SOP 13.0: Control of Mexican Wolves), may be translocated anywhere within the MWEPA except into the BRWRZ. Conversely, AMOC will also propose, within the context of Recommendation (5), above, that wolves occurring within the BRWRZ that must be relocated to address nuisance or livestock depredation issues (per SOP 13.0) may only be translocated to other areas within the BRWRZ. Regardless, all translocations must be carried out in accordance with AMOC SOP 6.0: Wolf Translocations.

10. AMOC will propose, within the context of Recommendations (5) and (6), above, that States and Tribes be authorized to issue permits, in accordance with an appropriately revised AMOC SOP 13.0: Control of Mexican Wolves, to private individuals and/or their delegated representative(s) to use authorized non-lethal means (e.g. cracker shells, rubber bullets) to harass wolves engaged in nuisance behavior or livestock depredation, or which are attacking domestic pets on private, public, or Tribal Trust lands, and to take (i.e. permanent removal by authorized lethal means) wolves in the act of attacking domestic dogs on private or Tribal Trust lands.

11. AMOC will propose, within the context of Recommendations (5) and (6), above, that, when the MWEPA population (management) objective estimate on December 31 for two sequential years is 125 wolves or more, in each immediately subsequent year the States of Arizona and New Mexico and any Tribal AMOC Cooperators may:
    a. Take (i.e. permanently remove by any authorized means) as many wolves as necessary, above a MWEPA baseline of 125 wolves, to resolve documented wolf nuisance and livestock depredation incidents, consistent with AMOC SOP 13.0: Control of Mexican Wolves;
    b. Issue State or Tribal permits to private individuals to take (i.e. permanently remove by any authorized means) as many wolves as necessary, above a MWEPA minimum baseline of 125 wolves, to resolve documented wolf nuisance and livestock depredation incidents, consistent with AMOC SOP 13.0: Control of Mexican Wolves;
    c. Take (i.e. permanently remove by any authorized means) as many wolves as necessary, above a minimum baseline of 125 wolves, to resolve local unacceptable impacts on native ungulate populations.

    Note: Unacceptable impacts" will be defined in AMOC's recommended Mexican Wolf Nonessential Experimental Population Rule (see Recommendations [1] and [2], above).

12. AMOC will develop, no later than June 30, 2006, a report describing a proposed Federally, State, and/or Tribally-funded incentives program to address known and potential economic impacts of wolf nuisance and livestock depredation behavior on private, public, and Tribal Trust lands. AMOC may convene, if necessary, a technical advisory group of individuals with appropriate expertise to assist with this task. The conservation incentives discussion will consider all relevant livestock depredation issues, including: livestock depredation prevention; livestock depredation response; carcass discovery, monitoring, removal, burial, and/or destruction; and possible adjustment of the Federal grazing (AUM) fee (and any Tribal grazing subsidies) within the MWEPA to provide de facto compensation for documented and likely undocumented losses of livestock. The AMOC report shall also include a thorough evaluation of the effectiveness and procedural efficiency of the Defenders of Wildlife wolf depredation compensation fund, and provide recommendations for appropriate improvements.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

Note:
a. The technical advisory group, if convened, shall be chaired by an AMOC representative and include a maximum of 15 other members, each with appropriate expertise.
b. AMOC as a body will not advocate regulatory changes to address carcass removal or disposal issues (but see Recommendation [12], above, regarding a process by which AMOC will explore possible mechanisms to address this issue).

13. AMOC will convene a stakeholders group to assist AMOC in evaluating, and reporting in writing no later than December 31, 2006, social (human and socioeconomic) implications (including estimated annual livestock depredation losses) for any boundary expansions recommended per Recommendation (5), above.

Note: The stakeholders advisory group will be Co-Chaired by an AMOC representative and an AMWG Cooperator (County) representative, and include a maximum of 50 other members, representing, insofar as is possible, the full spectrum of stakeholders. This group will comply with FACA, if necessary.

14. No later than December 15, 2006, AMOC will complete a detailed plan for another Reintroduction Project Review.

Note: The Reintroduction Project Review will be conducted in 2009-2010 and completed no later than December 31, 2010.

15. AMOC will collaborate on a systems evaluation of all Reintroduction Project databases, to identify in a written report no later than December 31, 2006, recommendations for improving efficiency, reliability, and access relative to Reintroduction Project management information systems.

16. No later than March 1, 2006, AMOC will convene a science and research advisory group. The group will review, on a continuing basis, current and proposed management practices and recommend research priorities for AMOC to advocate to external entities and the cooperating agencies on all aspects of the Reintroduction Project. Review tasks will include, but not be limited to: overall Reintroduction Project effectiveness, statistically reliable wolf survey and population monitoring techniques, wolf population dynamics (demographics), prey base dynamics, total predator loads, seasonal wolf livestock depredation rates, annual wolf impacts on native ungulate populations, prey base monitoring techniques appropriate to determining when prescribed unacceptable levels of impact on native wild ungulates have been met or exceeded, wolf-related disease occurrence and prevention, seasonal livestock depredation rates, prevention and/or remediation of wolf nuisance and livestock depredation problems, livestock husbandry, wolf-related tourism, socioeconomics, and human dimensions.

17. AMOC will refine its annual population (management) objective estimates, including (if possible) developing a statistically valid confidence interval and making use of techniques in

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                    December 31, 2005

addition to telemetric monitoring, and promptly implement any constructive changes in its population estimation methods.

18. AMOC will use its IFT Annual Work Plan process to determine the need for initial releases of wolf packs in Calendar Year 2007 and beyond. Note: Releases of individual wolves as appropriate for management purposes (e.g. enhancing genetic diversity within the wild population) are not affected by this Recommendation.

19. AMOC will maintain all AMOC Reintroduction Project SOPs and continue to require employee compliance with them. Note: herein, "maintain" includes modify, revise, or delete existing SOPs, or add new SOPs, as necessary for purposes of adaptive management.

20. AMOC will make all Reintroduction Project wolf management, outreach, and budget information (redacted as appropriate to protect confidential personal information) available to the public through Annual Reports for the Reintroduction Project, and other publications and outreach materials as appropriate.

21. AMOC will collaborate with the USDA National Wildlife Research Center to complete and report no later than December 31, 2006, an independent evaluation of modified #3 soft-catch traps, McBride #7 traps, and any other live traps considered appropriate or potentially appropriate for capturing Mexican wolves.

22. AMOC will identify no later than June 30, 2006, in a confidential report to USFWS, any law enforcement actions that might help prevent unlawful take of Mexican wolves or help achieve closure on existing active investigations.

23. AMOC will direct Reintroduction Project-related outreach efforts in 2006 through the IFT Annual Work Plan to identify and reach specific target audiences, with emphasis on local communities and cooperating agencies within the BRWRA (>75% of outreach activity) and outside the BRWRA (<25% of outreach activity).

24. AMOC will ensure that all Reintroduction Project-related outreach activities emphasize wolf conservation and management as an integrated component of the social (human) as well as the ecological landscape, and provide a balanced, objective perspective on positive and negative aspects of wolves as ecosystem components in a multiple-use landscape of intermingled public, private, and Tribal Trust lands.

25. AMOC will collaborate with State and Tribal wildlife agencies to obtain updated abundance and distribution information for deer and elk populations every two years for each Game Management Unit in the BRWRA, and for as much of the rest of the wolf-occupied MWEPA as feasible.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review                December 31, 2005

26. AMOC will recommend, through IFT Annual Reports, or a special report updated each year, wolf-related habitat enhancements that can be accomplished through private property incentives programs and Federal, State, Tribal, and County agency planning processes.

27. No later than June 30, 2006, AMOC will review the USFWS Recovery Protocols for pre-release husbandry in captive-breeding facilities and on-site acclimation pens, and advise USFWS as to whether AMOC believes they are adequate to maximize post-release survival and breeding success.

28. No later than December 15, 2007, AMOC and the IFT will identify training recommendations to build and enhance administrative, project management, supervisory, communication, and technical skills and knowledge as appropriate to each staff member's job functions within the Reintroduction Project.

29. AMOC will advocate creating an IFT position in the Alpine field office to work with cooperators and stakeholders throughout Arizona and New Mexico on proactive measures by which to avoid or minimize wolf nuisance and livestock depredation problems. Note: AMOC as a body will not advocate regulatory changes to address carcass removal or disposal issues (but see Recommendation [12], above, regarding a process by which AMOC will explore possible mechanisms to address this issue).

30. AMOC will collaborate with an appropriate entity to complete an IFT staffing needs assessment no later than June 30, 2007, based on (a) Reintroduction Project experience to date and (b) the Arizona-New Mexico Mexican Wolf Nonessential Experimental Population Rule recommended to USFWS per Recommendations (1) and (2), above.

31. AMOC will advocate creating sufficient IFT positions in each Lead Agency as appropriate to implement the staffing needs assessment conducted pursuant to Recommendation (30), above. AMOC will also recommend that at least one IFT member from each Lead Agency be stationed in the Alpine field office, to facilitate and enhance interagency communication and cooperation.

32. AMOC will collaborate with an independent entity to identify all information needs (e.g. data types and sample sizes) for a statistically valid habitat/population viability analysis for the BRWRZ wolf population to be conducted and completed in Calendar Year 2010.

33. AMOC will recommend to USFWS completion of a Mexican Wolf Recovery Plan no later than June 30, 2007.

34. AMOC will maintain and improve administrative and adaptive management processes for the Reintroduction Project to enhance meaningful opportunities for, and participation by, the full spectrum of stakeholders and interested parties. AMOC efforts will include meeting with the IFT twice each year at the Alpine field office, and offering to meet once each year with the Commission or Board of Supervisors for each County within the BRWRA.

Mexican Wolf Blue Range Reintroduction Project 5-Year Review          December 31, 2005

35. AMOC will continue to advocate a clear and appropriate distinction between the AMOC-managed Blue Range Reintroduction Project and the USFWS-managed Mexican Wolf Recovery Program.

36. Concomitant with any recommended MWEPA Rule changes pursuant to Recommendations (1) and (2), above, AMOC recommends that State and Tribal Lead Agencies and non-Federal Cooperators make a contingent-obligation request for annual Congressional line item allocations sufficient to cover all aspects of AMOC and AMWG participation in NEPA processes and ESA-related rulemaking processes required by such activities, through to the Record of Decision.

37. AMOC recommends that no later than April 30, 2006, AMOC State and Tribal Lead Agencies and non-Federal Cooperators complete and deliver to Congress a funding request that is sufficient to fully staff and equip the Reintroduction Project as of October 1, 2006, at levels commensurate with all on-the-ground responsibilities in all areas of responsibility, including wolf management (including control), enforcement, outreach (including establishing a Mexican wolf education center in Hon-Dah Arizona), citizen participation in adaptive management, Reintroduction Project-related research, and landowner incentives.

Literature Cited

Carroll, C., M.K. Phillips, C.A. Lopez Gonzalez, and N.A. Schumaker. *In press*. Defining recovery goals and strategies for endangered species: the wolf as a case study. BioScience 56(1):1-13.

U.S. Fish and Wildlife Service. 1982. Mexican wolf recovery plan. U.S. Fish and Wildlife Service, Albuquerque, New Mexico. 115 pages.

_____. 1996. Final environmental impact statement: reintroduction of the Mexican wolf within its historic range in the southwestern United States. U.S. Fish and Wildlife Service, Albuquerque, New Mexico.

_____. 1997. Notice of record of decision and statement of findings on the environmental impact statement on reintroduction of the Mexican gray wolf to its historic range in the southwestern United States. U.S. Fish and Wildlife Service, Albuquerque, New Mexico. 21 pages.

_____. 1998. Establishment of a nonessential experimental population of the Mexican gray wolf in Arizona and New Mexico. Federal Register 63: 1752-1772.

Document MW 5YR Recommendations.20051231.Final.doc

Civ. Action No. 06-2119 (RCL)

Attachment 3

# MEXICAN WOLF RECOVERY: THREE-YEAR PROGRAM REVIEW AND ASSESSMENT[1]

*Prepared by the Conservation Breeding Specialist Group (CBSG), Apple Valley, Minnesota; for the United States Fish and Wildlife Service, Albuquerque, New Mexico:*

PAUL C. PAQUET
UNIVERSITY OF CALGARY &
CONSERVATION SCIENCE INC.

JOHN A. VUCETICH
MICHIGAN TECHNOLOGICAL UNIVERSITY

MICHAEL K. PHILLIPS
TURNER ENDANGERED SPECIES FUND

LEAH M. VUCETICH
MICHIGAN TECHNOLOGICAL UNIVERSITY

Conservation Breeding Specialist Group
12101 Johnny Cake Ridge Road
Apple Valley, MN   55124-8151
tel: 1-952-997-9800
e-mail: office@cbsg.org
June  2001

---

[1] **Recommended Citation:** Paquet, P. C., Vucetich, J., Phillips, M. L., and L. Vucetich.  2001.  Mexican wolf recovery: three year program review and assessment.  Prepared by the Conservation Breeding Specialist Group for the United States Fish and Wildlife Service.  86 pp.

# ACKNOWLEDGMENTS

We thank Onnie Byers and Linda Phillips for their help in preparing this document.  Wendy Brown, Daniel Groebner, and Brian Kelley promptly provided the biological information necessary for our review.  We are particularly grateful to the Interagency Field Team,  Interagency Management Advisory Group, and David Parsons for advising us about the details of the Mexican wolf reintroduction program.  Lastly, we thank the San Carlos Apache Nation for hosting a meeting with individuals and organizations involved with reintroduction of Mexican wolves.

# TABLE OF CONTENTS

ACKNOWLEDGMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -i-

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -ii-

LIST OF FIGURES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -v-

LIST OF TABLES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -vii-

1.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 1 of 85

2.     ISSUES FOR WHICH ASSESSMENTS WERE REQUESTED . . . . . . . Page 2 of 85

3.     OUR APPROACH . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 3 of 85

4.     ECOLOGICAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 5 of 85
       a.     RESILIENCY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 5 of 85
       b.     THE PERILS OF SMALL POPULATIONS . . . . . . . . . . . . . . . . . . . Page 6 of 85
       c.     USE OF HABITAT AND PATTERNS OF TRAVEL . . . . . . . . . . . Page 6 of 85
       d.     INFLUENCE OF WOLVES ON THE BIOLOGICAL COMMUNITY
              . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 6 of 85
       e.     RESPONSE OF WOLVES TO HUMAN ACTIVITIES . . . . . . . . . . Page 8 of 85
       f.     HUMAN INFLUENCE ON HABITAT USE BY WOLVES . . . . . . . Page 10 of 85
       g.     RESPONSE OF WOLVES TO LINEAR DEVELOPMENTS . . . . . Page 11 of 85

5.     HAVE WOLVES SUCCESSFULLY ESTABLISHED HOME RANGES WITHIN
       THE DESIGNATED WOLF RECOVERY AREA? . . . . . . . . . . . . . . . . Page 14 of 85
              a.     BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 14 of 85
              b.     DATA SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 14 of 85
              c.     METHODS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 14 of 85
              d.     RESULTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 15 of 85
              e.     CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 23 of 85

6.     HAVE REINTRODUCED WOLVES REPRODUCED SUCCESSFULLY IN THE
       WILD? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 24 of 85
              a.     BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 24 of 85
              b.     DATA SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 24 of 85
              c.     METHODS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 24 of 85
              d.     RESULTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 24 of 85
              e.     CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 27 of 85

7.     IS WOLF MORTALITY SUBSTANTIALLY HIGHER THAN PROJECTED IN THE
       EIS? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 28 of 85

|   | a. | BACKGROUND | Page 28 of 85 |
|   | b. | DATA SUMMARY | Page 29 of 85 |
|   | c. | METHODS | Page 29 of 85 |
|   | d. | RESULTS | Page 30 of 85 |
|   | e. | CONCLUSIONS | Page 33 of 85 |

**8.    IS POPULATION GROWTH SUBSTANTIALLY LOWER THAN PROJECTED IN THE EIS?** .......................................................... Page 34 of 85

|   | a. | BACKGROUND | Page 34 of 85 |
|   | b. | DATA SUMMARY | Page 34 of 85 |
|   | c. | METHODS | Page 34 of 85 |
|   | d. | RESULTS | Page 35 of 85 |
|   | e. | CONCLUSIONS | Page 44 of 85 |

**9.    ARE NUMBERS AND VULNERABILITY OF PREY ADEQUATE TO SUPPORT WOLVES?** ........................................................ Page 45 of 85

|   | a. | BACKGROUND | Page 45 of 85 |
|   | b. | DATA SUMMARY | Page 46 of 85 |
|   | c. | METHODS | Page 46 of 85 |
|   | d. | RESULTS | Page 47 of 85 |
|   | e. | CONCLUSIONS | Page 51 of 85 |

**10.   HAS THE LIVESTOCK DEPREDATION CONTROL PROGRAM BEEN EFFECTIVE?** ........................................................... Page 52 of 85

|   | a. | BACKGROUND | Page 52 of 85 |
|   | b. | DATA SUMMARY AND METHODS | Page 52 of 85 |
|   | c. | RESULTS | Page 52 of 85 |
|   | d. | CONCLUSIONS | Page 54 of 85 |

**11.   HAVE DOCUMENTED CASES OF THREATS TO HUMAN SAFETY OCCURRED?** ........................................................... Page 55 of 85

|   | a. | DATA SUMMARY AND METHODS | Page 55 of 85 |
|   | b. | RESULTS | Page 55 of 85 |
|   | c. | CONCLUSIONS | Page 59 of 85 |

**12.   OVERALL CONCLUSIONS AND RECOMMENDATIONS** ........ Page 60 of 85

|   | a. | PREFACE | Page 60 of 85 |
|   | b. | CONCLUSIONS | Page 60 of 85 |
|   | c. | RECOMMENDATIONS | Page 61 of 85 |
|   |    | **Biological and Technical Aspects** | Page 61 of 85 |
|   |    | **Valuational and Organizational Aspects** | Page 64 of 85 |

**BIBLIOGRPAHY AND LITERATURE CITED** ........................ Page 69 of 85

-iii-

# LIST OF FIGURES

**Figure 1**.  Summary of Mexican wolf radio telemetry data, 1998-2001. . . . . . . . . . Page 17 of  85

**Figure 2**.  Monthly radio-telemetry locations of reintroduced Mexican wolves, Arizona, 1998-2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 17 of  85

**Figure 3**. Many  telemetry locations resulted from data entry errors.  For example,  numerous locations were in the state of California and in the Gulf of California.  . . . . Page 18 of  85

**Figure 4**.  Variation among wolf packs in the proportion of telemetry locations within the primary zone and within the recovery area (Apache/Gila N.F.).  These data include all telemetry locations of reintroduced Mexican wolves from 3 March 1998 to 3 March 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 19 of  85

**Figure 5**.  Temporal trends in the proportion of telemetry locations (pooled across all packs) within the primary zone (Apache N.F.) and within the recovery area (Apache/Gila N.F.). These data include all telemetry locations of reintroduced Mexican wolves from 3 March 1998 to 3 March 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 19 of  85

**Figure 6**.  Approximate area occupied by free- ranging Mexican wolf population in Arizona and New Mexico, 1998-2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 20 of  85

**Figure 7**.  Density of free-ranging Mexican wolf population in Arizona and New Mexico, 1998-2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 20 of  85

**Figure 8**.  Seasonal distribution of free-ranging Mexican wolf population in Arizona and New Mexico, 1998-2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 21 of  85

**Figure 9**.  Polygons reflecting the spatial extent of pack home ranges in relation to the primary zone (Apache N.F.) And recovery area (Apache/Gila N.F.).  These data include all telemetry locations of reintroduced Mexican wolves from 03 March 1998 to 03 March 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 22 of  85

**Figure 10**.  Projected numbers of breeding pairs (in the EIS) and actual numbers of litters for reintroduced Mexican wolves, 1998-2001. . . . . . . . . . . . . . . . . . . . . . . . Page 26 of  85

**Figure 11**.  Actual and projected numbers of recruits for reintroduced Mexican wolves, 1998-2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 26 of  85

**Figure 12**.  Causes of wolf mortality for Mexican wolves reintroduced to Arizona, 1998-2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 31 of  85

**Figure 13**.  Cause specific wolf mortality for Mexican wolves reintroduced to Arizona, 1998-2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 31 of  85

**Figure 14**.  Survival analysis of reintroduced Mexican wolf population assuming that recapture represents a mortality event.  Analysis was conducted for the period 1998-2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 32 of  85

**Figure 15**.  Survival analysis of reintroduced Mexican wolf population assuming that recaptures do not represent a mortality event.  Analysis was conducted for the period 1998-2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 32 of  85

**Figure 16**.  Projected and actual annual growth rates of free-ranging Mexican wolf population. Actual growth rate is strongly influenced by frequent intervention.  . . . . . . . Page 36 of  85

**Figure 17**.  Projected and actual sizes of free-ranging Mexican wolf population, 1998-2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 37 of  85

**Figure 18**.  Number of free-ranging radiocollared Mexican  wolves, 1998-2001.  The difference

between the max and min accounts for 4 wolves whose signals were lost, and in one case, a wolf that threw its collar. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 38 of 85

**Figure 19**. Growth rates of other recovering wolf populations.  Sources: <http://www.r6.fws.gov/wolf/annualrpt99/> and unpublished documents from JAV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 39 of 85

**Figure 20**. Mean annual growth rate for other recovering populations. . . . . . . . . . Page 40 of 85

**Figure 21**. Number of wolves over time in other recovering  populations. . . . . . . . Page 40 of 85

**Figure 22**. Mean onthly growth rate (*r*) since March 1998.  The expected value of *r* is 0.02.  The standard error is 0.07.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 42 of 85

**Figure 23**. Mean monthly growth rate (*r*) since December 1998 (when population went temporarily extinct).  The expected value of *r* is 0.06.  The standard error is 0.08. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 43 of 85

**Figure 24**. Because of frequent interventions the vital rates we derived (survival and population growth) are unlikley to reflect the population's future viability.  A balance between intervention and the effects of natural population processes is needed. . . . . Page 44 of 85

**Figure 25**. Prey (n = 55) probably killed by reintroduced Mexican wolves, 1998-2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 48 of 85

**Figure 26**. Potential number of wolves that, in theory, could occupy target objective of 12,950 km² (5,000 mi²) within the Blue River Wolf Recovery Area.  Estimates are based on prey biomass available to wolves and are maximum numbers.  The individual contribution of ungulate prey species is shown for comparison with other studies. . . . . . . . Page 49 of 85

**Figure 27**. The number of livestock-wolf interactions fluctuated seasonally in the primary recovery zone. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 53 of 85

# LIST OF TABLES

**Table 1.**  Known births and recruitments of reintroduced Mexican wolves recorded from 1998-2001.  Only 1 litter was conceived in the wild. . . . . . . . . . . . . . . . . . . . . . . . Page 25 of  85

**Table 2.**  Population events recorded for reintroduced Mexican wolf population between 1998 and 2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 35 of  85

**Table 3.**  Potential wolf numbers (ranges) for recovery areas based on predicted population densities of . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 50 of  85

**Table 4.**  Numbers of domestic animal injuries and deaths due to wolf depredation.  The data are for confirmed, probable and unconfirmed wolf depredations. . . . . . . . . . . . Page 53 of  85

**Table 5.**  Ownership of property where domestic animal injuries and death due to wolves took place.  The data are for confirmed, probable, and unconfirmed  wolf depredations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 53 of  85

**Table 6.**  Summary of wolf-human interactions reported for the Mexican wolf reintroduction program, 1998-2001. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 56 of  85

**Table 7.**  Biological criteria for measuring project success of Mexican wolf reintroduction at about 5 and 10 years following completion of reintroduction phase.  If the evaluation falls between failure and success, the viability of the population should be classified as uncertain.  These guidelines follow the Red List Categories (IUCN 1994: www.iucn.org/themes/ssc/redlists/ssc-rl-c.htm) . . . . . . . . . . . . . . . . . . . . . Page 63 of  85

# 1.    INTRODUCTION

Herein we assess the progress of efforts to reestablish Mexican wolves *(Canis lupus baileyi)* in the Blue Range Wolf Recovery Area (BRWRA).  This review is a direct result of an Environmental Impact Statement (EIS) concluded by the U.S. Fish and Wildlife Service (USFWS) in 1996 (U.S. Fish and Wildlife Service 1996).  The EIS and associated final rule (Parsons 1998) call for the USFWS to reestablish Mexican wolves to the BRWRA.  The recovery area encompasses 17,752 km² (6,854 mi²) of the Apache National Forest in southeastern Arizona and the Gila National Forest in southwestern New Mexico.

Specifically, the U.S. Department of Interior has authorized the USFWS to reintroduce about 15 wolves every year for 3 to 5 years in the BRWRA primary recovery zone.  The primary recovery zone comprises about 2,664 km² (1,029 mi²) of the Apache National Forest (Groebner *et al*. 1995).  The remainder of the Apache National Forest and all the Gila National Forest make up the secondary recovery zone.  The USFWS may conduct re-releases in the secondary recovery zone and wolves that move from the primary recovery zone can inhabit the secondary zone.

The USFWS began reintroductions with the release of 11 wolves in March 1998.  From then until March 2001 the USFWS released another 45 individuals on 61 occasions.  An Interagency Field Team comprising employees from the USFWS, Wildlife Services (U.S. Department of Agriculture), Arizona Department of Game and Fish, and New Mexico Department of Game and Fish carried out the releases and associated fieldwork

The final rule governing the reintroduction project (Parsons 1998) and the 1998 Mexican Wolf Interagency Management Plan both require the USFWS to conduct a comprehensive review of the project at the end of the third year (i.e., March 2001).  The full evaluation must include recommendations regarding continuation, modification, or cancellation of the reintroduction effort.  If appropriate, the evaluation may include  recommendations on whether and how to use the White Sands Wolf Recovery Area.

The primary goal of the reintroduction effort is to restore a self-sustaining population of about 100 wild Mexican wolves distributed over 12,950 km² (5,000 mi²) of the BRWRA.  Such an objective is consistent with the 1982 Mexican Wolf Recovery Plan (U.S. Fish and Wildlife Service 1982 (EIS).  The 1998 Mexican Wolf Interagency Management Plan projects that about 9 years will be required to achieve this objective.  Wolves in the BRWRA are to be managed to reduce negative impacts and maximize positive influences on the lifestyles and economy of local residents.

The USFWS contacted the Conservation Breeding Specialist Group (CBSG) to conduct the specified  review.  CBSG is ideally suited for the task because of extensive worldwide experience with small population restoration, conservation, and management.  On behalf of CBSG, Paul Paquet assembled an expert review team composed of John Vucetich, Michael Philips, and Leah Vucetich.  The team review is based on data provided by the USFWS data collected in the first 3 years of the reintroduction project.

## 2. ISSUES FOR WHICH ASSESSMENTS WERE REQUESTED

Our assessment addresses the following questions as outlined by the 1998 Mexican Wolf Interagency Management Plan.

▸ Have wolves successfully established home ranges within the designated wolf recovery area?
▸ Have reintroduced wolves reproduced successfully in the wild?
▸ Is wolf mortality substantially higher than projected in the EIS?
▸ Is population substantially growth lower than projected in the EIS?
▸ Are numbers and vulnerability of prey are adequate to support wolves?
▸ Is the livestock depredation control program effective?
▸ Have documented cases of threats to human safety occurred?

We were not asked to address the following 2 additional questions identified in the 1998 Mexican Wolf Interagency Management Plan:

▸ Is effective cooperation occurring with other agencies and the public?
▸ Are combined agency funds and staff adequate to carry out needed management, monitoring and research?

# 3.    OUR APPROACH

Although a paucity of data compels us to speculate on many biological issues, we do so using the best available information about wolf ecology. The lack of information reflects the short time the Program has been underway. Where necessary and appropriate we infer from published studies conducted elsewhere, our own experiences, and the experience of other researchers and managers. Throughout the report, we are careful to distinguish fact from inference, speculation, and professional opinion. Our conclusions and recommendations reflect our current knowledge and the fundamental principles of Conservation Biology.

Conclusions and recommendations depend on the likelihood of the assumptions underlying the assessment. Therefore, we reviewed several principles of conservation biology, which apply to restoring and maintaining a viable population of wolves. Some of these principles are established generalizations, some are testable hypotheses, and others are practical guides that we assessed as important in developing our recommendations.

- The fewer data or more uncertainty involved, the more conservative conclusions must be
- To be comprehensive, an assessment must be concerned with multiple levels of biological organizations and with many different spatial and temporal scales.
- Species well distributed across their native range are less susceptible to extinction than species confined to small portions of their range.
- Large blocks of habitat containing large populations of a target species are superior to small blocks containing small populations.
- Maintaining viable ecosystems is usually more efficient, economical, and effective than a species by species approach.
- Viability of wild populations depends on the maintenance of ecological processes.
- Human disturbances that mimic or simulate natural disturbances are less likely to threaten restoration efforts than disturbances radically different from the natural regime.

We note that how we measure and perceive the success or failure of wolf recovery is contextual. Accordingly, our focus is on wolf ecology and how the quality of management affects the persistence of the reintroduced Mexican wolf population. Specifically, we are concerned with the viability of the population as affected by habitat quality, population size, population isolation, and agency management. Although a viable wolf population could affect people's lives and the economy, we do not consider social and economic issues in this report.

Finally, our protocol for assessment was to:
- Review pertinent scientific literature
- Use available data provided by the Interagency Field Team
- Review pertinent regulations, polices, and rules
- Evaluate data quality
- Identify data gaps
- Analyze and interpret data
- Compare progress with program goals
- Evaluate program success & failures

‣          Develop data collection, data management & conservation recommendations

# 4.    ECOLOGICAL BACKGROUND

a.    RESILIENCY

Resilience has been defined as the ability to absorb disturbance and still maintain the same relationship between populations or state variables (Holling 1973) and the degree to which an entity can be changed without altering its minimal structure (Pickett *et al*. 1989). Thus, resilience can be thought of as a property of a system, whereas persistence is the outcome (Weaver *et al*. 1996).

Wolves evolved in environments that included prevailing disturbance regimes with certain ecological characteristics and boundary conditions. Disturbance varied in frequency, duration, extent, and intensity, thereby resulting in different spatio-temporal patterns of change. Behaviors and life history traits conferred resilience that enabled wolves to absorb these intrinsic disturbances and persist. Modern humans, however, have presented new regimes of disturbance that could be considered exotic because they are qualitatively novel or quantitatively atypical.

Three mechanisms of resilience at different hierarchical levels are: individual - plasticity in foraging behavior that ameliorates flux in food availability; population - demographic compensation that mitigates increased exploitation; and metapopulation dispersal - that provides functional connectivity among fragmented populations. Accordingly, flexible food habits, high annual productivity, and dispersal capabilities enable wolves to respond to natural and human-induced disturbances (Weaver *et al*. 1996). However, environmental disturbances at various temporal and spatial scales may exceed the ability of wolves and systems that support them to absorb disturbance (Weaver *et al*. 1996).

Wolves display remarkable behavioral plasticity in using different prey and habitats (Mech 1991). They are able to substitute one resource for another in the face of environmental disturbance (Weaver *et al*. 1996). Specifically, wolves specialize on vulnerable individuals of large prey [elk (*Cervus elaphus*) and moose (*Alces alces*)] yet readily generalize to common prey [usually deer (*Odocoileus sp.*)] (Weaver *et al*. 1996).

Wolf populations are able to compensate demographically for excessive mortality. Under certain circumstances this compensation enables wolves to respond to increased rates of juvenile or adult mortality with increased reproduction and/or survival, thereby mitigating demographic fluctuations (Weaver *et al*. 1996). Dominant wolves are able to reproduce at a very young age and usually reproduce every year thereafter (Weaver *et al*. 1996). Age at reproductive senescence has not been well documented but few females survive to reproduce past age 9 (Mech 1988). Wolves also display remarkable ability to recover from exploitation. For example, during a wolf reduction program in the Yukon, wolves recovered to pre-reduction densities within 5 years (Hayes and Harestad 2000). Wolves immigrated into the study area during early recovery, followed by increases in pack size from reproduction (Hayes *et al*. 2000).

The final mechanism that confers resilience to wolf populations is dispersal. When dispersal is successful, vanishing local populations are rescued from extirpation (Brown and Kodric-Brown 1977) and functional connectivity of metapopulations is established (Hansson 1991). Wolves have tremendous dispersal capabilities and as a result, "connectivity" of populations can be high. Dispersing wolves typically establish territories or join packs within 50-100 km of the pack in which they were born (Fritts and Mech 1981, Fuller 1989, Gese and Mech

Case 1:06-cv-02119-RCL     Document 12-5     Filed 04/26/2007     Page 14 of 93

1991, Wydeven *et al*. 1995, Boyd *et al*. 1996). Some wolves, however, move longer distances. For example, Fritts (1983) observed a wolf that traveled at least 917 km.

      b.      THE PERILS OF SMALL POPULATIONS

      Small populations, because of random normal variability in demographics, are more likely to become extinct than larger populations (Schonewald-Cox *et al*. 1983). Moreover, these small populations are thought to be vulnerable because of deleterious effects of inbreeding (Wright 1977) and chance environmental disturbances such as forest fires, disease or infestations that affect a species or its prey (Franklin 1980). In theory, the interaction of these factors increases the probability of extinction (Shafer 1987).

      Small insular populations may have a restriction of genetic variation because they represent a very small subset of the total population (i.e., a few individuals). As populations become smaller a further reduction in genetic variation results in decreased survival (i.e., increased mortality). Increased mortality leads to additional reduction in genetic variation resulting in an "extinction vortex." Biologists theorize that because of this self-amplifying cycle the rate of extinction for small populations is higher than predicted from the population size alone (cf. Caro and Laurenson 1994).

      c.      USE OF HABITAT AND PATTERNS OF TRAVEL

      Throughout its broad geographical distribution the gray wolf is considered an ecosystem and prey generalist. However, populations are adapted to local conditions and are, therefore, specialized concerning den site use, foraging habitats, and prey selection. In mountain regions, the effects of physiography, weather, prey distribution, and prey abundance combine to concentrate activities of wolves into forested valley bottoms (Paquet 1993, Paquet *et al*. 1996, Paquet *et al*. 1996, Weaver 1994, Singleton 1995, and others).

      Elevation can also govern seasonal movements of wolves. In mountainous areas with high snowfall, use of low elevation valleys increases during winter, where frozen rivers and lakes, shorelines, and ridges are preferred because of ease of travel. Ski trails, snowmobile trails, graded roads, and packed roads can artificially enhance the range and efficiency of winter forays (Paquet 1993). Singleton (1995) has suggested that variation in pack size, variation in home range size, and interactions with sympatric predators may influence habitat use and travel patterns. He further speculated that turning frequency or travel route complexity are likely to vary depending on whether an animal is within a patch of concentrated resource availability (e.g., deer winter ranges), moving between known patches, or exploring new areas.

      d.      INFLUENCE OF WOLVES ON THE BIOLOGICAL COMMUNITY

      Generally we understand that the ecology of predators, prey, and scavengers, is intertwined. However, the details of these relationships, and the general role of predation in shaping the structure of ecological communities is poorly understood. Changes in predator-prey relationships may affect species other than wolves and their prey. Disruption of top predators can affect interspecific associations by disrupting relationships within food webs. This, in turn, may cause unanticipated ripple effects in populations of other species (Paine 1966, 1969, 1980; Terborgh and Winter 1980, Frankel and Soulé 1981, Wilcox and Murphy 1985, Wilcove *et al*. 1986, Valone and Brown 1995), which markedly alter the diversity and composition of a

community (Paine 1966). Multi species effects often occur when changes in a third species mediate the effect of one species on a second species (or analogous higher-order interactions). For example, a wolf can affect a grizzly bear (*Ursus arctos*) by reducing the availability of a limiting resource (possibly an ungulate). Also a secondary carnivore such as a coyote (*C. latrans*) can affect the degree to which a herbivore's lifestyle is influenced by a primary carnivore such as a wolf. Ecologists have only begun to develop theory that attempts to explain the coexistence of prey in terms of predator-influenced niches ("enemy-free space").

Terborgh and Winter (1980) noted that we know little about the loss of top carnivores in terrestrial environments, and predicted a wave of extinctions following the loss of any key species. For example, if species interact as competitors, as predator and prey, or as facilitators in successional processes, then the presence of one species may influence the extinction probability of another "linked" species.

Recent evidence suggests the importance of cascading trophic interactions on terrestrial ecosystem function and processes. Research has documented differences within systems from which large predators have been removed or are missing (Glanz 1982, Emmons 1984, Terborgh 1988, Leigh *et al.* 1993, Terborgh *et al.* 1999). Accordingly, the ecosystem impacts of wolves may be more profound than previously expected. For example, on Isle Royale, Michigan wolf predation on moose has been shown to influence positively biomass production in trees of boreal forest (McLaren and Peterson 1994). Growth rates of balsam fir (*Abies balsamea*) were regulated by moose (*Alces alces*) density, which in turn was controlled by wolf predation (McLaren & Peterson 1994). When the wolf population declined for any reason, moose reached high densities and suppressed fir growth. This top-down "trophic cascade" regulation is apparently replaced by bottom-up influences only when stand-replacing disturbances such as fire or large windstorms occur at times when moose density is already low (McLaren & Peterson 1994). This is strong evidence of top-down control of a food chain by wolves (Terborgh *et al.* 1999). Research elsewhere suggests elk (*Cervus elaphus*) populations not regulated by large predators affect negatively the growth of aspen (*Populus tremuloides*) (Kay 1990, Kay and Wagner 1994, White *et al.* 1992, D. Smith pers. comm.), though information remains equivocal (L. Morgantini pers. comm.).

In addition to the obvious interactions between wolves and prey, wolves provide a regular supply of carrion to scavengers. Less obvious community dynamics might include the relationships between different predators, and how wolves influence these relationships. For example, how do wolves modify the relationships between coyotes and foxes?

Interest in the role of wolves in the broader ecosystem is not new. From 1939-1944 Adolf Murie (1944) conducted field studies in Denali Park Alaska to determine "...the ecological picture centering about the wolf of Mount McKinley National Park". Here, he entertained questions about the relationships between park wolves and other wolves, between wolves and their prey, and between wolves and other predators. Few studies, however, are available to yield insights into many of the relationships between wolves and other ecosystem components.

e.     RESPONSE OF WOLVES TO HUMAN ACTIVITIES

The seriousness of human disturbance is ultimately a human judgement and, as such, some may consider any alteration of the normal activities of wolves to be undesirable. The ecological issue is how the probability of persistence changes with habitat degradation, small population size,

and population isolation.  The management issue is what probability of persistence and environmental quality is compatible with legislation and acceptable to society.  Interpretation of the wolf-human interaction is confounded by multiple factors that influence how wolves use the landscape and react to people (Mladenoff *et al*. 1995, L. Boitani pers. comm., L.  Carbyn pers. comm., E.  Zimen pers. comm.).  Because of the wolf's inherent behavioural variability, it is unlikely that all wolves react equally to human induced change.  Moreover, many extraneous factors contribute to variance in behaviour of individual wolves.  Because we have developed no reasonable expression of those differences, assessments are usually applied at the pack and population levels.

The specific conditions in which wolves are 'disturbed' (i.e., distribution, movements, survival, or fecundity are impaired) are believed to be highly variable.  The extent and intensity of disturbance appear to vary with environmental and social context, and the individual animal (L. Boitani pers. comm.).  Though wolves are sensitive to human predation and harassment (Thiel 1985, Jensen *et al*.  1986, Mech *et al*.  1988, Fuller 1989, Mech 1989, Purves *et al*. 1992, Fuller *et al*. 1992, Mech 1993, Mech 1995, Thurber *et al*. 1994, Mladenoff *et al*. 1995. Paquet *et al.* 1996), we have limited empirical information on tolerance to indirect human disturbance.  Several studies suggest the main factor limiting wolves where they are present and tolerated by humans is adequate prey density (Fuller *et al*. 1992).  Although human activities have been shown to influence the distribution (Thiel 1985, Fuller *et al*. 1992, Paquet 1993, Mladenoff *et al.* 1995) and survival of wolves (Mech *et al.* 1995, Mladenoff *et al.* 1995, Paquet 1993. Paquet *et al.* 1996), human-caused mortality is consistently cited as the major cause of displacement (Fuller *et al*. 1992, Mech and Goyal 1993, and others).

Studies that have quantified wolf/human interactions have shown wolves avoid humans or are displaced via human induced mortality (Paquet *et al.* 1996).  Avoidance is temporal (Boitani 1982) and spatial (Mladenoff *et al*. 1995, Paquet *et al.* 1996).  Several studies that used road densities as an index of human influence concluded that human activities associated with roads affect the survival and behaviour of wolves.  Interpretation, however, was confounded because many human activities associated with roads result in the death of wolves.  Thus, absence of wolves in an area may not be the result of behavioural avoidance per se.  Data from Ontario, Wisconsin, Michigan, and Minnesota suggest that wolf survival is usually assured at road densities below 0.58 and 0.70 km/km² (Thiel 1985,  Jensen *et al*. 1986, Mech *et al*. 1988, Fuller 1989, Mech 1989, Fuller *et al*. 1992).  A study in Alaska concluded that wolves avoid heavily used roads and areas inhabited by humans, despite low human caused wolf mortality (Thurber *et al.* 1994).  Landscape level analysis in Wisconsin found mean road density was much lower in pack territories (0.23 km/km² in 80% use area) than in random non pack areas (0.74) or the region overall (0.71).  Few areas of use exceeded a road density of >0.45 km/km² (Mladenoff  *et al.* 1995).

Recent reports suggest wolves in Minnesota tolerate higher levels of disturbance than previously thought possible.  Wolves, for example, are now occupying ranges formerly assumed to be marginal because of prohibitive road densities and high human populations (Mech 1993, Mech 1995).  Legal protection and changing human attitudes are cited as the critical factor in the wolf's ability to use areas that have not been wolf-habitat for decades.  If wolves are not killed, they seem able to occupy areas of greater human activity than previously assumed (Mech 1993, Fuller

*et al*. 1992).  Based on these observations, Mech (1995, p. 275) comments that misconceptions about the wolf's inherent ability to tolerate human activity encourage unwarranted protection.

Nonetheless, wolves in Minnesota continue to avoid populated areas, occurring most often where road density and human population are low (Fuller *et al*. 1992).[2]  Moreover, the fact that wolves are using areas of greater human activity suggests dispersers or marginalised individuals are being pushed into suboptimal habitat. More suitable and safe habitat may be saturated by dominant animals or packs.  This supports the idea that wolves occupy habitat closer to humans only if necessary. A similar phenomenon has been shown in grizzly bears (D. Mattson *et al*. 1987, Mattson pers. Comm.) and many avian species.

We are aware of only 4 studies that have systematically and explicitly examined human population density and wolf distribution.  In all studies, the absence of wolves in human dominated areas may have reflected high levels of human caused mortality, displacement resulting from behavioural avoidance, or some combination of both.  All were conducted at a landscape scale and assessed population or pack level responses of wolves to humans.  In Wisconsin, human population density was much lower in pack territories than in non pack areas.  Wolf pack territories also had more public land, forested areas with at least some evergreens, and lower proportions of agricultural land.  Notably, no difference was detected between white-tailed deer (*Odocoileus virginianus*) densities in pack territories and non pack areas.  Overall, wolves selected those areas that were most remote from human influence (Mladenoff  *et al*. 1995) using areas with fewer than 1.54 humans/km² and less than 0.15 km roads/km².  Most wolves in Minnesota (88%) were in townships with <0.70 km roads/km² and <4 humans/km² or with <0.50 km² and <8 humans/km².  High human or road densities likely precluded the presence of wolf packs in several localities within contiguous, occupied wolf range (Fuller *et al*. 1992).  In Italy, wolf absence was related to human density, road density, urban areas, cultivated areas, and cattle and pig density.  However, because human density, road density, and urbanized areas were highly inter correlated no specific human effect was established (Duprè *et al*. in press).

In the Bow River Valley, Alberta the selection or avoidance of particular habitat types was related to human use levels and habitat potential (Paquet *et al*. 1996).  Wolves used disturbed habitats less than expected, which suggests the presence of humans altered their behaviour.  Very low intensity disturbance (<100 people/month) did not have a significant influence on wolves, nor did it seriously affect the ecological relationships between wolves and their prey.  At low to intermediate levels of human activity (100-1,000 people/month) wolves were dislocated from suboptimal habitats.  Higher levels of activity resulted in partial displacement but not complete abandonment of preferred habitats.  As disturbance increased, wolves avoided using some most favourable habitats.  In portions of the Valley where high elk abundance was associated with high

---

[2]Wolves from the Midwestern United States have hybridized with coyotes (*Canis latrans*) (Wayne *et al*. 1991,  Wayne *et al*. 1992, Lehman *et al*. 1991), be red wolves, or red wolf hybrids (Wilson *et al*. 2001), which may affect their behaviour (Fox 1971) and their relationship with humans.  Consequently, extrapolating information from Minnesota, Michigan, Minnesota, and Ontario may be inappropriate for the Rocky Mountains.  Wolves in the Rocky Mountains show no introgression of coyote genes (Forbes and Boyd 1996).

road and/or human population density, wolves were completely absent.  Overall, habitat alienation resulted in altered predator/prey relationships.

The observed patterns of displacement suggest the presence of humans repulses wolves, although a strong attraction to highly preferred habitats increases a wolf's tolerance for disturbance.  As conditions become less favorable, the quality of habitat likely takes on greater importance.  Tolerance thresholds are unknown but, as noted, in the Bow River Valley changes in patterns of habitat use were evident when human activity exceeded 100 people/month.  Nearly complete alienation of wolves occurred when more than 10,000 people/month used an area.

        f.        HUMAN INFLUENCE ON HABITAT USE BY WOLVES
        The degree of human influence probably varies according to the environmental context.  If a particular habitat is highly attractive, wolves appear willing to risk exposure to humans, at least within some limits (Chapman 1977).  As levels of disturbance increase, favorableness of habitat likely takes on greater importance.  For example, we know that wolves select home sites near intense human activity when denning areas are limited, or where innocuous human activity occurs (Chapman 1977).  The presence of artificial food sources (e.g., carrion pits, garbage dumps) also attracts wolves and reduces avoidance of human activity (Chapman 1977, L.D. Mech pers. comm., Paquet 1996, Krizan 1998).  In the Bow River Valley, wolves denned within 500 m of the Trans Canada highway when Parks Canada was dumping carrion in the area.  Wolves abandoned the home site after Parks stopped dumping of the carrion.

        The tension between attraction and repulsion is probably expressed differently by individuals, packs, and populations.  Attraction to an area is a complex sum of physiography, security from harassment, positive reinforcement (e.g., easily obtained food), population density, and available choice.  Moreover, the response to a particular disturbance seems to depend on disturbance-history (E. Zimen pers. comm.); a critical concept in understanding the behaviour of long-lived animals that learn through social transmission (Curatolo and Murphy 1986, S. Minta pers. comm.).

        We can group human influence into effects on wolf habitat and populations.  Habitat disturbance can be short or long term and can include direct loss of habitat (i.e., vegetation removal, vegetation change, or isolation and removal of prey).  Direct habitat loss does not include the loss of habitat due to temporal or spatial alienation (sensory disturbance) or from fragmentation of habitat.  Indirect losses will occur due to habitat alienation, where wolves abandon habitat because of nearby disturbances or are spatially isolated from using them because of impediments to movements.  Changes in population can occur directly through alterations in habitat and indirectly because of disturbing activities.

        The major impacts of human induced changes are, in order of decreasing importance, physical loss of habitat, loss of prey species, fragmentation of habitat, isolation of habitat, alienation of habitat, alteration of habitat, changes in original ratios of habitat, and changes in juxtaposition of habitats.  These effects combine to have local and population level influences by altering the composition of biological communities upon which wolves are dependent, restricting movements, reducing foraging opportunities, and limiting access to prey.  Obstructing movements also increases the vulnerability of wolves to other disturbances as they attempt to learn new travel routes.

The degree to which human activities disrupt wildlife reflects the type and extent of disturbance, which interacts with the natural environment to affect environmental quality. In mountainous landscapes wildlife often responds markedly to disturbances that occur at small spatial scales. This is because the topography amplifies the effects of disturbances by concentrating activities of humans and wildlife into valley bottoms. The forced convergence of activities limits spatially the range of options wildlife have for coping with disruption, reducing resilience to anthropogenic disturbance (Weaver *et al*. 1996, Alaska Department of Fish and Game unpublished data).

Indirect human influences can affect an animal's chance to survive and reproduce. As wolves approach their limits of tolerance, they become increasingly susceptible to what would otherwise be minor influences. In the mountainous terrain, natural landforms and the condensed arrangement of habitats make wolves highly susceptible to the adverse effects of human disturbance. Because most development occurs in areas preferred by wolves, human activities unavoidably increase the risk of death and injury for wolves, decrease opportunities for wolves to move freely about, displace or alienates wolves from preferred ranges, and interrupt normal periods of activity. In less physiographically complex environments multiple travel routes link blocks of wolf habitat. Destruction or degradation of one or 2 routes is not usually critical, because safe alternative routes are available. In contrast, wolves living in mountains cannot avoid valley bottoms or use other travel routes without affecting their fitness. Therefore, tolerance of disturbance is probably lower than in other human dominated environments where wolves can avoid disturbed sites without seriously jeopardizing survival.

g.      RESPONSE OF WOLVES TO LINEAR DEVELOPMENTS

The security of wolf populations in the many regions may be tenuous, because linear developments heavily dissect wolf ranges (i.e., highways, secondary roads, railways, and power line corridors). Highway mortality has become a primary cause of wolf mortality and there is accumulating evidence of habitat loss, fragmentation, and degradation related to roads (Purves *et al*. 1992, Paquet 1993). Ensured connectivity of quality habitats is important for survival of large carnivores (Beier 1993, Paquet and Hackman 1995, Doak 1995, Noss *et al.* in press), especially for those that face a high risk of mortality from humans or vehicles when travelling across settled landscapes (Noss 1992, Beier 1993).

There are several plausible explanations for the absence of wolves in densely roaded areas. Wolves may behaviourally avoid densely roaded areas depending on the type of use the road receives (Thurber *et al*. 1994). In other instances, their absence may be a direct result of mortality associated with roads (Van Ballenberhe *et al*. 1975, Mech 1977, Berg and Kuehn 1982). Besides fragmenting and consuming critical habitat, linear developments provide access to remote regions, which allows humans to deliberately, accidentally, or incidentally kill wolves (Van Ballenberghe *et al.* 1975, Mech 1977, Berg and Kuehn 1982). Despite legal protection, 80% of known wolf mortality in a Minnesota study was human-caused (30% shot, 12% snared, 11% hit by vehicles, 6% killed by government trappers, and 21% killed by humans in some undetermined manner) (Fuller 1989). Mech (1989) reported 60% of human-caused mortality in a roaded area (even after full protection), whereas human caused mortality was absent in an adjoining region without roads. On the east side of the Central Rockies between 1986 and 1993, human caused

mortality was 95% of known wolf death.  Thirty-six percent (36%) of mortality was related to roads (Paquet 1993).

Wolves also experience higher mortality in areas with higher road density.  On Prince of Wales Island, Alaska, researchers report a significant jump in wolf mortality (kill/259 km²) in areas where road densities exceeds.25 km/km².  While wolf mortality in the category of most densely roaded areas is highest, the variance is also high.  The authors suggest that at some threshold of road density or human activity, wolves may abandon an area, resulting in decreased trapping and hunting mortality (Alaska Department of Fish and Game, unpublished data).

Linear developments may also be physical and/or psychological impediments to wolf movement.  Road density and human density have been inversely correlated with viable populations of wolves in several areas.  Along the Ontario-Michigan border, distribution of breeding packs occurred only in Ontario.  Except for Cockburn Island, only lone wolves were found in areas close to the border or in Michigan.  In Ontario, the density of roads in areas not occupied by wolves was greater than in areas occupied by wolves.  Mean road density in Michigan, where no wolves resided, was also greater than in wolf-occupied areas of Ontario.  High human densities, represented by road densities of > 0.6 km/km², were believed to be a barrier to wolf dispersal into Michigan (Jensen *et al.* 1986).

Studies in Wisconsin, Michigan, Ontario, and Minnesota have shown a strong relationship between road density and the absence of wolves (Thiel 1985, Jensen *et al.* 1986, Mech *et al.* 1988, Fuller 1989).  Wolves generally are not present where the density of roads exceeds 0.58 km/km² (Thiel 1985 and Jensen *et al.* 1986, cf. Fuller 1989).  Landscape level analysis in Wisconsin, Minnesota, and Michigan found mean road density was much lower in pack territories (0.23 km/km² in 80% use area) than in random nonpack areas (0.74) or the region overall (0.71).  Road density was the strongest predictor of wolf habitat favorability out of 5 habitat characteristics and 6 indices of landscape complexity (Mladenoff *et al*. 1995).  Few areas of use exceeded a road density of >0.45 km/km² (Mladenoff  *et al*. 1995).  Notably, radio collared packs were not bisected by any major federal or state highway.  In Minnesota, densities of roads for the primary range, peripheral range, and disjunct range of wolves were all below a threshold of 0.58 km/km².  These results, however, probably do not apply to areas on which public access is restricted.  Mech (1989), for example, reported wolves using an area with a road density of 0.76 km/km², but it was next to a large, roadless area.  He speculated that excessive mortality experienced by wolves in the roaded area was compensated for by individuals that dispersed from the adjacent roadless area.  Wolves on Prince of Wales Island, Alaska currently use areas with road densities greater than 0.58 km/km².  Core areas, however, are generally in the least densely roaded areas of the home range, and wolf activity that does occur in densely roaded areas occurs primarily at night.  This behavioral response may reflect the limited options wolves have to relocate when they live on islands or insularized landscapes.

The response of wolves to different road types and human presence at the boundaries of Kenai National Wildlife Refuge, Alaska, was examined in a study of radio-collared wolves (Thurber *et al*. 1994).  Wolves avoided oilfield access roads open to public use, yet were attracted to a gated pipeline access road and secondary gravel roads with limited human use.  Thurber *et al*. speculated that roads with low human activity provide easy travel corridors for wolves.  The response of wolves to a major public highway was equivocal.  They thought wolf absence from settled areas and some roads were caused by behavioral avoidance rather than direct

attrition resulting from killing of animals.  In Montana, Singleton (1995) found that wolves preferred areas 0.5-1 km from open roads for travel routes.  He speculated that wolves did not select locations more distant from open roads because of the distribution patterns of wintering ungulates and the barrier provided by the river.  Overall, wolves preferred areas with 0.01-2 mi/mi² for travel routes.

# 5.    HAVE WOLVES SUCCESSFULLY ESTABLISHED HOME RANGES WITHIN THE DESIGNATED WOLF RECOVERY AREA?

### a.    BACKGROUND

Biologists usually define the home range of a wolf as an area within which it can meet all of its annual biological requirements.  Seasonal feeding habitat, thermal and security needs, travel, denning, the bearing and raising of young, are all essential life  requirements.  The manner in which habitats for these requirements are used and distributed influences home range size and local and regional population distributions.  Generally, wolves locate their home ranges in areas where adequate prey are available and human disturbance minimal (Mladenoff *et al*. 1995, 1997, Mladenoff and Sickley 1998).  Wolves use areas within those home ranges in ways that maximize encounters with prey (Huggard 1993a, b).

Newly colonizing wolf pack might shift home ranges in response to climate, food availability, human disturbance, and other factors.  A colonizing pack might have a larger, more fluid, home range than a pack surrounded by other wolf packs (Boyd *et al*. 1996).  Some evidence suggests that wolf packs colonize areas that were first "pioneered"by dispersing lone wolves (Ream *et al.* 1991)

In mountainous areas, topographic position influences selection of home ranges and travel routes (Paquet *et al*. 1996).  Wolf use of valley bottoms and lower slopes correspond to the presence of wintering ungulate prey and snow depth in these areas (Singer 1979, Jenkins and Wright 1988, Paquet *et al.* 1996).  In areas of higher prey density pack sizes increase (Messier 1985) and home range size is closely correlated with pack size (Messier 1985, Peterson *et al*. 1984).

### b.    DATA SUMMARY

We assessed home ranges using locations from radio-collared animals.  Radio-telemetry data (>7000 locations) were provided in an Excel database (Monitor).  These data include all telemetry locations from 3 March 1998 to 3 March 2001.  Each location was appended by wolf identification, date, time, and pack membership.  Although locations were qualitatively ranked for accuracy, no quantitative assessment of telemetry error was available.  Thus, we classified locations into 4 categories, which corresponded to the database provided.  Class 1, 2, 3, and 4 locations were those within 100 m, 100-250 m, 250-450 m, and greater than 450 m from the true location, respectively.  Only class 1 aerial and ground locations were used in the home range analysis.

### c.    METHODS

Our objective was to quantitatively describe areal distribution of reintroduced Mexican wolves within the recovery region.  In a few cases, however, subjective determination of the home range was more appropriate.

Using ArcView Spatial Analyst, we plotted all class 1 locations.  We discarded locations deemed to be recording errors, extraterritorial forays, and dispersals.  We assumed a wolf dispersed if it permanently left its original pack and formed a new pack or joined an existing one (Messier 1985b).

Locations of individual wolves were grouped by pack affiliation.  We defined a pack as 2 or more wolves that traveled together more than 1 month (Messier 1984).  For each pack we used one wolf/year to represent the annual home range of the pack.  This is a reasonable assumption if a high degree of association exists between pack members (Kolenosky and Johnston 1967, Fuller and Keith 1980, Fritts and Mech 1981, Ciucci *et al.* 1997).  We confirmed pack affiliations by examining telemetry locations of wolves believed to be associating and through visual observations of the wolves by the field crew.

We used Home Range and Ranges V® software (Kenward and Hodder 1996) to calculate annual (1 Apr–31 Mar) and seasonal 95% minimum convex polygons (Mohr 1947) for individual packs and the entire free ranging wolf population within the primary zone and recovery area (Apache/Gila N.F.).  Home range is an extension of ArcView Spatial Analyst.  We assumed home ranges were defined when the observation-area curve formed an asymptote (Kenward and Hodder 1996) and locations were obtained throughout the year.

Accuracy of aerial and ground locations for the entire study was estimated to be 250 m, which is the highest mean error of telemetry obtained by researchers on other wolf projects.  To account for the 250-m error, we changed the fix resolution from the RangesV® software default of 1 m to 250 m.  This resolution is used to set the width of the boundary strip that is included in polygon edges and areas (Kenward and Hodder 1996, R. Kenward, pers. comm.).  We left the scaling parameter at the software default of 1 m, which means that each coordinate unit was 1 m from the next.

d.     RESULTS

From 1998 through 2001, 9 wolf packs were identified by name in the telemetry database.  However, the criteria for specifying packs were not always biological.  Release sites, geographic locations, and affiliations with other wolves influenced pack designation.  Packs, pack compositions, and configurations of home ranges changed as reintroduced wolves encountered other wolves, and established new territories.  In addition, the frequent removal and reintroduction of wolves confounded the assignment of individual wolves to specific packs.

The number of recorded aerial and ground locations varied among wolf packs (Figure 1).  For the most part, the frequency of locations reflected the time that radio collared wolves were free-ranging, rather than differential effort by the field crew.  Time of year, however, affected the number of locations acquired (Figure 2).  Discussions with the field team confirmed that for logistic reasons they reduced monitoring activities in winter.  We identified some locations that were far outside the reintroduction area.  Many of these were recording or data entry errors (Figure 3).  Several, however, were from wandering or dispersing wolves.

The proportion of telemetry locations within the primary recovery zone (Apache N.F.) and within the Blue Range wolf recovery area (Apache/Gila N.F.) varied among packs (Figure 4).  Temporal trends in the proportion of telemetry locations (pooled across all packs) within the primary zone and within the recovery area also varied (Figure 5).  The approximate area occupied by free-ranging Mexican wolf population changed over time as did the density of wolves.  This was partially a reflection of periodic releases and recaptures of wolves, and also free-ranging wolves shifting centers of activity as they established pack affiliations and home ranges (Figures 6, 7, 8).

Many individuals and packs showed home range fidelity typical of wolves with established territories (Figure 9).  However, frequent social disruption via mortality, recaptures, and re-releases may have altered the natural territorial behavior of packs.  Wolves are long-lived social carnivores that transmit information between generations and among individual pack members.  In this regard, the establishment, location, and maintenance of home ranges likely depend on a stable pack structure and the persistence of traditional pack knowledge.  The home range behavior of reintroduced wolves may be highly susceptible to social disruption because they lack a cognitive map of the area.  Moreover, lack of familiarity with the landscape may have a stronger influence on captive reared animals than wild born.



**Figure 1**. Summary of Mexican wolf radio telemetry data, 1998-2001. Numbers in parentheses are telemetry locations recorded.



**Figure 2**. Monthly radio-telemetry locations of reintroduced Mexican wolves, Arizona, 1998-2001.



**Figure 3**. Many  telemetry locations resulted from data entry errors.  For example,  numerous locations were in the state of California and in the Gulf of California.

Case 1:06-cv-02119-RCL    Document 12-5    Filed 04/26/2007    Page 27 of 93



**Figure 4**.  Variation among wolf packs in the proportion of telemetry locations within the primary zone and within the recovery area (Apache/Gila N.F.).  These data include all telemetry locations of reintroduced Mexican wolves from 3 March 1998 to 3 March 2001.



**Figure 5**.  Temporal trends in the proportion of telemetry locations (pooled across all packs) within the primary zone (Apache N.F.) and within the recovery area (Apache/Gila N.F.).  These data include all telemetry locations of reintroduced Mexican wolves from 3 March 1998 to 3 March 2001.



**Figure 6.** Approximate area occupied by free- ranging Mexican wolf population in Arizona and New Mexico, 1998-2001.



**Figure 7.** Density of free-ranging Mexican wolf population in Arizona and New Mexico, 1998-2001.



**Figure 8**. Seasonal distribution of free-ranging Mexican wolf population in Arizona and New Mexico, 1998-2001.



**Figure 9**. Polygons reflecting the spatial extent of pack home ranges in relation to the primary zone (Apache N.F.) And recovery area (Apache/Gila N.F.). These data include all telemetry locations of reintroduced Mexican wolves from 03 March 1998 to 03 March 2001.

e.        CONCLUSIONS

We conclude that some wolves have successfully established home ranges and possibly pack territories within the designated wolf recovery area.  We caution, however, that frequent recaptures and re-releases confounded our analysis.  These manipulations may also be interfering with pack formation and establishment and maintenance of home ranges.  Lastly, individual wolves have shown some indication of dispersing outside the recovery area.  This is to be expected and required if the regional population is to be viable.

## 6.    HAVE REINTRODUCED WOLVES REPRODUCED SUCCESSFULLY IN THE WILD?

a.    BACKGROUND
   i.    Births versus recruitment
      (1)    Compared with adults, pups have relatively low survival rates during the first year of life.
      (2)    In a sense, pups do not really contribute to the viability of a population until they have survived a period of high mortality rate associated with being a pup.
      (3)    Although the EIS refers to projected numbers of pups, the projections seem to treat pups as though they have been recruited into the adult population (i.e., with survival rates like adults).

b.    DATA SUMMARY

We used information recorded in the telemetry and events databases.  Additional information on reproduction was garnered from discussions with the Field Team.  Dense vegetation and the secretive nature of wolves precluded regular and accurate visuals of wolves. Consequently, the Interagency Field Team did not routinely observe wolves during spring and summer when pups are easiest to distinguish from adults.  We assumed the presence of dens and rendezvous sites when movements became localized in April through July or when lactating females or pups were captured.  Sometimes, ground checks confirmed potential denning and rendezvous areas.

c.    METHODS

We determined natality directly from field observations of dens, rendezvous sites (pup rearing and resting areas), and packs.  We ascertained successful year-specific reproduction using changes in pack size from March to the following December.  We assumed unsuccessful reproduction (i.e., no or failed reproduction) when a pack did not display focal activities in the summer.  Annual recruitment was derived from winter pack sizes recorded in February.

d.    RESULTS

Births have taken place in the wild (Table 1).  Births and recruitment rates, however  are lower than projected in the EIS (Figures 10 and 11).

**Table 1.** Known births and recruitments of reintroduced Mexican wolves recorded from 1998-2001.  Only 1 litter was conceived in the wild.

| PARENTS | | | | |
|---------|------|-----------------------------------------|--------------------|-------------|
| Female | Male | ESTIMATED DATE OF BIRTH (M/D/Y) | CONCEIVED IN WILD? | WILD BIRTHS |
| 174 | 166 | 35915 | No | Litter of 5 pups (known number due to necropsy report showing 5 placental scars); one survived to ~ 4 months., then disappeared after 174 was killed. |
| 191 | 208 | 5/1/99 | No | Litter of unknown number (6 confirmed). |
| 482 | 166 | 5/1/99 | No | Litter of 6 pups (known number due to necropsy report showing 6 placental scars); pups were never documented for this pair by the field team --pair never settled in an area so likely pups were lost immediately. |
| 486 | 131 | 5/1/00 | Yes | Litter of unknown number (one confirmed). |
| 191 | 208 | 5/1/00 | No | Litter of unknown number (one confirmed). |
| 189 | 190 | 4/15/00 | No | Litter of unknown number |



**Figure 10**. Projected numbers of breeding pairs (in the EIS) and actual numbers of litters for reintroduced Mexican wolves, 1998-2001.



**Figure 11**. Actual and projected numbers of recruits for reintroduced Mexican wolves, 1998-2001.

e.     CONCLUSIONS

The number of free-ranging Mexican wolves at the end of third year is similar to that projected in the EIS.  Survival and recruitment rates, however are far too low to ensure population growth or persistence.  Without dramatic improvement in theses vital rates, the wolf population will fall short of predictions for upcoming years.

# 7.    IS WOLF MORTALITY SUBSTANTIALLY HIGHER THAN PROJECTED IN THE EIS?

### a.    BACKGROUND

Researchers do not agree on the annual rate of mortality that causes a population decline in wolves.  However, Keith (1983) and Fuller (1989) reviewed several wolf studies across North America and concluded that harvests exceeding 28-30% of fall populations resulted in declines. Fuller (1989) further concluded that populations would stabilize with an overall annual mortality rate of 35%.  He felt, however, the effects of harvest could vary with time and population structure.  Specifically, a population containing many pups could withstand much higher mortality.

Various researchers have suggested different rates of annual mortality they believe control growth of wolf populations.  However, the annual rate of mortality that causes a population decline in wolves is unknown.  Furthermore, many researchers consider only harvest (hunting or trapping) when they calculate mortality rates that cause wolf population declines.  For instance Mech (1970) concluded an annual harvest of 50% or more was necessary to control wolf populations based on pup-adult ratios but did not distinguish between harvest and natural mortality.  Keith (1983) reviewed studies of 13 exploited populations and determined that harvests exceeding 30% of fall populations resulted in population declines.  Similarly Fuller (1989) found annual rates of wolf increase vary in direct response to rates of mortality and where humans kill wolves, harvests exceeding 28% of autumn or early winter populations might result in a population decline.  He concluded a population would stabilize with an overall rate of annual mortality of 0.35 or rate of human-caused mortality of 0.28.  Consequently, the exact relationship between the annual rate of mortality from all human causes (harvest, collisions with cars and trains) and population limitation or decline in wolves is uncertain.

In areas where ungulate biomass is low, researchers have noted that starvation and intraspecific aggression are common.  For instance, in southwestern Quebec, Messier (1985a) noted wolves with fewer prey available incurred more deaths from natural causes, namely starvation and intraspecific aggression.  Similarly, Mech (1977a) noted occurrence of starvation and intraspecific aggression increased as prey availability declined in Minnesota.  Disease cannot be linked with certainty to low availability of food but the relationship makes sense intuitively.  A population of wolves lacking food should be more vulnerable to disease than one with more food available.  Furthermore, food shortage leading to nutritional stress could combine with disease factors to increase the significance of otherwise innocuous or sub-lethal conditions (Brand *et al*. 1995).

In most studies, no disease-related mortality has been reported (VanBallenberghe *et al*. 1975, Mech 1977a, Fritts and Mech 1981, Messier 1985a, Potvin 1987, Ballard *et al*. 1989, Hayes *et al*. 1991, Meier *et al*. 1995, Pletscher *et al*. 1997).  In other studies, from 2-21% of wolf mortality has been attributed to disease (Carbyn 1982, Peterson *et al*. 1984, Fuller 1989, Ballard *et al*. 1997).  Ballard *et al*. (1997) concluded that occurrence of rabies was a significant factor in a decline of wolves from Alaska.  In that study, rabies-caused mortality was 21%.

Quantifying the importance of food in limiting population growth based on cause of death alone is difficult.  In the literature, results vary among studies.  On Isle Royale, annual mortality from starvation and intraspecific strife (both related to low food availability) ranged from 18-57%

during a 20-year period (Peterson and Page 1988).  In populations where some human-caused mortality occurs, and thus compensates for natural mortality (starvation, accidents, disease and intraspecific strife), about 8% of individuals greater than 6 months-of-age can be lost each year (Ballard *et al*. 1987, Fuller 1989).  Some researchers have accepted this variability and decided any sign of starvation among adult wolves means food is limiting population growth (Fritts and Mech 1981, Ballard *et al*. 1997, P. Paquet, pers. comm.).  This assumption is reasonable given adults typically are the last members of the population affected by food shortage (Eberhardt 1977) and as such, may be the most sensitive indicators of a shortage of food.

Human-caused mortality can also be an important limiting factor (Peterson *et al*. 1984; Ballard *et al*. 1989, 1997).  However, quantifying the importance of human-caused mortality as a limiting factor is difficult.  These causes include legal harvest (Fuller and Keith 1980, Keith 1983, Gasaway *et al*. 1983, Messier 1985a, Ballard *et al*. 1987, 1997, Peterson *et al*. 1984, Potvin 1987, Bjorge and Gunson 1989, Fuller 1989, Hayes *et al*. 1991, Pletscher *et al*. 1997), illegal harvest (Fritts and Mech 1981, Fuller 1989, Pletscher *et al*. 1997), vehicles on highways (Berg and Kuehn 1982, Potvin 1987, Fuller 1989, Paquet 1993, Parks Canada 1994, Forbes and Theberge 1995, Paquet and Hackman 1995, Thiel and Valen 1995, Bangs and Fritts 1996), and trains (Paquet 1993, Parks Canada 1994, Paquet and Hackman 1995, Paquet *et al*. 1996).

b.     DATA SUMMARY

We used information recorded in the telemetry and events databases.  Additional information, clarification of events, and interpretation of events was provided by the Interagency Field Team.  All free-ranging Mexican wolves were radio-collared from time of release.  Moreover, each radio-collared Mexican wolf was and continues to be relocated regularly and frequently via ground and aerial telemetry.  Frequent monitoring reveals whether each wolf is alive or dead at the time of relocation

c.     METHODS

We were not able to address the question of annual mortality directly because removals and re-releases precluded calculating annual rates of mortality.  Thus, we estimated survival rates for the Mexican wolf population and then compared these estimated values with the survival rates projected in the EIS.  Survival rate is the chance (or probability) of surviving some specified time.  Survival rates are typically expressed as values between zero and one.  For example, if the annual survival rate of an individual is 0.82, we would say that individual has an 82% chance of surviving during the next year.  Survival is a critical population process and estimating survival rates is an important part of measuring viability of populations.  Management of protected wolf populations requires quantitative survival measurements to identify factors that drive population change.  From the survival rate one can also understand the mortality rate.  The mortality rate of an individual or population is one minus the survival rate.

Using the telemetry data we compiled a table showing the number of wolves that were alive each month, died each month, and recaptured each month.  The table provided the foundation for formal analysis of survival rates.  We estimated survival rates of radio-collared wolves using the Kaplan-Meier (K-M) product limit estimator (Kaplan EL and Meier 1958).  We carried out this analysis using the programs MARK and Minitab (Version 12).  Conceptually, the analysis uses the relationships between the number of wolves that die each month and the number monitored

each month.  Although estimating a rate of survival for each month is possible, the data show that annual survival rates do not vary substantially across longer periods.  Thus, we estimated survival rates using an information-theoretic approach (Buhrnam and Anderson 1999) that determines the most appropriate time scale (e.g., monthly, seasonally, or annually).

From the perspective of a free-ranging population, returning a wolf to captivity (from now on, recapture event) is equivalent to a mortality event.  Thus, we conducted 2 survival analyses.  One analysis considered only true biological deaths, and the other treated biological deaths and recapture events as mortality events.  In both analyses, we reincluded wolves from time of release until "mortality" or disappearance of the radio-signal occurred.

Sample sizes were too small to use Cox's proportional hazards model and determine the influence of important covariates (such as age and sex) on survival.  We did not calculate cause-specific mortality.  Mortality was described, however, using percents.  We assumed that the proximate cause of death was the ultimate cause of death.  We were unable to assess the relative importance of other factors that may have been involved.

The starting date of the survival study was March 1998 and the end date was March 2001.  For known deaths we estimated the date of mortality to the nearest day using evidence from the telemetry and events data bases.  When information was unavailable, we deemed day of mortality the midpoint of the interval between the last day the wolf was known alive and the day it was discovered dead.  The cause of mortality was often identified on site and when possible, confirmed by necropsy (Interagency Field Team pers. comm.)

d.     RESULTS

Forty-seven (47) wolves were monitored From March 1998 (when Mexican wolves were first released) to March 2001.  Twenty-three (23) wolves are currently being monitored.  Four (4) wolves are unaccounted for.  Twenty (20) wolves were recaptured following release.  Nine (9) of these were re-released and are known to be alive.  Two (2) wolves were re-released but contact was lost and their fate is unknown.  One of the re-released wolves died.  Eight (8) of the recaptured wolves were not re-released and some died in captivity.  Seventeen (17) wolves are known to have died, 10 in the wild (Figure 12).  Human caused mortality was the most common cause of death.  Of the human related deaths, most were caused by gunshots (Figure 13).  Wolves also died from distemper and parvovirus.  Both these diseases are contracted or originally spread from domestic animals.  Death by disease was higher than projected in the EIS.

When recaptures were included as mortalities, survival rates were lower than projected in the EIS (Figure 14).  Excluding recaptures as mortalities resulted in survival rates exceeding the EIS  projections in 1999 and 2000 (Figure 15).  Survival rates from either method, however, were lower than for wolves in the Flathead region of Montana and British Columbia (Pletscher *et al*. 1997), lower than for wolves in the central Canadian Rocky Mountains, lower than a recovering wolf population in the Yukon (Hayes and Harestad 2000), and higher than an exploited population in Alaska (Ballard *et al*. 1987).



**Figure 12**.  Causes of wolf mortality for Mexican wolves reintroduced to Arizona, 1998-2001.



**Figure 13**.  Cause specific wolf mortality for Mexican wolves reintroduced to Arizona, 1998-2001.



**Figure 14**. Survival analysis of reintroduced Mexican wolf population assuming that recapture represents a mortality event. Analysis was conducted for the period 1998-2001.



**Figure 15**. Survival analysis of reintroduced Mexican wolf population assuming that recaptures do not represent a mortality event. Analysis was conducted for the period 1998-2001.

e.        CONCLUSIONS

Frequent removals and re-releases of wolves confounded our analysis of rates and causes of mortality.  However, if recaptured wolves were at high risk of being killed, then survival is much lower than projected in the EIS.  Human-related deaths were the greatest source of mortality for reintroduced Mexican wolves.  Shooting was the major source of death.  Numerous other studies have reported human-caused deaths as the major cause of wolf mortality (Fuller and Keith 1980, Berg and Kuehn 1982, Boitani 1982, Carbyn 1982, Ballard *et al*. 1987, Fuller 1989, Mech 1989, Pletscher *et al.* 1997, and many others).

# 8.    IS POPULATION GROWTH SUBSTANTIALLY LOWER THAN PROJECTED IN THE EIS?

### a.    BACKGROUND

Rates of increase in wild wolf populations have varied between 0.93 and 2.40 (Fuller and Keith 1980, Fritts and Mech 1981, Ballard *et al*. 1987, Hayes *et al*. 1991, Messier 1991, Pletscher *et al*. 1997).  Several factors limit growth of wolf populations; those reported most commonly include ungulate biomass (Van Ballenberghe *et al*. 1975, Mech 1973, 1977a, 1977b, Fuller and Keith 1980, Packard and Mech 1980, Keith 1983, Messier 1985a, 1987, Peterson and Page 1988) and human-caused mortality (Van Ballenberghe 1981, Gasaway *et al*. 1983, Keith 1983, Peterson *et al*. 1984, Fuller 1989, Paquet *et al*. 1996, Noss *et al*. 1996). Keith calculated the maximum rate of increase for wolves (r = 0.304, ~ = 1.36) (1983) based on the highest reproductive and survival rates reported from studies on wild wolves.  He corroborated the results by comparing the estimate with data from wolves that colonized Isle Royale National Park, 1952-1959 (r = 0.304, λ = 1.39).  These were likely maximum rates of increase because the population was initiated by few individuals with abundant food (Keith 1983).  However, both rates are still much lower than a theoretical exponential rate of 0.833 (λ = 2.30) given maximum reproduction (Rausch 1967), a stable age distribution and no deaths.

Keith (1983) suggested the amount of food available and age structure of the population affect rates of growth of wolf populations.  VanBallenberghe (1981), Gasaway *et al*. (1983), Keith (1983), Peterson *et al*. (1984), Ballard *et al*. (1987), and Fuller (1989) found that wolf populations can be limited by harvest levels of 20-40%, but that the lower rate has a more significant effect in an area with low ungulate biomass (Gasaway *et al*.1983).  Another factor to consider is that effects of harvest vary with time and population structure (Peterson *et al*. 1984, Fuller 1989).  If productivity is high, and consequently the ratio of pups to adults is high, the population can withstand a higher overall mortality because pups (non-producers) make up a disproportionate amount of the harvest (Fuller 1989).  Furthermore, net immigration or emigration may mitigate the effects of harvest (Fuller 1989).

### b.    DATA SUMMARY

We assessed the density of the wolf population, size of established packs, and population growth using radiotelemetry data and direct observation by the Interagency Field Team.  Most of these data are contained in the Monitoring and Events databases.

### c.    METHODS

We calculated density of wolves/1000 km$^2$ by determining intra-pack densities (home range size/number of wolves in pack) of radio-collared wolves and averaging these densities per year (Potvin 1987, Bjorge and Gunson 1989, Okarma *et al*.1998).  The size of packs was based on numbers of wolves observed during midwinter aerial locations (15 Jan-15 Feb).  We estimated population growth using finite rates of increase (λ) based on the ratio of successive yearly estimates of density.  Mean annual finite rate of increase was calculated by taking the antilogarithm of the mean exponential rate of increase (r = ln λ) for the population (Fuller 1989).

The fundamental equation of population demography for a closed population is:

$$N_t = N_{t-1} + B_t - D_t$$

where $N_t$ = population size at time $t$, $B_t$ = number of recruits at time $t$, $D_t$ = number of deaths at time $t$,

For a wild population, removals are similar to mortality and re-releases similar to recruitment. Therefore, the equation that best describes the reintroduced Mexican wolf population is:

$$N_t = N_{t-1} + B_t - D_t + \beta_t - \delta_t$$

where $\delta_t$ = (unpredictable) removals of 'naughty' wolves, $\beta_t$ = subsequent re-releases of those 'naughty' wolves, $\beta_t \gg B_t$, $\delta_t \gg D_t$

d.      RESULTS

From available databases and discussions with the Interagency Field Team, we identified a number of events relevant to assessment of population dynamics (Table 2). Using this information, we calculated population growth rates (Figures 16, 17) and the varying number of free-ranging wolves over time (Figures 18 and 19). Growth rates and numbers of wolves were close to projections, although frequent re-releases and removals obscured comparisons. To provide context for interpreting these results, we also generated mean growth rates for other reintroduced and recovering wolf populations (Figures 20, 21, 22). To date, the growth rate of the reintroduced Mexican wolf population is comparable with similar reintroduction and recovery efforts.

**Table 2.** Population events recorded for reintroduced Mexican wolf population between 1998 and 2001..

| POPULATION EVENT | NUMBER |
|---|---|
| Recruits | 3 - 5 |
| Re-releases | 21 |
| Deaths | 10 - 16 |
| Removals | 31 |



**Figure 16**.  Projected and actual annual growth rates of free-ranging Mexican wolf population. Actual growth rate is strongly influenced by frequent intervention.



**Figure 17**.  Projected and actual sizes of free-ranging Mexican wolf population, 1998-2001.



**Figure 18**. Number of free-ranging radiocollared Mexican wolves, 1998-2001. The difference between the max and min accounts for 4 wolves whose signals were lost, and in one case, a wolf that threw its collar.



**Figure 19**. Growth rates of other recovering wolf populations.  Sources:
<http://www.r6.fws.gov/wolf/annualrpt99/> and unpublished documents from JAV



**Figure 20**.  Mean annual growth rate for other recovering populations.



**Figure 21**.  Number of wolves over time in other recovering  populations.

    Assessing the average growth rate only tells part of the story.  Fluctuations in growth rates are also critical.  The more fluctuation the greater the extinction risk.  In this case, to assess fluctuations, we need to examine the population trajectory on a different time scale.

    Using data collected since March 1998, we calculated a 39% chance that the annual growth rate is < 0.0; a 43% chance the annual growth rate is $\lesssim$ 0.10; and a 50% chance the annual growth rate $\lesssim$ 0.20 (Figure 22).  Using data collected since December 1998, we calculated a 23% chance that the annual growth rate is < 0.0; a 26% chance the annual growth rate is $\lesssim$ 0.10; and a 29% chance annual growth rate $\lesssim$ 0.20 (Figure 23).

*A monthly growth rate of 0.083 corresponds to an annual growth rate of 0.1. A monthly growth rate of 0.0166 corresponds to an annual growth rate of ~0.2.



**Figure 22**. Mean onthly growth rate (*r*) since March 1998. The expected value of *r* is 0.02. The standard error is 0.07.*



**Figure 23**.  Mean monthly growth rate (*r*) since December 1998 (when population went temporarily extinct).  The expected value of *r* is 0.06.  The standard error is 0.08.

e.        CONCLUSIONS

To date, intervention has dominated natural processes.  So, determining if the growth rate is lower than predicted in the EIS is not possible.  If the current rate of  intervention continues, restoration of a population of 100 wolves would require 28 re-releases annually and 41 removals annually.  Although the current population size is similar to that projected in the EIS, we suspect that population growth would have fallen far short of expectations without intervention.  Clearly, managers must balance future introductions, recaptures, and re-releases with the need to establish and maintain natural population processes (Figure 24).



**Figure 24**.  Because of frequent interventions the vital rates we derived (survival and population growth) are unlikley to reflect the population's future viability.  A balance between intervention and the effects of natural population processes is needed.

# 9.    ARE NUMBERS AND VULNERABILITY OF PREY ADEQUATE TO SUPPORT WOLVES?

a.    BACKGROUND

Without human disturbance, densities reflect the wolf's dependency on ungulate prey species (Keith 1983).  Wolf population dynamics are believed to be largely dictated by the per capita amount of prey and its vulnerability to predation, and the degree of human exploitation (Keith 1983; Fuller 1989).  The effect of food on wolf demography is mediated by social factors, including  pack formation, territorial behavior, exclusive breeding, deferred reproduction, intraspecific aggression, dispersal, and by primary prey shifts (Keith 1983).

Wolf populations are closely linked to population levels of their ungulate prey (Keith 1983, Messier 1985a, Fuller 1989).  Maintaining viable, well-distributed wolf populations depends on maintaining an abundant, available, and stable ungulate population.  Packard and Mech (1980) concluded that intrinsic social factors and the influence of food supply are interrelated in determining population levels of wolves.  In situations where other factors reduce prey populations (e.g., winter weather), predation by wolves can inhibit the recovery of prey populations for long periods (Gasaway *et al*. 1983).  In a multiprey system, the stability, or equilibrium, of ungulate prey and wolf populations seems to depend on a variety of factors, including the wolf predation rate, the number of ungulates killed by hunters, the ratio of ungulates to wolves, and the population growth rate of different ungulate species (Carbyn 1982, Huggard 1992, Paquet 1993, Paquet *et al*. 1996, Paquet 1989).

Changes in habitat composition and distribution can have a significant effect on prey densities and distributions, and therefore wolf spatial distribution.  Wolf packs may react to changing conditions in varying ways, depending on the location of their territories in relation to other packs and prey distribution.  If packs have lower prey densities within their territories, they may exploit territories more intensely.[3]  This may be achieved by 1) persevering in each attack, 2) using carcasses thoroughly, 3) feeding on alternative and possibly second -choice food resources such as beaver (*Castor canadensis*) (Messier and Crete 1985), and 4) patrolling their territory more intensely (Messier 1985).  Messier, in his study area in southeastern Quebec, found daily distances of Low Prey packs were on average either greater (summer) or equal (winter) to daily distances of High Prey packs.  The territory size, however, was approximately 35% smaller in the Low Prey area, supporting the fact that wolves were searching each unit area with greater intensity in both seasons.

Many studies emphasize the direct effects (e.g., prey mortality) wolves have on the population dynamics of their ungulate prey (Carbyn 1974, Mech and Karns 1977, Carbyn 1983, Gasaway *et al*. 1983, Messier 1994, Messier and Crete 1985, Peterson *et al*. 1984, Gunson 1983, Ballard *et al*. 1987, Boutin 1992, and others).  However, predation can also profoundly affect the behaviour of prey, including use of habitat, time of activity, foraging mode, diet, mating systems,

---

[3]  Territory and home range size is more closely correlated with pack size than with prey density (Messier 1985, Peterson *et al*. 1984).  In areas of higher prey density pack sizes increase (Messier 1985).  Messier's (1985) data indicate that between 0.2 and 0.4 moose/km², territory area per wolf is independent of moose abundance.

and life histories (Sih *et al*. 1985). Accordingly, several studies describe the influence wolves have on movements, distribution, and habitat selection of caribou (*Rangifer tarandus*), moose, and white-tailed deer (Mech 1977, Stephens and Peterson 1987, Ballard *et al.* 1987, Nelson and Mech 1981, Messier and Barrette 1985, Messier 1994). Wolves can increase the rate at which they accrue resources by seeking out areas with dense concentrations of prey (Huggard 1991, Weaver 1994). Prey, in turn, can lower their expected mortality rate by preferentially residing in areas with few or no wolves. Several studies have suggested that ungulate prey seek out predator-free refugia to avoid predation by wolves (Mech 1977, Holt 1987, Paquet 1993). Wolf predation in the Superior National Forest of northern Minnesota was found to affect deer distributions within wolf territories (Mech 1977). Densities were greater along edges of territories where predation was thought to be less.

Unusually mild or severe winter weather can result in ungulate populations that are temporarily higher or lower than predicted habitat capability (which reflects long-term average maximum). Where predation is a factor, ungulates may exist at levels well below carrying capacity for relatively long periods. The interactions of ungulates and their predators (in our case wolves, coyotes, foxes, black bears, and cougars) may, under some circumstances, overshadow habitat capability as a controlling factor for ungulate populations. Ungulate populations may be more strongly influenced by the frequency and depth of population lows, than by habitat capability.

Ungulate biomass can affect rates of population increase and resulting densities of wolves. Building on work of Keith (1983), Fuller (1989) reviewed 25 studies of North American wolf and prey populations and found rates of increase of wolf populations are most affected by relative availability of ungulate biomass (directly influencing survival of pups <6 months old) and human-caused mortality. He concluded that regardless of prey type or stability of wolf populations, average wolf densities are clearly correlated with the biomass of ungulates available per wolf. Furthermore, he found the index of ungulate biomass per wolf is highest for heavily exploited (Ballard *et al.* 1987) or newly protected (Fritts and Mech 1981) wolf populations and lowest for unexploited wolf populations (Oosenbrug and Carbyn 1982, Mech 1986) or those where ungulates are heavily harvested (Kolenosky 1972).

b.    DATA SUMMARY

We used information in the carcasses database to assess wolf use of prey species. Prey densities and the weights of prey were derived from Groebner *et al*. (1995).

c.    METHODS

We estimated potential wolf numbers using regression equations that relate wolf numbers to ungulate biomass (Keith 1983, Fuller 1989). The equations were modified to reflect prey species available to wolves in Arizona and New Mexico.[4] Accordingly, biomass was calculated by multiplying population densities of elk, white-tailed deer, and mule deer (*O. hemionus*) by average edible weights of elk, white-tailed deer, and mule deer. We used weights of 159 kg (350 lb.) for elk, 36 kg (80 lb.) for white-tailed deer, and 55 kg (122 lb.) for mule deer (Groebner *et al*.

---

[4]$Y = 0.041X$
where Y = wolf numbers, X = prey biomass

1995).  We used prey densities of 1.1 km² for elk, 0.9 km² for white-tailed deer, and 2.8 km² for mule deer (Groebner *et al*. 1995).  Assuming that ungulate populations would decline slightly in the presence of wolf predation, prey densities were reduced 10% in our final calculations.  We assumed prey were evenly distributed and equally available throughout the primary and secondary release sites.  Bighorn Sheep (*Ovis canadensis*), pronghorn (*Antilocapra americana,* javelina (*Tayassu tayacu*), and beaver (*Castor canadensis*) were not included in our analyses because no population data were available.

      d.     RESULTS

     The Interagency Field Team recorded 55 probable wolf kills.  Elk constituted 85%, mule deer 7%, and deer of unknown species about 4% of recorded kills.  The predominance of elk in the diet was consistent among packs (Figure 25).  Based on numbers of prey available and biomass available within the primary release site, elk were used disproportionately.  Note, however, that observational bias may skew collection of kill data.  Elk are easier to find because they are larger than deer and not consumed as rapidly.  In addition, the seasonal movements of wolves and their prey can affect spatial overlap and thus availability.  Lack of data and time prevented us from assessing this possibility.

     Based on ungulate biomass, the Blue Range Wolf Recovery Area (6,854 mi² or 17,751 km²) can, in theory, support a an estimated 468 wolves (range 292-821).  The target recovery area of 12,950 km² (5,000 km²) could support between-212 and 599 wolves (Figure 26) (Table 3).  We believe these estimates are high because they assumes all prey are equal and will be consumed in proportion with availability.  Given our experience with multiple prey systems elsewhere this is unlikely to occur.  We therefore calculated wolf population estimates for individual prey species.  Accordingly, elk in the Blue Range Wolf Recovery Area could support about 213 wolves, and the combined deer species about 255  wolves.



**Figure 25**.  Prey (n = 55) probably killed by reintroduced Mexican wolves, 1998-2001.

Case 1:06-cv-02119-RCL     Document 12-5     Filed 04/26/2007     Page 57 of 93



**Figure 26**. Potential number of wolves that, in theory, could occupy target objective of 12,950 km² (5,000 mi²) within the Blue River Wolf Recovery Area. Estimates are based on prey biomass available to wolves and are maximum numbers. The individual contribution of ungulate prey species is shown for comparison with other studies.

**Table 3.**  Potential wolf numbers (ranges) for recovery areas based on predicted population densities of ungulates 5 years post restoration of Mexican wolf population.  We partitioned the table to show the contributions of different ungulate species.

| PREY SPECIES | Primary Zone (2,664 km²) | Recovery Objective* (12,950 km²) | BRWRA* Low (17,563 km²) | BRWRA* High (17,563 km²) |
|---|---|---|---|---|
| White-tailed Deer | 10-13 | | | |
| Mule Deer | 46-63 | | | |
| White-tailed and Mule Deer | | 118-323 | 162-245 | 293-443 |
| Elk | 50-67 | 94-276 | 129-195 | 250-378 |
| All Prey | 106-143 | 212-599 | 292-441 | 543-821 |

*For white-tailed and mule deer, we used an average biomass.to derive wolf estimates.

e.       CONCLUSIONS

Given the current ratio of wolves to ungulate prey, we conclude the reintroduced Mexican wolf population is not limited by food.  Adequate prey are available to support and sustain a growing wolf population.  Estimated wolf numbers derived from ungulate biomass were similar to numbers projected in the EIS.  Because wolves depend primarily on ungulates for food, long-term survival of wolves in the study region depends primarily on protection of habitat for elk and deer.

# 10.    HAS THE LIVESTOCK DEPREDATION CONTROL PROGRAM BEEN EFFECTIVE?

### a.    BACKGROUND

Although an effective livestock depredation program is critical for wolf recovery, effective assessment of such a program requires more specific guidance and data than we were provided.

### b.    DATA SUMMARY AND METHODS

Our analysis is based on interpreting records in the Events and Incidences databases.

### c.    RESULTS

Forty-two (42) reports of possible wolf-livestock interactions were recorded between March 1998 and March 2001.  Of these, the Interagency Field Team concluded that 5 events were accidents, 9 were non-wolf predators [e.g., bear (*Ursus americanus*), lion (*Felis concolor*), coyote (*C. latrans*)], 18 were wolf related, and 10 were probably wolf related.  That is, 28 events involved wolves or probably involved wolves.  These included uninjured livestock, injured livestock, and killed livestock (Table 4).  The Interagency Field Team recorded 10 confirmed livestock-wolf interactions where no injury or death occurred.  At a minimum, 55% (26) of all free-ranging wolves have interacted with livestock.  Thirty-six percent (17) have interacted with livestock 3 or more times.  Approximately 10% have interacted with livestock 5 or more times.  Approximately three-quarters of the livestock injuries or deaths occurred on National Forests.

The number of reported livestock-wolf interactions varied seasonally (Figure 27).  The interactions reported annually since the first reintroduction of Mexican wolves were; 5 from March 1998 to March 1999, 17 from March 1999 to March 2000, and 6 from Mar 2000 to Mar 2001.

Seventeen (17) reports of wolf interactions with cats or dogs were recorded between March 1998 and March 2001.  These 17 reports included uninjured dogs, injured dogs, and killed dogs or cats.  Of these, we concluded that; 13 interactions involved wolves; 1 interaction probably involved a wolf, and; 3 interactions cannot be classified using the data provided.  The Interagency Field Team recorded 8 dog-wolf interactions where no injury or death occurred.  Of the 13 interactions that definitely involved wolves, 5 resulted in the cat or dog being killed or injured (Table 5).

The average response time for all reported domestic animal-wolf interactions was less than 24 hours.  The longest response time was 3 days, which occurred once.

**Table 4.**  Numbers of domestic animal injuries and deaths due to wolf depredation.  The data are for confirmed, probable and unconfirmed wolf depredations.

| SPECIES | OUTCOME OF INTERACTION | |
|---|---|---|
| | **Injured** | **Killed** |
| Cow | 1 | 5 |
| Calf | 2 | 8 |
| Bull | 1 | 1 |
| Mini Colt | 0 | 1 |
| Lamb | 0 | 1 |
| Dog | 3 | 1 |
| Cat | 0 | 1 |
| **Total** | 7 | 18 |

**Table 5.**  Ownership of property where domestic animal injuries and death due to wolves took place.  The data are for confirmed, probable, and unconfirmed  wolf depredations.

| OWNERSHIP | LIVESTOCK INJURIES OR DEATHS | CAT/DOG INJURIES OR DEATHS |
|---|---|---|
| National Forest | 14 | 1 |
| Private | 3 | 2 |
| Other or not recorded | 2 | 2 |



**Figure 27**. The number of livestock-wolf interactions fluctuated seasonally in the primary recovery zone.

d.    CONCLUSIONS

Livestock are omnipresent in the Blue Wolf reintroduction area. Because of the extensive temporal and spatial distribution of livestock, interactions with wolves are unavoidable. From the information made available to us, we believe the Service has been responsive to wolf-livestock and wolf-domestic animal conflicts. An equivalent level of responsive will be necessary in the future. Similarly, livestock producers using public lands can make a substantive contribution to reducing conflicts with wolves through improved husbandry and better management of carcasses.

# 11.  HAVE DOCUMENTED CASES OF THREATS TO HUMAN SAFETY OCCURRED?

Although no injuries or deaths have occurred, several wolf-human interactions have been reported.  Consequently, evaluation of these incidences is largely qualitative based on our experiences with wolves in other parts of North America.  We note that captive reared wolves released to the wild  may behave differently than wild born wolves (Breitenemoser *et al.* in press).

### a.     DATA SUMMARY AND METHODS
Our analysis of this issue is based on interpreting records in the Events and Incidences database.

### b.     RESULTS
The Interagency Field Team reported eleven interactions between March 1998 and March 2001 (Table 6).  On average, they reported one event every 3 months.  However, the rate may be increasing (3 events from Mar 1998 to Mar 1999, 1 event from Mar 1999 to Mar 2000, 7 events from Mar 2000 to Mar 2001).  If the rate is increasing, it is probably due to more wolves rather than an increased propensity for wolves to interact with humans.  On average, one interaction was reported every 7 weeks from Mar 2000 to Mar 2001.  Although data are too few to be certain, interactions do not seem to predominate in any particular time of the year.

Seven (of 11) interactions involved something that would be expected to attract wolves (e.g., dogs, deer carcass, livestock).  Specifically, 5 (of these 7) involved dogs.  One (of 11) interaction was instigated by the people involved (event #10).  In 2 (of 11) events, the people involved _felt_ as though their lives were threatened.  In 4 (of the 11) events, an official response (i.e., from reintroduction personnel) occurred within 24 hours.  In the other 7 events, no response date or time is reported.  In 9 (of the 11) events, response involved an inspection of the site.

In 2 events (# 1 and #7), the people involved reported being fearful for their safety.  However, experience suggests that because the people of event #7 responded appropriately, they were probably never in danger.  In event #1, the wolf was shot.  Event #8 is similar to cases in Ontario, British Columbia, and Alaska where wolves have injured people.  In these all these cases, the people responded inappropriately to curious wolves or wolves attracted to food.

Twelve (12) different wolves have been involved with human interactions.  Approximately 25% of all the wolves that have been released into the wild have been involved in a reported wolf-human inearction.  Eight (of these 12) wolves were involved in only a single event.  One (of these 12) wolves (i.e., 590) was involved in 4 events.  All these events took place in August and September of 2000.  Since then, wolf 590 has not been involved in any human interactions.  Three (of the 12) wolves (i.e., 587, 509, 511) were involved in 3 events.  All 3 events included wolf 590.

The 'immediate' fate of the 12 wolves was: 1 shot, 2 brought into captivity, 1 brought into an acclimation pen, and in 8 cases no attempt was made to capture the wolf.  The 'ultimate' fate of of the 12 wolves was: 2 shot, 3 permanently brought into captivity, 6 either are still free-ranging or died of natural causes, and for 1 wolf (i.e., #298, the potential data entry error) no data were available.

**Table 6.**  Summary of wolf-human interactions reported for the Mexican wolf reintroduction program, 1998-2001.

| EVENT | DATE | WOLVES INVOLVED | MEMO |
|---|---|---|---|
| 1 | April 28, 1998 | 156 | Wolf 156 was shot by a camper who feared for his family's safety when the wolf came into their camp and attacked their dog. |
| 2 | May 8, 1998 | 494 | 494 became a nuisance frequenting the town of Alpine from 5/8/98 through 5/28/98 and was permanently removed from the wild. |
| 3 | January 6, 1999 | 166, 482 | Campbell Blue pair jerked down a deer carcass hanging in some archery hunter's camp. |
| 4 | January 5, 2000 | 522 | Female 522 hanging around hunters camp interacting with dogs.  Trapped and put in acclimation pen to hold through hunting season. |
| 5 | April 14, 2000 | 166, 518 | Dean Warren reported very aggressive encounter with Campbell Blue pair with the female, 518 bumping his horse and passing under it.  Wolves also attacked one of his dogs.  They followed him to cabin and he held up in it until the wolves left. |
| 6 | May 16, 2000 | 298, 191 | Renee Dupree jogging with 2 dogs when 2 wolves approached -- wolves clearly interested in dogs.  Renee scares wolves away. |

| 7 | August 20, 2000 | 511, 509, 587, 590 | Don and his cocker spaniel were out in the middle of the meadow behind his trailer when 4 wolves ( most likely Francisco) came tearing out of the woods towards them.  Don fired 1 hot in front of the wolves but they kept coming ("one with a look of fierce determination").  He fired a second shot as they got closer and they reared away.  He was very upset at the situation and felt that they were a danger to both people and animals/pets.  Later that week, people camped nearby observed several wolves and pups resting in the shade under and around Don's trailer. At the time, he was inside watching golf with his dog, unaware that the wolves were outside.  He was irate when he learned of the incident, stating that this was not the behavior of wild animals and concerned about what would have happened had he or his dog come out of the trailer. |
| 8 | August 24, 2000 | 511, 509, 587, 590 | Scott observed Francisco (and Cienega) on multiple occasions during his time camping at Double Cienega.  Sometimes they came right through cmp < 5 ft of him taking pictures, although the pups seemed more skittish, other times farther away within the campground or out in the meadow. He also saw them once farther up Double Cienega and "the shaggy one" (yearling male 590) laid down w/in 10 ft and just looked at him while he took pictures. |
| 9 | September 25, 2000 | 590 | Yearling male 590 hanging around Double Cienega Campground for the majority of the day. |

| 10 | September 29, 2000 | 511, 509, 587, 590 | 5-6 people camped in Double Cienega from about 8/21-8/30/00. Throughout the week they interacted with Francisco. On multiple occasions they howled the pack in, chased them on ATVs, left food out, and shot blunt arrows at them. The wolves also chased their horses, mules, and the people in the ATVs. They were informed that this behavior was not acceptable, and we explained that what they were doing may possibly have negative effects on the wolves behavior. On 8/30/00, while speaking with the hunters, N. Sanchez observed the wolves chasing the mules. He then hazed the wolves by running at them and throwing rocks. They ignored him. We first spoke with the group on about 8/23/00. We informed them about the Mexican Wolf Recovery Project, the presence of wolves in the area, and proper behavior with respect to the wolves (ie. Do not leave out food; keep an eye on mules/ horses; if you see the wolves, yell and throw rocks at them.) We also told them to let us know if they had any interactions with the wolves. |
| 11 | October 1, 2000 | Unknown | At about 0440 Cole went out the front door on the porch and observed an animal in the driveway. At first he thought it was a German Shepard, then by the color and size he realized it was a wolf. He shewed it away and it headed west down the road. He tried to follow it in his truck but lost track of it. When he got back to the house it was by the back door eating out of the dog dish. He shewed it away again and it ran behind the house between the animal pens and the barn. He checked the dog dish and it was empty. He was not sure if there had been food in it or not. Stark and Grant responded to the call made by Ms. Leona Brown (the landowners sister). We looked at the area where the report was taken and observed large canid tracks in the driveway and yard. (track size=5x3 1/2", in sand and gravel). No other tracks were found in area. Stark and Armistead returned on 10/2 at about 0500. |

c.    CONCLUSIONS

Wolf-human interactions have been reported consistently and regularly since the beginning of the program.  Approximately 25% of the individuals in the free-ranging population have been involved with wolf-human interactions.  As the wolf population grows, the Program should be prepared for steadily increasing frequencies of wolf-human interactions.  Over time, the frequency of wolf-human interactions (per wolf) may decline with wild-born wolves that are less tolerant of humans.  Because wolves can pass information between generations, the attraction to humans may take some time to extinguish.  In the Republic of Georgia, for example, captive-born wolves were intensively trained to kill wild prey and to avoid humans before their reintroduction.  This release procedure was considered successful after the third generation of wild-born wolves still showed the same behavior as their hand raised parents (J. Badrize pers. comm.).

The Program has responded well to wolf-human interactions, although documentation and data recording have been poor.  For example, in the databases USFWS provided us no response dates or times were recorded for 7 events.  It is critical that the Interagency Field Team keep comprehensive notes on wolf-human interactions.  The Program should continue its practice of responding to all wolf-human interactions with immediate on site inspections and investigations.  The Interagency Field Team appears to have made responsible decisions regarding the recapture of wolves involved in human interactions.

# 12.    OVERALL CONCLUSIONS AND RECOMMENDATIONS

### a.    PREFACE

On 25 April we convened a meeting in Globe, Arizona to present our draft report to the Mexican Wolf Interagency Management Advisory Group (IMAG).  We purposefully presented a draft to provide the IMAG a chance to make substantive contributions to our review.  Many comments we received during the meeting clarified issues, thus materially improving our review.  During the week of 30 April the draft report was, without our knowledge released to the media.  During the following weeks several newspaper stories presented the findings of our draft review as final determinations.  Moreover, on 12 May the Arizona Game and Fish Commission received a briefing about the reintroduction from representatives from the Arizona Game and Fish Department who also presented our draft findings as final determinations.  Draft reports are by definition works in progress.  Any discrepancy between the conclusions and recommendations presented in the draft report and those presented here are a result of that simple fact.

Our conclusions and recommendations are based on our analysis of the data.  We believe the long term objective is to protect the wolf population and meet human needs by reducing the potential for one to seriously encroach upon the other.  Current circumstances demand that wolves be conserved in a human dominated landscape.  This requires a systematic and rigorous approach to wolf recovery that integrates the social and economic aspirations of humans with the ecological necessities of wolves.

### b.    CONCLUSIONS

The ultimate factor determining population viability for wolves is human attitude.  Thus, an active and fully enabled Recovery Program comprising private interests, non governmental conservation organizations, local, state, federal, and tribal agencies is essential to ensure success of any restoration.  The biology, politics, and sociology of wolf reintroduction in the Blue River Wolf Recovery Area are too complex for recovery to be successful without a fully engaged and participatory Program.  Fortunately, the Service has a successful history of reintroducing and effectively managing recovered wolf populations in other parts of the country (Refsnider 2000).  Based on this success and the first 3 years of the Mexican wolf reintroduction, we think that expecting a similar outcome in the Blue River Wolf Recovery Area is reasonable.

Overall we are satisfied with the progress of the reintroduction project since its inception in 1998.  During May 2001, the Service reported that at least 28 wolves were free-ranging.  Most of these animals are in social groups and the Service reports up to 5 litters have been produced in the wild this spring.  Monitoring of reintroduced wolves has revealed that captive-born Mexican wolves can adjust to life in the wild by primarily preying on elk.  This fact combined with the likely presence of several litters in the wild bodes well for the future.  We believe the likelihood is high that continued application of the Service's current practices will result in the restoration of a self-sustaining population of Mexican wolves in the Blue Range Wolf Recovery Area.  We believe, however, the Program should continue with some adjustments and modifications.

Not surprisingly, our review revealed room for improvement.  Restoration of any wildlife population is fraught with uncertainty and work elsewhere shows that many projects are unsuccessful because of a failure to accommodate new information (Breitenmoser *et al.* in press).

Several factors currently hinder recovery of a self-sustaining and viable wolf population.  Those that predominate are:

1.     The small areal extent of the primary recovery zone, which greatly hinders the vigor of the reintroduction phase of the reestablishment project

2.     The Service's insistence that wolves only inhabit the small Blue Range Recovery area, which is at odds with the naturally extensive movements that characterize gray wolves and current thinking regarding the viability of large carnivore populations (Noss *et al.* 1996).

3.     The Service's embrace of a target population of 100 wolves (EIS, page 2) when such a population is not viable over the long term (Shaffer 1987, IUCN 1994, Noss *et al.* 1996, Breitenmoser *et al.* in press).

c.     RECOMMENDATIONS

The architects of the Mexican wolf reintroduction program properly accounted for the inevitable uncertainty and difficulty of the project by establishing adaptive management as the overarching operational paradigm.  Consequently, our recommendations are largely the inevitable result of the reintroduction project's maturation.  In this regard, we predict that the next review will also identify changes that can be made for improving the program..

If the Service adopts the recommendations presented below then the effectiveness of the reintroduction project and prospects for success will improve.  Proper adoption of our recommendations will require a long-term and diligent effort by the Service.  For many of the recommendations to be effective, biologists involved in the daily matters of the reintroduction effort must embrace them as standard operating procedures.

The current reintroduction project will greatly influence the future of the Mexican wolf recovery program since additional reintroduction projects will be required to remove *Canis lupus baileyi* from the list of endangered and threatened wildlife.  Accordingly, we used our review to develop a few recommendations that consider Mexican wolf recovery overall.  We also decided to consider programmatic issues that are germane to reintroduction, and issues the Service did not provide data for such as injuries resulting from capture.  All of the recommendations below relate directly to the successful restoration of Mexican wolves the BRWRC.  We did not elaborate on several biological issues, identified in our recommendations as important, because the reintroduction process is in too early a stage to have accumulated sufficient data.

**Biological and Technical Aspects**

*WE RECOMMEND THAT THE SERVICE:*

**Continue to develop appropriate opportunities to release (and re-release) wolves for at least 2 years to ensure the restoration of a self-sustaining population.**

**Begin developing population estimation techniques that are not based exclusively on telemetric monitoring.**  As the wolf population grows it will become increasingly difficult to maintain telemetric contact with all known or suspected packs.  Consequently, the Service needs to

develop non-telemetrically-based methodology (e.g., track station surveys, genetic sampling of hair or fecal material) for assessing the distribution and size of the wolf population.

**Develop data collection forms and data collection and management procedures similar to those used by the red wolf restoration program in North Carolina.**

**Require biologist to promptly and carefully enter field data into a computer program for storage and analysis.** The Service should require biologists to record data on a per wolf and per day basis. Data checking should be improved to eliminate data entry errors. In this regard, picklists and auto filling fields can simplify data entry and improve accuracy. Lastly, the Service should require that data files be proofed at least once before they conduct analyses. We remind field biologist working on the project that generally 1 hour of productive time in the field requires 2 hours in the office for data management and initial analyses.

**Make all data available for research and peer review.**

**Carefully consider using a modified #3 soft-catch trap for capturing Mexican wolves rather than the McBride #7.** We are concerned that the #7 might cause unacceptably frequent and serious foot injuries. The Service might find that a modified #3 soft-catch trap is more appropriate for capturing wolves that have a high probability of being re-released or that are fairly small (e.g., smallish adults or pups). Modified soft-catch traps have been used to capture hundreds of red wolves that are similar in size to Mexican wolves and larger gray wolves (Quebec) with no serious foot injuries (M. Phillips unpublished data, P. Paquet unpublished data). However, careful consideration of all aspects of capturing wolves with leghold traps will lead to a proper decision about the use of a modified trap for capturing Mexican wolves.

**Encourage research that will help to inform future Program evaluations and adjustments.**
The research we suggest is beyond the scope of the current Mexican wolf program because of resource limitations (personnel and fiscal) and the need to focus on the central mission of reintroducing wolves. However, research partnerships with universities and other organizations should be developed. Increasing the capacity of the Mexican wolf recovery Program, should be a principle charge of the Recovery Team. The following areas are of contemporary conservation and academic interest and should be research priorities:

1.  Population modeling (PVA and metapopulation model) and sensitivity analysis of short-and long-term demography and distribution
1.  Assessment of new threats to population including new guild structure, disease, and human activity.
2.  Habitat viability analyses of the release area and projected population range (environment, resources, carrying capacity, spatial characteristics, etc.)
3.  Development of guidelines for decision-making in conflict situations
4.  Reassessment of policies for intervention in the release phase
5.  Assessment of monitoring programs
6.  Evaluation and design of long-term management program, including

      a.     Evaluation design of long-term monitoring program
          1.     demography and population range
          2.     genetic surveillance
          3.     health surveillance
          4.     long-term adaptation of individuals and population to ecosystem
          5.     effects on ecosystem (predation, displacement)

7.    The interaction of Mexican wolves with other carnivores in the reintroduction area. Reintroduction or recolonization of wolves influences the behavior, abundance, and distribution of other carnivore species. For example, wolf recovery in the Rocky Mountains has resulted in interference and exploitation competition among wolves, bears, coyotes, and cougars, causing changes in the composition and structure of the carnivore guild.

**Develop a contemporary definition of a biologically successful wolf reintroduction and the criteria needed to measure success. The latter includes methods and time scales. Specific issues that need to be considered are:**

1.    How many wolves and how many breeding pairs will result in a demographically and genetically viable population?
2.    How do metapopulation dynamics affect the viability of Mexican wolves?
3.    How broad a geographic area would such a population inhabit?
4.    What affect will a viable population have on elk, deer, cattle, etc.?
5.    What target population size will lead to long-term demographic viability?
6.    What target population size will lead to long-term genetic viability?

     We propose the application of the IUCN Red List Categories (IUCN 1994) to assess success and failure at 5 and 10 years following completion of the release phase (Table 7). The classification is based on an assessment using 5 criteria; population reduction, area of occurrence and occupancy, 2 criteria for population density, and a quantitative analysis of the extinction probability. If the population is assessed as "critically endangered" after 10 years the project should be considered a failure because there is a very high risk of extinction in the wild in the future. The minimum standard for success should be vulnerable or better. Vulnerable populations still face a high risk of extinction in the medium-term future and require ongoing management.

**Table 7.** Biological criteria for measuring project success of Mexican wolf reintroduction at about 5 and 10 years following completion of reintroduction phase. If the evaluation falls between failure and success, the viability of the population should be classified as uncertain. These guidelines follow the Red List Categories (IUCN 1994: www.iucn.org/themes/ssc/redlists/ssc-rl-c.htm)

| CRITERIA | FAILURE | SUCCESS |
|---|---|---|
| Population reduction of x%, projected or suspected within the next 10 years. | > 80% | < 20% |

| | | |
|---|---|---|
| Extent of occurrence estimated to be x km² or area of occupancy estimated to be y km², and estimates indicating 2 of the following: (1) severely fragmented or known to exist in only one location; (2) projected decline or extreme fluctuations in extent of occurrence, area of occupancy, habitat area or quality, number of locations or subpopulations, or number of mature individuals; (3) continuous, observed, inferred or projected decline in area, extent or quality of habitat. | x < 100 <br> y < 10 | x ≥ 5,000 <br> y ≥ 500 |
| Population estimated to number x mature individuals and projected continuous decline in number of mature individuals, and population severely fragmented or all individuals in a single population | x < 250 | x ≥ 250 |
| Population estimated to number x mature individuals. | x = 50 | x ≥ 250 |
| Probability of extinction is x within ye years or z generations, whichever is longer. | x ≥ 50% <br> y = 10, z = 3 | x < 20% <br> y = 20, z = 5 |

## Valuational and Organizational Aspects

WE RECOMMEND THAT THE SERVICE:

**Modify the recovery team by inviting an appropriate individual other than the recovery coordinator to serve as the team leader**.  While ultimate responsibility for Mexican wolf recovery would still reside with the recovery coordinator, enlisting another individual to serve as team leader would increase the capacity of the recovery program.  Other recover program use this administrative structure and it works well (e.g., the California condor recovery program).

**Instruct the modified recovery team to revise by June 2002 the 1982 recovery plan.**  A revision of the recovery plan is long overdue for several reasons.  First, the current plan does not contain any standards for removing *C. l. baileyi* from the endangered species list.  Second, since the plan was approved great advances have been made in the science of conservation biology; such advances would greatly instruct revision of the recovery plan.  Finally, due to work with red wolves in the southeast, gray wolves in the Great Lakes states and the northern Rockies, and Mexican wolves in the Blue River Wolf Recovery Area we have a much greater understanding of wolf reintroductions and management; such understanding would greatly inform revision of the Mexican wolf recovery plan.

**Immediately engage the services of the modified recovery team**. The challenges of wolf restoration are many and varied. Meeting such challenges requires a restoration effort that is itself diverse and capable. The current reintroduction project and Mexican wolf recovery in general would benefit substantially from the efforts of a fully engaged recovery team.

**Immediately modify the final rule (Parsons 1998) and develop the authority to conduct initial releases into the Gila National Forest.** Several releases conducted during the first 3 years of the reintroduction project resulted in wolves settling much of the primary recovery zone in the Blue River Wolf Recovery Area. As work elsewhere (Phillips unpublished data) has revealed, wolves should not be released in areas that support resident animals. Over time, it will become harder for the Service to find suitable release sites in the primary recovery zone. The Service can best address this problem by obtaining the authority to conduct initial release in the secondary recovery zone, most notably the Gila National Forest. This recommendation was first made to the Service by a panel of experts (including Phillips) enlisted by the Service to review the reintroduction program in January 1999. Despite the Service's approval of the recommendation, they have taken no implementation action. This is by far the most important and simplest change the Service can make to the existing reintroduction project. The Gila National Forest is approximately 75% of the 4.4 million acre Blue River Wolf Recovery Area. The Gila Forest includes about 700,000 acres that are roadless and free of livestock. Several high-quality release sites are available in the area. Using them is the best way for improving the cost-effectiveness and certainty of the reintroduction project. Accordingly, we strongly recommend that the Service immediately take whatever action is necessary to conduct initial releases of captive-born (and wild-born if appropriate) Mexican wolves to the Gila National Forest.

**Immediately modify the final rule to allow wolves that are not management problems to establish territories outside the Blue River Wolf Recovery Area.** For specific language and instruction for this modification we strongly recommend that the Mexican wolf recovery program review the final rule promulgated for the gray wolf recovery in the northern Rockies (Bangs 1994). During the first 3 years of the reintroduction the Service recaptured some Mexican wolves simply because they left the Blue River Wolf Recovery Area. As the wolf population grows, more animals will disperse from the Blue River Wolf Recovery Area. Retrieving animals because they wander outside the primary recovery area is is inappropriate because it is:

1.    inconsistent with the Service's approach to recover wolves in the southeast, Great Lakes states, and the northern Rockies;

2.    will lead to serious logistical and credibility problems as the wolf population grows and more wolves disperse from the area; and

3.    needlessly excludes habitat that could substantially contribute to recovery of *Canis lupus baileyi*.

Before the current Mexican wolf reintroduction project was initiated, the red wolf recovery program adopted a similar approach (Henry 1995) with dire consequences (Phillips and Smith 1998). Extensive tracts of public land and some private land outside the Blue River Wolf Recovery Area are suitable for wolves. Consequently, we strongly recommend that the Service develop the appropriate flexibility to allow wolves to occupy lands outside the Blue River Wolf

Recovery Area. We believe that obtaining the requisite flexibility will require that the Service modify the final rule currently governing the reintroduction project.

We recognize that the statements above as they relate to private land may cause controversy so we offer the following remarks. Allowing Mexican wolves to inhabit suitable tracts of private land (e.g., large holdings) in the absence of problems, would bring the reintroduction project into compliance with Service-led efforts to recover wolves elsewhere. Allowing wolves to inhabit private property in the absence of a problem should not be construed to mean that the Service would begin to actively target private lands as wolf habitat that needs to be settled. Quite the contrary, and note that nowhere is the Service effecting management of private land to promote wolf conservation. However, throughout the U.S (except in the Blue River Wolf Recovery Area) if a wolf wanders onto private property and does not cause a definable problem, and its mere presence is not a definable problem, then the Service is not required to remove the animal even if the landowner demands such action.

Such an approach to wolf recovery is consistent with the determination in the United States that the public owns wildlife, rather than private landowners. Within limits, landowners can manage their property in a way that promotes or hinders the welfare of wildlife. However, through laws enforced by state and federal officials, citizens decide under what circumstances wildlife can be captured and moved or killed from public <u>and</u> private land. Such decisions are not the prerogatives of the landowner, regardless of whether the animal(s) in question are naturally occurring or present because of a reintroduction program.

In sharp contrast with the Service's approach elsewhere, the Mexican wolf project developed a rule that requires wolves to be removed from public and private land outside the Blue River Wolf Recovery Area, even in the absence of a problem (Parsons 1998). Such regulations are inappropriate for at least 2 reasons: 1) they are nearly impossible to effectively carry out as the wolf population grows because of the difficulties of managing an ever-increasing number of wide-ranging dispersing animals, and 2) they establish a precedent that could be effectively used to argue for the removal of other endangered species inhabiting certain tracts of public or private land.

Certainly local opposition to the Mexican wolf reintroduction program affected the development of such a rule. Indeed, the recovery program coordinator assumed from personal knowledge of local politics and sentiments that a more restrictive rule would have significantly hindered and possibly caused the termination of the project (D. R. Parsons personal communication 1996). Maybe this was a valid assumption. Opinion polls, however, suggest widespread and persistent local support for wolf recovery in the southwest (Duda and Young 1995, Pate *et al*. 1996, Meadows 2001). Regardless, noting that wolf recovery elsewhere has faced substantial opposition is instructive, but the Service did not promulgate similarly onerous rules (e.g., see Bangs 1994, Henry 1995). And to date, recovery efforts elsewhere have been quite successful (Refsnider 2000).

**Resist any opportunity to reintroduce Mexican wolves in the White Sands Wolf Recovery Area (WSWRA)**. Two independent assessments suggest that the WSWRA could support only 20 to 30 wolves (Bednarz 1989, Green-Hammond 1994); such a population is not viable (Shaffer 1987). The inability of the WSWRA to support a viable population of wolves is due to the area's relative smallness (about 10,311 km$^2$ or 4,028 mi$^2$) and its distance from other suitable habitat.

For example, the WSWRA is about 100 km (62 miles) from the extreme eastern edge of the BRWRA. While wolves can easily traverse such a distance, the "dispersal area" comprises very poor wolf habitat, supports the town of Truth or Consequences, New Mexico in its core, and is bisected by the heavily traveled federal Interstate 25. Accordingly, the USFWS should not expend resources on reintroducing wolves to the WSRWA.

**Provide biologists with opportunities to visit other wolf projects to gain training with capturing and handling free-ranging and captive wolves.**

**Station the field coordinator in the Blue River Wolf Recovery Area (e.g., in Glenwood or Silver City, New Mexico or Alpine, Arizona) and insist that this person be intimately involved with all aspects of fieldwork (wolf management; public relations; data collection, management, analysis, report preparation; etc.).** We think it would be a serious mistake to station the field coordinator in the Regional Office in Albuquerque. Such a decision would add a level of complexity that is entirely unwarranted.

**Put forth a concerted effort to develop realistic expectations for the project.** Restoration is an imprecise process that is by definition "heavy-handed". The Service needs to constantly remind the public and the media of this fact. It is certain that the Service will have to overcome great challenges in the future. Such challenges will mean that intervention will be required, that wolves will disappear, and that some animals will die. But just as certainly, meeting the challenges will ensure the restoration of a self-sustaining population of Mexican wolves in the Blue River Wolf Recovery Area.

**Initiate programs to educate people about wolf behavior. In most events involving humans, wolves are interested in dogs or food (e.g., carcasses, dog food, etc.).** Members of the program expected to respond to wolf-human interactions should be well educated on the nature and variety of reports from Algonquin provincial park, Alaska, and British Columbia. The Program should contact other western communities and agencies that have dealt with large carnivore-human interactions (e.g., mountain lions, bears, wolves). The Program should also actively warn people that dogs, deer/elk carcasses, and livestock carcasses may attract wolves. Although the danger is not the same, hunters should be advised to behave as though they are in grizzly bear country.

**Require livestock operators on public land to take some responsibility for carcass management/disposal to reduce the likelihood that wolves become habituated to feeding on livestock.** Currently livestock grazing is permitted on about 66% of the Blue River Wolf Recovery Area. At least 3 packs were removed from the wild because they scavenged on dead livestock left on national forest lands. Such scavenging may predispose wolves to eventually prey on livestock. Accordingly, reducing the wolves' access to carcasses will greatly facilitate coexistence between ranchers and wolves in this portion of the recovery area carcasses.

While some predation on livestock is inevitable, reasonable means of reducing the frequency of occurrence will enhance wolf recovery so that is respectful of the needs and concerns of livestock producers. Consequently, livestock producers using public land in occupied Mexican

wolf range should be required to exercise reasonable diligence in finding livestock that have died to either dispose of the carcass or enable the Service to do so.  Such diligence will probably reduce predation on livestock, which in turn will improve the cost-effectiveness and certainty of the reintroduction project.

**When writing or lecturing about the project, the Service should emphasize a community approach to understanding the wolf reintroduction project and its  effect on other species and ecological processes.**  Conservation policy is shifting away from the preservation of single species toward preservation and management of interactive networks and large-scale ecosystems on which species depend.  It is extremely important that the Service view the wolf reintroduction program in this context.

## BIBLIOGRPAHY AND LITERATURE CITED

Alexandre, A., J. P. Barde, C. Lamure and F. J. Langdon.. 1975. Road Traffic Noise. Halsted Press, Wiley & Sons. New York.

Ballard, W. B. and J. R. Dau. 1983. Characteristics of gray wolf, *Canis lupus*, den and rendezvous sites in southcentral Alaska. Canadian Field Naturalist 97:299–302.

Ballard, W. B., J. S. Whitman, and C. L. Gardner. 1987. Ecology of an exploited wolf population in south-central Alaska. Wildlife Monographs 98.

Ballard, W. B., L. A. Ayres, P. R. Krausman, D. J. Reed, and S. G. Fancy. 1997. Ecology of wolves in relation to a migratory caribou herd in northwest Alaska. Wildlife Monographs 135.

Bangs, E. E. 1994. Establishment of a nonessential experimental population of gray wolves in Yellowstone National Park in Wyoming, Idaho, and Montana – final rule. Federal Register 59:60252-60281.

Bangs, E. E., and S. H. Fritts. 1996. Reintroducing the gray wolf into central Idaho and Yellowstone National Park. Wildlife Society Bulletin 24:402-413.

Bednarz, J. C. 1998. An evaluation of the ecological potential of White Sands Missile Range to support a reintroduced population of Mexican wolves. Endangered Species Report 19. U.S. Fish and Wildlife Service, Albuquerque, New Mexico. 96 pp.

Beier, P. 1993. Determining minimum habitat areas and habitat corridors for cougars. Conservation Biology: 7:94-108.

Berg, W. E., and D. W. Kuehn. 1982. Ecology of wolves in northcentral Minnesota. Pages 4 - 11 *in* F. H. Harrington, and P. C. Paquet, editors. Wolves of the world - perspectives of behaviour, ecology and management. Noyes Publications, Parks Ridge, New Jersey, USA.

Bergerud, A. T. 1985. Antipredator strategies of caribou: dispersion along coastlines. Canadian Journal of Zoology 63:1324-1329.

Bjorge, R. R., and J. R. Gunson. 1989. Wolf, *Canis lupus*, population characteristics and prey relationships near Simonette River, Alberta. Canadian Field-Naturalist 103:327-334.

Boitani, L. 1982. Wolf management in intensively used areas of Italy. Pages 158-172 *in* Harrington, F.H., and Paquet, P.C., eds. Wolves of the World. Noyes Publications, Park Ridge, N.J.

Boutin, S.  1992.  Predation and moose population dynamics:  a critique.  Journal of Wildlife Management. 56:116-127.

Boyd, D. K.  1997.  Dispersal, genetic relationships and landscape use by colonizing wolves in the central Rocky Mountains. Ph.D. thesis, University of Montana. 184 pp.

Boyd, D. K., D. H. Pletscher, R. R. Ream, and M. W. Fairchild.  1994.  Prey characteristics of colonizing wolves and hunters in the Glacier National Park area.  Journal of Wildlife Management.  58:289-295.

Boyd, D. K., P. C. Paquet, S. Donelon, R. R. Ream, D. H. Pletscher, and C. C. White. 1996.  Transboundary movements of a recolonizing wolf population in the Rocky Mountains.  Pages 135-140 in L. N. Carbyn, S. H. Fritts, and D. R. Seip, eds. Ecology and conservation of wolves in a changing world. Canadian Circumpolar Institute, University of Alberta, Edmonton, Alberta.

Brand, C. J., M. J. Pybus, W. B. Ballard, and R. O. Peterson.  1995.  Infectious and parasitic diseases of the gray wolf and their potential effects on wolf populations in North America.  Pages 419-429 *in* L. N. Carbyn

Breitenemoser, U., Breitenmoser-Würsten, C., Carbyn, L. N., and S. M. Funk.  In press.  Assessment of carnivore reintroductions.

Brown, J. H., and A. Kodric-Brown.  1977.  Turnover rates in insular biogeography: effect of immigration on extinction.  Ecology 58:445-449.

Burnham K.P. and D.R. Anderson.  1998.  Model selection and inference, Springer Verlag New York.

Burrows, F., P. Krizan, G. Neale, and P. Paquet.  1996.  Interim report on the ecology of gray wolves and associated prey species in the Greater Pukaskwa Ecosystem, Ontario, 1994-1996.  Parks Canada, Heron Bay, Ontario, Canada.  93pp.

Carbyn, L. N.  1974.  Wolf predation and behavioural interactions with elk and other ungulates in an area of high prey diversity.  Ph.D thesis, Univ.  Toronto, Toronto.  233pp.

Carbyn, L. N.  1982.  Incidence of disease and its potential role in the population dynamics of wolves in Riding Mountain National Park, Manitoba.  Pages 106 – 116 *in* F. H. Harrington and P.C. Paquet, editors.  Wolves of the world: perspectives of behaviour, ecology, and conservation.  Noyes, Park Ridge, New Jersey, USA.

Caro, T. M. and M. K. Laurenson.  1994.  Ecological and genetic factors in conservation: a cautionary tale. Science 263: 465-466.

Chapman, R. C.  1977.  The effects of human disturbance on wolves (*Canis lupus*).  M.S. Thesis, Univ. Alaska, Fairbanks.  209pp.

Ciucci, P., L. Boitani, F. Francisci, and G. Andreoli.  1997.  Home range, activity, and movements of a wolf pack in central Italy.  Journal of Zoology (London) 243:803-819.

Cowan, I. McT.  1947.  The timber wolf in the Rocky Mountain National Parks of Canada.  Canadian Joural of Res. 25:139-174.

Curatolo, J. A. and Murphy, S. M.  1986.  The effects of pipelines, roads, and traffic on the movements of caribou, *Rangifer tarandus*, Canadian Field Naturalist.  100:218-224.

Doak, D. F.  1995.  Source-sink models and the problem of habitat degradation: general models and applications to the Yellowstone Grizzly.  Conservation  Biology. 9:1370-1379.

Duda, M. D., and K. C. Young.  1995.  New Mexico resident's opinions toward Mexican wolf reintroduction.  Responsive Management, Harrisonburg, Virginia.  60 pp.

East, R.  1981 . Species-curves and populations of large mammals in African savanna reserves.  Biological Conservation 21:111-126.

Eberhardt, L. L.  1977.  Optimal policies for conservation of large mammals, with special reference to marine ecosystems.  Environmental Conservation 4:205-212.

Eisenberg, J. F.  1980.  The density and biomass of tropical animals.  Pages 35-55 *in* M. E. Soule, and B. A. Wilcox, editors.  Conservation biology: an evolutionary - ecological perspective.  Sinauer Associates Incorporated, Sunderland, Massachusetts, USA.

Emmons, L. E.  1984.  Geographic variation in densities and diversities of non-flying mamals in Amazonia.  Biotropica 16:210-222.

Forbes, G. J., and J. B. Theberge.  1995.  Influences of a migrating deer herd on wolf movements and mortality in and around Algonquin provincial park, Ontario.  Pages 303-313 *in* L. N. Carbyn, S. H. Fritts, and D. R. Seip, editors.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Edmonton, Alberta, Canada.

Forbes, G. J., and J. B. Theberge.  1996.  Response by wolves to prey variation in central Ontario.  Canadian Journal of Zoology 74:1511-1520.

Forbes, S. H. and D. K. Boyd.  1996.  Genetic variation of naturally colonizing wolves in the central Rocky Mountains.  Conservation Biology 10: 1082-1090.

Forbes, S. H. and D. K. Boyd.  1997.  Genetic structure and migration in native and reintroduced Rocky Mountain wolf populations.  Conservation Biology 11:1226-1234.

Forman, R. T. T.  1995.  Land Mosaics: the ecology of landscapes and regions.  Cambridge University Press, Cambridge, Mass.

Forman, R. T. and A. M. Hersperger.  1996.  Road ecology and road density in different landscapes, with international planning and mitigation solutions.  *In* G. L. Evink, D. Zeigler and J. Berry (eds.) Trends in addressing transportation related wildlife mortality. Florida Department of Transportation. Orlando.

Forman, R. T. T., and M. Godron.  1986.  Landscape ecology. John Wiley and Sons, New York, N.Y. 619pp.

Frankel, O. H., and Soulé, M. E.  1981.  Conservation and evolution.  Cambridge Univ. Press, London.

Franklin, J. F.  1993.  Preserving biodiversity: species, ecosystems, or landscapes.  Ecological Applications.  3:202-205.

Fritts, S. H.  1983.  Record dispersal by a wolf from Minnesota.  Journal of Mammalogy 64:166-167.

Fritts, S. H. and L. D. Mech.  1981.  Dynamics, movements and feeding ecology of a newly protected wolf population in northwestern Minnesota. Wildlife Monographs 80. 79 pp.

Fritts, S. H., and L. N. Carbyn.  1995.  Population viability, nature reserves, and the outlook for gray wolf conservation in North America.  Restoration Ecology 3:26-38.

Fuller, T. K., and L. B. Keith.  1980.  Wolf population dynamics and prey relationships in northeastern Alberta.  Journal of Wildlife Management 44:583-602.

Fuller, T. K.  1989.  Population dynamics of wolves in north-central Minnesota.  Wildlife Monographs 105.  41pp.

Fuller, T. K., W. E. Berg, G. L. Radde, M. S. Lenarz, and G. B. Joselyn.  1992.  A history and current estimate of wolf distribution and numbers in Minnesota.  Wildlife  Society  Bulletin. 20:42-55.

Gasaway, W. C., R. O. Stephenson, J. L. Davis, P. E. K. Shepherd, and O. E. Burris.  1983. Interrelationships of wolves, prey, and man in interior Alaska.  Wildlife Monographs 84.

Gasaway, W. C., S. D. Dubois, D. J. Reed, and S. J. Harbo.  1986.  Estimating moose population parameters from aerial surveys.  Biological Paper 22.  University of Alaska-Fairbanks, Alaska, USA.  108pp.

Gese, E. M, and L. D. Mech.  1991.  Dispersal of wolves (*Canis lupus*) in northeastern Minnesota, 1969 - 1989.  Canadian Journal of Zoology 69:2946-2955.

Gilpin, M. E.  1987.  Spatial structure and population vulnerability.  Pages 125-139 *in* Soulé, M. E., ed.  Viable populations for conservation.  Univ. Cambridge Press.  Cambridge, Mass.

Gese, E. M, and L. D. Mech.  1991.  Dispersal of wolves (*Canis lupus*) in northeastern Minnesota, 1969 - 1989.  Canadian Journal of Zoology 69:2946-2955.

Glanz, W. E.  1982.  The terrestrial mammal fauna of Barr Colorado Island.  Census and long-term changes.  Pages 239 *in* E.G. Leigh, Jr.., A.S. Rand, and D.M. Windsor, eds.  The ecology of a tropical forest: seasonal rhythms and long-term changes.  Smithsonian Institution Press, Washington, DC.

Green-Hammond, K. A.  1994.  Assessment of impacts to populatons and humans harvests of deer and lek caused by the reintroduction of Mexican wolves.  Contractor report to the U.S. Fish and Wildlife Service, Albuquerque, New Mexico.  30 pp.

Groebner, D. J., Girmendonk, A. L., and Johnson, T. B.  1995  .A proposed cooperative reintroduction plan for the Mexican wolf in Arizona.  Technical Report 56.  Nongame and Endangered Wildlife Program.  Arizona Game and Fish Department, Phoenix, Arizona.

Gunson, J. R.  1983.  Wolf-ungulate predation in North America: review of major studies.  Altberta Fish and Wildlife Division Report.  31pp.

Gunson, J. R.  1992.  Historical and present management of wolves in Alberta.  Wildlife Society Bulletin.  20:330-339.

Hansson, L.  1991.  Dispersal and connectivity in metapopulations.  Pages 89 – 103 *in* M. Gilpin, and I. Hanski, editors.  Metapopulation dynamics: empirical and theoretical investigations.  Academic Press, New York, New York, USA.

Harris, L. D. and P. B. Gallagher.  1989.  New initiatives fro wildlife conservation: the need for movement corridors.  Pages 11-34 in G.  MacKintosh (ed.).  Preserving communities and corridors.  Defenders of Wildlife, Washington, DC.

Harrison, S.  1991.  Local extinction in a metapopulation context: an empirical evaluation.  Pages 73-88 in M.  Gilpin and L.  Hanski (eds.).  Metapopulation dynamics: empirical and theoretical investigations.  Academic Press, New York.

Harrison, R. L.  1992.  Toward a theory of inter-refuge corridor design.  Conserv. Biol. 6:293-295.

Hayes, R. D., A. M. Baer, and D. G. Larsen.  1991.  Population dynamics and prey relationships of an exploited and recovering wolf population in the southern Yukon.  Yukon Fish and Wildlife Branch Final Report.  TR-91-1.  68pp.

Hayes, R. D., and A. Harestad.  2000.  Demography of a recovering wolf population in the Yukon.  Canadian Journal of Zoology.  78:36-48.

Hayes, R. D., A. M. Baer, U. Wotschikowsky, and A. Harestad.  2000.  Kill rate by wolves on moose in the Yukon.  Canadian Journal of Zoology.  78:49-59.

Hayes, R. D., and A. Harestad.  2000.  Wolf functional response and regulation of moose in the Yukon.  Canadian Journal of Zoology.  78:60-66.

Heisey, D., and T. K. Fuller.  1985a.  Evaluation of survival and cause-specific mortality rates using telemetry data.  Journal of Wildlife Management.  49:668-674.

Heisey, D., and T. K. Fuller.  1985b.  MICROMORT user's guide. Forest and Wildlife Population and Research Group, Grand Rapids, Minnesota.

Henry, V. G.  1995.  Revision of the special rule for nonessential experimental populations of red wolves in North Carolina and Tennessee – final rule.  Federal Register 60:18940-18948.

Holling, C. S.  1973.  Resilience and stability of ecological systems.  Annual Review of Ecology and Systematics.  4:1-23.

Holroyd, G. L. and K. J. Van Tighem. 1983. Ecological (biophysical) land classification of Banff and Jasper National Parks. Volume III: the wildlife inventory. Canadian Wildlife Service, Edmonton. 691 pp.

Huggard, D. J.  1991.  Prey selectivity of wolves in Banff National Park.  M.Sc. Thesis.  Univ. B.C., Vancouver, B.C.  119pp.

Huggard, D. J.  1993a.  Effect of snow depth on predation and scavenging by gray wolves.  Journal of Wildlife Management.  57:382-388.

Huggard, D. J.  1993b.  Prey selectivity of wolves in Banff National Park, I.  Age, sex, and condition of elk.  Canadian  Journal of Zoology.  71:130-139.

Huggard, D. J.  1993c.  Prey selectivity of wolves in Banff National Park, II.  Age, sex, and condition of elk. Canadian Journal of Zoology.  71:140-147.

IUCN.  1994.  Red list categories.  (www.iucn.org/themes/ssc/redlists/ssc-rl-c.htm

Jalkotzy, M. G., P. I. Ross and M. D. Nasserden.  1997.  The effects of linear developments on wildlife: a review of selected scientific literature. Prepared for Canadian Association of Petroleum Producers. Calgary. 224 pp.

Janz, B. and D. Storr.  1977.  The climate of the contiguous mountain parks. Atmospheric Environment Services, Toronto. Project report No. 30. 324 pp.

Jenkins, K.J., and R.G. Wright.  1988.  Resource partitioning and competition among cervids in the Northern Rocky Mountains.  Journal of Applied Ecology. 25:11-24.

Jensen, W. F.; Fuller, T. K.; Robinson, W. L.  1986.  Wolf, *Canis lupus* , distribution on the Ontario-Michigan border near Sault Ste. Marie.  Canandian Field Naturalist.

Kaplan, E. L. and P. Meier.  1958.  Nonparmetric estimation from incomplete observations.  Journal of American Statistics Association 53:475-481.

Kay, C. E.  1990.  Yellowstone's northern elk herd: a critical evaluation of the "natural regulation" paradigm.  Ph.D. Thesis, Utah State Univ., Logan.  490 pp.

Kay, C. E. and F. H. Wagner.  1994.  Historic condition of woody vegetation on Yellowstone's northern range: a critical test of the "natural regulation paradigm.  Pp. 159-169 *in* D. Despain, ed.  Plants and their environment.  Proc. First Bienn. Conf. Greater Yellowstone ecosystem.  U.S. Natl. Park Serv. Tech. Rep.

Keith, L. B.  1983.  Population dynamics of wolves.  Pages 66 – 77 *in* L. N. Carbyn, editor.  Wolves in Canada and Alaska: Their Status, Biology and Management.  Canadian Wildlife Service Report Series Number 45, Edmonton, AB.

Keller, V. and H. P. Pfister.  1995.  Wildlife passages as a means of mitigating effects of habitat fragmentation by roads and railway lines.  *In* Habitat fragmentation and infrastructure.  Proceedings of the international conference: habitat fragmentation, infrastructure and the role of ecological engineering, 17 – 21 September, 1995. Naastricht, The Hague, The Netherlands.  474 pp.

Kenward, R. E., and K. H. Hodder.  1996.  RANGES V: An analysis system for biological data.  Institute of Terrestrial Ecology, Furzebrook Research Station, Wareham, Dorset, England, UK.  66pp.

Kolenosky, G. B., and D. H. Johnston.  1967.  Radio-tracking timber wolves in Ontario.  American Zoologist 7:289-303.

Kolenosky, G. B.  1972.  Wolf predation on wintering deer in east-central Ontario.  Journal of Wildlife Management 36:357-369.

Klein, D. R.  1995.  The introduction, increase, and demise of wolves on Coronation Island, Alaska. *In* Carbyn, L. N., S. H. Fritts, D. R. Seip (*Eds.*). Ecology and conservation of wolves in a changing world. Canadian Circumpolar Institute, University of Alberta. Edmonton, AB.

Kolenosky, G. B., and D. H. Johnston.  1967.  Radio-tracking timber wolves in Ontario.  American Zoologist 7:289-303.

Krizan, P.  1997.  The effects of human development, landscape features, and prey density on the spatial use of wolves *(Canis lupus)* on the north shore of Lake Superior.  M. S. Thesis.  Center for Wildlife and Conservation Biology, Acadia University, Wolfville, Nova Scotia, Canada. 109pp.

Land, D. and M. Lotz.  1996.  Wildlife crossing design and use by Florida panthers and other wildlife in southwest Florida.  *In* G. L. Evink, D. Zeigler and J. Berry (eds.) Trends in addressing transportation related wildlife mortality. Florida Department of Transportation. Orlando.

Larkin R. P.  1996.  Effects of military noise on wildlife. USACERL Technical Report 96/21.  219 pp.

Leeson, B.  1996.  Highway conflicts and resolutions in Banff National Park, Alberta. *In* G. L. Evink, D. Zeigler and J. Berry (eds.) Trends in addressing transportation related wildlife mortality. Florida Department of Transportation, Orlando.

Leigh, E.G., S.J. Wright, E.A. Herre, and F.E. Putz.  1993.  The decline of tree diversity on newly isolated tropical islands: a test of a null hypothesis and some implications.  Evolutionary Ecology 7:76-102.

Lovejoy, T. E., R. O. Bierregaard Jr., A. B. Rylands, J. R. Malcolm, C. E. Quintela, L. H. Harper, K. S. Brown Jr., A. H. Powell, G. V. N. Powell, H. O. R. Schubart and M. B. Hays.  1986. Edge and other effects of isolation on Amazon forest fragments. Pages 257-285 *in* Conservation biology: The science of scarcity and diversity.  Sinauer Associates., Sunderland, MA.

McLaren, B. E., and R. O. Peterson.  1994.  Wolves, moose, and tree rings on Isle Royale. Science 266:1555-1558.

Meadows, B.  2001.  Southern Rockies wildlife and wilderness survey report.  Decision Research, Washington, D.C.  121 pp.

Mech, L. D.  1970.  The wolf: the ecology and behavior of an endangered species.  The Natural History Press, Garden City, New York.  384pp.

Mech, L. D.  1973.  Wolf numbers in the Superior National Forest of Minnesota.  United States Forest Service Research Report.  NC-07.  10pp.

Mech, L. D.  1977a.  Productivity, mortality, and population trends of wolves in northeastern Minnesota.  Journal of Mammalogy 58:559-574.

Mech, L. D.  1977b.  Population trend and winter deer consumption in a Minnesota wolf pack.  Pages 55-74 *in* R. L. Phillips and C. Jonkel, editors.  Proceedings of the 1975 predator symposium.  Montana Forest and Conservation Experiment Station, University of Montana, Missoula, Montana, USA.  268pp.

Mech, L. D.  1986.  Wolf population in the central Superior National Forest, 1967-1985.  USDA Forest Service Research Paper.  NC-270.  6pp.

Mech, L. D.  1989.  Wolf population survival in an area of high road density.  Amer. Midl. Nat. 121:387 - 389.

Mech, L. D.  1991.  The way of the wolf.  Voyageur press, Stillwater, Minnesota, USA. 120pp.

Mech, L. D.  1993.  Updating our thinking on the role of human activity in wolf recovery.  Research information bulletin 57.  U.S. Fish and Wildlife Service.  St. Paul, Minnesota.

Mech, L. D.  1995.  The challenge and opportunity of recovering wolf populations.  Conservation Biology 9: 270 - 278.

Mech, L. D.  1996.  A new era for carnivore conservation. Wildlife Society Bulletin 24: 397 - 401.

Mech, L.D. and P. D. Karns.  1977.  Role of the wolf in a deer decline in the Superior National Forest.  U.S. Dept. Agricul.  For.  Serv., Res. Pap.  NC-143.  23pp.

Mech, L. D., S. H. Fritts, G. L. Radde, and W. J. Paul.  1988.  Wolf distribution and road density in Minnesota. Wildlife Society Bulleting. 16:85-87.

Mech, L. D. and S. M. Goyal.  1993.  Canine parvovirus effect on wolf population change and pup survival.  Journal of Wildlife Diseases.  22:104-106.

Meidinger, D. and J. Pojar (eds.).  1991.  Ecosystems of British Columbia. British Columbia Ministry of Forests.  Special Report Series No. 6. Victoria.  330 pp.

Meier, T. J., J. W. Burch, L. D. Mech, and L. G. Adams.  1995.  Pack structure and genetic relatedness among wolf packs in a naturally-regulated population.  Pages 293-302 *in* L. N. Carbyn, S. H. Fritts, and D. R . Seip, editors.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Edmonton, Alberta, Canada.

Merriam, G., and A. Lanoue.  1990.  Corridor use by small mammals: field measurements for three experimental types of *Peromyscus leucopus*.  Landscape Ecology 4:123-131.

Merrill,S. B.  2000.  Road densities and Wolf, Canis lupus, habitat suitability:an exception.  Canadian Field Naturalist 114:312-314.

Messier, F.  1984.  Moose-wolf dynamics and the natural regulation of moose populations. Ph. D. Thesis, University of British Columbia, Vancouver, British Columbia, Canada.  143pp.

Messier, F.  1985a.  Social organization, spatial distribution, and population density of wolves in relation to moose density.  Canadian Journal of Zoology 63:1068-1077.

Messier, F.  1985b.  Solitary living and extraterritorial movements of wolves in relation to social status and prey abundance.  Canadian Journal of Zoology 63:239-245.

Messier, F.  1987.  Physical condition and blood physiology of wolves in relation to moose density.  Canadian Journal of Zoology 65:91-95.

Messier, F.  1991.  The significance of limiting and regulating factors on the demography of moose and white-tailed deer.  Journal of Animal Ecology 60:377-393.

Messier, F.  1994.  Ungulate population models with predation: a case study with the North American moose.  Ecology 75:478-488.

Messier, F., and C. Barrette.  1985.  The efficiency of yarding behavior by white-tailed deer as an anti-predatory strategy.  Canadian Journal of Zoology.  63:785-789.

Messier, F. and M. Crête.  1985.  Moose-wolf dynamics and the natural regulation of moose populations.  Oecologica.  65:503-512.

Mladenoff, D. J. , T. A. Sickley, R. G. Haight, A. P. Wydeven..  1995.  A regional landscape analysis and prediction of favorable gray wolf habitat in the northern Great Lakes region. Conservation Biology.  9:279 - 294.

Mladenoff, D. J., R. G. Haight, T. A. Sickley, and A. P. Wydeven. 1997. Causes and implications of species restoration in altered ecosystems: a spatial landscape projection of wolf population recovery. Bioscience 47:21-31.

Mladenoff, D. J. and T. A. Sickley.  1998.  Assessing potential gray wolf restoration in the Northeastern United States: a spatial prediction of favorable habitat and population level. JWM 62:1-10.

Mohr, C. O.  1947.  Table of equivalent populations of North American small mammals. American Midland Naturalist 37:223-249.

Nams, V. O., and Boutin, S. 1991. What is wrong with error polygons? Journal of Wildlife Management 55:172-176.

Murie, A. 1944. The wolves of Mount McKinley. Fauna of the National Parks of the United States. Fauna Series No. 5. U.S. Govt. Printing Office, Wash, D.C. 238pp.

Nelson, M. E., and L. D. Mech. 1981. Deer social organization and wolf predation in northeastern Minnesota. Wildlife Monograph. 77:1-53.

Nelson, M. E. and L. D. Mech. 1986. Relationship between snow depth and gray wolf predation on white-tailed deer. J. Wildl. Mange. 50:471-474.

Nelson, M. E. and Mech, L. D. 1986. Mortality of white-tailed deer in northeastern Minnesota. Journal of Wildlife Management. 50:691-698.

Noss, R. F. 1991. Landscape connectivity: different functions at different scales. Pp. 27-39 *In* W. E. Hudson (ed.). Landscape linkages and biodiversity. Island Press, Washington.

Noss, R. F. 1992. The wildlands project land conservation strategy. Pp. 10 – 25 *In* Wild Earth (special issue), Plotting a North American wilderness recovery strategy. The Wildlands Project. Canton, N. Y. 88 pp.

Noss, R. F. 1993. Wildlife corridors. In D.S. Smith and P.A. Hellmund, eds. Ecology of Greenways. University of Minnesota Press, Minneapolis, MN.

Noss, R. F. 1995. Maintaining ecological integrity in representative reserve networks. A World Wildlife Fund Canada/World Wildlife Fund United States Discussion Paper. Toronto, Ontario, Canada, and Washington, DC, USA.

Noss, R. F., H. B. Quigley, M. G. Hornocker, T. Merrill, and P. C. Paquet. 1996. Conservation biology and carnivore conservation in the Rocky Mountains. Conservation Biology 10:949-963.

Okarma, H., W. Jedrzejewski, K. Schmidt, S. Sniezko, A. N. Bonevich,, and B. Jedrzejewska. 1998. Home ranges of wolves in Bialowieza Primeval Forest, Poland, compared with other Eurasian populations. Journal of Mammalogy 79:842-952.

Oosenberg, S. M., and L. N. Carbyn. 1982. Winter predation on bison and activity patterns of a wolf pack in Wood Buffalo National Park. Pages 43-53 *in* F. H. Harrington and P. C. Paquet, editors. Wolves: a worldside perspective of their behaviour, ecology and conservation. Noyes Publications, Park Ridge, New Jersey, USA.

Oxley, D. J., Fenton, M. B., and Carmody, G. R. 1984. The effects of roads on populations of small mammals. J. Appl. Ecol. 2:51-59.

Packard, J. M., and L. D. Mech.  1980.  Population regulation in wolves. Pages 35-150 *in* M. N. Cohen, R. S. Malpass, and H. G. Klein, editors.  Biosocial mechanisms of population regulation.  Yale University Press, New Haven, Connecticut, USA, and London, England, UK.

Paine, R. T.  1966.  Food web complexity and species diversity.  American Naturalist.  100:65-75.

Paine, R. T.  1969.  A note on trophic complexity and community stability.  American. Naturalist.  103:91-93.

Paine, R. T.  1980.  Food webs: linkage, interaction strength and community infrastructure.  Journal of. Animal Ecology.  49:667-685.

Paquet, P. C.  1993.  Summary reference document - ecological studies of recolonizing wolves in the Central Canadian Rocky Mountains.  Unpublished Report by John/Paul and Assoc. for Canadian Parks Service, Banff, AB.  176pp.

Paquet, P. C., and A. Hackman.  1995.  Large carnivore conservation in the Rocky Mountains: a long-term strategy for maintaining free-ranging and self-sustaining populations of carnivores.  World Wildlife Fund-Canada.  Toronto, Ontario, Canada.  53pp.

Paquet, P. C., J. Wierchowski, and C. Callaghan.  1996.  Effects of human activity on gray wolves in the Bow River valley.  Banff National Park, Banff, Alberta, Canada.  113pp. + maps.

Paquet, P. C. and C. Callaghan.  1996.  Effects of linear developments on winter movements of gray wolves in the Bow River Valley of Banff National Park, Alberta.  *In* G. L. Evink, D. Zeigler and J. Berry (eds.) Trends in addressing transportation related wildlife mortality.  Florida Department of Transportation. Orlando.

Paquet, P. C., J. Wierzchowski and C. Callaghan.  1996.  Summary report on the effects of human activity on gray wolves in the Bow River Valley, Banff National Park, Alberta. Chapter 7 *In*: Green, J., C. Pacas, S. Bayley and L. Cornwell (eds.).  A Cumulative Effects Assessment and Futures Outlook for the Banff Bow Valley.  Prepared for the Banff Bow Valley Study, Department of Canadian Heritage, Ottawa, ON.

Paquet, P. C., J. Wierzchowski and C. Callaghan.  1999.  Summary document of wolf ecology in Kootenay and Yoho National Parks. Prepared for Parks Canada.

Parks Canada.  1994.  Initial assessment of proposed improvements to the TransCanada highway in Banff National Park IIIA, Sunshine Interchange to Castle Mountain Interchange.  Calgary, Alberta, Canada.

Parsons, D. R.  1998.  Endangered and threatened wildlife and plants;  establishment of a nonessential experimental population of the Mexican wolf in Arizona and New Mexico:  final

rule. Federal Register 63:1752-1772

Pate, J., M. J. Manfredo, A. D. Bight, and G. Tischbein. 1996. Coloradan's attitudes toward reintroducing the gray wolf into Colorado. Wildlife Society Bulletin 24:421-428.

Person, D. K. 2000. Wolves, deer and logging: Population viability and predator-prey dynamics in a disturbed insular landscape. PhD Thesis. University of Alaska, Fairbanks, AK.

Person, D. K., M. Kirchoff, V. Van Ballenberghe, G. C. Iverson and E. Grossman. 1996. The Alexander Archipelago wolf: a conservation assessment. United States Department of Agriculture - Forest Service. General Technical Report. PNW-GTR-384.

Person, D. K. and M. A. Ingle. 1995. Ecology of the Alexander Achipelago wolf and responses to habitat change. Progress Report Number 3. Alaska Department of Fish and Game. Douglas, AK.

Peterson, R. L. 1977. Wolf ecology and prey relationships on Isle Royale. United States National Park Service Scientific Monograph Series 11:1-210.

Peterson, R. O., J. D. Woolington, and T. N. Bailey. 1984. Wolves of the Kenai Peninsula, Alaska. Wildlife Monographs 88.

Peterson, R. O., J. D. Woolington and T. N. Bailey. 1984. Wolves of the Kenai Peninsula, Alaska. Wildlife Monographs 88: 1 – 52.

Peterson, R. O., and R. E. Page. 1988. The rise and fall of Isle Royale wolves, 1975-1986. Journal of Mammalogy 69:89-99.

Phillips, M. K., and D. W. Smith. 1998. Gray wolves and private landowners in the Greater Yellowstone Area. Transactions of the North American Wildlife and Natural Resources Conference 63:443-450.

Pickett, S. T. A., J. Kolasa, J. J. Armesto, and S. L. Collins. 1989. The ecological concept of disturbance and its expression at various hierarchical levels. Oikos 54:129-136.

Pimlott, D. 1967. Wolf predation and ungulate populations. American Zoologist 7:267-278.

Pletscher, D. H., R. R. Ream, D. K. Boyd, M. W. Fairchild, and K. E. Kunkel. 1997. Population dynamics of a recolonizing wolf population. Journal of Wildlife Management 61:459-465.

Potvin, F. 1987. Wolf movements and population dynamics in Papineau-Labelle reserve, Quebec. Canadian Journal of Zoology 66:1266-1273.

Purves, H. D., White, C. A., and Paquet, P. C. 1992. Wolf and grizzly bear habitat use and

displacement by human use in Banff, Yoho, and Kootenay National Parks: a preliminary analysis.  Canadian Parks Service Reptort.  Banff, Alta.  54pp.

Rausch, R. A.  1967.  Some aspects of the population ecology of wolves, Alaska.  American Zoologist 7:253-265.

Ream, R. R., M. W. Fairchild, D. K. Boyd, and D. H. Pletscher.  1991.  Population dynamics and home range changes in a colonizing wolf population. Pages 349-366 in R. B. Keiter and M. S. Boyce, eds. The greater Yellowstone ecosystem: redefining America's wilderness heritage.  Yale University Press, New Haven, CT.

Refsnider, R.  2000.  Endangered and threatened wildlife and plants; proposal to reclassify and remove the gray wolf from the list of endangered and threatened wildlife in the conterminous United States;  proposal to establish three special regulations for threatened gray wolves.  Federal Register 65:43450-43496.

Schonewald-Cox, C. M., S. M. Chambers, B. MacBryde, and L. Thomas.  1983.  Genetics and conservation: a reference for managing wild animal and plant populations.  Benjamin-Cummings, Menlo Park, CA.

Schonewald-Cox, C. M., and M. Buechner.  1992.  Park protection and public roads.  Pages 373-396 *in* P. L. Fiedler and S. K. Jain (eds.), Conservation biology:  The theory and practice of nature conservation, preservation and management.  Chapman and Hall, New York.

Shaffer, M.  1987.  Minimum viable populations:  coping with uncertainty.  Pages 69-87 in M. Soule, ed.  Viable populations for conservation.  Cambridege University Press, New York, New York.

Sih, A., P. Crowley, M. McPeek, J. Petranka, and K. Strohmeier.  1985.  Predation, competition, and prey communities: a review of field experiments. Ann. Rev. Ecol. Syst. 16:269-311.

Simberloff, D.  1998.  Flagships, umbrellas, and keystones: Is single-species management passe in the landscape era? Biological Conservation 83:247 – 257.

Singer, F. J. 1979.  Status and history of the timber wolves in Glacier National Park, Montana.  Pages 19-42 *in* E.  Klinghammer (ed.).  The bheavior and ecology of wolves.  Garland STPM Press, N.Y.

Singleton, P. H..  1995.  Winter habitat selection by wolves in the North Fork of the Flathead River Basin, Montana and British Columbia.  M.Sc. Thesis, Univeristy of Montana, Missoula.116 pp.

Soulé, M. E.  1980.  Thresholds for survival: maintaining fitness and evolutionary potential.  Pages 151-169 *In* M. E. Soulé and B. A. Wilcox (eds.), Conservation biology: an ecological-

evolutionary perspective.  Sinauer Associates, Sunderland, MA.

Soulé, M. E. and D. Simberloff.  1986.  What do genetics and ecology tell us about the design of nature reserves?  Biological Conservation. 35:19-40.

Soulé, M. A.  1987.  Viable populations for conservation.  Cambridge University Press, New York.

Stephens, P. W. and R. O. Peterson.  1987.  Wolf avoidance strategies of moose.  Holacrtic Ecology 7:239-244.

Terborgh, J.  1988.  The big things that run the world - a sequel to E. O. Wilson. Conservation Biology 2: 402-403.

Terborgh, J., and B. Winter.  1980.  Some causes of extinction.  Pages 119-134 *in* M.E. Soulé and Wilcox, B.A., eds., Conservation biology: an evolutionary-ecological perspective.  Sinauer Assoc., Sunderland, Mass.

Terborgh, J., J. Estes, P. Paquet, K. Ralls, D. Boyd-Heger, B. Miller and R. Noss.  1999.  The role of top carnivores in regulating terrestrial ecosystems. Wild Earth 9:42–56.

Thiel, R. P.  1985.  Relationship between road densities and wolf habitat suitability in Wisconsin, American Midland Naturalist 113:404-407.

Thiel, R. P., S. Merrill and L. D. Mech.  1998.  Tolerance by denning wolves, *Canis lupus*, to human disturbance. Canadian Field Naturalist 112: 340 - 342.

Thiel, R. P., and J. Valen.  1995.  Developing a state timber wolf recovery plan with public input: the Wisconsin experience. Pages 169-175 *in* L. N. Carbyn, S. H. Fritts, and D. R. Seip, editors.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Edmonton, Alberta, Canada.

Thurber, J. M.; Peterson, R. O.; Drummer, T. D.; Thomasma, S. A.  1994.  Gray wolf response to refuge boundaries and roads in Alaska.  Wildlife Society Bulletin. 22:61-68.

Thurber, J. M., and R. O. Peterson.  1993.  Effects of population density and pack size on the foraging ecology of gray wolves.  Journal of Mammalogy 74:879-889.

Trainer, C. E., J. C. Lemos, T. P. Kristner, W. C. Lightfoot, and D. C. Toweill.  1981.  Mortality of mule deer fawns in southeastern Oregon.  1968-1979.  Oregon  Department of Fish Wildlife., Wildlife  Restoration.  Report 10.  113pp.

Trent, T. T., and O. J. Rongstad.  1974.  Home range and survival of cottontail rabbits in southwestern Wisconsin.  Journal of Wildlife Management.  47:716-728.

U.S. Fish and Wildlife Service. 1996. Reintroduction of the Mexican wolf within its historic range in the southwestern United States - final environmental impact statement. U.S. Fish and Wildlife Service, Albuquerque, New Mexico.

U.S. Fish and Wildlife Service. 1982. Mexican wolf recovery plan. U.S. Fish and Wildlife Service, Albuquerque, New Mexico. 115 pp.

Van Ballenberghe, V., and L. D. Mech. 1975. Weights, growth, and survival of timber wolf pups in Minnesota. Journal of Mammalogy 56:44-63.

Van Ballenberghe, V., A.. W. Erickson and D. Byman. 1975. Ecology of the timber wolf in northeastern Minnesota. Wildlife Monographs. Vol. 43. 43 pp.

Van Ballenberghe, V. 1981. Population dynamics of wolves in the Nelchina Basin, southcentral Alaska. Pages 1246-1258 *in* J. A. Chapman, and D. Pursley, editors. Worldwide Furbearer Conference, Frostburg, Maryland, USA.

Waters, D. 1988. Monitoring program mitigative measures. Canadian Parks Service, Banff National Park Warden Service Report. 57 pp.

Weaver, J. L., P. C. Paquet, and L. F. Ruggiero. 1996. Resilience and conservation of large carnivores in the Rocky Mountains. Conservation Biology 10:964-976.

Weaver, J. L. 1994. Ecology of wolf predation amidst high ungulate diversity in Jasper National Park, Alberta. PhD thesis. University of Montana, Missoula. 166pp.

White, G. C., and R. A. Garrot. 1990. Analysis of wildlife radio-tracking data. Academic Press Limited, San Diego, California, USA. 383pp.

White, C.A., P. C. Paquet, and H. D. Purves. 1992. Nursing Humpty's syndrome: Bow Valley ecosystem restoration. Paper presented at the Society for Ecological Restoration, Fourth Annual Conference. 10-14 August, University of Waterloo, Waterloo, ON.

White, G. C. 2000 MARK (software) Www.cnr.colostate.edu/~gwhite/mark/mark.htm

Wilcove, D. S., McLellan, C. H., and Dobson, A. P. 1986. Habitat fragmentation in the temperate zone. Pages 237-256 in Soulé, M. E., ed. Conservation biology: the science of scarcity and diversity. Sinauer Associates. Sunderland, Mass.

Wilcox, B. A., and Murphy, D.D. 1985. The effects of fragmentation on extinction. Am. Naturalist 125:879-887.

Wilson, P. J., Grewal, S., Lawford, I. D., Heal, J., Granacki, A. G., Pennock, D., Theberge, J. B., Theberge, M. T., Voigt, D., Waddell, W., Chambers, R. E., Paquet, P. C., Goulet, G., Cluff, D.,

and B. N. White.  2000.  DNA profiles of the eastern Canadian wolf and the red wolf provide evidence for a common evolutionary history independent of the gray wolf.  Canadian Journal of Zool.78:2156 - 2166

Wright, S.  1977.  Evolution and the genetics of populations.  Vol. 3.  Univ. of Chicago Press, Chicago.

Wydeven, A. P., R. N. Schultz, and R. P. Thiel.  1995.  Monitoring of a recovering wolf population in Wisconsin, 1979 – 1991.  Pages 147-156 *in* L. N. Carbyn, S. H. Fritts, and D. R. Seip, editors.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Edmonton, Alberta

Wydeven, A. P., R. N. Schultz, and R. P. Thiel.  1995.  Monitoring of a recovering wolf population in Wisconsin, 1979 – 1991.  Pages 147-156 *in* L. N. Carbyn, S. H. Fritts, and D. R. Seip, editors.  Ecology and conservation of wolves in a changing world.  Canadian Circumpolar Institute, Edmonton, Alberta

Young, S. P. and E. A. Goldman.  1944.  Wolves of North America.  Dover Publications.  New York. NY.

Civ. Action No. 06-2119 (RCL)

Attachment 4



THE STATE OF ARIZONA

**GAME AND FISH DEPARTMENT**

2221 WEST GREENWAY ROAD, PHOENIX, AZ 85023-4399
(602) 942-3000 • WWW.AZGFD.COM

GOVERNOR
*Jane Dee* HULL
**COMMISSIONERS**
CHAIRMAN, MICHAEL M. GOLIGHTLY, FLAGSTAFF
JOE CARTER, SAFFORD
SUSAN E. CHILTON, ARIVACA
W. HAYS GILSTRAP, PHOENIX
JOE MELTON, YUMA
**DIRECTOR**
DUANE L. SHROUFE
**DEPUTY DIRECTOR**
STEVE K. FERRELL



September 30, 2002

Mr. H. Dale Hall, Director
U.S. Fish and Wildlife Service Region 2
Post Office Box 1306
Albuquerque, New Mexico 87103-1306

NON̲̲̲̲̲̲ ̲̲̲̲U.
OCT 0 4 2002

Dear Mr. Hall:

Recently you asked our agencies to conduct an independent review of the Service's 3-Year Review of the Mexican Wolf Reintroduction Project, to comply with Congressional direction to conduct such a review. Enclosed is our joint review. It is important to note that we believe many of the Project recommendations are entirely in line with changes you have discussed with our agencies in the short time since you were named permanent Region 2 Director.

We look forward to working with you to implement the recommended changes, to fully restore the Primary Cooperator roles intended for our agencies, and to enhance public trust in our ability to be responsive to wolf management needs and urgent operational issues. We believe the Commission actions that enabled us to conduct this review provide a strong foundation for such collaboration and improvement.

We hope this is a watershed moment in the Reintroduction Project, and that Congress will seize this opportunity to provide funding commensurate with our recommendations. Toward that end, we would welcome any opportunity to join you in discussing this review with Congress.

Sincerely,

Duane L. Shroufe, Director
Arizona Game and Fish Department

Larry Bell, Director
New Mexico Department of Game and Fish

DLS:TBJ:tj

cc: Arizona and New Mexico Commissioners

Attachment

Document MW Skeen Review.Submittal Cover Letter.20020930.doc

Arizona-New Mexico Review of the U.S. Fish and Wildlife Service's
3-Year Review of the Mexican Wolf Reintroduction Project

Arizona Game and Fish Department and New Mexico Department of Game and Fish

Final: September 30, 2002

## Summary

In 2001, the U.S. Fish and Wildlife Service (Service) initiated a 3-Year Review of the Mexican
Wolf Reintroduction Project in Arizona and New Mexico. The review consisted of a responsive
management survey of the Mexican Wolf Interagency Management Assistance Group, a
biological review, 11 Community Open Houses, and a Stakeholder Workshop. In June 2001,
Congress requested an independent review of the Service's review. In October 2001, the Service
ended its 3-Year Review. In August 2002, as a result of the 2001 Congressional direction, the
Service asked the Arizona Game and Fish Department (AGFD) and the New Mexico Department
of Game and Fish (NMDGF) to conduct the required independent review.

In September 2002, the Commissions governing the two State wildlife agencies directed them to
conduct the review and complete it by September 30, 2002. Neither Commission supports wolf
reintroduction in its respective state, but both agree that the State wildlife agencies must be
involved when reintroduction occurs, to ensure that State interests are represented effectively.
Citizens in the reintroduction area have also consistently asked the State wildlife agencies to play
a leadership role in the effort.

The Service's 3-Year Review identified a series of problems and potential solutions relating to
technical and operational aspects of the Reintroduction Project. The review appeared to be most
successful in identifying problems expressed by scientists and stakeholders. Management
recommendations were developed, but never integrated, compiled, or fully evaluated by priority
and feasibility into a form that decision makers could use. Despite this, some Project
modifications and improvements have occurred. An implementation plan is still needed to ensure
that constructive change continues, to facilitate and inform a collaborative decision-making
process among the Primary Cooperators, stakeholders, and other interested parties.

The major findings of the State review are (1) a need to restructure administrative and adaptive
management processes to ensure (a) appropriate participation by the States and the full spectrum
of stakeholders and other interested parties, and (b) field staff response capability commensurate
with wolf management needs and urgent operational issues such as depredation incidents; and
(2) the biological component of the 3-Year Review was appropriately objective and provides a
credibly, reasonably objective scientific foundation for further adaptive management.

The States recommend that Project restructuring be initiated within 60 days of September 30,
2002, and that the initial changes be completed within an additional 120 days. Additional time
would be needed to complete any Project changes that would require modifications of applicable
laws, special rules, or policies.

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 2 of 27

## Introduction

In a June 19, 2001 report, entitled "Department of Interior and Related Agencies Appropriations Bill. 2002," Congress directed the U.S. Fish and Wildlife Service (Service) to initiate an independent review of its 3-Year Review of the Mexican Wolf Reintroduction Project (House of Representatives Report 107-103, P. 30, No. 6). Congressman Joe Skeen (R-NM) had already provided the same direction in a May 2001 letter to the Service.

The Service completed public participation elements of its 3-Year Review in October 2001, with release of a final report on a Stakeholder Workshop in Arizona. However, the Service did not further discuss, or implement, any of the changes recommended in the review because it had not conducted the "Skeen Review."

On August 27, 2002, the Service's Region 2 Director, H. Dale Hall, informed the Arizona Game and Fish Department and New Mexico Department of Game and Fish that Congressman Skeen's staff had agreed the two agencies could conduct the independent review. However, Congress's deadline of September 30, 2002 for completing the review would not be extended.

Subsequently, in separate public sessions, the Arizona Game and Fish Commission and the New Mexico State Game Commission agreed that their wildlife agencies would provide the Skeen Review. Both Commissions passed motions providing guidance to the two agencies, and requiring the two Directors to jointly submit their findings to the Service. The motions are as follows:

### Arizona Game and Fish Commission (September 14, 2002)

The Commission directs the Department to convey in writing, to the U.S. Fish and Wildlife Service, the concerns and issues that we have discussed today. This is in effect our independent State review of the Service's 3-Year Review and the Mexican Wolf Reintroduction Project itself. We further direct that this letter be submitted by September 30, 2002, under joint signature with the Director of the New Mexico Department of Game and Fish. Specifically, we direct the Department to focus its letter on the crucial need to address and resolve the following issues:

1. The roles and functions of the Primary Cooperators (AGFD, NMDGF, FWS) must be restructured to ensure State participation, authorities, and responsibilities as reflected in today's discussion.
2. The administrative and adaptive management processes must be restructured to ensure opportunities for, and participation by, the full spectrum of stakeholders.

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 3 of 27

3. The Interagency Field Team response protocols must be restructured, and staff capacity must be enhanced, to ensure immediate response capability to, and resolution of, urgent operational issues, such as depredation incidents.

4. Project outreach must be restructured as necessary to address the Commission, Department, and public concerns expressed today.

5. All actions in the wolf Project must be in strict compliance with any applicable, approved special rules, policies, protocols, management plans, and interagency agreements.

6. The Project's review protocols and procedures must be restructured and improved to ensure that the 5-year review is effective and efficient, and an improvement over the 3-Year Review.

We further direct that issues 1, 2, and 3 be resolved within 60 days of September 30, 2002, at the Primary Cooperator level, and that the changes and the issues they reflect be taken through the restructured Adaptive Management Process for stakeholder discussion and further refinement.

In short, we direct the Department to restructure the Mexican Wolf Reintroduction Project as discussed today within 180 days of September 30, 2002, and report back to the Commission on the results of this effort in April 2003.

The Commission reserves the right, if these issues are not resolved within the timeframes outlined in the letter, to take further action on the Department's participation in this Project.

New Mexico State Game Commission (September 27, 2002)

The Commission directs the Department to convey in writing, to the U.S. Fish and Wildlife Service, the concerns and issues that we have discussed today. This is in effect our independent State review of the Service's 3-Year Review and the Mexican Wolf Reintroduction Project itself. We further direct that this letter be submitted by September 30, 2002, under joint signature with the Director of the Arizona Game and Fish Department. Specifically, we direct the Department to focus its letter on the crucial need to address and resolve the following issues:

1. The roles and functions of the Primary Cooperators (AGFD, NMDGF, FWS) must be restructured to ensure State participation, authorities, and responsibilities as reflected in today's discussion.

2. The administrative and adaptive management processes must be restructured to ensure opportunities for, and participation by, the full spectrum of stakeholders.

3.  The Interagency Field Team response protocols must be restructured, and staff capacity must be enhanced, to ensure immediate response capability to, and resolution of, urgent operational issues, such as depredation incidents.

4.  Project outreach must be restructured as necessary to address the Commission, Department, and public concerns expressed today.

5.  All actions in the wolf Project must be in strict compliance with any applicable, approved special rules, policies, protocols, management plans, and interagency agreements.

6.  The Project's review protocols and procedures must be restructured and improved to ensure that the 5-year review is effective and efficient, and an improvement over the 3-Year Review.

This document represents the States' review of the Service' 3-Year Review.

## Results and Discussion

1.  The 3-Year Review

    a.  Origins of, and Mandates, for the 3-Year Review

        The Mexican Wolf Reintroduction Project began in the early to mid-1980s. However, the Project review concept stems from a 1995 AGFD report by Groebner, Girmendonk, and Johnson (NGTR 56) that suggested the Project should be reviewed after the third year of post-release field activity (ending in March 2001), and again after the fifth year. The review concept was subsequently integrated into, and modified in, the Final Environmental Impact Statement (1996) and the final non-essential experimental population rule (January 1998) addressing wolf reintroduction in Arizona and New Mexico.

        Groebner et al. (1995) (pages ix, 9, 18, 41, 47, 48, 116). Groebner et al. 1995 called for a 3-year "experimental phase" of Mexican wolf reintroduction to be completed before a decision would be made to continue with reintroduction and enter into a "recovery phase." The experimental phase was intended to provide a period during which problems could be identified and corrected. The review was intended to assess the viability of additional reintroduction efforts, on the basis of progress to date, and to determine whether to proceed toward the ultimate goal of delisting the Mexican wolf in Arizona. Examples of anticipated post-release problems identified for the wolf Project included: low wolf survival rates, livestock depredation, wolf dispersal, significant impacts on ungulates, or unforeseen complications. Our premise was that the recovery phase could be suspended until significant problems (if any) were corrected. We anticipated that

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 5 of 27

in the recovery phase the population might reach the recovery area goal of four
breeding packs of Mexican wolves by the year 2001.

Groebner et al. (1995) stated that AGFD and the Service, the only two Primary
Cooperators at that time, would conduct the preliminary analysis of the
experimental phase of the plan, and an evaluation of its success. The Service
would then decide whether to proceed with the recovery phase of the
reintroduction effort. No specific dates were set for these activities, or for making
decisions about Project modification, including continuation.

Groebner et al. (1995) defined specific reasons to re-evaluate the Project during
both the experimental" and recovery" phases: "In addition to the formal
evaluation process during the experimental phase of reintroduction, regular
evaluations and progress reports will keep the public apprised of Project activities
and developments." The report also identified triggers for review/re-evaluation, as
follows:

During the Experimental Phase the reintroduction will be re-evaluated if
any of the following occur:
1.    This recovery plan, or an acceptable alternative, is not approved.
2.    The proposed "nonessential experimental" designation, or an
      acceptable alternative, is not approved.
3.    A viable, reproducing population of wild Mexican wolves is
      discovered within the reintroduction zone.
4.    Prey biomass with the reintroduction zone falls below $53kg/km^2$
      $(300lb/mi^2)$.

During the Recovery Phase, continued reintroductions will be re-evaluated
if any of the following conditions are met:
1.    Criteria 3 or 4 from above [Note: this is a reference to the
      Experimental Phase criteria that would trigger re-valuation].
2.    The depredation program is ineffective in alleviating, or
      compensating for, livestock losses.
3.    Cases of threatening behavior by reintroduced wolves are verified,
      and cannot be remedied by capturing the wolves involved.
4.    No reintroduced wolves reproduce and raise pups past one year in
      age for three consecutive years.
5.    Population growth of the reintroduced wolves varies considerably
      from the predicted scenario.
6.    No reintroduced packs establish home ranges within the
      reintroduction zone for three consecutive years.

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 6 of 27

Groebner et al. (1995, pages 116 and 126) included a draft 10(j) Rule as its
Appendix 10, which mentioned evaluations a couple of times:

> The Service and cooperating agencies will measure the success or failure
> of the reintroductions, and the effects of such success or failure on the
> conservation and recovery of Mexican wolves, by continuously
> monitoring, researching, and evaluating the status of released wolves in
> the wild. The agencies will prepare periodic progress reports, annual
> reports, and full evaluations after 3 and 5 years that will recommend
> continuation or termination of the reintroduction effort. The reports will
> also evaluate whether, and how, to use the second wolf recovery area, that
> is, the one not used initially.

> Progress will be continuously evaluated. The Service will prepare periodic
> progress reports, detailed annual reports, and full evaluations after 3 and 5
> years that recommend continuation or termination of the reintroduction
> effort.

Final EIS (FWS 1996). The Final EIS on Mexican wolf reintroduction also
mentioned evaluations, as follows:

> The FWS and cooperating agencies will closely monitor, study, evaluate,
> and actively manage the reintroduction. (FWS 1996, p. i, v, 2-5).

> Management of the reintroduction will be constantly evaluated and
> adapted as new circumstances arise (FWS 1996 p. 1-1).

> Groebner et al. (1996) sets forth minimum criteria to be considered in
> evaluating implementation of the plan. (FWS 1996, p 1-12).

> Groebner et al. (1996) will be considered a subset of the EIS Preferred
> Alternative pertaining just to the Arizona side. (FWS 1996, p 2-5).

> Various agencies, tribes, and local governments have policies and plans
> that could be affected by the final decision. They may need to follow their
> own decision-making procedures regarding their participation in future
> wolf recovery actions (FWS 1996, 1-13).

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 7 of 27

The FWS and the cooperating agencies will use a flexible "adaptive management" approach based on careful monitoring, research, and evaluation throughout the release phase (FWS 1996, p.2-11).

The FWS will prepare periodic progress reports, detailed annual reports, and full evaluations after three and five years. The full evaluations will include recommendations regarding continuations or termination of the reintroduction effort and whether, and how to use the WSWRA [White Sands Wolf Recovery Area]. Decision-making criteria that the FWS and cooperating agencies will consider will include those recommended by AGFD (Groebner et al. 1995), which also calls for full evaluation of the initial "experimental" phase after three years. (FWS 1996, p.2-11&12). Evaluation criteria include:

1. Whether the wolves have successfully established home ranges within the designated recovery area.
2. Whether the reintroduced wolves reproduce successfully in the wild.
3. Whether the numbers and vulnerability of prey are adequate to support wolves.
4. Whether the livestock depredation control program is effective.
5. Whether significant threats to human safety have occurred.
6. Whether wolf mortality is substantially higher than expected.
7. Whether effective cooperation with other agencies and the public is occurring.
8. Whether combined agency funds and staff are adequate to carry out needed management, monitoring, and research.

At three and five years, fully evaluate whether the reintroduction effort should continue or terminate. (FWS 1996, p. 2-18, 21, & 24 in summaries of Alternative A, B, and C)

Final 10(j) Rule as published in the Federal Register (FWS 1998, pages 1754 and 1771)). The Final 10(j) Non-Essential Experimental Population Rule for Mexican wolf reintroduction was also clear about review commitments:

The Service and cooperating agencies will measure the success or failure of the releases by monitoring, researching, and evaluating the status of released wolves and their offspring. Using adaptive management principles, the Service and cooperating agencies will modify subsequent releases depending on what is learned from the initial releases. The

agencies will prepare periodic progress reports, annual reports, and full evaluations after three and five years that will recommend continuation, modification, or termination of the reintroduction effort (FWS 1998, p. 1754).

The Service will evaluate Mexican wolf reintroduction progress and prepare periodic progress reports, detailed annual reports, and full evaluations after three and five years that will recommend continuation, modification, or termination of the reintroduction effort (FWS 1998, p. 1771).

Mexican Wolf Interagency Management Plan (Parsons 1998). The Mexican Wolf Interagency Management Plan (MWIMP) was crafted to provide oversight and specific guidance in the Reintroduction Project. It addressed Project review as follows:

The Interagency Field Team (IFT) will prepare a full evaluation report after three and five years. The full evaluations will include recommendations regarding continuation, modification, or termination of the reintroduction effort. Decision-making criteria to be considered by the cooperating agencies will include those recommended by the AGFD in its Cooperative Reintroduction Plan (*i.e. Groebner 1995*), which also calls for full evaluation of the initial "experimental" phase after three years. (Parsons 1998, p.35)

The MWIMP also lists specific evaluation criteria, which are nearly identical to those listed above from FWS (1996).

Memorandums of Understanding and Cooperative Agreements. The Arizona Game and Fish Department, New Mexico Department of Game and Fish, and U.S. Fish and Wildlife Service are viewed as Primary Cooperators in the Mexican Wolf Reintroduction Project. More recently, the White Mountain Apache Tribe has formally embraced that status. Various cooperative agreements have been executed among these entities to provide structure to the cooperative effort. No reference was made in any of these agreements to evaluation of the reintroduction effort. Instead, they reference the MWIMP.

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 9 of 27

b.    The Service's Perspective

The Service's Region 2 website -- http://mexicanwolf.fws.gov/review/ --
provides an overview of the purpose and status of the 3-year project review.
Below are listed the "Frequently Asked Questions" excerpted from that website:

1.    Why is the U.S. Fish and Wildlife Service Conducting a 3-Year
Review of the Mexican Wolf Program?

When the Mexican Wolf Recovery Program (Program) was being
planned, the U.S. Fish and Wildlife Service (Service) agreed to
review the progress of the Program after 3 and 5 years. The stated
purpose of these reviews was to determine whether the program
should continue, continue with modification, or be terminated.

2.    How is the Review Being Conducted?

March 2001 marked the end of the third year of the Program. As
such, the Service has embarked on an intensive process to insure
an objective review of the Program. The first step in this process
was to determine, scientifically, whether the program was meeting
its stated objectives. The Service enlisted the assistance of the
Conservation Breeding Specialist Group (CBSG) to do this. CBSG
is part of the World Conservation Union with a specialty of being a
neutral facilitator of the complex social and biological issues that
often surround the management and conservation of small
populations of animals. CBSG selected a group of scientists that
are independent of the U.S. Fish and Wildlife Service to conduct
the 3-Year Review of the Program and provide their findings with
respect to the three possible outcomes: the program should
continue, continue with modification, or be terminated.

The Service also conducted a series of 11 Open Houses in Arizona
and New Mexico (See question #4 below) and will work with
CBSG to host a facilitated stakeholder workshop in August (see
question #5 below) as part of the three-year review.

3.    When will the findings of the Review be available to the public?

The preliminary conclusion of the independent scientists was that
the program should continue but indicated that modifications were

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 10 of 27

necessary. [Note: at this point the website enables readers to download a copy of the 3-Year Biological Review of The **Mexican Gray Wolf Recovery Program**, which is the Paul Paquet et al. report].

4.   What are the Community Open Houses?

The Service conducted a series of Community Open Houses in Arizona and New Mexico to share the biological findings from the review with the public and get their input on how it can be improved. The goals of the Community Open Houses were to: (1) share the findings of the 3-Year Review with the public; (2) solicit feedback from the public; (3) and explain the Mexican Wolf Management Rule, the Rule-making process, and how the public can be involved.

The schedule for the Open Houses was the last week of June 2001 for Arizona communities (Phoenix, Clifton, the White Mountain Apache Reservation, and Springerville) and the second week of July 2001 for the New Mexico communities (Albuquerque, Truth or Consequences, Silver City, Glenwood, and Reserve).

CBSG has agreed to incorporate comments from the Open Houses into the stakeholder workshop since there is a limit of 60 participants at that workshop. By doing this, members of the public that cannot participate directly in the workshop will still have an opportunity to provide input. (Note: There will also be another opportunity for the public to provide more formal input on the program when the Mexican Gray Wolf Nonessential Experimental Population rule is updated to incorporate many of the suggestions made by the CBSG biologists and by the public).

5.   What is the facilitated stakeholder workshop all about?

CBSG's expertise is facilitating workshops that bring stakeholders together and generate a series of consensus based recommendations on how a program might change. At the request of the Service, CBSG will be holding one of these facilitated stakeholder workshops for the Mexican Wolf Recovery Program during August 2001 for the purpose of developing recommendations to the Service on possible modifications to the

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 11 of 27

Mexican Wolf Program. The participants of the CBSG stakeholder workshop will perform an in-depth analysis of issues that the participants of the workshop and members of the public that provided comments during the Open Houses feel are important regarding the future of the Mexican Wolf Recovery Program. The workshop participants will generate recommendations to the Service regarding the Program. The participants of the stakeholder workshop will be selected to insure that all diverse viewpoints held about the Program are present. The list of participants will be determined by the Program's Interagency Management Advisory Group (IMAG). The IMAG is made up of agency partners such as U.S. Dept. of Agriculture, the White Mountain and San Carlos Apache Tribes, the Arizona Game and Fish Department, the New Mexico Department of Game and Fish and, County representatives from Grant, Apache, Sierra and Catron Counties.

Subsequent to agreeing to participate in the Skeen Review, the two State wildlife agencies met with Service Region 2 staff to discuss how to proceed. The Service staff made clear that they were available as needed to provide information and respond to questions, but would not participate in constructing the state report. Region 2 Director H. Dale Hall had instructed his staff that this was necessary to ensure the independence mandated by Congressman Skeen.

The discussions also clarified that the Service's perspective about the review process and components was consistent with the website description referenced above. The Service believed that it had completed the 3-Year Review in a manner consistent with the expectations set forth for it, and at a quality level that provided an appropriate foundation for further adaptive management of the Project. In addition to the Biological Review (Paquet et al. 2001), the Community Open Houses, and the Stakeholder Workshop, the Service advised that a responsive management survey of IMAG members in 2001 was considered a part of the review. All of these documents are available from the Service, at the Region 2 website: http://mexicanwolf.fws.gov/review/. However, Service staff also noted that the Service had failed to act on recommendations identified in the review because it believed it was required to complete the Skeen Review before doing so.

c.    The States' Perspective

The Mexican Wolf Reintroduction Project is focused on the Blue Range Wolf Recovery Area, in Arizona and New Mexico. It considers adaptive management as its overarching operational paradigm (Paquet et al. 2001). Adaptive resource

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 12 of 27

management is a framework that helps objectify management decisions in an environment of uncertain outcomes, through a cyclical process of monitoring, evaluation, and informed decision-making (Walters 1986, Johnson et al. 1997). The Service's contracted 3-Year Review was intended to serve as the evaluation component for adaptive management, at an interval that had been pre-determined by the Mexican wolf non-essential experimental population rule (FWS 1998).

In evaluating whether the 3-Year Review was adequate, the States considered 2 primary factors: (1) whether the review assessed monitoring information and previous Project decisions, and (2) whether the evaluation provided a foundation that could be used to support an informed decision-making process using the adaptive management paradigm. These considerations were applied to both the process and the outcomes of the 3-Year Review as they relate to technical issues of the Project. Technical issues are not limited to those that address the biological objectives of the Program. Technical solutions may be necessary to help achieve non-biological objectives, such as use of a particular wildlife management technique to help achieve stakeholder satisfaction, whether or not the stakeholder satisfaction relates in any way to biological objectives. Therefore, technical and substantive issues arose from all the components of the 3-Year Review: the Biological Review, IMAG Survey, Community Open Houses, and Stakeholder Workshop.

The States' perspective of the 3-Year Review, and the documents considered or produced during the review, is generally as follows:

1   The primary state cooperators (AGFD and NMDGF) were not adequately involved in structuring and implementing the review, including the process and timeframes, criteria, desired outcomes (objectives and expectations), and process components (i.e. Biological Review, IMAG Survey, Community Open Houses. Stakeholder Meeting[s]. etc. (cf. p. 2, number 7 of the AGFD-FWS MOU). This is a primary concern, because the States believe that, over the course of the Project, the Service has increasingly been making unilateral decisions about all aspects of the Project, including policy issues as well as operational (implementation) activities. The State wildlife agencies have essentially become just one of many stakeholders, rather than Primary Cooperators. The States are usually informed of Service decisions, and sometimes have opportunities to provide input on decisions, but they are no longer part of a consensus-driven decision-making process among three Primary Cooperators.

2.  The Service did not respond in timely fashion to an Arizona Game and Fish Commission May 17, 2001 request for Community Open House and

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 13 of 27

Stakeholder Workshop locations, times, etc. that would help promote greater public participation in the review. However, the Open House and Stakeholder components were conducted at locations that did allow interested and affected persons to evaluate technical and substantive aspects of the Project. Most of the Community Open Houses, and the Stakeholder Workshop, were conducted within or adjacent to the Recovery Area, which facilitated participation by those with personal knowledge of conditions specific to the Project. Although more people from the vicinity of the Recovery Area might have participated if these events had been closer to their homes, this would likely have occurred no matter where the meetings were held. Other individuals were excluded from the Stakeholder Workshop due to scheduling conflicts with dates chosen, but again this would have been an unavoidable consequence for any dates.

3. The Service did not adhere to the 10(j) rule commitment to have the IFT conduct the review, and bring forth its findings through IMAG for discussion with stakeholders and other interested parties.

4. The Service did not involve the two State wildlife agencies in deciding to contract the Biological Review to a conservation organization (albeit one with superlative qualifications, CBSG), or in allowing the contractor to include the Executive Director of the Turner Endangered Species Fund (who also has superlative qualifications as a scientist) as a co-author of the Biological Review. The Service thus caused other entities to question whether the Biological Review was truly objective, and to question the propriety of affording the Turner Fund a level of participation that was not available to other stakeholders.

5. The final format the Service employed differed from the concept initially described within the Mexican Wolf Interagency Management Plan (MWIMP). Instead of having the IFT provide answers to the 9 questions listed in the MWIMP as 3-year "benchmarks," these questions were addressed through the more detailed analysis contracted to CBSG. The Service made this change in an effort to evaluate the Project in a manner that was more independent and more consistent with the principles of adaptive management (CBSG 2001). The benefits of this approach, compared to the less-detailed review that had initially been envisioned, are arguable. However, the approach itself did not appear to preclude the 3-Year Review from identifying areas of perceived problems and needs for modification. Viewpoints and opinions regarding cooperation among agencies and publics, as well as allocation of resources to achieve the Project's actions, were already being expressed prior to the 3-Year

Review, therefore it did not appear premature to address these topics in some depth.

6. As noted by Paquet et al. (2001), the Biological Review was hampered by a scarcity of data on some biological aspects of the Project. Wolves had not been in the wild long enough or in sufficient numbers to generate large sample sizes in many areas. Sample size problems were expected at this juncture of the Project, but they did cause difficulty in answering the 7 biological questions established in the MWIMP as metrics for the 3-Year Review. Even so, the Biological Review included an answer for each of the 7 questions, and these analyses were sufficient to provide basic yes/no answers. In several cases, the reviewers also provided an analysis that went beyond a straightforward yes/no answer. However, 2 of the 7 questions were not definitively answered ("Is wolf mortality higher than projected in the EIS?" and "Is population growth lower than projected in the EIS?"), primarily because of the limited data available at that point in the Project. In answering both questions, the reviewers strongly emphasized active intervention (releases of new wolves, removal of "problem" wolves) in their analysis. They anticipated that acts of intervention (e.g. releases) would dominate the initial stages of the Project, so the conclusions did not seem inappropriate. However, analysis of recruitment, survival, and mortality rates relative to the demographic projections in the final EIS still need to be evaluated in more detail. The States believe it has not been conclusively determined that the Mexican wolf population cannot reach the rates projected in the EIS without active intervention. This should be re-evaluated when more data are available, as might be the case during the 5-Year Review.

7. The Service did not provide the Primary Cooperators an adequate opportunity to evaluate and discuss the Biological Review report before the final document was made available to the public.

8. The Service provided an abundance of useful information (e.g. CBSG 2001 and other relevant documents) for Stakeholder Workshop participants to consider. However, the Service (a) did not provide Stakeholder Workshop participants with adequate opportunity to read those documents prior to the Workshop; and (b) did not ensure that Workshop participants had adequate time in the Workshop for meaningful discussion within and among workgroups on issues of concern, before being forced by process and time constraints to develop priority rankings for incompletely developed recommendations.

9. The Service did not conduct sufficient Stakeholder Workshops to ensure that the full spectrum of interested parties could to participate. One long-time stakeholder (Ms. Bobbie Holaday), a private individual who had at

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 15 of 27

her own time and expense coordinated voluntary stakeholder discussion meetings during the early phases of the Project, was denied access to the Stakeholders Workshop. The Workshop was, by necessity, limited to invited participants, and the list of participants had to pared down from the original suggested list of participants. The Service made the final decisions on participation.

10. Despite the Holaday issue noted above, and a few other conspicuous absences, the breadth of perspective among the Stakeholder Workshop participants appeared sufficient to help produce an evaluation that would adequately fuel the adaptive management process. The Open House, IMAG survey, and Stakeholder Workshop all resulted in viewpoints and problem identification that included issues being raised by a variety of publics at the time of, or prior to, the review. The comments also reflected a breadth of viewpoints, and therefore suggest that the review captured the range of existing opinions regarding the Project, without attempting to quantify the frequency with which those opinions were expressed. The Stakeholder Workshop produced the most clearly-articulated set of identified issues, and grouped those by topic areas. Despite the varied backgrounds of the Workshop participants, some common themes did arise through the problem identification. Many of these themes related to the processes used by the Project, but others addressed more substantive issues (e.g. lack of timely availability of monitoring information and data to use in adaptive management). Participant groups within the Workshop also developed goals and objectives to address the identified problems, and some specific action items under these goals.

In discussions with the Service prior to the August 2001 Stakeholder Workshop, and with the Arizona Commission from June through September 2001, after the Workshop, AGFD identified specific actions that would help address its concerns with the 3-Year Review and the overall Reintroduction Project. AGFD believed that a change in Service staff behavior was needed such that henceforth the Project would (again) be conducted as a true partnership among the Primary Cooperators. Thus, AGFD requested the following:

1. A staff-level meeting of the Primary Cooperators prior to release of the 3-Year Review, so issues and concerns could be resolved amicably, thus ensuring that the three parties could present consensus recommendations to the public, to the maximum extent possible.

2. A commitment from Directors of the Primary Cooperators to collaborative decision-making among their agencies, and for the Directors to

collaboratively resolve any significant conflicts that could not be resolved at the staff level.

3. A commitment from the Service that the Primary Cooperators would jointly modify the MWIMP to incorporate relevant comments from 3-Year Review prior to releasing the plan to secondary cooperators and the public for further discussion and comment.

4. A commitment from the Service that the Primary Cooperators would jointly structure a draft 5-year review process by December 31, 2001, before soliciting process comment from secondary cooperators and the public.

5. A commitment from the Service that the Primary Cooperators would, by December 31, 2001, develop a comprehensive outreach plan to address the full range of agency and public needs in substantive fashion, with clearly-defined objectives, targets, and deliverables, so progress on the Reintroduction Project could be assessed (and reported in writing) on a quarterly and annual basis.

6. A commitment from the Service that the existing Mexican Wolf Recovery Team would be reconvened to (a) evaluate the draft "Thlel" Recovery Plan revision of ca. 1995 (thus addressing the Final 10(j) Rule commitment to revise the Plan); (b) delineate downlisting and delisting (recovery) goals and objectives; and (c) revise the Recovery Plan.

7. A commitment from the Service that a Mexican Wolf Recovery Implementation Team would be designated, in consultation with the Directors of the Primary Cooperators, to provide operational oversight to the reintroduction effort.

These concerns reflected fundamental problems the States perceived at a policy level and an operational level with the Reintroduction Project and the 3-Year Review.

The States were also concerned that:

1. Service Region 2 leadership was not fully committed to a Primary Cooperator partnership as it was conceived and constructed prior to releasing wolves in Arizona.

2. The absence of commitment to cooperation at a policy level was reflected at the operational level on a daily basis.

3. IMAG, the intended backbone of the Project's approach to adaptive management, was not being used effectively and indeed appeared to have a design flaw that effectively precluded participation by NGOs (both pro and con wolf reintroduction) -- IMAG membership is restricted to

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 17 of 27

governmental entities, in order to comply with the Federal Advisory Committee Act.

4. Annual performance reports for the Project were not being written, let alone used (as was intended) to provide for adaptive management through IMAG review and discussion.

5. The MWIMP was outdated. The MWIMP, signed in 1998, was intended to provide adaptive management through annual review and updating by the Primary Cooperators and field team, and discussion with IMAG. In winter 1998-99, a panel of experts was convened to review the Project and provide recommendations for use in updating the MWIMP. The Primary Cooperators also met to discuss outreach concerns, and made recommendations for improvement. As of this date, the MWIMP remains unchanged from its 1998 form.

6. Project outreach efforts were insufficient. AGFD concerns about outreach had been surfaced in an October 1997 meeting with the Service, were expressed again in 1998-99, but have not been fully addressed yet.

7. No clear strategy was delineated for acting on the outcomes of the 3-Year Review, to ensure that all the Primary Cooperators (not just the Service) played a role in developing program-change recommendations, with appropriate opportunities for discussion with all stakeholders and all interested parties, before decisions were made by the Primary Cooperators.

These concerns remained unresolved through 2001 and into 2002. During that period, the Service was without an agency-wide Director or a permanent Region 2 Director, and its interim leaders apparently could not make policy decisions of the nature required by the 3-Year Review and the Skeen Review. These leadership issues were resolved in Spring 2002, when Steve Williams was hired as the agency's Director, and in Summer 2002, when H. Dale Hall was named Region 2 Director.

2.    Components and Outcomes of the 3-Year Review.

   a.    Components

      (1)    Issue identification (scoping). The Service used the MWIMP to identify nine issues for the review:
            (a)    Have wolves successfully established home ranges within the designated wolf recovery area?
            (b)    Have reintroduced wolves reproduced successfully in the wild?
            (c)    Is wolf mortality substantially higher than projected in the EIS?

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 18 of 27

        (d)    Is population growth substantially lower than projected in the EIS?

        (e)    Are numbers and vulnerability of prey adequate to support wolves?

        (f)    Is the livestock depredation control program effective?

        (g)    Have documented cases of threats to human safety occurred?

        (h)    Is effective cooperation occurring with other agencies and the public?

        (i)    Are combined agency funds and staff adequate to carry out needed management, monitoring, and research?

The Service assigned 7 issues, (a) through (g), to the Captive Breeding Specialists Group (CBSG) for scientific review. The Service then presented the CBSG report (Paquet et al. 2001) to the public as the Biological Review component of the 3-Year Review.

The Service decided that the other 2 issues, (h) and (i), would be reviewed through Community Open Houses and Stakeholder Workshops. In June-July 2001, 11 Open Houses were held in Arizona and New Mexico. In August 2001, a single Stakeholder Workshop was held, in Show Low, Arizona.

(2)    State findings regarding the components.

Biological Review (Paquet et al. 2001). The States believe the findings and recommendations of the Biological Review are scientifically valid, and largely represent objective scientific analysis. However, the States have two major concerns with the Biological Review as presented by the Service: (a) the state wildlife agencies, as Primary Cooperators, were not afforded an appropriate role in structuring or reviewing this component; and (b) some of the recommendations do not adequately reflect social and cultural issues that must be considered in identifying possible biological alternatives. There is no such thing as "pure science" in an endangered species reintroduction, or for that matter in any wildlife reintroduction, virtually every biological issue has a social and cultural context.

It is important to note that these concerns reflect not on the CBSG or on Paquet et al., but on how the Service managed the overall 3-Year Review process – there was no closing adaptive-management discussion after the Stakeholder Workshop (see also below), to resolve (to the extent possible) the social and cultural aspects of the change recommendations the Primary Cooperators were expected to develop.

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 19 of 27

> Open Houses. The States believe the Service held an appropriate number of Open Houses (11). and in places that facilitated public participation in and near the Recovery Area. However, in some cases public notice of the Open Houses was not sufficient timely. Moreover, although many people attended the Open Houses, it remains unclear what use was made of their comment in the overall review. Copies of the raw comment were provided to Stakeholder Workshop participants, but the material was not analyzed before or after the Workshop and participants had no time during the Workshop to digest it. Thus, some participants have come to believe that the Open Houses were simply "venting posts," rather than meaningful opportunities for public involvement.
>
> Stakeholder Workshop. The Stakeholder Workshop was a Service innovation beyond the original review concepts outlined by Groebner et al. (1995). We believe the Workshop was a well-facilitated opportunity for public participation. However, we do not believe it was an effective means (as executed) of providing input for adaptive management. Moreover, we believe this 3-Year Review component suffered from the following: (a) the single Workshop was not sufficient to allow participation by enough stakeholders – at least one more should have been held, in New Mexico; (b) the Primary Cooperators and IMAG were not afforded sufficient time to collaborate effectively in selecting Workshop participants; (c) Workshop participants were not provided essential background material in advance to allow them to prepare for the Workshop; (d) Workshop participants did not have sufficient time in the Workshop to review all the background material, discuss the background material or emerging issues with other participants, or engage in open discussion of Workshop "findings" before subgroup priorities were set and the event ended; (e) the Workshop final report presents all participant opinions and findings without providing essential context (e.g. without identifying whether a given statement is based on opinion or fact, or a given recommendation is legally permissible under current state or federal law); and (f) adaptive-management follow-up for the Workshop was insufficient and not timely.
>
> The IFT and IMAG. The States believe the IFT and IMAG were not sufficiently involved in the 3-Year Review. The IFT did not craft a Project review as required under MWIMP, thus said review was not taken through IMAG for stakeholder discussion.

b.    Outcomes

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 20 of 27

    (1)    The Service, as discussed above, believes that Congressional direction in the FY02 Appropriations Bill precluded it from coming to closure on the 3-Year Review until the Skeen Review was completed. Why the Skeen Review was not initiated until Regional Director H. Dale Hall was hired remains unclear to the States.

    (2)    Notwithstanding the Service's belief regarding its inability to effect changes until the Skeen Review was completed, as stated immediately above, during the September 2002 discussions for the Skeen Review several changes were identified that can be at least partially attributed to the 3-YearReview. Examples are as follows:

        (a)    The Service is providing an additional $30,000 annually to U.S.D.A. Wildlife Services to increase effectiveness in reducing and resolving wolf-livestock conflicts.

        (b)    Moving the Field Coordinator position from Albuquerque to the Recovery Area (Alpine).

        (c)    Opening up IMAG meetings so individual stakeholders, and not just government officials, can participate.

        (d)    Meeting between two of the Primary Cooperators (AGFD and the Service) in June 2002 to reconfirm a commitment to adaptive management that incorporates shared decision-making among the Primary Cooperators, and incorporation of local input.

        (e)    The Service has executed a formal agreement with the White Mountain Apache Tribe for cooperation and participation in the Project.

        (f)    Implementing improved procedures for more timely documentation of field results, including compilation of standard operating procedures (they are in final review now) into a Procedures Manual that is readily available to all field staff.

        (g)    Creating incentives for increased staff retention, to better maintain experienced personnel that are crucial to being responsive to public needs regarding Project implementation.

        (h)    Initial planning for proposed research to provide better information on the economic impacts of Mexican wolf depredation.

Although many of these actions will likely improve the Project, most are in the early stages of implementation. Other recommendations, such as encouraging research through academic and other partnerships designed to help inform future Project evaluations and adjustments, have yet to be agreed to or implemented by the Primary Cooperators and other cooperators as a group. Consequently, some

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 21 of 27

individual cooperators are pursuing wolf-related research individually, and not consistently applying the results of the 3-Year Review to inform and support a collaborative decision-making process.

3.    Recommendations

The States offer the following recommendations as a result of conducting this independent review of the Service's 3-Year Review:

a.    Roles and Functions

(1)    The Mexican Wolf Recovery Program must be restructured to ensure that the two primary components (recovery planning and reintroduction) are managed as collaborative but separate Projects.

(2)    The roles and functions of the Primary Cooperators (AGFD, NMDGF, and FWS) must be restructured to ensure State participation, authorities, and responsibilities as reflected in this report.

(3)    The administrative and adaptive management processes for the Reintroduction Project component must be restructured to ensure meaningful opportunities for, and participation by, the full spectrum of stakeholders and interested parties (see also "Public Participation and Outreach" below).

(4)    The Service should immediately ask the White Mountain Apache Tribe whether it wishes to become a Primary Cooperator in the overall Reintroduction Project component, or retain such status only on its own Tribal lands.

(5)    The Mexican Wolf Recovery Planning component should be staffed by the Service's Mexican Wolf Recovery Coordinator, and centered in Albuquerque. Other elements of this Federally-staffed component should address the captive breeding program, pre-release acclimation husbandry at Sevilleta and other cooperating facilities, program-level outreach, revision of the 1983 Mexican Wolf Recovery Plan, and coordination of Mexican wolf recovery planning range-wide, as well as conceptual oversight for (not daily supervision of) the reintroduction effort in Arizona and New Mexico.



AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 22 of 27

(6)    The Recovery Planning component should be responsible for reviewing and approving adaptive management Project implementation protocols and procedures that are developed by the Reintroduction Project component that is outlined below.

(7)    The Reintroduction Project component (in Arizona and New Mexico) must be centered in Alpine, Arizona, and/or elsewhere in the Recovery Area, as necessary to ensure adequate field presence and outreach to manage released and wild-born wolves effectively, and to minimize real and perceived public conflicts.

(8)    The IFT Leader must be a State employee, and all elements of the IFT (including biologists and outreach specialists) must report to that Leader. If IFT presence is needed in New Mexico, it must be funded, staffed, structured, and supervised as agreed to by the Primary Cooperators, in keeping with the State-lead recommendation above.



AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 22 of 27

(9)    IFT response protocols must be restructured, and staff capacity must be enhanced (and funded), as necessary to ensure immediate (24-hr or less) response capability for, and resolution of, urgent operational issues, such as depredation incidents. Response capability should be reviewed each calendar year to identify appropriate staffing, budget, and response protocol adjustments as reintroduction continues.

(10)    All field and other Reintroduction Project protocols, and all management actions in the Project, must always be in strict compliance with any applicable, approved special rules, policies, protocols, management plans, and interagency agreements.

(11)    The Reintroduction Project must be adaptively managed by collaboration and consensus among all three Primary Cooperators, with appropriate and meaningful opportunities for participation by stakeholder and other interested parties (see also below).

(12)    The Reintroduction Project Coordinator position must be restructured and empowered to coordinate the adaptive management process, including identification, planning, review, and approval of future release sites and release protocols for Arizona and/or New Mexico. The Project Leader shall provide a transition between Recovery (Federal) and Reintroduction (State), by reporting to the Recovery Coordinator (Federal) and supervising the Field Team Leader (State).

(13)   The adaptive management component of the Reintroduction Project must be restructured in collaboration with stakeholders and other interested parties, in accordance with the primary roles and functions identified herein. IMAG should be dissolved or restructured to provide a forum open to any and all interested parties. The States prefer that a State-led Conservation Team approach be used to create this forum.

(14)   Within the new adaptive management forum, the Primary Cooperators should use other Cooperators signatory to a Memorandum of Agreement as a sounding board for Project management recommendations that are subsequently approved and implemented by the Primary Cooperators. Consensus should be sought with all formal Cooperators and other interested parties for all decisions, but in the absence of consensus the Primary Cooperators should be jointly responsible and accountable for making the necessary decisions. Signatory Cooperator status in this adaptive management forum should be open to any interested governmental or non-governmental agency or organization. Participation by individuals should be without limit, except that voting on recommendations should be restricted to formal Cooperators.

b.   Public Participation and Outreach

(1)   The administrative and adaptive management processes for the Reintroduction Project component must be restructured to ensure meaningful opportunities for, and participation by, the full spectrum of stakeholders and interested parties (see also above).

(2)   Reintroduction Project outreach must be restructured and funded as necessary to address the Commission, Department, and public concerns expressed in this report.

(3)   An outreach specialist must be added to the IFT, to be supervised by the IFT Leader and with funding provided through the AGFD-NMDGF-FWS Memorandum of Understanding for this Project, to focus entirely on reintroduction issues as opposed to recovery issues.

c.   Technical (Biological) Recommendations in the 3-Year Review

(1)   Given the time constraints on this independent review, the States are unable to provide detailed technical recommendations on biological

aspects of the Reintroduction Project. However, we wish to reaffirm that we find scientific merit in the biological recommendations offered in Paquet et al. (2001), and in some of those offered in the Stakeholders Workshop final report.

(2)     Not later than January 31, 2003, the Primary Cooperators should jointly decide on which technical recommendations to take through the newly restructured Reintroduction Project adaptive management process, for discussion, refinement, and implementation, and which ones to assign to the Recovery Program to address at that level. We note again that the Reintroduction Project continues to suffer from the Service's failure to revise the Mexican Wolf Recovery Plan, to integrate reintroduction population objectives with appropriate recovery objectives.

(3)     Not later than March 31, 2003, the Primary Cooperators must discuss their recommendations with other Cooperators in public session, and develop a draft plan for implementing the recommendations selected. This plan must include timelines and measurable objectives for implementation.

(4)     At least annually thereafter, the Primary Cooperators must present to stakeholders and cooperators an annual report and annual work plan for discussion and comment. These documents would collectively serve as the monitoring and evaluation components needed for adaptive management. The agreed-upon annual work plans must be flexible (adaptive), so changing needs can be met, but must also be followed sufficiently closely to allow effective evaluation and monitoring of Project actions in a manner that will provide a solid foundation for subsequent decision-making processes and adaptive management.

d.     5-Year Review.

(1)     The Reintroduction Project's review protocols and procedures must be restructured and improved to ensure that the 5-Year Review is (a) effective and efficient, (b) makes full use of all appropriate material from the 3-Year Review, (c) an improvement over the 3-Year Review, and (d) completed by September 30, 2004.

e.     Priority Actions

The public has waited patiently for the 3-Year Review to result in adaptive management, but it has not. Thus, we recommend that "Roles and Functions"

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 25 of 27

recommendations 1, 2, and 3 be implemented and resolved within 60 days of September 30, 2002, at the Primary Cooperator level, and that the changes and the issues they reflect be taken through the restructured Adaptive Management Process for stakeholder discussion and further refinement.

We further commit to working with the Service to restructure the Mexican Wolf Reintroduction Project as discussed in this report within 180 days of September 30, 2002, and to reporting back to our respective Commissions on the results of this effort in April 2003.

We further note that our Commissions have reserved the right, if these issues are not resolved within the timeframes outlined herein, to take further action on the States' participation in this Project.

5.    Summary and Conclusions

It is vitally important that those who read these remarks understand the context in which they are made. Without doubt, the States have been and remain critical of the manner in which the Service constructed and conducted the 3-Year Review. We believe the planning was flawed, and the execution was imperfect. However, we believe the scientific portions of the review (Paquet et al. 2001) do represent the best available science, and we believe those recommendations are credible and reasonably objective from a scientific perspective.

Principal among the flaws that we perceive were (a) failure to approach the Review as a collaborative effort among Primary Cooperators, with appropriate and meaningful opportunities for public participation, and (b) failure to address social and cultural aspects of wolf reintroduction. We are also concerned that CBSG reviewers and Stakeholder Workshop participants were forced by process and time constraints to use datasets that were generally insufficient in size and scope to frame recommendations for Project change.

Nevertheless, the 3-Year Review appears to us to have been effective in identifying a broad spectrum of biological and other concerns. We believe it provided important information that can and should be used in an adaptive management process, with continued scientific rigor and with due consideration of other factors that were not fully addressed in the review, to improve the Project.

We also believe the Project's adaptive management process must become much more inclusive of the public than IMAG has been, and that collaborative decision-making

among the Primary Cooperators, using any and all input and recommendations gained through that adaptive management process, must be at the core of the Project henceforth.

Equally importantly, we wish to make clear that the concerns we have about this Project reflect decisions and guidance from a previous era of leadership in FWS Region 2, and in no way reflect on the current leadership of Regional Director H. Dale Hall. In fact, in just a few short months, Director Hall has aggressively worked to re-establish an open and honest dialogue about these issues, and to restore both the true Primary Cooperators roles and a commitment to full and open public participation in this Project. He seems to recognize that under federal law the endangered species "buck" unquestionably stops with the Service, but there are many legally, professionally, and ethically appropriate ways to ensure that issues can be amicably discussed, and collaboratively resolved, before invoking his authority to make a unilateral decision.

Finally, the States believe that with implementation of the recommendations offered herein, the public's interests in wolf reintroduction will be much better served.

**Selected Documents Relevant to the 3-Year Review**

Conservation Breeding Specialist Group (SSC/IUCN). 2001. Mexican gray wolf three year review: briefing book. CBSG, Apple Valley, MN. [Note: this report includes the IMAG responsive management survey, the Paquet et al. 2001 report, and various other documents that are important to the Reintroduction Project.]

FWS. 1996. Reintroduction of the Mexican wolf within its historic range in the southwestern United States. Final Environmental Impact Statement.

FWS. 1998. Establishment of a nonessential experimental population of the Mexican gray wolf in Arizona and New Mexico. Federal Register 63(7):1763-1772.

Gibbs, J.P., H.L. Snell, and C.E. Causton. 1999. Effective monitoring for adaptive wildlife management: lessons from the Galapagos Islands. Journal of Wildlife Management 63:1055-1065.

Groebner, D.J., A.L Girmendonk, and T.B. Johnson. 1995. A proposed cooperative reintroduction plan for the Mexican wolf in Arizona. Nongame and Endangered Wildlife Program Technical Report 56. Arizona Game and Fish Department, Phoenix, Arizona.

Johnson, F.A., C.T. Moore, W.L. Kendall, J.A. Dubrovsky, D.F. Caithamer, J.T. Kelley Jr. Kelley, and B.K. Williams. Uncertainty and the management of mallard harvests. Journal of Wildlife Management 61:203-217.

Mexican Wolf Reintroduction Project
AGFD-NMDGF Independent Review
Final: September 30, 2002
Page 27 of 27

Kelly, B., M. Brown, and O. Byers (eds.). 2001. Mexican wolf reintroduction program three-year review workshop: final report. IUCN/SSC Conservation Breeding Specialist Group, Apple Valley, MN.

Memorandum of Understanding among FWS and AGFD (to promote recovery of the Mexican wolf). Unpublished document. Signed final version, 10 June 1997, 5 pages. Signed by Nancy Kaufman (FWS) and Duane L. Shroufe (AGFD).

Memorandum of Understanding among FWS, AGFD, and NMDGF (to promote recovery of the Mexican wolf). Unpublished document. Signed final version, 5 pages. Signed by Nancy Kaufman (FWS, 30 Oct 1998), Thomas R. Spalding for Duane L. Shroufe (AGFD, 16 June 1998), and Jerry Maracchini (NMDGF, 13 May 1998).

Paquet, P.C., J.A. Vucetich, M.K. Phillips, and L.M. Vucetich. 2001. Mexican wolf recovery: three year program review and assessment. Prepared by the Conservation Breeding Specialist Group for the U.S. Fish and Wildlife Service.

Parsons, D.R. 1998. 1998 Mexican wolf interagency management plan. Unpublished document. U.S. Fish and Wildlife Service, Ecological Services Office, Albuquerque New Mexico.

Walters, C.J. 1986. Adaptive management of renewable resources. MacMillan, New York, New York, USA.

Civ. Action No. 06-2119 (RCL)

Attachment 5

# Before the Department of the Interior
# U.S. Fish and Wildlife Service

WASHINGTON, D.C.  20240

| | |
|---|---|
| **In Re: Mexican gray wolf recovery,** | ) |
| **Arizona and New Mexico.** | ) |
| **Petition for Rule-making to enhance** | ) |
| **prospects for recovery of the Mexican** | ) |
| **gray wolf experimental population, in** | ) |
| **accordance with scientific findings.** | ) |

*To the Secretary of the Interior and*
*the Director, Fish and Wildlife Service:*

### Petition for Rule-making

Michael J. Robinson
Center for Biological Diversity
P.O. Box 53166
Pinos Altos, NM 88053

March 29, 2004

1

## TABLE OF CONTENTS

Page

Summary------------------------------------------------------------------------------------3

Introduction: Recovery of Mexican gray wolves will benefit natural ecosystems
        and human communities.-----------------------------------------------------------3

Petition for Rule-making----------------------------------------------------------------4

Adaptive Management at Heart of Reintroduction Effort------------------------------5

Three Year Review Process Intended to Implement Adaptive
        Management through a Vetting of Biological and Social Issues-----------------5

Recommendations of Three Year Review------------------------------------------------7

Consequences of Failing to Revise Rule-----------------------------------------------11

Paquet Report Analysis Affirmed by State Wildlife Agencies----------------------13

Standing to File-----------------------------------------------------------------------------13

Conclusion----------------------------------------------------------------------------------14

## SUMMARY

This Petition filed by the Center for Biological Diversity requests that the Department of the Interior and the U.S. Fish and Wildlife Service promulgate regulations revising the experimental non-essential rule for the reintroduction of the Mexican gray wolf into the wild in Arizona and New Mexico.  Specifically, this petition seeks the following elements in the new regulations:

(a)      Providing the Fish and Wildlife Service the authority to release Mexican gray wolves from the captive breeding population into New Mexico.

(b)      Providing the Fish and Wildlife Service the authority to allow wolves to establish territories outside the boundaries of the Gila and Apache National Forests.

(c)      Defining "nuisance wolves" and "problem wolves" so as to exclude animals that scavenge on the carcasses of livestock that died of non-wolf causes.

Such regulations are necessary to follow the urgent recommendations of a team of expert, independent wolf biologists contracted by the Fish and Wildlife Service to assess the progress of the Mexican wolf reintroduction program.   Following scientific recommendations, in turn, is part of the "adaptive management" policy which the Service pledged itself to in its 1996 Mexican wolf reintroduction Final Environmental Impact Statement.  Failure to promulgate such regulations jeopardizes the recovery of the Mexican wolf and violates Section 7(a)(1) of the Endangered Species Act, which requires all federal agencies to utilize their authorities to recover threatened and endangered species.

## Introduction:  Recovery of Mexican gray wolves will benefit natural ecosystems and human communities.

The ongoing program to reintroduce the Mexican gray wolf (*Canis lupus baileyi*) into the wild is intended to correct an historic mistake and save an endangered species and the ecosystems of which it is a part.  The Mexican wolf is the engine of evolution for southwestern ecosystems, contributing to the strength and vigor of elk, the alertness of deer, the agility and sense of balance of bighorn sheep, and the speed and keen eyesight of pronghorn antelope.  The "lobo" also provides carrion for scavenger species such as eagles, badgers and bears, and may subtly change the inter-relationships between other species, such

3

as foxes and coyotes, and between herbivores such as elk and the vegetation they utilize.

Beginning in 1915, the federal government poisoned, trapped and dug up the dens of wolves and by the late 1920s had completely exterminated the Mexican wolf from the United States. Starting in 1950, the U.S. Fish and Wildlife Service began sending poison and salaried American personnel to the Republic of Mexico to duplicate this extermination program south of the border.

Only after passage of the Endangered Species Act did these policies end. The last five Mexican wolves confirmed from Mexico were captured between 1977 and 1980 in an emergency effort to save this animal via captive breeding. It is the progeny of three of these last survivors, and of four previously captured wolves later certified through genetic testing to be pure-bred Mexican wolves, that were first reintroduced in March, 1998 and that now roam their ancient habitats in southeastern Arizona and southwestern New Mexico.

Reintroduction of the Mexican wolf is part of this generation's commitment to generations yet to come that we will leave them some landscapes teeming with life. Appropriately, polls taken over the past several years have consistently indicated strong public support for wolf reintroduction, including in the rural counties where lobos now roam.

But this program, and the wolves' chances of success, are currently being undermined by arbitrary and capricious federal regulations. These regulations mandate a control program targeting wolves that do not attack livestock, fail to prevent preventable conflicts between wolves and the livestock industry, and needlessly restrict the authority of the Fish and Wildlife Service and its agency partners in the States of New Mexico and Arizona, the White Mountain Apache Tribe, and the U.S. Forest Service in deciding where to release wolves and under what circumstances to allow them to roam.

## Petition for Rule-making

The Center for Biological Diversity, pursuant to the Administrative Procedures Act (16 U.S.C. 553 (e)) and Department of the Interior regulations (43 C.F.R. Part 14), hereby petition the U.S. Fish and Wildlife Service to revise the experimental non-essential rule for the reintroduction of the Mexican gray wolf into the wild in Arizona and New Mexico.

(50CFR17.84)  Administrative Procedures Act directs that "[e]ach agency (of the Federal Government) shall give an interested person the right to petition for the issuance…of a rule." 5 U.S.C. 553.

## Adaptive Management at Heart of Reintroduction Effort

On November 6, 1996, the Fish and Wildlife Service's southwest regional director, Nancy M. Kaufman, signed the notice for a  Final Environmental Impact Statement on the Reintroduction of the Mexican Wolf within its Historic Range in the Southwestern United States ("FEIS").  This document, and subsequent federal register notice (50CFR17.84) authorized reintroduction of an experimental, non-essential population of the Mexican gray wolf into the Blue Range Wolf Recovery Area of southwestern New Mexico and southeastern Arizona, and established a broader Experimental Population Area.

The FEIS premised the reintroduction program on principles of adaptive management:  "The FWS and the cooperating agencies will use a flexible 'adaptive management' approach based on careful monitoring, research, and evaluation throughout the release phase."  (FEIS, p. v)

To ensure implementation of adaptive management, the FEIS and the federal register notice pledged to "evaluate Mexican wolf reintroduction progress and prepare periodic progress reports, detailed annual reports, and full evaluations after 3 and 5 years that recommend continuation, modification, or termination of the reintroduction effort." (50CFR17.84)

## Three Year Review Process Intended to Implement Adaptive Management through a Vetting of Biological and Social Issues

On February 16, 2001, the FWS held an invitation-only meeting in Silver City, New Mexico to unveil its plans to conduct the three-year review.  At that meeting, Mexican wolf recovery coordinator Brian T. Kelly introduced representatives of the Conservation Breeding Specialist Group (CBSG), a non-profit organization, to the invited guests, who largely consisted of ranchers and representatives of groups opposing Mexican wolf reintroduction,

and explained that CBSG would be conducting a three day workshop, again only open to invited guests, to evaluate the program and produce a review document that included recommendations for the future. However, by majority vote of participants at that Silver City meeting, the Service modified that plan to authorize the CBSG to conduct a separate scientific evaluation of the recovery program, to precede and inform the workshop.

The CBSG subsequently contracted with Paul C. Paquet, Ph.D., of the University of Calgary to conduct that scientific evaluation. Dr. Paquet is considered one of the world's top experts on carnivores, and especially on wolves. He selected three colleagues with wide expertise in conservation, wolf recovery, and demographic and statistical analysis, to assist him. None of them were at the time affiliated with the government. The resulting 86-page document, *Mexican wolf recovery: three year program review and assessment* (by Paul C. Paquet, John A. Vucetich, Michael K. Phillips and Leah M. Vucetich, "Paquet, *et al*"), released in June, 2001, to date is still the sole published scientific research study of the Mexican wolf population in the wild. It incorporates all the monitoring data conducted by the interagency Mexican wolf field team, and was conducted by the CBSG's contract biologists and paid for with federal endangered species recovery funds, specifically for its value in guiding future actions in the Mexican wolf reintroduction program.

Paquet, *et al* included the following remarks germane to adaptive management:

> The architects of the Mexican wolf reintroduction program properly accounted for the inevitable uncertainty and difficulty of the project by establishing adaptive management as the overarching operational paradigm. Consequently, our recommendations are largely the inevitable result of the reintroduction project's maturation. In this regard, we predict that the next review will also identify changes that can be made for improving the program. (p. 61)

After release of Paquet, *et al*, the Service hosted eleven "Open House" public meetings to gather public opinion on the recovery program. Nine of the meetings occurred in small towns and even smaller rural communities proximate to the reintroduction area. The remaining two meetings were held in Albuquerque, New Mexico and Phoenix, Arizona. Written comments were accepted at these open houses and were compiled in a document entitled *Mexican Gray Wolf: Three Year Review: Open House Participant Comments*

6

("Participant Comments").

Finally, the CBSG conducted the planned workshop in Show Low, Arizona, on August 7 - 10, 2001. The results of this workshop was a rambling, digressive document entitled *Mexican Wolf Reintroduction Program Three-Year Review Workshop: Final Report* (edited by Brian T. Kelly and Michelle H. Brown of the Service and Onnie Byers of the CBSG, "Workshop Final Report").

## Recommendations of Three Year Review

The tripartite review process produced three discrete sets of recommendations: Those of Dr. Paquet and his colleagues, of the public attendees of the open house meetings, and of the invitation-only workshop. Strikingly, however, two salient recommendations emerged from all three processes, and a third was endorsed in two of the three.

The biological report, Paquet, *et al*, advised as follows:

**Immediately modify the final rule (Parsons 1998) and develop the authority to conduct initial releases into the Gila National Forest.** Several releases conducted during the first 3 years of the reintroduction project resulted in wolves settling much of the primary recovery zone in the Blue River Wolf Recovery Area. As work elsewhere (Phillips unpublished data) has revealed, wolves should not be released in areas that support resident animals. Over time, it will become harder for the Service to find suitable release sites in the primary recovery zone. The Service can best address this problem by obtaining the authority to conduct initial release in the secondary recovery zone, most notably the Gila National Forest. This recommendation was first made to the Service by a panel of experts (including Phillips) enlisted by the Service to review the reintroduction program in January 1999. Despite the Service's approval of the recommendation, they have taken no implementation action. This is by far the most important and simplest change the Service can make to the existing reintroduction project. The Gila National Forest is approximately 75% of the 4.4 million acre Blue Range Wolf Recovery Area. The Gila Forest includes about 700,000 acres that are roadless and free of livestock. Several high-quality release sites are available in the area. Using them is the best way for improving the cost-effectiveness and certainty of the reintroduction project. Accordingly, we strongly recommend that the Service immediately take whatever action is necessary to conduct initial releases of captive-born (and wild-born if appropriate) Mexican wolves to the Gila National Forest.

**Immediately modify the final rule to allow wolves that are not management**

7

**problems to establish territories outside the Blue River Wolf Recovery Area.** For specific language and instruction for this modification we strongly recommend that the Mexican wolf recovery program review the final rule promulgated for the gray wolf recovery in the northern Rockies (Bangs 1994). During the first 3 years of the reintroduction the Service recaptured some Mexican wolves simply because they left the Blue Range Wolf Recovery Area. As the wolf population grows, more animals will disperse from the Blue Range Wolf Recovery Area. Retrieving animals because they wander outside the primary recovery area is inappropriate because it is:

1. inconsistent with the Service's approach to recover wolves in the southeast, Great Lakes states, and the northern Rockies;

2. will lead to serious logistical and credibility problems as the wolf population grows and more wolves disperse from the area; and

3. needlessly excludes habitat that could substantially contribute to recovery of *Canis lupus bailey*i.

Before the current Mexican wolf reintroduction project was initiated, the red wolf recovery program adopted a similar approach (Henry 1995) with dire consequences (Phillips and Smith 1998). Extensive tracts of public land and some private land outside the Blue Range Wolf Recovery Area are suitable for wolves. Consequently, we strongly recommend that the Service develop the appropriate flexibility to allow wolves to occupy lands outside the Blue Range Recovery Area. We believe that obtaining the requisite flexibility will require that the Service modify the final rule currently governing the reintroduction project.

We recognize that the statements above as they relate to private land may cause controversy so we offer the following remarks. Allowing Mexican wolves to inhabit suitable tracts of private land (e.g., large holdings) in the absence of problems, would bring the reintroduction project into compliance with Service-led efforts to recover wolves elsewhere. Allowing wolves to inhabit private property in the absence of a problem should not be construed to mean that the Service would begin to actively target private lands as wolf habitat that needs to be settled. Quite the contrary, and note that nowhere is the Service effecting management of private land to promote wolf conservation. However, throughout the U.S (except in the Blue Range Wolf Recovery Area) if a wolf wanders onto private property and does not cause a definable problem, and its mere presence is not a definable problem, then the Service is not required to remove the animal even if the landowner demands such action.

Such an approach to wolf recovery is consistent with the determination in the United States that the public owns wildlife, rather than private landowners. Within limits, landowners can manage their property in a way that promotes or hinders the welfare of wildlife. However, through laws enforced by state and federal officials, citizens decide under what circumstances wildlife can be captured and moved or killed from public and private land. Such decisions are not the prerogatives of the landowner, regardless of whether the animal(s) in question are naturally occurring or present because of a reintroduction program.

In sharp contrast with the Service's approach elsewhere, the Mexican wolf project developed a rule that requires wolves to be removed from public and private

8

land outside the Blue Range Wolf Recovery Area, even in the absence of a problem (Parsons 1998). Such regulations are inappropriate for at least 2 reasons: 1) they are nearly impossible to effectively carry out as the wolf population grows because of the difficulties of managing an ever-increasing number of wide-ranging dispersing animals, and 2) they establish a precedent that could be effectively used to argue for the removal of other endangered species inhabiting certain tracts of public or private land.

Certainly local opposition to the Mexican wolf reintroduction program affected the development of such a rule. Indeed, the recovery program coordinator assumed from personal knowledge of local politics and sentiments that a more restrictive rule would have significantly hindered and possibly caused the termination of the project (D. R. Parsons personal communication 1996). Maybe this was a valid assumption. Opinion polls, however, suggest widespread and persistent local support for wolf recovery in the southwest (Duda and Young 1995, Pate *et al*. 1996, Meadows 2001). Regardless, noting that wolf recovery elsewhere has faced substantial opposition is instructive, but the Service did not promulgate similarly onerous rules (e.g., see Bangs 1994, Henry 1995). And to date, recovery efforts elsewhere have been quite successful (Refsnider 2000).

. . .

**Require livestock operators on public land to take some responsibility for carcass management/disposal to reduce the likelihood that wolves become habituated to feeding on livestock.** Currently livestock grazing is permitted on about 66% of the Blue Range Wolf Recovery Area. At least 3 packs were removed from the wild because they scavenged on dead livestock left on national forest lands. Such scavenging may predispose wolves to eventually prey on livestock. Accordingly, reducing the wolves' access to carcasses will greatly facilitate coexistence between ranchers and wolves in this portion of the recovery area carcasses. While some predation on livestock is inevitable, reasonable means of reducing the frequency of occurrence will enhance wolf recovery so that is respectful of the needs and concerns of livestock producers. Consequently, livestock producers using public land in occupied wolf range should be required to exercise reasonable diligence in finding livestock that have died to either dispose of the carcass or enable the Service to do so. Such diligence will probably reduce predation on livestock, which in turn will improve the cost-effectiveness and certainty of the reintroduction project. (pp. 65-67)

Comments from the open houses adduced strong sentiment in favor of the same three recommendations. Out of 364 signed comments (each of which could include more than one issue), the single largest category of comments advising on specific program policies addressed releasing wolves from the captive breeding program directly into New Mexico. Eighty-three comments supported such releases, and only two opposed them.

The second largest category of such specific comments addressed the issue of allowing wolves to roam/and or establish territories outside the boundaries of the currently constituted recovery area.  Fifty-five comments indicated support for such a change, while seven opposed this.

Another forty-four comments supported disposal of livestock carcasses so as to prevent wolves from habituating to livestock.  No one wrote to oppose such disposal. (Participant Comments, pp. 5-24)

Finally, the three-day workshop resulted – despite the cacophony of a process tarnished by a biased and Federal Advisory Committee Act-violating process – in a series of recommendations along the same lines.  The Workshop Final Report includes the following two proposed action items from among a multitude issued by the six working groups constituted during the workshop:

- "Change the 10(j) management rule to allow direct releases of wolves anywhere within the Blue Range Recovery Area." (p. 52)
- "Change rule to allow for possible release of wolves from captive population throughout recovery area and allow wolves to disperse outside recovery area." (p. 64)

None of the proposed action items are at odds with either of these two courses of action.

## Consequences of Failing to Revise Rule

The scientific report, Paquet, *et al*, included the following minatory remarks:

- "We conclude that some wolves have successfully established home ranges and possibly pack territories within the designated wolf recovery area. We caution, however, that frequent recaptures and re-releases confounded our analysis. These manipulations may also be interfering with pack formation and establishment and maintenance of home ranges. Lastly, individual wolves have shown some indication of dispersing outside the recovery areas.  This is to be expected and required if the regional population is to be viable." (p. 23)
- "The number of free-ranging Mexican wolves at the end of third year is similar to that projected in the EIS. Survival and recruitment rates, however are far too low to ensure population growth or persistence. Without dramatic improvement in these vital rates, the wolf population will fall short of predictions for upcoming years." (p. 27).
- "Frequent removals and re-releases of wolves confounded our analysis of rates and causes of mortality. However, if recaptured wolves were at high risk of being killed,

10

then survival is much lower than projected in the EIS." (p. 33)

- "Using data collected since March 1998, we calculated a 39% chance that the annual growth rate is < 0.0; a 43% chance the annual growth rate is $\leq$0.10; and a 50% chance the annual growth rate $\leq$0.20 (Figure 22). Using data collected since December 1998, we calculated a 23% chance that the annual growth rate is < 0.0; a 26% chance the annual growth rate is $\leq$ 0.10; and a 29% chance annual growth rate $\leq$0.20 (Figure 23). " (p. 41)

These remarks indicate that if trends from the first three years of the reintroduction program continue, there is a greater than one third possibility of a decline in the population. And indeed, between June, 2001, when the Paquet Report was released and today, the population of radio-collared and monitored Mexican wolves in the wild declined from 27 to 18 animals. According to the 1996 *Final Environmental Impact Statement on Reintroduction of the Mexican Wolf within its Historic Range in the Southwestern United States*, at the end of 2003, there were projected to be a total of 55 wolves in the wild. That FEIS also projected ten breeding pairs established by this time, whereas at the end of last year, only three breeding pairs could be documented (p. 2-8).

Radio collared wolves are the only objective benchmark for the demographics of this population. Some non-radio collared wolves and possibly animals whose collars have malfunctioned also roam the recovery area, but their numbers are unknown. Over the past two and a half years the Fish and Wildlife Service has made a concerted effort to capture wild-born wolves in order to radio collar them and monitor demographic trends, and the agency has captured nine (whose numbers are incorporated into the eighteen that are currently collared and monitored). However, guesstimates as to how many more uncollared wolves there might be do not suffice as the basis for recovery decisions; the only actual data available indicates a declining population.

The trends producing such an uncertain prognosis for recovery are largely based on frequent government control actions against the wolves. Such control actions to date have directly resulted in the deaths of ten wolves (nine accidental and one purposefully) and in the destruction of numerous packs and the resultant loss in (additional) individual animals' lives and in many possibilities for success in reproduction. Even in cases in which wolves captured from the wild are re-released, their survival chances diminish significantly because

11

family packs break up and their individual members then travel vast distances alone, often succumbing to poachers and automobiles. In sum, the control actions are the greatest single limitation in the growth of the Mexican wolf population, and to a greater degree than can likely be sustained in the absence of continual re-infusion of wolves from the captive population. These control actions are overwhelmingly due to the wolves' discovery and utilization of livestock carcasses, and dispersal outside the recovery area. Allowing the wolves to so disperse, and limiting the availability of livestock carcasses through modifying the rule would at once remove the two greatest risk factors to the population.

Furthermore, releasing wolves from the captive breeding pool directly into the Gila National Forest in New Mexico would accelerate establishment of a wolf population in the largest areal extent of the recovery area, a region which continues to lag behind Arizona in supporting a wolf population, despite several years of translocations of wolves first released in Arizona or born in the wild. The failure to change the rule in this respect is to rely largely on such translocations, despite their very limited success to date and the Paquet, *et al* warning that they "may also be interfering with pack formation and establishment and maintenance of home ranges" – in other words, the conditions necessary for successful growth of the population.

## Paquet Report Analysis Affirmed by State Wildlife Agencies

The Paquet Report's validity was affirmed by both the Arizona and New Mexico departments of Game and Fish, in a joint September 30, 2002 statement to the Fish and Wildlife Service to be transmitted to Congress, in accordance with report instructions contained within the Department of Interior and Related Agencies Appropriations Bill, 2002 at the request of former Representative Joe Skeen (House of Representatives Report 107-103). In their review, the Departments stated that "the findings and recommendations of the Biological Review are scientifically valid" (*Arizona-New Mexico Review of the U.S. Fish and Wildlife Service's 3-Year Review of the Mexican Wolf Reintroduction Project*, p. 18).

## Standing to File

The Center for Biological Diversity is dedicated to protecting and restoring the imperiled species

and wild places of North America, operating through science, policy, education, citizen activism and environmental law.

The Center has a longstanding interest in the recovery of the Mexican gray wolf. Our executive director, Kieran Suckling, was part of the 1989 litigation against the Departments of the Interior and Defense (Wolf Action Group et al vs. Lujan, et al) that broke the logjam on recovery and precipitated development of the reintroduction EIS. Subsequently, we helped build public support for the program over many years.

After reintroduction began, we contributed to the reward fund that helped capture and convict James Michael Rogers for illegally killing a Mexican wolf in 1998. We continue to offer a reward of $5,000 for apprehension and conviction of those illegally killing wolves. We played a leading role in advocating for, and removing the political obstacles to the translocation of wolves into the Gila National Forest in 2000. Currently, we are building further grassroots support for the wolves through a slide show tour that has reached thousands of people in the Southwest and nationwide over three years.

The Center for Biological Diversity has over 9,000 members, many of whom reside in New Mexico and Arizona and show up at public hearings and otherwise participate in management decisions on the Mexican wolf, insofar as they are permitted. In sum, the Center for Biological Diversity meets all the criteria for "an interested person" under the Administrative Procedures Act.


## Conclusion

The Fish and Wildlife Service's failure to date to promulgate new regulations in contravention to this record directly contradicts the Endangered Species Act's intent to recover endangered species and the ecosystems upon which they depend. On July 15, 1986, Fish and Wildlife Service mammalogist Ronald M. Nowak stated that "the Mexican wolf may be the most critically endangered mammal in North America, and is of unusual biological, historical, and cultural interest" (in an internal FWS memo to James Johnson). Today, there is just one tenuous population derived from the last wolves captured in Mexico, and that population is at grave risk.

In devising an elaborate and expensive review of the Mexican wolf reintroduction program in 2001, the Fish and Wildlife Service made numerous public commitments to act on the review's findings. "This is an important time for communities to voice their issues with the program," Brian T.

13

Kelly, Mexican gray wolf recovery coordinator, told the media in June 2001. "In addition to the science, we need the local views and recommendations on what changes to make to the management plan" ("Meetings set to discuss wolf reintroduction," 6/7/2001, *Silver City Daily Press*). Other examples abound.

The failure of the Fish and Wildlife Service to follow through on a process in which members of the public volunteered their time to participate, which was paid for by endangered species funds and which was explicitly intended to guide management, is breeding cynicism about the agency's commitment to recovery of the lobo.

Given the danger of further population declines toward extirpation of the remaining Mexican wolves, and of the likelihood that the population will not achieve the reintroduction's objectives under current management, we request that the Fish and Wildlife Service immediately begin the rule-making process to modify policies in accordance with the Paquet Report's recommendations and the public sentiment expressed in the social components of the three-year review.

Civ. Action No. 06-2119 (RCL)

Attachment 6



# United States Department of the Interior

## FISH AND WILDLIFE SERVICE

P.O. Box 1306
Albuquerque, New Mexico 87103
http://ifw2es.fws.gov

In Reply Refer To:
R2/ES-TE
CL 6-41

JUN 3 0 2004

Mr. Michael Robinson
Center for Biological Diversity
P.O. Box 53166
Pinos Altos, New Mexico  88053

Dear Mr. Robinson:

This is to acknowledge receipt of your March 29, 2004, petition for rule-making, requesting the
U.S. Fish and Wildlife Service (Service) promulgate regulations revising the experimental non-
essential rule (rule) for the reintroduction of the Mexican gray wolf into the wild in Arizona and
New Mexico.  Specifically, your petition requests the Service modify the rule to:  (1) allow
direct releases of captive wolves into New Mexico; (2) allow wolves to establish territories
outside the boundaries of Gila and Apache National Forests and; (3) define nuisance and
problem wolves so as to exclude animals that scavenge livestock carcasses that died of non-wolf
causes.  The petition was filed pursuant to the Administrative Procedures Act (APA) and several
articles and editorials that followed the petition suggested that the Service had 90 days for an
initial response and 1 year to promulgate new regulations.

Under the APA, upon which the petition was filed, each Federal agency "shall give an interested
person the right to petition for the issuance, amendment, or repeal of a rule."  APA petitions are
not subject to the strict deadlines mandated for petitions under the Endangered Species Act and;
therefore, the previous conclusion that the Service must make a determination on your petition
within a 90-day time frame is incorrect.  In fact, no definitive time frame for response to a
petition is required by the APA or the Department of the Interior.  Instead, the APA simply states
that petitions will be given prompt consideration and the petitioner will be notified promptly of
the action taken.

As you are aware, the Service is currently evaluating the need for modifying the rule, but no
final determination has been made at this time.  In accordance with the APA, we will notify you
when a determination has been made and whenever action is taken on your petition.

If you have any questions, please contact Bryan Arroyo, Assistant Regional Director of the
Division of Ecological Services, at 505-248-6454.

Sincerely,

*Larry Bell* ACTING

Acting Regional Director

cc:  Assistant Wolf Coordinator, Ecological Services Field Office, Albuquerque, NM
     Recovery Coordinator, Region 2 (ES)

Civ. Action No. 06-2119 (RCL)

Attachment 7

Mexican Wolf Blue Range Reintroduction Project Statistics

Table 1.  Minimum population count and number of breeding pairs of Mexican wolves within the Blue Range Wolf Recovery Area, compared to projections in the 1996 Final Environmental Impact Statement, 1998 to 2006.

### Data Current as of 8 March 2007

| Year | Population count | | No. of breeding pairs | |
|------|------------------|------------------|------------------|------------------|
|      | Minimum | FEIS prediction | Minimum | FEIS prediction |
| 1998 | 4 | 7 | 0 | 1 |
| 1999 | 15 | 14 | 0 | 2 |
| 2000 | 22 | 23 | 1 | 4 |
| 2001 | 26 | 35 | 3 | 6 |
| 2002 | 42 | 45 | 5 | 8 |
| 2003 | 55 | 55 | 3 | 10 |
| 2004 | 44-48 | 68 | 6 | 12 |
| 2005 | 35-49 | 83 | 5 | 15 |
| 2006 | 59 | 102 | 7 | 18 |

Civ. Action No. 06-2119 (RCL)


Attachment 8



# Blue Range Wolf Reintroduction Area (BRWRA) Monthly Project Updates

March 13, 2007

[ View Note ]

## Update Submitted: March 13, 2007

Mexican Wolf Blue Range Reintroduction Project Monthly Update February 1 – 28, 2007

The following is a summary of Mexican wolf reintroduction project activities in Arizona on the Apache-Sitgreaves National Forests (ASNF) and in New Mexico on the Gila National Forest (GNF), collectively known as the Blue Range Wolf Reintroduction Area (BRWRA). Additional information can be obtained by calling (928) 339-4329 or toll free at 1-888-459-9653, or by visiting the Arizona Game and Fish Department Web site at http://www.azgfd.gov/wolf or by visiting the U.S. Fish and Wildlife Service Web site at http://www.fws.gov/southwest/es/mexicanwolf. Past updates may be viewed on either Web site, or interested parties may sign up to receive this update electronically by visiting http://www.azgfd.gov/signup. This update is a public document and information in it can be used for any purpose. The reintroduction project is a multi-agency cooperative effort among the Arizona Game and Fish Department (AGFD), New Mexico Department of Game and Fish (NMDGF), USDA Forest Service (USFS), USDA Animal and Plant Health Inspection Service, Wildlife Services (USDA APHIS WS), U.S. Fish and Wildlife Service (USFWS) and the White Mountain Apache Tribe (WMAT) located on the Fort Apache Indian Reservation (FAIR). Other entities cooperate through the Adaptive Management Work Group (AMWG) that meets quarterly in Arizona and/or New Mexico, including private individuals, organizations and tribes.

To view the wolf distribution map, which contains the previous three months of wolf aerial locations, please visit http://www.azgfd.gov/wolf. Under "Mexican Wolf Conservation and Management," scroll down to the links under "Distribution." To be consistent in disseminating Mexican wolf location information, the weekly telemetry flight locations are now available on the same link and under "Distribution," as per Standard Operating Procedure 26.0, Location Dissemination Guidelines.

Please report any wolf sightings or suspected livestock depredations to: (928) 339-4329 or toll free at 1-888-459-9653. To report incidents of take or harassment of wolves, please call AGFD's 24-hour dispatch (Operation Game Thief) at 1-800-352-0700.

Numbering System: Mexican wolves are given an identification number recorded in an official studbook that tracks their history. Capital letters (M = Male, F = Female) preceding the number

indicate adult animals 24 months or older. Lower case letters (m = male, f = female) indicate wolves younger than 18 months or pups. The capital letter "A" preceding the letter and number indicate alpha wolves.

Definitions: For the purposes of the Monthly Update, a "wolf pack" is defined as two or more wolves that maintain an established home range. The Interagency Field Team (IFT) recognizes that wolves without radio telemetry collars sometimes form packs. If the IFT confirms that wolves are associating with each other and are resident within the same home range, they will be referenced as a pack.

CURRENT POPULATION STATUS

At the end of February, the collared population consisted of 31 wolves with functional radio collars dispersed among nine packs and six single wolves. This number is different from last month because the IFT lethally removed San Mateo pack AM796, and M992 is no longer associated with the Rim pack and is considered a single wolf.

IN ARIZONA:

Bluestem Pack (collared AM806, AF521, m1041 and f1042) Throughout February, the IFT located this pack within the central portion of their traditional home range on the ASNF. On the February 5 telemetry flight, the IFT located f1028 with the pack. On the February 20 telemetry flight, the IFT observed seven wolves, but f1028 was not among them.

Hawks Nest Pack (collared AM619 and AF486 with a non-functional collar) The IFT located AM619 in its traditional home range north and northeast of the Big Lake area on the ASNF.

Rim Pack (collared AM991, AF858 and m1043) Throughout February, the IFT located the pack within their traditional home range in the central portion of the ASNF. The IFT located pup m1043 on the FAIR, separate from the alpha pair. M992 is no longer associated with the Rim pack, and is now considered a single wolf listed under "New Mexico."

M990 (collared) During February, the IFT located M990 on the FAIR.

f1028 (collared) Throughout February, the IFT located f1028 in the central portion of the ASNF. On the February 5 telemetry flight, the IFT located f1028 with members of the Bluestem pack.

FAIR:

Paradise Pack (collared M1044, M1045 and M795) Throughout February, the IFT located the pack in the northwest corner of the BRWRA.

IN NEW MEXICO:

Aspen Pack (collared AF667, m1038, m1039, f1040, f1046 and uncollared AM512) Throughout February, the Aspen pack continued to use areas to the northeast and southeast of the Gila Cliff Dwellings National Monument. On the February 14 telemetry flight, the IFT located M863 with the Aspen pack, excluding f1040, north of the traditional Aspen pack territory. On the February 21 telemetry flight, the IFT located m1039 approximately five miles south of the pack. During the same telemetry flight, the IFT located f1040 over 20 miles south-southwest of the pack. They again located M863 with AF667 and m1038 on this flight and on the February 26 telemetry flight.

Luna Pack (collared AM583, f1047 and uncollared AF562) During February, the Luna pack remained north of the Gila Wilderness. On the February 5 telemetry flight, the IFT located f1047 approximately 15 miles south of the pack.

Middle Fork Pack (collared AM871 and AF861) Throughout February, the IFT located the pair together in the northern portion of the Gila Wilderness.

Saddle Pack (collared AM732, AF797, M1007 and f1016) The pack remained in the GNF and in the northern portion of the Gila Wilderness. On the February 14 telemetry flight, the IFT observed four wolves. On February 13, a permittee discovered a calf in this area that the IFT later confirmed had been injured by a wolf. The calf died on February 22 from its injuries. This resulted in a third depredation incident for M1007. On February 24, the USFWS issued a permanent removal order for M1007 for the three confirmed depredation incidents involving three cows in New Mexico.

San Mateo Pack (collared AF903) During February, the pack continued to use areas east of Escudilla Mountain in the Apache National Forest in New Mexico. On February 5, the USFWS issued a permanent removal order for AM796 for involvement in three depredation incidents. The removal order applied only to AM796, not the other members of the pack, as detailed examinations of canine bite measurements in two confirmed cattle depredation incidents and in one injury to a horse were consistent with AM796. In the third cattle depredation, the IFT was not able to obtain measurements due to the deterioration of the carcass. On February 20, the IFT lethally removed AM796 in an area east of Escudilla Mountain in New Mexico's GNF.

M863 (collared) In February, the IFT located M863 in the northeast portion of the GNF. On the February 14, 21 and 26 telemetry flights, the IFT located M863 with the Aspen pack.

F923 (collared) During February, F923 made wide-ranging movements. The IFT located F923 along the New Mexico/Arizona border and in the west-central portion of the GNF.

M925 (collared) – Formerly of the Luna pack The IFT located M925 separate from the Luna pack in the northern portion of the BRWRA.

M992 (collared) – Formerly of the Rim pack The IFT located M992 in New Mexico in the vicinity of single F923.

INCIDENTS

On February 2, the IFT investigated a calf carcass in Catron County, New Mexico. They confirmed that it was a wolf depredation committed by an unknown, uncollared wolf in the area.

On February 6, a permittee in Apache Country, Arizona, contacted the IFT to report a missing 350-pound calf after the permittee received telemetry information of a wolf location nearby. The IFT and permittee searched the relatively small, fenced pasture, but were unable to locate the calf or a carcass. Five days later, the permittee found a different calf dead and observed a cow fighting off three canids. An IFT investigation determined that coyotes were responsible for the calf depredation and found no sign of wolves in the area.

On February 12, the IFT received a call concerning an injured calf in Catron County. The IFT confirmed that wolves caused the injury the previous evening. Despite administration of antibiotics, the calf died on February 22, making it a third depredation incident for Saddle pack M1007. On February 24, the USFWS issued a permanent removal order for M1007 for the three confirmed incidents involving three cows in New Mexico.

On February 24, the IFT investigated the remains of a calf in Catron County. They confirmed that it was a wolf depredation committed by an unknown, uncollared wolf, as they didn't pick up any wolf telemetry signals in the area. Following this investigation, the IFT examined the remains of a cow on the same allotment, shown to them by the permittee, that had died three weeks prior. Due to insufficient remains and some wolf scat in the vicinity, they deemed it a possible depredation.

On February 26, the IFT received a report of a wolf interacting with two dogs in Apache County. One of the dogs sustained a minor puncture wound. The IFT didn't locate any wolves with radio collars in the vicinity, and they monitored the area to prevent any further interaction. CAPTIVE MANAGEMENT

Nothing new to report.

COMMUNICATION AND COORDINATION

On February 14, Shawna Nelson gave a presentation to 150 Arizona Sonora Desert Museum docents as part of their advanced docent training at Lowes Ventana Canyon Resort in Tucson, Arizona.

On February 15 and 16, Shawna Nelson provided three presentations to 76 fourth-grade students at Keeling Elementary School in Tucson, Arizona.

On February 15-19, the IFT assisted a British Broadcasting Corporation videographer with obtaining on-site footage of free-ranging wolves in Arizona. The BBC was following up on a previous filming assignment covering the transfer of the Meridian pack into its release acclimation pen last summer.

The 19th Annual North American Wolf Conference will be held April 24-26 at the Little American Hotel in Flagstaff, Arizona. The conference serves as a bridge to bring together leading wolf biologists, conservationists, livestock owners, depredation specialists, educators, and state, tribal and federal wolf managers to share information ranging from ecological and genetic research, non-lethal techniques to reduce livestock conflicts, and economic and environmental impacts of wolf restoration. Please visit http://www.defenders.org/wolf/conference/ for more details.

PROJECT PERSONNEL

AGFD completed interviews for the Field Team Leader position and is now going through the selection/approval process.

REWARDS OFFERED

The U.S. Fish and Wildlife Service is offering a reward of up to $10,000 and the Arizona Game and Fish Department Operation Game Thief is offering a reward of up to $1,000 for information leading to the conviction of the individual(s) responsible for the shooting deaths of Mexican wolves. A variety of public interest groups are offering an additional $35,000, for a total reward amount of up to $46,000, depending on the information provided. Individuals with information they believe may be helpful are urged to call one of the following agencies: U.S. Fish and Wildlife Service special agents in Mesa, AZ, at (480) 967-7900, in Alpine, AZ, at (928) 339-4232, or in Albuquerque, NM, at (505) 346-7828; the White Mountain Apache Tribe at (928) 338-1023 or (928) 338-4385; Arizona Game and Fish Department Operation Game Thief at 1-800-352-0700; or New Mexico Department of Game and Fish Operation Game Thief at 1-800-432-4263. Killing a Mexican wolf is a violation of the Federal Endangered Species Act, and can result in criminal penalties of up to $50,000 and/or not more than one year in jail, and/or a civil penalty of up to $25,000.

[ Return to BRWRP Home ]