# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civ. Action No. 06-02119 (RCL) |
| DIRK KEMPTHORNE, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## EXPEDITED MOTION TO COMPEL THE COMPLETE ADMINISTRATIVE RECORD AND SUPPORTING MEMORANDUM

In this case challenging the U.S. Fish and Wildlife Service's ("FWS" or "Service") unreasonable delay in responding to plaintiff's March 29, 2004 Rulemaking Petition to prevent the critically imperilled Mexican wolf from becoming extinct in the wild, plaintiff Center for Biological Diversity ("Center") requests that the Court order defendants to immediately file the "whole record" for this case, as required by the Administrative Procedure Act ("APA"),  5 U.S.C. § 706, before the Center's brief for summary judgment is due on August 3, 2007.  Because of the urgency of the underlying matter, plaintiff does not wish to delay the briefing schedule in this case if at all possible, which is why it has requested expedited consideration of this motion. Defendants' counsel has represented that defendants oppose this Motion, but agree to a briefing schedule in which defendants file an opposition to plaintiff's motion on or before July 17, 2007, and plaintiff files any reply on or before July 18, 2007.

## BACKGROUND

This case concerns the FWS's failure to make a final decision on plaintiff's March 29,

2007 Rulemaking Petition, which sought three, specific amendments to the "10(j) regulations" –
promulgated under the Endangered Species Act – to prevent the endangered Mexican wolf from
becoming extinct in the wild.  The Center's requested amendments were premised on the
recommendations of an independent panel of scientists, who published a report in June 2001 –
**over six years ago** – urging the Service to amend the Mexican wolf 10(j) regulations
"immediately" in order for the wild wolf population to be viable and able to survive in the wild.
Plaintiff's Complaint requests that this Court order the FWS to immediately provide a final
decision addressing the issues raised in the Center's Rulemaking Petition, because, during the
Service's delay in taking any action on the Center's Rulemaking Petition, the Mexican wolf
population continues to falter precariously on the brink of extinction in the wild.

On June 27, 2007, the FWS provided plaintiff the Administrative Record for this case.
By letter dated June 29, 2007, plaintiff notified the Service of several concerns about the
completeness of that Record, including the agency's failure to include in the Record extremely
pertinent records that are undeniably "before" the agency, such as: (1) records pertaining to the
status of Mexican wolves in the wild, including the 1987 Mexican Wolf Recovery Plan and the
1996 Environmental Impact Statement for adoption of the 10(j) regulation; (2) records pertaining
to the Service's management of wild Mexican wolves, such as monthly progress reports that
detail the agency's ongoing efforts to trap, relocate, and even kill wild wolves under the terms of
the 10(j) regulation, as well as the Administrative Records compiled for the agency's Three- and
Five-Year Reviews of the progress of the reintroduction project; and (3) electronic
communications and records of meetings of FWS staff during the agency's consideration of
whether to act on the Center's Rulemaking Petition, since only a handful of such records were

reflected in the Record compiled by the agency.  See Plaintiff's Exhibit A (hereinafter "Plf. Exh.").

       In response, counsel for FWS has informed plaintiff's counsel that FWS will not produce any of the material outlined in plaintiff's June 29, 2007 letter, except for three annual "progress reports" that the agency has published on its web site.  Therefore, because the Record for this case remains incomplete, the Center has no choice but to move the Court to compel the FWS to immediately produce all of the materials that are pertinent to the agency's decision under review – i.e., its failure to make a decision on the Center's March 29, 2004 Rulemaking Petition – as outlined in plaintiff's June 29, 2007 letter.  However, because of the urgency of the situation here, plaintiff does not wish to delay briefing in this matter and, therefore, requests that the Court require that FWS supplement the Administrative Record prior to August 3, 2007, the deadline for plaintiff's motion for summary judgment.

## ARGUMENT

       The Court's task under section 706(1) of the Administrative Procedure Act is determine whether FWS has "unreasonably delayed" agency action required by law.  5 U.S.C. § 706(1).  In reaching a decision, the Court is obligated to review the "whole record" that is before the agency. 5 U.S.C. § 706; see also Biodiversity Legal Found. v. Norton, 180 F. Supp. 2d 7, 10 (D.D.C. 2001) (requirement to review the "whole record" applies "whether a court is reviewing agency action or inaction").  Thus, the agency is required to include, and the Court is required to review, "neither more nor less information than [was before] the agency" when it made its "decision" – i.e., in this case, the Service's failure to provide a final decision addressing all of the issues raised by the Center in its Rulemaking Petition.  Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d

788,792 (D.C. Cir. 1984); see also Puerto Rico Higher Educ. Assistance Corp. v. Riley, 10 F.3d

847, 850-51 (D.C. Cir. 1993) (review is to be based on "the materials that were before the

Department at the time its decision was made").

   In particular, the Record "must include all documents that the agency directly or

indirectly considered." Fund for Animals v. Williams, 391 F. Supp.2d 191, 196-97 (D.D.C.

2005) (internal citations and quotations omitted) (emphasis added); see also Amfac Resorts

L.L.C. v. Dep't of Interior, 143 F. Supp. 2d 7, 12 (D.D.C. 2001) ("a complete administrative

record should include all materials that might have influenced the agency's decision and not

merely those on which the agency relied in it final decision") (internal citations omitted)

(emphasis added).   Thus, although the agency is charged with compiling the Record, it may not

"exclude information on the grounds that it did not 'rely' on the excluded information in its final

decision." Williams, 391 F. Supp. 2d at 197 (citing Ad Hoc Metals Coalition v. Whitman, 227 F.

Supp.2d 134, 139 (D.D.C. 2002)); see also Clairton Sportsmen's Club v. Pennsylvania Turnpike

Comm'n, 882 F. Supp. 455, 464 (W.D. Pa. 1995) (a document need not even "pass before the

eyes of the final agency decision maker to be considered part of the administrative record").  Nor

may the agency "skew the 'record' for review in its favor by excluding from that 'record'

information in its own files which has great pertinence to the proceeding in question." Envtl.

Def. Fund v. Blum, 458 F. Supp. 650, 661 (D.D.C. 1978).

   Nevertheless, this is precisely what the FWS appears to have done in compiling the

Administrative Record for this case.  In fact, as detailed in the attached letter, see Plf. Exh. A, the

Service has omitted extensive material that is extremely pertinent to the Court's analysis of

whether the agency's delay is "unreasonable" under section 706(1) of the APA.  Indeed, the

information outlined in the Center's June 29, 2007 letter is particularly relevant to the Court's evaluation of the "nature and extent" of the interests "prejudiced" by the delay, see Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984) – i.e., information concerning the status of the Mexican wolf population and the agency's ongoing efforts to trap, remove from the wild, and kill individual members of the species – all of which has been a major contributing factor to the Mexican wolf's failure to establish a viable population, an issue that is central to the Center's March 29, 2004 Petition. Although potentially adverse to the agency's position in the case, such material is highly relevant to the issues here – i.e., whether the agency's delay in responding to the Center's Rulemaking Petition is unreasonable because, during the agency's delay, Mexican wolves are being killed and the population is struggling to survive in the wild.

        Nor can the government rationally contend that such information is not "before" the agency, particularly since the government appears to concede that the proper scope of the Administrative Record is any "records directly or indirectly pertinent to the U.S. Fish and Wildlife Service's decisions at issue in this litigation." Declaration of Santiago R. Gonzales ¶ 2 (emphasis added) (Plf. Exh. B). Certainly, records pertaining to the current imperilled status of the wild Mexican wolf population, as well as the agency's efforts to manage individual wolves under the requirements of the 10(j) regulation, are "directly or indirectly pertinent" to the agency's inaction here. Yet, the government has failed to include such highly relevant information in the Administrative Record for this case.

        Indeed, pursuant to the Freedom of Information Act, the Center obtained electronic communications between FWS staff that undermines the agency's assertion that the Record

contains "all" of the material that is "directly or indirectly pertinent" to this matter, Gonzales

Decl. ¶ 2.  See Attachment B to Plf. Exh. A (internal FWS e-mail correspondence concerning a

wolf that was shot by FWS on July 11, 2004).  In fact, the Service has included in the Record

barely a handful of e-mail communications and almost no records of meetings or meeting notes,

even though agency staff surely have participated in internal discussions and meetings during the

time that the agency has been considering whether to amend the 10(j) regulation in response to

the Center's Rulemaking Petition.  Such material, which is also clearly "before" the agency and

"pertinent" to the agency's failure to respond to the Center's Petition, must be included in the

Record for this case.

     Moreover, records that the agency has included in the Record also undermine the basis

for the agency's pending motion to dismiss, because they further indicate that they agency has

certainly not provided plaintiff with a final answer to the matters raised in its Rulemaking

Petition.[1]

     Accordingly, since the Center has not yet received a final decision addressing all of the

issues raised by its March 29, 2004 Rulemaking Petition, and is plainly entitled to such a

decision under the APA, see 5 U.S.C. § 555(b), the Service must produce a complete

Administrative Record comprising all material that is "before" the agency and "directly or

indirectly" pertinent to its failure to provide any such response in well over three years now, and

---

[1]     Thus, a letter from the FWS's Acting Southwest Regional Director states that only certain mechanisms for protecting the wolf – which do not encompass at least one of the mechanisms addressed by plaintiff's Petition – are being considered as part of the Service's "process of developing a new 10(j) Proposed Rule and associated NEPA analysis."  See Letter from Acting Regional Director Tuggle to Terry B. Johnson at 4 (Plf. Exh. C).

counting.[2]

## **CONCLUSION**

Plaintiff is cognizant that disputes about the Administrative Record should, if possible, be resolved before the parties brief summary judgment.  However, plaintiff is extremely concerned that the agency's failure to produce a complete Administrative Record will only further lengthen the inexcusable delay that has occurred since the Center filed its Rulemaking Petition, to the detriment of Mexican wolves that are already on the brink of extinction.  Accordingly, plaintiff filed this Motion at the earliest opportunity and respectfully requests that the Court compel the defendants to provide a complete Administrative Record for this case as soon as possible, but certainly prior to August 3, 2007, when plaintiff's motion for summary judgment is due.

Respectfully submitted,

  /s/ Erin M. Tobin
Erin M. Tobin
(D.C. Bar No. 494948)
Katherine A. Meyer
(D.C. Bar No. 244301)
Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206
(202) 588-5049

Dated: July 10, 2007

---

[2]     The Record ordered by the Court should also include all relevant records that are in the agency's possession as of the date of the agency's compilation of the Administrative Record.

**Civil Action No. 06-2119 (RCL)**

**Exhibit A**

# Meyer Glitzenstein & Crystal

1601 Connecticut Avenue, N.W.
Suite 700
Washington, D.C. 20009-1056

Katherine A. Meyer
Eric R. Glitzenstein
Howard M. Crystal
Kimberly D. Ockene
Joshua R. Stebbins
Tanya M. Sanerib
Erin M. Tobin

Telephone (202) 588-5206
Fax (202) 588-5049
www.meyerglitz.com

June 29, 2007

**By Electronic Mail**

Robert L. Gulley
United States Department of Justice
Environment and Natural Resources Division
Wildlife and Marine Section
601 D Street, N.W., Room 3904
Washington, D.C. 20004

Re:    Center for Biological Diversity v. Kempthorne, et al., No. 06-cv-02119 (RCL)

Dear Mr. Gulley:

We have received and conducted a preliminary review of the Administrative Record for this case, in which Plaintiff Center for Biological Diversity contends that the U.S. Fish and Wildlife Service ("Service" or "FWS") has unreasonably delayed responding to its March 29, 2004 Petition seeking several important amendments to the 10(j) regulation for the reintroduction of Mexican wolves. Although we have not yet completed a thorough review of the entire Record, we wanted to make you aware of several concerns with the current Record that we hope can be resolved promptly.

As you know, the Administrative Record in this case must include the "whole record" of the agency decision under review – i.e., in this case, the agency's "failure to act." 5 U.S.C. § 706; see also Biodiversity Legal Found. v. Norton, 180 F. Supp. 2d 7, (D.D.C. 2001) (requirement to review the "whole record" applies "whether a court is reviewing agency action or inaction"). Thus, the agency is required to include, and the Court is required to review, "neither more nor less information than [was before] the agency when it made its decision." Walter O. Boswell Mem'l Hosp. v. Heckler, 749 F.2d 788,792 (D.C. Cir. 1984); Puerto Rico Higher Education Assistance Corporation v. Riley, 10 F.3d 847, 850-51 (D.C. Cir. 1993) (review is to be based on "the materials that were before the


recycled paper

Department at the time its decision was made"). In particular, the Record "must include <u>all documents that the agency directly or indirectly considered</u>." <u>Fund for Animals v. Williams</u>, 391 F. Supp.2d 191, 196-97 (D.D.C. 2005) (internal citations and quotations omitted) (emphasis added). There appears to be no dispute among the parties as to the proper scope of the Administrative Record, since the Assistant Mexican Wolf Recovery Coordinator – who certified the Record provided here – asserts in his declaration that the Record includes "records <u>directly or indirectly pertinent</u> to the U.S. Fish and Wildlife Service's decisions at issue in this litigation." Declaration of Santiago R. Gonzales ¶ 2 (emphasis added).

However, as discussed below, we do not believe that the current Administrative Record includes the entire class of records that were "directly or indirectly considered" by the agency, <u>Williams</u>, 391 F. Supp. 2d at 196-97. Therefore, plaintiff requests that defendants file a revised or supplemental Administrative Record reflecting the following changes.

### 1.    <u>Documents Pertaining to the Status of Mexican Wolves</u>

The Record omits key information pertaining to the status of Mexican wolves and the FWS's analysis of whether and how to reintroduce this species in the wild, such as the 1996 Environmental Impact Statement for adoption of the 10(j) regulation and the Mexican Wolf Recovery Plan, as well as records pertaining to the agency's ongoing efforts to revise the Recovery Plan. These two documents in particular were cited in plaintiff's Complaint and Opposition to Defendant's Motion to Dismiss, are clearly before the agency, and are highly relevant to the matter at issue here. Likewise, although the Record includes the Three- and Five-Year Reviews, the FWS has largely omitted the administrative records compiled for the agency's preparation of these two reports, even though such information is also relevant to this case and is "before" the agency. <u>See, e.g.</u>, Attachment A (public comment letter regarding the Five-Year Review). FWS should supplement the Record with these documents, as well as any other material concerning the status of Mexican wolves, such as population statistics or projections, whether internally generated or provided by members of the public. <u>See, e.g.</u>, Attachment B (population statistics as of March 8, 2007, available on the Service's web site).

### 2.    <u>Documents Pertaining to the Service's Management of Mexican Wolves</u>

The Service omitted other material from the Record related to the agency's management of Mexican wolves (<u>e.g.</u>, its efforts to trap, relocate, or kill wild wolves), such as annual progress reports, monthly progress updates, and other material reflecting the Service's internal discussions as to whether and what actions the FWS should take with respect to individual wolves. <u>See, e.g.</u>, Attachment B (internal FWS email concerning a wolf that was shot by FWS on July 11, 2004). For instance, the FWS included as part of the Record annual "progress reports" from 2001 and 2002, but has omitted progress reports published in 2003, 2004, and 2005. Likewise, although all of these progress reports are posted on FWS's web site (including those that the agency included in the Record), FWS has omitted from the Record any "monthly updates" that are also posted on its web site. <u>See</u> http://www.the FWS.gov/southwest/es/mexicanwolf/BRWRP_notes.cfm. There is no rational basis for excluding this clearly pertinent information from the Administrative Record.

To save the agency time and also conserve the amount of paper needed to produce an adequate Record, plaintiff is willing to stipulate that any information contained on the Service's web site is part of the Administrative Record and may be relied on by the parties.

### 3. Documents Pertaining to the Service's Prior Consideration of Whether to Amend the 10(j) Regulations

In the past, the Service has considered whether to amend the 10(j) regulation for Mexican wolves. For example, in 1999 a panel of experts recommended modifying the rule to permit the Service to release wolves into the Gila National Forest in New Mexico, and the agency drafted a proposed rule implementing the scientists' recommendations. FWS appears to have omitted any material pertaining to its consideration of whether or not to adopt this proposed amendment to the 10(j) rule. The Record must include any records concerning the Service's consideration of whether to amend the 10(j) regulation.

### 4. Electronic Mail Communications and Meeting Notes

Barely a handful of email communications are reflected in the Record, even though the agency claims to have been working assiduously on Mexican wolf reintroduction for the past nine years. Much of this information was produced to my client in response to Freedom of Information Act requests and, therefore, such material is clearly "before" the agency. In addition, the government has not included any meeting notes or records of meetings (aside from those generated over six years ago in connection with the Interagency Management Advisory Group), although surely agency staff have participated in meetings during the time that the agency has been considering whether to amend the 10(j) regulation. These documents must be included in the Administrative Record.

### 5. Any Information on Which The Service Intends to Rely in Arguing its Delay is Not Unreasonable.

Since the Service has not included in the Administrative Record any records concerning competing agency priorities that have delayed the resolution of plaintiff's Rulemaking Petition at issue here, plaintiff assumes that FWS does not intend to argue that its delay is reasonable because the agency is faced with "higher or competing" priorities, see Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 80 (D.C. Cir. 1984), since any evidence upon which the FWS intends to rely concerning this factor of the analysis must be included in the Administrative Record. See Heckler, 749 F.2d at 788 n.6 ("both parties" must have "a fair opportunity to examine the [record] and refer to it in their briefs").

\*       \*       \*

In addition to these concerns with the content of the Administrative Record, the government has not marked the pages of the Administrative Record with a Bates Stamp. Plaintiff's copy of the Record does not even identify each document with the number given it in the "Index," making it

extremely difficult to locate material listed in the Index. As it also will raise confusion and make it difficult to refer the Court to relevant information in the Record if its pages are not separately marked, plaintiff requests that FWS Bate Stamp the supplemental or revised Administrative Record to assist the parties and the Court in reviewing this matter.

These are plaintiff's preliminary concerns with the Administrative Record, as we have not yet been able to conduct a thorough examination. As our review progresses, we may find additional errors or omissions and bring them to your attention at that time. Nevertheless, particularly in light of the time sensitive nature of this matter, we are bringing these issues to your attention now so that they may be rectified without further delay. Accordingly, please respond within a week so that we may determine whether we will need to modify the briefing schedule in order to resolve these concerns.

Regards,

Erin M. Tobin
Counsel for Plaintiff

Attachment A

# The Rewilding Institute

## POB 13768, Albuquerque, NM 87192 *
## TRI@rewilding.org www.rewilding.org

March 15, 2005

U.S. Fish and Wildlife Service
New Mexico Ecological Services Field Office
2105 Osuna Road NE
Albuquerque, NM 87113
ATTENTION: Mexican Wolf Project: Five-Year Review

**Re:  Comments on Mexican Gray Wolf Project Five-Year Review**

The Rewilding Institute (TRI), a conservation think tank, welcomes the opportunity to comment on the U.S. Fish and Wildlife Service's (FWS) draft 5-year review of the Mexican Wolf Reintroduction Project.  We compliment the FWS for the detailed analyses and comprehensive assessments presented in the three documents that collectively represent the 5-year review of this ESA-mandated recovery program.  Our comments on each of the three primary review documents follow.

***Mexican Wolf Recovery: Technical Component of the Five-Year Program Review and Assessment***

With some exceptions as noted below, TRI generally agrees with the four recommendations in the technical report for improving the Mexican wolf reintroduction project:  1) modify the current non-essential experimental population rule to allow wolves to colonize suitable habitats throughout the Southwestern Gray Wolf Distinct Population Segment (SWDPS) where they do not conflict with livestock or humans; 2) translocate wolves with wild experience after their first removal; 3) improve project databases; and 4) fund more research.

We strongly agree that there should be no restrictions to wolf movements throughout the geographic scope of the SWDPS or the geographic scope of the 1978 gray wolf listing rule, whichever rule currently applies.  However, we strongly disagree with the part of recommendation number 1 that would exclude areas from wolf occupation where wolves "conflict with livestock and humans."  Most of the SWDPS comprises areas where wolves may come into conflict with livestock or humans.  The report documents that 47% of the radio-collared wolves released into the Blue Range Wolf Recovery Area (BRWRA) were involved in at least one confirmed depredation incident and an additional

11% were removed for engaging in human-nuisance behavior. The report does not document how many individual wolves came into conflict with humans, but we assume it was more than the number of wolves removed from the wild for this reason. Wolf recovery goals (yet to be established by the Recovery Team) in the SWDPS may not be achievable if "conflict with livestock or humans" excludes areas from wolf recolonization. Thus, in areas within the SWDPS with high potential suitability for wolves (not considering conflict potential), innovative solutions for conflict resolution that do not result in the removal or exclusion of wolves from the area may be necessary for the achievement of SWDPS recovery goals and the goals of the current Mexican wolf reintroduction project. We request that the language of recommendation 1 be revised to indicate that while conflicts with livestock and humans must be addressed and resolved, they will not automatically preclude wolf recovery in a given area.

We strongly recommend that the experimental population rule be revised to allow initial releases of wolves anywhere in the Blue Range Wolf Recovery Area (BRWRA), Fort Apache Indian Reservation, and any other Native American or private lands within Mexican wolf historic range where the owners have entered into agreements to support wolf recovery. Data from the review document fully support this recommendation. To date there have been only 8 successful dispersals, only 3 of which were "natural." Only 9 of 17 translocated (for depredation) wolves reproduced in the wild. Few, if any, suitable release sites remain in the primary wolf recovery zone because the area is mostly occupied by existing wolf packs. Large areas of the secondary wolf recovery zone (currently off limits to "direct" releases) remain unoccupied or sparsely occupied by wolves. Releases in New Mexico (secondary zone) have been more than twice as successful as releases in Arizona. The failure rate (mortality + removal) of radio-collared wolves is high (62%) and more releases are needed to meet population growth objectives. Wolves should be released in places that offer the greatest chances of success. There is no science-based reason to exclude from direct releases of wolves any part of the BRWRA or nearby areas where wolf recovery is authorized.

As recommended by the FWS report, existing boundaries limiting Mexican wolf recovery to the BRWRA must be removed. These boundaries were politically motivated and are not supported by sound science or FWS policy or practices for other endangered species. The greatest cause (36%) for removing reintroduced Mexican wolves from the wild has been their movement outside the established recovery boundaries. Sixty-eight percent of lone wolves have moved outside the boundary at least once; and 28% of all pack home ranges are partly outside the recovery area. Obviously, these boundaries are not recognized by the wolves. Removal of these wolves is unnecessarily slowing recovery and adding to recovery costs. Long-term recovery of wolves in the Southwest will require multiple populations connected by linkages that are suitable for the movement of wolves among the core populations. Existing boundaries are counterproductive to both short- and long-term recovery goals for wolves in the Southwest and are not supported by science or ESA policy.

We are deeply concerned by the conflict that exists between wolf recovery and livestock production on the public lands within the BRWRA and its effect on recovery success. On

average, for every confirmed depredation incident, a wolf is removed from the wild or translocated. Nearly half of all monitored wolves eventually were involved in confirmed depredation incidents, which usually trigger a management response of removal from the wild or translocation. Wolves have the opportunity to learn to prey on domestic livestock nearly everywhere within the BRWRA. Rates of wolf removal exceed mortality rates and the combination of these rates (62%) is not sustainable. Under current rules, land use priorities, and management practices, we believe that self-sustained population growth achieving the project objective of at least 100 wolves will not occur without continued releases of wolves. Figure 3 clearly shows that population growth is heavily subsidized by continued releases of wolves to offset unsustainable failure (mortalities + removals) rates. Indeed, the EIS predicted that releases would not be needed beyond the year 2002, after which the population would be self-perpetuating (i. e., reproductive success would exceed failure rate). However in actual practice, releases have continued through 2004. This is not yet a "recovery" scenario. The report adds that removals of wolves for reasons of livestock depredation are not likely to decline. Given the near-ubiquitous distribution of livestock within the BRWRA, we view this as a serious impediment to wolf recovery. In our opinion, the restored population has not yet reached a "source" status, and we question whether it ever will under current rules. Many conservation biologists believe that large core areas capable of supporting viable "source" populations are key to recovery success. Unpublished research by Dr. Carlos Carroll has shown that the BRWRA has the potential to support a source population of wolves, but his analysis did not account for the high level of "management" removals in response to livestock depredations that are currently occurring and projected to continue in the BRWRA. The FWS report states that "[t]he overall pattern of source-sink dynamics within the BRWRA suggest that a large area may be required to maintain a viable population of wolves within the southwestern United States…." We agree.

We recommend that the revised rule prohibit the removal or lethal control (aversive harassment should continue to be encouraged) of wolves for engaging in livestock depredation within the currently defined BRWRA. Wolf recovery should be established as at least a co-equal (to livestock grazing) priority on the approximately 7,000 square miles of public lands within the BRWRA. We recognize that this is potentially a very controversial recommendation; and we are not recommending forced elimination of grazing privileges within the BRWRA. What we are recommending are innovative solutions that are fair to all interests and that promote wolf recovery. For example, these solutions may take the form of compensatory incentives to implement new livestock husbandry and management practices that minimize wolf-livestock conflicts and are compatible with wolf recovery objectives or voluntary grazing allotment retirement programs where permittees who choose to participate are generously compensated for the permanent retirement of their grazing allotment. Such approaches have been recommended elsewhere and bills pending in Congress proposing voluntary buyouts of grazing privileges on public lands have broad support from both livestock and conservation interests. If approached correctly with the involvement of key stakeholders, this need not be a controversial or adversarial recommendation. We believe it is essential to successful wolf recovery in the Southwest.

Having not done a legal analysis, it is not clear to us whether the above recommendation can be accomplished under the current "non-essential experimental population" classification. We believe that the current level of "take" of wolves authorized and accomplished through the provisions of the existing non-essential experimental population rule is unsustainable and violates the provision of section 10(j)(2)(A) of the ESA requiring that releases of listed species under section 10(j) provisions must "further the conservation" of the species. If the above recommendations cannot be accomplished under a revised non-essential experimental population classification, then we recommend that the revised rule reclassify this population as either "essential experimental" or fully endangered. In the latter case, the rule would be rescinded rather than revised.

Some specific comments on the technical report follow.

On page 70, the description of "event 1" is not entirely accurate. The dog was not "in camp" when it was attacked by the wolf, and the wolf was not "in camp" when it was shot. These events took place some distance away from the actual "camp" site.

Page 97, Comment #49: *Scientists and administrators involved in the program need to have a high level of sensitivity to the political factors, operating at various levels, that seek to influence the program and resist purely politically motivated solutions to problems.*

We strongly agree with this comment and note that the current short-comings of the Mexican Wolf Reintroduction Project stem directly from politically-motivated project components incorporated into the initial project design and non-essential experimental population rule. We strongly recommend a science-based revision of the current rule and science-based implementation of the project from this point forward.

Page 101, Comment #66: The primary author of this review is a member of the SWDPS Recovery Team and has no knowledge of a "population/habitat viability analysis of the wild population in the BRWRA" being conducted by the Recovery Team. Even if this statement by the FWS was true at the time this document was written, this action cannot now be categorized as "being implemented," because activities of the SWDPS Recovery Team have been placed on indefinite hold, pending FWS interpretation of a recent litigation decision nullifying the validity of the 2003 rule that established the SWDPS as a listed entity under the ESA.

*Mexican Gray Wolf Reintroduction Project Five-Year Review - Section B - Administrative Component*

The *Introduction* section of this document fails to mention the turn-over in the Mexican Wolf Recovery Project Leader position and the long lapses of time during which the position remained vacant.

On page 10, this document states that "the Regional Director has stated that in order to revise the rule, the Service must first have a unified, consensus recommendation from the

SWDPS Recovery Team, including both the Technical and Stakeholder sub-groups." Anyone familiar with the makeup of the Recovery Team would conclude that this requirement is extremely unrealistic. Some members of the Recovery Team are also members of organizations that have twice sued the FWS in attempts to kill the reintroduction project and have all wolves removed from the wild. The Regional Director may as well require that "pigs fly." As noted above the SWDPS Recovery Team's status is currently "on hold," and the Team is not currently active. The FWS recently cancelled the Recovery Team meeting scheduled for April and stated that no further meetings were scheduled.

The FWS has an affirmative responsibility and a mandate under the ESA to recover endangered species. That responsibility cannot be transferred to a non-government entity like the Recovery Team. Plus, as noted above, the Team's current and future status is uncertain. Furthermore, the nullification of the 2003 gray wolf listing rule does not obviate the FWS's mandate under the ESA to continue to recover the Mexican gray wolf. Rather, the mandate reverts to the 1978 listing under which Mexican wolf recovery was conceived and implemented. The FWS has no legitimate excuse or reason to delay actions necessary for the recovery of the Mexican wolf. Indeed, it has every reason to expedite these actions.

Beginning at the bottom of page 12, the report states the following: "*A modification to the rule to address the boundary has larger implications than allowing direct releases of wolves into the SRZ. The establishment of the SWDPS requires the Service to view recovery from a large-scale perspective encompassing the entire DPS, not just the BRWRA. As such, the Service needs to carefully consider how a rule modification for the BRWRA fits into the broader picture of delisting the SWDPS, including established recovery goals and objectives to be defined within the Recovery Plan. As discussed above in #4 however, the Service will not seek to modify the rule unless the Service receives a recommendation from the Recovery Team. After weighing the considerations from the Recovery Team and this Five-Year Review, the Service will be prepared to proceed with any necessary actions if altering the BRWRA boundary is determined to be a necessary outcome to recover the gray wolf in the SWDPS.*" Please apply comments in the paragraph above to this section of the report, as well. In addition, it should be abundantly clear to the FWS and to the Recovery Team that successful recovery of gray wolves in the SWDPS depends upon and is advanced by successful recovery of the BRWRA population. Clearly, changes that will improve chances for the success of the BRWRA reintroduction project will contribute to and expedite the achievement of the ultimate objective of the SWDPS recovery plan, if such a plan is ever prepared. Such changes are clearly necessary to achieve the objectives of the project under review here. As mentioned above, recent litigation decisions do not absolve the FWS of its responsibility or authority to recover gray wolves under the ESA. The authority and mandate for advancing the recovery of the Mexican gray wolf derives, for the foreseeable future, from the 1978 listing document. Furthermore, the controlling objective for the BRWRA reintroduction project derives from the formally approved Mexican Wolf Recovery Plan. Thus, the existing Mexican Wolf Recovery Plan remains the controlling recovery document for this action. It is inappropriate and an abrogation of ESA responsibility for

the FWS to postpone currently authorized recovery actions for the Mexican gray wolf, pending some uncertain future decision or plan rendered by the now inactive SWDPS Recovery Team.

The comments above apply equally to the last paragraph on page 13 of the report. Furthermore, the existing EIS analyzes an alternative without boundaries. Any additional NEPA analysis required for a revised rule should require considerably less time than the original EIS. The fact that additional analysis will be required before the rule can be changed also argues for getting started sooner rather than later.

We believe the issue of livestock carcasses serving as attractants to wolves and possible catalysts for the onset of livestock depredation behavior by wolves must be addressed through revisions to the rule. Compelling evidence for this recommendation is contained within the FWS report. The report states that 91% of wolves known to have scavenged dead livestock carcasses were confirmed to have subsequently killed living domestic livestock at least once; and up to 68% of those engaged in additional livestock depredation activities. Removal of wolves for livestock depredation is a significant component of the high failure rate reported by the FWS and a continuing cause of the failure to meet population growth objectives when continuing annual releases are discounted. To date 27 wolves have been removed from the wild for depredation and an additional 24 have been translocated. The report fails to discuss the "attractant" aspect of livestock carcasses and the role carcasses may play in bring wolves into close proximity of living livestock.

***Methodology for Evaluating Socioeconomic Impacts Associated with the Reintroduction of the Mexican Wolf***

This evaluation should place livestock depredation by wolves in proper perspective by comparing this source of livestock mortality to all other sources of livestock mortality.

To be fair, the socio-economic assessment should address both the potential effects/conflicts of wolf recovery on the existing/future socio-economic landscape of the region and the potential effects/conflicts of the existing/future socio-economic landscape of the region on the success of wolf recovery efforts. Even though the FWS's goal is to overlay wolf recovery onto existing land use practices, this analysis needs to remain open to the possibility that land use priorities on public lands may need to change (as discussed above) to accommodate wolf recovery at a meaningful level. One major difference between this and other gray wolf recovery projects is the lack of a large wild "core" recovery area where conflicts between wolf recovery and other land uses generally do not exist.

Additionally, this analysis must address the potential economic benefits to the region from wolf recovery as well as the potential costs.

Finally, we note that this is the third technical review of this project since 1999—all of which have recommend that the existing rule be revised. Also, in September of 1999, the

Regional Director and the Assistant Secretary of the Interior for Fish Wildlife and Parks authorized the FWS to carry out actions that would result in an expeditious revision of the rule. These recommendations have come from both external independent scientists and internal agency scientists and decision makers. The consensus opinion of the scientific experts is that the rule needs to be revised to enhance the prospects for recovery of the Mexican gray wolf. We set forth our recommendations for rule revisions in these comments. The FWS has now delayed this important decision for 5.5 years! Further delays cannot be justified.

The Rewilding Institute appreciates this opportunity to comment. These official comments of The Rewilding Institute are also endorsed by the individuals and organizations whose names appear below the signature block.

Sincerely,

David R. Parsons
Wildlife Biologist
Vice Chairman & Science Fellow

The following individuals and organizations endorse these comments:

**Dave Foreman**
Director, Senior Conservation Fellow, and Board Chairman
The Rewilding Institute
Albuquerque, New Mexico

**Michael Soulé, PhD**
Senior Science Fellow – The Rewilding Institute
Professor Emeritus in Environmental Studies
University of California, Santa Cruz.

**Animal Defense League of Arizona**
Tucson, Arizona

**Arizona Wilderness Coalition**
Alpine, Arizona

**Paul Beier, PhD**
Professor
Conservation Biology & Wildlife Ecology
Northern Arizona University

**Matthew Clark**
Conservation Fellow – The Rewilding Institute

Graduate Student in Conservation Biology
Northern Arizona University

**Colorado Plateau Chapter of the Society for Conservation Biology**
Flagstaff, Arizona

**Nicole J Corbo**
Coordinator, Grand Canyon Wolf Recovery Project
Flagstaff, Arizona

**Kim Crumbo**
Conservation Fellow – The Rewilding Institute
Wilderness and Planning Coordinator
Grand Canyon Wildlands Council
Flagstaff, Arizona

**Forest Guardians**
Santa Fe, New Mexico

**Grand Canyon Wildlands Council**
Flagstaff, Arizona

**Grand Canyon Wolf Recovery Project**
Flagstaff, Arizona

**Ed Grumbine, PhD**
Conservation Biologist
Prescott College
Prescott, Arizona

**Robert Howard, PhD**
Conservation Fellow – The Rewilding Institute
El Dorado, New Mexico

**Allison Jones**
Science Fellow – The Rewilding Institute
Conservation Biologist
Wild Utah Project
Salt Lake City, Utah

**C. Wesley Leonard**
Chairman, New Mexico Wilderness Alliance
El Paso, Texas

**Brian Miller, PhD**
Science Fellow – The Rewilding Institute

Conservation Biologist
Wind River Ranch Foundation
Watrous, New Mexico

**Susan Morgan, PhD**
Conservation Fellow – The Rewilding Institute
Albuquerque, New Mexico

**New Mexico Wilderness Alliance**
Albuquerque, New Mexico

**New Mexico Wildlife Federation**
Albuquerque, New Mexico

**Paul Paquet, PhD**
Science Fellow – The Rewilding Institute
Wolf Biologist
University of Calgary & Conservation Science, Inc.
Calgary, Alberta, Canada

**Tony Povilitis, PhD**
Conservation Biologist
Zuni, New Mexico

**Thomas P. Rooney, PhD**
Science Fellow – The Rewilding Institute
Assistant Scientist
University of Wisconsin-Madison

**Donald M. Waller, PhD**
Professor
Department of Botany
University of Wisconsin-Madison

Attachment B



 Colleen
Buchanan/RO/R2/FWS/DOI
04/06/2004 02:06 PM

To   Susan MacMullin/RO/R2/FWS/DOI@FWS
cc   Stuart Leon/RO/R2/FWS/DOI@FWS
bcc  John Oakleaf/R2/FWS/DOI
Subject  San Carlos Wolf M574

Susan -- as requested:

SOP 32.0, entitled Control of Mexican Wolves, outlines the guidelines for determining the status of problem/nuisance wolves and also establishes guidelines for conducting wolf control actions.  M574, the wolf in question, meets 2 of the criteria that are spelled out in the definition of a problem wolf since he has depredated lawfully present livestock and  is a member of a pack that was directly involved in livestock depredations.  Once a wolf is determined to be a "problem wolf," it is the Service's responsibility to take the necessary action (relocating, return to captivity, or lethal take) to alleviate the situation.  Each situation is determined on a case-by-case basis depending on the circumstances and there are no specific guidelines when to use lethal take, except for human safety situations.   Lethal take is to be considered a last resort as outlined in both the SOP as well as in the Mexican Wolf Final Rule which states:  "The Service encourages those authorized to take wolves to use non-lethal means when practical and appropriate."   If efforts to live-capture problem or nuisance wolves are unsuccessful and depredations continue, lethal control may be used in consultation with and following a decision by the Mexican Wolf Recovery Coordinator (MWRC) or his designee under the following general guidelines:

1.  The IFT will permanently remove from the wild, or as a last resort, euthanize any wolves exhibiting a consistent pattern of livestock depredation (three or more confirmed kills within one year in the primary recovery zones or two or more in other areas); a wolf would be euthanized *only after a determination by the MWRC that it had no further value to the recovery program*.  In the case with M574, he has significant value to the recovery program as a whole in that he is the most genetically valuable wolf in the wild, but more significantly, he is ranked #6 genetically overall in the Mexican wolf in the recovery program (includes both the wild population plus the captive wolves throughout the United States and Mexico).  In hindsight, it is questionable that he was ever released to the wild because he is so high ranking (i.e., he is not considered "surplus" or "genetically redundant").   Because of this, all attempts should be made to capture him alive.

2.  Lethal methods of take may be used when reasonable attempts to capture wolves alive fail and when the Service determines that immediate removal of a particular wolf from the wild if necessary.  In the case with M574, one could argue that all reasonable attempts to capture him have not been exhausted yet since trapping has occurred for only approximately 10 trap days (I am checking with the IFT the number of trap days to verify since I do not know the exact #).  In the past, when trapping has been unsuccessful, we have used a helicopter and net gun to capture.  We have not yet attempted this capture method and do not know if it is feasible due to the terrain he is inhabiting.  Darting the wolf is a third option that has not yet been tried.  Immediate removal does not seem to be necessary at this point in time for the following reasons:  1) San Carlos is aware of the situation, recognizes his genetic value, and is not asking for lethal control; 2) as per Stuart, the elders would  not support killing him; 3) Defenders of Wildlife has been notified and is expected to fully compensate San Carlos for the livestock losses.  Trapping efforts are suspended for the moment due to weather and road conditions (San Carlos is aware of this and is okay with it); however, once the roads become passable again likely by the end of the week, Wildlife Services will again set traps.

From my captive management perspective, if the wolf is captured then euthanized once in captivity, we can expect a huge outcry from the SSP. Lethal control of wild Mexican wolves is already a highly controversial issue within the SSP but to kill a wolf once it is captured will be unacceptable to many facilities given his genetic value. The reason all these facilities actively participate in the program is to breed genetically valuable wolves for the program. This would be contrary to their mission and I suspect that many facilities would drop from the program which would have devastating effects on the breeding program. Space issues are already a major concern and to loose valuable pen space will be detrimental to our captive breeding goals and maintaining the genetic diversity of the population.

**Civil Action No. 06-2119 (RCL)**

**Exhibit B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY | ) | |
| | ) | Civ. No. 1:06-cv-02119-RCL |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES FISH AND WILDLIFE | ) | |
| SERVICE, | ) | |
| | ) | |
| Defendant. | ) | |
| ——————————————————— | ) | |

## DECLARATION OF SANTIAGO R. GONZALES

1.      I, Santiago R. Gonzales, am employed by the United States Department of the

Interior, as a Assistant Mexican Wolf Recovery Coordinator in the New Mexico Ecological

Services Field Office, U.S. Fish and Wildlife Service, in Albuquerque, New Mexico, and have

been so employed since 2001.  In this position, I have custody and control of all documents

constituting the official Mexican Wolf Rule Making Administrative Record prepared and

maintained by the U.S. Fish and Wildlife Service that appear in the Index to the Mexican Wolf

Rule Making Administrative Record that accompanies this declaration.

2.      To the best of my knowledge and belief, the documents filed with the Court in

this matter as listed in the Index to the Mexican Wolf Rule Making Administrative Record (when

combined with the documents listed in the Privilege Log Index that are not filed with the Court)

constitute a true and correct copy of all of the U.S. Fish and Wildlife Service records directly or

indirectly pertinent to the U.S. Fish and Wildlife Service's decisions at issue in this litigation,

namely the December 14, 2006, Complaint for Declaratory and Injunctive Relief of the March

29, 2004, Mexican gray wolf recovery, Arizona and New Mexico, Petition for Rule-making to

enhance prospects for recovery of the Mexican gray wolf experimental population, in accordance

with scientific findings.  The Plaintiff has challenged the United States Fish and Wildlife

Service's unreasonable delay in making a final decision to grant or deny a rule-making petition

under the Administrative Procedures Act, 5 U.S.C. §706(1).

3.      I declare under penalty of perjury that the foregoing is true and correct.


DATED this 21st day of June, 2007


Santiago R. Gonzales, Assistant Mexican Wolf Recovery
Coordinator
U.S. Fish and Wildlife Service, Region 2
New Mexico Ecological Services Field Office

**Civil Action No. 06-2119 (RCL)**


**Exhibit C**



United States Department of the Interior

FISH AND WILDLIFE SERVICE

P.O. Box 1306
Albuquerque, New Mexico 87103
http://ifw2es.fws.gov

In Reply Refer To:
R2/ES-MWRP
CL 7-12

JUL 2 4 2006

Terry B. Johnson, Chair
Mexican Wolf Adaptive Management
  Oversight Committee
Arizona Game and Fish Department
2221 West Greenway Road
Phoenix, Arizona 85023

Dear Mr. Johnson:

The Final Rule for "Establishment of a Nonessential Experimental Population of the Mexican Gray Wolf in Arizona and New Mexico" was published in the Federal Register (63 FR 1752) on January 12, 1998. The Final Rule requires the U.S. Fish and Wildlife Service (Service) to "evaluate Mexican wolf reintroduction progress and prepare periodic progress reports, detailed annual reports, and full evaluations after 3 and 5 years that recommend continuation, modification, or termination of the reintroduction effort." Toward this end, the Service (with concurrence of the five other primary cooperating agencies in the reintroduction project) asked the Mexican Wolf Adaptive Management Oversight Committee (AMOC) to draft a 5-Year Review of the Mexican Wolf Blue Range Reintroduction Project, and to provide recommendations to the Service on project direction, improvement, and/or modification.

In 2002, the agencies that would eventually form the AMOC began meeting to discuss agency and public concerns about the Blue Range Reintroduction Project and related Mexican wolf recovery issues. Many stakeholders and interested parties, including cooperating agencies, believed that concerns expressed during the 3-Year Review of the project had not been adequately acknowledged or addressed by the Service. The AMOC, consisting of the six State, Tribal, and Federal agencies most directly involved in reintroduction, was established to provide a forum in which agency and public concerns could, henceforth, shape the reintroduction project through adaptive management.

Since 2002, the AMOC has met with the public at least four times each year in Adaptive Management Working Group meetings to discuss relevant issues and respond to concerns about Mexican wolf reintroduction. The 5-Year Review was conducted within this framework to ensure ample opportunity for engagement by any and all interested parties.

Public review opportunities for the 5-Year Review were extensive. The formal public written-comment period extended from January through July 2005. In addition, the AMOC held 14

Terry B. Johnson, Chair                                                                                2

public meetings in Arizona and New Mexico to provide opportunities for discussion and comment as the review was being developed.

In the 5-Year Review, the AMOC considered and addressed all public comment that it received, as well as the content (including recommendations) from the preceding 3-Year Review "Paquet Report," the 3-Year Review Stakeholders Workshop, the Arizona-New Mexico Evaluation of the 3-Year Review, and all other material germane to rigorously re-evaluating the reintroduction project. The AMOC completed the 5-Year Review in December 2005, and transmitted its final report to the Service on December 31, 2005. The body of the report was divided into 6 sections: 1) administrative, 2) technical, 3) socioeconomic, 4) public comment, 5) literature cited, and 6) recommendations.

The recommendations section of the 5-Year Review resulted from analysis of the technical and socioeconomic information gathered during the review, as well as consideration of all comments received during this process. Although the recommendations section constituted the AMOC's response to the Service for program direction, this portion of the document had not undergone the same level of public review as the rest of the 5-Year Review. As a result, the Service deemed it prudent to publish a Federal Register Notice of document availability to allow additional time for the public to review and comment. Although the notice invited the public to provide comment on any aspect of the 5-Year Review, comment on the recommendations section was of particular interest to the Service.

The first notice of document availability in this final round of review was announced in the Federal Register (71 FR 13624) on March 16, 2006, with a closing date of April 17, 2006. Due to requests by some stakeholders, a re-opening of document availability was posted on the Federal Register (71 FR 28049) on May 15, 2006, with a closing date of May 30, 2006.

The Service received a total of 252 responses during the two final public comment periods. The responses were categorized as six letters supportive of wolf recovery but opposed to the reintroduction project; 38 not supportive of wolf reintroduction; and 90 in support of wolf reintroduction. In addition, the Service received one petition with 503 signatures and 117 form-letter postcards, all in support of wolf reintroduction.

The Service read and carefully considered all comments received during the two final public comment periods. Many of the responses contained no substantive information beyond expressing a like or dislike for wolves and/or Mexican wolf reintroduction or the reintroduction project. All comments of this nature were considered, but (as was noted in similar circumstances in the 5-Year Review) such comment does not provide a basis for making adaptive management changes in reintroduction.

The vast majority of comments received during the final comment periods focused on issues that had been addressed in the administrative, technical, or socioeconomic components of the 5-Year Review, and/or discussed at length in the public comment section of the 5-Year Review. Many of these challenged the AMOC's responses to public comments in the 5-Year Review or

Terry B. Johnson, Chair                                                            3

expanded on earlier comments. Primary topics and common themes were the rationale behind reintroducing wolves into the Blue Range Wolf Recovery Area; perceived physical dangers from wolves toward humans, livestock, and pets; human health and stress; wolf impacts on hunting and wild game; wolf genetics and hybridization; disease; loss of revenues to counties; termination of the program; development of enclosed wolf "refugia"; the role of livestock carcasses in pre-conditioning wolves to depredate and livestock carcass removal; White Sands Missile Range; County involvement in the AMOC; adherence to all laws in conducting Mexican wolf recovery; outreach; staffing levels; conduct of the 3- and 5-Year Reviews; moratorium; and Standard Operating Procedure 13.0 and the "3 strikes rule". All these comments were duly considered by the Service and determined to have already been adequately addressed in the 5-Year Review.

Eleven of the individual public responses contained more extensive, substantive comments, many of which focused on the AMOC recommendations in the 5-Year Review. The overwhelming majority of these comments related to proposals for a Final Rule change as elucidated in AMOC recommendations 1-2, and 4-11. Specific comments centered on requests for clarification of the AMOC's recommendation(s), statements of support or disagreement with specific recommendations or elements thereof, requests for elimination of specific recommendations, and direction to rewrite specific recommendations (all or in part). The AMOC anticipated many of these substantive issues and recognizes that initiation of any regulatory processes stemming from its recommendations will require additional opportunities for public input before any final agency decisions are made.

Federal rule-making, as it applies to the Endangered Species Act and Mexican wolf recovery, is inherently a Service responsibility. Although the AMOC will be fully engaged in and a crucially important component of any future rule-making with regard to Mexican wolf reintroduction in Arizona and New Mexico, the ultimate authority and responsibility for formally proposing and determining relevant Federal rules lies with the Service. In short, recommendations 1-2, and 4-11 are the AMOC's recommendations to the Service that will be fully investigated in the process of future rule-making and/or NEPA analysis, in full compliance with applicable laws, policies, and procedures. Meanwhile, the Service has duly considered all public comment relative to rule changes and future rule-making as they pertain to the reintroduction project and has determined that they do not require changes to the 5-Year Review and/or AMOC recommendations contained therein.

Other elements of the previously mentioned 11 public responses (and to a lesser extent some of the other public responses) were directed at other AMOC recommendations within the 5-Year Review. With the exception of the aforementioned recommendations 1-2 and 4-11, and 3 (decision to continue the Reintroduction Project with modifications) and 33 (decision on completion of a Mexican Wolf Recovery Plan), the Service considers the remainder of the recommendations in the 5-Year Review to be under the purview of the AMOC. The Service has now duly considered all public comment relative to these other recommendations and has determined that nothing contained therein warrants changes to the 5-Year Review or to AMOC's recommendations therein.

Terry B. Johnson, Chair                                                                                    4

Finally, several public responses expressed dissatisfaction with the socioeconomic component of the 5-Year Review. Specific comments centered on a perceived failure to adequately address: 1) negative impacts from wolf reintroduction to landowners, livestock operators, and other residents of the Blue Range Wolf Recovery Area; 2) the full range and depth of positive impacts to the Blue Range Wolf Recovery Area as a consequence of increased tourism from wolf reintroduction; and 3) fundamental disagreement with the methodology of the analyses. The Service has duly considered all public comment relative to these issues and considers the issues to have been appropriately addressed in the Public Comments and Responses section of the 5-Year Review. Although additional data collection and data analyses, as suggested in several public comments, might further refine some of the conclusions presented in the socioeconomic component of the 5-Year Review, it would not significantly change the 5-Year Review or AMOC recommendations contained therein.

In summary, the Service has read and considered all public comment on the Mexican Wolf Blue Range Reintroduction Project 5-Year Review, including the AMOC recommendations component of the 5-Year Review. As the Service's Regional Director for Region 2, I have determined that the Mexican Wolf Reintroduction Program will continue with modifications as generally outlined within the recommendations component of the 5-Year Review. Furthermore, the Service will work with the cooperating agencies and the AMOC to begin the process of developing a new 10(j) Proposed Rule and associated NEPA analysis to help guide the next phase of the Mexican Wolf Reintroduction Project as contained in recommendations 1-2, and 4-11. I have also determined that recommendations 12-32, and 34-37 are under the purview of the AMOC and support implementation of these recommendations by the AMOC. Finally, the Service will continue to evaluate the role, function, scope, and timing of reassembling the Mexican Wolf Recovery Team (as identified in AMOC recommendation 33) within the context of the legal status and larger, national effort to recover the gray wolf species.

Sincerely,

ACTING     Regional Director

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | **Civ. Action No. 06-02119 (RCL)** |
| **DIRK KEMPTHORNE, <u>et al.</u>,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

**(PROPOSED) SCHEDULING ORDER**

It is hereby ORDERED that defendants shall file an opposition to plaintiff's Expedited

Motion to Compel the Complete Administrative Record on or before July 17, 2007, and plaintiff

shall file any reply on or before July 18, 2007.

SO ORDERED.

Dated this ___ day of _____ 2007        _____
                                         Royce C. Lamberth
                                         United States District Court Judge

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **CENTER FOR BIOLOGICAL DIVERSITY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | )    **Civ. Action No. 06-02119 (RCL)** |
| **DIRK KEMPTHORNE, <u>et</u> <u>al.</u>,** | ) |
| | ) |
| | ) |
| **Defendants.** | ) |

_____

**(PROPOSED) ORDER**

Upon consideration of plaintiff's Expedited Motion to Compel the Complete Administrative

Record and Supporting Memorandum ("Motion to Compel"), and any opposition thereto, it is

hereby:

ORDERED that by no later than the close of business on            , 2007, Defendants shall

provide to Plaintiff's counsel the complete Administrative Record, including, but not limited to, the

materials listed in Exhibit A to Plaintiff's Motion to Compel, as well as all records that pertain to

this matter that are in the agency's possession as of the date of the agency's compilation of the

complete Administrative Record.

SO ORDERED.


Dated this __ day of _____ 2007            _____
                                           Royce C. Lamberth
                                           United States District Court Judge