UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

|  |  |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | )  Civ. Action No. 06-02119 (RCL) |
| DIRK KEMPTHORNE, et al., | ) |
| | ) |
| | ) |
| Defendants. | ) |

---

## REPLY IN SUPPORT OF PLAINTIFF'S EXPEDITED MOTION TO COMPEL THE COMPLETE ADMINISTRATIVE RECORD

Plaintiff Center for Biological Diversity ("Center") has filed an expedited motion to compel the complete Administrative Record for the matter under review in this case, which, according to defendants, involves one issue: "why FWS has taken the time that it has to respond to Plaintiff's petition."  Defendants' Opposition to Plaintiff's Motion to Compel the Complete Administrative Record ("Defs. Opp.") at 2 (emphasis added).  The Center agrees that whatever documents bear on this questions should be in the Administrative Record.  The problem here is that the Service has not included all such records.

Thus, defendants (collectively "Service" or "FWS") acknowledge that the reason for the agency's delay in responding to the Center's March 29, 2004 Rulemaking Petition is that the agency needed to further "evaluat[e] the need for modifying" the Mexican wolf 10(j) regulations (the specific action sought by the Center's Petition) by engaging in a "five-year review" of the progress of the reintroduction project.  See Defs. Opp. at 7; see also Exhibit 1 to Defs. Opp.

(June 30, 2004 letter from the Service to the Center). Therefore, because the agency has

<u>excluded</u> from the Administrative Record material that was clearly "before" the agency and

pertinent to its "evaluation" of whether to modify the 10(j) regulations – <u>i.e.</u>, the agency's own

stated reason for its delay in responding to the Center's Petition – plaintiff's Expedited Motion to

Compel the Complete Administrative Record ("Motion to Compel") should be granted. In

addition, because many of these records should be easily accessible by the agency, there is no

reason why the Administrative Record cannot be supplemented with all such material prior to

August 3, 2007, when plaintiff's summary judgment brief is due.

## <u>ARGUMENT</u>

**A.      The Service's Own Documents Demonstrate That The Agency
         Has Omitted From The Administrative Record Material That Was
         Clearly "Before" The Agency.**

There appears to be no dispute here that the proper scope of the Administrative Record in

a case under the Section 706(1) of the Administrative Procedure Act ("APA") is the "whole

record" that is before the agency, including "all documents that the agency directly or indirectly

considered." <u>See</u> Plaintiff's Expedited Motion to Compel the Complete Administrative Record

("Plfs. Motion to Compel") at 3-4; Defs. Opp. at 3. Furthermore, the presumption that an agency

has properly designated the Administrative Record is easily overcome where, as here, a party

presents "clear evidence" that the agency excluded from the Record material that was in fact

"before" the agency in its consideration of the matter under review. <u>See</u> <u>Fund for Animals v.</u>

<u>Williams</u>, 391 F. Supp. 2d 191, 197-99 (D.D.C. 2005) (despite presumption that record is

complete, "the defendants cannot justify the exclusion of . . . highly relevant, adverse documents

from the administrative record simply by claiming that the documents were not 'directly or

indirectly considered' by the agency"); <u>Pacific Shores Subdivision of Cal. Water Dist. v. U.S.</u>
<u>Army Corps of Engineers</u>, 448 F. Supp. 2d 1, 6 (D.D.C. 2006) (plaintiff must provide
"reasonable, non-speculative grounds for its belief that the documents were considered by the
agency and not included in the record").

As the government explained to the Center in its June 30, 2004 correspondence,  the Fish
and Wildlife Service initially declined to "act" on the Center's March 29, 2004 Rulemaking
Petition – which, again, requested certain amendments to the Mexican wolf 10(j) regulations –
because the agency needed to continue "evaluating the need for modifying" the Mexican wolf
10(j) regulations.  Exhibit 1 to Defs. Opp.  The government again emphasized in its opposition to
plaintiff's Motion to Compel that the Service "told Plaintiff" it would not be able to "act" on
Plaintiff's petition "<u>until</u> FWS completed the five-year review to determine whether modification
of the 10(j) Rule" – <u>i.e.</u>, the "action" sought by the Center in its Rulemaking Petition – "was
necessary."  Defs. Opp. at 7 (emphasis added).

In light of defendants' repeated assertions that the <u>reason</u> "why" the agency was not in a
position to respond to the Center's Rulemaking Petition was that the agency was <u>continuing</u> to
evaluate whether the agency should amend the Mexican wolf 10(j) regulations, Defs. Opp. at 7,
all material that was "before" the agency during this evaluation must be included in the
Administrative Record for this case, according to the agency's own formulation of what
constitutes the appropriate scope for the Administrative Record.  <u>See</u> Defs. Opp. at 2
("Defendants produced the whole record for the only issue that will be before the Court – <u>why</u>
FWS has taken the time that it has to respond to Plaintiff's petition") (emphasis added); <u>see also</u>
<u>Walter O. Boswell</u>, 749 F.2d at 792.  Indeed, not only does the agency's consideration of whether

to amend the 10(j) regulations essentially subsume the agency's consideration of whether to grant

or deny the Center's Rulemaking Petition, but, in fact, under defendants' view of the case, since

this is the agency's justification for "why" the agency has not made a final decision on plaintiff's

Petition, the documents reflecting that evaluation constitute the "only" relevant Administrative

Record for this case.  Defs. Opp. at 2.

  The situation might be different if, for example, the agency's justification for not acting

on the Center's Petition was that the agency had to divert its attention to other unrelated and

competing priorities.  See, e.g., Biodiversity Legal Foundation v. Norton, 285 F. Supp. 2d 1, 16

(D.D.C. 2003) (FWS contended that its delay in revising a species' critical habitat designation

was not unreasonable because it had to devote its energies to "listing activities" related to other

species).  However, here, the agency's stated reason for not responding to the Center's Petition is

that the agency needed to continue "evaluating" the precise issue raised by that Petition – i.e.,

whether to amend the Mexican wolf 10(j) regulations.  See Exhibit 1 to Defs. Opp.  Accordingly,

all records that were submitted to the agency in relation to its consideration of this issue –

including public comments, population statistics, and internal e-mail correspondence on the same

topic – were and continue to be unquestionably "before" the agency for purposes of this case and

must be included as part of the Administrative Record.

  Moreover, contrary to defendants' suggestion, Defs. Opp. at 6, it is not plaintiff's position

here that any "agency documents" that "may be relevant to a TRAC factor" are part of the

Administrative Record.  See also Defs. Opp. at 8 ("The fact that they are FWS documents is not

enough to carry [plaintiff's] burden").  However, it is plaintiff's view that the Administrative

Record for this case consists of agency records that are "before" the agency for purposes of its

consideration of whether to amend the 10(j) regulations, because, as the parties appear to agree, this was the process the agency decided to "shift" its attention to in order to determine whether it is necessary to grant or deny the Center's Petition. See Defs. Opp. at 7.

Thus, the Court need not speculate in order to determine that defendants omitted from the Record material that was "before" the agency for purposes of its consideration of whether to take the action requested by the Center in its Rulemaking Petition and amend the Mexican wolf 10(j) regulations. As plaintiff pointed out in its June 29, 2007 letter, there are public comments and other population data that the Service did not include in the Administrative Record even though such information was presented to FWS as part of the agency's consideration of whether to adopt the recommendations of the Five-Year Review (the mechanism by which the agency was "evaluating" whether to amend the 10(j) regulations). Exhibit A to Plfs. Motion to Compel at 2.

Yet the Service does not provide any coherent rationale for its decision to exclude such information from the Administrative Record. Rather, the government's arguments essentially boil down to its general plea for agency deference. See Defs. Opp. at 6, 8 ("A strong presumption exists that FWS properly designated the record"). However, because plaintiff has provided a "reasonable, non-speculative" basis for its belief that FWS excluded from the Record material that was "before" the agency during its consideration of whether and how to amend the 10(j) regulations, see Pacific Shores, 448 F. Supp. 2d at 6 – again, the only justification given for the agency's delay in responding to the Center's Petition – such sweeping claims of agency deference are easily overcome. See, e.g., Williams, 391 F. Supp. 2d at 197 ("defendants cannot justify the exclusion of . . . highly relevant, adverse documents from the administrative record simply by claiming that the documents were not 'directly or indirectly considered' by the

agency"); see also Coastal Conservation Assoc. v. Gutierrez, Civ. Action No. H-05-1214, at * 4

(S. D. Tex. Feb. 17, 2006) (plaintiff overcame presumption of regularity by demonstrating that

there was an "absence of documents and materials" on an issue relevant to the decision under

review) (attached herein as Exhibit 1).[1]

      Thus, the government's repeated claim that it "produced the whole record documenting

its consideration of the petition and the scope of the five-year review," is confusing at best.  Defs.

Opp. at 11 (emphasis added); see also id. at 7.  The agency certainly has not provided the "whole

record" documenting its "consideration" of the five-year review since, as previously explained,

the agency did not include public comments and other information provided to the agency to

inform its consideration of the final conclusions of that review.  See Attachment 1 to Exhibit A

of Plfs. Motion to Compel (public comment letter sent to the Service concerning the draft Five-

Year Review that was not included in the Administrative Record); see also 71 Fed. Reg. 13624

(March 16, 2006) (notice of availability and acceptance of public comments concerning final

Mexican wolf Reintroduction Project Five-Year Review).[2]

      In short, the government cannot rationally contend that it did not "directly or indirectly"

---

[1]    For example, public comments provided to FWS criticized the Five-Year Review because
it excluded the Service's recent population data demonstrating that the Mexican wolf was
declining in numbers.  See Exhibit 2 (comment letter from Center for Biological Diversity to the
Service regarding the Five-Year Review).  Courts have routinely held that agencies may not
"skew" Administrative Records – as the Service appears to have done here – by excluding
information that is adverse to the agency's position in the case.  See Williams, 391 F. Supp. 2d at
197 (citing Envtl. Def. Fund, Inc. v. Blum, 458 F. Supp. 650, 661 (D.D.C. 1978).

[2]    Furthermore, irrespective of whether the Five-Year Review (or the Three-Year Review) is
an "agency action" under the APA, see Defs. Opp. at 9 n.5, any material put "before" the agency
during its consideration of whether to take the action requested by the Center's Petition – i.e.,
whether to amend the 10(j) regulations – must be included as part of the Record for this case.

consider the material outlined in plaintiff's June 29, 2007 letter – such as the Three- and Five-Year Reviews, as well as the 1982 Mexican Wolf Recovery Plan and the 1996 Environmental Impact Statement – in relation to its ongoing consideration of whether to amend the 10(j) regulations.  Therefore, all such material must be included in the Record for this case.  See Miami Nation of Indians of Indiana v. Babbitt, 979 F. Supp. 771, 777 (N.D. Ind. 1996) (if agency "directly or indirectly considered any guidelines, directives, or manuals, those materials should be included in the record").

> **B      There Is No Basis For The Government's Failure To Include In The Record All Relevant E-Mails and Agency Meeting Notes.**

The government's fundamental misconception of the scope of the Administrative Record for this case is also reflected in the government's assertion that it included in the Record all "non-privileged" e-mail communications and meeting notes "relating to consideration of Plaintiff's petition."  Defs. Opp. at 10.  Indeed, this statement further suggests that the agency narrowed the scope of the Record to only material that makes some reference to the Center's Petition.  However, as previously explained, particularly in this case, where the Service delayed acting on the Center's Petition precisely because the agency felt it needed to continue "evaluating" whether to act on the Petition and amend the 10(j) regulations, Exhibit 1 to Defs. Opp., the scope of the Administrative Record must at least include all materials that were "before" the agency for purposes of the agency's ongoing consideration of whether to amend the 10(j) regulations.  Unless the government claims that such material is privileged – which it has not asserted – this applies whether such records are e-mails or other documents that were "before" the agency.  Yet, with minor exceptions, the agency's Record fails to include any FWS

staff emails except those that specifically reference the Center's Rulemaking Petition. However, it is simply untenable to suppose that agency staff have not communicated via email at all concerning the Five-Year Review and the agency's ongoing consideration of whether to amend the 10(j) regulations.[3]

Nor do the cases relied on by the government support its assertion that e-mails and meeting notes are "not routinely included in the record." Defs. Opp. at 10. The principal case in defendants' brief, Nat'l Wildlife Fed'n v. U.S. Army Corps of Engineers, did not even involve a challenge to the completeness of an Administrative Record but, rather, merely held that certain agency staff e-mails were not a sufficient basis for invalidating an agency decision because they did not represent the "official" view of the agency. 384 F.3d 1163, 1174 (9th Cir. 2004). In fact, many courts have required that agencies supplement administrative records with electronic communications, staff notes, and working papers when such material is "before" the agency. See, e.g., Gutierrez, Civ. Action No. H-05-1214, at * 5 (Exhibit 1) (granting motion to compel complete administrative record and ordering agency to produce all non-privileged material, "including emails," directly or indirectly considered by the agency); see also Miami Nation, 979 F. Supp. at 777 (agency "notes, personal logs and working papers" may not be excluded from administrative record simply because they did not "literally pass before the eyes of the final decision maker") (quoting Clairton Sportsmen's Club v. Pa. Tpk. Comm'n, 882 F. Supp. 455, 464 (W.D.Pa. 1995)); see also Int'l Longshoremen's Assoc. v. Nat'l Mediation Bd., Civ. Action

---

[3]     Furthermore, to the extent that such records contain factual, as opposed to deliberative, information, they may not be withheld from the Administrative Record in full under the deliberative process privilege. See, e.g., EPA v. Mink, 410 U.S. 73, 87-88 (1973)

No. 04-824, 2006 WL 197461, at * 4 (agency failed to demonstrate that handwritten notes of agency staff were privileged and properly excluded from the administrative record) (D.D.C. Jan. 25, 2006) (Unreported).

In any event, certainly, the test for whether an Administrative Record is complete is not whether agencies "routinely" include particular information in their Administrative Records. Rather, the only relevant inquiry here is whether material was "before" the agency and, hence, was "directly or indirectly considered by the agency" in the course of its considerations of the matter at issue. Williams, 391 F. Supp. 2d at 198-99.[4]  Accordingly, since the Service has demonstrably failed to include in the Record information that relates to the Service's ongoing consideration of whether to amend the 10(j) regulations pursuant to the Five-Year Review and other processes – the agency's own explanation for its delay here – the current Record is incomplete and must be supplemented.[5]

---

[4]     Mooreover, although agencies may withhold material in some cases if it is privileged, see Amfac Resorts v. U.S. Dep't of the Interior, 143 F. Supp. 2d 7, 13 (D.D.C. 2001), such material must be identified in a privilege log. See, e.g., Int'l Longshoremen's Assoc., Civ. Action No. 04-824, 2006 WL 197461, at * 4 (when excluding documents from the administrative record because they are privileged, an agency must "necessarily provide the same information it would submit when defending against a challenge for withholding such information in a Freedom of Information Act action").  However, the Service has identified only one document in its privilege log for the Record in this case.

[5]     Although it is plaintiff's position that all of the requested material should have been designated as part of the Administrative Record for this case because it was "before" the Service during its consideration of whether to amend the 10(j) regulations, it would also be appropriate to "supplement" the Record with this information because it was "known to the agency at the time it made its decision . . . [is] directly related to the decision, and . . . [is] adverse to the agency's decision." Williams, 391 F. Supp. 2d at 198 (requiring supplementation of the Record with certain documents under exception to record-review requirement allowing supplementation of the Record with information "when an agency considers evidence which it failed to include in the record") (citing Esch v. Yeutter, 876 F.2d 976, 991 (D.C. Cir. 1989)).

**C.      The Government's Request For Sixty Days In Which to Compile
<u>A Complete Administrative Record Should Be Denied.</u>**

In the event that the Court grants plaintiff's Motion to Compel, defendants should not be

granted sixty days to produce the complete Administrative Record for this case, nor should the

briefing schedule also be stayed during this time, as requested by defendants.  <u>See</u> Defs. Opp. at

12.  As plaintiff has already explained, staying this case will further exacerbate the inexcusable

delay that is jeopardizing the Mexican wolf's chances for survival and recovery in the wild.  <u>See</u>

Plaintiff's Opposition to Defendants' Motion to Stay Briefing at 6.  Moreover, any such further

delay is not warranted here.

In fact, most of the information plaintiff seeks to compel is readily available to the

Service, such as the 1982 Mexican Wolf Recovery Plan, the 1996 Environmental Impact

Statement, and recent information concerning the Service's ongoing management of individual

wolves. Moreover, most of the requested information is also available on the Service's web-site

for the Mexican wolf reintroduction project.  <u>See</u> <u>http://www.fws.gov/southwest/es/mexicanwolf/</u>

(last visited on July 18, 2007).  Precisely to prevent any further delay, plaintiff specifically

offered in its June 29, 2007 letter to stipulate that any information available on the Service's web

site pertaining to the Mexican wolf is part of the Administrative Record and may be relied on by

the parties; however, the Service declined this reasonable offer.  Exhibit 1 to Plfs. Motion to

Compel at 3.

In addition, contrary to the government's portrayal of plaintiff's motion, it is not as if

plaintiff is seeking to chase down every single possible document that might be relevant to the

Mexican wolf.  Defs. Opp. at 12 ("documents potentially within the scope of Plaintiff's motion is

enormous").  To the contrary, there is clear evidence here that defendants have unreasonably

narrowed the scope of the Administrative Record for this case by excluding information

pertaining to the Service's ongoing consideration of whether to amend the Mexican wolf 10(j)

regulations.  Plaintiff's Motion to Compel merely requests that all such information – which

should be readily accessible to the agency – be included in the Record for this case.  Indeed, since

there is a designated Mexican wolf recovery coordinator located in a single office in

Albuquerque, New Mexico, see http://www.fws.gov/southwest/es/mexicanwolf/addphone.shtml,

the government has not provided any reason why the requested information will be uniquely

onerous to locate and and produce.  See also Exhibit 3 (Service's April 24, 2007 response to

plaintiff's April 3, 2007 FOIA request, explaining that its headquarter offices did not possess

information concerning the Center's Petition because "this was a regional issue for which all

pertinent records would be located in the Region").  Accordingly, because of the important

endangered species concerns at issue here, the government's request to stay this case while it

complies with the duty it already had to provide the complete Administrative Record on June 29,

2007, see Joint Rule 16.3 Meet and Confer Report (Document No. 11), should be denied.

Further, plaintiff's request that the court require defendants to produce this information prior to

the deadline for plaintiff's motion for summary judgment should be granted.

## CONCLUSION

For the reasons stated herein, plaintiff's Motion to Compel should be granted.

Respectfully submitted,


_____/s/ Erin M. Tobin_____
Erin M. Tobin
(D.C. Bar No. 494948)
Katherine A. Meyer
(D.C. Bar No. 244301)
Meyer Glitzenstein & Crystal
1601 Connecticut Ave., N.W., Suite 700
Washington, D.C.  20009
(202) 588-5206
(202) 588-5049


Dated: July 18, 2007

Exhibit 1

Civ. Action No. 06-2119

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts
Southern District of Texas
ENTERED

FEB 1 7 2006

Michael N. Milby, Clerk of Court

COASTAL CONSERVATION
ASSOCIATION, ET AL.,

    Plaintiffs,

V.

CARLOS GUTIERREZ, in his official capacity
as Secretary of the United States Department
of Commerce, ET AL.,

    Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§

CIVIL ACTION NO. H-05-1214

Consolidated with

GULF RESTORATION NETWORK and
THE OCEAN CONSERVANCY,

    Plaintiffs,

V.

CARLOS GUTIERREZ, in his official capacity
as Secretary of the United States Department
of Commerce, and the NATIONAL MARINE
FISHERIES SERVICE,

    Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§

CIVIL ACTION NO. H-05-2988

## ORDER

Before the Magistrate Judge upon referral from the District Judge is Plaintiffs' Motion to

Compel Completion of the Administrative Record (Document No. 56). In that motion, Plaintiffs seek

an Order compelling Defendants to complete the administrative record that has been filed in this case

by adding to the record "all materials generated through the development of Amendment 22, which

purports to establish the red snapper rebuilding plan and accompanying regulations", which

amendment and regulations form the basis of this case. Plaintiffs' Brief in Support of Motion to Compel Completion of the Administrative Record Document No. 56) at 2. According to Plaintiffs, the administrative record that has been filed in this case does not include records of staff communications and discussions, internal NMFS reviews and analyses, evaluations of competing proposals and their possible impacts, or disputes in the scientific literature. Plaintiffs argue that in order for the Court to determine in this case whether Defendants' promulgation of Amendment 22 and its accompanying regulations was arbitrary and capricious, an abuse of discretion, or contrary to law, a complete record of all materials and documents directly or indirectly considered by the agency decision makers must be provided to the Court.

In response to Plaintiffs' motion, Defendants first state that they have "filed with the Court an Administrative Record ("record") supporting the challenged agency actions." Defendants' Response (Document No. 60) at 3; *see also* Defendants' Response (Document No. 60) at ("Here, the 4,900 page administrative record includes all documents containing 'information and deliberations' relied upon by the agency decision-maker in making the decisions challenged by Plaintiffs in this case). Then, Defendants argue that because they have complied with their own internal "Guidelines" for compiling an administrative record, the administrative record they have filed is entitled to a presumption of regularity which shields it from the type of criticism advanced by Plaintiffs. Finally, Defendants argue that because the administrative record, as they have filed it, is "sufficient to allow the reviewing court to evaluate the challenged action and ascertain whether the agency considered relevant factors when taking that action" and because Defendants have not omitted "documents considered by the decision-maker when making his or her decision", *see* Defendants' Response (Document No. 60) at 15-16, the record currently before the Court is complete.

2

In this case, Plaintiffs are challenging "the substantive decisions made by Defendants pertaining to the approval of Reef Fish Fishery Management Plan ("Reef Fish FMP"), Final Amendment 22, May 2004 ("Amendment 22") and the adoption of Amendment 22 without mandating bycatch reduction standards and regulations in the Shrimp Fishery in order to prevent overfishing of red snapper within the Reef Fish Fishery." Plaintiff Coastal Conservation Association's Second Amended Complaint (Document No. 50) at 2. Plaintiffs allege that Amendment 22 fails to comply with National Standards 1, 2, 9, and § 303(a)(1) of the Magnuson-Stevens Act by "failing to address shrimp trawl bycatch", and by "failing to prevent overfishing of red snapper and failing to achieve optimum yield on a continuing basis". *Id.* at 19-22. In addition, Plaintiffs allege that the decision to adopt Amendment 22 "without addressing shrimp industry bycatch", and "without addressing the best available scientific data indicating that overfishing is derived almost exclusively from shrimp trawl bycatch" is "arbitrary, capricious, contrary to law and is an abuse of agency discretion in violation of the APA [Administrative Procedures Act], 5 U.S.C. § 706(2)." *Id.*

Under the Administrative Procedures Act, a District Court is empowered to "hold unlawful and set aside agency action, findings, and conclusions found to be – (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law". 5 U.S.C. § 706(2)(A). In making such a determination, "the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error." 5 U.S.C. § 706. At issue with respect to Plaintiffs' motion is what constitutes the "whole record" for purposes of review under § 706.

An administrative record is considered "whole" or "complete" when it contains documents and materials directly or indirectly considered by agency decision-makers, including evidence that is contrary to the decision-maker's decision. *See Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th

3

Cir. 1993); *Thompson v. United States Department of Labor*, 885 F.2d 551, 555 (9th Cir. 1989); *International Longshoremen's Association v. National Mediation Board*, ___ F. Supp.2d ___, 2006 WL 197461 (D. D.C. 2006); *Miami Nations of Indians of Indiana v. Babbitt*, 979 F. Supp. 771, 775 (N.D. Ind. 1996); *Warren Land Exchange Project v. Dombeck*, 47 F. Supp.2d 1196, 1205 (D. Ore. 1999); *Arizona Rehabilitation Hospital, Inc. v. Shalala*, 185 F.R.D. 263, 266 (D. Ariz. 1998); *see also Portland Audubon Society v. Endangered Species Committee*, 984 F.2d 1534, 1548 (9th Cir. 1993) ("'The whole record' includes everything that was before the agency pertaining to the merits of its decision."). Whether a document has "literally pass[ed] before the eyes of the final agency decision maker" is not determinative. *Clairton Sportsmen's Club v. Pennsylvania Turnpike Commission*, 882 F.Supp. 455, 464 (W.D. Pa. 1995). While an administrative record compiled and submitted by an agency is presumed to be complete, that presumption can be rebutted. *Miami Nation of Indians*, 797 F.Supp. at 776.

Here, at least with respect to the absence of documents and materials evidencing a dispute in the scientific literature, or as Plaintiffs characterize it – documents and materials evidencing "a robust debate among scientists, NMFS staff and Council members and staff during the red snapper stock assessment process", Plaintiffs have rebutted the presumption that the administrative record submitted by Defendants in this case is complete. While it cannot be determined, upon this record, exactly what may be missing from the administrative record that has been submitted, it cannot be said that the Court currently has before it all the information that the Defendants did when the decisions made the basis of this suit were made. *Walter O. Boswell Memorial Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984) ("If a court is to review an agency's actions fairly, it should have before it neither more nor less information that did the agency when it made its decision."). As such, it is

4

ORDERED that Plaintiffs' Motion to Compel Completion of the Administrative Record (Document No. 56) is GRANTED. Within thirty days after the entry of this Order, Defendants shall "complete" the administrative record, by providing to the Court all non-privileged documents and materials directly or indirectly considered by Defendants in making the decisions made the basis of this case, including evidence and material that may be contrary to such decisions. This should include non-privileged communications (including emails) among and between NMFS staff, the staff of the Council and other parties relating to the development of Amendment 22, and all non-privileged records related to the EIS process concerning (a) the possible impacts of the proposed rule, (b) assessments of alternatives, (c) the impact of scientific uncertainties on the selection of alternatives, and (d) the alternatives related to how much to reduce bycatch in the shrimp fishery (as opposed to lowering the TAC in the directed fishery). Defendants shall also have thirty days after the entry of this Order to compile a privilege log covering the documents and materials that have been withheld on the basis of privilege. Such log shall be served upon Plaintiffs, who then may challenge any such privilege assertions.

Signed at Houston, Texas, this 17th day of February, 2006.

FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE

5

Exhibit 2

Civ. Action No. 06-2119

John Morgart                                                                                          May 30, 2006
Mexican Wolf Recovery Coordinator
By e-mail:  FW2ESWolf5YReview@fws.gov.

Re: Federal Register notice of May 15, 2006 (Volume 71, Number 93); Mexican Gray Wolf Blue
Range Reintroduction Project Five-Year Review.

Dear John,

        These comments supercede and replace the comments we submitted on April 17, 2006 for
the previous Federal Register comment period on the Five-Year Review.
        The Center for Biological Diversity supports the continuation of the Mexican gray wolf
reintroduction program, which is necessary though not sufficient for eventual recovery of the
Mexican wolf.  The program should be continued with modifications.  However, some of the
recommendations included in the Five-Year Review are misguided and are marred by incomplete
and flawed analysis and by bias.

Recommendations Component (numbers below refer to recommendation numbers from pages
ARC-3 to ARC-6).

1 & 2.  April 30, 2007 is far too late for AMOC to recommend a rule change to the U.S. Fish and
Wildlife Service (Service).  The Service received the preliminary results of the Three-Year
Review in April 2001, with its recommendations (including those to be initiated "immediately"),
but has not acted on those.  Prior to that, in 1999, an internal Service report recommended a rule
change to allow for direct release of wolves into the Gila National Forest – and that
recommendation was approved for action by the Assistant Secretary of the Interior the same year.
As noted in AC-16 of the present review, the Service drafted language for a proposed rule that
would accomplish that in February 2000, but failed to issue a proposal.  In 2003, Service
biologists drafted language for a rule change that would allow for wolves to establish territories
outside of the recovery area, as recommended in the Three-Year Review.  The result of the
Service's inaction is failure of the population to reach the reintroduction project's goals –
precisely as predicted in the Three-Year Review.  The Service should not wait another year for
the AMOC to propose rule change language, but rather should immediately issue a proposal in
the Federal Register

3.  As noted above, we concur with the general point of this recommendation that the
reintroduction program should be continued with modifications.

4.  It is not appropriate to un-designate the White Sands Wolf Recovery Area.  Instead, the
Service should expeditiously promulgate a reintroduction rule to act on its current authority to
reintroduce wolves to White Sands Missile Range.  The prediction of failure if wolves are
released there is based on the discredited notion of confining wolves to a specific recovery area.
That practice must be discarded, as the Review itself admits.  White Sands is supposed to be used
if the Blue Range Wolf Recovery Area ends up insufficient to get to 100 wolves.  There is now
abundant evidence that under current management, that goal will never be reached.  Therefore,

White Sands should be open for releases.

5.  This recommendation is phrased dishonestly and is designed to accomplish the opposite of what it explicitly states is its intent.  The recommendation calls for consideration of expanding the current Mexican Wolf Experimental Population Area's (MWEPA) outer boundaries to enable the wolf population "to exist within a metapopulation context consistent with Leonard et al. 2005 and Carroll et al. *in press*."  In subheading C, the recommendation also calls for allowing "wolves to disperse throughout the MWEPA, subject to management consistent with current Blue Range Reintroduction Project SOPs."  Yet, expanding the MWEPA and establishing a metapopulation conflict and cannot be reconciled.  And subjecting wolves throughout that expanded MWEPA to  management consistent with current Blue Range Reintroduction Project SOPs would exacerbate the mismanagement that would preclude such a metapopulation.

Leonard et al's study indicates that more wolves must be allowed to survive, and must be restored to much broader regions, for true recovery to take place:  "We suggest restoration goals might be reconsidered so as to better restore wolves to past population sizes and enable them to significantly influence the Rocky Mountain ecosystem."  The authors make clear that they consider the Rocky Mountain ecosystem very broadly, to include "more open habitats" that contrast with "forested and mountain areas" (p. 7).  They also make clear that past population sizes were on the order of several hundred thousand to two million wolves throughout North America.

The Carroll et al study makes clear that wolves in other parts of New Mexico or Arizona will have lower densities, and thus expanded home range requirements, than those in the Blue Range Wolf Recovery Area, while at the same time road densities are higher in other parts of these two states.  In fact, Carroll et al rate most of the region south of the current MWEPA as too arid, and therefore insufficiently productive of wolf prey animals, to allow for wolf breeding within a standardized wolf territory size of 504 square kilometers (pp. 9, 14).  However, Mexican wolves were originally found throughout these regions; thus, their territory sizes originally were, and would have to be once again significantly larger than Carroll et al use in their analysis (and which they stress "should be viewed with caution" (p. 25)).  As a result, wolves would be even more likely to encounter livestock, and the livestock carcasses that often lead them to habituate to livestock, in the areas most likely to be targeted for expansion of the MWEPA.

Current management, and especially SOP 13 which requires removal and/or killing of wolves according to a rigid formula based on depredations, has led to a declining wolf population in the Blue Range Wolf Recovery Area.  Yet, as shown, wolves outside the current recovery area will encounter livestock, and adverse ranching practices, more often than those within the recovery area.  For wolves to survive elsewhere in these two states, there must be a lower mortality/removal rate (or a higher recruitment rate) than for them to survive in the Blue Range Wolf Recovery Area.  Instead, they will face higher rates of removal and government killing.  Thus, Carroll's study, along with experience from the last nine years of reintroduction, indicates that adopting management consistent with that in the Blue Range Wolf Recovery Area will not allow for creation of a wolf metapopulation, especially if the MWEPA is expanded southward.  In fact, adopting current management in particular in more arid regions, and those with higher road densities and higher livestock densities, will preclude survival and reproduction of wolves; it will prevent establishment of a metapopulation.

Even without adopting management consistent with current Blue Range Reintroduction

Project SOPs into an expanded MWEPA, the expansion alone would preclude establishment of a metapopulation. Carroll et al's study indicates that wolf management in more arid areas with higher road densities will have to be more conservative (ie. lenient on the wolves) in order to enable wolf survival and reproduction. This would require either the government not killing as many wolves or private individuals not killings as many. To accomplish the latter, roads would have to be closed to provide for greater habitat security. Forest Service and BLM management plans do not call for significant road closures; thus, the mechanism to accomplish this would have to be critical habitat designation – which is precluded in experimental population areas.

To accomplish the former, wolves that prey on livestock would have to be allowed to survive in the wild, or husbandry measures would have to be adopted such as consistent removal of livestock that wolves don't kill prior to their locating and scavenging on them, to significantly reduce depredations. Yet, again, experimental populations have never received that level of forbearance; the stated purposed of designating them is precisely to allow for killing of depredating wolves and to avoid land use restrictions – including regulations concerning grazing on public lands. No matter what management is adopted from within the range of legal and bureaucratic possibilities, expansion of the MWEPA will preclude wolf survival and reproduction in a larger area, and thus preclude establishment of a metapopulation.

In contrast, allowing wolves to establish territories outside of the Blue Range Wolf Recovery Area but without expanding the MWEPA holds promise of contributing to creation of a metapopulation consistent with Leonard et al and Carroll et al.

Even if the logic of this recommendation was not pretzel-shaped and untenable, the recommendation's purview extends beyond responsibility for the Blue Range Wolf Reintroduction project and is properly categorized under recovery planning for the Mexican wolf – the bailiwick of a recovery team. It is simply inappropriate for inclusion in the present review. No matter how the historic range of the Mexican wolf is interpreted, and especially if the Service adopts Leonard et al's recommendation to prioritize "ecological rather than genetic heritage" (p. 7) in guiding places for future reintroductions, areas in Arizona and New Mexico north and south of the current MWEPA boundaries will be central to Mexican wolf recovery. By suggesting that significantly larger reaches of these two states than are already designated as the MWEPA will become part of the MWEPA, the AMOC is infringing on key decisions of a recovery team in its creation of a recovery plan; these are not responsibilities related to success of reintroduction project goals in the Blue Range Wolf Recovery Area.

For example, the recovery team may decide that designation of critical habitat will be necessary for recovery. Yet, as noted above, critical habitat would be precluded and preempted in areas covered by expansion of the MWEPA. Even without critical habitat designation, the recovery team might conclude that full protection of Mexican wolves to be reintroduced in Mexico should be afforded to those that cross over into the United States. Again, such protection would be precluded by expansion of the MWEPA.

There is no need to expand the MWEPA in order to promulgate and finalize a rule change allowing wolves to roam outside of the Blue Range Wolf Recovery Area. In the northern Rocky Mountains, wolves roam in areas where they are designated as experimental, non-essential and in areas where they are not so designated – and the Service has no rule requiring removal of wolves that cross any jurisdictional boundaries. The Service should categorically reject this recommendation in its entirety.

6.  This recommendation aggravates the destructiveness of the previous recommendation.  The demographic goal of the Mexican Wolf Reintroduction Project for the Blue Range Wolf Recovery Area is a minimum of 100 wolves.  The current *Mexican Wolf Recovery Plan* calls for establishing two viable wolf populations in the wild as a necessary but not sufficient step toward recovery. Whether or not the MWEPA is expanded in size, transferring the population goal for the Blue Range Wolf Recovery Area to the much larger MWEPA amounts to diluting the number of wolves per acre, or conceived in a slightly different frame, lowering the demographic bar for the Blue Range Wolf Recovery Area.  But the review notes that the Blue Range Wolf Recovery Area could support 213 wolves based on elk biomass, and 468 wolves based on the biomass of all wild ungulates (TC-18).  So there is no reason to lower the minimum number from 100 wolves, except as a means of avoiding necessary and overdue reforms that would enable the Blue Range Wolf Recovery Area to grow to (and beyond) this minimal goal.  Furthermore, it is clear that 100 wolves does not comprise a viable population.  Contrary to the "Note" appended to this recommendation, the recommendation is not consistent with the recovery plan nor the 1996 FEIS on reintroduction, nor the 1998 final rule.

7.  The general theme of this recommendation, to allow for wolf releases from the captive breeding population throughout the Blue Range Wolf Recovery Area and the adjoining Fort Apache Indian Reservation, is appropriate and long overdue.  As noted, the Department of the Interior approved such a step in 1999 but the Service did not act on that authority to change the rule.  However, linking this recommendation to recommendation #5 renders it fatally flawed.   It should be reworded to stand on its own merits and not be tied to expansion of the MWEPA.

8.  This objective of this recommendation is reasonable given that new releases in areas outside the Blue Range Wolf Recovery Area (as reconfigured to include the Fort Apache Indian Reservation) would constitute a different reintroduction program whose delineation is properly the purview of the recovery team.  However, the recommendation is superfluous as it does not change the existing regulatory situation.  As such, it should be stricken, because articulating a redundant recommendation implies a broader policy objective (ie. prohibiting new reintroduction programs in recovery areas yet to be designated) that, similarly, is the purview of the recovery team.

9.  This recommendation to limit where wolves can be translocated appears to be a relic of the old Service compulsion to draw arbitrary lines on the map, without regard for biology, and constrain its own actions accordingly.  There is no basis for this recommendation in any of the documentation included in the review.   It should be axed.

10.  This recommendation is inappropriate.  The Service should not delegate issuance of take permits to states and tribes, which have demonstrated through the AMOC their inability to resist using their expanded authorities to greatly reduce the wolf population.  The Service should be allowed to issue permits to private individuals to use non-lethal, non-injurious means to harass wolves engaged in nuisance behavior, livestock depredation or domestic pets.  However, such permits should not be transferable.  And most important, no permits should be issued to kill wolves in order to protect dogs.  Ranchers have already used livestock carcasses to habituate wolves to livestock in order to effect their removal – as attested by the documented examples concerning wolf numbers 166 and 592, in which ranchers refused Service requests to remove

livestock carcasses of animals that had not been killed by wolves but were being scavenged upon. It would be too easy to precipitate conflict between wolves and dogs as an excuse to shoot the wolves.  Federal predator control has already resulted in an unsustainably high removal rate of Mexican wolves, and implementation of this recommendation would result in an additional toll.

11.  This recommendation should be soundly rejected as an egregious attempt to prevent wolf recovery through capping the wolf population at 125 animals in an as-yet undefined but enormous area.  It contradicts the *Mexican Wolf Recovery Plan*'s charge to establish two viable populations in the wild because 125 animals will not constitute one viable population, much less two, and because the expanded MWEPA on which these few wolves would be distributed would encompass (as noted) most of the region in which additional U.S. populations might otherwise be established.

12.  This recommendation addresses broad issues of national land use policy through a very narrow focus and should not be part of the review of Mexican wolf reintroduction in the Blue Range Wolf Recovery Area.  For example, the current grazing fee that reflects a formula developed for the 1978 Public Lands Improvement Act already incorporates the assumption that livestock on public lands will be killed by carnivores more than livestock on private lands.  Creating additional "incentives" – more accurately described as subsidies – goes beyond the purview of creating a successful wolf reintroduction project, especially since there is no evidence that subsidies to the livestock industry actually reduce wolf mortality or in any other way assist recovery success.  If any governmental or private entity wants to study national land use policies and make recommendations, they are free to do so.  But such activities should not receive the imprimatur of the Service in its Five-Year Review of Mexican Gray Wolf Reintroduction.

Furthermore, subheading B of this recommendation, precluding regulations regarding livestock carcasses, will prevent addressing one of the most pressing problems facing the reintroduction project.

13.  Since recommendation #5 is fatally flawed and would be illegal, creating the additional bureaucracy called for in the present recommendation is unnecessary and wasteful.

14.  This recommendation, if nothing else, provides evidence of either a keen sense of irony inhering in the authors of the present review – or an appalling lack of bureaucratic self-insight.  For in recommending release of "a detailed plan for another Reintroduction Project Review" prior to a release of proposed language for the rule change that has already been delayed for over five years (at least since the Three-Year Review) the authors must intend a parody of their own inaction.  If in the alternate this recommendation is for real then it is evidence of the Kafkaesque nature of this reintroduction program.  Mexican wolf recovery should be reviewed in the course of revising the *Mexican Wolf Recovery Plan,* and in accordance with regular status reviews similar to those undertaken by the Service of many species.  But planning for a third review of the reintroduction program, especially given that it will delay action on what the first review recommended, is preposterous.

Lastly, the Recommendations Component should also include concrete regulatory mechanisms, such as were discussed in the Three-Year Review, and as are explained in our comments below on

the Administrative Component, to prevent wolves from scavenging on carcasses of cattle and horses and thus becoming habituated to livestock.  This omission constitutes a failure to address one of the two most serious and yet solvable problems stymying consistent growth of the wolf population.

Technical Component (TC refers to the page numbers at which the item under discussion is raised)

TC-2: The statement that "Historically, Mexican wolves were distributed across a significant portion of the southwestern United States and northern and central Mexico . . . includ[ing] eastern and central Arizona, southern New Mexico, and western Texas" is simplistic and misleading.  A much more complete report on Mexican wolf historic range follows, utilizing the more precise identification of putative subspecies represented through the Latin nomenclature rather than the colloquial use of "Mexican wolves," the meaning of which has changed.

*Canis lupus baileyi* was first identified as a unique subspecies from a diminutive male wolf killed at around 6,700 feet elevation in the mountains of Chihuahua, Mexico by two biologists for the Bureau of Biological Survey (predecessor to the U.S. Fish and Wildlife Service).  Edward W. Nelson, later to be chief of the Survey, and Edward A. Goldman "collected" the animal during an 1899 expedition.  Three decades later and with 64 more specimens having become available for their examination, they published a description of the creature in a May, 1929 *Journal of Mammalogy* article, classified it as a subspecies, and named it for fellow Survey employee Vernon Bailey. (E. W. Nelson and E. A. Goldman, "A New Wolf from Mexico," *Journal of Mammalogy*, vol. 10 no. 2, May, 1929, pp. 165-166.)

What seemed striking to the two scientists in 1929, and to Goldman in his 1944 taxonomic contribution to *The Wolves of North America*, was the Mexican wolf's smaller size and distinct dentition in comparison to the subspecies to its north and east.  "In southeastern Arizona and southwestern New Mexico, *baileyi* intergraded with *mogollonesis*," Goldman wrote.  "Although wolves are known to wander over considerable distances, the transition from *baileyi* to *mogollonesis* is remarkably abrupt."  (Young, Stanley P. and E. A. Goldman, *The Wolves of North America*.  American Wildlands Institute, Washington, D.C. 1944, pp. 470, 471.)

In *The Wolves of North America*, Goldman mapped the taxonomy of gray wolves throughout the continent based on comparison of skulls and pelts, and on that phenotypic basis he drew the line that delineated the northern range of *C. l. baileyi* – approximately at today's Interstate 10 where it crosses from New Mexico to Arizona.  In 1959, the great mammalogist E. Raymond Hall, Ph.D., of the University of Kansas, kept *baileyi* intact as a subspecies and confirmed Goldman's boundary line.  (Hall, E. R., and K. R. Nelson, *The Mammals of North America*.  The Ronald Press, New York.  1959.)

In 1980, Michael A. Bogan, Ph.D., and Patricia Mehlhop, Ph.D., suggested that two extinct southwestern subspecies – the Texas gray wolf (*C. l. monstrabilis*) and the Mogollon mountain wolf (*C. l. mogollonesis*) – could in fact be attributable to *baileyi*.  (Bogan, M. A. and P. Mehlhop. "Systematic relationships of gray wolves (*Canis lupus*) in southwestern North America."  National Fish and Wildlife Laboratory, Washington, and Univ. of New Mexico, Albuquerque.  1980.) (After wolf extirpation from the western U.S., dispersing *baileyi* individuals from Mexico had traveled into the ranges of these other two subspecies, demonstrating that – until they were killed by the Fish and Wildlife Service – *baileyi* could survive in these regions.)

The 1982 *Mexican Wolf Recovery Plan* was agnostic on whether *baileyi* should be synonymized with these other two subspecies, but adopted the revised taxonomy with the statement that the "additional room provided by the Bogan and Mehlhop assessment" would help the recovery team find "suitable wolf release areas."

In 1986, another Fish and Wildlife Service taxonomist, Ronald M. Nowak, Ph.D., suggested "accept[ing] *baileyi* as a separate subspecies as originally delineated," explaining: "I have long been impressed by the tendency to small size shown by gray wolves of Mexico and the border region. A complete gray wolf skull found at a late Pleistocene site in Nuevo Leon is the smallest of any adult North American *C. lupus* that I have seen."

Nowak affirmed the original northern range boundary for *baileyi* (and extended it to the east into the range of *mostrabilis*), but endorsed placement of *baileyi* "beyond its designated range, on the grounds that it could have occupied such sites naturally, if other wolves had not already been there, and, indeed, may have been attempting to do just that after the other wolves had been extirpated." (R. M. Nowak to J. Johnson (USFWS), "Mexican Wolf Reintroduction" (memo), 7/15/1986.) (Indeed, the current reintroduction project occurs in the Gila and Apache National Forests, within the originally identified range of *mogollensis*.)

The evidence of uniqueness is corroborated in the genetic record. In 1992, four researchers led by Robert K. Wayne, Ph.D., published a DNA study indicating that *bailey* is markedly different from all other North American wolves (but they did not assign a specific boundary to its unique assemblage of genes). (Wayne, Robert K.; Niles Lehman; Marc W. Allard and Rodney L. Honeycutt, "Mitochondrial DNA Variability of the Gray Wolf: Genetic Consequences of Population Decline and Habitat Fragmentation," *Conservation Biology*, Vol. 6, No. 4. 12/1992.)

Collectively, this additional detail makes clear that the core of the Mexican wolf's range, the area in which it evolved, comprises the Sierra Madre range in Mexico and the Sky Islands range in southeastern Arizona and the Bootheel of southwestern New Mexico. An additional range roughly consisting of the Mogollon Rim, the present Blue Range Wolf Recovery Area, eastern New Mexico and the desert and range country of West Texas belonged to closely related subspecies, and is appropriately described today as suitable for the Mexican wolf.

TC-2: The review provides incomplete information in stating that "the main objectives of the Recovery Plan were to maintain a captive population and to re-establish a viable, self-sustaining wild population of Mexican wolves." Rather, the recovery plan calls for such a viable, self-sustaining wild population "in at least two areas in Mexico and/or adjoining areas of [the] southwestern United States" (*Mexican Wolf Recovery Plan*, p. 32). This should be accurately noted in the review.

TC-3: The review should not omit predicted and actual population numbers in the years following 2003. The review states in Appendix II that "Projected population growth and current population are very similar" (TC-50), and concludes under the heading "Management Implications" (TC-23) that "Many of the goals and projections described in the FEIS (USFWS 1996) have been met or exceeded. Most notably, population counts are at projected levels, with mortality lower than estimated in the FEIS (USFWS1996). Thus, the overall Reintroduction Project is functioning at least as well as projected" (TC23). Unstated is the fact that the annual census population of the Mexican wolf fell from 55 animals at the end of 2003, to 44 at the end of 2004, to 33 at the end of 2005 – and the decline continues as of Mayl 2006.

In other instances the review includes post-2003 information, as noted on page TC-4: "Data from subsequent years (ie. 2004 and 2005) were used when available and appropriate." An example of such use is the inclusion of a 2005 instance of hybridization in the discussion, with this explanation: "Although this incident occurred outside the scope of the 5-Year Review, it is included because of its relevance to the discussion" (TC-16). Similarly, in assessing cattle kills due to wolves, the Socioeconomic Component included figures from 2004 (pp. SEC 3-9, 3-13, 3-14).

Nothing is more germane to evaluating the reintroduction project than the demographics of the wolf population. To cut off such demographic information prior to the twenty percent annual population decline that occurred in 2004 and 2005 dramatically misrepresents the effects of current management. The omission undercuts the validity of the analysis by significantly diminishing the data set. Consequently, it skews the conclusions (as indicated in the untrue quotation, above, stating that population counts *are* at projected levels) and ultimately provides dishonest backing for a set of recommendations that will not solve the most pressing problems. Information from 2004, 2005 and (now) the first five months of 2006 is available, and its use is certainly appropriate.

TC-5:    The method for estimating success of wolf releases is flawed: "We considered a successful initial release or translocation to be any wolf that ultimately bred and produced pups in the wild (breeding season data from 2004 for wolves released in 2003 was included in the analysis). We excluded wolves whose fate was unknown (e.g. uncollared released pups, or missing collared animals) from this analysis. We considered each time an animal was released to be an independent sample."

This method takes a very small sample size, posits success as an either/or variable based on subsequent reproduction, ignores the preponderance of evidence that most missing wolves have died (as properly acknowledged on p. TC-7 in categorizing missing wolves as part of the failure rate) and excludes some causative factors that are far more important than the ones that were chosen to be assessed.

A small sample size is an inherent limit to this model, but the weakness it introduces should be minimized through a more careful look at the specific circumstances attending each wolf released to ensure that idiosyncratic factors do not overwhelm the data and confound the analysis. A prime example is the fate of the Lupine Pack, nine animals who died as a result of multiple causes, but all likely precipitated by intraspecific strife that resulted from the Service's limitations on where initial releases could take place – ie. only Arizona, where wolf packs already inhabited most available territories. (See more information, below.)

Success should be measured by the total number of successfully raised pups, which would indicate more than mere parturition but also the crucial factor of the pups' ultimate survival as well as how many litters were produced. (See explanation, below.)

Several factors assessed as causes of release success or failure are in fact minimally germane and should be removed or conflated with others. First, the year of release does not convey any biological information (though it might be pertinent to an astrological analysis). Second, time spent in the acclimation pen is functionally synonymous with method of release, and thus one of these should be dropped from the analysis. Third, state (ie. New Mexico or Arizona) to a large extent is a stand-in for the question of type of release (ie. translocation or initial release), and does not in and of itself represent a biological factor; information that might stem from using this factor could better be analyzed by substituting "distance from other wolf pack home ranges," which better

distinguished the situation in New Mexico from that in Arizona during the period under review. What ultimately may be the most important factor in success of wolf release is the annual unit months (AUMs) of livestock grazed or authorized (if actual use figures are not available) within a given distance from the release site.

The combination of poorly chosen factors to assess, and other methodological choices that fail to capture the reality of what is influencing population demographics result in the mistaken conclusion that translocations (and by implication, the capture of wild animals) offer a better chance for success than initial releases. This conclusion, in turn, helps justify heavy-handed policies that result in capture of more wolves from the wild, because the implication that such captures coupled with subsequent releases might ultimately benefit the wolves militates against a more cautious approach.

But such is not the case. Success would better be measured by total number of successfully raised pups, rather than as a yes/no proposition. This method would properly account for the three litters of pups (from the first Pipestem Pack, the Francisco Pack, and most recently the Hon-Dah Pack) largely destroyed as a probable result of being captured or residing in captivity – and thus count these packs as less successful as a result. In the case of the Pipestem Pack, biologist Bret Snyder who conducted the necropsy on the three victims opined that it was "most likely" that the fatal recrudescence of the disease occurred because of stress from capture. In the case of the Francisco Pack, Service personnel warned that construction activity proximate to the wolves' holding pen would be stressful and might hurt the pups; subsequently all five pups disappeared and were assumed to have died and been consumed by the remainder of the pack.

The present review, by requiring a standard close to beyond-a-reasonable-doubt, improperly discounts the probable effects of capture and residing in captivity in contributing to the deaths of these eight pups from the Pipestem and Francisco packs. And by not accounting at all for these deaths (and those of the Hon-Dah Pack) in assessing release success, the review improperly fails to account for the factor that led to their capture – relative proximity of their release locations to livestock – a factor instrumental in reducing the number of their surviving progeny. Counting the breeding animals of these packs as "successful" misrepresents the reality that the numbers of their progeny in the wild were significantly reduced in the course of events (capture and residing in captivity) that had to take place in order for them to be re-released. The yes/no proposition obscures the effects of control operations, and the factors leading to control operations, that contributed to the difference between the projected population of 83 wolves at the end of last year and the actual population of 35 wolves (and the projected number of 15 breeding pairs and the actual number of 5 breeding pairs). The yes/no standard is too gross a measurement, and fails to identify the nuances of cause and effect that must be examined in particular when a small sample size increases the chances of erroneous conclusions.

Furthermore, proximity to established packs should be an analysis factor because of its clear causative relation to the fatal intraspecific strife that precipitated the demise of the nine-member Lupine Pack. As best as can be determined by the evidence compiled by the Fish and Wildlife Service, these animals were released within the territory of another pack, which attacked them, thus causing the alpha male to run into a rattlesnake, which bit him, causing his neck to swell, resulting in his death by asphyxiation through constriction by his radio collar. (See comments and documentary evidence below relating to instraspecific strife.) His death and the territorial behavior of the established pack led to the other animals fleeing separately, their failure to establish a home range together, their individual vulnerability to poachers and hit and run drivers – and thus to loss of

the entire pack. But the existing analysis tallies these nine unsuccessful animals as falling within the initial release category – thus skewing the analysis due to a factor that is only incidentally (because animals released from captivity must be released in Arizona according to the rule) germane to the circumstances of their unhappy fates. Similarly, the fact that most were pups would skew the analysis to over-count age of animals as a factor in their loss. Because nine animals is relatively large in the small sample size available, such misunderstandings of cause and effect contribute to a significant misreading of what factors are actually effecting release success.

_____

TC-6: "Mortality was primarily human-caused. Thus, there was not enough consistent variability in cause of death to justify additional breakdown of mortality rates, or to warrant calculation of cause-specific mortality rates." It is at least as important to calculate causes of mortality when mortality is caused by humans, because that may be the factor most amenable to change. Such a calculation should be included.

TC-9: We agree that "the most valid analysis [of depredation numbers] must be based on the best available data, which currently are depredation investigations, versus unknown livestock loss figures." Unknown loss figures can represent an almost infinite variety of causes that may vary from year to year -- including weather, other predators, poisonous weeds, stocking rates, time spent in husbandry (which might vary by year according to other responsibilities befalling the livestock owner), and disease.

TC-12 & ARPCC-41 & 42: The review misstates the circumstances leading to the Lupine Pack alpha male's death, whose immediate cause was asphyxiation by his radio collar as a result of a swelling in his neck due to a rattlesnake bite. The Veterinary Medical Examination Record states that "another alpha male was in the area," and Mexican Wolf Recovery Coordinator Brian T. Kelly told me within days of the event that intraspecific strife was thought to be the cause of Wolf 480 failing to avoid the rattlesnake.

Yet, the review states that "Canine bite marks on his head were likely caused by other pack members reacting to his aberrant behavior," ignoring that there were also canine bite marks on his hind (consistent with fleeing from other wolves), and that in all the voluminous records of wolves in the process of dying due to poison (with similar effects to rattlesnake venom) there are no records of pack mates attacking the dying animal – but innumerable records of wolves being attacked by members of other packs in a variety of circumstances.

The fact that the bites were not fatal, but the venom (with radio collar) was, indicates that 480 successfully fled the attacking wolves prior to getting bit by the snake. Once he died, the rest of the pack immediately disintegrated – a much more precipitous disintegration than is typical of the pre-dispersal meanderings of young wolves gradually leaving their natal pack.

This chain of admittedly circumstantial but nevertheless convincing evidence establishes intraspecific strife as the most likely primary cause of the entire pack's demise. The reason the Lupine Pack was placed in another pack's territory is because the rule that the Service failed to amend forbids initial releases in New Mexico, where abundant areas in the recovery area were (and are) unoccupied by wolves.

_____

TC-13 & ARPCC-43: The review comes to illogical conclusions as to variables that predict mortality and removal. In general, the review understates the role of federal management in high

wolf mortality and low recruitment (as indicated above). This understatement serves to camouflage the urgency of reforming the management so as to enable population growth.

The same abuse of logic described above in the erroneous method for calculating success of wolf releases has been applied in calculating the factors that lead to mortality and removal. Once again, unless astrology explains mortality and control operations, the year is not a valid cause in explaining a wolf's fate. Accumulated time and proportion of the wolf's life in the wild may be causative merely in that re-releases of wolves (translocations) enabled managers to avoid the strictures of the present rule and to place wolves in areas of low livestock density and outside of areas already used by established wolf packs; thus, the happenstance that the longer a wolf lives, the more likely it is to be translocated, falsely implicates experience in the wild with survival.

Furthermore, it is inappropriate that the model to identify factors in allowing wolves to survive only measures survival, as opposed to reproduction, while the previous model to measure release success measures reproduction. Release success must be presumed to influence a shorter period of time than survival success, and thus it would be more appropriate to correlate release success with the absence of mortality or removal, and survival success with breeding success.

Even if the benchmark for survival success is held to be appropriate, the independent variables miss the four most pertinent factors effecting survival: (1) AUMs of livestock grazed or (if actual use figures are not available) authorized within home range or region in which wolf travels, (2) road density within home range or region in which wolf travels, (3) land classification (ie. within BRWRA and FAIR or outside of these jurisdictions), and (4) whether the wolf encounters livestock carcasses or not.

Altogether, by ignoring the real factors through misconstruing the evidence (again, including that pertaining to the Lupine Pack) and setting up an inappropriate methodology, the review succeeds in confirming the reviewers' self-exculpatory prejudice that so-called "naive wolves" fare worse than more experienced ones – thus removing the onus of responsibility from the Service and the AMOC for their mismanagement and failure to revise the rule.

TC-17-18: The discussion of Mexican wolves' small litter sizes omits the possibility that this is a result of in-breeding depression. More broadly, the review is deficient in not addressing genetic issues involving this population. Specifically, Philip Hedrick, Ph.D., has analyzed the management-induced genetic pauperization of the population and recommended much greater introduction of animals from the Ghost Ranch and Aragon lineages. The review should incorporate and address Dr. Hedrick's analysis.

It does not suffice to state that the population is on track with EIS predictions simply because the population numbers were on track by the fifth year. These numbers reflect continued releases from the wild after such releases were predicted to no longer be necessary, and releases of greater numbers of wolves than were predicted. The more germane benchmark is the number of breeding pairs, predicted to be ten at the end of 2003, because that number reflects the progress toward a self-sustaining population. But this section omits the number of breeding pairs actually present (despite our request in our comments on the draft review that it be included in the final). Furthermore, as noted, demographic projections and information, including numbers of wolves and numbers of breeding pairs, should have been updated to include the latest information available, and not cut off at 2003.

Finally, the entire section devoted to "Reproduction and Population Growth" should have included a population viability analysis that incorporates all the factors effecting the population and

its prospects, including its genetic composition. It is inappropriate to defer such an urgently needed analysis until the year 2010; it should have been a centerpiece of the present review.

TC-19: The following statement is not based on science or fact: "Some forms of removal (e.g. those caused by livestock depredations) will likely remain near current levels . . . as they are a necessary part of any successful wolf-recovery program." There have been 2 unequivocally successful wolf recovery programs (in the northern Rocky Mountains and the Lake States), one reintroduction program that failed (Great Smoky Mountains National Park) and one whose fate is still up in the air but that may turn out unsuccessful (the North Carolina red wolf reintroduction). Each of such programs has included removing wolves for livestock depredations, so there has been no attempt to institute a wolf recovery program that does not do so. Therefore, the statement is not based on any empirical comparison, but rather on a preconceived notion.

The Mexican wolf population has dropped precipitously on several occasions as a direct result of wolf removals. So the notion that removals for depredations are an unalterable part of the management landscape but will not impact success has no relation to the experience of this program. The Endangered Species Act requires recovery but does not require continued removal of wolves that prey on livestock (although the current rule governing the population does). Furthermore, the Paquet Report clearly identifies measures that can (and should) be taken – the prophylactic removal or destruction of livestock carcasses to prevent wolves from becoming habituated to stock – that would substantially reduce the levels of wolf removal. The opinion quoted above held by agency personnel that the numbers of wolves removed due to depredations will not substantially change reflects a prejudice in favor of the current failing management paradigm, and not a considered evaluation of the facts on the ground, the analysis by Dr. Paquet and his colleagues, nor the experiences of other wolf recovery programs. The statement is inappropriate.

TC-19/20: The analysis of the effect of the boundary rule and of dispersal is cogent and accurate.

<u>Administrative Component</u>

AC-27-33, 57: This review understates the incidents in which wolves first scavenged on livestock carcasses and subsequently depredated on livestock, since record-keeping has been haphazard.

First, this analysis should not have been based merely on visual observations of wolves scavenging, but also on such instances documented from necropsies performed on dead livestock. Second, the limited (once or twice a week, for the most part) monitoring of the wolves almost certainly missed other scavenging incidents, many of which would have preceded the depredations; it is inappropriate to assume that only those events documented actually occurred. Third, as examples of the failure of consistent record-keeping, Nick Smith of New Mexico Game and Fish informed me that the Gavilan Pack scavenged on a dead cow prior to that pack's killing of cattle in New Mexico, but this was never put in writing. More recently, personnel who wished to remain anonymous in some of the agencies participating in the reintroduction program have informed us that for a period of approximately a year from spring 2004 to spring 2005, during which we (the Center for Biological Diversity) were publicly pointing out the correlation between wolves that scavenge and those that subsequently depredate, USDA Wildlife Services systematically failed to document for the field team instances in which their personnel investigated dead livestock fed upon by wolves except in the cases that wolves caused the deaths.

The example of wolf 592, shot and killed by the Service on May 27, 2003, is misrepresented in the chart on p. AC-57 of depredating wolves. As evidenced in the documents provided the AMOC in our comments on the draft of this review, 592 scavenged on livestock in March 2001 prior to beginning to depredate (and she ended up traversing dozens of miles to finally depredate precisely where she had first scavenged two years previously). Similarly, the chronology regarding wolf 511's depredations and scavenging incidents is incorrect; this wolf too began depredating subsequent to scavenging.

In other instances, the chart is misleading in implying that depredations preceded scavenging, when in fact the depredated stock and the scavenged stock were discovered at the same time, in the same area, and chronology was never established. The Gavilan Pack's experience in Arizona is one such instance; the original Pipestem Pack in Arizona is another such instance.

The review is incorrect in stating that there is no legal means to address this recurring problem Permittees on the public lands should be required by the Forest Service and BLM to monitor their stock and remove dead animals promptly, or treat them with lime (or other methods) to make them inedible before wolves scavenge on them. The Supreme Court decisions in Light vs. U.S. (1911) and Public Lands Council vs. Babbitt (2000) make clear the Forest Service and BLM have such authority. Alternately, the Fish and Wildlife Service could by regulation and protocol hold wolves that have been exposed to livestock carcasses of animals that they did not kill exempt from all future control actions based on their subsequent depredations. The Service already utilizes a similar (though loosely worded) regulation pertaining to "attractants" (which include livestock carcasses) in the rule establishing an experimental non-essential population of wolves in the northern Rocky Mountains.    This review is negligent not only in misrepresenting the impacts of making cattle and horse carcasses available to wolves and habituating them to livestock, but also in failing to identify what level of predator control ultimately caused by such scavenging the Mexican wolf population can sustain in perpetuity while still meeting demographic goals.

Socioeconomic Component

In general, the Socioeconomic Component of the review is deficient in not noting or even attempting to assess the impacts on local residents of the failure of the Fish and Wildlife Service to implement the 3-Year Review recommendations on boundaries, direct release of wolves to New Mexico, and livestock carcasses, and how the subsequent low numbers of breeding pairs of wolves diminished the advantages local residents and others would have had in greater success in the program.

Data sources were inadequate for this component of the review. Pro-wolf people in the recovery region (including the Center of Biological Diversity) were only contacted very late (if at all) in the review process, and their opinions and impacts not fully incorporated into the results. This lateness resulted in several pro-wolf people who could not be reached at a first phone call, but who called back later, not being contacted at all.

Furthermore, among miscellaneous deficiencies in the review, the documented instances of trespass grazing, including (among others) the cases of the Gavilan Pack on the Wild Bunch Allotment (Apache NF) and wolf 166, in habituating wolves to livestock should have been enumerated and analyzed fully in the context of socio-economic effects of wolves (as requested in our comments on the draft review)..

SEC 7-11: The results from the League of Women Voters poll is misstated in this section.  The percentage of regional (ie. southwestern New Mexico) respondents who support vs. oppose reintroduction (52% / 34%) is misstated in this review as 50% / 30%.

SEC 3-22 - 3-23: The value of time spent in applying for compensation is greatly overstated, since the compensation procedures consist only of mailing off a form provided by the government, and since most depredations are located by the government and not by the rancher. It is inappropriate to use a figure from a 1993 article, printed years prior to the reintroduction of wolves both to the Southwest and to the northern Rockies, to come to this wildly inflated figure.  It is inadequate to note via a footnote (note 88) that the Center for Biological Diversity impeached the validity of this figure in our comments on the draft of this review, without substantively addressing the issues we raised then (and raise again in the present comments).

The review should have quantified how many depredations were found by ranchers and how many by agency people, and should have examined the actual paperwork (almost nil) involved in receiving compensation, instead of relying on a single article with little or no applicability to the issue at hand.

SEC 6-8 - 6-9:  Wolf tourism is in fact far greater than noted.  I have run across several groups of people who traveled to this area for the purpose of viewing Mexican wolves.  The failure of the contract reviewers to contact pro-wolf people, including those who visited the recovery area for the purpose of hearing or seeing wolves, contributed to the underestimation of economic benefits. As one of several examples, Brad Bartlett of Nederland, Colorado has taken several trips with other people to the recovery area for this purpose, spending money at a variety of lodges and other businesses.  He was not contacted even though his contact information was provided to the reviewers.

SEC 6-12 - 6-14:  Many agency expenditures would never have been made in the absence of wolves.  Again, this was noted in our comments on the draft but no attempt was made to assess this in the final review.

Sincerely,

(signed)

Michael J. Robinson
Center for Biological Diversity
P.O. Box 53166
Pinos Altos, NM 88053

Exhibit 3

Civ. Action No. 06-2119



# United States Department of the Interior

### FISH AND WILDLIFE SERVICE
Washington, D.C. 20240

IN REPLY REFER TO:

APR 2 4 2007

Mr. Michael J. Robinson
Conservation Advocate
Center for Biological Diversity
P.O. Box 53166
Pinos Altos, NM  88053-3166

Dear Mr. Robinson,

This is in response to your April 3, 2007, FOIA request for the following information:

> "*All agency records, in any form, that the Service has considered as part of its processing of the Center's March 29, 2004 petition for rule-making concerning the 10(j) regulation for Mexican gray wolves ( a copy of the petition is attached herein). This request includes, but should not be limited to any communications or other records concerning or in any way related to the Service's February 8, 2007 letter to the Center, purporting to be a "decision" on the Center's petition (a copy of this letter is attached herein).*"

I queried Michelle Morgan, Chief, Branch of Recovery and Delisting located organizationally within the Division of Consultation, Habitat Conservation Planning, Recovery and State Grants. Ms. Morgan indicated that we would have no pertinent records related to your request and that it was a regional issue. She also indicated that there would be no records within the Office of the Director as both of their offices deal with policy level issues related to the '10j' program. She indicated that this was a regional issue for which all pertinent records would be located in Region. Therefore we are submitting a 'no records found' response on behalf of headquarters Fish and Wildlife.

Technically, under 43 CFR 2.28 – 2.32 of the Department's regulations, you may appeal this response by writing to the Freedom Information Appeals officer at the following address:

> U.S Department of the Interior
> Office of the Solicitor
> Freedom of Information Act Appeals Officer
> Mail Stop 6556, MIB
> 1849 C Street NW
> Washington, DC 20240

Your appeal must be received no later than 30 workdays after the date of this letter. The appeal letter and envelope should be marked "FREEDOM OF INFORMATION APPEAL". Your appeal should be accompanied by a copy of your original request and